Jonathan L. Hauser
VSB No. 18688
TROUTMAN SANDERS LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, VA 23462
Telephone:    (757) 687-7768
Facsimile:    (757) 687-1505

Richard M. Cieri (*pro hac vice* pending)
Christopher J. Marcus (*pro hac vice* pending)
Michael A. Cohen (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Attorneys for the Debtor and
Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BEAR ISLAND PAPER COMPANY, L.L.C.,[1] | ) | Case No. 10-_____  (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DECLARATION OF EDWARD D. SHERRICK,
### SENIOR VICE PRESIDENT AND CHIEF FINANCIAL OFFICER
### FOR BEAR ISLAND PAPER COMPANY, L.L.C.,
### IN SUPPORT OF THE CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

Pursuant to 28 U.S.C. § 1746, I, Edward D. Sherrick, hereby declare as follows under

penalty of perjury:

1.    I am the Senior Vice President and Chief Financial Officer of Bear Island Paper

Company, L.L.C. ("Bear Island" or "Debtor"), a limited liability company organized under the

laws of the State of Virginia and the above-captioned debtor and debtor in possession.  In this

capacity, I am familiar with Bear Island's day-to-day operations, businesses, financial affairs and

books and records.

---

[1]    The last four digits of the Debtor's federal tax identification number are 0914.  The principal address for the
Debtor is 10026 Old Ridge Road, Ashland, Virginia 23005.

2.      Except as otherwise indicated herein, all facts set forth in this declaration (the "First Day Declaration") are based upon (a) my personal knowledge of Bear Island's operations and finances, (b) information learned from my review of relevant documents, (c) information supplied to me by other members of Bear Island's management and its advisors or (d) my opinions based on my experience, knowledge and information concerning Bear Island's operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtor.  If called upon to testify, I could and would testify competently to the facts set forth herein.

3.      To minimize the adverse effects of the commencement of this chapter 11 case on its business and operations, the Debtor has requested a variety of relief in "first day" motions and applications (each, a "First Day Motion," and, collectively, the "First Day Motions"), filed concurrently herewith.  I am familiar with the contents of each of the First Day Motions and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11. In fact, I believe that the Debtor's estate would suffer immediate and irreparable harm absent the ability to obtain certain of the relief within the first 21 days of this chapter 11 case, including a debtor in possession financing facility and cash on hand to make certain essential payments and otherwise continue its business operations as sought in the First Day Motions.  In my opinion, approval of the relief requested in the First Day Motions will minimize disruption to the Debtor's business operations, thereby preserving and maximizing the value of the Debtor's estate.

4.      To assist the Court in becoming familiar with the Debtor and the initial relief sought to stabilize the Debtor's operations, I submit this First Day Declaration, which is organized as follows:  (a) Part I describes the WB Group's (as defined herein) organizational structure, business operations and capital structure; (b) Part II describes the events leading to the

commencement of this chapter 11 case, the related chapter 15 cases and CCAA Cases (as defined herein), as well as the WB Group's out-of-court restructuring efforts; and (b) Part III provides an overview of, and evidentiary support for, the relief sought pursuant to the First Day Motions.

I.   **WB Group and Bear Island's Organizational Structure, Business Operations and Capital Structure**

A.   **WB Group's Business Operations**

5.   White Birch Paper Holding Company is a Nova Scotia limited liability company ("WB Holding"), which, as depicted on the following organizational structure chart, directly or indirectly owns 100% of its 17 subsidiaries, including Bear Island (collectively, the "WB Group" or the "Company").



6.     Notably, WB Holding is owned by: (a) 3095809 Nova Scotia Company, a Nova Scotia company wholly-owned by (i) Mr. Peter Brant and (ii) PB-RF, Inc., a Delaware corporation, 75% of which is owned by Mr. Peter Brant and 12.5% of which is owned by White Birch Investor I and White Birch Investor II LLC, respectively; (b) RF White Birch L.P., a Delaware limited partnership, 50% of which is owned by White Birch Investor I and White Birch Investor II LLC, respectively; and (c) Brant Paper, Inc. (directly and through a wholly-owned subsidiary, Soucy Partners Newsprint, Inc.), a Delaware corporation, 75% of which is owned by Mr. Peter Brant and 12.5% of which is owned by White Birch Investor I and White Birch Investor II LLC, respectively.

**B.     The WB Group's Business Operations**

7.     In addition to the Bear Island mill located in Ashland Virginia, the WB Group operates three pulp and paper mills in the province of Quebec, Canada, respectively situated in Quebec City (the "Stadacona Mill"), Riviere-du-Loup (the "Soucy Mill") and Masson-Angers, Quebec (the "Papier Masson Mill"). The WB Group is the second-largest newsprint producer in North America. As of December 31, 2009, the WB Group held a 12% share of the North American newsprint market and employed approximately 1,300 individuals. For the twelve months ended December 31, 2009, the WB Group maintained an annual production capacity of approximately 1.3 million metric tons of newsprint and directory paper, up to 50% of which consists of recycled content and achieved net sales of approximately $667 million.

**C.     Bear Island's Business Operations**

8.     Bear Island's history dates back to April 1978 when its predecessor, Bear Island Paper Company, L.P. ("Bear Island Predecessor"), was formed as a limited partnership owned by White Birch Paper Company ("White Birch Company"), as general partner, and subsidiaries of The Washington Post Company ("The Washington Post") and Dow Jones & Company ("Dow

4

Jones"), as limited partners. In 1997, White Birch Company redeemed The Washington Post and Dow Jones's respective 35% limited partnership interests in the Bear Island Predecessor. As a result of these acquisitions and related transactions, White Birch Company became the sole owner of Bear Island.

