+Jonathan L. Hauser
VSB No. 18688
TROUTMAN SANDERS LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, VA 23462
Telephone:      (757) 687-7768
Facsimile:      (757) 687-1505

*Proposed Attorneys for the Debtor and
Debtor in Possession*

Richard M. Cieri (*pro hac vice* pending)
Christopher J. Marcus (*pro hac vice* pending)
Michael A. Cohen (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BEAR ISLAND PAPER COMPANY, L.L.C.,[1] | ) | Case No. 10-_____ (___) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## MOTION OF BEAR ISLAND PAPER COMPANY, L.L.C. FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105, 361, 362, 363, 364(c), 364(d) AND 364(e) OF THE BANKRUPTCY CODE AND RULES 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (A) AUTHORIZING DEBTOR TO OBTAIN SECURED POSTPETITION FINANCING ON SUPER-PRIORITY PRIMING LIEN BASIS, GRANTING ADEQUATE PROTECTION FOR PRIMING AND MODIFYING THE AUTOMATIC STAY, (B) AUTHORIZING DEBTOR TO USE CASH COLLATERAL OF PREPETITION SECURED LENDERS AND GRANTING ADEQUATE PROTECTION FOR USE THEREOF, (C) AUTHORIZING DEBTOR TO REPAY EXISTING ABL REVOLVER INDEBTEDNESS UPON INTERIM APPROVAL AND (D) PRESCRIBING FORM AND MANNER OF NOTICE AND SETTING THE TIME FOR THE FINAL HEARING

Bear Island Paper Company, L.L.C., as a debtor and debtor in possession ("Bear Island,"

or the "Debtor"), files this motion (the "Motion") for the entry of an interim order substantially

in the form attached hereto as **Exhibit A** (the "Interim DIP Order") and a final order (the "Final

---

[1] The last four digits of the Debtor's federal tax identification number are 0914. The principal address for the Debtor is 10026 Old Ridge Road, Ashland, Virginia 23005.

DIP Order," and together with the Interim DIP Order, the "DIP Orders"), pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c), 364(d) and 364(e) and Fed. R. Bankr. P. 4001 and 9014, (i) authorizing the Debtor to obtain secured postpetition financing on a super-priority administrative claim and first priority priming lien basis, granting adequate protection to existing secured lenders for the priming of their existing liens, and modifying the automatic stay, (ii) authorizing the Debtor to use the cash collateral of existing secured lenders and granting adequate protection to existing secured lenders for the use of their cash collateral, (iii) authorizing the Debtor to repay the existing asset-backed revolver indebtedness upon entry of the Interim DIP Order, (iv) prescribing the form and manner of notice and setting the time for the final hearing on the Motion and (v) granting related relief, all as more fully described below and in the proposed DIP Orders. In support of this Motion, the Debtor respectfully states as follows:[2]

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157 (b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001(a)-1 of the Local Bankruptcy Rules for the

---

[2]      The facts and circumstances supporting this Motion are set forth in the Declaration of Edward D. Sherrick, Senior Vice President and Chief Financial Officer of Bear Island Paper Company, L.L.C. in Support of First Day Motions (the "Sherrick Declaration") and the declaration of Stephen Goldstein in Support of Debtor-in-Possession Financing (the "Goldstein Declaration"), filed contemporaneously herewith.

United States Bankruptcy Court for the Eastern District of Virginia (the "<u>Local Bankruptcy Rules</u>").

**<u>Background</u>**

4.     On the date hereof (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     Simultaneously with the commencement of this chapter 11 case, the Debtor's indirect parent -- White Birch Paper Holding Company ("<u>WB Holding</u>") -- and ten of WB Holding's direct and indirect Canadian subsidiaries (collectively the "<u>CCAA Applicants</u>," and, together with Bear Island, the "<u>WB Group</u>") have sought relief under the *Companies' Creditors Arrangement Act* (the "<u>CCAA</u>") in the Quebec Superior Court of Justice (the "<u>Canadian Court</u>") in Montreal, Quebec, Canada (the "<u>CCAA Cases</u>").[3]  So as to ensure consistency and comity among the courts overseeing these related cases, the Debtor and the CCAA Applicants intend to seek Bankruptcy Court and Canadian Court approval of a customary cross-border protocol that will govern procedures for, among other things, court-to-court communications and matters requiring approval by both Courts.  Moreover, six of the CCAA Applicants, contemporaneously herewith, are seeking relief under chapter 15 of the Bankruptcy Code.[4]

---

[3]     The CCAA Applicants include (a) WB Holding, (b) White Birch Paper Company, (c) Stadacona General Partner Inc., (d) Black Spruce Paper Inc., (e) F.F. Soucy General Partner Inc., (f) 3120772 Nova Scotia Company, (g) Arrimage De Gros Cacouna Inc., (h) Papier Masson Ltee, (i) Stadacona Limited Partnership, (j) F.F. Soucy Limited Partnership and (k) F.F. Soucy Inc. & Partners, Limited Partnership.

[4]     The six chapter 15 debtors include (a) White Birch Paper Company, (b) Stadacona General Partner Inc., (c) Stadacona Limited Partnership, (d) F.F. Soucy Limited Partnership, (e) F.F. Soucy Inc. & Partners, Limited Partnership and (f) Papier Masson Ltee.

6.      The WB Group is the second-largest newsprint manufacturer in North America. In fact, as of December 31, 2009, the WB Group held a 12% share of the North American newsprint market and employed approximately 1,300 individuals.  Additionally, for the twelve months ended December 31, 2009, the WB Group's mills maintained a production capacity of approximately 1.3 million metric tons of newsprint and directory paper (50% of which is made from recycled content) and achieved net sales of approximately $667 million.

7.      The WB Group operates four integrated paper mills strategically located to serve many of the largest newsprint markets in North America.  The WB Group's mills include the Bear Island mill, located in Ashland, Virginia, the Soucy mill located on the St. Lawrence River in Riviere-du-Loup, Quebec, the Stadacona mill located on the St. Lawrence River in Quebec City, Quebec and the Papier Masson mill, located in Gatineau, Quebec.  In addition to newsprint, the WB Group produces small amounts of directory paper, paperboard and lumber.   Its customers include publishers like Gannett and Dow Jones, as well as commercial printers such as Transcontinental.

8.      Bear Island is a Virginia limited liability company that was organized in 1997 as a wholly-owned subsidiary of White Birch Paper Company and employs approximately 200 of the WB Group's 1,300 employees.  Strategically located in Ashland, Virginia, the Bear Island mill annually produces approximately 235 thousand metric tons of newsprint paper that services customers in New York, Philadelphia, Baltimore and Washington, D.C.   Bear Island also operates a paper machine, woodyard, pulping system, recycling facility, an on-site waste and water treatment facility, an industrial landfill for its on-site solid waste disposal, as well as storage and transportation facilities.  For the twelve months ended December 31, 2009, Bear

Island's net sales totaled approximately $125 million, which accounted for 19% of the WB Group's net sales for the same period.

**The WB Group's Prepetition Capital Structure**

9.     WB Group's principal debt obligations consist of three major credit agreements, each of which is more fully described below:  (a) the First Lien Term Loan Agreement; (b) the Second Lien Term Loan Agreement; and (c) the Revolving ABL Agreement (each as defined herein).   Bear Island serves as a guarantor under the First and Second Lien Term Loan Agreements and a borrower under the Revolving ABL Agreement.   In addition, White Birch Company is a party to three interest rate swap agreements (collectively, the "Swap Agreements"), which, as of the Petition Date (as defined herein), were out of the money by approximately $51.5 million in the aggregate.   White Birch Company's obligations under the Swap Agreements are collateralized by the same assets pledged under the First and Second Lien Term Loan Agreements, including Bear Island's assets, and the Swap Agreement lenders' liens rank *pari passu* with the lenders under the First Lien Term Loan Agreement.