9.      Bear Island employs approximately 200 (or 15%) of the WB Group's approximately 1,300 total employees. On an annual basis, Bear Island maintains a production capacity of approximately 235,000 tons of newsprint paper for sale to customers throughout New York, Philadelphia, Baltimore and Washington, D.C. In addition to its newsprint production, Bear Island also operates a woodyard, pulping system, recycling facility, water treatment facility and industrial landfill for its on-site solid waste disposal and related utility, storage and transportation facilities. For the twelve months ended December 31, 2009, Bear Island's net sales totaled approximately $125 million, which accounted for 19% of WB Group's net sales for the same period.

**D.      WB Group's Capital Structure**

10.     WB Group's principal debt obligations consist of three major credit agreements, each of which is more fully described below: (a) the First Lien Term Loan Agreement; (b) the Second Lien Term Loan Agreement; and (c) the Revolving ABL Agreement (each as defined herein). Bear Island serves as a guarantor under the First and Second Lien Term Loan Agreements and a borrower under the Revolving ABL Agreement. In addition, White Birch Company is a party to three interest rate swap agreements (collectively, the "Swap Agreements"), which, as of the Petition Date (as defined herein), were out of the money by approximately $51.5 million in the aggregate. White Birch Company's obligations under the Swap Agreements are collateralized by the same assets pledged under the First and Second Lien Term Loan Agreements, including Bear Island's assets, and the Swap Agreement lenders' liens

rank *pari passu* with the lenders under the First Lien Term Loan Agreement.

### 1.    First Lien Term Loan Agreement

11.    On or about April 8, 2005, White Birch Company and WB Holding, as borrowers, entered into that certain First Lien Term Loan Credit Agreement (as amended and restated on January 27, 2006 and May 8, 2007, the "First Lien Term Loan Agreement"), with Credit Suisse First Boston, as sole lead arranger, sole bookrunner, syndication agent and documentation agent, Credit Suisse First Boston Toronto Branch, as Canadian collateral agent and administrative agent, TD Securities (USA) LLC, as co-arranger and the lender parties thereto.

12.    As of the Petition Date, approximately $428 million in principal and $9.8 million in interest remains outstanding under the First Lien Term Loan Agreement. Bear Island, among others, guarantees the borrowers' obligations under the First Lien Term Loan Agreement. To secure their obligations under the First Lien Term Loan Agreement, the WB Group granted first priority liens and security interests in substantially all of their assets, including Bear Island's assets, other than assets that are pledged to the lenders under the Revolving ABL Agreement (the "Term Loan Collateral").

### 2.    Second Lien Term Loan Agreement

13.    On or about April 8, 2005, White Birch Company and WB Holding, as borrowers, entered into that certain Second Lien Term Loan Credit Agreement (as amended and restated on January 27, 2006 and May 8, 2007, the "Second Lien Term Loan Agreement"), with Credit Suisse First Boston, as sole lead arranger, sole bookrunner, syndication agent and documentation agent, Credit Suisse First Boston Toronto Branch, as Canadian collateral agent and administrative agent, TD Securities (USA) LLC, as co-arranger and the lender parties thereto.

14.    As of the Petition Date, approximately $100 million in principal and $4 million in interest remains outstanding under the Second Lien Term Loan Agreement. Bear Island, among

others, guarantees the borrowers' obligations under the Second Lien Term Loan Agreement. To secure their obligations under the Second Lien Term Loan Agreement, the WB Group granted second priority liens and security interests in the Term Loan Collateral.

### 3.    Revolving ABL Agreement

15.    On or about March 29, 2005, White Birch Company, WB Holding, Stadacona Limited Partnership, F.F. Soucy Limited Partnership, Papier Masson Ltee and Bear Island (collectively, the "ABL Borrowers") entered into that certain Revolving Credit Agreement (as amended and restated on January 27, 2006 and February 26, 2008, the "Revolving ABL Agreement"), with GE Capital Markets Inc., as lead arranger and syndication agent, General Electric Capital Corporation, as administrative agent, U.S. collateral agent and documentation agent, GE Canada Finance Holding Company, as Canadian agent and Canadian collateral agent, and the lender parties thereto.

16.    As of the Petition Date, approximately $50 million remains outstanding under the Revolving ABL Agreement, including undrawn letters of credit. To secure their obligations under the Revolving ABL Agreement, the WB Group granted first priority liens and security interests on, among other things, their inventory, accounts receivable and cash (the "Revolving ABL Collateral").[2]

### 4.    The Swap Agreements

17.    Prior to the Petition Date, White Birch Company entered into certain transactions pursuant to the following Swap Agreements:

---

[2]    The summary descriptions of the Term Loan Collateral and the Revolving ABL Collateral are qualified entirely by reference to the collateral descriptions in the respective loan and collateral agreements.

a.   an ISDA 2002 Master Agreement, dated as of May 16, 2005, between White Birch Company and The Toronto-Dominion-Bank (the "TD Swap Agreement");

b.   an ISDA Master Agreement, dated as of April 13, 2005, between White Birch Company and Credit Suisse First Boston International (the "CS Swap Agreement"); and

c.   an ISDA Master Agreement, dated as of May 8, 2007, between White Birch Company and Merrill Lynch Capital Services, Inc. (the "ML Swap Agreement").

18.   As of the Petition Date, the interest rate swap transactions under the Swap Agreements have been terminated and payments of approximately $51.5 million remain outstanding under the Swap Agreements. Bear Island, among others, guarantees the borrowers' obligations under the Swap Agreements. The Swap Agreements are secured by the Term Loan Collateral, including Bear Island's assets, and the Swap Agreement lenders' liens in such collateral rank *pari passu* with the lenders under the First Lien Term Loan Agreement.