A.     **First Lien Term Loan Agreement**

10.     On or about April 8, 2005, White Birch Company and WB Holding, as borrowers, entered into that certain First Lien Term Loan Credit Agreement (as amended and restated on January 27, 2006 and May 8, 2007, the "First Lien Term Loan Agreement"), with Credit Suisse Securities (USA) LLC, as sole lead arranger, sole bookrunner, syndication agent and documentation agent, Credit Suisse AG, Toronto Branch, as Canadian collateral agent and

administrative agent, Merrill Lynch, Pierce, Fenner & Smith, Inc., as co-arranger and the lender parties thereto (collectively, the "First Lien Term Lenders").[5]

11.     As of the Petition Date, approximately $428 million in principal and $9.8 million in interest remains outstanding under the First Lien Term Loan Agreement. Bear Island, among others, guarantees the borrowers' obligations under the First Lien Term Loan Agreement. To secure their obligations under the First Lien Term Loan Agreement, the WB Group granted first priority liens and security interests in substantially all of their assets, including Bear Island's assets, other than assets that are pledged to the lenders under the Revolving ABL Agreement (the "Term Loan Collateral").

**B.      Second Lien Term Loan Agreement**

12.     On or about April 8, 2005, White Birch Company and WB Holding, as borrowers, entered into that certain Second Lien Term Loan Credit Agreement (as amended and restated on January 27, 2006 and May 8, 2007, the "Second Lien Term Loan Agreement"), with Credit Suisse Securities (USA) LLC, as sole lead arranger, sole bookrunner, syndication agent and documentation agent, Credit Suisse AG, Toronto Branch, as Canadian collateral agent and administrative agent,[6] Merril Lynch, Pierce, Fenner & Smith, Inc., as co-arranger and the lender parties thereto (collectively, the "Second Lien Term Lenders").[7]

---

[5] The collective term "First Lien Term Lenders" may mean one, some, or all First Lien Term Lenders, or one, some, or all agents under the First Lien Credit Agreement, depending on the context. To the extent that the First Lien Term Loan Agreement specifies the rights and responsibilities of the respective First Lien Term Lenders and agents under the First Lien Term Loan Agreement as between such parties, the terms of the First Lien Term Loan Agreement shall be determinative and shall not be deemed modified by the use of the collective term "First Lien Term Lenders" in this Motion or in the DIP Orders.

[6] Effective as of October 2009, Credit Suisse Securities (USA) LLC and Credit Suisse AG, Toronto Branch, resigned as lead agent and Canadian agent, respectively. The process of obtaining a new lead agent and Canadian agent is ongoing.

[7] The collective term "Second Lien Term Lenders" may mean one, some, or all Second Lien Term Lenders, or one, some, or all agents under the Second Lien Credit Agreement, depending on the context. To the extent that the Second Lien Term Loan Agreement specifies the rights

13.     As of the Petition Date, approximately $100 million in principal and $4 million in interest remains outstanding under the Second Lien Term Loan Agreement. Bear Island, among others, guarantees the borrowers' obligations under the Second Lien Term Loan Agreement. To secure their obligations under the Second Lien Term Loan Agreement, the WB Group granted second priority liens and security interests in the Term Loan Collateral.

14.     The rights of the Second Lien Term Lenders in the Term Loan Collateral are junior and subordinate to the rights therein of the First Lien Term Lenders pursuant to and in accordance with the Second Amended and Restated Intercreditor Agreement dated as of May 8, 2007 (the "Intercreditor Agreement").

15.     Under the Intercreditor Agreement, the Second Lien Term Lenders have agreed not to oppose—or request adequate protection in connection with—any cash collateral agreement or postpetition financing approved by the First Lien Term Lenders that would prime the Second Lien Term Lenders' liens on the Term Loan Collateral so long as (a) the total amount of priming postpetition financing and outstanding first lien term debt obligations is less than a certain level, and (b) the Second Lien Term Lenders retain the right to object to any ancillary agreements or arrangements regarding the cash collateral usage or financing that are materially prejudicial to their interests. The Debtor submits that both conditions are satisfied with the relief requested herein, and the Second Lien Term Lenders are deemed to consent thereto.

---

and responsibilities of the respective Second Lien Term Lenders and agents under the Second Lien Term Loan Agreement as between such parties, the terms of the Second Lien Term Loan Agreement shall be determinative and shall not be deemed modified by the use of the collective term "Second Lien Term Lenders" in this Motion or in the DIP Orders.

## C.     Revolving ABL Agreement

16.     On or about March 29, 2005, White Birch Company, WB Holding, Stadacona Limited Partnership, F.F. Soucy Limited Partnership, Papier Masson Ltee and Bear Island (collectively, the "ABL Borrowers") entered into that certain Revolving Credit Agreement (as amended and restated on January 27, 2006 and February 26, 2008, the "Revolving ABL Agreement"), with GE Capital Markets Inc., as lead arranger and syndication agent, General Electric Capital Corporation, as administrative agent, U.S. collateral agent and documentation agent, GE Canada Finance Holding Company, as Canadian agent and Canadian collateral agent, and the lender parties thereto (collectively, "GE").

17.     As of the Petition Date, approximately $50 million remains outstanding under the Revolving ABL Agreement, including undrawn letters of credit.  To secure their obligations under the Revolving ABL Agreement, the WB Group granted first priority liens and security interests on, among other things, their inventory, accounts receivable and cash (the "Revolving ABL Collateral").[8]

## D.     The Swap Agreements

18.     Prior to the Petition Date, White Birch Company entered into certain transactions pursuant to the following Swap Agreements:

> a.     an ISDA 2002 Master Agreement, dated as of May 16, 2005, between White Birch Company and The Toronto-Dominion-Bank (the "TD Swap Agreement");

---

[8] The summary descriptions of the Term Loan Collateral and the Revolving ABL Collateral are qualified entirely by reference to the collateral descriptions in the respective loan and collateral agreements.

b. an ISDA Master Agreement, dated as of April 13, 2005, between White Birch Company and Credit Suisse First Boston International (the "CS Swap Agreement"); and

c. an ISDA Master Agreement, dated as of May 8, 2007, between White Birch Company and Merrill Lynch Capital Services, Inc. (the "ML Swap Agreement").

19. As of the Petition Date, the interest rate swap transactions under the Swap Agreements have been terminated and payments of approximately $51.5 million remain outstanding under the Swap Agreements. Bear Island, among others, guarantees the borrowers' obligations under the Swap Agreements. The Swap Agreements are secured by the Term Loan Collateral, including Bear Island's assets, and the Swap Agreement lenders' liens in such collateral rank *pari passu* with the lenders under the First Lien Term Loan Agreement.

**The Proposed Postpetition Financing**

20. A subset of the WB Group's existing First Lien Term Lenders have agreed to backstop a $140 million delayed-draw postpetition term loan facility (the "Postpetition Facility") with administrative super-priority status against the Debtor's estate and secured by priming liens on current Term Loan Collateral, property acquired by the WB Group after the Petition Date, and new liens on Revolving ABL Collateral once the proceeds of interim borrowings under the Postpetition Facility are used to completely repay the WB Group's obligations under the Revolving ABL Agreement (collectively, the "Postpetition Collateral"). Notably, the Postpetition Facility is not just crucial for the Debtor alone. The CCAA Applicants have already received interim authority to borrow under the Postpetition Facility from the Canadian Court as part of the relief granted in the Initial CCAA Order.

21.     In addition to the postpetition financing to be provided under the Postpetition Facility, the Debtor will require the use of cash on hand and amounts generated by the collection of accounts receivable, sales of inventory or other dispositions thereof, all of which constitute cash collateral (the "Cash Collateral") under the First and Second Lien Term Loan Agreements and the Revolving ABL Agreement.  The DIP Orders provide the terms on which the Debtor proposes to use the Cash Collateral.