**5.   Trade Debt**

19.   In the ordinary course of business, Bear Island has incurred approximately $9.5 million of trade debt and accrued liabilities which, as of January 31, 2010, remains due and owing.

**II.   Events Leading to the Commencement of the Chapter 11 Case**

20.   For more than a year, the WB Group has been confronted with an unprecedented combination of negative economic circumstances, including: (a) the overall decline in the world economy and its impact on demand for, and price and inventories of, newsprint; (b) the fundamental decline in demand for newsprint as consumers establish greater reliance on electronic alternatives; (c) the increased strength of the Canadian dollar and corresponding weakness of the U.S. dollar; (d) the WB Group's significant debt service obligations; and (e) the

detrimental effect of low floating interest rates on the WB Group's position in certain major interest rate swap transactions.

21.     Specifically, the worldwide economic downturn has caused newsprint prices to drop nearly $330 per metric ton between the fourth quarter of 2008 through the third quarter of 2009, resulting in the WB Group losing approximately $380 million in revenue.  Moreover, because most of the WB Group's clients are located in the U.S. and remit payment in U.S. currency, yet most of the WB Group's expenses are payable in Canadian currency, the increased strength of the Canadian dollar and the weakness of the U.S. dollar have contributed to the WB Group's financial decline.

22.     In response to the impact of these factors on the WB Group's finances, and in an effort to maximize value and efficiency during this difficult time, the WB Group, beginning in 2009 and through early January 2010, significantly increased its cost-cutting efforts and reduced output at all of the WB Group's mills.  As part of these cost-cutting efforts, the WB Group shutdown production at each of its mills for the following extended periods of time: (a) Stadacona Mill -- 107,000 metric tons (75 days); (b) Papier Masson Mill -- 452,000 metric tons (76 days); (c) Bear Island Mill -- 30,000 metric tons (46 days); and (d) Soucy Mill -- 20,000 metric tons (28 days).

23.     In addition to the reductions in output, the WB Group took various other cost-cutting measures, most notably:  (a) reducing capital expenditures to the bare minimum required to continue operating the WB Group's mills; (b) imposing restrictions on travel and other related expenses; and (c) suspending the corporate policy of matching U.S. employees' 401(k) contributions through December 31, 2009.  Unfortunately, these cost-cutting measures were not sufficient to combat the increasing severity of the WB Group's liquidity crisis.

24.    As a result of these negative impacts on liquidity, on September 30, 2009, the WB Group did not make certain payments pursuant to its First and Second Lien Term Loan and Swap Agreements, including:  (a) an interest payment of approximately $3.7 million under the First Lien Term Loan Agreement; (b) an interest payment of approximately $1.4 million under the Second Lien Term Loan Agreement; and (c) payments of approximately $51.5 million under the Swap Agreements.

25.    In light of the WB Group's continued financial difficulties, in September 2009, management approached the lenders under the First Lien Term Loan Agreement and counterparties to the Swap Agreements in an effort to seek a comprehensive waiver and forbearance that would provide the WB Group with an opportunity to negotiate a consensual restructuring.  To that end, on or about September 30, 2009, the WB Group executed forbearance agreements with the agent and lenders under the First Lien Term Loan Agreement and the CS Swap Agreement, respectively, pursuant to which the agent and lenders agreed to forbear from exercising their rights and remedies through and including October 30, 2009.  Such forbearance agreements were amended on three separate occasions, extending these forbearance periods through and including February 26, 2010.

26.    In addition, on or about October 5, 2009, the WB Group entered into forbearance agreements with the lenders under the Revolving ABL Agreement and the counterparty under the ML Swap Agreement, pursuant to which such lenders and counterparty agreed to forbear from exercising their rights and remedies through and including October 30, 2009.  Such forbearance agreements were similarly amended on three separate occasions, extending these forbearance periods through and including February 26, 2010.

27.    Then, on or about October 30, 2009, the WB Group entered into a forbearance agreement with the counterparty under the TD Swap Agreement, pursuant to which Toronto-Dominion Bank agreed to forbear from exercising its and rights and remedies through and including November 30, 2009.    Such forbearance agreement was similarly amended on two separate occasions, extending this forbearance period through and including February 26, 2010.

28.    Finally, the WB Group engaged in discussions with certain lenders under the Second Lien Term Loan Agreement regarding entry into a forbearance agreement. Unfortunately, however, the WB Group and such lenders were unable to agree upon the terms of such forbearance.    Notwithstanding this result, the lenders under the Second Lien Term Loan Agreement were subject to a 180-day standstill pursuant to that certain Second Amended and Restated Intercreditor Agreement, dated as of May 8, 2007, and thus, were precluded from exercising their rights or remedies through and including the end of March 2010.

29.    During the forbearance periods described above, the WB Group participated in arms-length and good faith negotiations to reach an out-of-court arrangement with certain of its stakeholders.    Unfortunately, no out-of-court restructuring could be reached.    Accordingly, the WB Group has determined that commencing this chapter 11 case, the related chapter 15 cases and the CCAA Cases, is in the best interests of its stakeholders and will, among other things, preserve and maximize the going-concern value of its businesses while continuing to explore its restructuring and asset sale options.

30.    Accordingly, on February 24, 2010 (the "Petition Date"), Bear Island filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

31.     Simultaneously with the commencement of this chapter 11 case, WB Holding and ten of its direct and indirect Canadian subsidiaries (collectively, the "CCAA Applicants") sought relief under the *Companies' Creditors Arrangement Act* (the "CCAA") in the Quebec Superior Court of Justice (the "Canadian Court") in Montreal, Quebec, Canada (the "CCAA Cases").[3]  In addition, six of the CCAA Applicants, contemporaneously herewith, are seeking relief under chapter 15 of the Bankruptcy Code.[4]

32.     To facilitate its entry into chapter 11 and provide assurances to key constituents such as employees, customers and vendors that the Debtor's operations will continue uninterrupted, the Debtor has filed various First Day Motions designed to effectuate a smooth transition of its operations into chapter 11.