**Relief Requested**

22.     By this Motion, the Debtor requests that the Court grant the following relief as provided for in the Interim DIP Order and the Final DIP Order:

    a.    pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 364(e) of the Bankruptcy Code and Rules 4001 and 9014 of the Bankruptcy Rules:

        i.    authorization for the Debtor to obtain postpetition loans, advances and other financial accommodations pursuant to the Postpetition Credit Agreement in the amount of up to $104 million on an interim basis under the Interim DIP Order and up to $140 million on a final basis under the Final DIP Order;

        ii.    authorization for the Debtor to enter into and comply in all respects with the Postpetition Credit Agreement and all other Postpetition Loan Documents and approval of all of the terms and conditions of the Postpetition Credit Agreement and all other Postpetition Loan Documents;

        iii.    the granting in favor of the Postpetition Lenders of super-priority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all Obligations (as defined in the Postpetition Credit Agreement);

        iv.    as security for the Obligations, the granting in favor of the Postpetition Lenders of perfected, valid, enforceable and non-avoidable liens upon and security interests in all of the Postpetition Collateral (as hereinafter defined, including upon the proceeds of avoidance actions upon entry of the Final DIP Order) having the priorities described in sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code;

v.      as further security for the Obligations, the granting of perfected, valid, enforceable and non-avoidable senior priming liens upon and security interests in the Postpetition Collateral (as defined in the Interim DIP Order) other than in collateral secured by Prior Liens (as defined in the Interim DIP Order) pursuant to Section 364(d) of the Bankruptcy Code and, in consideration thereof, the granting of adequate protection for such priming in the form of subordinate super-priority administrative claims for the First Lien Term Lenders and additional liens and security interests junior to those liens and security interests securing the Obligations for the First Lien Term Lenders and the Second Lien Term Lenders (collectively, the "Adequate Protection Term Loan Liens"); and

vi.      upon entry of the Final DIP Order, the waiver of the Debtor's right to surcharge the Collateral securing the Obligations pursuant to section 506(c) of the Bankruptcy Code;

b.      pursuant to sections 361, 362, and 363 of the Bankruptcy Code, authorization for the Debtor to use Cash Collateral pursuant to the terms and conditions set forth in the DIP Orders and the granting of adequate protection to the applicable Prepetition Debt Lenders for such use of Cash Collateral, including payment of the First Lien Term Lenders' costs and expenses, the granting of Adequate Protection Term Loan Liens and Adequate Protection Revolving Liens, and the additional rights provided in the Interim DIP Order (including the waiver of the Debtor's right to surcharge the collateral securing the existing indebtedness under the First Lien Term Loan and the Second Lien Term Loan pursuant to section 506(c) of the Bankruptcy Code);

c.      upon the entry of the Interim DIP Order, authorization for the Debtor to immediately repay in full the outstanding indebtedness under the Revolving ABL Agreement with the proceeds of loans provided under the Postpetition Credit Agreement;

d.      the scheduling of the final hearing on the Motion to consider entry of the Final DIP Order authorizing and granting the relief requested in the Motion; and

e.      the granting of certain related relief.

### Summary of Principal Terms of Postpetition Financing

23.      The significant terms of the Postpetition Credit Agreement are as follows:[8]

---

[8] This summary of the Credit Agreement is provided for the benefit of the Court and other parties in interest. The Credit Agreement proposed to be executed by the parties will be substantially in the form attached hereto as Exhibit C and incorporated herein by reference.

a.      Borrowers:  White Birch Paper Company, a Nova Scotia unlimited company, Stadacona L.P., a Quebec limited partnership, F.F, Soucy L.P., a Quebec limited partnership, Papier Masson Ltee, a Canada corporation (collectively, the "Canadian Borrowers")) and Bear Island Paper Company, L.L.C., a Virginia limited liability company (the "U.S. Borrower," and together with the Canadian Borrowers, the "Borrowers").

b.      Guarantors:  (i) White Birch Paper Holding Company, a Nova Scotia unlimited liability company and (ii) White Birch Paper Company, a Nova Scotia unlimited liability company (together with White Birch Paper Holding Company, the "Guarantors" and, together with the Borrowers, the "Debtors")

c.      Total Commitment:  $140 million under the Postpetition Facility

d.      Initial Availability/Full Availability:  Upon entry of the Interim DIP Order and satisfaction of the conditions to Initial Availability as described in the Credit Agreement, up to $104 million of the Postpetition Facility.  Upon entry of the Final DIP Order and satisfaction of the conditions to Full Availability as described in the Credit Agreement, the balance of the Postpetition Facility shall be available to the Debtors.

e.      Maturity: Earliest of (i) the date on which all the DIP Loans have been indefeasibly repaid in full in cash and all of the DIP Commitments have been permanently and irrevocably terminated, (ii) the date that is [nine (9)] calendar months after the Closing Date, (iii) the date of the closing of a sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code and Section 36 of the CCAA, (iv) the implementation date of a sanctioned plan compromise or arrangement under the CCAA and the effective date of a confirmed plan of reorganization or liquidation pursuant to Chapter 11 of the Bankruptcy Code, (v) with respect to the U.S. Cases, the date of filing of a case under Chapter 7 of the Bankruptcy Code, conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, or with respect to the Canadian Cases, the filing of an assignment in bankruptcy or the making of a bankruptcy order, or the date liquidation or receivership proceedings are initiated in Canada, (vi) the date of dismissal or termination of any of the Cases and (vii) the date of termination of the commitments and/or acceleration of any outstanding extensions of credit, in either case, following the occurrence and during the continuance of an event of default (the earliest to occur, the "Maturity Date").  Notwithstanding the foregoing, the date set forth in clause (ii) of the definition of the Maturity Date may be extended by three (3) calendar months with the approval of the

To the extent there are any conflicts between this summary and the Credit Agreement, the terms of the Credit Agreement shall govern. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Credit Agreement.

12

Administrative Agent, the Syndication Agent and the Required Lenders in their sole discretion.

f.  **Interest Rate**:  All amounts outstanding under the Postpetition Facility will bear interest, at the Borrower's option, as follows:

> (i)  One month LIBOR, adjusted for statutory reserves, plus 10.0% *per annum* payable monthly in arrears.  "LIBOR" is defined as the greater of (a) the interest rate at which United States dollars are offered for deposit in the London interbank market or (b) 2.0% *per annum*; or

> (ii) during such periods that a Loan under the Postpetition Facility is a Base Rate Loan the interest rate shall be calculated for any day at a rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) 3.00%.

g.  **Interest Payments**:  To be paid monthly, in arrears.

h.  **Fees, Costs, Expenses and Indemnities**:  The Borrower has agreed to the following:

i.   Arranger Fee – 2.5% of the DIP Commitment to Administrative Agent, for the benefit of the Arrangers (to be allocated among the Arrangers in the manner to be determined by the Arrangers), to be paid upon the entry of the Interim Orders.

ii.  Initial Fee – 2.5% of the DIP Commitment to Administrative Agent, for the ratable benefit of the Postpetition Lenders, to be paid upon the entry of the Interim Orders.

iii. Administrative Fee - $100,000 to Administrative Agent, for the benefit of the Administrative Agent, to be paid on the Closing Date, plus $25,000 to Administrative Agent, for the benefit of the Administrative Agent, in the event that the Maturity Date is extended beyond 9 months after the Closing Date, to be paid on the date of such extension, plus $25,000 to Administrative Agent, for the benefit of the Administrative Agent, in the event that the Maturity Date is extended beyond 12 months after the Closing Date, to be paid on the date of such extension (and $25,000 for each additional 3 months extension thereafter, to be paid on the date of such extension).