**III.    Evidentiary Support for First Day Motions**

33.     As discussed above, Bear Island has entered this chapter 11 process with the goal of stabilizing its operations and ensuring a smooth transition into chapter 11.   To that end, concurrently with the filing of its chapter 11 petition, Bear Island has filed a number of First Day Motions seeking relief that it believes is necessary to enable it to operate with minimal disruption and loss of productivity.

34.     Bear Island requests that the relief requested in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating its operations during the pendency of, this chapter 11 case.  I have reviewed each of the First Day

---

[3]    The CCAA Applicants include (a) WB Holding, (b) White Birch Paper Company, (c) Stadacona General Partner Inc., (d) Black Spruce Paper Inc., (e) F.F. Soucy General Partner Inc., (f) 3120772 Nova Scotia Company, (g) Arrimage De Gros Cacouna Inc., (h) Papier Masson Ltee, (i) Stadacona Limited Partnership, (j) F.F. Soucy Limited Partnership and (k) F.F. Soucy Inc. & Partners, Limited Partnership.

[4]    The six chapter 15 debtors include (a) White Birch Company, (b) Stadacona General Partner Inc., (c) Stadacona Limited Partnership, (d) F.F. Soucy Limited Partnership, (e) F.F. Soucy Inc. & Partners, Limited Partnership and (f) Papier Masson Ltee.

Motions discussed below and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.[5]

**A.   Motion of Bear Island Paper Company, L.L.C. for Entry of an Order Setting an Expedited Hearing on "First Day Motions" and Other Related Relief (the "Expedited Hearing Motion")**

35.   The Debtor requests that the Court set an expedited First Day Hearing for _____, 2010 at ___:___ a.m./p.m. prevailing Eastern Time, or as soon thereafter as counsel may be heard, to consider the First Day Motions described below.  In addition, the Debtor requests that the Court deem the Debtor's Notice of Filing of Chapter 11 Petition and First Day Motions and of Proposed Hearing on First Day Motions to be adequate and appropriate notice under the circumstances.

36.   I believe that the relief requested in the Expedited Hearing Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest.  Prompt entry of the relief requested in the First Day Motions is critical to maintaining the Debtor's ongoing operations and the value of its bankruptcy estate.  Accordingly, on behalf of the Debtor, I respectfully submit that the Expedited Hearing Motion should be approved.

**B.   Motion of Bear Island Paper Company, L.L.C. for Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures (the "Case Management Motion")**

37.   The Debtor requests the authority to establish certain Case Management Procedures which include the following:  (a) directing that matters requiring notice under Bankruptcy Rule 2002(a)(2)-(6) will only be served to those individuals or entities who are

---

[5]   All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the relevant First Day Motion.

identified on a shortened mailing list as well as those creditors who file with the Court a request to receive such notice pursuant to Bankruptcy Rule 2002, in accordance with Local Bankruptcy Rules 2002-1 and 9013-1(M); (b) allowing electronic service of all documents (except complaints and summonses); and (c) directing that all matters be heard at periodic omnibus hearings to be scheduled in advance by the Court. In addition, the Debtor requests that the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules apply to the Debtor's chapter 11 case to the extent that they do not conflict with the Case Management Procedures.

38.     In support of the Case Management Motion, it is important to note that the Debtor has hundreds of potential creditors who, along with other parties in interest in this chapter 11 case, may file requests for service of filings pursuant to Bankruptcy Rule 2002. The Debtor also expects that numerous motions and applications will be filed in this chapter 11 case in pursuit of various forms of relief. The notice, case management and administrative procedures set forth in the Case Management Procedures will allow for all parties in interest to be better able to plan for and schedule attendance at hearings, which, in turn, will reduce the need for emergency hearings and requests for expedited relief, and will foster consensual resolution of important matters. Moreover, by directing that certain notices be mailed only to recipients named on a shortened mailing list and those creditors who file a request with the Court to receive such notices, all parties in interest will be assured of receiving appropriate notice of matters affecting their interests and ample opportunity to prepare for and respond to such matters.

39.     In addition, the Debtor's proposed notice, claims and solicitation agent, The Garden City Group, Inc., intends to establish the Case Website, where, among other things, electronic copies of all pleadings filed in the Debtor's chapter 11 case shall be posted within three business days of filing and may be viewed free of charge. The Case Management

Procedures will be distributed to the Core Group and the 2002 List and will be available at all times by accessing the Case Website.

40.     I believe that the relief requested in the Case Management Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest, and will substantially reduce administrative burdens and result in substantial cost savings to the Debtor's estate given the reduction of time and money the Debtor will have to expend without adversely affecting any party in interest.   Accordingly, on behalf of the Debtor, I respectfully submit that the Case Management Motion should be approved.

C.     **Motion of Bear Island Paper Company, L.L.C. for Entry of an Order Authorizing, But Not Directing, the Debtor to (A) Continue Using Its Existing Cash Management System, Bank Accounts and Business Forms; (B) Maintain Existing Investment Practices; and (C) Continue Performing Ordinary Course Intercompany Transactions (the "Cash Management Motion")**

41.     The Debtor requests the authority to:  (a) continue to use, with the same account numbers, all of the Bank Accounts in its Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtor as debtor in possession; (c) open new debtor in possession accounts, if needed; (d) use, in their present form, all correspondence and business forms (including, without limitation, letterhead, purchase orders and invoices) and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtor's status as a debtor in possession; e) maintain its existing Investment Practices; and (f) continue performing Intercompany Transactions in the ordinary course of business.