iv.    Prepayment Fee – 4% of the DIP Commitment to Administrative Agent, for the ratable benefit of the Postpetition Lenders, to be paid upon the earlier of the Maturity Date (as it may be extended) and the reduction, in whole or in part, of the DIP Commitment. The Prepayment Fee will be waived if the Postpetition Facility is paid in full in cash simultaneously with either (i) the closing of a sale of all or substantially all the WB Group's assets or (ii) the consummation of a plan of reorganization under applicable U.S. and Canadian law, in each case which sale or plan of reorganization is in form and substance acceptable to holders of at least two-thirds in principal amount of obligations held under the First Lien Term Loan Agreement in their sole discretion.

v.    A Commitment Fee shall equal to (a) the average of the daily difference of (i) the DIP Commitments *minus* (ii) the aggregate principal amount of all outstanding DIP Loans *times* or (b) 2.0% per annum for the period from and including the Closing Date to the Maturity Date. Accrued Commitment Fees will be payable monthly in arrears (calculated on a 360-day year basis) to the Administrative Agent for the account of the Postpetition Lenders commencing on the first such dates to occur after the Closing Date.

i.    <u>Optional Prepayments</u>: Optional Prepayments permitted in whole or in part, with prior notice and including accrued and unpaid interest. Each partial prepayment shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000.

j.    <u>Mandatory Prepayments</u>: Mandatory prepayments will be required, subject to certain limitations, for the net cash proceeds of certain asset sales, proceeds of insurance on account of any loss of property or assets and net cash proceeds received from the incurrence of indebtedness not permitted by the loan documents.

k.    <u>Priority/Security</u>: All obligations of the Borrower to the Postpetition Lenders, subject to the Carve-Out (as defined herein), shall at all times:

i.    pursuant to section 364(c)(1) of the Bankruptcy Code and the DIP Orders (as applicable), all Obligations at all times shall constitute allowed joint and several super-priority administrative-expense claims in each of these cases having priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code;

ii.    pursuant to section 364(c)(2) of the Bankruptcy Code and the DIP Orders (as applicable), all Obligations shall be secured by a perfected First Priority senior Lien on all Collateral that is not otherwise subject to valid, perfected and nonavoidable liens as of the Commencement Date;

iii.     pursuant to section 364(c)(3) of the Bankruptcy Code and the DIP Orders (as applicable), all Obligations shall be secured by a perfected second priority junior Lien on all Collateral that is otherwise subject to (a) valid, perfected and nonavoidable liens as of the Commencement Date or (b) valid liens in existence at the Commencement Date that are perfected subsequent to the Commencement Date as permitted by section 546(b) of the Bankruptcy Code (other than Collateral that is subject to the Liens securing the obligations under the Existing Agreements referred to in clause (iv) below, which Liens shall be primed by the Liens described in such clause); and

iv.     pursuant to section 364(d)(1) of the Bankruptcy Code and the DIP Orders (as applicable), all Obligations shall be secured by a perfected First Priority senior priming Lien on the Existing Collateral, subject to those valid, perfected and nonavoidable Liens in existence on the Commencement Date to which the Liens in the Existing Collateral granted in connection with the Existing Credit Agreements are subject in accordance with the Existing Credit Agreements, to the extent such liens and security interests are valid, perfected, enforceable and non-avoidable (provided that with respect to such excepted liens and security interests, the Postpetition Lenders shall be granted junior liens and security interests under subparagraph (iii) above).

Except for the Carve-Out, no costs or expenses of administration shall be imposed against the Postpetition Lenders, Prepetition Debt Lenders or any of the Collateral under section 105 or 506(c) of the Bankruptcy Code, or otherwise, and each of the Debtors waives for itself and on behalf of their estates in bankruptcy, any and all rights under section 105 or 506(c), or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the Postpetition Lenders or the Collateral.

No filings, recordings or other actions will be necessary to perfect and maintain the perfection and status of any liens or security interests granted to the Postpetition Lenders.

l.     <u>Collateral</u>:  The assets and property subject to the liens and security interests granted to the Postpetition Lenders include, without limitation:  Existing Collateral and all other of the Debtors' now owned or hereafter acquired real and personal property, including, but not limited to, leasehold interests, inventory, accounts, chattel paper, documents, general intangibles, goods, instruments, insurance, intellectual property, investment related property, letter of credit rights, money, receivables and receivable records, commercial tort claims and upon entry of a Final DIP Order, avoidance claims and causes of action brought under

Chapter 5 of the Bankruptcy Code, all collateral records, collateral support and supporting obligations relating to any of the foregoing; and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (but limited to 65% of the Debtors' interests in Foreign Subsidiaries as and to the extent set forth in the Credit Documents, (collectively, the "Collateral").

m.    **Carve-Out**:  Notwithstanding anything to the contrary contained in this Order, upon the occurrence of the Carve-Out Trigger Date (as defined below), the liens and claims granted to any of the Postpetition Agent, Postpetition Lenders, Prepetition Debt Agents, and Prepetition Debt Lenders in this Order, the Postpetition Loan Documents and/or the Prepetition Debt Loan Documents shall be subject to the payment, without duplication, of the following fees and claims (collectively, the "**Carve-Out**") to the extent that there are not sufficient, unencumbered funds in the Debtor's estate or in the possession of any other Loan Party to pay such amounts at the time payment is required to be made:

    i.    with respect to claims incurred prior to the Carve-Out Trigger Date, the claims of (x) professionals of the Debtor whose retention is approved by this Court during the Chapter 11 Case pursuant to Sections 327, 328 and 363 of the Bankruptcy Code (the "Debtor's Professionals") for unpaid fees and expenses which were incurred on and after the Petition Date and prior to the Carve-Out Trigger Date; and (y) professionals of any statutory committees appointed in the Chapter 11 Case whose retention is approved by this Court during the Chapter 11 Case pursuant to Section 1103 of the Bankruptcy Code (the "Committee's Professionals" and together with the Debtor's Professionals, the "Retained Professionals") for unpaid fees and expenses which were incurred on and after the Petition Date and prior to the Carve-Out Trigger Date; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed on a final basis by this Court under sections 330 and 331 of the Bankruptcy Code, comply with the Approved Budget and are not excluded from the Carve-Out under paragraph 30 of this Order (such fees and expenses, the "Pre-Carve-Out Trigger Date Expenses" and the permitted amount thereof, the "Pre-Carve-Out Trigger Date Amount");

    ii.    with respect to claims incurred on or after the Carve-Out Trigger Date, the claims of Retained Professionals for unpaid fees and expenses which were incurred on and after the Carve-Out Trigger Date; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed on a final basis by this Court under sections 330 and 331 of the Bankruptcy Code, are not excluded from the Carve-Out under paragraph 30 of this Order and do not exceed $2,800,000 in the aggregate for all of the Retained Professionals (such fees and expenses, the "Post-Carve-Out Trigger Date Expenses" and the permitted amount thereof, the "Post-

Carve-Out Trigger Date Amount" and, together with the Pre-Carve-Out Trigger Date Amount, the "Carve-Out Amount"); and

iii.     unpaid fees payable to the United States Trustee and Clerk of the Bankruptcy Court pursuant to Section 1930 of Title 28 of the United States Code.

iv.     Carve-Out Trigger Date.  As used herein, the term "**Carve-Out Trigger Date**" means the date on which the Postpetition Agent provides written notice to the Debtor that the Carve-Out is invoked, which notice shall be delivered only on or after the occurrence and continuation of an Event of Default under the Postpetition Credit Agreement.