42.     In addition, the Debtor requests that the Court authorize the Banks to: (a) continue to maintain, service and administer the Bank Accounts and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks drawn on the Bank

Accounts that are presented for payment at the Banks or exchanged for cashier's checks prior to

the Petition Date; (ii) checks or other items deposited in the Bank Accounts prior to the

Petition Date that have been dishonored or returned unpaid for any reason (including associated

fees and costs), to the same extent the Debtor was responsible for such items prior to the Petition

Date; and (iii) undisputed, outstanding service charges owed to the Banks as of the Petition Date

on account of the maintenance of the Debtor's Cash Management System, if any.

43. In the ordinary course of business, the Debtor utilizes an integrated, centralized

cash management system to collect, transfer and disburse funds generated by its operations in the

U.S. and Canada, and maintain current and accurate accounting records of all daily cash

transactions. If the Debtor were required to comply with the U.S. Trustee Guidelines, the burden

of opening new accounts, revising cash management procedures, instructing customers to

redirect payments and the immediate ordering of new checks with a "Debtor in Possession"

legend, would disrupt the Debtor's business at this critical time. The Debtor respectfully submits

that parties in interest will not be harmed by its maintenance of the existing

Cash Management System, including its Bank Accounts, because the Debtor has implemented

appropriate mechanisms to ensure that unauthorized payments will not be made on account of

obligations incurred prior to the Petition Date.

44. The Debtor also adheres to certain Investment Practices, which the Debtor

believes will provide the protection contemplated by section 345(b) of the Bankruptcy Code,

while providing additional interest income. Therefore, the Debtor seeks a waiver of strict

compliance with the requirements of section 345(b) of the Bankruptcy Code.

45. In addition, in the ordinary course of business, the Debtor maintains a large and

complex system of Intercompany Transactions for, among other reasons, facilitating

intercompany sales, centralizing accounting and purchasing departments, and moving cash

between entities. If the Intercompany Transactions are discontinued, a number of services

provided by and to the Debtor would be disrupted and could impact the Debtor's ability to pay

wages and benefits to its employees and make timely payments to vendors.

46.    The relief requested in the Cash Management Motion is vital to ensuring the

Debtor's seamless transition into bankruptcy. Authorizing the Debtor to maintain its Cash

Management System will avoid many of the possible disruptions and distractions that could

divert its attention from more critical matters during the initial days of this chapter 11 case.

47.    I believe that the relief requested in the Cash Management Motion is in the best

interests of the Debtor's estate, its creditors and all other parties in interest, and will enable the

Debtor to continue to operate its businesses in chapter 11 without disruption. Accordingly, on

behalf of the Debtor, I respectfully submit that the Cash Management Motion should be

approved.

**D.    Motion of Bear Island Paper Company, L.L.C. for Entry of an Order Authorizing, But Not Directing, the Debtor to Pay Prepetition (A) Wages, Salaries and Other Compensation; (B) Reimbursable Employee Expenses; and (C) Employee Medical and Similar Benefits (the "Wages and Benefits Motion")**

48.    The Debtor requests the authority, in its sole discretion, to pay prepetition claims,

honor obligations and to continue programs, in the ordinary course of business and consistent

with past practices, relating to the Employee Obligations. In addition, the Debtor seeks a waiver

of the automatic stay under section 362 of the Bankruptcy Code as it applies to workers'

compensation claims.

49.    As of the Petition Date, the Debtor employs approximately 200 employees.

Although the Debtor has paid their wage, salary and other obligations in accordance with their

ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition Employees Obligations may nevertheless be due and owing.

50.     The majority of the Debtor's Employees rely exclusively on their compensation, benefits and expense reimbursement payments to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Debtor is not permitted to honor its obligations for unpaid compensation, benefits and reimbursable expenses. Moreover, if the Debtor is unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support and productivity are critical. In the absence of such payments, I believe that the Debtor's Employees may seek alternative employment opportunities, perhaps with the Debtor's competitors, thereby hindering the Debtor's ability to meet its customer obligations and likely diminish creditors' confidence in the Debtor. Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a massive and costly distraction at a time when the Debtor should be focusing on stabilizing its operations.

51.     In addition, the Debtor seeks authorization, under section 362(d) of the Bankruptcy Code, to permit the Employees to proceed with their workers' compensation claims in the appropriate judicial or administrative forum. The Debtor believes that cause exists to modify the Automatic Stay because staying the workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture.

52.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption. Accordingly, on

behalf of the Debtor, I respectfully submit that the Wages and Benefits Motion should be approved.

**E.** **Motion of Bear Island Paper Company, L.L.C. for Entry of an Order Authorizing, But Not Directing, the Debtor to Maintain and Administer Customer Programs and Honor Prepetition Obligations Related Thereto (the "Customer Programs Motion")**

53. The Debtor requests the authority to maintain and administer customer programs and honor prepetition obligations to customers related thereto in the ordinary course of business and in a manner consistent with past practice.

54. To maintain the loyalty and goodwill of their customers, in the ordinary course of business the Debtor implemented various Customer Programs to encourage new purchases, enhance customer satisfaction, sustain goodwill and ensure the Debtor's competitiveness. The Debtor's ability to honor its Customer Program Obligations in the ordinary course of business is necessary to retain its customer base and reputation for quality. The Debtor believes that the relief requested herein will pay dividends with respect to the long-term reorganization of its business, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of this chapter 11 case.