v.      Carve-Out Trigger Date Amounts.  Subject to the terms and conditions of this Order and the Postpetition Loan Documents, the Debtor shall be permitted, during the time period prior to the Carve-Out Trigger Date, to pay compensation and reimbursement of reasonable fees and expenses of the Retained Professionals allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code and that are consistent with the Approved Budget, as the same may be due and payable, that constitute Pre-Carve-Out Trigger Date Expenses and such payments shall not reduce or be deemed to reduce the Post-Carve-Out Trigger Date Amount.  On and after the Carve-Out Trigger Date, the dollar amounts available to be paid under the Carve-Out Amount shall be reduced, dollar-for-dollar, by the aggregate amount of payments made to the Retained Professionals on account of their Pre-Carve-Out Trigger Date Expenses or Post-Carve-Out Trigger Date Expenses (whether from Cash Collateral, any proceeds of the Postpetition Facility, or otherwise).

vi.     Reservation of Rights.  Payment of any fees and expenses of the Retained Professionals pursuant to the Carve-Out shall not, and shall not be deemed to, (i) reduce the Debtor's obligations owed to any of the Postpetition Agent, Postpetition Lenders, Prepetition Debt Agents, and/or Prepetition Debt Lenders or (ii) subordinate, modify, alter or otherwise affect any of the claims, liens, and security interests of such parties.  The Postpetition Agent, Postpetition Lenders, Prepetition Debt Agents, and Prepetition Debt Lenders shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Retained Professionals (or of any other Person) incurred in connection with the Chapter 11 Case or any Successor Case, and nothing in this Order or otherwise shall be construed to obligate such parties in any way to pay compensation to or to reimburse expenses of any Retained Professional or any other Person, or to ensure that the Debtor has sufficient funds to pay such compensation or reimbursement.  Nothing herein shall impair, or be construed to impair,

the ability of any party to object to any of the fees, expenses, reimbursement or compensation of the Retained Professionals. For the avoidance of doubt, the Carve-Out described herein is an aggregate carve-out for the Debtor and all respective Loan Parties.

vii. The following claims are included within the Carve-Out: (a) fees pursuant to 28 U.S.C. § 1930(a)(6); (b) fees payable to the clerk of the Court and any agent thereof; and (d) professional fees and expenses incurred by the Debtors and the Committee (collectively, the "Professional Fees") subsequent to the delivery of a Carve-Out Trigger Notice (regardless of when such Professional Fees become allowed by order of the Court), in an aggregate amount not in excess of $2,800,000 plus all unpaid Professional Fees incurred prior to the delivery of a Carve-Out Trigger Notice to the extent previously or subsequently allowed by the Court, subject to the right of the Postpetition Lenders and any other party in interest to object to the award of such Professional Fees in accordance with any applicable Bankruptcy Rule or, if applicable, order of the Court relating to the approval of Professional Fees and objections thereto. The Carve-Out shall not include, apply to, or be available for any Professional Fees incurred by any party, including the Credit Parties, any Committee or any Professional in connection with the investigation, initiation or prosecution of any claims, defenses or causes of action against the DIP Agents, the Postpetition Lenders or the Existing First Lien Loan Parties; provided, further, that prior to delivery of a Carve-Out Trigger Notice, the payment of Professional Fees allowed and payable under the Bankruptcy Code or otherwise pursuant to an order of the Court, as the same may be due and payable, shall not reduce the Carve-Out, subject to the right of the Administrative Agent, the Postpetition Lenders and any other party in interest to object to such payments in accordance with applicable Bankruptcy Rule or, if applicable, order of the Court relating to the approval of Professional Fees and objections thereto.

n. Events of Default: The Credit Agreement contains such events of default (and, as appropriate, grace periods) as are usual and customary for financings of this kind, including, without limitation, failure to pay any principal, interest or letter of credit reimbursement with respect to the Obligations; failure to pay material amounts due with respect to other postpetition indebtedness or breach of any material term of the agreement governing such indebtedness; failure to comply with specific covenants in the Credit Documents; breach of any representation, warranty, certification or other statement made or deemed made in any Credit Document; any other default under the Credit Documents that is not remedied or waived within thirty (30) days of notice; the occurrence of certain ERISA events; the occurrence of a change of control; and the failure of or challenge to the validity or enforceability of any Guaranty, Collateral Document or other Credit

Document with respect to the Obligations.  In addition to the foregoing, the DIP Facilities include the following bankruptcy–related Events of Default:

i.      the bringing of a motion by any Loan Party or the issuance and entry of an order or ruling (which has not been withdrawn, dismissed or reversed): (w) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code or similar legislation in Canada not otherwise permitted pursuant to this Agreement (unless such financing is proposed to refinance and pay in cash in full the Obligations due under this Agreement); (x) to grant any Lien other than Permitted Liens, the Carve-Out and the Administration Charge upon or affecting any Collateral; (y) except as provided in the Applicable Order, to use cash collateral of Agents or Prepetition Senior Agents under Section 363(c) of the Bankruptcy Code or provision of similar effect pursuant to an order of the Canadian Court; or (z) adverse to Agents, Lenders, Prepetition Senior Agents, Prepetition Senior Lenders or their rights and remedies hereunder or under the First Lien Loan Documents or their interest in the Collateral or the collateral pursuant to the Prepetition Senior Credit Agreement, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

ii.     the filing of any plan of reorganization, arrangement or compromise or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party which plan does not propose to provide for the payment in full in cash of all Obligations under this Agreement on the effective date thereof unless otherwise agreed to by written agreement;

iii.    the issuance and entry of an order in any Case confirming a plan or plans of reorganization, arrangements or compromises that does not contain a provision for termination of the Commitment and repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans;

iv.     without the prior consent of the Majority Lenders, the issuance and entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Interim Order, the CCAA Initial Order or the Final Order, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

v.      the Interim Order is not issued and entered on or before the date that is five (5) Business Days after the Petition Date or the Final Order is not issued and entered, and the CCAA Initial Order is not final, on or before the date that is thirty (30) days after the Petition Date;

<ol type="i" start="6">
<li>the payment by a Loan Party of, or application by any Loan Party for authority to pay by a Loan Party, any Prepetition claim unless such payment is otherwise permitted under this Agreement or provided pursuant to the First Day Order and specifically provided for in the Approved Budget;</li>

<li>following the entry of the Final Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against any Agent, any Lender, any Prepetition Senior Agent or any Prepetition Senior Agent or any of their respective collateral, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;</li>

<li>the appointment of an interim or permanent trustee in any US Case or the appointment of a receiver or an examiner in any US with expanded powers to operate or manage the financial affairs, the business, or reorganization of such Loan Party, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;</li>

<li>the Canadian Loan Parties are declared bankrupt or a proceeding is taken to have a receiver, interim receiver, receiver and manager, agent, liquidator or other like Person appointed over all or any material portion of their property and assets or, except for the Monitor in the CCAA Case, any such appointment is made or any creditor takes possession of all or a material portion of such property and assets or otherwise enforces any of its rights against the Canadian Loan Parties, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;</li>

<li>the sale of all or substantially all of the assets of the Loan Parties through a sale under Section 363 of the Bankruptcy Code or a similar sale pursuant to an order of the Canadian Court, through a confirmed plan of reorganization, arrangement or compromise in any Case, or otherwise that does not provide for payment in full in cash of the Obligations and termination of the Commitments, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;</li>

<li>the dismissal of any US Case, or the conversion of any US Case from one under Chapter 11 or Chapter 15 to one under Chapter 7 of the Bankruptcy Code, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;</li>