55. I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Customer Programs Motion should be approved.

F.   **Motion of Bear Island Paper Company, L.L.C. for Entry of an Order Authorizing, But Not Directing, the Debtor to Pay (A) Claims for Goods Ordered Prepetition and Delivered Postpetition in the Ordinary Course of Business and (B) Prepetition Claims of Shippers and Materialman's Lien Claimants (the "Shippers and Claimants Motion")**

56.   The Debtor requests the authority to pay, in the ordinary course of business, amounts due in respect of Outstanding Orders for goods ordered by the Debtor prior to the Petition Date and delivered after the Petition Date.  In addition, the Debtor seeks the authority to pay, in the ordinary course of business, and in its business judgment, prepetition Shipping Charges and Materialman's Lien Claims.

57.   Prior to the Petition Date, and in the ordinary course of business, the Debtor ordered goods pursuant to the Outstanding Orders, which will be delivered to the Debtor after the Petition Date.  Suppliers may refuse to ship or transport these goods (or recall such shipments) unless the Debtor issues substitute prepetition purchase orders or obtains an order of the Court (a) granting all undisputed obligations of the Debtor arising from the acceptance of goods subject to Outstanding Orders administrative expense priority under section 503(b) of the Bankruptcy Code and (b) authorizing the Debtor to satisfy such obligations in the ordinary course of business.

58.   I believe and am advised that the granting of the relief sought in the Shippers and Claimants Motion with respect to the Outstanding Orders will not provide the suppliers with any greater priority then they otherwise would have if the relief herein were not granted and will not prejudice any other party in interest.  Absent such relief, the Debtor will suffer disruption to the continuous and timely flow of raw materials, which could result in substantial delays in its operations, dissatisfied customers and an erosion of customer confidence in the Debtor.

59.   In addition, the Debtor relies extensively on the services of Shippers to assure the timely shipping and delivery of raw materials to the Debtor and finished goods to customers in

the ordinary course of the Debtor's business. The Debtor also does business with a number of vendors who could potentially assert mechanic's liens and materialman's liens against the Debtor and its property for amounts the Debtor owes to those vendors. Paying the prepetition obligations owed to the Shippers and Materialman's Lien Claimants will benefit the Debtor's estate and its creditors by allowing the Debtor's business operations to continue without interruption.

60.     I believe that the relief requested in the Shippers and Claimants Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Shippers and Claimants Motion should be approved.

**G.     Motion of Bear Island Paper Company, L.L.C. for an Order Authorizing, But Not Directing, the Debtor to (A) Continue Insurance Coverage Entered into Prepetition and (B) Maintain Postpetition Financing of Insurance Premiums (the "Insurance Motion")**

61.     The Debtor requests the authority to (a) continue prepetition insurance policies and programs and (b) maintain premium financing agreements for insurance coverage entered into prepetition. In the ordinary course of business, the Debtor is the beneficiary of insurance coverage under a number of insurance Policies for which White Birch Paper Company deducts an allocable share as payment for such benefit. The Policies are essential to the preservation of the value of the Debtor's businesses, properties and assets. In many cases, insurance coverage such as that provided by the Policies is required by the diverse regulations, laws and contracts that govern the Debtor's commercial activities.

62.     In addition, in the ordinary course of the Debtor's business, White Birch Paper Company deducts an amount from the Debtor's revenue and applies such deduction towards

payment of premiums under certain Financed Policies pursuant to premium financing agreements with third-party lenders. Financed Policies benefit the Debtor by allowing the Debtor to amortize the cost of the Financed Policies over the applicable coverage period as opposed to requiring the Debtor to pay the full amount of the policy at the beginning of the coverage period.

63.    I believe that the relief requested in the Insurance Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest, and will enable the Debtor to continue to operate its businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Insurance Motion should be approved.

**H.    Motion of Bear Island Paper Company, L.L.C. for Entry of an Order Authorizing, But Not Directing, the Debtor to Pay Certain Prepetition Taxes and Fees (the "Taxes and Fees Motion")**

64.    The Debtor requests the authority to pay any Taxes and Fees that, in the ordinary course of business, accrued or arose before the Petition Date. In the ordinary course of business, the Debtor incurs and/or collects certain Taxes and Fees and remits such Taxes and Fees to various Authorities. The Debtor must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid costly distractions during this chapter 11 case.

65.    Specifically, it is my understanding that the Debtor's failure to pay the Taxes and Fees could adversely affect the Debtor's business operations because the Authorities could suspend the Debtor's operations, file liens or seek to lift the automatic stay. In addition, certain Authorities may take precipitous action against the Debtor's directors and officers for unpaid Taxes, which undoubtedly would distract those key personnel from their duties related to the Debtor's restructuring.

66.    I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest, and will enable the

22

Debtors to continue to operate its businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Taxes and Fees Motion should be approved.

I.   **Motion of Bear Island Paper Company, L.L.C. for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Utilities Motion")**

67.   The Debtor requests the entry of interim and final orders: (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtor's proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtor's proposed adequate assurance pending entry of the Final Order; (d) determining that the Debtor is not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion, pending entry of the Final Order; and (e) setting a final hearing on the Debtor's proposed adequate assurance.

68.   In the ordinary course of business, the Debtor incurs expenses for gas, water, sewer, electric, telecommunications and other similar utility services provided by approximately nine utility providers. Uninterrupted utility services are essential to the Debtor's ongoing operations and, therefore, to the success of its reorganization. Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtor's operations, customer relationships, revenues and profits, seriously jeopardizing the Debtor's reorganization efforts and, ultimately, value and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during this chapter 11 case.