<li>the dismissal of the CCAA Case or a conversion of the CCAA Case to a liquidation proceeding or receivership under the BIAor otherwise, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;</li>
</ol>

xiii. the issuance and entry of an order by the Bankruptcy Court or the Canadian Court granting relief from or modifying any stay, including the automatic stay of Section 362 of the Bankruptcy Code, (x) to allow any creditor to execute upon or enforce a Lien on any Collateral having a value in excess of $1,000,000 in the aggregate, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

xiv. except as expressly contemplated herein, an order is entered by the Bankruptcy Court or Canadian Court subordinating, or that has the effect of subordinating, or that avoids, or that has the effect of avoiding, the perfection, priority or validity of, any or all of the Obligations or Liens of any Agent or any Lender under the Loan Documents (or any or all of the adequate protection claims or liens of any Prepetition Senior Agent or any Prepetition Senior Lender under the Applicable Order) to any other claim or Lien, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

xv. the issuance and entry of an order in any US Case or the CCAA Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

xvi. the failure of any Loan Party to perform any of its obligations under the Applicable Order, subject to any applicable cure period;

xvii. any Applicable Order shall either (i) cease to be in full force and effect or (ii) be amended, supplemented, stayed, reversed, vacated or otherwise modified, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

xviii. except as otherwise provided by the Applicable Order, the issuance and entry of an order in any Case granting any other super priority administrative claim or Lien equal or superior to that granted to any Agent, on behalf of itself and/or the Secured Parties, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

xix. any motion or application is filed by, on behalf of, or supported by any Loan Party seeking the issuance and entry of an order, or an order is issued and entered in any Case, approving any subsequent debtor-in-possession facility for borrowed money or other extensions of credit unless such subsequent facility and such order expressly provide for the indefeasible payment and complete satisfaction in full in cash to the

Administrative Agent of all Obligations (and termination of all Commitments) hereunder prior to, or concurrently with, any initial borrowings or other extensions of credit under such subsequent facility;

xx.    any motion or pleading is filed by any of the Loan Parties seeking to grant, or the issuance and entry of any order granting, to any party, (x) any Lien senior or equal to the Liens described in the Applicable Order or the Loan Documents that are held by any of the Agents or Lenders in the Collateral (or senior or equal to the adequate protection Liens described in the Applicable Order that are held by any of the Prepetition Senior Agents or Prepetition Senior Lenders in the Collateral), or (y) any claim or expense senior or equal to the claims and expenses described in the Applicable Order or the Loan Documents that are held by any of the Agents or Lenders against any of the Loan Parties (or senior or equal to the adequate protection claims described in the Applicable Order that are held by any of the Prepetition Senior Agents or Prepetition Senior Lenders against any of the Loan Parties);

xxi.    termination of the exclusive period for Loan Parties to file a plan of reorganization in the US Case;

xxii.    any of the Loan Parties' return of goods constituting Collateral pursuant to Section 546(h) of the Bankruptcy Code other than in accordance with any such program (a) approved pursuant to a First Day Order, or (b) otherwise approved by the Bankruptcy Court and consented to by the Administrative Agent and the Syndication Agent in writing; or

xxiii.    any holder of any security interest, mortgage, charge, claim or Lien of any kind enforces against or becomes entitled to enforce against (unless subject to a stay) or otherwise takes possession, management or control of all or any material part of the Loan Parties' property or assets.

o.    Remedies:  Subject to the terms and conditions of the Interim DIP Order, upon the occurrence of an Event of Default, after giving five (5) business days notice in writing:  (i) all of the Obligations will become immediately due and payable; (ii) the automatic stay provided for pursuant to section 362 of the Bankruptcy Code and any other restrictions on the enforcement by Postpetition Lenders of their liens upon and security interests in the Collateral or any other rights under the Credit Documents will be automatically vacated and modified without any further action being required; and (iii) the Postpetition Lenders, without further notice, hearing or approval of the Court, will be authorized to take any and all actions or remedies to proceed against and realize upon the Collateral.

## Basis for Expedited Relief

24.     The Debtor brings this Motion on an expedited basis in light of the immediate and irreparable harm that will likely be suffered by the its estate, and indeed, the WB Group as a whole, if the Debtor cannot obtain approval of the Postpetition Facility. Indeed, the Debtor has an urgent need to obtain the Postpetition Financing and use Cash Collateral for, among other things, continuing the operation of its business in an orderly manner, maintaining business relationships with vendors, suppliers and customers, paying employees and satisfying other working capital and operational needs — all of which are necessary to preserve and maintain going-concern values and, ultimately, effectuate a successful cross-border restructuring.

25.     In light of the foregoing, the Debtor must access the Postpetition Financing and Cash Collateral immediately for certain requirements, which will enable it to demonstrate to its customers, suppliers, employees and vendors that it has sufficient capital to ensure ongoing operations. If approved by the Court on an interim basis, the Debtor will immediately have initial availability of up to $104 million under the terms and conditions of the Postpetition Credit Agreement, as well as access to Cash Collateral. Thus, the Postpetition Credit Agreement provides the Debtor, and the WB Group as a whole, with funding needed to operate and maintain their business and to pay necessary expenses during the pendency of their cross-border restructuring proceedings. Absent approval of the DIP Orders, the entire WB Group may have to curtail or even terminate its business operations to the material detriment of creditors, employees and other parties in interest.

26.     The Debtor was unsuccessful in its attempt to obtain financing (a) as unsecured credit pursuant to section 364(a) or (b) of the Bankruptcy Code, (b) allowable as an

administrative expense under section 503(b)(1) of the Bankruptcy Code or (c) as secured credit pursuant to section 364(c) of the Bankruptcy Code on more favorable terms from other sources. Accordingly, pursuant to the terms set forth in the Postpetition Credit Agreement, the Postpetition Lenders have agreed to provide the entire WB Group with funding needed to sustain the its business operations, including those at the Bear Island Mill. In exchange, the Postpetition Credit Agreement provides the Postpetition Lenders with reasonable protections under the circumstances.

### Applicable Authority for Approval to Use Cash Collateral

27. The Debtor's use of estate property is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

28. A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code. See 11 U.S.C. § 1107(a).

29. Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtors to use cash collateral as long as the applicable secured creditors are adequately protected. In re Mellor, 734 F.2d 1396, 1400 (9th Cir. 1984); see also In re McCormick, 354 B.R. 246, 251 (Bankr. C.D. Ill. 2006) (to use the cash collateral of a secured creditor, the debtor

must have the consent of the secured creditor or must establish to the Court that the secured creditor's interest in the cash collateral is adequately protected). Section 363(c)(2) of the Bankruptcy Code establishes a special requirement with respect to "cash collateral," by providing that a debtor may not use, sell or lease "cash collateral" under subsection (c)(1) unless: each entity that has an interest in such collateral consents; or the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section. "Cash Collateral" is defined as, "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).

30.     The Prepetition Debt Agents and Prepetition Debt Lenders (each as defined in the Interim DIP Order) have consented to the Debtor's use of Cash Collateral subject to the entry of, and terms and conditions in, the Interim DIP Order.

**Applicable Authority for Approval of Adequate
Protection for Prepetition Lenders**

31.     Appropriate adequate protection is decided on a case-by-case basis. See e.g., In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Beker Indus. Corp., 58 B.R. 725 (Bankr. S.D.N.Y. 1986); see also In re JKJ Chevrolet, Inc., 190 B.R. 542, 545 (Bankr. E.D. Va. 1995) (adequate protection is a flexible concept that is determined by considering the facts of each case) (citing In re O'Connor, 808 F.2d 1393, 1396-97 (10th Cir.1987). Although adequate protection is not defined in the Bankruptcy Code, section 361 of the Bankruptcy Code provides the following three nonexclusive examples of what may constitute adequate protection:

> (1) requiring the [debtor] to make a cash payment or periodic cash payments to such entity, to the extent that the . . . use . . . under section 363 . . . results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such . . . use . . . results in a decrease in the value of such entity's interest in such property; or
>
> (3) granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361. Essentially, with the provision of adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See In re Hubbard Power & Light, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. at 736; see also In re Nice, 355 B.R. 554, 563 (Bankr. N.D. Va. 2006) ("adequate protection is solely a function of preserving the value of the creditor's secured claim as of the petition date due to a debtor's continued use of collateral").