69.   I believe and am advised that the proposed procedures are necessary in this chapter 11 case because if such procedures are not approved, the Debtor could be forced to

23

address numerous requests by the Utility Providers in a disorganized manner during the critical

first weeks of this chapter 11 case. Moreover, a Utility Provider could blindside the Debtor by

unilaterally deciding -- on or after the 30th day following the Petition Date -- that it is not

adequately protected, and as a result, discontinue service or make an exorbitant demand for

payment to continue service. Discontinuation of utility service could essentially shut down

operations; any significant disruption of operations could put this chapter 11 case in jeopardy.

70.     I believe that the relief requested in the Utilities Motion is in the best interests of

the Debtor's estate, its creditors and all other parties in interest, and will enable the Debtor to

continue to operate its businesses in chapter 11 without disruption. Accordingly, on behalf of the

Debtor, I respectfully submit that the Utilities Motion should be approved.

**J.     Motion of Bear Island Paper Company, L.L.C. for Entry of an Order Implementing a Procedural Protocol for the Administration of the Cross-Border Insolvency Proceedings (the "Protocol Motion")**

71.     The Debtor seeks entry of an order approving and implementing a protocol to,

among other things, establish a clear framework of general principles that will govern the cross-

border administration of this chapter 11 case and address certain key issues that may arise during

the chapter 11 case (the "Protocol").

72.     This chapter 11 case, together with the CCAA Case (collectively, the

"Restructuring Proceedings"), involve the restructuring of twelve entities and affect the rights of

thousands of creditors and other interested parties in the U.S., Canada and other jurisdictions. In

light of the cross-border issues and claims that are likely to arise (and in some instances

imminently) given the complex, transnational nature of the Restructuring Proceedings, the terms

of the Protocol are designed to achieve four core goals.

73.     First, the Protocol is designed to harmonize and coordinate activities in the

Restructuring Proceedings before this Court and the Canadian Court, thereby promoting the

24

orderly and efficient administration of the Restructuring Proceedings.   Such coordination is essential and will, among other things, maximize the efficiency of the Restructuring Proceedings, reduce the costs associated therewith, and avoid duplication of effort.

74.     Second, the Protocol is designed to honor the independence and integrity of the Courts and other courts and tribunals of the U.S. and Canada and promote international cooperation and respect for comity among the Courts, the Debtors, the CCAA Applicants and other creditors and interested parties.

75.     Third, the Protocol is designed to facilitate the fair, open and efficient administration of the Restructuring Proceedings for the benefit of all credits and other interested parties of the Debtor and the CCAA Applicants, wherever located.

76.     Fourth, the Protocol is designed to establish guidelines for communication between this Court and the Canadian Court by providing for appropriate notice to all key constituencies of matters arising in both Restructuring Proceedings, an opportunity for all parties in interest to be heard in both Courts, maximize efficiency (*e.g.*, reducing costs and duplicative efforts), an orderly administration of the proceedings and the express preservation of all parties' substantive rights.

77.     I believe that the relief requested in the Protocol Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption.  Accordingly, on behalf of the Debtor, I respectfully submit that the Protocol Motion should be approved.

**K.**    **Motion of Bear Island Paper Company, L.L.C. for Entry of an Order Granting an Extension of Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases and Statement of Financial Affairs (the "Schedules and SOFA Motion")**

78.    The Debtor requests the authority to extend the deadline by which the Debtor must file the Schedules and SOFA to a date to be determined that is at least seven days before the meeting of creditors pursuant to section 341 of the Bankruptcy Code, without prejudice to the Debtor's ability to request additional time for cause shown.

79.    Notwithstanding the Debtor's hundreds of potential creditors, the conduct and operation of the Debtor's business operations require the Debtor to maintain voluminous records and manage a complex accounting system.    Thus, due to the substantial size, scope and complexity of the chapter 11 case, the related chapter 15 cases the CCAA Cases, and the volume of material that must be compiled and reviewed by the Debtor's staff in order to complete the Schedules and SOFA during the initial days of this chapter 11 case, the Debtor anticipates that it will be unable to complete the Schedules and SOFA in the time required under Bankruptcy Rule 1007(c) and Local Bankruptcy Rule 1007-1.    However, I believe that the Debtor recognizes the importance of the Schedules and SOFA in this chapter 11 case and that the Debtor intends to complete the Schedules and SOFA as quickly as possible under the circumstances.

80.    I believe that the relief requested in the Schedules and SOFA Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest.    Accordingly, on behalf of the Debtor, I respectfully submit that the Schedules and SOFA Motion should be approved.

**L.    Motion of Bear Island Paper Company, L.L.C. for Entry of an Order Authorizing the Retention and Compensation of Professionals Utilized in the Ordinary Course of Business (the "OCP Motion")**

81.    The Debtor requests the authority to retain and compensate various professionals utilized in the ordinary course of business (each, an "OCP"), in accordance with certain procedures (the "OCP Procedures"), without the need for each OCP to file formal applications for retention and compensation pursuant to sections 327, 328, and 330 of the Bankruptcy Code. In addition, the Debtor requests the authority to reserve the right to retain additional OCPs from time to time during this chapter 11 case; provided, however, that the additional OCPs sought to be retained must comply with the OCP Procedures; provided, further, that the Debtor will file an amended OCP List with the Court and serve the amended OCP List on the Notice Parties. The Debtor is not requesting authority to pay prepetition amounts owed to OCPs.

82.    The Debtor employs various attorneys, accountants, auditors and other professionals in the ordinary course of its business. These OCPs provide services for the Debtor in a variety of matters unrelated to this chapter 11 case, including specialized legal, accounting, auditing, tax and certain consulting services. The OCPs have a great deal of background knowledge, expertise and familiarity with the Debtor and its operations.