32. Section 363(e) provides that upon request of an entity that has an interest in property to be used by a debtor, the court shall prohibit or condition such use as necessary to provide adequate protection of such interest. Further, as previously noted, under section 364(d), a debtor may obtain credit secured by a senior or equal lien only if an existing secured creditor's interest in the collateral is adequately protected.

33. As adequate protection for, and to the extent of, any diminution in value of the Prepetition Debt Lenders' interests in the Prepetition Debt Collateral resulting from the priming of their liens upon and security interests in the Prepetition Debt Collateral by the liens and security interests granted to the Postpetition Lenders to secure the Obligations, the use of their

Cash Collateral, the use, sale, lease, depreciation or other diminution in value of the Existing Collateral and the imposition of the automatic stay, but subject in all cases to the Carve-Out, the Debtors propose that (a) the First Lien Term Lenders receive super-priority administrative expense claims subordinate to those of the Postpetition Lenders, liens on and security interests in all Postpetition Collateral junior to the liens granted to the Postpetition Lenders, payment of all other fees, costs and charges (including for lawyers, financial advisors and other advisors) incurred by the agent under the First Lien Term Loan Agreement; (b) the Second Lien Term Lenders receive liens on and security interests in all Postpetition Collateral junior to the liens granted to the Postpetition Lenders and the First Lien Term Lenders; and (c) GE, as lender under the Revolving ABL Agreement, will receive super-priority administrative expense claims that are *pari passu* with the adequate protection claims of the First Lien Term Lenders and current payment in cash of any accrued interest and postpetition interest on the outstanding obligations under the Revolving ABL Agreement at the applicable non-default rate provided for therein until the WB Group's obligations to GE are paid in full with the proceeds from the Interim DIP Order.

### Applicable Authority for Approval of Proposed Postpetition Facility

**A. Incurrence of Secured Super-Priority Debt Under Section 364(c) and (d)**

34. The WB Group's reorganization efforts, including those of the Debtor, hinge upon being able to access postpetition financing and use cash collateral. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business and (c) obtaining credit with specialized priority or on a secured basis. As discussed below, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain

credit or incur debt that is entitled to super-priority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property. See 11 U.S.C. § 364(c)(1), (2) and (3); see also In re Garland Corp., 6 B.R. 456, 461 (1st Cir. B.A.P. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); In re Ames Dept. Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a), (b)); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under section 364(c) must prove that it cannot obtain unsecured credit pursuant to section 364(b)); see also In re The Rowe Cos., Case No. 06-11142 (KRH) (Bankr. E.D. Va. Oct. 16, 2006) (authorizing credit on a super-priority basis); In re US Airways, Inc., Case No. 04-13819 (SSM) (Bankr. E.D. Va. Feb. 28, 2005) (same); In re NTELOS Inc., Case No. 03-32094 (DOT) (Bankr. E.D. Va. Mar. 24, 2003) (same); In re AMF Bowling Worldwide, Inc., Case No. 01-61119 (DHA) (Bankr. E.D. Va. Aug. 8, 2001) (same).

35.    The Debtor's efforts to obtain necessary postpetition financing from other sophisticated lenders satisfy the statutory requirements of section 364(c). See, e.g., Ames, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); see also In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"). Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to

conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

36.     Further, as noted above, the Second Lien Term Lenders have agreed not to oppose any postpetition financing or cash collateral agreement that would prime the Second Lien Term Lenders' liens on the Term Loan Collateral so long as approved by the First Lien Term Lenders, subject to the terms of the Intercreditor Agreement. The Debtor submits that such terms and conditions are satisfied, and the Second Lien Term Lenders are deemed to consent thereto.

37.     However, pursuant to section 364(d), a court may authorize postpetition credit secured by a senior or equal lien on encumbered property (i.e., a "priming" lien) without consent from affected secured parties if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. See 11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if —
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

## B.     The Debtors Do Not Have a More Favorable Alternative to the Postpetition Facility

38.     Prior to the Petition Date, the WB Group, including the Debtor, with the assistance of its financial advisor and investment banker, Lazard Freres & Co. LLC ("Lazard"),

assessed its financing needs. As discussed more fully in the Goldstein Declaration, no other more favorable financing alternative to the Postpetition Facility was available. The Debtor, with the assistance of Lazard, considered each of the financing proposals and after evaluating the terms and costs associated with the DIP Agents' proposal as compared to other similar facilities provided to debtors in the manufacturing industry, determined that the proposal of the Postpetition Lenders provided the most advantageous and flexible terms to the Debtor's estate. Among other benefits, since the Postpetition Lenders are a subset of the First Lien Term Lenders, obtaining financing through the Postpetition Lenders allows the Debtor to avoid the cost and risks to business operations associated with attempting to prime the Existing First Lien Indebtedness over the First Lien Term Lenders' potential objection.[9]

39.     Additionally, the WB Group was unable to obtain more favorable postpetition financing in the form of unsecured credit, an administrative expense or credit secured by junior liens on the Debtor's assets. Nonetheless, a debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by section 364(c) or 364(d). In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) ("the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); Ames, 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached several lending institutions).

---

[9] As described in the Goldstein Declaration, the Postpetition Facility does not pose the same risks of sparking contested priming disputes with the Second Lien Term Lenders because, based on the terms of the Intercreditor Agreement, the Second Lien Term Lenders should be deemed to consent to the Postpetition Facility and the priming liens created pursuant thereto.

**C.    The Postpetition Facility Is Necessary to Preserve Assets of the WB Group and the Debtor's Estate**

40.    It is vital that the WB Group is successful in immediately instilling confidence in its employees, vendors and customers by displaying its ability to seamlessly transition into cross-border chapter 11 and CCAA proceedings, operate normally in this environment and, ultimately, reorganize in a successful and expedient manner.  The Postpetition Facility will provide the working capital necessary to allow the WB Group, including the Debtor, to continue operating its businesses in the ordinary course and navigate this cross-border restructuring process with the ultimate goal of maintaining and maximizing value for the benefit of all parties in interest.

41.    Indeed, the ultimate success of the WB Group's cross-border restructuring efforts and the stabilization of the Debtor's operations at the outset of this chapter 11 case is largely dependent upon the confidence of the WB Group's employees, vendors and customers, which, in turn, depends upon the WB Group's ability to minimize the disruption of the commencement of parallel chapter 11 and CCAA proceedings.  All major constituencies understand that the WB Group is suffering severe liquidity constraints and cannot continue to operate without additional financing.  If the relief sought in this Motion is delayed or denied, confidence may be shattered.

42.    The WB Group's inability to access financing and thereby generate revenues to support adequately their business at this critical juncture would severely jeopardize the reorganization efforts.  Approval and implementation of the Postpetition Financing, however, will enable continued functioning of the WB Group's operations on a daily basis and preserve the going concern value of the Debtor's estate for the benefit of all parties.

**D.     The Terms of the DIP Financing Are Fair, Reasonable and Appropriate**

43.     The terms and conditions of the DIP Financing are fair and reasonable and were negotiated by the parties in good faith and at arm's-length.  In the reasonable exercise of the Debtor's business judgment, the DIP Financing is the best financing option available under the present circumstances.  Further, with the inclusion of the Carve-Out, the DIP Financing does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  See Ames, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").

44.     Generally, the proposed DIP Financing subjects the security interests and administrative expense claims of the Postpetition Lenders and the prepetition lenders to the Carve-Out, as described above.  In Ames, the court found such "carve-outs" for professional fees to be not only reasonable but necessary to ensure that official committees and debtors' estates can retain assistance from counsel.  See Id. at 41.

45.     Likewise, the various fees and charges required under the Postpetition Facility are reasonable and appropriate under the circumstances.  Courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364.  See, e.g., In re Delphi Corp., No. 05-44481 (Bankr. S.D.N.Y. Jan. 5, 2007); In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving financing facility pursuant to section 364 that included a lender "enhancement fee").