83.    In light of the substantial number of OCPs, and the significant costs associated with the preparation of employment applications for professionals who will receive relatively modest fees, I believe that it would be impractical and inefficient for the Debtor and its legal advisors to prepare and submit individual applications and proposed retention orders for each OCP. I do not believe that any of the OCPs, however, hold interests materially adverse to the Debtor, its creditors or other parties in interest.

84.    I believe that the relief requested in the OCP Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest.   Accordingly, on behalf of the Debtor, I respectfully submit that the OCP Motion should be approved.

**M.    Motion of Bear Island Paper Company, L.L.C. for Entry of an Administrative Order Under Sections 105(a) and 331 of the Bankruptcy Code Establishing Interim Compensation Procedures (the "Interim Compensation Motion")**

85.    The Debtor requests the authority to establish procedures for interim compensation and reimbursement of professional expenses incurred during these cases.

86.    I believe that the relief requested in the Interim Compensation Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest, and will streamline the administration of this chapter 11 case by facilitating efficient review of the professionals' fees and expenses.   Accordingly, on behalf of the Debtor, I respectfully submit that the Interim Compensation Motion should be approved.

**N.    Application of Bear Island Paper Company, L.L.C. for Entry of an Order Authorizing the Employment and Retention of The Garden City Group, Inc. as Notice, Claims and Solicitation Agent (the "Garden City Retention Motion")**

87.    The Debtor requests entry of an order pursuant to 28 U.S.C. § 156(c) and section 503(b) of the Bankruptcy Code authorizing the employment and retention of The Garden City Group, Inc., effective as of the Petition Date, as the notice, claims and solicitation agent in accordance with the terms and conditions set forth in the Administration Agreement.

88.    I believe that the relief requested in the Garden City Retention Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption.   Accordingly, on behalf of the Debtor, I respectfully submit that the Garden City Retention Motion should be approved.

**O.    Application of the Bear Island Paper Company, L.L.C. for Entry of an Order Authorizing the Employment and Retention of Kirkland & Ellis LLP as Counsel for the Debtor and Debtor in Possession *Nunc Pro Tunc* to the Petition Date (the "K&E Retention Motion")**

89.    The Debtor requests the authority to retain Kirkland & Ellis LLP ("K&E") *nunc pro tunc* to the commencement of the chapter 11 case as its lead attorneys in accordance with the terms and conditions set forth in the Engagement Letter.

90.    I believe that K&E is both well qualified and uniquely able to represent the Debtor in this chapter 11 case in an efficient and timely manner.   I believe that the relief requested in the K&E Retention Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest.   Accordingly, on behalf of the Debtor, I respectfully submit that the K&E Retention Motion should be approved.

**P.    Application of Bear Island Paper Company, L.L.C. for Entry of an Order Authorizing the Employment and Retention of Troutman Sanders LLP as Co-Counsel for the Debtor *Nunc Pro Tunc* to the Petition Date (the "Troutman Sanders Retention Application")**

91.    The Debtor requests the authority to retain Troutman Sanders LLP *nunc pro tunc* to the commencement of the chapter 11 case as the Debtor's co-counsel in accordance with the terms and conditions set forth in the Engagement Letter.

92.    I believe that Troutman Sanders LLP is both well qualified and uniquely able to represent the Debtor in this chapter 11 case in an efficient and timely manner.   I believe that the relief requested in the Troutman Sanders Retention Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest.   Accordingly, on behalf of the Debtor, I respectfully submit that the Troutman Sanders Retention Motion should be approved.

**Q.    Application of Bear Island Paper Company, L.L.C. for Entry of an Order Authorizing the Employment and Retention of AlixPartners LLP as Restructuring Advisor to the Debtor *Nunc Pro Tunc* to the Petition Date (the "AlixPartners Retention Motion")**

93.    The Debtor requests the authority to employ and retain AlixPartners LLP as its restructuring advisor *nunc pro tunc* to the commencement of the chapter 11 case in accordance with the terms and conditions of the Engagement Letter.

94.    AlixPartners has extensive experience in providing restructuring advisory services in large and complex chapter 11 cases on behalf of debtors and creditors throughout the U.S.

95.    I believe that the relief requested in the AlixPartners Retention Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest. Accordingly, on behalf of the Debtor, I respectfully submit that the AlixPartners Retention Motion should be approved.

**R.    Application of Bear Island Paper Company, L.L.C. for Entry of an Order Authorizing the Employment and Retention of Lazard Freres & Co. LLC as Financial Advisor to the Debtor *Nunc Pro Tunc* to the Petition Date (the "Lazard Retention Motion")**

96.    The Debtor requests the authority to employ and retain Lazard Freres & Co. LLC as its financial advisor *nunc pro tunc* to the commencement of the chapter 11 case in accordance with the terms and conditions of the Engagement Letter.

97.    Lazard provides a broad range of corporate advice to its clients, including, with respect to: (a) general corporate finance; (b) mergers, acquisitions and divestures; (c) corporate restructurings; (d) special committee assignments; and (e) capital raising.

98.    I believe that the relief requested in the Lazard Retention Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest. Accordingly, on behalf of the Debtor, I respectfully submit that the Lazard Retention Motion should be approved.

99.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23rd day of February, 2010.

By: _____
Name:    Edward D. Sherrick
Title:    Senior Vice President and Chief
Financial Officer for Bear Island Paper
Company, L.L.C.

Jonathan L. Hauser, Esquire
VSB No. 18688
Troutman Sanders LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, VA 23462
Telephone:    (757) 687-7768
Facsimile:    (757) 687-1505

        - and –

Richard M. Cieri (*pro hac vice* pending)
Christopher J. Marcus (*pro hac vice* pending)
Michael A. Cohen (*pro hac vice* pending)
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Attorneys for the Debtor and
Debtor in Possession*

31