46.     Moreover, pursuant to the terms of the Postpetition Credit Agreement, the WB Group seeks authority to repay the outstanding Revolving ABL indebtedness with the proceeds of the Postpetition Facility upon entry of the Interim DIP Order.  The Postpetition Credit Agreement contemplates making the repayment of the Revolving ABL indebtedness subject to the right of the Court to unwind the repayment in the event that there is a timely and successful challenge to the validity, enforceability, extent, perfection or priority of the First Lien Term Lenders' claims or liens, or a determination that the Revolving ABL indebtedness is undersecured as of the Petition Date.

47.     Courts in this district and elsewhere have approved debtor in possession financing facilities that were used, in part, to repay prepetition secured credit obligations.  See, e.g., In re Movie Gallery, Inc., No. 07-33849 (DOT) (Bankr. E.D. Va. Oct. 16, 2007); In re Twinlab Corp., Case No. 03-15564 (Bankr. S.D.N.Y. Sept. 4, 2003) (interim order authorizing debtors to pay the prepetition lenders on account of prepetition obligations).

**E.      Application of the Business Judgment Standard**

48.     After appropriate investigation and analysis, the WB Group, including the Debtor, has collectively concluded that the Postpetition Facility presents the best alternative available under the circumstances.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision fails the arbitrary and capricious standard.  See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility and asset-based facility "reflect[ed] sound and prudent business judgment . . . [was] reasonable under the circumstances and in the best interests of [the debtor] and its creditors"); cf. Group of Inst.

Investors v. Chicago, Mil., St. P. & Pac. Ry., 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Indeed, "[m]ore exacting scrutiny [of a debtor's business decisions] would slow the administration of the debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

49.     The Debtor has exercised sound business judgment in determining the appropriateness of the Postpetition Facility and has satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the Postpetition Credit Agreement. The Debtor believes that the Postpetition Credit Agreement contains terms that are fair, reasonable and in the best interests of the Debtor, its estate, and the WB Group as a whole. Accordingly, pursuant to section 364(c) and (d) of the Bankruptcy Code, the Debtor respectfully submits that it should be granted authority to enter into the Postpetition Credit Agreement and obtain funds from the Postpetition Lenders on the secured and administrative "super-priority" basis described herein.

## Support for Modification of Automatic Stay

50.     As set forth more fully in the proposed DIP Orders, the proposed financing under the Postpetition Credit Agreement contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code to permit the Postpetition Lenders, in their sole discretion, to: (a) file financing statements, deeds of trust, mortgages or other similar documents to evidence the Postpetition Lenders' liens and security interests; (b) give the Debtor any notice

provided for in the Postpetition Credit Agreement; (c) execute upon their security interests or exercise other remedies under the Postpetition Credit Documents upon the occurrence of an Event of Default, after giving five (5) business days' notice in writing, served by hand or telefax upon the Debtor's counsel and other parties; and (d) take such other actions required or permitted by the Postpetition Credit Documents. Stay modification provisions of this sort are ordinary and usual features of postpetition debtor in possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances. The Court accordingly should modify the automatic stay to the extent contemplated by the Postpetition Credit Agreement and the proposed DIP Orders.

### Interim Approval Should Be Granted

51.     The Debtor respectfully requests that the Court conduct an expedited preliminary hearing on this Motion and authorize the Debtor (from and after the entry of the Interim DIP Order and pending the final hearing) to obtain credit under the Postpetition Credit Agreement in the amount of not more than $104 million, which the Debtor shall be permitted to use for, among other things, payment of the Revolving ABL indebtedness, working capital purposes and the payment of certain obligations in accordance with the relief authorized by the Court. Interim access to the Postpetition Facility will ensure that the Debtor and the WB Group maintain ongoing operations and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest pending the final hearing.

52.     Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion.

> If the motion so requests, the court may conduct a hearing before
> such 15 day period expires, but the court may authorize the
> obtaining of credit only to the extent necessary to avoid immediate
> and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

53.     After the final hearing, Bankruptcy Rule 4001(c) does not limit the request solely

to those amounts necessary to prevent immediate and irreparable harm to the estates, and the

debtor can borrow those amounts it views as prudent to the operation of its business.  See, e.g.,

Ames, 115 B.R. at 36.  The Debtor submits that, for the reasons set forth herein, immediate

access to the DIP financing and the use of Cash Collateral (first, on an interim basis as requested

in this Motion) is necessary to preserve the value of the WB Group and the Debtor's estate for

the benefit of all parties in interest.

## Request for Final Hearing

54.     Pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2), the Debtor requests that

the Court set a date for the final hearing that is as soon as practicable, but in no event later than

30 days following the entry of the Interim DIP Order, and fix the time and date prior to the final

hearing for parties to file objections to this Motion.

## Request for Waiver of Stay

55.     The Debtor further seeks a waiver of any stay of the effectiveness of the DIP

Orders that may be imposed by any applicable Bankruptcy Rule.   As set forth above, the

financing to be provided under the Postpetition Credit Agreement and the use of Cash Collateral

are essential to prevent potentially irreparable damage to the WB Group's and the Debtor's

operations, value, and ability to reorganize.  Accordingly, ample cause exists to justify a waiver

of any stay imposed by the Bankruptcy Rules, to the extent applicable.

## Waiver of Memorandum of Points and Authority

56.     The Debtor respectfully requests that this Court treat this Motion as a written memorandum of points and authorities or waive any requirement that this Motion be accompanied by a written memorandum of points and authorities as described in Local Bankruptcy Rule 9013-1(G).

## Notice

57.     The Debtor has provided notice of this Motion to:  (a) the Office of the United States Trustee for the Eastern District of Virginia; (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agent under the Debtor's proposed postpetition financing agreement; (d) counsel to the agent under the First Lien Term Loan Agreement; (e) counsel to the agent under the Second Lien Term Loan Agreement; (f) counsel to the agent under the Revolving ABL Agreement; (g) counsel to counterparties under the Swap Agreements; (h) the monitor appointed in the CCAA Cases; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the Virginia Secretary of State; and (l) the Virginia Secretary of Treasury.  In light of the nature of the relief requested, the Debtor respectfully submits that no further notice is necessary.

## No Prior Request

58.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and in the Sherrick Declaration and the Goldstein Declaration, the Debtor respectfully requests that the Court enter an interim order, substantially in the form attached hereto as <u>Exhibit A</u>, and a final order (a) authorizing the Debtor to obtain secured postpetition financing on a super-priority administrative claim and first priority priming lien basis, granting adequate protection to prepetition secured lenders for the priming of their liens on prepetition collateral, and modifying the automatic stay, (b) authorizing the Debtor to use the Cash Collateral of prepetition secured lenders and granting adequate protection to prepetition secured lenders for the use of their Cash Collateral, (c) authorizing the Debtor to repay the Revolving ABL indebtedness upon entry of the Interim DIP Order, (d) prescribing the form and manner of notice and setting the time for the final hearing on the Motion and (e) granting such other and further relief as is just and proper.

Dated: February 24, 2010
      Richmond, Virginia

BEAR ISLAND PAPER COMPANY, L.L.C.

By: /s/ *Jonathan L. Hauser*
                 Of Counsel


Jonathan L. Hauser, Esquire
VSB No. 18688
Troutman Sanders LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, VA 23462
Telephone:    (757) 687-7768
Facsimile:    (757) 687-1505

    - and -

Richard M. Cieri (pro hac vice pending)
Christopher J. Marcus (*pro hac vice* pending)
Michael A. Cohen (*pro hac vice* pending)
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Attorneys for the Debtor and
Debtor in Possession*

**Exhibit A**

**Interim DIP Order**

## Exhibit B

**Postpetition Credit Agreement**