$140,000,000

**SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT**

**among**

**WHITE BIRCH PAPER HOLDING COMPANY,**

**as Guarantor**

**WHITE BIRCH PAPER COMPANY,**

**STADACONA L.P.,**

**F.F. SOUCY L.P.,**

**PAPIER MASSON LTÉE, and**

**BEAR ISLAND PAPER COMPANY, L.L.C.,**

**as Borrowers (and each a Debtor and Debtor in Possession),**

**the Several Lenders
from time to time parties hereto,**

**CREDIT SUISSE AG,**

**as Administrative Agent [and US Collateral Agent],**

**BLACK DIAMOND COMMERCIAL FINANCE, L.L.C.,**

**as Syndication Agent,**

**BLACK DIAMOND COMMERCIAL FINANCE, L.L.C. and CREDIT SUISSE AG,**

**as Lead Arrangers,**

**[CREDIT SUISSE, TORONTO BRANCH], as Canadian Collateral Agent,**

**Dated as of February [__], 2010**

# TABLE OF CONTENTS

Page

SECTION 1. DEFINITIONS ................................................................................................. 2
    1.1    Defined Terms ................................................................................................. 2
    1.2    Other Definitional Provisions ...................................................................... 30

SECTION 2. AMOUNT AND TERMS OF COMMITMENTS ........................................ 31
    2.1    Loan Commitments ...................................................................................... 31
    2.2    Procedure for Making Loans ....................................................................... 32
    2.3    Repayment of Loans; Evidence of Debt ..................................................... 32
    2.4    Fees, etc. ....................................................................................................... 33
    2.5    Optional Prepayments ................................................................................. 34
    2.6    Mandatory Prepayments. ............................................................................. 34
    2.7    Continuation of Eurodollar Loans. .............................................................. 35
    2.8    Minimum Amounts and Maximum Number of Eurodollar Tranches ................. 36
    2.9    Interest Rates and Payment Dates ............................................................... 36
    2.10    Computation of Interest and Fees ............................................................... 38
    2.11    Inability to Determine Interest Rate ........................................................... 38
    2.12    Pro Rata Treatment and Payments .............................................................. 39
    2.13    Requirements of Law ................................................................................... 40
    2.14    Taxes ............................................................................................................ 41
    2.15    Indemnity ..................................................................................................... 44
    2.16    Illegality ....................................................................................................... 45
    2.17    Change of Lending Office ............................................................................ 45
    2.18    Super Priority Nature of Obligations and Liens .......................................... 45
    2.19    Payment of Obligations ................................................................................ 46
    2.20    No Discharge; Survival of Claims ............................................................... 46
    2.21    Release ......................................................................................................... 46
    2.22    Waiver of any Priming Rights ..................................................................... 47
    2.23    Soucy 2 ......................................................................................................... 47
    2.24    Joint and Several Liability of Borrowers ..................................................... 48

SECTION 3. REPRESENTATIONS AND WARRANTIES ............................................ 50
    3.1    Financial Condition ..................................................................................... 50
    3.2    No Change .................................................................................................... 51
    3.3    Corporate Existence; Compliance with Law ............................................... 51
    3.4    Corporate Power; Authorization; Enforceable Obligations ........................ 51
    3.5    Compliance with Law and Contracts .......................................................... 52
    3.6    No Material Litigation ................................................................................. 52
    3.7    No Default .................................................................................................... 52
    3.8    Ownership of Property; Liens ...................................................................... 52
    3.9    Intellectual Property .................................................................................... 53
    3.10    Taxes ............................................................................................................ 53
    3.11    Operation of Core Business; Federal Regulations ...................................... 53
    3.12    Labor Matters .............................................................................................. 53

NY\1620408.3

3.13   Pensions and Benefit Plans ............................................................... 54
3.14   Investment Company Act; Other Laws................................................ 55
3.15   Subsidiaries ...................................................................................... 55
3.16   Environmental Matters....................................................................... 55
3.17   Accuracy of Information, etc.............................................................. 56
3.18   Security Documents ........................................................................... 57
3.19   Approved Budget ............................................................................... 57
3.20   Reorganization Matters...................................................................... 58
3.21   Insurance ........................................................................................... 58
3.22   Real Estate......................................................................................... 58
3.23   Valid Liens ......................................................................................... 58
3.24   Survival of Representations and Warranties ...................................... 59

SECTION 4. CONDITIONS PRECEDENT................................................................ 59
4.1    Conditions to Effectiveness................................................................ 59
4.2    Additional Conditions to Credit Events ............................................. 63
4.3    Conditions to all Extensions of Credit .............................................. 64

SECTION 5. AFFIRMATIVE COVENANTS ............................................................. 64
5.1    Financial Statements.......................................................................... 64
5.2    Certificates; Other Information ......................................................... 65
5.3    Payment of Obligations...................................................................... 67
5.4    Maintenance of Existence; Permits; Compliance with Law; Contracts and
       Other Obligations .............................................................................. 67
5.5    Maintenance of Property.................................................................... 67
5.6    Inspection; Discussions...................................................................... 68
5.7    Notices ............................................................................................... 68
5.8    Environmental Laws .......................................................................... 69
5.9    Collateral, Etc. .................................................................................. 70
5.10   Use of Proceeds ................................................................................. 73
5.11   Pension and Benefits Plans ............................................................... 75
5.12   Landlords' Agreements, Mortgagee Agreements, Bailee Letters, Real
       Estate Purchases ................................................................................ 76
5.13   Ratings............................................................................................... 76
5.14   Further Assurances. ........................................................................... 76
5.15   Insurance ........................................................................................... 77
5.16   [Post-Closing Deliverables................................................................ 78
5.17   Litigation ........................................................................................... 78
5.18   Taxes .................................................................................................. 78
5.19   Plan of Reorganization and Sale Milestones..................................... 78
5.20   Approved Budget................................................................................ 81
5.21   Cash Management System .................................................................. 82
5.22   Payment of Other Costs and Expenses .............................................. 82

SECTION 6. NEGATIVE COVENANTS.................................................................... 82
6.1    Financial Covenants........................................................................... 82
6.2    Limitation on Indebtedness ............................................................... 83

iii

6.3     Limitation on Liens..................................................................................85
6.4     Limitation on Fundamental Changes..........................................................88
6.5     Limitation on Disposition of Property.........................................................88
6.6     Limitation on Restricted Payments.............................................................89
6.7     Limitation on Capital Expenditures.............................................................90
6.8     Limitation on Investments..........................................................................91
6.9     Limitation on Optional Payments and Modifications of Debt Instruments
        and Other Agreements...............................................................................92
6.10    Limitation on Transactions with Affiliates ..................................................93
6.11    Limitation on Sales and Leasebacks..........................................................93
6.12    Limitation on Changes in Financial Periods ..............................................94
6.13    Limitation on Negative Pledge Clauses......................................................94
6.14    Limitation on Restrictions on Subsidiary Distributions...............................94
6.15    Limitation on Lines of Business; Ownership...............................................94
6.16    Limitation on Hedge Agreements...............................................................95
6.17    Repayment of Indebtedness ......................................................................95
6.18    No Returns; Setoffs....................................................................................95
6.19    Critical Vendor and Other Payments .........................................................95
6.20    Soucy Intercompany Note..........................................................................96
6.21    Excluded Non US Subsidiaries ..................................................................96
6.22    Management Agreement .............................................................................96

SECTION 7. EVENTS OF DEFAULT ......................................................................96

SECTION 8. THE AGENTS; THE ARRANGERS ...................................................102
8.1     Appointment.............................................................................................102
8.2     Delegation of Duties.................................................................................103
8.3     Exculpatory Provisions.............................................................................104
8.4     Reliance by Agents...................................................................................104
8.5     Notice of Default.......................................................................................104
8.6     Non-Reliance on the Lead Arrangers, the Agents and Other Lenders ...............105
8.7     Indemnification..........................................................................................105
8.8     Lead Arrangers and Agents in their Individual Capacities .................................106
8.9     Successor Agents......................................................................................106
8.10    Authorization to Release Liens and Guarantees........................................107
8.11    The Lead Arrangers and the Syndication Agent .........................................107
8.12    Withholding Tax.........................................................................................107

SECTION 9. MISCELLANEOUS ............................................................................108
9.1     Amendments and Waivers ........................................................................108
9.2     Notices ......................................................................................................109
9.3     No Waiver; Cumulative Remedies .............................................................112
9.4     Payment of Expenses................................................................................112
9.5     Successors and Assigns; Participations and Assignments ..........................113
9.6     Replacements of Lenders under Certain Circumstances ...............................116
9.7     Adjustments; Set-off..................................................................................117
9.8     Counterparts .............................................................................................117

9.9      Severability.................................................................................................. 118
9.10    Integration .................................................................................................. 118
9.11    GOVERNING LAW.................................................................................... 118
9.12    Submission to Jurisdiction; Waivers......................................................... 119
9.13    Acknowledgments ...................................................................................... 119
9.14    Confidentiality ........................................................................................... 120
9.15    Release of Collateral and Guarantee Obligations...................................... 120
9.16    Accounting Changes ................................................................................. 121
9.17    Delivery of Lender Addenda ..................................................................... 122
9.18    WAIVERS OF JURY TRIAL .................................................................... 122
9.19    Judgment Currency.................................................................................... 122
9.20    Limitation on Liability .............................................................................. 122
9.21    Parties Including Trustees; Bankruptcy Court Proceedings........................ 123
9.22    Prepetition Senior Loan Documents. ........................................................ 123

SCHEDULES:

1.1(a)    First Day Orders
1.1(b)    Initial Approved Budget
1.1(c)    Material Agreements
2.1        Interim Date Commitment/Delayed Draw Commitment
3.6        Material Litigation Events
3.10      Taxes
3.15(a)  Subsidiaries
3.17      Environmental Matters
3.19      Filing Jurisdictions under Personal Property Security Legislation
3.22      Owned and Leased Property, Mortgaged Property
4.1(k)    Environmental Assessments
5.16      Designated Agreements
6.2(d)    Existing Indebtedness
6.3(f)     Existing Liens
6.8        Existing Investments

EXHIBITS:

A        Form of Security Documents
B        Form of Compliance Certificate
C        Form of Closing Certificate
D        Form of Interim Order
E        Form of Assignment and Acceptance
F-1      Form of Legal Opinion of Kirkland & Ellis LLP
F-2      Form of Legal Opinion of [Stikeman Elliott LLP]
F-3      Form of Legal Opinion of [Troutman Sanders LLP]
F-4      Form of Legal Opinion of [Stewart McKelvey]
G        Form of Note
H        Form of Exemption Certificate
I         Form of Lender Addendum

NY\1620408.3

J          Form of Borrowing Notice
K          Form of Intercompany Note
L          Form of Soucy Intercompany Note
M          Form of Joinder Agreement

NY\1620408.3

This SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
TERM LOAN CREDIT AGREEMENT, dated as of February [__], 2010, among WHITE
BIRCH PAPER HOLDING COMPANY, an unlimited liability company organized under the
laws of Nova Scotia, WHITE BIRCH PAPER COMPANY, an unlimited liability company
organized under the laws of Nova Scotia ("White Birch" or the "Company"), STADACONA
L.P., a limited partnership organized under the laws of Quebec ("Stadacona"), F.F. SOUCY L.P.,
a limited partnership organized under the laws of Quebec ("Soucy 2"), PAPIER MASSON
LTÉE, a corporation organized under the laws of Canada ("Papier Masson" and together with
White Birch, Stadacona and Soucy 2, the "Canadian Borrowers") and BEAR ISLAND PAPER
COMPANY, L.L.C., a limited liability company organized under the laws of Virginia (the "U.S.
Borrower" or "Bear Island" and together with the Canadian Borrowers, collectively as the
"Borrowers"), each a debtor-in-possession, the LENDERS from time to time party to this
Agreement (the "Lenders" or "DIP Lenders"), CREDIT SUISSE AG and BLACK DIAMOND
COMMERCIAL FINANCE, L.L.C., as joint lead arrangers (in such capacity, the "Lead
Arrangers"), BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., as syndication agent (in
such capacity and together with its successors, the "Syndication Agent"), [CREDIT SUISSE
AG] as administrative agent (in such capacity and together with its successors, the
"Administrative Agent"), CREDIT SUISSE AG, as US collateral agent (in such capacity and
together with its successors, the "US Collateral Agent") and CREDIT SUISSE, TORONTO
BRANCH, as Canadian collateral agent (in such capacity and together with its successors, the
"Canadian Collateral Agent", and together with the US Collateral Agent, the "Collateral
Agents").

W I T N E S S E T H:

WHEREAS, on February [24], 2010 (the "CCAA Filing Date") the Canadian
Borrowers filed an application with the Quebec Superior Court, Commercial Division for the
District of Montreal (the "Canadian Court") for relief and commenced proceedings (each a
"CCAA Case" and collectively, the "CCAA Cases") under the *Companies' Creditors
Arrangement Act* (Canada), as amended (the "CCAA") and have continued in possession of their
assets and in the management of their business pursuant to the CCAA and the CCAA Initial
Order (as defined herein);

WHEREAS, on February [24], 2010 (the "Petition Date"), the U.S. Borrower
commenced Chapter 11 Case No. 10-[_____] (the "Chapter 11 Case") and [the Company,
Papier Masson, Stadcona General Partner, Inc., Stadacona LP, Soucy 2 and Soucy1] commenced
Chapter 15 Case Nos. 10-[_____] through 10-[_____], as jointly administered at
Chapter 15 Case No. 10-[_____] (each a "Chapter 15 Case" and collectively, the "Chapter 15
Cases" and together with the Chapter 11 Case, the "US Cases") by filing a voluntary petition
for reorganization under the applicable chapter of 11 U.S.C. 101 et seq. (the "Bankruptcy Code"),
with the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division
(the "Bankruptcy Court").  The U.S. Borrower continues to operate its business and manage its
properties as a debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the
Bankruptcy Code.

WHEREAS, the Borrowers have requested that Lenders provide a senior secured,
super-priority delayed draw term loan facility to the Borrowers of up to one hundred forty

million Dollars ($140,000,000) in the aggregate to fund the working capital requirements of the Borrowers and other Loan Parties during the pendency of the US Cases and the CCAA Cases and to repay in full all "Obligations" under, and as defined in, the Prepetition Revolving Credit Agreement (hereinafter referred to as the "Prepetition Revolving Obligations");

WHEREAS, the Lenders are willing to make certain Postpetition loans and other Extensions of Credit to the Borrowers of up to such amount upon the terms and conditions set forth herein;

WHEREAS, the Borrowers and other Loan Parties have agreed to secure all of their Obligations under the Loan Documents by granting to the applicable Collateral Agent, for the benefit of Administrative Agent, each other Agent and Lenders, a security interest in, hypothec and lien upon substantially all of their existing and after-acquired personal and real property;

WHEREAS, the Borrowers' and other Loan Parties' business is a mutual and collective enterprise and the Borrowers and other Loan Parties believe that the consolidation of all loans and other Extensions of Credit under this Agreement will enhance the aggregate borrowing powers of the Borrowers and other Loan Parties and facilitate the administration of the US Cases and the CCAA Cases and their loan relationship with the Administrative Agent and the Lenders, all to the mutual advantage of the Borrowers and other Loan Parties and their respective Subsidiaries;

WHEREAS, each Borrower and other Loan Parties acknowledges that it will receive substantial direct and indirect benefit by reason of the making of loans and other financial accommodations to the Borrowers as provided in this Agreement; and

WHEREAS, the Lenders' willingness to make loans and other extensions of credit to the Borrowers, and the Administrative Agent's and Collateral Agent's willingness to administer each Borrower's and each other Loan Party's collateral security therefor, on a combined basis as more fully set forth in this Agreement, is done solely as an accommodation to the Borrowers and at the Borrowers' and other Loan Parties' request and in furtherance of the Borrowers' and other Loan Parties' mutual and collective enterprise.

NOW, THEREFORE, in consideration of the premises and the agreements herein set forth, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## SECTION 1.  DEFINITIONS

1.1    Defined Terms.  As used in this Agreement, including the recitals hereto, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"3120772": 3120772 Nova Scotia Company, an unlimited liability company organized under the laws of Nova Scotia.

"Accounting Change":  as defined in Section 9.16.

NY\1620408.3

"Accounts": any "account" (as that term is defined in the UCC now or hereafter in effect).

"Administration Charge": the charge provided for in the CCAA Initial Order, which charge shall exceed $2,800,000 in the aggregate, to secure the Administration Charge Expenses.

"Administration Charge Expenses": (a) all fees and expenses of the Monitor required to be paid to the Monitor, including the fees and expenses of the Monitor's legal counsel and (b) all fees and expenses of counsel to the Canadian Loan Parties and such advisors retained by the Canadian Loan Parties, in each case subject to and in accordance with the CCAA Initial Order and this Agreement.

"Administrative Agent":  as defined in the preamble hereto.

"Affiliate":  with respect to any Person, (a) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified or (b) any Person with (x) the same general partner, manager or investment manager as such Person or (y) a general partner, manager or investment manager affiliated with such general partner, manager or investment manager of such Person.  "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have correlative meanings.

"Agents":  the collective reference to the Syndication Agent, the Administrative Agent, the Canadian Collateral Agent and the US Collateral Agent.

"Aggregate Reserve Amount": the aggregate of (i) the Carve-Out, (ii) the Administration Charge, (iii) the Canadian Priority Reserve and (iv) the Directors' Charge.

"Agreement":  this Senior Secured, Super-Priority Debtor-In-Possession Term Loan Credit Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Applicable Margin": (a) with respect to Base Rate Loans, 9.00% and (b) with respect to Eurodollar Loans, 10.00%.

"Applicable Order": the Interim Order (until such time as the Final Order shall have been entered and, thereafter, the Final Order) and the CCAA Initial Order, as the case may be.

"Approved Budget": the aggregate, without duplication, of all items that are set forth in the Initial Approved Budget as such budget may be amended, modified, replaced or supplemented from time to time by any Supplemental Approved Budget.

"Arrimage":  Arrimage de Gros Cacouna Inc., a Canadian federal corporation.

"Asset Sale":  any Disposition of Property or series of related Dispositions of Property (excluding any such Disposition permitted by clause (a), (b), (f), (h), [(i)], (j), (k), (l) or

3

(n) of Section 6.5) which yields Net Cash Proceeds to any Company Group Member (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at Fair Market Value in the case of other non-cash proceeds) in excess of $250,000.

"Assignee":  as defined in Section 9.5(c).

"Assignment and Acceptance":  as defined in Section 9.5(c).

"Assignor":  as defined in Section 9.5(c).

"Avoidance Actions" as defined in Section 5.9(a)(i).

"Bankruptcy Code": as defined in the recitals hereto.

"Bankruptcy Court": as defined in the recitals hereto.

"Bankruptcy Rules": the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the US Cases.

"Base Rate":  for any day, a rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) 3.00%.  For purposes hereof:  "Prime Rate" shall mean the rate of interest determined from time to time by the Administrative Agent as being its reference rate then in effect for determining interest rates on Dollar denominated commercial loans made by it in the United States.  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually available.  Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate, or the Federal Funds Effective Rate, respectively.

"Base Rate Loans":  Loans for which the applicable rate of interest is based upon the Base Rate.

"Bear Island":  as defined in the preamble hereto.

"Benefited Lender":  as defined in Section 9.7(a).

"BIA":  the *Bankruptcy and Insolvency Act* (Canada) as such legislation now exists or may from time to time hereafter be amended, modified, recodified, supplemented or replaced, together with all rules, regulations and interpretations thereunder or related thereto.

"Black Spruce":  Black Spruce Paper Inc., a Nova Scotia limited liability company.

"Board":  the Board of Governors of the Federal Reserve System of the United States of America (or any successor).

"Board of Directors": with respect to any Person, (i) in the case of any corporation, the board of directors of such Person, (ii) in the case of any limited liability company, the board of managers of such Person, (iii) in the case of any partnership, the board of directors of the general partner of such Person and (iv) in any other case, the functional equivalent of the foregoing.

"Borrower": as defined in the preamble hereto.

"Borrowing Base Availability": as of any date, an amount equal to the sum of:

(a)    the book value of all Accounts owned by the Borrowers and the Guarantors as of such date, multiplied by the advance rate of 60%; *plus*

(b)    (x) the difference of (i) the book value of all Inventory owned by the Borrowers and the Guarantors as of such date, minus (ii) all Stores owned by the Borrowers and the Guarantors as of such date multiplied by (y) the advance rate of 40%; *plus*

(c)    $75,000,000.

"Borrowing Date": any Business Day specified by a Borrower as a date on which such Borrower requests the Lenders to make Loans to such Borrower hereunder.

"Borrowing Notice": with respect to any request for the borrowing of Loans hereunder, a notice from a Borrower, substantially in the form of, and containing the information prescribed by, Exhibit J, delivered to the Administrative Agent.

"British Bankers' Association Interest Settlement Rate": the rate on the display designated as the LIBOR01 page on the Reuters Screen (or such other page as may replace such page on such service for the purpose of displaying the rates at which the relevant Dollar deposits are offered by leading banks in the London interbank deposit market).

"Business Day": (a) for all purposes other than as covered by clause (b) below, a day other than a Saturday, Sunday or other day on which commercial banks in New York City or Toronto, Ontario are authorized or required by law to close and (b) with respect to all notices and determinations in connection with, and payments of principal and interest on Loans, any day that is a Business Day described in clause (a) and which is also a day for trading by and between banks in Dollar deposits in the interbank Eurodollar market.

"Canadian Benefit Plans": all employee benefit plans established, maintained or contributed to by any Company Group Member in Canada, or under which any Company Group Member in Canada has or will have any liability or contingent liability, or pursuant to which payments are made or benefits provided to, or an entitlement to payments or benefits may arise, that are not Canadian Pension Plans, including, without limitation, all profit sharing, savings, supplemental retirement, retiring allowance, severance, retirement compensation, deferred compensation, welfare, bonus, incentive compensation, phantom stock, supplementary unemployment benefit plans or arrangements and all life, health, dental and disability plans and arrangements in which the employees or former employees of any Company Group Member employed in Canada, or individuals working on contract with any Company Group Member in

5

Canada, participate or are eligible to participate, in each case whether written or oral, registered or unregistered, funded or unfunded, insured or self-insured, reported or unreported, but excluding all stock option or stock purchase plans and government sponsored pension, employment insurance, health financing, prescription drugs, prenatal insurance, workers compensation and similar plans.

"Canadian Borrowers": as defined in the preamble hereto.

"Canadian Collateral Agent":  as defined in the preamble hereto.

"Canadian Court": as defined in the recitals hereto.

"Canadian Loan Parties": any Loan Party that is incorporated, organized or formed under the laws of Canada or any province thereof.

"Canadian Multi-Employer Pension Plan": (i) a multi-employer plan within the meaning of the *Income Tax Act* (Canada) to which any Company Group Member contributes or is required to contribute in respect of its Canadian employees, and (ii) any other Canadian pension plan in which a Company Group Member participates but which is not sponsored and administered by the Company Group Member.

"Canadian Pension Plans":  any plan which is considered to be a pension plan for the purposes of any applicable pension benefits standards statute and/or regulation in Canada or any province thereof established, maintained or contributed to by any Company Group Member, their respective employees or former employees, in each case whether written or oral, funded or unfunded, insured or self-insured, reported or unreported and government sponsored pension, employment insurance, health financing, prescription drugs, prenatal insurance, workers compensation and similar plans.

"Canadian Priority Reserve": a reserve of an amount to be determined for payment of amounts specified under Sections 81.3, 81.4, 81.5 and 81.6 of the *Bankruptcy and Insolvency Act* (Canada).

"Canadian Subsidiaries":  Stadacona, Soucy 1 and Soucy 2, Papier Masson, and each other Subsidiary of the Company that is incorporated, organized or formed under the laws of Canada or any province thereof.

"Capital Expenditures":  for any period, with respect to any Person, the aggregate of all expenditures by such Person for the acquisition or leasing (pursuant to a capital lease or Synthetic Lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) to the extent required to be capitalized under GAAP on a balance sheet of such Person, excluding (a) expenditures to the extent they are made with the proceeds of (i) any equity contribution to the Company from a Person other than a Company Group Member or (ii) a capital contribution to Holdings, (b) expenditures that are accounted for as capital expenditures of such Person and that actually are paid for by a third party (excluding the Company or any Subsidiary thereof) due to indemnification, reimbursement or similar obligations and for which neither the Company nor any Subsidiary thereof has provided or is required to provide or incur, directly or indirectly, any consideration or obligation

6

to such third party or any other Person (whether before, during or after such period), (c) the book value of any asset owned by such Person prior to or during such period to the extent that such value is included as a capital expenditure during such period as a result of such Person reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period; <u>provided</u>, that (i) any expenditure necessary in order to permit such asset to be reused shall be included as a Capital Expenditure during the period that such expenditure actually is made and (ii) such book value shall have been included in Capital Expenditures when such asset was originally acquired, (d) the purchase price of equipment purchased during such period to the extent the consideration therefor consists of (i) worn out, obsolete or surplus equipment traded in at the time of such purchase or (ii) the proceeds of a concurrent sale of worn out, obsolete or surplus equipment, in each case, in the ordinary course of business and (e) expenditures funded with the proceeds from any Recovery Event.

"<u>Capital Lease Obligations</u>":  with respect to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP; and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"<u>Capital Stock</u>":  any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"<u>Carve-Out</u>": as defined in the DIP Order.

"<u>Carve-Out Amount</u>": as defined in the DIP Order.

"<u>Carve-Out Expenses</u>": as defined in the DIP Order.

"<u>Carve-Out Trigger Notice</u>": as defined in the DIP Order.

"<u>Cases</u>": collectively, the US Cases and the CCAA Cases.

"<u>Cash Equivalents</u>":  (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States of America or Canada or issued by any agency thereof and backed by the full faith and credit of the United States of America or Canada or any agency, state, province or territory thereof, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits or overnight bank deposits having maturities of 364 days or less from the date of acquisition issued by any Lender or by any commercial bank or trust company organized under the laws of the United States of America or any state thereof or by a bank listed in Schedule I of the Bank Act (Canada) and having combined capital and surplus of not less than $500,000,000; (c) commercial paper, bonds, notes or debentures of an issuer rated at least A-2 by S&P or P-2 by Moody's or R-1 by DBRS or carrying an equivalent rating by a nationally recognized rating agency, if all of the three named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing

within 364 days from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities issued or fully guaranteed or insured by the United States of America or Canada; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, province, commonwealth or territory of the United States of America or Canada, by any political subdivision or taxing authority of any such state, province, commonwealth or territory or by any foreign government, the securities of which state, province, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P, A by Moody's, or A by DBRS; (f) securities with maturities of 364 days or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; and (g) shares of money market mutual or similar funds substantially all of whose assets satisfy the requirements of any of clauses (a) through (f) of this definition.

"Cash Flow Forecasts": collectively, the 13-week Cash Flow Forecasts prepared each week by the Borrowers in form [and with detail substantially similar to the 13-week Cash Flow Forecast delivered to the Administrative Agent on [   ], 20[  ]][and substance reasonably satisfactory to the Lead Arrangers], which shall reflect the Borrowers' good faith projection of all cash receipts and disbursements in connection with the operation of its business in the 13-week period beginning on the date of delivery of such Cash Flow Forecast.

"CCAA": as defined in the recitals hereto.

"CCAA Cases": as defined in the recitals hereto.

"CCAA DIP Charge":  the court ordered hypothecs, security interests, pledges and charges made by the Canadian Court on all of the existing and after-acquired assets, property and undertaking of the Canadian Loan Parties which secures all Obligations of the Canadian Loan Parties and rank in priority to all Liens other than Permitted Liens (save and except for the Directors' Charge which shall remain subordinate to the CCAA DIP Charge).

"CCAA Filing Date": as defined in the recitals hereto.

"CCAA Initial Order": collectively, the initial order of the Canadian Court issued on the CCAA Filing Date, together with all extensions, modifications and amendments thereto, in each case in form and substance satisfactory to the Administrative Agent, the Syndication Agent and the Lead Arrangers in their respective sole discretion, approving this Agreement and providing for the CCAA DIP Charge and also providing that any material amendments to this Agreement require approval of the Canadian Court.

"Chapter 11 Case": as defined in the recitals hereto.

"Chapter 15 Cases":  as defined in the recitals hereto.

"Closing Date":  the date on which the initial funding of the Loans occurs.

"Code":  the Internal Revenue Code of 1986, as amended from time to time.

"Collateral":  collectively, all Property of the Loan Parties, now existing or hereafter acquired, upon which a Lien is purported to be created by this Agreement, any Security Document, any Applicable Order or any other Loan Document.

"Commitment":  each Interim Date Commitment and each Delayed Draw Commitment.

"Committees":  collectively, the official committee of unsecured creditors and any other committee formed, appointed, or approved in the Chapter 11 Case and each of such Committees shall be referred to herein as a Committee.

"Commonly Controlled Entity":  an entity, whether or not incorporated, that is under common control with the Company within the meaning of Section 4001(b)(1) of ERISA or is part of a group that includes the Company and that is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Section 412 of the Code to the extent required by such section, Section 414(m) or 414(o) of the Code.

"Company":  as defined in the preamble hereto.

"Company Group Member":  each of the Company and each of its Subsidiaries other than Immaterial Subsidiaries.

"Compliance Certificate":  a certificate duly executed by a Responsible Officer, substantially in the form of Exhibit B.

"Consolidated EBITDA":  of any Person for any period, Consolidated Net Income of such Person and its Subsidiaries for such period plus, without duplication and to the extent reflected as a charge in the statement of such Consolidated Net Income for such period, the sum of (a) income tax expense, (b) total Consolidated Interest Expense of such Person and its Subsidiaries, amortization or write-off of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness and, without duplication, other noncash consolidated interest expense calculated in accordance with GAAP, (c) depreciation and amortization expense, (d) amortization of intangibles (including, but not limited to, goodwill) and organization costs, (e) any extraordinary or non-recurring expenses or losses (including non-recurring cash or non-cash, costs, fees and expenses related to a financial restructuring or to the Cases (including but not limited to legal, consulting and advisory costs, fees and expenses) in an amount not to exceed the corresponding amount set forth on the Approved Budget), (f) any other non-cash charges and expenses (including any non-cash losses attributable to fluctuations in foreign currency exchange rates) and (g) all fees and expenses, and any prepayment premium or penalties or similar costs, incurred in connection with the incurrence of Indebtedness and issuance of Capital Stock permitted by this Agreement, and minus, without duplication, to the extent included in the statement of such Consolidated Net Income for such period, the sum of (a) interest income, (b) any extraordinary or non-recurring income or gains and (c) any other non-cash income (including any gains attributable to fluctuations in foreign currency exchange rates), all as determined on a consolidated basis; provided, for avoidance of doubt, that any of the foregoing additions and deductions shall only be made in respect of such items of Persons whose net income was included in the determination of Consolidated Net

9

NY\1620408.3

Income and to the extent of such inclusion; provided, further, that, for purposes of calculating Consolidated EBITDA of the Company and its Subsidiaries for any period, the Consolidated EBITDA of any business unit Disposed of by the Company or any of its Subsidiaries during such period shall be excluded for such period (assuming for purposes of the calculation of Consolidated EBITDA the consummation of such Disposition occurred on the first day of such period).

"Consolidated Interest Expense":  of any Person for any period, without duplication, total cash interest expense (including that attributable to Capital Lease Obligations), net of cash interest income, of such Person and its Subsidiaries for such period with respect to all outstanding Indebtedness of such Person and its Subsidiaries (including, without limitation, all commissions, discounts and other fees and charges owed by such Person with respect to letters of credit and bankers' acceptance financing and net costs of such Person under Hedge Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP).

"Consolidated Net Income":  of any Person for any period, the consolidated net income (or loss) of such Person and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP; provided that in calculating Consolidated Net Income of the Company and its Subsidiaries for any period, there shall be excluded (without duplication) (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary of the Company, or is merged into or consolidated with any of the Company or any of its Subsidiaries, (b) the income (or deficit) of any Person (other than a Subsidiary of the Company) in which any of the Company or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by the Company or any of its Subsidiaries in the form of cash dividends or similar distributions, and (c) the undistributed earnings of any Subsidiary (other than a Guaranteeing Subsidiary) of any Person to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted under the terms of any Contractual Obligation (other than any Loan Document) or Requirement of Law applicable to such Subsidiary or such Subsidiary's constitutive or organizational documents.

"Contingent Obligation":  with respect to any Person, all contingent liabilities required to be included or noted in the financial statements of such Person in accordance with GAAP.

"Contractual Obligation":  with respect to any Person, any provision constituting an obligation or liability of such Person under any security issued by such Person or under any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"Control Investment Affiliate":  with respect to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person or the manager, advisor or administrator of such Person primarily for the purpose of making equity or debt investments in one or more companies.  For purposes of this definition, "control" of a Person means the power, directly or

10

indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Core Business":  (a) the paper producing business and any services, activities or businesses incidental, directly related or similar thereto and (b) any line of business engaged in by the Borrowers and their respective Subsidiaries on the Closing Date and any business activity that is a reasonable extension, development or expansion thereof or ancillary thereto (including the use of assets in existence on the Closing Date).

"Covenant Availability": at any time, the lesser of (a) the difference of (i) the undrawn portion of the total Commitments at such time minus (ii) the Aggregate Reserve Amount at such time and (b) the difference of (i) Borrowing Base Availability at such time minus (ii) the sum of ((A) the aggregate principal amount of Loans outstanding under the DIP Facility at such time plus (B) the Aggregate Reserve Amount at such time).

"DBRS":  Dominion Bond Rating Service Limited and any successor entity thereto.

"Default":  any of the events specified in Section 7, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Delayed Draw Commitment": with respect to each Lender, the commitment of such Lender to make Delayed Draw Loans hereunder as set forth on Schedule 2.1, or in the Assignment and Acceptance pursuant to which such Lender assumed its Delayed Draw Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.1 or 2.5 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.5.  The total amount of the Delayed Draw Commitments is $140,000,000 minus the aggregate principal amount of Interim Date Loans funded hereunder in accordance with Section 2.1(a).

"Delayed Draw Commitment Period": the period from and including the Closing Date to the Delayed Draw Termination Date.

"Delayed Draw Loans": as defined in Section 2.1(b).

"Delayed Draw Termination Date": the earliest to occur of (i) the date the Delayed Draw Commitments are permanently reduced to zero pursuant to Section 2.1 or Section 2.5, and (ii) the Maturity Date.

"Derivatives Counterparty":  as defined in Section 6.6.

"Designated Agreements":  as defined in Section 5.16(a).

"DIP Facility": the credit facility evidenced by this Agreement.

"DIP Order": the Interim Order or the Final Order, whichever is in effect as of the relevant date in question.

"Directors' Charge": the charge provided for in the CCAA Initial Order, which charge shall be subordinate to the CCAA DIP Charge and shall not exceed $9,400,000 in the aggregate, to secure the Directors' Charge Expenses.

"Directors' Charge Expenses": those indemnities, disbursements, expenses and fees secured by the Directors' Charge, subject to and in accordance with the terms of the CCAA Initial Order.

"Disposition": with respect to any Property, any sale, lease, sale and leaseback, exchange, assignment, conveyance, transfer or other disposition thereof (other than the granting or creation of any Liens with respect to such Property); and the terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Stock": any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Capital Stock), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is 91 days after the Maturity Date; provided, however, that (i) only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock and (ii) any class of Capital Stock of the Company that by its terms authorizes the Company to satisfy its obligations thereunder by delivery of Capital Stock of the Company that is not Disqualified Stock shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Capital Stock that would constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the Company to repurchase such Capital Stock upon the occurrence of a change of control or an asset sale will not constitute Disqualified Stock if the terms of such Capital Stock provide that the Company may not repurchase or redeem any such Capital Stock pursuant to such provisions so long as the DIP Facility is outstanding unless such repurchase or redemption complies with Section 6.6. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Company and its Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.

"Documents": all "documents" as defined in applicable Personal Property Security Legislation.

"Dollars" and "$": lawful currency of the United States of America.

"Domestic Subsidiary": any Subsidiary of the Company organized under the laws of any jurisdiction within the United States of America.

"Environmental Law": all applicable United States, Canadian and other applicable jurisdictions' federal, state, provincial, municipal, local and other foreign laws, statutes, regulations, rules and ordinances and any policies, guidelines, protocols and standards issued, promulgated or approved thereunder, but only to the extent that any of the foregoing have

12

the force of law, and all common laws, in each case now or hereafter in effect which relate to the environment (including, without limitation, plants, animals or other living thing, indoor and outdoor air, surface water, ground water, sediment, land surface or subsurface strata), including, without limitation, such laws, statutes, regulations, rules, ordinances, policies, guidelines, protocols, standards and common laws with respect to: (a) greenhouse gases, asbestos, asbestos containing material, exposure to asbestos or asbestos containing materials; (b) regulation, pollution, contamination, control or protection of the environment; (c) protection of public health; (d) emissions, discharges, releases or threatened releases of any Hazardous Substance into the environment; (e) the presence of any Hazardous Substances in the environment; (f) the manufacture, processing, distribution, use, generation, treatment, storage, disposal, transport, handling, import or export of any Hazardous Substance; (g) any condition which could give rise to liability with respect to the environment; and (h) underground or aboveground storage tanks and related piping, or emissions, discharges and releases or threatened releases of Hazardous Substances therefrom.

"Environmental Permits":  any and all permits, licenses, approvals, notifications, certifications, registrations, exemptions and other authorizations required under any applicable Environmental Law.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Eurocurrency Reserve Requirements":  for any day, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including, without limitation, basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate":  with respect to each day during each Interest Period the greater of (a) the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by the Bloomberg Information Service or any successor thereto or any other service selected by the Administrative Agent which has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period and (b) 2.00%.  In the event that such rate is not ascertainable pursuant to the foregoing provisions of this definition, the "Eurodollar Base Rate" for purposes of this definition shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent.

"Eurodollar Loans":  Loans for which the applicable rate of interest is based upon the Eurodollar Rate.

"Eurodollar Rate":  with respect to each day during each Interest Period, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"Eurodollar Tranche":  the collective reference to Eurodollar Loans for the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default":  any of the events specified in Section 7, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Exchange Act":  the Securities Exchange Act of 1934, as amended.

"Excluded Non US Subsidiary":  for so long as the Company is considered a Person subject to United States federal net income tax for purposes of United States federal tax law (or a disregarded entity (the "Pass-through Entity") owned by a single U.S. taxpayer directly or indirectly through one or more Pass-through Entities), (i) any Non-US Subsidiary (other than Papier Masson, 3120772, Stadacona GP and Stadacona) in respect of which either (a) the pledge of all of the assets of such Subsidiary as Collateral for the Borrowers' Obligations or (b) the guaranteeing by such Subsidiary of the Borrowers' Obligations, would, in the good faith judgment of the Company, result in material taxes payable by any Company Group Member (or by any of the Company's direct or indirect equity-holders) or (ii) any direct or indirect U.S. subsidiary of any such Non-US Subsidiary.  As of the Closing Date each of Soucy 1, Soucy 2, Soucy GP, Black Spruce and Arrimage is an Excluded Non US Subsidiary.

"Excluded Taxes":  as defined in Section 2.14(a).

"Extensions of Credit":  as to any Lender at any time and as the context may require, (a) the aggregate principal amount of all Loans made by such Lender then outstanding or (b) the making of any Loan by such Lender.

"Facility Availability":  at any time, the lesser of: (a) the difference of (i) the total Commitments outstanding hereunder at such time minus (ii) the Aggregate Reserve Amount at such time and (b) the aggregate amount of disbursements set forth in the Approved Budget in effect at such time for the period commencing with the Closing Date and ending with the applicable week during which Facility Availability is being calculated.

"Fair Market Value":  the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party. The Fair Market Value of any Property that is required to be valued hereunder will, if the Fair Market Value exceeds $4,000,000, be determined in good faith by the Board of Directors of the Company.

"Federal Funds Effective Rate":  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by

14

federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"F.F. Soucy, Inc.":  F.F. Soucy, Inc., a corporation organized under the laws of Québec.

"Final Order":  collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be substantially in the form and substance of the Interim Order and shall otherwise be satisfactory in form and substance to the Administrative Agent, the Syndication Agent and the Lead Arrangers in their respective sole discretion, and the CCAA Initial Order (and related recognition orders entered by the Bankruptcy Court in the Chapter 15 Cases), in each case from which no appeal or motion to reconsider, amend or vary has been filed and such orders are not in any respect subject of a stay pending appeal, together with all extensions, modifications, amendments or supplements thereto, in form and substance satisfactory to the Administrative Agent, the Syndication Agent and the Lead Arrangers in their respective sole discretion, which, among other matters but not by way of limitation, authorizes the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents, to obtain credit, incur (or guaranty) the Obligations, and grant the Liens described under this Agreement and the other Loan Documents.

"Final Status Date":  the first Business Day on which both (i) the Bankruptcy Court has entered the Final Order and (ii) the CCAA Initial Order has become final and, in each case, which orders are in full force and effect and from which no appeal or motion to reconsider, amend or vary has been filed and such orders are not in any respect subject of a stay pending appeal.

"Financing Statement":  any "financing statement" (as defined in the UCC), any "application for registration," any "notice of intention" and any other document or instrument serving similar purpose under applicable Personal Property Security Legislation.

"First Day Orders":  the "first day" orders set forth on Schedule 1.1(a), which shall be in form and substance satisfactory to the Administrative Agent, the Syndication Agent, and the Lead Arrangers.

"Funding Office":  the office specified from time to time by the Administrative Agent as its funding office by notice to the Company and the Lenders.

"GAAP":  generally accepted accounting principles in the United States of America.

"Governmental Authority":  any nation or government, any state, province, territory or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Group Member":  each of Holdings and each of its Subsidiaries.

15

"<u>Guarantee</u>":  as defined in Section 5.9(a)(ii).

"<u>Guarantee Obligation</u>":  with respect to any Person (the "<u>Guaranteeing Person</u>"), any obligation of (a) the Guaranteeing Person or (b) another Person (including, without limitation, any bank under any letter of credit), if to induce the creation of which the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "<u>primary obligations</u>") of any other third Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, including, without limitation, any obligation of the Guaranteeing Person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; <u>provided</u>, <u>however</u>, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Company in good faith.

"<u>Guaranteeing Person</u>": as defined in the definition of Guarantee Obligation.

"<u>Guaranteeing Subsidiary</u>":  any Subsidiary of the Company that has directly guaranteed all of the Borrowers' Obligations pursuant to the applicable Security Documents.

"<u>Guarantees</u>":  collectively, (a) the guarantee of Stadacona GP in favor of the beneficiaries named therein, dated as of the Closing Date, (b) the guarantee of Soucy 1 in favor of the holder of the Soucy Intercompany Note, dated as of the Closing Date, (c) the guarantee of Soucy GP in favor of the holder of the Soucy Intercompany Note, dated as of the Closing Date, (d) the guarantee of Arrimage in favor of the holder of the Soucy Intercompany Note, dated as of the Closing Date, (e) the guarantee of 3120772 in favor of the beneficiaries named therein, dated as of the Closing Date, (f) the guarantee of Holdings in favor of the beneficiaries named therein, dated as of the Closing Date, (g) each guarantee given by each Guarantor created or acquired after the Closing Date, pursuant to Section 5.9, and (h)any other guarantee given by any Guarantor in favor of the beneficiaries named therein, in the case of each of clauses (a) – (h), as any such guarantee is amended, supplemented, replaced or otherwise modified from time to time.

16

"Guarantor":  Holdings, the Company and, subject to Section 2.23, each Subsidiary of the Company other than any Excluded Non US Subsidiary or any Immaterial Subsidiary.

"Hazardous Substance":  any substance, waste, liquid, gaseous or solid matter, pollutant, contaminant or chemical (including petroleum, crude oil or any fraction thereof) which is regulated by or can give rise to liability under Environmental Law.

"Hedge Agreements":  all interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by any Company Group Member providing for protection against fluctuations in interest rates, currency exchange rates, commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies.

"Holdings":  White Birch Paper Holding Company, an unlimited liability company organized under the laws of Nova Scotia.

"Hypothecs":  as defined in Section 8.1(b).

"Immaterial Subsidiary":  each of F.F. Soucy, Inc., Stadacona Amalco, Stadacona (US) Sales Corp., 3098583 Nova Scotia Company and Black Spruce.

"Indebtedness":  of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of Property or services (other than trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property), (e) all Capital Lease Obligations or Synthetic Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit, surety bonds (except unmatured reimbursement obligations in respect of surety bonds obtained in the ordinary course of business to secure the performance of obligations that are not Indebtedness pursuant to another clause of this definition) or similar facilities, (g) all Disqualified Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on Property (including, without limitation, accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation but limited to the lesser of the amount of such obligation secured by such Lien and the Fair Market Value of such Property and (l) for the purposes of Section 7(e) only, all obligations of such Person in respect of Hedge Agreements.

"Indemnified Liabilities":  as defined in Section 9.4.

"Indemnitee":  as defined in Section 9.4.

17

"Initial Approved Budget": the budget attached hereto as Schedule 1.1(b).

"Insolvency":  with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent":  pertaining to a condition of Insolvency.

"Intellectual Property":  the collective reference to all intellectual property, whether arising under United States of America, Canada, state, provincial, territorial, multinational or foreign laws or otherwise, including, without limitation, copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, service-marks, know-how and processes, formulas, trade secrets, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercompany Note":  the Soucy Intercompany Note and each intercompany note in the form of Exhibit K entered into as permitted under Section 6.2(b) hereof.

"Interest Payment Date":  (a) as to any Base Rate Loan, the last Business Day of each month while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan, the last day of the Interest Period applicable to such Loan and (c) as to any Loan, the date of any repayment or prepayment made in respect thereof.

"Interest Period":  as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing date with respect to such Eurodollar Loan and ending one month thereafter; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Loan and ending one month thereafter; provided that:

(i)    if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day; and

(ii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period.

"Interim Date Commitment": with respect to each Lender, the commitment of such Lender to make Interim Date Loans hereunder as set forth on Schedule 2.1, or in the Assignment and Acceptance pursuant to which such Lender assumed its Interim Date Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.1 or Section 2.5 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.5.  The total amount of the Interim Date Commitments is $[      ].

"Interim Date Loans": as defined in Section 2.1.

18

"Interim Date Loan Termination Date": the earliest to occur of (i) the date the Interim Date Commitments are permanently reduced to zero pursuant to Section 2.1 or Section 2.5, (ii) the Final Status Date and (iii) the date that is 35 days after the date of entry of the Interim Order.

"Interim Funding Amount": the lesser of (a) $[104,000,000] and (b) the maximum amount approved by the Bankruptcy Court in the Interim Order and the Canadian Court in the CCAA Initial Order to be made available to the Borrowers prior to the Final Status Date as part of the DIP Facility.

"Interim Order": collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law) substantially in the form of Exhibit D or otherwise acceptable to the Lead Arrangers, and with respect to the CCAA Initial Order, the related recognition orders entered by the Bankruptcy Court in the Chapter 15 Cases, together with all extensions, modifications, amendments and supplements of such orders, in each case in form and substance to the Administrative Agent, the Syndication Agent and the Lead Arrangers in their respective sole discretion, which, among other matters but not by way of limitation, authorizes the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents, to obtain credit, incur (or guaranty) the Obligations, and grant the Liens described under this Agreement and the other Loan Documents.

"Inventory": any "inventory" (as that term is defined in the UCC).

"Investments":  as defined in Section 6.8.

"Joinder Agreement": an agreement substantially in the form of Exhibit M.

"Judgment Conversion Date":  as defined in Section 9.19(a).

"Judgment Currency":  as defined in Section 9.19(a).

"Lead Arrangers":  as defined in the preamble hereto.

"Lender Addendum":  with respect to any Lender a Lender Addendum, substantially in the form of Exhibit I, as was or is to be executed and delivered by such Lender on the Closing Date, as provided in Section 9.17 of this Agreement.

"Lenders" or "DIP Lenders":  (a) the persons that deliver a Lender Addendum, (b) any person who becomes a party hereto pursuant to a Joinder Agreement, and (c) any person that has become a party hereto pursuant to an Assignment and Acceptance, in each case other than any such person that has ceased to be a party hereto pursuant to an Assignment and Acceptance.

"Lien":  any mortgage, pledge, hypothecation, hypothec, encumbrance, Prior Claim, deemed trust, lien (statutory or other), charge or other security interest or any security agreement with respect to Property (including, without limitation, any conditional sale or other

title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Liquidity":  at any time, the sum of (a) all unrestricted cash and Cash Equivalents on the balance sheet of the Company and its Subsidiaries at such time *plus* (b) Covenant Availability at such time.

"Loan Documents":  this Agreement (including any amendments, consents or waivers with respect thereto), each Guarantee, the Security Documents, the Notes and the Applicable Orders.

"Loan Parties":  Holdings, the Company and each Subsidiary of the Company that is a party to a Loan Document.

"Loans" or "DIP Loans":  the collective reference to Interim Date Loans and Delayed Draw Loans.

"Majority Lenders":  at any time, Lenders having Loans representing a majority of the aggregate principal amount of the total Loans then outstanding (or, if the Loans shall not yet have been made, Lenders having Commitments representing more than 50% of the aggregate principal amount of the total Commitments outstanding at such time).

"Management Agreement":  that certain Management and Administrative Services Agreement as in existence on the Petition Date, by and between Brant Industries, Inc. and the Company.

"Management Fee":  as defined in the Management Agreement as in effect on the Petition Date.

"Material Adverse Effect":  other than the events leading up to the filing of the Cases that have been disclosed to the Lenders or their Affiliates prior to the Closing Date and the filing of the Cases, which shall be deemed not to constitute or give rise to a Material Adverse Effect, a material adverse effect on (a) the business, assets, liabilities, or operating results or business prospects of the Company and its Subsidiaries considered on a consolidated basis, or on the ability of the Company and the Guarantors, taken as a whole, to perform any of their obligations under this Agreement or any other Loan Document, (b) the validity or enforceability of this Agreement or any of the other Loan Documents, the Liens granted thereunder, or any other rights or remedies of the Agents or the Lenders hereunder or thereunder or (c) the value of the Collateral.

"Material Agreement":  each of the agreements set forth on Schedule 1.1(c).

"Material Environmental Amount":  an amount or amounts payable by the Company Group Members in excess of $10,000,000 for:  (a) costs to comply with any Environmental Law; (b) costs of any investigation, remediation or other activity pursuant to any Environmental Law; and (c) compensatory damages (including, without limitation, damages to natural resources), punitive damages, fines, and penalties pursuant to any Environmental Law.

"<u>Maturity Date</u>":  the earliest to occur of any of the following: (a) the date on which all the Obligations (other than contingent indemnification obligations for which no claim, assertion of liability or demand for payment has been asserted) have been indefeasibly repaid in full in cash and all of the Commitments have been permanently and irrevocably terminated, (b) the date of the closing of a sale of all or substantially all of any Loan Party's assets pursuant to Section 363 of the Bankruptcy Code and Section 36 of the CCAA, whether done pursuant to one transaction or a series of transactions, (c) with respect to any Loan Party, the implementation date of a sanctioned plan of compromise or arrangement under the CCAA and the effective date of a confirmed plan of reorganization or liquidation pursuant to Chapter 11 of the Bankruptcy Code, (d) with respect to any US Case, the date of filing of a case under Chapter 7 of the Bankruptcy Code, conversion of any US Case to a case under Chapter 7 of the Bankruptcy Code, or with respect to the CCAA Cases, the filing of an assignment in bankruptcy or the making of a bankruptcy order, or the date of liquidation or receivership proceedings are initiated in Canada, (e) the date of dismissal or termination of any of the Cases, (f) the date of termination of all of the Commitments and/or acceleration of any outstanding Extensions of Credit, in either case following the occurrence and during the continuance of an Event of Default, (g) five (5) Business Days following the Petition Date if either the Interim Order or CCAA Initial Order has not been entered by the Bankruptcy Court or Canadian Court, respectively, by such date, (h) thirty-five (35) days following the Petition Date if either the Final Order has not been entered by the Bankruptcy Court or the CCAA Initial Order has not become final by such date and (i) November [__], 2010[; <u>provided</u>, however, that notwithstanding the foregoing and anything to the contrary set forth in Section 9.1, such date set forth in clause (i) above may be extended by [three (3)] calendar months with the approval of the Administrative Agent, the Syndication Agent and the Majority Lenders, in each case in their sole discretion.]

"<u>Monitor</u>": Ernst & Young, Inc. or its successor.

"<u>Moody's</u>":  Moody's Investors Service, Inc., together with its successors.

"<u>Mortgaged Properties</u>":  the owned real properties as listed on <u>Schedule 4.22</u>, as to which the US Collateral Agent or the Canadian Collateral Agent, as applicable, for the benefit of the Secured Parties, has been granted a Lien pursuant to the Mortgages or any Applicable Order.

"<u>Mortgages</u>":  each of the mortgages, deeds of hypothecs and deeds of trust made by any Loan Party in favor of, or for the benefit of, the US Collateral Agent or the Canadian Collateral Agent, as applicable, for the benefit of the Secured Parties, each in form and substance as the Syndication Agent and Administrative Agent shall reasonably approve, as the same may be amended, supplemented, replaced or otherwise modified from time to time in accordance with the terms hereof.

"<u>Multiemployer Plan</u>":  a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Company or a Commonly Controlled Entity is making or has an obligation to make contributions, or has within any of the preceding five plan years made or had an obligation to make contributions.

21

"Net Cash Proceeds":  in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received), net of reasonable and customary attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Indebtedness (including any premium payable in connection therewith) secured by a Lien expressly permitted hereunder on any asset which is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Security Document), and other reasonable and customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements) and, solely in connection with any such Asset Sale, any reserves in accordance with GAAP with respect to any adjustments to the sales prices of such assets or established with respect to any liabilities (including indemnities) potentially arising in connection with such sale; provided, that any such reserved amount shall become Net Cash Proceeds to the extent and at the time no longer required to be so reserved.

"Non-Consenting Lender":  as defined in Section 9.1(b).

"Non-Excluded Taxes":  as defined in Section 2.14(a).

"Non-US Lender":  as defined in Section 2.14(f).

"Non-US Subsidiary":  any Subsidiary of the Company that is not a Domestic Subsidiary.

"Note":  as defined in Section 2.3(e).

"Nova Scotia Company":  3098580 Nova Scotia Company, a Nova Scotia corporation.

"Obligation Currency":  as defined in Section 9.19(a).

"Obligations":  the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Loan Parties, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of the Loan Parties to the Secured Parties, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel and other advisors and professionals to the Lead Arrangers, to the Agents or to any Lender that are required to be paid by the Borrowers pursuant hereto or thereto) or otherwise.

NY\1620408.3

"<u>Other Taxes</u>":  any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"<u>Papier Masson</u>":  as defined in the recitals hereto.

"<u>Participant</u>":  as defined in Section 9.5(b).

"<u>Payment Office</u>":  the office specified from time to time by the Administrative Agent as its payment office by notice to the Company and the Lenders.

"<u>PBGC</u>":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"<u>Pension Plan Termination Event</u>":  an event which would entitle a Person (without the consent of any Company Group Member) to wind-up or terminate a Canadian Pension Plan in full or in part, or the institution of any steps by any Person to withdraw from, terminate participation in, wind-up or order the termination or wind-up of, in full or in part, any Canadian Pension Plan, or the receipt by any Company Group Member of material correspondence from a Governmental Authority relating to a potential or actual, partial or full, termination or wind-up of any Canadian Pension Plan, or an event respecting any Canadian Pension Plan which would result in the revocation of the registration of any such Canadian Pension Plan or which could otherwise reasonably be expected to adversely affect the tax status of any such Canadian Pension Plan.

"<u>Pension Plan Unfunded Liability</u>":  an unfunded liability in respect of any Canadian Pension Plan, including a going concern unfunded liability, a solvency deficiency or wind-up deficiency.

"<u>Perfection Certificate</u>": each perfection certificate delivered to the Administrative Agent by the Loan Parties on the Closing Date.

"<u>Permits</u>":  the collective reference to any and all franchises, licenses, leases, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, qualifications, easements, and rights of way, excluding Environmental Permits.

"<u>Permitted Liens</u>":  the collective reference to Liens permitted by Section 6.3.

"<u>Permitted Tax Distributions</u>":  so long as the Company is treated as a partnership or disregarded entity for the relevant tax purposes the payment of dividends or other distributions to any direct or indirect parent company of the Company in amounts required and due within 30 days thereafter for such parent company or its direct or indirect shareholders to pay federal, provincial, state or local taxes (as the case may be) imposed directly on such parent company or its direct or indirect shareholders, assuming that such taxes are payable at the highest applicable combined federal, provincial, state and local rates (as the case may be), to the extent such taxes are attributable to the income of the Company and its Subsidiaries (that are treated as a partnership or a disregarded entity), after taking into account any applicable deductions or credits

23

that may be claimed in the taxable year in respect of which the dividend or distribution is made and that are attributable to the taxes paid or expenses incurred by the Company or any of its Subsidiaries (including, without limitation, by virtue of such parent company being the common parent of a consolidated or combined tax group of which the Company and its Subsidiaries are members) without giving effect to any other attributes of income, loss, deduction or credit not attributable to the Company and its Subsidiaries.

"Person":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Personal Property Security Legislation":  all applicable personal property security legislation as all such legislation now exists or may from time to time hereafter be amended, modified, recodified, supplemented or replaced, together with all rules and regulations thereunder or related thereto, including without limitation, the UCC, the *Civil Code of Québec*, the *Bank Act* (Canada) and the Personal Property Security Acts of Ontario and Nova Scotia.

"Petition Date":  has the meaning given to that term in the recitals hereto and, as the context may require, collectively with the CCAA Filing Date, shall be referred to as the "Petition Date".

"Plan":  at a particular time, any employee benefit plan as defined in Section 3(3) of ERISA and in respect of which the Company or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA, but excluding, for greater certainty, Canadian Benefit Plans and Canadian Pension Plans.

"Postpetition": the time period beginning immediately upon the Petition Date.

"Prepetition": the time period ending immediately prior to the Petition Date.

"Prepetition Indebtedness":  all Indebtedness of any of the Loan Parties outstanding immediately prior to the Petition Date.

"Prepetition Intercreditor Agreement": that certain Second Amended and Restated Intercreditor Agreement, dated as of May 8, 2007, as amended, restated, replaced, supplemented or otherwise modified from time to time, with respect to the Prepetition Senior Obligations and Prepetition Junior Obligations.

"Prepetition Junior Agent": the administrative agent and other agents under the Prepetition Junior Credit Agreement (in their capacities as such).

"Prepetition Junior Credit Agreement": that certain $100,000,000 Second Amended and Restated Second Lien Term Loan Credit Agreement, dated as of April 8, 2005, as amended and restated as of January 27, 2006 and as amended and restated as of May 8, 2007, as amended, restated, replaced, supplemented or otherwise modified from time to time, among certain Borrowers, the other Loan Parties signatory thereto and the lenders from time to time signatory thereto.

"Prepetition Junior Lenders": the lenders under the Prepetition Junior Credit Agreement (in their capacities as such).

"Prepetition Junior Loan Documents": that certain Prepetition Junior Credit Agreement, together with all other "Loan Documents" (as such term is defined in such Prepetition Junior Credit Agreement), each as amended, restated, replaced, refinanced, supplemented or otherwise modified from time to time.

"Prepetition Junior Obligations": the "Obligations" as such term is defined in the Prepetition Junior Credit Agreement and any and all other Indebtedness outstanding from time to time under the Prepetition Junior Loan Documents.

"Prepetition Revolving Agent": the administrative agent and other agents under the Prepetition Revolving Credit Agreement (in their capacities as such).

"Prepetition Revolving Credit Agreement": that certain $100,000,000 Second Amended and Restated Revolving Credit Agreement, dated as of February 26, 2008, among the Company, the other borrowers named therein, the lenders from time to time party thereto and General Electric Capital Corporation, as administrative agent, as amended, supplemented or otherwise modified or replaced from time to time.

"Prepetition Revolving Lenders": the lenders under the Prepetition Revolving Credit Agreement (in their capacities as such).

"Prepetition Revolving Loan Documents": that certain Prepetition Revolving Credit Agreement, together with all other "Loan Documents" (as such term is defined in such Prepetition Revolving Credit Agreement), each as amended, restated, replaced, refinanced, supplemented or otherwise modified from time to time.

"Prepetition Revolving Obligations": as defined in the recitals hereto.

"Prepetition Senior Agent": the administrative agent and other agents under the Prepetition Senior Credit Agreement (in their capacities as such).

"Prepetition Senior Credit Agreement": that certain Second Amended And Restated First Lien Term Loan Credit Agreement, dated as of April 8, 2005, as amended and restated as of January 27, 2006, and as further amended and restated as of May 8, 2007, as amended, restated, replaced, supplemented or otherwise modified from time to time, among certain Borrowers, the other Loan Parties signatory thereto, Credit Suisse, Toronto Branch, as administrative agent, and the lenders from time to time signatory thereto.

"Prepetition Senior Lenders": the lenders under the Prepetition Senior Credit Agreement (in their capacities as such).

"Prepetition Senior Loan Documents": the Prepetition Senior Credit Agreement, together with all other "Loan Documents" (as such term is defined in such Prepetition Senior Credit Agreement), each as amended, restated, replaced, supplemented or otherwise modified from time to time.

NY\1620408.3

"Prepetition Senior Obligations": the "Obligations" as such term is defined in the Prepetition Senior Credit Agreement and any and all other Indebtedness outstanding from time to time under the Prepetition Senior Loan Documents.

"Prime Rate":  as defined in definition of Base Rate.

"Prior Claims":  all Liens created by applicable law (in contrast with Liens voluntarily granted) that rank or are capable of ranking prior to or *pari passu* with any of the Administrative Agent's security interests, hypothecs, pledges or other Liens for the benefit of the Secured Parties against all or part of the Collateral, including for amounts owing for employee source deductions, goods and services taxes, sales taxes, harmonized sales taxes, municipal taxes, workers' compensation, pension fund obligations and overdue rents.

"Prior Senior Lien": any valid, enforceable, and non-avoidable Lien that was perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code), which is not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and which is senior in priority to the Liens of the Prepetition Senior Agent and Prepetition Senior Lenders under applicable law and after giving effect to any subordination or inter-creditor agreements; provided that this definition shall exclude the Liens: (x) of both the Prepetition Senior Agent and the Prepetition Senior Lenders arising under the Prepetition Senior Loan Documents and (y) of both the Prepetition Junior Agent and the Prepetition Junior Lenders arising under the Prepetition Junior Loan Documents, which Liens shall be subordinate to the Liens securing the Obligations as provided in this Agreement and the Applicable Orders.

"Projections": as defined in Section 5.2(c).

"Property":  any right or interest in or to property of any kind whatsoever, whether real (or immovable), personal (or moveable) or mixed and whether tangible (corporeal) or intangible (incorporeal), including, without limitation, Capital Stock.

"rate of exchange":  as defined in Section 9.19(b).

"Recovery Event":  any settlement of or payment in respect of any Property or casualty insurance claim or any condemnation proceeding relating to any asset of any Company Group Member.

"Register":  as defined in Section 9.5(d).

"Regulation U":  Regulation U of the Board as in effect from time to time.

"Regulation X":  Regulation X of the Board as in effect from time to time.

"Related Fund":  with respect to any Lender, any fund that (x) invests in commercial loans and (y) is managed or advised by the same investment advisor as such Lender, by such Lender or an Affiliate of such Lender.

NY\1620408.3

"Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under PBGC Reg. § 4043.

"Requirement of Law":  as to any Person, any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Responsible Officer":  as to any Person, the chief executive officer, president or chief financial officer of such Person, but in any event, with respect to financial matters, the chief financial officer, vice president of finance or treasurer of such Person.  Unless otherwise qualified, all references to a "Responsible Officer" shall refer to a Responsible Officer of the Company.

"Restricted Payments":  as defined in Section 6.6.

"Revolving Loan Collateral": as defined in the Prepetition Senior Credit Agreement.

"S&P":  Standard & Poor's, a division of The McGraw-Hill Companies, Inc., together with its successors.

"SEC":  the Securities and Exchange Commission of the United States of America (or successors thereto or an analogous Governmental Authority).

"Secured Parties":  collectively, the Administrative Agent, the other Agents, each Lender and each of the other "Secured Parties" as defined in the Security Documents.

"Security Agreements":  collectively, (a) the deeds of hypothecs, debentures, and debenture pledge agreements between each of the Loan Parties constituted under the laws of Canada or any province thereof and the Agents or any of them, (b) the security agreements between each of the Loan Parties constituted under the laws of Canada or any province thereof and the Agents or any of them, (c) the pledge agreement between the Borrowers and the US Collateral Agent or the Canadian Collateral Agent, as the case may be, (d) the security agreement between Bear Island and the US Collateral Agent and (e) the security agreements and related agreements entered into by each Guarantor created or acquired after the Closing Date, as required hereby, and any other security agreement or related agreement entered into by any Loan Party in favor of any Agent or Lender, in the case of each of clauses (a) – (e), as any such agreement or instrument is amended, supplemented, replaced or otherwise modified from time to time, including, without limitation, the Canadian Security Agreements.

"Security Documents":  the collective reference to the guarantee agreements, security agreements, debenture pledge agreements, pledge agreements, debentures, hypothecs and Financing Statements filed in connection with the Soucy Intercompany Note, the Mortgages,

27

and all other security documents hereafter delivered to the US Collateral Agent or the Canadian Collateral Agent (including those granted to any Borrower and benefiting the US Collateral Agent or the Canadian Collateral Agent) granting or perfecting a Lien on any Property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document, and including the Applicable Orders, the Guarantees and the Security Agreements.

"Single Employer Plan":  any Plan that is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

"Solvent":  with respect to any Person, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal, state and provincial laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, (d) such Person will be able to pay its debts as they mature and (e) such Person is not insolvent within the meaning of any applicable Requirements of Law relating to bankruptcy, insolvency or creditor's rights.  For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

"Soucy 1":  F.F. Soucy, Inc. & Partners, Limited Partnership, a limited partnership organized under the laws of Québec.

"Soucy 2": F.F. Soucy L.P., a limited partnership organized under the laws of Québec.

"Soucy Companies":  each of Soucy 1, Soucy 2, Soucy GP and Arrimage and any Subsidiaries of the foregoing created or acquired after the Closing Date; provided such Subsidiaries guarantee, and pledge all of their assets to secure, all obligations of Soucy 2 under the Soucy Intercompany Note.

"Soucy GP":  F.F. Soucy General Partner Inc., a limited liability company organization under laws of Nova Scotia.

"Soucy Intercompany Note":  that certain secured Demand Promissory Note, dated as of the Closing Date, made by Soucy 2 to the Company in the face amount of $140,000,000, in the form of Exhibit L hereto.

"Soucy Intercompany Note Guarantee":  as defined in Section 5.9(a)(iii).

"Soucy Intercompany Note Guarantor":  as defined in Section 5.9(a)(iii).

28

"Stadacona":  Stadacona L.P., a limited partnership organized under the laws of Québec.

"Stadacona Amalco":  White Birch Paper Inc., a Québec company.

"Stadacona GP":  Stadacona General Partner Inc., a limited liability company under the laws of Nova Scotia.

"Stores": display items or packing or shipping materials, raw materials not readily saleable (excluding for greater certainty usable bunker oil), manufacturing supplies, store supplies, rotables for fixed assets, work-in-process inventory or replacement parts.

"Subordinated Debt": Indebtedness of any Borrower or any Guarantor that is by its terms subordinated in right of payment to the Obligations of such Borrower and/or such Guarantor, as applicable.

"Subsidiary":  as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the Board of Directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Company.  Notwithstanding the foregoing, Stadacona shall not be considered a Subsidiary of Soucy 2, but shall be considered a Subsidiary of the Company.  For avoidance of doubt, as of the Closing Date, each of Soucy 1 and Arrimage is a Subsidiary of Soucy 2.

"Supplemental Approved Budget":  in respect of the Initial Approved Budget, supplemental or replacement budgets delivered in accordance with Section 5.20 (covering any time period covered by a prior budget or covering additional time periods) in form and substance acceptable to the Administrative Agent and the Syndication Agent, which budget shall, among other things, reflect projected cash receipts, and which budget shall be in substance substantially similar to the Initial Approved Budget on a weekly basis.  It being understood that such budgets shall permit the Borrowers to pay the Management Fee in accordance with the Management Agreement and this Agreement.

"Supporting Obligations":  all "supporting obligations" as defined in applicable Personal Property Security Legislation.

"Syndication Agent":  as defined in the preamble hereto.

"Synthetic Lease Obligations":  all monetary obligations of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations which do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as indebtedness of such Person (without regard to accounting treatment); it being understood that obligations in respect of operating leases entered into by any Company Group Member in the

NY\1620408.3

ordinary course of business which would not, upon the insolvency of a Company Group Member be characterized as indebtedness of a Company Group Member, shall not constitute "Synthetic Lease Obligations".

"Transactions":  collectively, (a) the filing of the Cases, (b) the execution and delivery of this Agreement, (c) the borrowing of the Interim Date Loans and establishment of the Delayed Draw Commitments hereunder and (d) the payment of related costs, fees and expenses.

"Transferee":  as defined in Section 9.14.

"Type":  as to any Loan, its nature as a Base Rate Loan or a Eurodollar Loan.

"UCC":  the Uniform Commercial Code, as in effect from time to time in any jurisdiction.

"US Cases": as defined in the recitals hereto.

"US Collateral Agent": as defined in the preamble to this Agreement.

"USA Patriot Act":  the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001).

"WB Canada":  WB Canada, LLC, a Delaware limited liability company.

"White Birch Partners":  White Birch Partners L.P., a Québec limited partnership.

"Wholly Owned Guarantor":  any Guarantor that is a Wholly Owned Subsidiary of the Company.

"Wholly Owned Subsidiary":  as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

1.2    Other Definitional Provisions.  Unless otherwise specified therein, all terms defined in this Agreement shall have the meanings defined herein when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to any Company Group Member not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

NY\1620408.3

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    The expressions "payment in full," "paid in full" and any other similar terms or phrases when used herein with respect to the Obligations shall mean the payment in full, in immediately available funds, of all of the Obligations (other than contingent obligations that are not yet due).

(f)    Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP, as in effect on the Closing Date unless otherwise agreed to by the Company and the Majority Lenders.

SECTION 2.  AMOUNT AND TERMS OF COMMITMENTS

2.1    <u>Loan Commitments</u>.  Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, (a) at any time prior to the Final Status Date, to make loans to the applicable Borrower(s) on and after the date when both the Interim Order is entered by the Bankruptcy Court and the CCAA Initial Order is entered by the Canadian Court (or, to the extent the Applicable Order is entered after 5:00 p.m. (Toronto time), on and after the immediately succeeding Business Day) in an aggregate principal amount, when combined with all loans made by such Lender pursuant to this Section 2.1(a), not to exceed its Interim Date Commitment (such loans, individually, an "<u>Interim Date Loan</u>" and, collectively, the "<u>Interim Date Loans</u>"); provided that the Interim Date Loans made by all Lenders shall not exceed, in the aggregate, the Interim Funding Amount and no Interim Date Loans shall be made in excess of the Interim Funding Amount and (b) during the Delayed Draw Commitment Period, but only on and after the Final Status Date, subject to the terms and conditions hereof, to make loans (such loans, individually, a "<u>Delayed Draw Loan</u>" and, collectively, the "<u>Delayed Draw Loans</u>") to the applicable Borrower(s) in an aggregate principal amount, when combined with all loans made by such Lender pursuant to this Section 2.1(b), not to exceed such Lender's Delayed Draw Commitment.  Notwithstanding the foregoing, (a) no Interim Date Loan shall be made if, as a result of the making of such Loan, (i) the aggregate principal amount of Interim Date Loans made by any Lender under Section 2.1(a) would exceed such Lender's Interim Date Loan Commitment hereunder, (ii) the aggregate principal amount of Interim Date Loans made by all Lenders under Section 2.1(a) would exceed the aggregate Interim Date Commitments of all Lenders hereunder, (iii) the aggregate principal amount of Interim Date Loans made by all Lenders under Section 2.1(a), together with the aggregate principal amount of any Delayed Draw Loans made under Section 2.1(b), would exceed the Facility Availability, or (iv) the aggregate principal amount of Interim Date Loans made by all Lenders under Section 2.1(a), together with the aggregate principal amount of any Delayed Draw Loans made under Section 2.1(b), would exceed Covenant Availability and (b) no Delayed Draw Loan shall be made if, as a result of the making of such Loan, (i) the aggregate principal amount of Delayed Draw Loans made by any Lender under this Section 2.1(b) would exceed such Lender's Delayed Draw Commitments of all Lenders hereunder, (ii) the aggregate principal amount of Delayed Draw Loans made by all Lender under this Section 2.1(b) would exceed the aggregate Delayed Draw Commitments of all Lenders hereunder, (iii) the aggregate

31

principal amount of Delayed Draw Loans made by all Lenders under this Section 2.1(b), together with the aggregate principal amount of any Interim Date Loans made under Section 2.1(a), would exceed Facility Availability or (iv) the aggregate principal amount of Delayed Draw Loans made by all Lenders under Section 2.1(b), together with the aggregate principal amount of any Interim Date Loans made under Section 2.1(A), would exceed Covenant Availability.  Once funded, each Interim Date Loan and each Delayed Draw Loan shall be a "Loan" for all purposes under this Agreement and the other Loan Documents.  Each Lender's (a) Interim Date Commitment shall (i) reduce on a dollar-for-dollar basis by the amount of each Interim Date Loan made hereunder immediately after the borrowing of such Interim Date Loans pursuant to this Section 2.1(a) and (ii) terminate immediately and without further action on the Interim Date Loan Termination Date and (b) Delayed Draw Commitment shall (i) reduce on a dollar-for-dollar basis by the amount of each Delayed Draw Loan made hereunder immediately after the borrowing of such Delayed Draw Loans pursuant to this Section 2.1(b) and (ii) terminate immediately and without further action on the Delayed Draw Termination Date.  Amounts paid or prepaid in respect of Loans may not be reborrowed.

      2.2    <u>Procedure for Making Loans</u>.  The applicable Borrower(s) shall give to the Administrative Agent a Borrowing Notice (which written notice must be received by the Administrative Agent prior to 10:00 A.M., Toronto time, ten (10) Business Days (in the case of Interim Date Loans to be made on the Closing Date, two (2) Business Days) prior to the anticipated Borrowing Date) of its intention to borrow, specifying (i) the date of such borrowing, which shall be a Business Day, and (ii) the amount of such borrowing, which shall be in an aggregate principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof; provided, however, that not more than one Borrowing Notice per week may be given by the Borrowers hereunder.  The Loans made by the Lenders shall be, subject to Sections 2.11 and Section 2.16, Eurodollar Loans with an Interest Period of one month's duration.  A Borrowing Notice received after 10:00 A.M., Toronto time, shall be deemed received on the next Business Day.  The Administrative Agent shall promptly notify the Lenders of Borrowing Notice and not later than 12:00 Noon, Toronto time, on the proposed borrowing date, each Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the Loan to be made by such Lender.

      2.3    <u>Repayment of Loans; Evidence of Debt</u>.  (a) Each Borrower hereby unconditionally promises to pay on the Maturity Date, whether by acceleration or otherwise, to the Administrative Agent for the account of the Lenders, the principal amount of the Loans outstanding on such date.  Each Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans borrowed by it from time to time until payment in full thereof at the rate per annum and on the dates, set forth in Section 2.9.

      (b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower(s) to such Lender resulting from the Loan of such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

      (c)    The Administrative Agent, on behalf of the Borrowers shall maintain the Register pursuant to Section 9.5(d), and a sub-account therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder and any Note evidencing such Loan,

the Type of such Loan, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) both the amount of any sum received by the Administrative Agent hereunder from the Borrowers and each Lender's share thereof.

(d)    The entries made in the Register and the accounts of each Lender maintained pursuant to Section 2.3(b) shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of the Borrowers therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrowers to repay (with applicable interest) the Loans made to the Borrowers by such Lender in accordance with the terms of this Agreement.

(e)    Each Borrower agrees that, upon the request to the Administrative Agent by any Lender, the Borrowers will promptly execute and deliver to such Lender a promissory note of the Borrowers, evidencing any Loans of such Lender, substantially in the form of Exhibit G (a "Note"), with appropriate insertions as to date and principal amount.

2.4    Fees, etc..

(a)    Arranger Fees.  The Borrowers agree to pay, upon the entry of the Interim Order and the CCAA Initial Order, to the Administrative Agent, for the account of the Lead Arrangers (to be allocated among the Lead Arrangers as agreed by them, in their sole discretion) a fee equal to 2.50% of the aggregate amount of the total Commitments in effect on the Closing Date ($3,125,000).

(b)    Initial Fee. The Borrowers agree to pay, upon the entry of the Interim Order and the CCAA Initial Order, to the Administrative Agent for the ratable benefit of the Lenders, a fee equal to 2.50% of the aggregate amount of the total Commitments in effect on the Closing Date ($3,125,000).

(c)    Administrative Fee.  The Borrowers agree to pay to the Administrative Agent, for its own account, an administration fee in the amount of $100,000, to be paid on the Closing Date (the "Administrative Agent Fee"), plus an additional quarterly administration fee in an amount of $25,000 for each successive three-month period for which the DIP Facility remains outstanding past November [__], 2010 (such fees, the "Administrative Fees").  Each payment of such quarterly Administrative Fees after the Closing Date will be due in advance on November [__], 2010 and each three-month anniversary thereafter and ending prior to the termination of the DIP Facility.  All of the fees set forth in this Section 2.4(c) shall be in addition to any fees and expenses payable pursuant to Section 9.4.

(d)    Prepayment Fee.  The Borrowers agree to pay to the Administrative Agent, for the ratable benefit of the Lenders, a fee equal to 4.00% of the aggregate amount of the total Commitments in effect on the Closing Date ($5,000,000) upon the earlier of the Maturity Date (as it may be extended) and each reduction, in whole or in part, of the Commitments.  The Prepayment Fee will be waived if the DIP Facility is paid in full in cash simultaneously with either (i) the closing of a sale of all or substantially all of the Loan Parties'

assets or (ii) the consummation of a plan of reorganization under applicable U.S. and Canadian law, to the extent such sale or plan of reorganization, as applicable, is in form and substance approved by the Prepetition Senior Lenders that hold at least two-thirds (2/3) in principal amount of the Prepetition Senior Obligations outstanding under the Prepetition Senior Credit Agreement.

(e)    Commitment Fees.  The Borrowers agree to pay to the Administrative Agent for the account of each Lender a commitment fee equal to (i) the average of the daily difference of (x) the total Commitments *minus* (y) the aggregate principal amount of all outstanding Loans *times* (ii) 2.0% per annum for the period from and including the Closing Date to the Maturity Date, payable monthly in arrears on the last Business Day of each month and on the Maturity Date, commencing on the first of such dates to occur after the Closing Date.

All fees payable to the Administrative Agent for the benefit of the Administrative Agent, Lead Arrangers or the Lenders shall be fully earned on the date such payment is due, shall be paid in immediately available funds and shall be non-refundable.

2.5    Optional Prepayments.

(a)    The Borrowers may at any time and from time to time reduce the Commitments outstanding hereunder and/or prepay all or a part of the Loans, in each case upon irrevocable notice delivered to the Administrative Agent before 12:00 Noon Toronto time on a date that is at least three Business Days prior thereto, which notice shall specify the date and amount of such reduction or prepayment plus, in the case of a prepayment, accrued and unpaid interest to the applicable prepayment date on the Loans prepaid, and any amounts payable under Section 2.15.  In the case of a reduction of any Commitments, each such reduction made hereunder shall be made ratably among the Lenders in accordance with their respective applicable Commitments.  The Borrowers shall pay to the Administrative Agent for the account of the applicable Lenders on the date of each such reduction the Commitments Fees on the amount of Commitments so reduced accrued to but excluding the date of such reduction.

(b)    All optional prepayments made pursuant to this Section 2.5 shall be, in the case of partial prepayments, made in an amount that is an integral multiple of $500,000 and not less than $1,000,000.

2.6    Mandatory Prepayments.

(a)    Asset Sales.  If any Group Member shall receive Net Cash Proceeds from any Asset Sale or Recovery Event (other than in connection with the closing of a sale of all or substantially all of the Loan Parties' assets pursuant to Section 363 of the Bankruptcy Code (and a sale with similar effect pursuant to Section 36 of the CCAA and an order of the Canadian Court) in any Chapter 11 Case or CCAA Case which, concurrent with such sale, results in the repayment in full in cash of the Obligations) then the Company shall offer by notice in writing (a "Disposition Repayment Offer") to the Administrative Agent to prepay, at a price equal to 100% of the principal amount, the Loans in an amount equal to the amount of

34

such Net Cash Proceeds.  The Lenders will have 8 Business Days from the making of any such offer to accept such offer, and any offer not accepted within such time period shall be deemed rejected.  To the extent such offer is so accepted by the Lenders or any of them, such prepayment shall be made on a date no later 10 Business Days after the date of such offer.  The provisions of this Section 2.6 do not constitute a consent to the consummation of any Disposition not permitted by Section 6.5.  Failure to make the Disposition Repayment Offer or to make the payments contemplated thereby shall be deemed a material breach of this Agreement.

(b)     Soucy Intercompany Note.  If Soucy 2 or any Guarantor or other Person shall at any time repay or prepay any principal amount outstanding under the Soucy Intercompany Note, on the first Business Day after such repayment or prepayment, before 12:00 Noon Toronto time, the Borrowers shall offer by notice in writing to the Administrative Agent to prepay, subject to Section 2.15, at a price equal to 100% of the principal amount, the Loans in an amount equal to the amount of such repayment or prepayment of the Soucy Intercompany Note.  The Lenders will have 8 Business Days from the making of any such offer to accept such offer, and any offer not accepted within such time period shall be deemed rejected.  To the extent such offer is so accepted by the Lenders or any of them, such prepayment shall be made on a date no later 10 Business Days after the date of such offer.  All payments made under this paragraph shall be first applied to the payment of principal of the Loans set forth in Section 2.3(a) on a pro rata basis.

(c)     Issuance of Debt.  On the date of receipt by Borrowers or any of their respective Subsidiaries of any cash proceeds from the incurrence of any Indebtedness of Holdings or any of its Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 6.2), the Borrowers shall prepay the Loans in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(d)     Application of Proceeds.  All amounts required to be paid pursuant to this Section 2.6 shall be applied first, on a pro rata basis, to fees of the Administrative Agent, Syndication Agent, each other Agent under this Agreement and the Lead Arrangers, and, then, on a pro rata basis, to reimbursable expenses of such Agents, the Lead Arrangers and the Lenders, in each case to the extent then due and payable pursuant to any of the Loan Documents; second, on a pro rata basis, to accrued and unpaid interest on the Loans and any other fees payable under the Loan Documents in each case to the extent then due and payable hereunder or thereunder, as applicable; third, to the principal balance of the Loans outstanding hereunder on a pro rata basis; and fourth, to any other obligations under this Agreement.

2.7     Continuation of Eurodollar Loans.

Each Eurodollar Loan outstanding hereunder shall be continued automatically, without any action taken by any party hereto, as a Eurodollar Loan with an Interest Period of one month's duration upon the expiration of the then current Interest period with respect thereto.

35

2.8     <u>Minimum Amounts and Maximum Number of Eurodollar Tranches</u>.
Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions,
continuations and optional prepayments of Eurodollar Loans and all selections of Interest Periods
shall be in such amounts and be made pursuant to such elections so that, (i) after giving effect
thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar
Tranche shall be equal to $[1,000,000] or a whole multiple of $[500,000] in excess thereof and
(ii) no more than [five (5)] Eurodollar Tranches shall be outstanding at any one time.

2.9     <u>Interest Rates and Payment Dates</u>.  (a) Each Eurodollar Loan shall bear
interest for each day during each Interest Period with respect thereto at a rate per annum equal
to the Eurodollar Rate determined for such day plus the Applicable Margin.

(b)     Solely to the extent the Loans are Base Rate Loans as a result of the
circumstances set forth in Sections 2.11 and 2.16, each Base Rate Loan shall bear interest for
each day on which it is outstanding at a rate per annum equal to the Base Rate in effect for
such day plus the Applicable Margin.

(c)     If any Event of Default under Section 7 has occurred and is continuing,
then for so long as such Event of Default is continuing, to the extent permitted by applicable
law, all amounts outstanding under this Agreement and the other Loan Documents shall bear
interest (after as well as before judgment), (i) in the case of principal, at the rate otherwise
applicable to such Loan pursuant to Section 2.9(a) plus 2.00% per annum and (ii) in all other
cases, at a rate per annum (computed on the basis of the actual number of days elapsed over a
year of 365 or 366 days, as the case may be, when determined by reference to the Prime Rate
and over a year of 360 days at all other times) equal to the rate that would be applicable to a
Base Rate Loan plus 2.00% per annum.

(d)     Interest shall be payable in arrears on each Interest Payment Date,
<u>provided</u>, that interest accruing pursuant to paragraph (c) of this Section 2.9 shall be payable
from time to time on demand.

(e)     If any provision of this Agreement or any of the other Loan Documents
would obligate a Borrower to make any payment of interest with respect to the Obligations or
other amount payable to any Agent or any Lender in an amount or calculated at a rate which
would be prohibited by law or would result in a receipt by such Agent or such Lender of
interest with respect to the Obligations at a criminal rate (as such terms are construed under the
Criminal Code (Canada)) then, notwithstanding such provision, such amount or rates shall be
deemed to have been adjusted with retroactive effect to the maximum amount or rate of
interest, as the case may be, as would not be so prohibited by law or so result in a receipt by
such Agent or such Lender of interest with respect to the Obligations at a criminal rate, such
adjustment to be effected, to the extent necessary, as follows: (1) first, by reducing the amount
or rates of interest required to be paid to the affected Agent or the affected Lender under
Section 2.9(c); and (2) thereafter, by reducing any fees, commissions and other amounts
required to be paid to the affected Agent or the affected Lender which would constitute interest
with respect to the Obligations for purposes of Section 347 of the Criminal Code (Canada).
Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby,
if any Agent or any Lender shall have received an amount in excess of the maximum permitted

36

by that section of the Criminal Code (Canada), then the Company shall be entitled, by notice in writing to the affected Agent or the affected Lender, to obtain reimbursement from such Agent or such Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by such Agent or such Lender to the Company. Any amount or rate of interest under the Obligations referred to in this Section 2.9(e) shall be determined in accordance with generally accepted actuarial practices and principles as an effective annual rate of interest over the term that any Loans remain outstanding on the assumption that any charges, fees or expenses that fall within the meaning of "interest" (as defined in the Criminal Code (Canada)) shall, if they relate to a specific period of time, be pro-rated over that period of time and otherwise be pro-rated over the period from the Closing Date to the Maturity Date, and, in the event of a dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by the Administrative Agent shall be conclusive for the purposes of such determination.

(f)     For purposes of disclosure pursuant to the Interest Act (Canada), the annual rates of interest or fees to which the rates of interest or fees provided in this Agreement and the other Loan Documents (and stated herein or therein, as applicable, to be computed on the basis of a 360 day year or any other period of time less than a calendar year) are equivalent to the rates so determined multiplied by the actual number of days in the applicable calendar year and divided by 360 or such other period of time, respectively.

(g)     For the avoidance of doubt, it is the intention of the parties hereto that this DIP Facility comprise a loan facility of Eurodollar Loans with an Interest Period of one month's duration. The Borrowers shall have no right to borrow Base Rate Loans or convert any Eurodollar Loan into Base Rate Loans and, subject to Sections 2.11 and 2.16, each Loan hereunder, both when borrower and at all times thereafter, shall be a Eurodollar Loan with an Interest Period of one month's duration.

(h)     If any provision of this Agreement or any of the Collateral Documents would obligate any Loan Party to make any payment of interest with respect to the Obligations or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by that Lender of interest with respect to the Obligations at a criminal rate (as such terms are construed under the *Criminal Code* (Canada)) then, notwithstanding such provision, such amount or rates shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law or so result in a receipt by that Lender of interest with respect to the Obligations at a criminal rate, such adjustment to be effected, to the extent necessary, as follows: (1) first, by reducing the amount or rates of interest required to be paid to the affected Lender under this Section 2.9; and (2) thereafter, by reducing any fees, commissions, premiums and other amounts required to be paid to the affected Lender which would constitute interest with respect to the Obligations for purposes of Section 347 of the *Criminal Code* (Canada). Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received an amount in excess of the maximum permitted by that section of the *Criminal Code* (Canada), then the applicable Borrower shall be entitled, by notice in writing to the affected Lender, to obtain reimbursement from that Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to Borrower. Any amount or

37

rate of interest on the Obligations referred to in this Section 2.9(h) shall be determined in accordance with generally accepted actuarial practices and principles as an effective annual rate of interest over the term that the Loans remain outstanding on the assumption that any charges, fees or expenses that fall within the meaning of "interest" (as defined in the *Criminal Code* (Canada)) shall, if they relate to a specific period of time, be pro-rated over that period of time and otherwise be pro-rated over the period to the date on which all the Obligations have been indefeasibly repaid in full in cash and all of the Commitments have been permanently and irrevocably terminated and, in the event of a dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by Administrative Agent, acting reasonably, shall be conclusive for the purposes of such determination.

       2.10   <u>Computation of Interest and Fees</u>.  (a)  Interest, fees, and commissions payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to Base Rate Loans on which interest is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365-day (or 366-day, as the case may be) year for the actual days elapsed.  The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of a Eurodollar Rate.  Any change in the interest rate on a Loan resulting from a change in the Base Rate or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective.  The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

       (b)    Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Loan Parties and the Lenders in the absence of manifest error.  The Administrative Agent shall, at the request of the Company, deliver to the Company a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.9.

       2.11   <u>Inability to Determine Interest Rate</u>.  If prior to the first day of any Interest Period:

       (i)  the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Loan Parties) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

       (ii)  the Administrative Agent shall have received notice from the Majority Lenders that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent as applicable, shall give telecopy or telephonic notice thereof to the Borrowers and the relevant Lenders as soon as practicable thereafter.  If such notice is given (x) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made as Base Rate Loans, (y) any Loans that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as Base Rate Loans and (z) any

outstanding Eurodollar Loans shall be converted, on the last day of the then current Interest Period with respect thereto, to Base Rate Loans. Until the condition giving rise to such notice has been remedied as notified to the Borrowers by the Administrative Agent, no further Eurodollar Loans shall be made or continued as such, nor shall the Borrower have the right to convert Loans to Eurodollar Loans.

2.12   Pro Rata Treatment and Payments. (a) Each borrowing by the Borrowers from the Lenders hereunder shall be made pro rata from the Lenders in accordance with their unfunded Interim Date Commitments or Delayed Draw Commitments, as applicable, as of the time of such borrowing.

(b)   Each payment (including each prepayment) of the Loans shall be allocated among the Lenders (or, in the case of mandatory prepayments under Section 2.6(a), (b), (c) or (d), offered to the Lenders) pro rata according to the respective outstanding principal amounts of the Loans then held by the Lenders.

(c)   Each payment of the Loans shall be accompanied by accrued interest to the date of such payment on the amount paid and shall be subject to the provisions of Section 2.15.

(d)   All payments (including prepayments) to be made by the Borrowers hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim. All payments (including prepayments) to be made by the Borrowers hereunder, whether on account of principal, interest, fees or otherwise shall be made prior to 12:00 Noon, Toronto time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Payment Office, in Dollars and in immediately available funds. Any payment made by the Borrowers after 12:00 Noon, Toronto time, on any Business Day shall be deemed to have been made on the next following Business Day. The Administrative Agent shall distribute such payments to the applicable Lenders promptly upon receipt in like funds as received. If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(e)   Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the applicable Borrower(s) a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with

39

interest thereon at a rate equal to the daily average Federal Funds Effective Rate for amounts in Dollars for the period until such Lender makes such amount immediately available to the Administrative Agent.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error.  If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to Base Rate Loans, on demand, from the Borrower.

(f)     Unless the Administrative Agent shall have been notified in writing by the applicable Borrower(s) prior to the date of any payment due to be made by any Loan Party hereunder that the applicable Borrower(s) will not make such payment to the Administrative Agent, the Administrative Agent may assume that such Borrower(s) are making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount.  If such payment is not made to the Administrative Agent by the applicable Borrower(s) within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate for amounts in Dollars. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against such Loan Party.

(g)     After acceleration or maturity of the Obligations, all payments and proceeds of Collateral shall be applied to amounts then due and payable in the following order: (i) to the Agents' fees and expenses reimbursable hereunder on a ratable basis; (ii) to interest on the Loans, ratably in proportion to the interest accrued as to each Loan; (iii) to principal owing on the Loans and to satisfaction of net Obligations under Specified Hedge Agreements, ratably to the aggregate, combined principal balance of the Loans and such Obligations under Specified Hedge Agreements; (iv) to all other Obligations, including expenses of Lenders to the extent reimbursable under Section 9.4 and (v) to the extent of any excess of such payments and proceeds, to the payment to or upon the order of the applicable Company Group Member or to whomsoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

2.13    Requirements of Law. (a) If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the Closing Date (other than with respect to taxes, which shall be governed exclusively by Section 2.14):

(i)     shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Eurodollar Rate hereunder; or

(ii)       shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender reasonably deems to be material, of making, converting into, continuing or maintaining Loans, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the applicable Borrower(s) shall promptly pay such Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable.  If any Lender becomes entitled to claim any additional amounts pursuant to this Section 2.13, it shall promptly notify the applicable Borrower(s) (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)       If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or any Person controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the Closing Date shall have the effect of reducing the rate of return on such Lender's or such Person's capital as a consequence of its obligations hereunder to a level below that which such Lender or such Person could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such Person's policies with respect to capital adequacy) by an amount reasonably deemed by such Lender to be material, then from time to time, after submission by such Lender to the applicable Borrower(s) (with a copy to the Administrative Agent) of a written request therefor, the applicable Borrower(s) shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Person for such reduction on an after-tax basis.

(c)       If any Lender becomes entitled to claim any additional amounts pursuant to clause (a) or (b) above, it shall promptly deliver to the applicable Borrower(s) (with a copy to the Administrative Agent) a certificate setting forth in reasonable detail a description of the event by reason of which it has become so entitled and a calculation of such additional amounts.  Such certificate shall be conclusive in the absence of manifest error.  Notwithstanding anything to the contrary in this Section 2.13, the Borrowers shall not be required to compensate a Lender pursuant to this Section 2.13 for any amounts incurred more than 180 days prior to the date that such Lender notifies the Borrowers of such Lender's intention to claim compensation therefor.  The obligations of the Borrowers pursuant to this Section 2.13 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.14    Taxes.  (a) Except as otherwise required by law, all payments made under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority on or with respect to any payment hereunder, excluding with respect to the Lead Arrangers, any Agent or any Lender, taxes imposed on or measured by its net income or profit or overall gross income in lieu of net income, franchise taxes and branch profits or similar taxes imposed on it (however dominated) by the jurisdiction (or political subdivision thereof) under the laws of which the Lead Arrangers, any Agent or any Lender is organized or in which its principal

office is located or, in the case of any Lender, in which its applicable Lending Office is located, or as a result of any other present or former connection between the Lead Arrangers, such Agent or such Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Lead Arrangers', such Agent's or such Lender's having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document in such jurisdiction) (collectively, "Excluded Taxes"). If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings imposed with respect to and any payment to be made under this Agreement or any other Loan Document ("Non-Excluded Taxes") are required to be withheld from any amounts payable to the Lead Arrangers, any Agent or any Lender hereunder, the amounts so payable to the Lead Arrangers, such Agent or such Lender shall be increased to the extent necessary to yield to the Lead Arrangers, such Agent or such Lender (after payment of all Non-Excluded Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement; provided, however, that none of the Loan Parties shall be required to increase any such amounts payable to the Lead Arrangers, any Agent or any Lender with respect to (x) any Excluded Taxes or (y) any Non-Excluded Taxes (i) that are attributable to the Lead Arrangers', such Agent's or such Lender's failure to comply with the requirements of paragraph (f) or (g) of this Section 2.14 or (ii) in the case of any Non-US Lender (as defined below), any United States of America withholding taxes imposed on amounts payable to the Lead Arrangers, such Agent or such Lender under the law that was in effect at the time any such Person becomes a party to this Agreement, except to the extent that any such Person's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the Borrowers with respect to such Non-Excluded Taxes pursuant to this Section 2.14(a). The Borrowers or the applicable Guarantor shall make any required withholding and pay the full amount withheld to the relevant tax authority or other Governmental Authority in accordance with applicable Requirements of Law.

(b)    In addition, the Borrowers shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    The Borrowers will indemnify the relevant Lead Arranger, Agent or Lender for the full amount of Non-Excluded Taxes or Other Taxes (including any taxes on amounts payable under this Section 2.14) paid by such Lead Arranger, Agent or Lender, as the case may be, and any liability (including penalties, interest and reasonable expenses) arising therefrom or with respect thereto, whether or not such Non-Excluded Taxes or Other taxes were correctly or legally asserted by the relevant taxing authority or other Governmental Authority. Such indemnification shall be made within 30 days after the date any Lead Arranger, Agent or Lender, as the case may be, makes written demand therefore (which demand shall set forth in reasonable detail the nature and amount of Non-Excluded Taxes and Other Taxes for which indemnification is being sought); provided that the relevant Lead Arranger, Agent or Lender shall not be entitled to receive any indemnification with respect to any Non-Excluded Taxes or Other Taxes (i) to the extent the relevant Lead Arranger, Agent or Lender fails to provide notice to the Borrowers within six (6) months after it becomes aware of the imposition of any Non-Excluded Taxes or Other Taxes that give rise to such indemnification under this Section 2.14(c) or (ii) to the extent the liability or payment of such Non-Excluded Taxes or Other Taxes has been incurred as a result of the gross negligence, bad

42

faith or willful misconduct of the relevant Lead Arranger, Agent or Lender (or their respective Affiliates or employees).

(d)      Whenever any Non-Excluded Taxes or Other Taxes are payable by any Loan Party, as promptly as possible thereafter the Borrowers shall send to the Administrative Agent, for the account of the relevant Lead Arranger, Agent or Lender, as the case may be, a certified copy of an original official receipt received by such Loan Party showing payment thereof or other written proof of payment thereof that is reasonably satisfactory to the applicable Agent. If any Loan Party fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the applicable Agent the required receipts or other required documentary evidence, the Borrowers (for itself and on behalf of the Loan Parties) shall indemnify the Lead Arrangers, the Agents and the Lenders for any incremental taxes, interest or penalties that become payable by the Lead Arrangers, any Agent or any Lender as a result of any such failure; provided that the relevant Lead Arranger, Agent or Lender shall not be entitled to receive any indemnification with respect to any Non-Excluded Taxes or Other Taxes (i) to the extent the relevant Lead Arranger, Agent or Lender fails to provide notice to the Borrowers within six (6) months after it becomes aware of the imposition of any Non-Excluded Taxes or Other Taxes that give rise to such indemnification under Section 2.14(c) or (ii) to the extent the liability or payment of such Non-Excluded Taxes or Other Taxes has been incurred as a result of the gross negligence, bad faith or willful misconduct of the relevant Lead Arranger, Agent or Lender (or their respective Affiliates or employees).

(e)      The agreements in this Section 2.14 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(f)      Any Lender that is entitled to an exemption from or reduction of non-US withholding tax with respect to payments under this Agreement shall deliver to the Borrowers and the Administrative Agent at the time or times reasonably requested in writing by the Borrowers such properly completed and executed documentation prescribed by Requirements of Law or as may be required by the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate, provided that such Lender is legally entitled to complete, execute, and deliver such documentation and, with respect to non-U.S. taxes, in such Lender's reasonable judgment such completion, execution or submission would not materially prejudice the legal position of such Lender.

In addition, and without limiting the generality of the foregoing, each Lender (or Transferee) that is not a citizen or resident of the United States of America, a corporation, partnership or other entity created or organized in or under the laws of the United States of America (or any jurisdiction thereof), or any estate or trust that is subject to federal income taxation regardless of the source of its income (a "Non-US Lender") shall deliver to the Borrowers and the Administrative Agent two copies of either United States Internal Revenue Service Form W-8BEN (claiming benefits under an applicable income tax treaty) or Form W-8IMY or Form W-8ECI, as appropriate, or, in the case of a Non-US Lender claiming exemption from United States federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," a statement substantially in the form of Exhibit H to the effect that such Lender is eligible for a complete exemption from withholding of United

43

States taxes under Section 871(h) or 881(c) of the Code and a Form W-8BEN, or any subsequent versions thereof or successors thereto properly completed and duly executed by such Non-US Lender claiming complete exemption from, or a reduced rate of, United States federal withholding tax on all payments by the Borrowers under this Agreement and the other Loan Documents.  Such forms shall be delivered by each Non-US Lender on or before the date it becomes a party to this Agreement.  In addition, each Non-US Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-US Lender.  Each Non-US Lender shall promptly notify the Borrowers and the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrowers and the Administrative Agent (or any other form of certification adopted by the United States taxing authorities for such purpose).  Notwithstanding any other provision of this paragraph, a Non-US Lender shall not be required to deliver any form pursuant to this paragraph that such Non-US Lender is not legally able to deliver.

(g)    Each Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code (a "US Lender") shall deliver to the Borrowers and the Administrative Agent, on or before the date such Lender becomes a party to this Agreement, two copies of Internal Revenue Service Form W-9 or any successor or other form prescribed by the Internal Revenue Service certifying that such Lender is exempt from U.S. federal backup withholding tax.  In addition, each US Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered hereunder by such US Lender. Each US Lender shall promptly notify the Borrowers and the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrowers and the Administrative Agent (or any other form of certification adopted by the U.S. taxing authorities for such purpose).

(h)    If any Lender or Agent receives a refund in respect of any amount paid by the Borrowers pursuant to this Section 2.14, which refund in the reasonable judgment of such Agent or Lender is allocable to such payment, it shall promptly notify the Borrowers of such refund and shall, within 15 days after receipt, pay such refund over to the Borrowers net of all reasonable out-of-pocket expenses (including taxes) of such Agent or Lender; provided, that the Borrowers, upon the request of such Agent or Lender, shall repay the amount paid over to the Borrowers (plus any penalties or interest imposed by the relevant taxing authority) to such Agent or Lender in the event that such Agent or Lender is required to repay such refund to such taxing authority.

2.15    Indemnity.  The Borrowers agree to indemnify each Lender (each, an "Indemnified Person") for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by any Borrower in making a borrowing of Loans after such Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by any Borrower in making any prepayment after such Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Loans on a day that is not the last day of an Interest Period with respect thereto.  Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case

44

of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank Eurodollar market.  A certificate as to any amounts payable pursuant to this Section 2.15 submitted to the Borrowers by any Lender shall be conclusive in the absence of manifest error.  No Indemnified Person shall be responsible or liable to any other party to any Loan Document, any successor, assignee or third party beneficiary of such Person or any other Person asserting claims derivatively through such party, for indirect, punitive, exemplary or consequential damages which may be alleged as a result of credit having been extended, suspended or terminated under any Loan Document or as a result of any other transaction contemplated hereunder or thereunder.  This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.16    Illegality.  Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof, in each case after the Closing Date, shall make it unlawful for any Lender to make or maintain Eurodollar Loans as contemplated by this Agreement, (a) the commitment of such Lender hereunder to make Eurodollar Loans, continue Eurodollar Loans as such and convert Base Rate Loans to Eurodollar Loans shall forthwith be canceled and (b) such Lender's Loans then outstanding as Eurodollar Loans, if any, shall be converted automatically to Base Rate Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law.  If any such conversion of a Eurodollar Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.15.

2.17    Change of Lending Office.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.13 or 2.14 with respect to such Lender, it will, if requested by the Borrowers, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; provided, that such designation is made on terms that, in the sole good faith judgment of such Lender, cause such Lender and its lending office(s) to suffer no material economic, legal or regulatory disadvantage, and provided, further, that nothing in this Section 2.17 shall affect or postpone any of the obligations of the Borrowers or the rights of any Lender pursuant to Section 2.13 or 2.14.

2.18    Super Priority Nature of Obligations and Liens.

(a)    The priority of the Agents' and Lenders' claims against, and Liens on and in the Collateral of, the Loan Parties shall be set forth in, and the provisions of this Section 2.18 set forth below are qualified entirely by, the Applicable Order.

(b)    All Obligations shall (i) with respect to the US Cases, constitute administrative expenses of the Loan Parties, with administrative priority and senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code, and such administrative claim

45

shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of Loan Parties, Loan Parties' estates, and any successor trustee or estate representative in the US Cases or any subsequent proceeding or case under the Bankruptcy Code and (ii) with respect to the CCAA Cases, be secured by the CCAA DIP Charge ranking senior in priority to all hypothecs, priorities, security interests, encumbrances and liens, but in all cases subject to the Aggregate Reserve Amount and Prior Senior Liens.  The Liens granted to Agents and Lenders on and in the Collateral of the Loan Parties, and the priorities accorded to the Obligations shall have the priority and senior secured status afforded by Sections 364(c) and 364(d)(l) of the Bankruptcy Code, senior to all claims and interests other than the Aggregate Reserve Amount and Prior Senior Liens.

(c)    Except as expressly set forth herein or in the Applicable Order, no other claim having a priority superior or pari passu to that granted to Agents and Lenders by the Applicable Order shall be granted or approved while any Obligations under this Agreement (or any adequate protection obligations owed to any Prepetition Senior Agent or any Prepetition Senior Lender) remain outstanding.  Except for the Aggregate Reserve Amount, no costs or expenses of administration shall be imposed against Agents, or Lenders or any of their Collateral or against any of the Prepetition Senior Agent and Prepetition Senior Lenders under the Prepetition Senior Credit Agreement or their respective collateral under Sections 105, 506(c) or 552 of the Bankruptcy Code, any similar legislation in Canada or otherwise, and each of the Loan Parties hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights thereunder to assert or impose or seek to assert or impose, any such costs or expenses of administration against Agents or the Lenders or against the Prepetition Senior Agent or the Prepetition Senior Lenders or their respective collateral.

2.19    <u>Payment of Obligations</u>.  Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Agents and Lenders shall be entitled to immediate payment of such Obligations in full in cash without further application or notice to or order of, or hearing before, the Bankruptcy Court or Canadian Court.

2.20    <u>No Discharge; Survival of Claims</u>.  Loan Parties agree that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in any Chapter 11 Case (and Loan Parties pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) or an order sanctioning a Plan of Reorganization in the CCAA Cases and (ii) the superpriority administrative claim and Liens granted to Agents and Lenders pursuant to the Applicable Orders shall not be affected in any manner by the entry of an order confirming a plan of reorganization in any Case.

2.21    <u>Release</u>.  Subject to entry of the Final Order, each Loan Party hereby acknowledges effective upon entry of the Applicable Order, that each such Loan Party and their respective Subsidiaries have no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of each such Loan Party's or their respective Subsidiaries' liability to repay any Agent or any Lender as provided in this Agreement or to seek affirmative relief or damages of

46

any kind or nature from any Agent or any Lender. Loan Parties, each in their own right and with respect to the Loan Parties, on behalf of their bankruptcy estates, and on behalf of all their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever release and discharge Agents and Lenders and all of Agents' and Lenders' past and present officers, directors, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and similar legislation in Canada and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Loan Documents, the Applicable Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

2.22    Waiver of any Priming Rights.  Upon the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations (or any adequate protection obligations owed to any Prepetition Senior Agent or any Prepetition Senior Lender) shall be outstanding, without limiting any terms or conditions of the Applicable Order, the Loan Parties hereby irrevocably waive any right, (i) to grant or impose, or request that the Bankruptcy Court or Canadian Court grant or impose, under section 364 of the Bankruptcy Code, similar legislation in Canada or otherwise, Liens on or security interests in any Property of the Loan Parties, which are pari passu with, equal to or superior to the Liens and security interests held by any Agent or Lender or adequate protection Liens held by any Prepetition Senior Agent or Prepetition Senior Lender; (ii) to grant or impose, or request that the Bankruptcy Court or Canadian Court grant or impose, under section 364 of the Bankruptcy Code, similar legislation in Canada or otherwise, claims or expenses against any Loan Party, which are pari passu with, equal to or superior to the Obligations or the adequate protection claims of any Prepetition Senior Agent or Prepetition Senior Lender; and (iii) to use, or to request that the Bankruptcy Court or Canadian Court authorize the use of, proceeds of Collateral or proceeds of Loans, except for such consensual uses expressly provided under the Applicable Order.

2.23    Soucy 2.  Notwithstanding anything to the contrary elsewhere in this Agreement, Soucy 2 shall not be liable, jointly or severally, for the Obligations or any liabilities of any party hereto other than Soucy 2, and does not make any representation, warranty, covenant or agreement with respect to or on behalf of any such other party (other than its Subsidiaries).

NY\1620408.3

2.24    Joint and Several Liability of Borrowers.

(a)    Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Administrative Agent and the Lenders under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrower to accept joint and several liability for the Obligations. Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrower, with respect to the payment and performance of all of the Obligations (including any Obligations arising under this Section 2.24), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them. If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrower will make such payment with respect to, or perform, such Obligation. The Obligations of each Borrower under the provisions of this Section 2.24 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each such Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

(b)    Except as otherwise expressly provided in this Agreement and without limiting the generality of Section 9.4, each Borrower hereby waives notice of acceptance by each other Borrower of such Borrower's joint and several liability, notice of the making of any Loans under or pursuant to this Agreement to such other Borrower, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement as against such other Borrower, notice of any action at any time taken or omitted by the Administrative Agent, the Collateral Agents or any Lender under or in respect of any of the Obligations as against such other Borrower, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement as against such other Borrower (except as otherwise provided in this Agreement). Each Borrower hereby assents to, and waives notice of, as each of the following applies to the other Borrower, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by the Administrative Agent, the Collateral Agents or any Lender at any time or times in respect of any Default or Event of Default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower. Without limiting the generality of the foregoing, each Borrower assents, as each of the following applies to the other Borrower, to any other action or delay in acting or failure to act on the part of the Administrative Agent, the Collateral Agents or any Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.24 afford grounds for terminating, discharging or relieving any

48

Borrower, in whole or in part, from any of its Obligations under this Section 2.24, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of such Borrower under this Section 2.24 shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower under this Section 2.24 shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any Borrower or the Administrative Agent, the Collateral Agents or any Lender. The joint and several liability of the Borrowers hereunder shall continue in full force and effect notwithstanding any absorption, merger, amalgamation or any other change whatsoever in the name, constitution or place of formation of any of the Borrowers or the Administrative Agent, the Collateral Agents or any Lender.

(c)     Each Borrower represents and warrants to the Administrative Agent, the Collateral Agents and Lenders that such Borrower is currently informed of the financial condition of the Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. Each Borrower further represents and warrants to the Administrative Agent, the Collateral Agents and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents. Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition, the financial condition of other Guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(d)     Each Borrower waives all rights and defenses arising out of an election of remedies by the Administrative Agent, the Collateral Agents or any Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Administrative Agent's, the Collateral Agents' or such Lender's rights of subrogation and reimbursement against such Borrower by the operation of any applicable law.

(e)     The provisions of this Section 2.24 shall remain in effect until all Commitments have been terminated and the principal of and interest on each Loan, all fees and all other expenses or amounts payable under any Loan Document shall have been paid in full (other than contingent indemnification obligations). If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by the Administrative Agent, the Collateral Agents or any Lender upon the insolvency, bankruptcy or reorganization of any of the Borrowers, or otherwise, the provisions of this Section 2.24 will forthwith be reinstated in effect, as though such payment had not been made.

(f)     Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Administrative Agent, the Collateral Agents or the Lenders with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to the Administrative Agent, Collateral Agents or any

49

Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation, as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefore.

(g)    Each of the Borrowers hereby agrees that, after the occurrence and during the continuance of any Event of Default, the payment of any amounts due with respect to the Indebtedness owing by any Borrower to any other Borrower is hereby subordinated to the prior payment in full in cash of the Obligations.  Each Borrower hereby agrees that after the occurrence and during the continuance of any Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any Indebtedness of any other Borrower owing to such Borrower.  If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such Indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for the Administrative Agent, and such Borrower shall deliver any such amounts to the Administrative Agent for application to the Obligations in accordance with Section 2.12.

(h)    Notwithstanding the foregoing, this Section 2.24 in its entirety is subject to, and qualified by, the provisions set forth in Section 2.23.

## SECTION 3.  REPRESENTATIONS AND WARRANTIES

To induce the Lead Arrangers, the Agents and the Lenders to enter into this Agreement and to continue or to make the Loans, each Borrower hereby represents and warrants to the Lead Arrangers, each Agent and each Lender that as of the Closing Date:

3.1    <u>Financial Condition</u>.

(a)    The financial statements for the fiscal years ended December 31, 2007 and 2008, reported on by and accompanied by an unqualified report from PricewaterhouseCoopers, present fairly in all material respects the consolidated financial condition of the applicable Company Group Member and its Subsidiaries as at such date, and the consolidated results of its operations and its consolidated cash flows for the respective fiscal years then ended.  All of the foregoing financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein).  None of the Company Group Members has (i) any material Contingent Obligations known to it which are not disclosed or referred to in the financial statements delivered to the Agents in accordance with the provisions of this Section 3.1 or have not otherwise been disclosed to the Agents in writing, or (ii) incurred any Indebtedness which is not disclosed in or reflected in such financial statements, or has not otherwise been disclosed to the Agents in writing, other than Indebtedness permitted hereunder.  During the period from

NY\1620408.3

December 31, 2008 to and including the Closing Date there has been no Disposition by any Company Group Member of any material part of its business or Property.

(b)     The projections set forth in the Approved Budget have been prepared by the Borrowers in light of the past operations of its business and giving effect to anticipated developments and the current situation related to the Cases, and reflect projections on a month by month basis for the fiscal year ending in 2010. Such projections are based upon estimates and assumptions stated therein, all of which each Borrower believes to be reasonable and fair in light of current conditions and current facts known to such Borrower and, as of the Closing Date, reflect such Borrower's good faith and reasonable estimates of the future financial performance of such Borrower and its Subsidiaries and of the other information projected therein for the periods set forth therein; it being understood that projections by their nature are subject to uncertainty, and, thus, no assurance can be given that the results provided therein will be actually achieved and actual results during the period or periods covered may differ from the projections and such differences may be material.

3.2     No Change.  Since December 31, 2008, other than the commencement of the Cases, there has been no development or event that has had or would reasonably be expected to have a Material Adverse Effect. Solely with respect to the making of any Delayed Draw Loans, since the Closing Date, there has been no development or event that has had or would reasonably be expected to have a Material Adverse Effect.

3.3     Corporate Existence; Compliance with Law.  Each Borrower and each other Company Group Member is duly constituted and organized and validly existing in its jurisdiction of constitution and, except as would not reasonably be expected to result in a Material Adverse Effect and, subject to the entry of the Applicable Order and the First Day Orders, in good standing in all jurisdictions in which it carries on business or is otherwise required to be so qualified (to the extent such concepts are applicable in the applicable jurisdiction and except by reason of the commencement of the Cases). Each Company Group Member has the capacity and power, subject to the entry of the Applicable Order and the First Day Orders, to hold its assets and carry on the Core Business in each jurisdiction where such business is carried on except, in the case of Company Group Members other than the Borrowers, the Guarantors, Soucy GP and Soucy 1, as would not reasonably be expected to result in a Material Adverse Effect, subject to the entry of the Applicable Order and the First Day Orders and other than as a result of the Cases (including operation of the automatic stay) and the CCAA Case. Each Company Group Member is in full compliance in all material respects with all requirements of applicable law and with all of the conditions attaching to its material permits, authorizations, licenses, certificates and approvals, including without limitation its constitutive documents except as would not reasonably be expected to result in a Material Adverse Effect. Each Company Group Member holds all the material permits and licenses it requires to operate the Core Business.

3.4     Corporate Power; Authorization; Enforceable Obligations.  Subject to the entry of the Applicable Order and the First Day Orders, each Loan Party has the power and authority, and has taken all necessary steps under applicable law to be authorized to borrow hereunder, to provide the security under the Security Documents and to execute and deliver and perform its obligations under this Agreement and each of the Loan Documents to which it is a

51

party in accordance with the terms and conditions hereof and thereof.  Upon the entry of the Applicable Order and the First Day Orders, each of this Agreement and each other Loan Document shall have been duly executed and delivered by duly authorized officers of each Loan Party that is party hereto or thereto and, upon the issuance and entry of the Interim Order and the CCAA Initial Order (or the Final Order, when applicable) by the Bankruptcy Court and the Canadian Court, as applicable, and subject to the terms of such orders, when duly executed by the other parties thereto (if any) and subject to the terms of the Applicable Order, will be a legal, valid and binding obligation of the relevant Loan Party, enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by bankruptcy, insolvency, re-organization and similar laws affecting the enforceability of creditors' rights generally and the availability of the equitable remedies of specific performance or injunction.

3.5     <u>Compliance with Law and Contracts</u>.  Subject in each case to the issuance and entry of the Interim Order and the CCAA Initial Order (or the Final Order, when applicable) by the Bankruptcy Court and the Canadian Court, as applicable, and subject to the terms and conditions of such orders and other than as contemplated by Section 5.16, the execution and delivery of and performance of the obligations under this Agreement, each other Loan Document in accordance with their respective terms by each Loan Party thereto do not require any consents or approvals, do not violate any Requirement of Law, do not conflict with, violate or constitute a breach under the constitutive and organizational documents of such Loan Party or under any Material Agreements, contracts or deeds to which such Loan Party is a party or binding upon it or its assets and do not result in or require the creation or imposition of any Lien whatsoever on the assets of any Loan Party, whether presently owned or hereafter acquired, except for Permitted Liens.

3.6     <u>No Material Litigation</u>.

Other than the Cases and the events set forth in Schedule 3.6,  there are no actions, suits, orders, directives or other legal or regulatory proceedings instituted or pending or, to the knowledge of any Company Group Member, threatened, against any of them or their Property before any court or arbitrator or any Governmental Authority or instituted by any Governmental Authority (i) with respect to the Loan Documents or (ii) which, if decided against any of the Company Group Members, would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

3.7     <u>No Default</u>.  There exists no Default or Event of Default hereunder. Each of the Company Group Members is in compliance in all material respects with each and every one of its obligations under Material Agreements with third parties to which it is a party or by which it is bound, the breach of which would reasonably be expected to result in a Material Adverse Effect.

3.8     <u>Ownership of Property; Liens</u>.  Each of the Company Group Members has good, valid and marketable title to all of its material properties and assets (or a valid leasehold interest in any material properties or assets that are leased), free and clear of any Liens other than Permitted Liens.

3.9    Intellectual Property.  Except as would not reasonably be expected to have a Material Adverse Effect (a) each Company Group Member owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted, (b) no claim has been asserted and is pending by any Person for infringement of any Intellectual Property or challenging the validity of any Intellectual Property and (c) to each Company Group Member's knowledge, the use of Intellectual Property by the Company Group Members does not infringe on the rights of any Person in any material respect.

3.10    Taxes.  Except as set forth on Schedule 4.10, each of the Company Group Members has filed on a timely basis all federal, provincial, state or other tax returns which it is required by applicable law to file and all material taxes, assessments and other duties levied by any Governmental Authority with respect to any Company Group Member have been paid when due, except to the extent that payment thereof is being contested in good faith by such Company Group Member in accordance with appropriate procedures, and for which adequate reserves have been established in the books of the relevant Company Group Member and that the failure to file tax returns or to make payment of taxes, assessment or other duties would not reasonably be expected to result in a Material Adverse Effect.  Except as set forth on Schedule 3.10, to the knowledge of the Company, after due inquiry, no material claim is being asserted, and no Lien has been filed (other than Liens with respect to taxes not yet due and payable), with respect to any such unpaid tax, assessment or other duty, other than tax assessments or other duties that would not reasonably be expected to result in a Material Adverse Effect.

3.11    Operation of Core Business; Federal Regulations.  The Borrowers and their respective Subsidiaries operate the Core Business.  None of the Company Group Members is engaged in the business of extending credit for the purpose of purchasing or carrying "margin stock" or "margin security", as defined in Regulation U and Regulation X, and no proceeds of any Loans will be used to purchase or carry any equity security of a class which is registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended, or any such margin stock or "margin security", or for a purpose which violates, or would be inconsistent with, Regulation T, U or X of the Board.  Terms used in this Section 3.11 for which meanings are provided in Regulation T, U or X of the Board or any regulations substituted therefor, as from time to time in effect, have the meaning so provided.  If requested by any Lender or the Administrative Agent, the Company will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U 1 referred to in Regulation U.

3.12    Labor Matters.  There are no strikes, stoppages or slowdowns or other labor disputes against any Company Group Member pending or, to the knowledge of any Company Group Member, threatened that (individually or in the aggregate) would reasonably be expected to have a Material Adverse Effect.  Hours worked by and payments made to employees of any Company Group Member have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters that (individually or in the aggregate) would reasonably be expected to have a Material Adverse Effect.  All payments due from any Company Group Member on account of employee health and welfare insurance that (individually or in the aggregate) would reasonably be expected to have a Material Adverse Effect if not paid have been paid or accrued as a liability on the books of the relevant Company Group Member.

53

3.13    Pensions and Benefit Plans.  (a)  ERISA.  Except as would not reasonably be expected to result in a Material Adverse Effect, (i) no Reportable Event has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Single Employer Plan, (ii) each Single Employer Plan that is subject to Title IV of ERISA has satisfied the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Single Employer Plan, (iii) each Plan (other than a Multiemployer Plan) has complied in all material respects with the applicable provisions of ERISA and the Code, (iv) no termination, or institution of proceedings to terminate or appoint a trustee or administrator, of a Single Employer Plan has occurred, (v) no Lien in favor of a Single Employer Plan or in favor of the PBGC with respect to a Single Employer Plan has arisen during the five-year period prior to the date on which this representation is made or deemed made, (vi) none of the Company Group Members nor any Commonly Controlled Entity has had, or has taken affirmative steps to undertake, a complete or partial withdrawal from any Multiemployer Plan, (vii) no Multiemployer Plan is in Reorganization or Insolvent, and (viii) the expected post-retirement healthcare and life insurance benefit obligations (determined as of the most recently ended fiscal year in accordance with Financial Accounting Standards Board Statement No. 106, without regard to liabilities attributable to continuation coverage mandated by Section 4980B of the Code) of the Company Group Members have been disclosed in the appropriate financial statements, where required, and, in any event, would not be expected to result in a liability in excess of $10,000,000.

(b)    Canadian Pension Plans and Canadian Benefit Plans.  The Company will cause to be delivered to the Administrative Agent, promptly upon the Administrative Agent's request, a copy of each Canadian Benefit Plan and Canadian Pension Plan (or, where any such Canadian Benefit Plan or Canadian Pension Plan is not in writing, a complete description of all material terms thereof) then in effect and, if applicable, all related trust agreements or other funding instruments and all amendments thereto then in effect, and all written interpretations thereof and written descriptions thereof that remain applicable and that have been distributed to employees or former employees of the Company Group Members.  The Canadian Pension Plans are duly registered under the *Income Tax Act* (Canada) and any other Requirement of Law which to the knowledge of each Company Group Member requires registration and no event has occurred which is reasonably likely to cause the loss of such registered status.  All material, if any, obligations of each Company Group Member required to be performed pursuant to a Requirement of Law and the plan terms in connection with the Canadian Pension Plans and the funding agreements therefor have been performed in a timely fashion.  There have been no improper withdrawals or applications of the assets of the Canadian Pension Plans or the Canadian Benefit Plans.  Except as would not reasonably be expected to result in a Material Adverse Effect, (i) there are no outstanding disputes concerning the assets held under the funding agreements for the Canadian Pension Plans or the Canadian Benefit Plans and (ii) each Canadian Pension Plan is funded to the extent required by a Requirement of Law and the plan terms on an ongoing basis, a solvency basis and a wind-up basis (using actuarial methods and assumptions which are consistent with the valuations last filed with the applicable Governmental Authorities and which are consistent with generally accepted actuarial principles).  No promises of benefit improvements under the Canadian Pension Plans or the Canadian Benefit Plans have been made except where such improvement could not have a Material Adverse Effect.  No Pension Plan Termination Event has occurred.  Except as would

54

not reasonably be expected to result in a Material Adverse Effect, (i) all contributions or premiums required to be made or paid by each Company Group Member, if any, to the Canadian Pension Plans or the Canadian Benefit Plans have been made or paid in a timely fashion in accordance with the terms of such plans and all Requirements of Law, (ii) all employee contributions to the Canadian Pension Plans or the Canadian Benefit Plans by way of authorized payroll deduction or otherwise have been properly withheld or collected and fully paid into such plans in a timely manner, (iii) all material reports and disclosures relating to the Canadian Pension Plans required by such plans and any Requirement of Law to be filed or distributed have been filed or distributed in a timely manner and (iv) each Company Group Member has withheld all employee withholdings and has made all employer contributions to be withheld and made by it pursuant to applicable law on account of Canadian Pension Plans and the Canadian Benefit Plans, employment insurance and employee income taxes.

3.14    Investment Company Act; Other Laws.  None of the Company Group Members is an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended (15 U.S.C. § 80a-1 et seq.).  Without limiting the foregoing, none of the Company Group Members is subject to regulation under any other applicable law which may limit its ability to incur Indebtedness or which may otherwise render its obligations hereunder or under any other Loan Document in favor of the Secured Parties unenforceable.

3.15    Subsidiaries.  The Subsidiaries listed on Schedule 4.15(a) constitute all the Subsidiaries of Holdings as of the Closing Date.  Schedule 4.15(a) sets forth as of the Closing Date, the exact legal name as reflected on the certificate of incorporation (or formation) and, the jurisdiction of incorporation (or formation) of each Subsidiary of Holdings and, as to each such Subsidiary and, the percentage of shares or other interests of each class of Capital Stock owned by each Company Group Member.

3.16    Environmental Matters.  (a)  No Company Group Member has received written notice of any existing claims, demands, orders (including, without limitation, regulatory and court orders), damages, expenses, suits, actions, causes of action or other similar proceedings of any nature whatsoever asserted against any Company Group Member, whether threatened in writing or pending, arising out of or in relation to: (i) the presence of any Hazardous Substance on, at, in or under any property owned, occupied, managed, controlled or operated by any Company Group Member, either in the past or the present; or (ii) any past or present activity (including, without limitation, any releases, discharges, spills or emissions)  conducted or condition existing involving Hazardous Substances not in compliance with applicable Environmental Laws on, at in or under any property now owned by any Company Group Member, whether or not conducted by a Company Group Member, in each case which would reasonably be expected to result in a Material Adverse Effect, except as set forth in Schedule 3.17.

(b)    Other than as set forth on Schedule 3.17 and in the assessments listed on Schedule 5.1(k), and to the best of the knowledge of the Company Group Members, after due inquiry:

(i)    there is no Hazardous Substance condition relating to the environment existing at, on, in or under any real property of any Company Group Member which constitutes a violation of any Environmental Law or which exceeds or contravenes any generally accepted standard in the jurisdiction in which the property is located and which would reasonably be expected to result in a Material Adverse Effect.

(ii)    the business of each Company Group Member is being carried on so as to comply with all Environmental Laws, except for such noncompliance as would not reasonably be expected to have a Material Adverse Effect;

(iii)    no Hazardous Substance is being or has been released into the environment contrary to applicable Environmental Laws from any real property owned or operated by any Company Group Member which would reasonably be expected to result in any Material Adverse Effect;

(iv)    compliance by the Company Group Members with all current Environmental Laws would not reasonably be expected to result in a Material Adverse Effect;

(v)    none of the Company Group Members is in default in performing any task or activity or in filing any report, document or information with respect to its business with any Governmental Authority as required pursuant to Environmental Laws except as such noncompliance, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; and

(vi)    each of the Company Group Members has maintained all environmental and operating documents and records with respect to its business substantially in the manner required by all Environmental Laws, except where the failure to maintain such documents and records would not reasonably be expected to have a Material Adverse Effect.

(c)    To the best of the knowledge of the Company Group Members, there are no present or past environmental conditions or events near the property of any Company Group Member that would reasonably be expected to result in a Material Adverse Effect.

(d)    Except as expressly stated otherwise, all representations and warranties of the Borrowers with respect to environmental matters are contained solely and exclusively in this Section 3.16, and all other provisions of this Agreement shall be interpreted accordingly.

3.17    Accuracy of Information, etc.  No statement or information (other than projections) contained in this Agreement, any other Loan Document, or any other document, certificate or statement furnished to the Administrative Agent, the Lead Arrangers, the Agents or the Lenders or any of them, by or on behalf of any Group Member for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, taken as a whole, contained as of the date such statement, information, document or certificate was so furnished,

56

NY\1620408.3

any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which such statements were made. The projections are based upon good faith estimates and assumptions believed by management of Holdings and the Company to be reasonable at the time made, it being recognized by the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein. There is no fact known to any Company Group Member that would reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in the other Loan Documents or in any other documents, certificates and statements furnished to the Lead Arrangers, the Agents and the Lenders for use in connection with the transactions contemplated hereby and by the other Loan Documents.

       3.18    <u>Security Documents</u>.  Upon the issuance and entry of the DIP Order and the CCAA Initial Order by the Bankruptcy Court and the Canadian Court, as applicable, the DIP Order, the CCAA Initial Order and the applicable Security Documents are effective to create in favor of the US Collateral Agent, the Canadian Collateral Agent or, in respect of the Soucy Intercompany Note, the Company (and indirectly the Canadian Collateral Agent), as applicable, for the benefit of the Secured Parties defined therein, a legal, valid, binding and enforceable Lien on, and security interest in, the Collateral described therein and proceeds and products thereof, to the extent (with respect to personal or movable property) that such interest can be created pursuant to the applicable law or regulation.  In the case of the Collateral described in the applicable Security Documents, when Financing Statements and Mortgages (or, in the sole discretion of the Lead Arrangers, the Applicable Order) in appropriate form are filed in the offices specified on <u>Schedule 4.19</u> (which Financing Statements and Mortgages may be filed by the US Collateral Agent or the Canadian Collateral Agent, as applicable) at any time, such other filings as are specified in the applicable Security Documents have been completed (all of which filings may be filed by the US Collateral Agent or the Canadian Collateral Agent, as applicable, at any time) and upon the taking of possession or control by the US Collateral Agent or the Canadian Collateral Agent of Collateral in which a security interest may be perfected only by possession or control, each of the applicable Security Documents shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral described therein, including the Mortgaged Properties, and the proceeds and products thereof, as security for the Obligations described in the applicable Security Documents, and prior and superior in right to any other Person (as set forth in Section 2.18).  On or prior to the Closing Date, the Company will have delivered to the US Collateral Agent or the Canadian Collateral Agent, as applicable, or caused to be filed, duly completed UCC or other applicable termination or discharge statements under Personal Property Security Legislation, signed by the relevant secured party, if applicable, in respect of each Financing Statement filed in respect of Liens other than Permitted Liens or otherwise made arrangements reasonably satisfactory to the US Collateral Agent or the Canadian Collateral Agent, as applicable, with respect thereto. The information contained in the Perfection Certificates is true, correct and complete as of the Closing Date in all material respects.

       3.19    <u>Approved Budget</u>.

The Approved Budget includes and contains all fees, costs and/or expenses that are projected, in the Loans Parties' commercially reasonable judgment, to be payable, incurred and/or accrued by the Borrowers or other Loan Parties (or their respective Subsidiaries) during the period covered by such Approved Budget.  It being understood that the projections in the Approved Budget are based upon good faith estimates and assumptions believed by management of the Loan Parties to be reasonable at the time made, it being recognized by the Administrative Agent, the Syndication Agent and the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein and such differences may be material.

3.20    Reorganization Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date and the CCAA Cases were commenced on the CCAA Filing Date, in each case in accordance with applicable law and proper notice thereof and proper notice for (x) the motion seeking approval of the Loan Documents and the Applicable Order, (y) the hearing for the approval of the Interim Order and the CCAA Initial Order and (z) the hearing for the approval of the Final Order has been given or dispensed with by the terms of the Applicable Order.  The Borrowers shall give, on a timely basis as specified in the Applicable Order, all notices required to be given to all parties specified in the Applicable Order.

(b)    The CCAA Initial Order, the Interim Order (with respect to the period prior to entry of the Final Order) and the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, are each in full force and effect and have not been reversed, stayed, vacated, modified or amended, except as would not result in an Event of Default hereunder.

3.21    Insurance.  Each Company Group Member is insured in accordance with Section 5.15.  As of the Closing Date such insurance is in full force and effect and all premiums have been duly paid.  No Company Group Member has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers at a cost that would not reasonably be expected to have a Material Adverse Effect.

3.22    Real Estate.  As of the Closing Date, Schedule 4.22 sets forth a true, complete and correct list of all material real property owned or leased by any Company Group Member (but in any event all real property owned or leased by any Company Group Member that is used or useful in the Core Business) and indicates which such properties are Mortgaged Properties.

3.23    Valid Liens.  Upon the issuance and entry of the DIP Order and the CCAA Initial Order by the Bankruptcy Court and the Canadian Court, respectively, such orders shall be effective to create in favor of the Collateral Agents, for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, all of the Loan Parties' right, title and interest in and to the Collateral thereunder.  Upon the issuance and entry of the DIP Order and the CCAA Initial Order by the Bankruptcy Court and the Canadian Court, respectively, such

58

orders and the Liens created by such orders will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case with the priority set forth in Section 2.18 and subject to no Liens other than the Permitted Liens.

3.24    Survival of Representations and Warranties.  All of the representations and warranties made hereunder or under any other Loan Document are true and correct on and as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date) and shall survive the execution and delivery of this Agreement and the making of the Loans and the extensions of credit hereunder, as well as any investigation by or on behalf of any Agent or Lender or the making of any Loan hereunder, and none of same is or shall be waived, except in writing.

SECTION 4.  CONDITIONS PRECEDENT

4.1    Conditions to Effectiveness .  The obligation of each Lender to fund the initial Extensions of Credit requested to be made by it shall be subject to the prior or concurrent satisfaction [(except to the extent that such conditions are permitted to be satisfied on a post-closing basis pursuant to Section 5.16 hereof)] of each of the conditions precedent set forth in this Section 4.1.

(a)    Loan Documents.  The Administrative Agent shall have received (i) this Agreement, executed and delivered by a duly authorized officer of the Borrowers, (ii) the Notes (to the extent requested by any Lender), executed and delivered by a duly authorized officer of the Borrowers, (iii) the Security Agreements, and the Guarantees, executed and delivered by a duly authorized officer of each Loan Party party thereto and (iv) a Mortgage covering each of the Mortgaged Properties, executed and delivered by a duly authorized officer of each Loan Party party thereto.

(b)    Repayment of Prepetition Revolving Obligations.  The Prepetition Revolving Obligations shall have been repaid in full in cash from the proceeds of the Interim Date Loans made hereunder.

(c)    Approvals.  Other than with respect to the Applicable Order and subject to Section 5.16(a), any material governmental and third party approvals and consents necessary in connection with the Transactions, the other transactions contemplated hereby and the continuing operations of the Company Group Members shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent Governmental Authority that would restrain, prevent or otherwise impose adverse conditions on the Loans and other transactions contemplated hereby. There shall be no litigation, governmental, administrative or judicial action, actual or threatened, that could reasonably be expected to restrain, prevent or impose burdensome conditions on the Transactions or the other transactions contemplated hereby.

(d)    Fees.  The Lenders, the Lead Arrangers and the Agents shall have received all fees required to be paid, and been reimbursed all reasonable expenses for which invoices have been presented (including reasonable fees, disbursements and other charges of

59

counsel to the Lead Arrangers), on or before the Closing Date.  All such amounts [will be paid with proceeds of Interim Date Loans made on the Closing Date and] will be reflected in the funding instructions given by the Company to the Administrative Agent on or before the Closing Date.

(e)    Lien Searches.  The Agents shall have received the results of a recent lien, tax lien, bankruptcy and judgment search in each of the jurisdictions (including the United States of America and Canada) or offices in which Financing Statements under applicable Personal Property Security Legislation or other filings or recordations should be made to evidence or perfect (with the priority required under the Loan Documents) security interests in all assets of the Loan Parties (or would have been made at any time during the five years immediately preceding the Closing Date to perfect Liens on any assets of any Loan Party), and such search shall reveal no Liens on any of the assets of the Loan Parties, except for Permitted Liens.

(f)    Closing Certificate.  The Administrative Agent shall have received a certificate of Holdings and each Loan Party, dated the Closing Date, substantially in the form of Exhibit C, with appropriate insertions and attachments (including the Perfection Certificates).

(g)    Other Certifications.  The Administrative Agent shall have received the following in form and substance reasonably satisfactory to it and the Syndication Agent:

(i)    a copy of the charter and other constituting documents and bylaws of Holdings and each Loan Party and each amendment thereto, certified (as of a date reasonably near the Closing Date to the extent such certification is obtainable in the relevant jurisdiction) as being a true and correct copy thereof by the Secretary of State or other applicable Governmental Authority of the jurisdiction in which Holdings and each such Loan Party is organized;

(ii)    a copy of a certificate of the Secretary of State or other applicable Governmental Authority, to the extent such certification is obtainable, of the jurisdiction in which Holdings and each such Loan Party is organized, dated reasonably near the Closing Date, listing the charter of Holdings and such Loan Party and each amendment thereto on file in such office and certifying that (A) such amendments are the only amendments to Holdings' or such Loan Party's charter on file in such office, (B) Holdings and each such Loan Party has paid all franchise taxes to the date of such certificate (if obtainable in such jurisdiction) and (C) Holdings and each such Loan Party is duly organized and in good standing under the laws of such jurisdiction;

(iii)    to the extent obtainable, an electronic or facsimile confirmation from the Secretary of State or other applicable Governmental Authority of each jurisdiction in which Holdings and each Loan Party is organized certifying that Holdings and such Loan Party is duly organized and in good standing under the laws of such jurisdiction on the Closing Date, together with a written

confirmatory report in respect thereof prepared by, or on behalf of, a filing service acceptable to the Administrative Agent; and

        (iv)    to the extent obtainable, a copy of a certificate of the Secretary of State or other applicable Governmental Authority of each state or province where Holdings and any Loan Party is required to be qualified as a foreign corporation or entity, other than any state or province where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect, dated reasonably near the Closing Date, stating that Holdings or such Loan Party is duly qualified and in good standing as a foreign corporation or entity in each such jurisdiction and has filed all annual reports required to be filed to the date of such certificate; and an electronic confirmation, prepared by or on behalf of, a filing service reasonably acceptable to the Administrative Agent, stating that the Secretary of State or other applicable Governmental Authority of each such jurisdiction on the date of the initial extension of credit has confirmed the due qualification and continued good standing of each such Person as a foreign corporation or entity in each such jurisdiction on or about such date.

        (h)    <u>Legal Opinions</u>.  The Administrative Agent shall have received the following executed legal opinions in form and substance reasonably satisfactory to it and the Syndication Agent:

        (i)    the legal opinion of Kirkland & Ellis LLP, special US counsel of the Company Group Members, substantially in the form of Exhibit F-1;

        (ii)    the legal opinion of [Stikeman Elliott LLP], special Québec counsel of the Company Group Members, substantially in the form of Exhibit F-2;

        (iii)    the legal opinion of [Troutman Sanders LLP], special Virginia counsel of the Company Group Members, substantially in the form of Exhibit F-3; and

        (iv)    the legal opinion of [Stewart McKelvey] special Nova Scotia counsel of certain of the Company Group Members, substantially in the form of Exhibit F-4.

Each such legal opinion shall cover such other matters incident to the transactions contemplated by this Agreement as the Administrative Agent and the Syndication Agent may reasonably require.

        (i)    <u>Pledged Stock, Stock Powers; Acknowledgment and Consent; Pledged Notes; Soucy Intercompany Note</u>.  The US Collateral Agent and the Canadian Collateral Agent shall have received (i) the certificates representing all of the shares of Capital Stock pledged pursuant to the applicable Security Documents, together with an undated stock power and irrevocable proxy for each such certificate executed in blank by a duly authorized officer of the pledgor thereof, (ii) an Acknowledgment and Consent, in form and substance reasonably

satisfactory to the Canadian Collateral Agent, duly executed by any issuer of Capital Stock pledged pursuant to the applicable Security Documents (x) that is not itself a party to the applicable Security Documents or (y) which relates to Capital Stock which is not represented by a title, (iii) each promissory note pledged pursuant to the applicable Security Documents endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank reasonably satisfactory to such Agent) by the pledgor thereof, (iv)(x) the Soucy Intercompany Note and (y) a copy of the hypothec [to be] entered into between Soucy 2 and the Company in respect of the Soucy Intercompany Note and the direction described in Section 5.9(a)(iii), [all in form and substance reasonably satisfactory to such Agent] as well as the hypothec on the Soucy Intercompany Note (including all security therefor) in favor of the Canadian Collateral Agent, (v) a copy of the guarantee of Soucy 1 in respect of the Soucy Intercompany Note and a copy of the hypothec, debenture and debenture pledge to be entered into by Soucy 1 in respect thereof, [all in form and substance reasonably satisfactory to such Agent] (vi) a copy of the guarantee of Soucy GP in respect of the Soucy Intercompany Note and a copy of the hypothec, debenture and debenture pledge to be entered into by Soucy GP in respect thereof, [all in form and substance reasonably satisfactory to such Agent] (vii) a copy of the guarantee of Arrimage in respect of the Soucy Intercompany Note and a copy of the hypothec, debenture and debenture pledge to be entered into by Arrimage in respect thereof, and (viii) an executed lease and hypothec in respect of the agricultural lands held by Stadacona Amalco, all in form and substance reasonably satisfactory to the Canadian Collateral Agent.[1]

(j)    Filings, Registrations and Recordings.  Except as otherwise agreed by the US Collateral Agent or the Canadian Collateral Agent, as applicable, each document (including, without limitation, any Financing Statement filed pursuant to applicable Personal Property Security Legislation) required by the Security Documents or under law or otherwise requested by such Agent to be filed, registered or recorded in order to create in favor of the US Collateral Agent or the Canadian Collateral Agent, as applicable, for the benefit of the applicable Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Permitted Liens), shall have been filed, registered or recorded or shall have been delivered to such Agent in proper form for filing, registration or recordation.

(k)    Insurance.  The Agents shall have received insurance certificates satisfying the requirements of Section 5.15.

(l)    Patriot Act.  At least one Business Day before the Closing Date, the Administrative Agent shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA Patriot Act.[2]

(m)    Representations and Warranties.  Each of the representations and warranties made by Holdings or any Loan Party in or pursuant to any Loan Document shall be true and correct in all material respects on the Closing Date and the Administrative Agent shall

---

[1] Bracketed language to be deleted if new intercompany note is not necessary.

[2] Please confirm Agent has all required information.

NY\1620408.3

have received a certificate signed by the chief financial officer of the Borrowers to that effect, except for representations and warranties expressly stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date.

(n)     No Default.  No Default or Event of Default shall have occurred and be continuing on the Closing Date after giving effect to the Extensions of Credit requested to be made thereon.

(o)     Material Adverse Effect.  Since December 31, [2008],  no event, change or condition shall have occurred that, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect.

(p)     Commencement of Cases.  The Transactions shall have been duly authorized by each Loan Party and the Cases shall have been commenced by each Loan Party and each Loan Party shall each be a Debtor and a Debtor-in-Possession.

(q)     Agents shall be satisfied with the corporate structure, capital structure, debt instruments, material contracts, and governing documents of Borrowers and their Subsidiaries, and the tax effects resulting from the commencement of the Cases and the credit facility evidenced by this Agreement.

(r)     Applicable Orders.  Each Applicable Order shall have been entered by the Bankruptcy Court and Canadian Court (as applicable).  No Applicable Order shall (i) have been vacated, stayed, appealed, reversed, modified or amended; (ii) otherwise not be in full force and effect or (iii) be subject to a motion for reconsideration, a motion to amend, vary or appeal or a motion for a stay pending appeal (or similar relief).

(s)     First Day Orders.  The First Day Orders shall have been entered in the Cases.

(t)     Approved Budget.  The Administrative Agent, Syndication Agent and the Lead Arrangers shall have received and be satisfied with the Approved Budget.

(u)     Litigation.  Other than the commencement and effect of the Cases, there shall not exist any action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or Governmental Authority that affects any of the transactions contemplated hereby or that has or could reasonably be expected to have a Material Adverse Effect on any of the transactions contemplated hereby, or that has resulted in or would reasonably be expected to have a Material Adverse Effect on the business, assets, operations or condition (financial or otherwise) of the Borrowers and their respective Subsidiaries, taken as a whole.

4.2     Additional Conditions to Credit Events.  The obligations of the Lenders to make any Extensions of Credit requested to be made are subject to the satisfaction of the conditions set forth in Sections 4.1 and 4.3 hereof and, with respect to Delayed Draw Loans, to the satisfaction that within thirty (30) days following the Petition Date, the Final Status Date shall have occurred.

63

4.3    Conditions to all Extensions of Credit.  The obligations of the Lenders to make any Extensions of Credit (including the initial Extension of Credit) are subject to the satisfaction of the following conditions precedent on the relevant borrowing date:

(a)    Continuation of Representations and Warranties.  The representations and warranties contained in Article IV shall be true and correct in all material respects on and as of such borrowing, continuation or conversion date with the same effect as if made on and as of such date, except for any representation and warranty made as of an earlier date, which representation and warranty shall remain true and correct in all material respects as of such earlier date.

(b)    No Existing Default.  No Default or Event of Default shall have occurred and be continuing on the borrowing, continuation or conversion date with respect to such Loan or after giving effect to the Loans to be made, continued or converted on such date.

(c)    Approved Budget.  The Extensions of Credit so requested shall (i) not cause the aggregate outstanding amount of the Loans to exceed the amount then authorized by the Applicable Order and (ii) shall be consistent with the most recently delivered Approved Budget in effect at such time.

(d)    Bankruptcy Matters.  At the time of such Extensions of Credit, (i) if such Extensions of Credit is prior to the issuance and entry and effectiveness of the Final Order, the Interim Order and the CCAA Initial Order shall not have terminated or expired, and the date of such Extensions of Credit shall not be more than thirty (30) days after the Petition Date, (ii) if such Extensions of Credit is after the issuance and entry and effectiveness of the Final Order, the Final Order shall be effective, and shall not have terminated or expired, (iii) no Applicable Order shall have been vacated, reversed, stayed, appealed, amended, supplemented or otherwise modified, (iv) no motion for reconsideration, or to amend, vary or appeal, of any Applicable Order shall be pending, and (v) no appeal of any Applicable Order shall be pending and no Applicable Order shall be subject of a stay pending appeal or a motion for a stay pending appeal.

(e)    The Administrative Agent shall have received a Borrowing Notice from the Borrowers in accordance with Section 2.2.

SECTION 5.  AFFIRMATIVE COVENANTS

Each Borrower hereby agrees that, so long as any Commitment remains in effect or any Loan or other Obligation is owing to any Lender, any Agent or any Lead Arranger hereunder, each of Holdings and such Borrower shall, and shall cause each of its respective Subsidiaries to, on and after the Closing Date:

5.1    Financial Statements.  Furnish to the Administrative Agent:

(a)    within 150 days after the end of each fiscal year of the Company, a copy of the audited consolidated balance sheet of the [Company][3] and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative form the figures as of the end of and for the previous year reported on, and accompanied by an opinion of PricewaterhouseCoopers LLP or other independent public accountants of recognized national standing satisfactory to the Administrative Agent (which opinion shall not be qualified as to scope of the audit or other adverse qualification or exception (other than any "going concern or other" qualification and qualifications with respect to method of accounting as a result of the Cases)), stating that such financial statements fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of the Company as of the dates and for the periods specified in accordance with GAAP;

(b)    not later than 30 days after the end of each month, a copy of the unaudited consolidated balance sheet of the [Company] and its consolidated Subsidiaries as at the end of such month and the related unaudited consolidated statements of income and of cash flows for such month and the portion of the fiscal year through the end of such month, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal yearend audit adjustments and the absence of footnotes); and

(c)    by no later than [_____] (for distribution to the Lenders), the Cash Flow Forecasts, which in each case shall be acceptable to the Majority Lenders (which acceptance shall not be unreasonably withheld); provided that the Majority Lenders shall first provide to the Borrowers a detailed written explanation as to why the proposed Cash Flow Forecasts are unacceptable and the Borrowers shall thereafter have three (3) Business Days in which to cure any deficiencies identified by the Majority Lenders.

provided that all financial statements delivered from time to time in accordance with the provisions of Sections 5.1(a), (b) and (c) will be prepared in accordance with GAAP (subject to normal year end audit adjustments and except for footnote disclosures in the case of Section 5.1(b) and (c)) applied on a consistent basis throughout the periods specified.

5.2    Certificates; Other Information.  Furnish to the Administrative Agent:

(a)    [(i)] within five Business Days of receipt thereof by any Company Group Member, copies of all management letters, exception reports or similar letters or reports received by such Company Group Member from its accountants or auditors [and (ii) within ten days of the end of each fiscal year of the Borrowers, a certification of a Responsible Officer of Soucy 2  in form and substance reasonably satisfactory to the Administrative Agent confirming that Soucy 2  has paid all interest then due and owing on the Soucy Intercompany Note or acknowledging its indebtedness thereunder, and waiving any prescription right it may have];

---

[3] To confirm.

NY\1620408.3

(b)        concurrently with the delivery of any financial statements pursuant to Section 5.1(a) (b) or (c), a certificate of a Responsible Officer stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate, and (ii) a Compliance Certificate containing all information and calculations necessary for determining compliance by the Company Group Members with the provisions of this Agreement referred to therein as of the last day of the fiscal quarter or fiscal year of the Company, as the case may be;

(c)        no later than 15 days prior to December 31, 2010, a reasonably detailed consolidated budget for 2011 (including a projected consolidated balance sheet of the [Company] and its Subsidiaries as of the end of such following fiscal year, and the related consolidated statements of projected cash flow and projected income), and, as soon as available, significant revisions, if any, of such budget and projections with respect to such following fiscal year (collectively, the "Projections") (it being recognized by the Lenders that such Projections relate to uncertain future events and are not to be viewed as fact, and that actual results for the periods covered by such Projections may differ significantly from the projected results), which Projections shall in each case be accompanied by a certificate of a Responsible Officer stating that such Projections are based on reasonable assumptions;

(d)        within five days after the same are sent, copies of all financial statements and reports that any Company Group Member sends to the holders of any class of its public debt securities or public equity securities and, within five days after the same are filed, copies of all financial statements and reports that any Company Group Member may make to, or file with, the SEC;

(e)        within five Business Days of obtaining knowledge thereof:  (i) notice of any event or condition that, individually or in the aggregate with other related events or conditions, would reasonably be expected to result in the payment by any Company Group Member, in the aggregate, of a Material Environmental Amount; and (ii) any notice that any Governmental Authority will deny any application for a material Environmental Permit or other material Permit sought by, or will revoke or refuse to renew any material Environmental Permit or any other material Permit held by, a Loan Party, or to impose terms or conditions on any such material Environmental Permit or other material Permit issued to or to be issued to any Company Group Member that are materially more burdensome than the current terms and conditions of such permit, where such denial, revocation, refusal, term or condition could materially impede or preclude the normal conduct of such Loan Party's business in respect of the operation to which such Environmental Permit or material Permit applies;

(f)        concurrently with the delivery of the financial statements referred to in Section 5.1(a), a report of a reputable insurance broker with respect to the insurance required by Section 5.15, and, from time to time, such supplemental reports thereto as the Administrative Agent or the Syndication Agent may reasonably request;

(g)        promptly, all documentation and other information required from time to time by Agents or bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA Patriot Act; and

NY\1620408.3

(h)        promptly, such additional financial and other information as the Administrative Agent or the Syndication Agent may from time to time reasonably request.

5.3        Payment of Obligations.  Except as prohibited or excused by the Applicable Order, the Bankruptcy Code, similar Canadian legislation or by reason of commencement of the Cases, pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations (other than Indebtedness, to the extent not permitted hereby and taxes which will be governed exclusively by Section 5.18) of whatever nature, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the applicable Company Group Member.

5.4        Maintenance of Existence; Permits; Compliance with Law; Contracts and Other Obligations.  (a)  Subject to the provisions of Section 6.4 and except as prohibited or excused by the Applicable Order, the Bankruptcy Code, similar Canadian legislation or by reason of commencement of the Cases, do or cause to be done all things necessary to (i) preserve and maintain its existence in full force and effect, and (ii) remain in good standing in all applicable jurisdictions except in the case of this clause (ii) where the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

(b)        Except as prohibited or excused by the Applicable Order, the Bankruptcy Code, similar Canadian legislation or by reason of commencement of the Cases, maintain in effect and obtain, where necessary, all such material authorizations, approvals, licenses or consents of such Governmental Authorities, whether federal, state, provincial or local, which are necessary or required for any Company Group Member to carry on the Core Business and to satisfy its obligations hereunder and under the other Loan Documents.

(c)        Except as prohibited or excused by the Applicable Order, the Bankruptcy Code, similar Canadian legislation or by reason of commencement of the Cases, conduct its business in compliance with applicable law, and record or cause to be recorded all transactions with respect to its business in accordance with GAAP applied on a consistent basis, and comply with all Requirements of Law and with all the conditions attaching to its permits, authorizations, licenses, certificates and approvals, in each case if the failure to do so would reasonably be expected to result in a Material Adverse Effect.

(d)        Except as prohibited or excused by the Applicable Order, the Bankruptcy Code, similar Canadian legislation or by reason of commencement of the Cases, perform all obligations in the ordinary course of business, except to the extent that the non-fulfilment of the same would not reasonably be expected to result in a Material Adverse Effect, and except where the same are being contested in good faith, if the outcome of such contestation, if decided adversely to the applicable Company Group Member, would not reasonably be expected to result in a Material Adverse Effect.

5.5        Maintenance of Property.  Except as otherwise expressly permitted by this Agreement, as otherwise prohibited or excused by the Applicable Order, the Bankruptcy Code, similar Canadian legislation or by reason of commencement of the Cases, and except where failure to do so would not reasonably be expected to result in a Material Adverse Effect,

67

maintain or cause to be maintained in good operating condition all of its material assets used or useful in the conduct of the Core Business, as would a prudent owner of similar property, whether the same are held under lease or under any agreement providing for the retention of ownership, and from time to time make or cause to be made thereto all necessary and appropriate repairs, renewals, replacements, additions, improvements and other works.

      5.6    <u>Inspection; Discussions</u>. Allow the employees and representatives of the Agents and any Lender who, individually or together with its Affiliates, holds or has the power to control the vote with respect to more than ten percent (10%) of the Loans then outstanding, during normal business hours and upon reasonable notice, to have access to and inspect the assets of the Company Group Members, to inspect and take extracts from or copies of the books and records of the Company Group Members and to discuss the business, financial position, or operating results of the Company Group Members with the principal officers of the Company Group Members and, after obtaining the approval of the Company, which shall not be unreasonably withheld, with the auditors of the Company.

      5.7    <u>Notices</u>. Advise the Administrative Agent in writing forthwith upon obtaining knowledge of the occurrence of any of the following events:

      (a)    the commencement of any proceeding or investigation by or before any Governmental Authority or any action or proceeding before any court or arbitrator against a Company Group Member or any of its property, assets or activities, including, without limitation, any claim, order or other proceeding under any Environmental Law, which, in the event that a decision is rendered which is adverse to such Person, would reasonably be expected to result in a Material Adverse Effect, other than in connection with the Cases;

      (b)    notwithstanding the provisions of the foregoing subclause (a), any litigation or proceeding affecting any Company Group Member in which the amount involved is $5,000,000 or more or in which injunctive or similar relief is sought, other than in connection with the Cases;

      (c)    the following events if, individually or in the aggregate, they would reasonably be expected to result in a Material Adverse Effect, promptly and in any event within 30 days after any Company Group Member knows or has reason to know thereof: (i) the occurrence of any Reportable Event with respect to any Single Employer Plan, a failure to make any required contribution to a Single Employer Plan, the creation of any Lien in favor of a Single Employer Plan or in favor of the PBGC with respect to a Single Employer Plan or any withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan, or (ii) the institution or expected institution of proceedings or the taking of any other action by the PBGC, any Company Group Member or any Commonly Controlled Entity with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Single Employer Plan or Multiemployer Plan;

      (d)    promptly following any reasonable request therefor, copies of (i) any documents described in Section 101(k) of ERISA that any Company Group Member or any Commonly Controlled Entity may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA that any Company Group Member or any

NY\1620408.3

Commonly Controlled Entity may request with respect to any Multiemployer Plan; provided that if any Company Group Member or any Commonly Controlled Entity has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the applicable Company Group Member(s) or the Commonly Controlled Entity(ies) shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof;

(e)    (i) becoming aware of a Pension Plan Termination Event; (ii) the failure to make a required contribution or payment under any Canadian Pension Plan when due; (iii) the occurrence of any event which is reasonably likely to result in any Company Group Member incurring any material liability, fine or penalty with respect to any Canadian Benefit Plan or Canadian Pension Plan; (iv) the existence of any report which discloses a Pension Plan Unfunded Liability, prior to the filing of such report with a Governmental Authority; (v) the appointment of a third party administrator by any Governmental Authority; and (vi) withdrawal from or wind-up of any Canadian Multi-Employer Pension Plan;

(f)    the occurrence of any change in the location of any Company Group Member's principal place of business, chief executive office, office where it maintains books and records relating to the Collateral owned by it, office or facility at which Collateral owned by it is located (if such change adversely affects the rights of the applicable Secured Parties in such Collateral) or place where any Capital Stock may be transferred or name or jurisdiction;

(g)    the occurrence of any fact, event, development or circumstance that would reasonably be expected to have a Material Adverse Effect which is known to any Company Group Member, acting reasonably; and

(h)    any Default or Event of Default,

specifying in each case the relevant details and the action contemplated in respect thereof.

5.8    Environmental Laws. (a) Comply with, and take reasonable measures to ensure compliance by all tenants and subtenants of real property owned or leased by any of the Company Group Members, if any, with, all applicable Environmental Laws and Environmental Permits, and obtain, maintain and comply with, and take reasonable measures to ensure that all tenants and subtenants obtain, maintain and comply with, any and all Environmental Laws and Environmental Permits, except where failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)    Comply in all material respects with all applicable orders and directives of all Governmental Authorities regarding Environmental Laws, including, without limitation, such orders and directives to conduct and complete investigations, studies, sampling and testing, and remedial, removal and other actions required under Environmental Laws, except to the extent that any such order or directive is being challenged in good faith in proper proceedings and such compliance is not required during the time frame in which the challenge remains undecided or otherwise undetermined.

69

5.9     Collateral, Etc.  Subject to Section 5.16,

(a)       (i)     Pursuant to Section 364(c)(2) and (d) of the Bankruptcy Code and the applicable provisions of the CCAA, cause the Obligations, upon entry of the Applicable Order, to be secured by valid, binding, enforceable, unavoidable first priority and fully perfected Liens and court-ordered charges, senior and superior to the Liens securing any and all of the Prepetition Senior Obligations and/or Prepetition Junior Obligations, but subject to the Aggregate Reserve Amount and Prior Senior Liens, on all assets and Property of each Loan Party, whether Prepetition or Postpetition, real or personal, tangible or intangible Property (moveable and immoveable), of any kind or nature whatsoever, wherever located, whether now existing or hereafter acquired or arising, including, without limitation, all cash (including all proceeds of Collateral, wherever held), Cash Equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, machinery, goods, fixtures, real property interests, intellectual property, vehicles, general intangibles, investment property, supporting obligations, letter of credit rights, commercial tort claims, one hundred percent (100%) of the Capital Stock of each such Loan Party's direct and indirect domestic and foreign Subsidiaries (other than the Capital Stock of any Excluded Non US Subsidiary of the Company, in respect of which only 65% of the voting Capital Stock and 100% of the non-voting Capital Stock shall be subject to such Lien), all intercompany notes held by any Loan Party, the Soucy Intercompany Note, contract rights, leases, insurance policies, trademarks, trade names, licenses, rights to payment including tax refund claims, and causes of action (exclusive of actions for preferences, fraudulent conveyances, and other avoidance power claims under Chapter 5 of the Bankruptcy Code and any similar actions under the laws of Canada (the "Avoidance Actions" ) but including the proceeds and recoveries from the Avoidance Actions (the "Avoidance Action Proceeds") upon entry and approval of the Final Order), and the proceeds, products, offspring, rents and profits of all of the foregoing, including, without limitation, insurance proceeds; *provided however*, the Avoidance Actions and Avoidance Action Proceeds shall be substantially the last collateral used to repay the Obligations.

        (ii)     The Obligations of the Borrowers shall at all times be (x) guaranteed by each Guarantor (each such guarantee, a "Guarantee").  The obligations in respect of the Guarantee of each Guarantor shall at all times be secured by a perfected first priority Lien (except for, other than in the case of Capital Stock,[4] Prior Senior Liens and the Aggregate Reserve Amount) (subject, solely in the case of any Property with respect to which a purchase money lien or lien on a Capital Lease Obligations permitted hereunder is in effect, to such purchase money lien),

        (iii)     the obligations in respect of the Soucy Intercompany Note shall at all times be (x) guaranteed by Soucy GP and each Subsidiary of Soucy 2 (each

---

[4] Note:  Not all Permitted Liens will be senior.

such guarantor in such capacity a "Soucy Intercompany Note Guarantor" and each such guarantee a "Soucy Intercompany Note Guarantee") and (y) secured by a perfected first priority Lien (except for, other than in the case of Capital Stock, Prior Senior Liens and the Aggregate Reserve Amount) on all Property of Soucy 2 (subject, solely in the case of any Property with respect to which a purchase money lien or lien on a Capital Lease Obligation permitted hereunder is in effect),

(iv)    the obligations in respect of the Soucy Intercompany Note Guarantee of each Soucy Intercompany Note Guarantor shall at all times be secured by a perfected first priority Lien (except for, other than in the case of Capital Stock, Prior Senior Liens and the Aggregate Reserve Amount) on all Property of such Soucy Intercompany Note Guarantor (subject, solely in the case of any Property with respect to which a purchase money lien or lien on a Capital Lease Obligation permitted hereunder is in effect).

Subject to Section 8.2, any of the Liens referred to in this Section 5.9 on Canadian Property (other than those granted in support of the obligations of Soucy 2 in respect of the Soucy Intercompany Note, which shall be made in favor of the Company, as holder of the Soucy Intercompany Note, and which shall be hypothecated to support the Obligations as set forth herein and in the other Loan Documents) shall be made in favor of the Canadian Collateral Agent (either as agent or in the capacity described in Section 8.1(b), or in favor of the Administrative Agent in the case of the pledges of debentures) for the benefit of the Secured Parties, and any of the Liens referred to in this Section 5.9 on US Property (other than those granted in support of the obligations in respect of the Soucy Intercompany Note, which shall be made in favor of the Company, as holder of the Soucy Intercompany Note, and which shall be hypothecated to support the Obligations as set forth herein and in the other Loan Documents) shall be made in favor of the US Collateral Agent for the benefit of the Secured Parties.

(b)    With respect to any Property acquired after the Closing Date by any Company Group Member (other than any Property described in Section 5.9(d) or Section 5.9(e), as to which the US Collateral Agent or the Canadian Collateral Agent, as applicable, for the benefit of the Secured Parties, does not have a perfected Lien, promptly (i) execute and deliver to the US Collateral Agent or the Canadian Collateral Agent as applicable, such amendments to the applicable Security Documents or such other documents as the US Collateral Agent or the Canadian Collateral Agent, as applicable, deems necessary or advisable to grant to the US Collateral Agent or the Canadian Collateral Agent, as applicable, for the benefit of the Secured Parties, a valid security interest and/or other applicable Lien in such Property and (ii) take all actions necessary or advisable to grant to the US Collateral Agent or the Canadian Collateral Agent, as applicable, for the benefit of the Secured Parties, a perfected first-priority security interest and/or other applicable Lien (subject to Prior Senior Liens and the Aggregate Reserve Amount) in such Property, including without limitation, the filing of Financing Statements under applicable Personal Property Security Legislation in such jurisdiction as may be required by the applicable Security Documents or by law or as may be requested by the US Collateral Agent or the Canadian Collateral Agent, as applicable.

(c)    With respect to any fee interest (or if requested by the Administrative Agent leasehold interest, to the extent such leasehold is created under a triple net ground lease

71

or similar transaction, subject to paragraph (g) below) in any real property having a value (together with improvements thereof) of at least $500,000 acquired after the Closing Date by any Company Group Member (other than any such real property owned by an Excluded Non US Subsidiary), promptly (i) execute and deliver a first-priority Mortgage (subject to Prior Senior Liens and the Aggregate Reserve Amount) in favor of the US Collateral Agent or the Canadian Collateral Agent, as applicable, for the benefit of the Secured Parties, covering such real property, (ii) if requested by the US Collateral Agent or the Canadian Collateral Agent, provide the Lenders with (x) (1) if such property is located outside Canada, title and extended coverage insurance, covering such real property in an amount at least equal to the purchase price of such real property (or such other amount as shall be reasonably specified by the US Collateral Agent) as well as a recent ALTA survey thereof complying with the provisions of Section 5.16(b), together with a surveyor's certificate and (2) if such property is located within Canada, a reasonably satisfactory title opinion covering such real property or title insurance complying with clause (1) (except that the reference to the US Collateral Agent shall be to the Canadian Collateral Agent) and (y) any consents or estoppels reasonably deemed necessary or advisable by the US Collateral Agent or the Canadian Collateral Agent, as applicable, in connection with such Mortgage, to the extent that such consents or estoppels may be obtained using commercially reasonable efforts without payment of money and without obligation to commence litigation, each of the foregoing in form and substance reasonably satisfactory to the US Collateral Agent or the Canadian Collateral Agent, as applicable, and (iii) if requested by the US Collateral Agent or the Canadian Collateral Agent, as applicable, deliver to such Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to such Agent.

(d)    With respect to (i) any new Subsidiary (other than an Excluded Non US Subsidiary) created or acquired after the Closing Date by any Company Group Member and (ii) any Excluded Non US Subsidiary, whether existing on the Closing Date or thereafter created or acquired, upon such Excluded Non US Subsidiary becoming a Subsidiary other than an Excluded Non US Subsidiary (such Subsidiary being referred to in this Section 5.9(e) as a new Subsidiary), promptly (i) execute and deliver to the US Collateral Agent or the Canadian Collateral Agent, as applicable, such amendments to the Security Documents as such Agent deems necessary or advisable to grant to such Agent, for the benefit of the Secured Parties, a perfected first-priority security interest in the Capital Stock of such new Subsidiary, (ii) deliver to such Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the applicable Company Group Member, (iii) cause such new Subsidiary (A) to become a party to the applicable Security Documents and (B) to take such actions necessary or advisable to grant to the applicable Agent for the benefit of the Secured Parties a perfected first-priority security interest (except for, other than in the case of Capital Stock, Prior Senior Liens and the Aggregate Reserve Amount) in the Collateral described in the Security Documents with respect to such new Subsidiary, including, without limitation, the execution and delivery by all necessary persons of control agreements, and the filing of Financing Statements under applicable Personal Property Security Legislation in such jurisdictions as may be required by the Security Documents or by law or as may be requested by such Agent, and (iv) if requested by such Agent, deliver to such Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to such Agent.

NY\1620408.3

(e)       With respect to any Excluded Non US Subsidiary created or acquired after the Closing Date by the Borrowers or any of their respective Subsidiaries (other than by any Excluded Non US Subsidiary), promptly (i) execute and deliver to the US Collateral Agent or the Canadian Collateral Agent, as applicable, such amendments to the applicable Security Documents or such other documents as such Agent deems necessary or advisable in order to grant to such Agent, for the benefit of the Secured Parties, a perfected first-priority security interest in the Capital Stock of such new Subsidiary (provided that in no event shall more than 65% of the total outstanding voting Capital Stock of any such Excluded Non US Subsidiary be required to be so pledged), (ii) deliver to such Agent the certificates representing such Capital Stock, together with irrevocable proxies, undated stock powers, in blank, executed and delivered by a duly authorized officer of the applicable Company Group Member, and take such other action as may be necessary or, in the opinion of such Agent, desirable to perfect the Lien of such Agent thereon, and (iii) if reasonably requested by such Agent, deliver to such Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to such Agent.

(f)       Notwithstanding anything to the contrary in this Section 5.9, with respect to any leasehold interest in property that is used in the operation of any mill or manufacturing, processing or other facility operated in the Core Business and that is required to be encumbered with a first-priority Mortgage pursuant to paragraph (c) of this Section 5.9, (i) the applicable Company Group Member shall use commercially reasonable efforts (excluding commencing litigation) to obtain (y) (1) a memorandum or notice of lease in recordable (or registerable) form with respect to such leasehold interest, executed and acknowledged by the lessor of such leasehold interest, or (2) evidence that the applicable lease with respect to such leasehold interest or a memorandum or notice thereof has been recorded (or registered) in all places necessary, in the US Collateral Agent's or Canadian Collateral Agent's, as applicable, reasonable judgment, to give constructive notice to third-party purchasers of such leasehold interest, and (z) any lessor or mortgagee consent or approval of such Mortgage as may be required pursuant to the terms of the applicable lease with respect to such leasehold interest, and (ii) if the applicable Company Group Member shall fail to obtain the documents referred to in clauses (y) or (z) above with respect to any such leasehold interest after using commercially reasonable efforts to do so, the applicable Company Group Member shall have no further obligation to comply with paragraph (c) of this Section 5.9 with respect to the applicable leasehold interest.  The Company shall promptly, upon request, provide the US Collateral Agent or the Canadian Collateral Agent, as applicable, with a report in reasonable detail summarizing the commercially reasonable efforts undertaken to obtain the items referenced in this Section 5.9(g).

(g)       Nothing in this Section 5.9 (or the failure of any party to comply or enforce this Section 5.9) shall amend, modify, affect or limit the terms and conditions of the Applicable Order or the granting, attachment and perfection of the Liens granted thereunder or in connection therewith.

5.10    Use of Proceeds.

(a)       Utilize the proceeds of the Loans and the proceeds of Collateral solely in a manner consistent with the Approved Budget for the financing of their ordinary working

73

capital and general corporate needs; provided that Borrowers shall utilize the proceeds of the Loans which are incurred on the Closing Date to repay in full the Prepetition Revolving Obligations and provided further that the Approved Budget shall permit the Borrowers to pay the Management Fee in accordance with the Management Agreement and this Agreement.

(b)    Not use the proceeds of the Loans or the proceeds of Collateral: (i) for the payment of any Prepetition Junior Obligation, Subordinated Debt, other than the Soucy Intercompany Note[5] (except for amounts approved by the Bankruptcy Court and Canadian Court in the First Day Orders and the initial CCAA Order, as applicable, that are consistent with the Approved Budget), (ii) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to (a) the interests of Agents and Lenders or their rights and remedies under this Agreement, the other Loan Documents, or the Applicable Orders, or (b) the interests of the Prepetition Senior Agents and Prepetition Senior Lenders or their rights and remedies under the Prepetition Senior Credit Agreement, the other Prepetition Senior Loan Documents, or the Applicable Orders, including, without limitation, for the payment of any services rendered by the professionals retained by the Loan Parties or any Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Prepetition Senior Obligations or the Liens securing same, or the Obligations or the Liens securing same, (y) for monetary, injunctive or other affirmative relief against any Prepetition Senior Lender or Prepetition Senior Agent or any Lender or Agent or their respective collateral or claims, or (z) preventing, hindering or otherwise delaying the exercise by any Prepetition Senior Lender, Prepetition Senior Agent, Lender or Agent of any rights and remedies under the Applicable Order, the Prepetition Senior Loan Documents, the Loan Documents or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the court or otherwise) by any or all of the Prepetition Senior Lenders, the Prepetition Senior Agents, the Lenders and the Agents upon any of their respective collateral; (iii) except as expressly permitted by this Agreement, to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any Borrower or any other Loan Party (including so-called "Topping Fees," "Exit Fees," and similar amounts) and/or (iv) to investigate, conduct discovery for, assert, join, commence, support, finance or prosecute, or pay or reimburse any fees, costs or expenses related to the foregoing for, any action for preferences, fraudulent conveyances, substantive consolidation, re-characterization, other avoidance power claims or any other claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, any Agent, Lender, Prepetition Senior Agent or Prepetition Senior Lenders, or any of their respective officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns, or successors, including, without limitation, "lender liability" claims and causes of action, any actions under chapter 5 of the Bankruptcy Code or any other similar claims and causes of action under Canadian law, in each case without the prior written consent

---

[5] Discuss.

NY\1620408.3

of the Administrative Agent, Syndication Agent and Lead Arrangers given in their sole discretion.

5.11    Pension and Benefits Plans.

(a)    ERISA Documents.  The Company will cause to be delivered to the Administrative Agent, promptly upon the Administrative Agent's reasonable request, any or all of the following:  (i) the most recent determination letter issued by the Internal Revenue Service with respect to each Plan (other than any Plan of a Commonly Controlled Entity); (ii) for the most recent plan year preceding the Administrative Agent's request, Annual Reports on Form 5500 Series required to be filed with any governmental agency for each Single Employer Plan; (iii) any information that has been provided to the Company or any Commonly Controlled Entity regarding withdrawal liability under any Multiemployer Plan; and (iv) any agreements between the PBGC and the Company or any Commonly Controlled Entity with respect to any Plan.

(b)    Canadian Pension Plans and Canadian Benefit Plans.

(i)    Each Company Group Member shall obtain and provide the Administrative Agent with written confirmation from the applicable Governmental Authorities that each Canadian Pension Plan adopted by any Company Group Member which is required to be registered under the *Income Tax Act* (Canada) or any other Requirement of Law has been registered.  Subject to any power or right of the Company Group Member to terminate a Canadian Pension Plan in whole or in part, each Company Group Member shall ensure that each Canadian Pension Plan retains its registered status under and is administered in all material respects in accordance with the applicable pension plan text, funding agreement, the *Income Tax Act* (Canada) and all other Requirements of Law.

(ii)    Each Company Group Member shall cause all reports and disclosures relating to any Canadian Pension Plan that are required by the plan or any Requirement of Law to be filed or distributed in a timely manner.

(iii)    Each Company Group Member shall perform in all material respects all obligations (including (if applicable), funding, investment and administration obligations) required to be performed by it in connection with each Canadian Pension Plan and Canadian Benefit Plan and the funding media therefor; make all contributions and pay all premiums required to be made or paid by it in accordance with the terms of the plan and all Requirements of Law and withhold by way of authorized payroll deductions or otherwise collect and pay into the plan all employee contributions required to be withheld or collected by it in accordance with the terms of the plan and all Requirements of Law; and ensure that, except as would not reasonably be expected to result in a Material Adverse Effect, to the extent that the Company Group Member has a Canadian Pension Plan which is a defined benefit pension plan, such plan is funded to the extent required by law, both on an ongoing basis and on a solvency basis (using actuarial methods and assumptions which are consistent with the valuations last filed with

the applicable Governmental Authorities and which are consistent with generally accepted actuarial principles).

(iv)     The Company shall deliver to the Administrative Agent, (A) promptly on request, copies of each annual and other return, report or valuation with respect to each Canadian Pension Plan filed by any Company Group Member with any applicable Governmental Authority; (B) promptly on request, a copy of any material direction, order or notice that any Company Group Member may receive from any applicable Governmental Authority with respect to any Canadian Pension Plan; and (C) notification within 30 days of any material increases in the benefits of any existing Canadian Pension Plan or Canadian Benefit Plan, or the establishment of any new Canadian Pension Plan or Canadian Benefit Plan, or the commencement of contributions to any Canadian Pension Plan or Canadian Benefit Plan to which it was not previously contributing.

5.12   Landlords' Agreements, Mortgagee Agreements, Bailee Letters, Real Estate Purchases.  Without limiting any other provision herein, use commercially reasonable efforts to obtain a landlord's agreement, mortgagee agreement or bailee letter, as applicable, from the lessor of each leased property, mortgagee of owned property or bailee with respect to any warehouse, processor or converter facility or other location where Collateral having a value of greater than $500,000 is stored or located, which agreement or letter shall contain a waiver or subordination of all Liens or claims that the landlord, mortgagee or bailee may assert against the Collateral at that location, and shall otherwise be reasonably satisfactory in form and substance to the US Collateral Agent or the Canadian Collateral Agent, as applicable.  Each Loan Party shall timely and fully pay and perform its obligations under all leases and other agreements with respect to each leased location or public warehouse where any Collateral with a value in excess of $500,000 is or may be located.

5.13   Ratings.  No later than the date that is ten (10) days after the Closing Date, the Company will initiate the process with Moody's and S&P to obtain a rating (but not any specified rating) on the DIP Facility and will use its best efforts to obtain such rating from Moody's and S&P within ninety (90) days after the Closing Date.

5.14   Further Assurances.

(a)     From time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take all such actions, as the Agents may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Administrative Agent, the US Collateral Agent, the Canadian Collateral Agent and the Lenders with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other Property or assets hereafter acquired by any Company Group Member which may be deemed to be part of the Collateral) pursuant hereto or thereto.  Upon the exercise by any Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Company will execute and deliver, or will cause the execution

and delivery of, all applications, certifications, instruments and other documents and papers that such Agent or Lender may reasonably require to be obtained from the Company or any of its respective Subsidiaries (other than Immaterial Subsidiaries) for such governmental consent, approval, recording, qualification or authorization.

(b)     Preserve and protect the Lien status of each respective Mortgage and, if any Lien (other than unrecorded Liens permitted under Section 6.3 that arise by operation of law) is asserted against a Mortgaged Property, promptly, and at its expense, give the US Collateral Agent or the Canadian Collateral Agent, as applicable, a detailed written notice of such Lien and pay the underlying claim in full or take such other action so as to cause it to be released or bonded over in a manner reasonably satisfactory to such Agent.

(c)     From time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take all such actions, as the Agents may reasonably request in order to (i) permit the Agents and their designees to have, after the occurrence and during the continuance of an Event of Default, reasonable, non-exclusive access to any real property, equipment and fixtures as necessary or appropriate to remove, sell or otherwise dispose of, any Collateral, and (ii) grant to the Agents and their designees a royalty-free non-exclusive license to, after the occurrence and during the continuance of an Event of Default, use any patent, trademark, copyright or other proprietary information of the Borrowers or any Guarantor in connection with the manufacture or production of, or sale or other disposition of, any Collateral.

(d)     The Borrowers shall deliver or cause to be delivered to the Administrative Agent and the Administrative Agent's counsel (so long as such counsel has been identified to the Borrowers on or prior to the date of delivery thereof) all pleadings, motions and other documents filed on behalf of all of the Loan Parties with the Bankruptcy Court and Canadian Court.

5.15     Insurance.  Maintain insurance coverage with responsible insurers, in amounts and against risks normally insured by owners of similar businesses or assets in areas which are generally similar to those in which such Company Group Member is engaged, including business interruption insurance.  All such policies of insurance (or the loss payable and additional insured endorsements delivered to the US Collateral Agent and the Canadian Collateral Agent) will contain a standard "mortgage clause" reasonably acceptable to such Agents providing that no such policy may be cancelled or modified without the insurer providing at least 30 days' prior written notice to such Agents, and each Loan Party shall deliver to the US Collateral Agent and the Canadian Collateral Agent, as the case may be, in form and substance reasonably satisfactory to such Agent, endorsements to all (a) property insurance (other than any property insurance solely with respect to inventory) naming such Agent, on behalf of the Secured Parties, as loss payee, and (b) all general liability and other liability policies naming such Agent and the other Agents and Lenders, as additional insured.  The insurance policies confirming the insurance required hereunder shall not contain any co-insurance provisions except to the extent such co-insurance provisions would normally appear in policies covering other Persons engaged in similar businesses and owning similar properties as the Company Group Members, and consistent with prudent business practices.

NY\1620408.3

5.16    [Post-Closing Deliverables.    [RESERVED]

(b)    [Consider adding Collateral Documents, if necessary].

5.17    Litigation.  Diligently and in good faith contest or otherwise seek to resolve any actions, suits or legal proceedings instituted and outstanding or pending against it, the outcome of which would reasonably be expected to result in a Material Adverse Effect, and make such reserves or other appropriate provision therefor, if any, as shall be required by GAAP, other than in connection with the Cases and except as executed or prohibited by the Applicable Order, the Bankruptcy Code or the CCAA.

5.18    Taxes.  Except as prohibited or excused by the Applicable Order, the Bankruptcy Code, the CCAA or by reason of commencement of the Cases, timely pay all taxes, assessments and other governmental duties which are imposed on it or on its income or profits or its assets, when due and payable, provided that no such tax, assessment or duty need be paid if (a) it is being contested in good faith by appropriate proceedings promptly initiated and diligently conducted and adequate reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made therefor, or (b) the outcome of such contest, if adverse to such Person, would not reasonably be expected to result in a Material Adverse Effect.

5.19    Plan of Reorganization and Sale Milestones.

(a)    Each of the Loan Parties will, and will cause each of its Subsidiaries to, cause each of the following events to occur within the time periods specified below (for which time is of the essence):[6]

(i)    On or before April 23, 2010, the Loan Parties shall file and properly serve a motion, in form and substance acceptable to the Administrative Agent, Syndication Agent and Majority Lenders, (the "SISP Motion") seeking Canadian Court and Bankruptcy Court approval of a sale and investor solicitation process ("SISP") and procedures related thereto ("SISP Procedures") for all or substantially all assets of the Loan Parties and their respective Subsidiaries, which SISP Procedures shall provide, among other things, a deadline of June 15, 2010 for parties to submit non-binding letters of interest to the Loan Parties and a deadline of July 15, 2010 for parties to submit binding commitment letters to the Loan Parties, in each case for all or substantially all assets of the Loan Parties and their respective Subsidiaries.

(ii)    On or before April 30, 2010, the Loan Parties shall file and properly serve a motion, in form and substance acceptable to the Administrative Agent, Syndication Agent and Majority Lenders, (the "Bar Date Motion") seeking Canadian Court and Bankruptcy Court approval of a claims process and establishing a claims bar date.

---

[6] [Milestones and deadlines still under review]

NY\1620408.3

(iii)    On or before May 1, 2010, the Canadian Court and Bankruptcy Court shall each have entered an order, in form and substance acceptable to the Administrative Agent, Syndication Agent and Majority Lenders, (the "SISP Order") approving the SISP Motion, SISP and SISP Procedures, and the Loan Parties shall have commenced the sale and investor solicitation process in accordance with the SISP Procedures.

(iv)    On or before May 14, 2010, the Canadian Court and Bankruptcy Court shall each have entered an order, in form and substance acceptable to the Administrative Agent, Syndication Agent and Majority Lenders, (the "Bar Date Order") approving the Bar Date Motion and the claims process and establishing the claims bar date.

(v)    On or before June 15, 2010, the Loan Parties shall have entered into a lock-up and plan support agreement, in form and substance acceptable to the Administrative Agent, Syndication Agent and Majority Lenders, with Prepetition Senior Lenders that, in the aggregate, hold at least two-thirds (2/3) in principal amount of the Prepetition Senior Obligations outstanding under the Prepetition Senior Credit Agreement.

(vi)    On or before June 30, 2010, the Loan Parties shall file and properly serve a motion, in form and substance acceptable to the Administrative Agent, Syndication Agent and Majority Lenders, (the "CCAA Meeting Motion") seeking Canadian Court approval for the calling of meetings of creditors to vote on the CCAA Plan (as defined below).

(vii)    On or before June 30, 2010, the Loan Parties shall file and properly serve (a) a plan of reorganization, compromise or arrangement in respect of the CCAA Cases (the "CCAA Plan") and (b) a plan of reorganization in respect of the Chapter 11 Case (the "US Plan") and disclosure statement related thereto (the "Disclosure Statement"), in each case in form and substance acceptable to the Administrative Agent, Syndication Agent and Majority Lenders.

(viii)    On or before July 9, 2010, the Canadian Court shall have entered an order, in form and substance acceptable to the Administrative Agent, Syndication Agent and Majority Lenders, (the "CCAA Meeting Order") approving the CCAA Meeting Motion and calling of meetings of creditors to vote on the CCAA Plan.

(ix)    On or before August 2, 2010, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the Administrative Agent, Syndication Agent and Majority Lenders, (the "Disclosure Statement Order") approving the Disclosure Statement.

(x)    On or before August 30, 2010, the Loan Parties shall hold a meeting of creditors to vote on the CCAA Plan.

NY\1620408.3

(xi)    On or before September 3, 2010, the Canadian Court shall have entered an order, in form and substance acceptable to the Administrative Agent, Syndication Agent and Majority Lenders, (the "CCAA Sanction Order") sanctioning the CCAA Plan.

(xii)    On or before September 15, 2010, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the Administrative Agent, Syndication Agent and Majority Lenders, (the "Confirmation Order") confirming the US Plan.

(xiii)    On or before September 27, 2010, the Loan Parties shall have substantially consummated the transactions contemplated by the CCAA Plan and US Plan, in form and substance acceptable to the Administrative Agent, Syndication Agent and Majority Lenders, and the effective date under each such plan shall have occurred.

(b)    In the event that the Loan Parties fail to comply with the milestone contained in either clause (v) or clause (vii) above, then each of the Loan Parties will, and will cause each of its Subsidiaries to, cause each of the following events to occur within the time periods specified below (for which time is of the essence):[7]

(i)    On or before August 2, 2010, the Loan Parties shall have entered into an asset purchase agreement, with a purchase price and on terms and conditions acceptable to the Administrative Agent, Syndication Agent and Majority Lenders, (the "Stalking Horse Purchase Agreement") for the sale of all or substantially all assets of the Loan Parties and their respective Subsidiaries (collectively, the "Subject Assets") with one or more financially viable third parties (the "Stalking Horse Bidder").

(ii)    On or before August 2, 2010, the Loan Parties shall file and properly serve a motion, in form and substance acceptable to the Administrative Agent, Syndication Agent and Majority Lenders, (the "Sale Motion") seeking Canadian Court and Bankruptcy Court approval of: (a) the sale of the Subject Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement, subject to higher and better offers; (b) bidding procedures (acceptable to the Administrative Agent, Syndication Agent and Majority Lenders) in connection with the sale of the Subject Assets (the "Bidding Procedures"); and (c) the scheduling of an auction and sale hearing with respect thereto (the "Auction" and "Sale Hearing", respectively).

(iii)    On or before August 16, 2010, the Canadian Court and Bankruptcy Court shall each have entered an order, in form and substance acceptable to the Administrative Agent, Syndication Agent and Majority Lenders, (the "Bidding Procedures Order"): (a) approving the Stalking Horse Purchase Agreement and the Bidding Procedures; and (b) the scheduling the Auction and Sale Hearing.

---

[7] [Milestones and deadlines still under review]

NY\1620408.3

(iv)    On or before August 23, 2010, the Loan Parties shall conduct the Auction for the Subject Assets.

(v)    On or before August 26, 2010, the Canadian Court and Bankruptcy Court shall each have entered an order, in form and substance acceptable to the Administrative Agent, Syndication Agent and Majority Lenders, (the "Sale Order") approving the sale of the Subject Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement or to the Person otherwise submitting the highest and otherwise best bid(s) for the Subject Assets at the Auction, as acceptable to the Administrative Agent, Syndication Agent and Majority Lenders (such bidder making the highest and otherwise best bid, including the Stalking Horse Bidder, the "Winning Bidder" and such highest and otherwise best bid, the "Winning Bid").

(vi)    On or before September 11, 2010, the transactions contemplated in the Winning Bid made by the Winning Bidder shall have been consummated.

(c)    In making their respective determinations with respect to the Stalking Horse Purchase Agreement and Winning Bid, the Administrative Agent, Syndication Agent and Majority Lenders may (but are not required to) consider and take into account, among other things, the amount and form of consideration proposed by the applicable purchaser, the creditworthiness of the applicable purchaser, the financial and contractual terms of the applicable purchase agreement and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating an the applicable sale transaction.

5.20    Approved Budget.

(a)    Use the proceeds of Loans made under this Agreement and any cash maintained by the Loan Parties solely in a manner consistent with the Approved Budget.

(b)    Provide to the Administrative Agent, so that such reports are actually received within four (4) Business Days following the Friday of each week (the "Report Date"), weekly line-by-line certified variance reports for such preceding weekly period and on a cumulative basis from the Petition Date to such Report Date, comparing actual cash receipts and disbursements to amounts projected in the Approved Budget, in form and scope acceptable to the Administrative Agent and Syndication Agent.

(c)    On the fourth (4th) Business Day of each week beginning with the first full week after the Petition Date until the Maturity Date, deliver to the Administrative Agent an updated, "rolling" 13-week budget which sets forth by line item updated projected receipts and disbursements for the Borrowers and Loan Parties during the period commencing from the end of the previous week through and including the thirteen weeks thereafter; provided that the Borrowers and Loan Parties shall still be subject to and be governed by the terms of the Approved Budget then in effect and the Agents and Lenders shall, as applicable, have no obligation to fund to such updated "rolling budget" or permit the use of Loan or Collateral proceeds with respect thereto.

81

(d)    By no later than the date that is five (5) Business Days prior to the end of the period covered by the then applicable Approved Budget, deliver to the Administrative Agent a Supplemental Approved Budget.

(e)    No later than 15 days after each month, deliver to the Administrative Agent a report detailing for the prior month (i) professional fees and expenses that have been invoiced but unpaid to date in the Cases, (ii) the accumulated "hold-back" of professional fees and expenses to date in the Cases, and (iii) the total professional fees paid in the Cases during such month and to date, in each case compared to the amounts projected in the Approved Budget, in form and scope acceptable to the Administrative Agent and the Syndication Agent.

5.21    Cash Management System.  Maintain their cash management arrangements consistent with those in effect immediately prior to the Petition Date.

5.22    Payment of Other Costs and Expenses.  To the extent permitted by the Applicable Order, pay or reimburse, on the Closing Date and on a monthly basis thereafter, the Prepetition Senior Agents for any and all of their respective accrued and outstanding fees, costs and expenses payable under the Prepetition Senior Loan Documents, including without limitation, reasonable attorneys' and other professional fees, costs and expenses of the Prepetition Senior Agents, whether accrued Prepetition or Postpetition, all without further notice, motion or application to, order of, or hearing before, the Bankruptcy Court or Canadian Court.

## SECTION 6.  NEGATIVE COVENANTS

The Borrowers hereby agree that, so long as any Commitment remains in effect, any Loan or other Obligation is owing to any Lender, any Agent or any Lead Arrangers hereunder, the Borrowers shall not, and shall not permit any of its Subsidiaries to, directly or indirectly (and in respect of Section 6.15 only, Holdings shall not, and shall cause its Subsidiaries not to, directly or indirectly) on and after the Closing Date:

6.1    Financial Covenants.

(a)    Minimum Liquidity.  Permit cumulative Liquidity for the period beginning on January 1, 2010 and ending on the last day of any calendar month set forth below to be, on a cumulative basis, less than the minimum amount set forth in the table below opposite such day:

| Month | Amount |
|-------|--------|
| March 31, 2010 | [_____] |
| April 30, 2010 | [_____] |
| May 31, 2010 | [_____] |
| June 30, 2010 | [_____] |

| | |
|---|---|
| July 31, 2010 | [_____] |
| August 31, 2010 | [_____] |
| September 30, 2010 | [_____] |
| October 31, 2010 | [_____] |
| [Thereafter] | [_____] |

(b)    Minimum EBITDA.  Permit cumulative Consolidated EBITDA of the Company and its Subsidiaries for the period beginning on January 1, 2010 and ending on the last day of any calendar month set forth below to be, on a cumulative basis, less than the minimum amount set forth in the table below opposite such day:

| Month | Amount |
|---|---|
| March 31, 2010 | $0 |
| April 30, 2010 | $0 |
| May 31, 2010 | $0 |
| June 30, 2010 | ($2,500,000) |
| July 31, 2010 | ($1,500,000) |
| August 31, 2010 | $0 |
| September 30, 2010 | $1,500,000 |
| October 31, 2010 | $4,000,000 |
| November 30, 2010 | $6,500,000 |
| December 31, 2010 | $7,500,000 |
| January 31, 2011 | $15,000,000 |
| February 28, 2011 | $22,500,000 |

6.2    Limitation on Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness, or apply to the Bankruptcy Court or Canadian Court to do so, except:

(a)    Indebtedness of any Loan Party pursuant to any Loan Document;

NY\1620408.3

(b)      (i) unsecured Indebtedness of any Borrower or any Guarantor to Holdings; (ii) unsecured Indebtedness of any Borrower to any of its Subsidiaries; (iii) unsecured Indebtedness of any Guaranteeing Subsidiary to (A) a Borrower or (B) any other Subsidiary of a Borrower; and (iv) Indebtedness of Soucy 2 to the Company pursuant to the Soucy Intercompany Note and (v) Indebtedness of any Subsidiary that is not a Guaranteeing Subsidiary to any other Subsidiary (other than Soucy 2) that is not a Guaranteeing Subsidiary; provided that all Indebtedness incurred pursuant to this clause (b) (other than clause (b)(iv)) shall be subordinated to all of the Obligations on the terms and conditions set forth in the Intercompany Note attached hereto as Exhibit K and shall be evidenced by a note in the form of Exhibit K, which note shall (unless Holdings shall be the payee thereof) be pledged to the US Collateral Agent or the Canadian Collateral Agent, as applicable, for the benefit of the Secured Parties;

(c)      Indebtedness (including, without limitation, Capital Lease Obligations) of any Borrower or any Guarantor (including Indebtedness secured by Liens permitted by Section 6.3(g)) in an aggregate principal amount not to exceed $5,000,000 at any one time outstanding;

(d)      Indebtedness of the Borrower or any of its Subsidiaries outstanding on the Petition Date and listed on Schedule 6.2(d);

(e)      Guarantee Obligations made in the ordinary course of business by (i) any Subsidiary of any Borrower of Indebtedness of such Borrower, (ii) a Borrower of any Indebtedness of any Guaranteeing Subsidiary, (iii) any Guaranteeing Subsidiary of any Indebtedness of any other Guaranteeing Subsidiary and (iv) any Soucy Company of any Indebtedness of any other Soucy Company; provided, that any such Guarantee Obligation shall be expressly subordinated to the Obligations on at least as favorable terms to the Secured Parties (as determined by the Administrative Agent and Syndication Agent in their sole discretion) as those (if any) subordinating the Indebtedness being guaranteed to the Obligations; provided, further, notwithstanding the foregoing, that none of the Soucy Companies or any other Excluded Non US Subsidiary shall be permitted to incur Guarantee Obligations in respect of any Indebtedness of any Person owing to any other Person that is not a Company Group Member;

(f)      Indebtedness of any Borrower or any Subsidiary thereof to any employee thereof in an aggregate principal amount for all Company Group Members not to exceed [$1,000,000] at any one time outstanding;

(g)      Indebtedness of any Borrower or any Subsidiary thereof in respect of performance, surety, or appeal bonds provided in the ordinary course of business and constituting Permitted Liens, but excluding (in each case) Indebtedness incurred through or in connection with the borrowing of money or Contingent Obligations in respect thereof;

(h)      Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business;

(i)      Indebtedness arising in connection with the endorsement of instruments for deposit in the ordinary course of business;

(j)      judgments, attachments or awards not constituting an Event of Default;

(k)      warranties of products or services, in each case incurred in the ordinary course of business;

(l)      Indebtedness in connection with workmen's compensation obligations and insurance premiums; and

(m)      letters of credit in aggregate amount not to exceed $[_____],

provided that in no event shall any Soucy Company incur Indebtedness under clause (c) in an amount which, in the aggregate and taken together with any such Indebtedness incurred under clauses (c) of all other Soucy Companies, exceeds $5,000,000.

Notwithstanding the foregoing or any other provision of any Loan Document, no Indebtedness shall be permitted to have an administrative expense claim or super priority status under the Bankruptcy Code, a super priority charge under the CCAA senior to or pari passu with the super priority charge or administrative expense claims or super priority charge of the Agents and Lenders against the Loan Parties or their Property or the adequate protection claims of the Prepetition Senior Agents and Prepetition Senior Lenders against the Loan Parties or their Property, irrespective of whether such claim, Lien or interest may be adequately protected, in each case subject to the Aggregate Reserve Amount.

6.3    Limitation on Liens.  Create, incur, assume or suffer to exist any administrative claim, court ordered charge or other super-priority claim or Lien, or apply to the Bankruptcy Court or Canadian Court to do so, upon any of its Property, whether now owned or hereafter acquired, except for:

(a)      Liens for taxes, assessments and governmental charges or other impositions not yet due and payable or which are being contested in good faith by appropriate proceedings; provided that adequate reserves with respect thereto are maintained on the books of the applicable Company Group Member in conformity with GAAP;

(b)      carriers', warehousemen's, landlords', vendors', mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 60 days or that are being contested in good faith by appropriate proceedings; provided that adequate reserves with respect thereto are maintained in the books of the applicable Company Group Member, in conformity with GAAP;

(c)      pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)      [deposits by or on behalf of any Company Group Member and security interests on assets related to a particular performance bond granted to the surety providing such performance bond, in each case, to secure the performance of bids, trade contracts (other than

85

for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;][8]

(e)    easements, covenants, licenses, encroachments, protrusions, rights-of-way, restrictions and other similar encumbrances and minor title deficiencies affecting real property incurred in the ordinary course of business and any Liens permitted or excepted in the Mortgages that, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Company Group Members;

(f)    Prior Senior Liens in existence on the Petition Date listed on Schedule 6.3(f);

(g)    Liens securing Indebtedness of any Company Group Member incurred pursuant to Section 6.2(c) to finance the acquisition of fixed or capital assets; provided that (i) such Liens shall be created within 90 days of the acquisition of such fixed or capital assets, (ii) such Liens do not at any time encumber any Property other than the Property financed by such Indebtedness, (iii) the amount of Indebtedness secured thereby is not increased, and (iv) the amount of Indebtedness initially secured thereby is not more than 100% of the purchase price of such fixed or capital asset;

(h)    Liens created pursuant to the Security Documents and the Applicable Orders;

(i)    any interest or title of a lessor under any lease entered into by any Company Group Member in the ordinary course of its business and covering only the assets so leased;

(j)    the reservations, limitations, exceptions, provisos and conditions, if any, expressed in any original grants from the Crown;

(k)    facility cost sharing, servicing or reciprocal agreements in respect of a Property, (a) in respect of which the Company Group Members are in compliance, (b) which either individually or in the aggregate do not and will not materially impair the value, use or marketability of the applicable Property and (c) which do not contain any charging language or grant any security interests;

(l)    applicable municipal by-laws and regulations, zoning, subdivision agreements, development agreements, site plan agreements, servicing agreements, utility agreements, airport zoning regulations and other similar agreements with any Governmental Authority or private or public utilities affecting the development or use of a Property, (a) in respect of which the Company Group Members are in compliance, (b) which either individually or in the aggregate do not and will not materially impair the value, use or marketability of the applicable Property and (c) which do not contain any charging language or grant any security interests;

---

[8] To confirm.

(m)       any Lien granted by such Person to a public body, or to a Governmental Authority, or which may be imposed by one or the other, when required by such public body or Governmental Authority with respect to the operations of such Person or in the ordinary course of its business;

(n)       Restrictive covenants, private deed restrictions and other land use and building restrictions, (a) in respect of which the Company Group Members are in compliance, (b) which either individually or in the aggregate do not and will not materially impair the value, use or marketability of the applicable Property and (c) which do not contain any charging language or grant any security interests;

(o)       Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods in the ordinary course of business;

(p)       Liens consisting of licenses of Intellectual Property in the ordinary course of business; provided, that such Liens do not materially diminish the value of the Collateral;

(q)       bankers' Liens, rights of setoff and other similar Liens existing with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Company or any of its Subsidiaries;

(r)       the filing of Financing Statements as a precautionary measure in connection with operating leases;

(s)       Liens securing judgments, attachments or awards not constituting an Event of Default;

(t)       Inchoate statutory liens for taxes, assessments, governmental or utility charges or levies not yet due;

(u)       leases of the properties of any Loan Party in the ordinary course of business, to the extent such leases are permitted under this Agreement;

(v)       Liens consisting of an agreement to dispose of property in an Asset Sale permitted under Section 6.5;

(w)       Title defects or irregularities which are of a minor nature and either individually or in the aggregate do not and will not materially impair the value, use or marketability of the applicable Property;

(x)       the Administration Charge and Canadian Priority Reserve;

(y)       the Directors' Charge; and

(z)       Liens in respect of cash collateral for letters of credit permitted pursuant to Section 7.2(o).

Notwithstanding the foregoing or any other provision of any Loan Document, except as otherwise expressly allowed pursuant to the Applicable Order and this Agreement, no Loan Party may incur, create, assume, suffer to exist or permit any Lien or other administrative claim or security interest which is pari passu with or senior to the Liens or claims of the Agents and Lenders against the Loan Parties or their Property or the adequate protection Liens or claims of the Prepetition Senior Agents and Prepetition Senior Lenders against the Loan Parties or their Property, irrespective of whether such claim, Lien or interest may be adequately protected, in each case subject to the Aggregate Reserve Amount**.**

      6.4   <u>Limitation on Fundamental Changes</u>.

Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its Property or business, except that:

      (a)   (i) any Solvent Domestic Subsidiary of US Borrower may be merged or consolidated or amalgamated with or into, or wind up or dissolve itself into, the US Borrower or a Guaranteeing Subsidiary that is also a Domestic Subsidiary (<u>provided</u> that the US Borrower or such Guaranteeing Subsidiary shall be the continuing or surviving Person), (ii) any Solvent Canadian Subsidiary of a Canadian Borrower (including Soucy GP but excluding any other Soucy Company) may be merged, consolidated or amalgamated with or into, or wind up or dissolve itself into, such Borrower or a Guaranteeing Subsidiary that is also a Canadian Subsidiary (<u>provided</u> that such Canadian Borrower or Guaranteeing Subsidiary shall be the continuing or surviving Person) and (iii) any Soucy Company may be merged, consolidated or amalgamated with or into, or wind up or dissolve itself into, any other Soucy Company; <u>provided</u>, <u>further</u>, that, in the case of each of clauses (i) and (ii), after giving effect thereto, the value of the Collateral pledged to the Secured Parties pursuant to the Security Documents and the Guarantees in favor of the Secured Parties under the Loan Documents has not materially diminished as a result of such transaction;

      (b)   the Borrowers or any Subsidiary of any Borrower may merge with any Person in connection with an acquisition permitted herein, so long as (i) if such transaction involves a Borrower, such Borrower is the continuing or surviving corporation and (ii) if such transaction involves any Subsidiary of any Borrower, the surviving corporation must be or becomes a Guarantor of all the Obligations under this Agreement; and

      (c)   any Subsidiary may Dispose of its assets (by merger, consolidation, dissolution or otherwise) in a transaction permitted, in its entirety, by Section 7.5.

      6.5   <u>Limitation on Disposition of Property</u>.  Dispose of any of its Property (including, without limitation, receivables and leasehold interests), whether now owned or hereafter acquired, or, in the case of any Subsidiary of the Company, issue or sell any shares of such Subsidiary's Capital Stock to any Person, except:

      (a)   the Disposition of obsolete or worn out property in the ordinary course of business;

(b)        Dispositions permitted by Section 6.4(a) or (b);

(c)        Dispositions of currently owned [oil tanks] located at [INSERT PROPERTY LOCATION] not in excess of [$4,000,000] provided that (i) the Disposition shall be done in compliance with Environmental Laws and (ii) any funds received in connection with such Dispositions may only be used (A) for the investigation, cleanup or other remedial action with respect to the tanks and any related known or potential contamination as required by and in compliance with Environmental Laws and (B) if and to the extent such funds exceed the costs of such remediation, to the repayment of the Loan;[9]

(d)        as a result of any Recovery Event;

(e)        sales of inventory in the ordinary course of the Core Business;

(f)        Restricted Payments otherwise permitted hereunder;

(g)        [the sale, transfer or disposition of cash or Cash Equivalents;]

(h)        the sale, transfer or disposition of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business;

(i)        leases, subleases, licenses or sublicenses of property in the ordinary course of business and which do not materially interfere with the business of the Company Group Members;

(j)        consignment or similar arrangements for the sale of assets in the ordinary course of business;

(k)        Dispositions of Property (i) by a Borrower to another Borrower or to a Guaranteeing Subsidiary; (ii) by any Soucy Company to a Borrower or any Guaranteeing Subsidiary; (iii) by a Borrower or any Guaranteeing Subsidiary to any other Guaranteeing Subsidiary; and (iv) by any Soucy Company to any other Soucy Company; provided that, in the case of clause (iii), after giving effect thereto, the value of the Collateral pledged to the Secured Parties pursuant to the Security Documents and the Guarantees in favor of the Secured Parties under the Loan Documents has not materially diminished;

(l)        sales or issuances of Capital Stock of Holdings; and

(m)        non-exclusive licenses of Intellectual Property in the ordinary course of business that do not materially diminish the value of the Collateral.

6.6        Limitation on Restricted Payments.  Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of the Company or any of its Subsidiaries, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in

---

[9] Please provide additional information as to what this provision relates to.

obligations of any Company Group Member, or enter into any derivatives or other transaction with any financial institution, commodities or stock exchange or clearinghouse (a "Derivatives Counterparty") obligating any Company Group Member to make payments to such Derivatives Counterparty as a result of any change in market value of any such Capital Stock (collectively, "Restricted Payments"), except that:

(a)    any Subsidiary of a Borrower may make Restricted Payments to such Borrower;

(b)    Holdings, the Borrowers and each Subsidiary of Holdings may make Restricted Payments in the form of Capital Stock of such Person;

(c)    for so long as the Company is a partnership or disregarded entity for United States federal income tax purposes, the Company may pay dividends to Holdings to permit Holdings to pay Permitted Tax Distributions;

(d)    each Subsidiary that is not a Guaranteeing Subsidiary (other than Soucy 2) may make Restricted Payments to any other Subsidiary that is not a Guaranteeing Subsidiary;

(e)    Restricted Payments in connection with the retirement, acquisition or termination of any warrant, option or other rights in Capital Stock upon exercise, so long as there is no cash payment in respect of such exercise;

(f)    Restricted Payments by a Subsidiary (other than the Company) of a Loan Party to the Loan Party generally so long as (x) the Loan Party that owns Capital Stock in the Subsidiary making such Restricted Payment receives at least its proportionate share thereof (based on its relative holdings of Capital Stock in the Subsidiary making such Restricted Payment and taking into account relative preferences, if any, of the various classes of Capital Stock in such Subsidiary) and (y) in the case of Restricted Payments by Stadacona to Soucy 2 , such payments are immediately distributed by Soucy 2  to the Company via an irrevocable direction of payment, whether as a payment of interest on the Soucy Intercompany Note or as a dividend or distribution of profits;

(g)    any Company Group Member may issue Capital Stock in connection with stock splits, stock dividends and additional issuances or sales of Capital Stock which do not decrease the percentage ownership of the Borrowers and the Guarantors in any class of the Capital Stock of such Guarantor; and

(h)    payment of the Management Fee; provided that no Loan Party shall individually, or together with all other Loan Parties, pay to Brandt Industries, Inc. any fees or other amounts in an aggregate amount at any time greater than that specified in the Management Agreement on the Petition Date and in no event in an amount in excess of 3.0% of the Adjusted Revenues (as defined in the Management Agreement) of the Company at any time.

6.7    Limitation on Capital Expenditures.  Make or commit to make any Capital Expenditure, except Capital Expenditures of the Company Group Members in the ordinary course of business not exceeding, for the period beginning on January 1, 2010 and ending on the

last day of any calendar month set forth below, on a cumulative basis, the maximum amount set forth in the table below opposite such day.

| Month | Amount |
|---|---|
| March 31, 2010 | $3,500,000 |
| April 30, 2010 | $4,000,000 |
| May 31, 2010 | $5,000,000 |
| June 30, 2010 | $6,000,000 |
| July 31, 2010 | $7,500,000 |
| August 31, 2010 | $9,000,000 |
| September 30, 2010 | $10,500,000 |
| October 31, 2010 | $12,000,000 |
| November 30, 2010 | $13,500,000 |
| December 31, 2010 | $15,000,000 |
| January 31, 2011 | $17,000,000 |
| February 28, 2011 and thereafter | $19,000,000 |

6.8    Limitation on Investments.  Make any advance, loan, extension of credit (by way of guaranty or otherwise), capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting an ongoing business from, or make any other investment in or give financial assistance to, any other Person (all of the foregoing, "Investments"), except:

(a)    Investments constituting (i) accounts receivable arising, (ii) trade debt granted, or (iii) deposits made in connection with the purchase price of goods or services, in each case in the ordinary course of the Core Business;

(b)    Investments arising in connection with the incurrence of Indebtedness permitted by Sections 6.2(b), or 6.2(e);

(c)    loans and advances to employees of any Company Group Member in the ordinary course of business (including, without limitation, for travel, entertainment and relocation expenses) in an aggregate amount for all Company Group Members not to exceed $500,000 at any one time outstanding;

(d)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of the Core Business;

(e)    Investments outstanding on the Petition Date and listed on Schedule 6.8;

(f)    endorsements of negotiable instruments held for collection in the ordinary course of business;

(g)    lease, utility and other similar deposits in the ordinary course of business;

(h)    Investments contemplated by Section 6.3(c) or (d); and

(i)    Any Borrower or any Subsidiary may make good faith deposits in the ordinary course of business in respect of surety bonds, appeal bonds, statutory obligations to Governmental Authorities, tenders, sales, contracts (other then for borrowed money), bids, leases, government contracts, performance and return of money binds and other similar obligations  incurred in the ordinary course of business of any Borrower and the applicable Subsidiaries for sums not more than 90 days overdue or being contested in good faith by appropriate proceedings and for which the Borrower and its Subsidiaries maintain adequate reserves in accordance with GAAP.

(j)    Investments in cash and Cash Equivalents.

6.9    Limitation on Optional Payments and Modifications of Debt Instruments and Other Agreements.  (a)  Make or offer to make any optional or voluntary payment, prepayment, repurchase or redemption of, or otherwise voluntarily or optionally defease any hypothec, or loans under the Prepetition Senior Loan Documents, Prepetition Junior Loan Documents, or any other Indebtedness (other than the Loans), or segregate funds for any such payment, prepayment, repurchase, redemption or defeasance, or enter into any derivative obligating any Company Group Member to make payments to such Derivatives Counterparty as a result of any change in market value of the loans under the Prepetition Senior Loan Documents, the Prepetition Junior Loan Documents or any such Indebtedness without the prior written consent of the Administrative Agent, the Syndication Agent and the Majority Lenders or as otherwise required by the Applicable Order with respect to the Prepetition Senior Obligations;

(b)    amend, modify or otherwise change, or consent or agree to any amendment, modification, waiver or other change to, any of the Prepetition Senior Loan Documents, any of the Prepetition Junior Loan Documents or any other Indebtedness (other than the Loans, as permitted hereby) without the prior written consent of the Administrative Agent, the Syndication Agent and the Majority Lenders;

(c)    designate any Indebtedness as "Designated Senior Indebtedness" (or any comparable concept) for purposes of any other agreement or instrument governing any subordinated Indebtedness without also designating the Obligations as "Designated Senior Indebtedness" (or any comparable concept) with respect thereto without the prior written consent of the Administrative Agent, the Syndication Agent and the Majority Lenders;

NY\1620408.3

(d)    without limiting any other express requirement hereof or of any other Loan Document, if the result could reasonably be expected to be adverse to the Lenders in any material respect (or, in the case of Material Agreements set forth on Part II of Schedule 1.1(c), if the result could reasonably be expected to have a Material Adverse Effect), terminate, amend, supplement, waive, or otherwise modify any of its constitutive documents or any Material Agreement (other than a Material Agreement that is separately provided for in another subsection of this Section 6.9, which Material Agreement shall be subject to the standard in such subsection) without the prior written consent of the Administrative Agent, the Syndication Agent and the Majority Lenders;

(e)    make any payments or transfer, or agree to any setoff or recoupment with respect to any Prepetition claim, Prepetition Lien or Prepetition Indebtedness except (i) as approved by order of the Bankruptcy Court and Canadian Court and (ii) as expressly permitted by the terms of the Loan Documents and any Approved Budget, with the prior written consent of the Administrative Agent, the Syndication Agent and the Majority Lenders (or as otherwise required by the Applicable Order with respect to the Prepetition Senior Obligations);

(f)    make any adequate protection or other payments or transfers on account of any Prepetition Indebtedness or other obligations or any Liens related to Prepetition Indebtedness, except to the extent provided in the Applicable Orders with respect to the Prepetition Senior Obligations; or

(g)    amend or modify, or permit the amendment or modification of any Applicable Order or any First Day Order, without the written consent of the Administrative Agent, the Syndication Agent and the Lead Arrangers.

6.10    <u>Limitation on Transactions with Affiliates</u>.  Enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate unless such transaction is (a) (i) otherwise not prohibited by this Agreement, (ii) in the ordinary course of business of Holdings, the Borrowers or such Subsidiary, as the case may be, and (iii) upon fair and reasonable terms no less favorable to Holdings, the Borrowers or such Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate, and (b) expressly permitted by Section 6.6, (c) expressly permitted by Section 6.8, (d) reasonable and customary director, officer and employee compensation (including bonuses) and other benefits (including retirement, health, stock option and other benefit plans) and indemnification arrangements otherwise not prohibited by this Agreement and (e) usual and customary transactions among the Company and its Subsidiaries or between or among such Subsidiaries consistent with past practice and otherwise not prohibited by this Agreement.

6.11    <u>Limitation on Sales and Leasebacks</u>.  Enter into any arrangement with any Person providing for the leasing by any Company Group Member of real or personal property which has been or is to be sold or transferred by such Company Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of such Company Group Member, except for any arrangement with respect to which the sale of such real or personal property was permitted by

93

Section 6.5 and the capitalized lease created in connection therewith was permitted by Section 6.2.

6.12    Limitation on Changes in Financial Periods.  Permit the financial year of the Company to end on a day other than December 31 or change the Company's method of determining financial quarters.

6.13    Limitation on Negative Pledge Clauses.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Company Group Member to create, incur, assume or suffer to exist any Lien upon any of its Property or revenues, whether now owned or hereafter acquired other than (a) this Agreement and the other Loan Documents, (b) any agreements governing Indebtedness permitted by Sections 6.2(c) or (d) (in which case any such prohibition shall only be effective against the assets permitted to be subject to Liens permitted by Sections 6.3(f), (g), (l) and (q), as applicable), (c) the Prepetition Senior Credit Agreement and the Prepetition Junior Credit Agreement, each as in effect as of the Petition Date, (d)  provisions in leases that restrict the transfer of such lease by the lessee, and (f) any prohibition or limitation that (i) exists pursuant to applicable law, (ii) consists of customary restrictions and conditions contained in any agreement relating to the transfer or disposition of any asset permitted hereunder pending the consummation of such sale, or (iii)  is contained in any documents governing any Indebtedness incurred after the Petition Date in accordance with the provisions of this Agreement, which prohibition or limitation is not more restrictive than those contained in this Agreement.

6.14    Limitation on Restrictions on Subsidiary Distributions.  Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary to (a) make Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay or subordinate any Indebtedness owed to, the Company or any other Subsidiary, (b) make Investments in the Company or any Subsidiary or (c) transfer any of its assets to the Company or any other Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, (ii) any restrictions existing under the Loan Documents, (iii) any restrictions existing under the Prepetition Senior Credit Agreement and/or Prepetition Junior Credit Agreement, as in effect as of the Petition Date, (iv) with respect to the foregoing clause (c) only, agreements described in clause (b) of Section 6.13, to the extent set forth in such clause, and (v) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary.

6.15    Limitation on Lines of Business; Ownership.  (a)  Enter into any business, either directly or through any Subsidiary, except for the Core Business; provided, that notwithstanding the foregoing, (i) Holdings shall not engage in any trade or business, or own any assets other than the Capital Stock of WB Canada and White Birch Partners, (ii) (A) WB Canada shall not engage in any trade or business, or own any assets other than the Capital Stock of Nova Scotia Company and (B) Nova Scotia Company shall not engage in any trade or business, or own any assets other than the Capital Stock of White Birch Partners, (iii) the Company shall not engage in any trade or business, or own any assets other than (A) the holding of the Capital Stock of Stadacona GP, Stadacona, Soucy 1, Soucy 2 , Soucy GP, Bear Island, 3120772, Papier Masson, Black Spruce, and any Person acquired in compliance with Section 6.8 and (B) notes evidencing Indebtedness between Company Group Members permitted hereunder, (iv) each of

94

Stadacona GP and Soucy GP shall not engage in any trade or business other than being a general partner of Stadacona and Soucy 2 , respectively, or own any assets other than the Capital Stock of Stadacona and Soucy 2, respectively, (v) the total assets of Arrimage shall not exceed a value of $250,000 at any time, and (vi) no Immaterial Subsidiary may engage in any trade or business, or own any assets other than the Capital Stock of any Person that it owns on the Closing Date; or (b) permit any Subsidiary to cease being wholly-owned, or create or acquire any Subsidiaries other than Wholly Owned Subsidiaries which provide first-priority perfected Liens on all of their assets to the US Collateral Agent or the Canadian Collateral Agent, as applicable, for the benefit of the Secured Parties to the extent required by Section 5.9.   Notwithstanding the foregoing, this Section 6.15 shall not restrict (i) the Company from acting as one of the general partners of Soucy 1, Soucy 2 and Stadacona and (ii) the hiring of employees in connection with performing its functions as a general partner of Soucy 1, Soucy 2 and Stadacona.

6.16    Limitation on Hedge Agreements.  Enter into any Hedge Agreement other than (a) any such agreement or arrangement entered into in the ordinary course of business and consistent with prudent business practice to hedge or mitigate risks to which the Borrowers or any Subsidiary is exposed in the conduct of its business or the management of its liabilities or (b) any such agreement entered into to hedge against fluctuations in interest rates or currency incurred in the ordinary course of business and consistent with prudent business practice; provided that in each case such agreements or arrangements shall not have been entered into for speculation purposes.

6.17    Repayment of Indebtedness.  Except pursuant to a confirmed reorganization plan or a First Day Order in the U.S. Case or a sanctioned plan or reorganization or sanction order in the CCAA Cases and except as specifically permitted hereunder, make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the filing of the Cases that is subject to the automatic stay provisions of the Bankruptcy Code or the stay provisions in the Initial CCAA Order, whether by way of "adequate protection" under the Bankruptcy Code or otherwise (except as otherwise required by the Applicable Order with respect to the Prepetition Senior Obligations).

6.18    No Returns; Setoffs.  Enter into any agreement to return any of its Inventory to any of its creditors for application against any Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims under Section 546(h) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims based upon any such return pursuant to Section 553 of the Bankruptcy Code or otherwise.

6.19    Critical Vendor and Other Payments.  Make (i) any prepetition "critical vendor" payments or other payments on account of any creditor's pre-petition unsecured claims, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, or (iii) payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except in each case in amounts and on terms and conditions that (a) are approved by order of the Bankruptcy Court or Canadian Court, from time to time and (b) are expressly permitted by the terms of the Loan Documents and (c) are expressly identified in the applicable Approved Budget.

NY\1620408.3

6.20    <u>Soucy Intercompany Note</u>.  Sell, assign or otherwise transfer any interest in the Soucy Intercompany Note to any Person other than the Company, or suffer to exist any interest in the Soucy Intercompany Note of any Person other than the Company, or, without limiting the foregoing, permit any Person other than the Company, the Lenders and Agents and the lenders and agents under the Prepetition Senior Loan Documents or the Prepetition Junior Loan Documents to be a beneficiary of any Lien on any Property of any Company Group Member or of any Guarantee Obligation, in either case that at any time is created in respect of or otherwise relates to the Soucy Intercompany Note.

6.21    <u>Excluded Non US Subsidiaries</u>.  Take, or allow to be taken, any action that seeks to have any then-current Guarantor treated as an Excluded Non US Subsidiary for purposes of this Agreement and the other Loan Documents.

6.22    <u>Management Agreement</u>.  Amend or modify, or permit the amendment or modification of the Management Agreement without the consent of the Administrative Agent, the Syndication Agent and Majority Lenders.

SECTION 7.  EVENTS OF DEFAULT

Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion to, hearing before, or order of the Bankruptcy Court or the Canadian Court or any notice to any Loan Party, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default") hereunder:

(a)    (i) a Borrower or any other Loan Party, as applicable, shall fail to pay any principal of, or interest on, any Loan when due in accordance with the terms hereof, or (ii) a Borrower or any other Loan Party, as applicable, shall fail to pay any other amount payable by it hereunder or under any other Loan Document, and in the case of clause (ii) within five (5) days after any such amount becomes due in accordance with the terms hereof; or

(b)    Any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been false in any material respect on or as of the date made or deemed made or furnished; or

(c)    Any Loan Party shall default in the observance or performance of any agreement contained in Section 5.4(a)(i) (with respect to a Borrower only), Section 5.7(h), Section 5.9, Section 5.10, Section 5.19, Section 5.20, Section 5.21 or Section 6 of this Agreement; or

(d)    Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section 7), and such default shall continue unremedied for a period of five (5) days after notice thereof shall have been delivered to a Borrower by the Administrative Agent; or

NY\1620408.3

(e)      Except for defaults occasioned by the filing of the Cases and defaults resulting from obligations with respect to which the Bankruptcy Code and similar Canadian legislation and any Applicable Order prohibit any Loan Party from complying or permit any Loan Party not to comply, any Company Group Member shall (i) default in making any payment of any principal of any Indebtedness (including, without limitation, any Guarantee Obligation, but excluding the Loans) on the scheduled or original due date with respect thereto beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or to become subject to a mandatory offer to purchase by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; provided that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate $5,000,000;[10] or

(f)      (i) Any Person shall engage in any "nonexempt prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Single Employer Plan, (ii) any failure by any Single Employer Plan that is subject to Title IV of ERISA to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA), whether or not waived, shall exist with respect to any Single Employer Plan, or any Lien in favor of a Single Employer Plan or in favor of the PBGC with respect to a Single Employer Plan shall arise on the assets of the Borrowers or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, (iv) there is a determination that any Single Employer Plan that is subject to Title IV of ERISA is in "at risk" status (within the meaning of Title IV of ERISA) or (v) the Borrowers or any Commonly Controlled Entity shall, or is reasonably likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan; and in each case in clauses (i) through (v) above, such event or condition, together with all other such events or conditions, if any, would reasonably be expected to have a Material Adverse Effect; or

(g)      One or more judgments or decrees shall be entered against any Company Group Member involving for all Company Group Members taken as a whole a liability (to the extent not paid or fully covered by insurance as to which a solvent and unaffiliated insurance

---

[10] To confirm.

company has not denied coverage) of \$5,000,000[11] or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

(h)    any Loan Document or any material provision(s) thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Loan Party or any other person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Loan Party shall repudiate or deny any portion of its liability or obligation for the Obligations;

(i)    any security interest or Lien purported to be created by any Security Document or pursuant to an Applicable Order shall cease to be in full force and effect, or shall cease to give the Collateral Agent, for the benefit of the Secured Parties, the Liens, rights, powers and privileges purported to be created and granted under such Security Document or the Applicable Order (including a perfected security interest in and Lien with the priority set forth in Section 2.18 on all of the Collateral thereunder (except as otherwise expressly provided in such Security Document or the Applicable Order)) in favor of the Collateral Agent, or shall be asserted by any Borrower or any other Loan Party not to be a valid, perfected, and with the priority set forth in Section 2.18 (except as otherwise expressly provided in this Agreement, such Security Document or the Applicable Order) security interest in or Lien on the Collateral covered thereby;

(j)    The Guarantee contained in applicable Loan Documents shall cease, for any reason (other than by reason of the express release thereof pursuant to Section 9.15), to be in full force and effect or any Loan Party or any Affiliate of any Loan Party shall so assert;

(k)    A Pension Plan Termination Event occurs which results in any Company Group Member owing an amount to or in respect of a Canadian Pension Plan, any Company Group Member fails to make a required contribution to or payment under any Canadian Pension Plan when due, a third party administrator is appointed by a Governmental Authority in respect of a Canadian Pension Plan, or any Company Group Member will incur, or is reasonably likely to, incur any liability in connection with a withdrawal from or the wind-up of a Canadian Multi-Employer Pension Plan; or

(l)    the occurrence of any of the following in any Case:

(i)    the bringing of a motion by any Loan Party or the issuance and entry of an order or ruling (which has not been withdrawn, dismissed or reversed): (w) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code or similar legislation in Canada not otherwise permitted pursuant to this Agreement (unless such financing is proposed to refinance and pay in cash in full the Obligations due under this Agreement); (x) to grant any Lien other than Permitted Liens and the Carve-Out and the Administration Charge upon or affecting any Collateral; (y) except as provided in the Applicable Order, to use cash collateral of Agents or Prepetition Senior Agents under

---

[11] To confirm.

NY\1620408.3

Section 363(c) of the Bankruptcy Code or provision of similar effect pursuant to an order of the Canadian Court; or (z) adverse to Agents, Lenders, Prepetition Senior Agents, Prepetition Senior Lenders or their rights and remedies hereunder or under the Prepetition Senior Loan Documents or their interest in the Collateral or the collateral pursuant to the Prepetition Senior Credit Agreement, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

(ii)    the filing of any plan of reorganization, arrangement or compromise or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party which plan does not propose to provide for the payment in full in cash of all Obligations under this Agreement on the effective date thereof;

(iii)    the issuance and entry of an order in any Case confirming a plan or plans of reorganization, arrangements or compromises that does not contain a provision for the termination of all Commitments and repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans;

(iv)    the issuance and entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Interim Order, the CCAA Initial Order or the Final Order, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

(v)    the Interim Order is not issued and entered on or before the date that is five (5) Business Days after the Petition Date or the Final Order is not issued and entered, and the CCAA Initial Order is not final, on or before the date that is thirty (30) days after the Petition Date;

(vi)    the payment by a Loan Party of, or application by any Loan Party for authority to pay by a Loan Party, any Prepetition claim unless such payment is otherwise permitted under this Agreement or provided pursuant to any First Day Order or the Initial CCAA Order, as applicable, and specifically provided for in the Approved Budget;

(vii)    following the entry of the Final Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against any Agent, any Lender, any Prepetition Senior Agent or any Prepetition Senior Agent or any of their respective collateral, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

(viii)    the appointment of an interim or permanent trustee in any US Case or the appointment of a receiver or an examiner in any US Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of such Loan Party, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

NY\1620408.3

(ix)    the Canadian Loan Parties are declared bankrupt or a proceeding is taken to have a receiver, interim receiver, receiver and manager, agent, liquidator or other like Person appointed over all or any material portion of their property and assets or, except for the Monitor in the CCAA Cases, any such appointment is made or any creditor takes possession of all or a material portion of such property and assets or otherwise enforces any of its rights against the Canadian Loan Parties, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

(x)    the sale of all or substantially all of the assets of the Loan Parties through a sale under Section 363 of the Bankruptcy Code or a similar sale pursuant to Section 36 of the CCAA and an order of the Canadian Court, through a confirmed plan of reorganization, arrangement or compromise in any Case, or otherwise that does not provide for payment in full in cash of the Obligations and the termination of all Commitments, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

(xi)    the dismissal of any US Case, or the conversion of any US Case from one under Chapter 11 or Chapter 15 to one under Chapter 7 of the Bankruptcy Code, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

(xii)    the dismissal of the CCAA Cases or a conversion of the CCAA Case to a liquidation proceeding or receivership under the BIA or otherwise, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

(xiii)    the issuance and entry of an order by the Bankruptcy Court or the Canadian Court granting relief from or modifying any stay, including the automatic stay of Section 362 of the Bankruptcy Code, (x) to allow any creditor to execute upon or enforce a Lien on any Collateral having a value in excess of $500,000 in the aggregate, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

(xiv)    except as expressly contemplated herein, an order is entered by the Bankruptcy Court or Canadian Court subordinating, or that has the effect of subordinating, or that avoids, or that has the effect of avoiding, the perfection, priority or validity of, any or all of the Obligations or Liens of any Agent or any Lender under the Loan Documents (or any or all of the adequate protection claims or liens of any Prepetition Senior Agent or any Prepetition Senior Lender under the Applicable Order) to any other claim or Lien, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

(xv)    the issuance and entry of an order in any US Case or the CCAA Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

100

(xvi)    the failure of any Loan Party to perform any of its obligations under the Applicable Order, subject to any applicable cure period;

(xvii)    any Applicable Order shall either (i) cease to be in full force and effect or (ii) without the consent of the Majority Lenders, be amended, supplemented, stayed, reversed, vacated or otherwise modified, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

(xviii)    except as otherwise provided by the Applicable Order, the issuance and entry of an order in any Case granting any other super priority administrative claim or Lien equal or superior to that granted to any Agent, on behalf of itself and/or the Secured Parties, or in each case, any Loan Party applies for, consents to, or acquiesces in, any such relief;

(xix)    any motion or application is filed by, on behalf of, or supported by any Loan Party seeking the issuance and entry of an order, or an order is issued and entered in any Case, approving any subsequent debtor-in-possession facility for borrowed money or other extensions of credit unless such subsequent facility and such order expressly provide for the indefeasible payment and complete satisfaction in full in cash to the Administrative Agent of all Obligations (and termination of all Commitments) hereunder prior to, or concurrently with, any initial borrowings or other extensions of credit under such subsequent facility;

(xx)    any motion or pleading is filed by any of the Loan Parties seeking to grant, or the issuance and entry of any order granting, to any party, (x) any Lien senior or equal to the Liens described in the Applicable Order or the Loan Documents that are held by any of the Agents or Lenders in the Collateral (or senior or equal to the adequate protection Liens described in the Applicable Order that are held by any of the Prepetition Senior Agents or Prepetition Senior Lenders in the Collateral), or (y) any claim or expense senior or equal to the claims and expenses described in the Applicable Order or the Loan Documents that are held by any of the Agents or Lenders against any of the Loan Parties (or senior or equal to the adequate protection claims described in the Applicable Order that are held by any of the Prepetition Senior Agents or Prepetition Senior Lenders against any of the Loan Parties);

(xxi)    termination of the exclusive period for Loan Parties to file a plan of reorganization in the US Case;

(xxii)    any of the Loan Parties' return of goods constituting Collateral pursuant to Section 546(h) of the Bankruptcy Code other than in accordance with any such program (a) approved pursuant to a First Day Order, or (b) otherwise approved by the Bankruptcy Court and consented to by the Administrative Agent and the Syndication Agent in writing; or

(xxiii)    any holder of any security interest, mortgage, charge, claim or Lien of any kind enforces against or becomes entitled to enforce against (unless subject to a

NY\1620408.3

stay) or otherwise takes possession, management or control of all or any material part of the Loan Parties' property or assets.

(m)    Material Adverse Effect Since Petition Date.  There shall occur any event or circumstances (or series of events or circumstances) that has had or would reasonably be expected to have a Material Effect since the Petition Date.

then, and in any such event, any of the following actions may be taken by the Administrative Agent with the consent of the Majority Lenders (and shall be taken by the Administrative Agent upon the written direction of the Majority Lenders), in each case notwithstanding the provisions of Section 362 of the Bankruptcy Code or similar legislation in Canada, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court or Canadian Court, but in each case subject to the Applicable Order:  (i) declare all Commitments to be terminated forthwith, whereupon all Commitments shall immediately terminate; (ii) declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable; (iii) reduce the Commitments from time to time and (iv) exercise any rights and remedies provided to any Agent under the Loan Documents or at law or equity, including all remedies provided under the Uniform Commercial Code or similar legislation in Canada.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no Lender in its capacity as a Secured Party or as beneficiary of any security granted pursuant to the Security Documents shall have any right to exercise remedies in respect of such security without the prior written consent of the Majority Lenders.

If any Default or Event of Default has occurred and is continuing, the Administrative Agent may, or upon the request of the Majority Lenders, the Administrative Agent shall, notwithstanding the provisions of Section 362 of the Bankruptcy Code or similar legislation in Canada, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court or Canadian Court, increase the rate of interest applicable to the Loans to the default rate.

SECTION 8.  THE AGENTS; THE ARRANGERS

8.1    Appointment.  (a) Each Lender hereby irrevocably designates and appoints the Agents as the agents of such Lender under this Agreement and the other Loan Documents, and each Lender irrevocably authorizes each Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto, and each Agent hereby accepts such appointment. Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent.

(b)    For greater certainty, and without limiting the powers of the Agents or any other Person acting as an agent, attorney-in-fact or mandatary for the Agents under this

Agreement or under any of the Loan Documents, each Lender (for itself and for all other Secured Parties that are Affiliates of such Lender) and each Agent and Lead Arranger (i) irrevocably constitutes (to the extent necessary), the Canadian Collateral Agent as the holder of an irrevocable power of attorney (*fondé de pouvoir* within the meaning of Article 2692 of the *Civil Code of Québec*) for the purposes of holding on their behalf, and for their benefit, any Liens, including hypothecs ("Hypothecs"), granted or to be granted by the Company or any other Loan Party on movable or immovable property pursuant to the laws of the Province of Québec to secure obligations of the Company or any other Loan Party under any debenture issued by the Company or any other Loan Party and exercising such powers and duties which are conferred upon the Canadian Collateral Agent in its capacity as *fondé de pouvoir* under any of the Hypothecs; and (ii) appoints on the Closing Date and agrees that the Administrative Agent, acting as agent for the Secured Parties, may act as the debentureholder and mandatory with respect to any debenture that may be issued and pledged from time to time for the benefit of the Secured Parties.

(c)     The said constitution of the *fondé de pouvoir* (within the meaning of Article 2692 of the *Civil Code of Québec*) as the holder of such irrevocable power of attorney and of the Administrative Agent as debentureholder and mandatory with respect to any debenture that may be issued and pledged from time to time for the benefit of the applicable Secured Parties shall be deemed to have been ratified and confirmed by any Assignee by the execution of an Assignment and Acceptance to be bound by the provisions of this Section 8 as if it were a Lender party thereto.

(d)     Notwithstanding the provisions of Section 32 of An Act Respecting the Special Powers of Legal Persons (Québec), the Administrative Agent and the Canadian Collateral Agent may purchase, acquire and be the holder of any debenture issued by a Canadian Borrower or any other Loan Party.  Each of the Loan Parties hereby acknowledges that any such debenture shall constitute a title of indebtedness, as such term is used in Article 2692 of the *Civil Code of Québec*.

(e)     The Canadian Collateral Agent appointed as *fondé de pouvoir* shall have the same rights, powers and immunities as the Agents as stipulated in this Section 8 of this Agreement, which shall apply mutatis mutandis.  Without limitation, the provisions of Section 8.9 shall apply mutatis mutandis to the resignation and appointment of a successor to the Canadian Collateral Agent acting as *fondé de pouvoir*.

(f)     Without limiting the foregoing, each Lender hereby authorizes the Administrative Agent to consent, on behalf of each such Lender in such capacity, to (i) an Interim Order substantially in the form attached as Exhibit D hereto, (ii) the CCAA Initial Order, and (iii) a Final Order to be negotiated between the Loan Parties, the Administrative Agent and the Syndication Agent.

8.2     Delegation of Duties.  Each Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact (including the Canadian Collateral Agent in the case of the US Collateral Agent and the US Collateral Agent in the case of the Canadian Collateral Agent) and shall be entitled to advice of counsel

103

concerning all matters pertaining to such duties.  No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

        8.3    <u>Exculpatory Provisions</u>.  Neither the Lead Arrangers, any Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a court of competent jurisdiction to have resulted directly from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Lead Arrangers, the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party to perform its obligations hereunder or thereunder.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

        8.4    <u>Reliance by Agents</u>.  Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Loan Parties), independent accountants and other experts selected by such Agent.  The Agents may deem and treat the payee of any Note as the owner thereof for all purposes unless such Note shall have been transferred in accordance with Section 9.5 and all actions required by such Section 9.5 in connection with such transfer shall have been taken.  Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Majority Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Majority Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

        8.5    <u>Notice of Default</u>.  No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless such Agent shall have received notice from a Lender or the Borrowers referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent shall receive such a notice, the Administrative Agent shall give notice thereof to the Lenders.  The Agents shall take such action with respect to such Default or Event

104

of Default as shall be reasonably directed by the Majority Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement); provided that unless and until the Agents shall have received such directions, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

8.6    Non-Reliance on the Lead Arrangers, the Agents and Other Lenders. Each Lender expressly acknowledges that neither the Lead Arrangers, any of the Agents nor any of their respective officers, directors, employees, agents, attorneys and other advisors, partners, attorneys-in-fact or Affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any Affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by such Agent to any Lender.  Each Lender represents to the Agents and the Lead Arrangers that it has, independently and without reliance upon the Lead Arrangers, any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon the Lead Arrangers, any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, no Lead Arrangers and no Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Lead Arrangers or Agent or any of its officers, directors, employees, agents, attorneys and other advisors, partners, attorneys-in-fact or Affiliates.

8.7    Indemnification.  The Lenders agree to indemnify the Lead Arrangers and each Agent in its capacity as such (to the extent not reimbursed by the Loan Parties and without limiting the obligation of the Loan Parties to do so), ratably according to their respective pro rata percentage interests in a Commitments or the Loans, as applicable, in effect on the date on which indemnification is sought under this Section 8.7 (or, if indemnification is sought after the date upon which all Commitments shall have terminated and all Loans shall have been paid in full, ratably in accordance with such pro rata percentage interests in the Loans immediately prior to such date), for, and to save the Lead Arrangers and each Agent harmless from and against, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (including, without limitation, at any time following the repayment of the Loans) be imposed on, incurred by or asserted against the Lead Arrangers or such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Lead Arrangers or such Agent under or in

105

connection with any of the foregoing; including, in connection with, the obtaining of approval of the Loan Documents by the Bankruptcy Court and the Canadian Court and the preparation and review of pleadings, documents and reports related to any Case and any subsequent case under Chapter 7 of the Bankruptcy Code or similar proceeding in Canada, attendance at meetings, court hearings or conferences related to any Case and any subsequent case under Chapter 7 of the Bankruptcy Code or similar proceeding in Canada, and general monitoring of any Case and any subsequent case under Chapter 7 of the Bankruptcy Code or similar proceeding in Canada, provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a court of competent jurisdiction to have resulted directly from the Lead Arrangers' or such Agent's gross negligence or willful misconduct.  The agreements in this Section 8.7 shall survive the payment of the Loans and all other amounts payable hereunder.

   8.8 <u>Lead Arrangers and Agents in their Individual Capacities</u>.  The Lead Arrangers and each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though the Lead Arrangers or such Agent were not Lead Arrangers or an Agent.  With respect to its Loans made or renewed by it, the Lead Arrangers and each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though they were not the Lead Arrangers or an Agent, and the terms "Lender" and "Lenders" shall include the Lead Arrangers and the Agent in their individual capacities.

   8.9 <u>Successor Agents</u>.  (a) The Administrative Agent, the US Collateral Agent and the Canadian Collateral Agent may resign as Administrative Agent, US Collateral Agent or Canadian Collateral Agent, respectively, upon 30 days' notice to the Lenders and the Borrowers and the Administrative Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to Borrowers and Administrative Agent and signed by Majority Lenders.  If the Administrative Agent, US Collateral Agent or Canadian Collateral Agent shall resign as Administrative Agent, US Collateral Agent or Canadian Collateral Agent, as applicable, under this Agreement and the other Loan Documents, or is removed as Administrative Agent under this Agreement, then the Majority Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default shall have occurred and be continuing) be subject to approval by the Borrowers (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, the US Collateral Agent or the Canadian Collateral Agent, as applicable, and the term "Administrative Agent," "US Collateral Agent" or "Canadian Collateral Agent," as applicable, shall mean such successor agent effective upon such appointment and approval, and the former Agent's rights, powers and duties as Administrative Agent, US Collateral Agent or Canadian Collateral Agent, as applicable, shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of the Loans.  If no successor agent has accepted appointment as Administrative Agent, US Collateral Agent or Canadian Collateral Agent, as applicable, by the date that is 30 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent, US Collateral Agent or Canadian Collateral Agent, as applicable, hereunder until such time, if any, as the Majority Lenders appoint a successor agent as provided for above.  The

106

Syndication Agent may resign as an Agent hereunder upon 30 days' notice to the Administrative Agent, the Lenders and the Borrowers. If the Syndication Agent shall resign as Syndication Agent hereunder, as applicable, the duties, rights, obligations and responsibilities of such Agent hereunder, if any, shall automatically be assumed by, and inure to the benefit of, the Administrative Agent, without any further act by the Lead Arranger, any Agent or any Lender. After any retiring Agent's resignation or removal as Agent, the provisions of this Section 8 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

　　　　8.10　Authorization to Release Liens and Guarantees. The US Collateral Agent and the Canadian Collateral Agent, as applicable, are hereby irrevocably authorized by each of the Lenders to effect any release of Liens or Guarantee Obligations contemplated by Section 9.15.

　　　　8.11　The Lead Arrangers and the Syndication Agent. The Lead Arrangers and the Syndication Agent, in their respective capacities as such, shall have no duties or responsibilities, and shall incur no liability, under this Agreement and the other Loan Documents.

　　　　8.12　Withholding Tax. (a) To the extent required by any applicable law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax. If the forms or other documentation required by Section 2.14(e) and (f) are not delivered to the Administrative Agent, then the Administrative Agent may withhold from any interest payment to any Lender not providing such forms or other documentation, a maximum amount of the applicable withholding tax.

　　　　(b)　If the Internal Revenue Service, Canada Revenue Agency or any authority of the United States of America, Canada or any other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including penalties and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.

　　　　(c)　If any Lender sells, assigns, grants a participation in, or otherwise transfers its rights under this Agreement, the purchaser, assignee, participant or transferee, as applicable, shall comply and be bound by the terms of Sections 2.14(e) and (f) and this Section 8.12; provided that with respect to any Participant, as set forth in Section 9.5(b), such Participant shall only be required to comply with the requirements of Sections 2.14(e) and (f) if such Participant seeks to obtain the benefits of Section 2.14.

107

## SECTION 9.  MISCELLANEOUS

9.1    <u>Amendments and Waivers</u>.  (a) Neither this Agreement nor any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 9.1.  The Majority Lenders and each Loan Party that is party to the relevant Loan Document may, or (with the written consent of the Majority Lenders) the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (1) enter into written amendments, supplements or modifications hereto and to the other Loan Documents (including amendments and restatements hereof or thereof) for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (2) waive, on such terms and conditions as may be specified in the instrument of waiver, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; <u>provided</u>, <u>however</u>, that no such waiver and no such amendment, supplement or modification shall (except as provided in Section 9.1(b)):

(i)    forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest payable hereunder or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Commitment of any Lender, in each case without the consent of each Lender directly affected thereby;

(ii)    (A) amend, modify or waive any provision of this Section 9.1 or reduce any percentage specified in the definition of Majority Lenders without the consent of all Lenders, (B) consent to the assignment or transfer by either Holdings or the Borrowers of any of their respective rights and obligations under this Agreement and the other Loan Documents without the consent of all Lenders, (C) release any of the Guarantors from their Guarantee Obligations under the applicable Security Documents (except as otherwise provided herein), in each case without the consent of all Lenders, or (D) release all or substantially all of the Collateral (other than pursuant to transactions permitted hereunder) without the consent of all Lenders;

(iii)    amend, modify or waive any provision of Section 8 or any other provision of any Loan Document affecting the rights, duties and obligations of the Lead Arrangers or any Agent without the consent of the Lead Arrangers or Agent affected thereby; or

(iv)    amend, modify or waive the provisions of Section 2.12 or the provisions of any of the Security Documents specifying the priority or order in which payments shall be applied, in each case without the consent of each Lender directly affected thereby.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Lead Arrangers, the Agents and all future holders of the Loans.  In the case of any waiver, the Loan Parties, the Lenders, the Lead Arrangers and the Agents shall be restored to their former

position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon. Any such waiver, amendment, supplement or modification shall be effected by a written instrument signed by the parties required to sign pursuant to the foregoing provisions of this Section 9.1; provided, that delivery of an executed signature page of any such instrument by facsimile transmission shall be effective as delivery of a manually executed counterpart thereof.

(b)    If, in connection with any proposed amendment, modification, waiver or termination of or in respect of this Agreement, a Lender fails to consent thereto (any such Lender whose consent is not obtained being referred to as "Non-Consenting Lender"), then at the Borrowers' sole cost and expense, the Borrowers may require such Non-Consenting Lender to promptly transfer to a bank or other financial institution specified by the Borrowers (which other bank or financial institution approves the proposed amendment, modification, waiver or termination) all of the Loans of such Non-Consenting Lender for an amount equal to, from such purchaser of the Loans, the principal balance of all Loans held by such Non-Consenting Lender and all accrued interest and fees with respect thereto through the date of sale (such purchase and sale to be consummated pursuant to an executed Assignment and Acceptance).  In connection with any such replacement, if the Non-Consenting Lender does not execute and deliver to the Administrative Agent a duly completed Assignment and Acceptance reflecting such replacement upon the request of the Administrative Agent following the execution and delivery by such replacement Lender of such Assignment and Acceptance to the Non-Consenting Lender, then such Non-Consenting Lender shall be deemed to have executed and delivered such Assignment and Acceptance for all purposes of this Agreement and the other Loan Documents.

9.2    Notices.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed (a) in the case of Holdings, the Borrowers, the Lead Arrangers and the Agents, as follows and (b) in the case of the Lenders, as set forth in an administrative questionnaire delivered to the Administrative Agent or on Schedule I to the Lender Addendum to which such Lender is a party or, in the case of a Lender which becomes a party to this Agreement pursuant to an Assignment and Acceptance, in such Assignment and Acceptance or (c) in the case of any party, to such other address as such party may hereafter notify to the other parties hereto:

Holdings:                          80 Field Point Rd.
                                   Greenwich, Connecticut 06830
                                   Attention:  Jay Epstein
                                   Telecopy:  (203) 661-3349
                                   Telephone: (203) 661-3344

NY\1620408.3

with a copy to

Kirkland & Ellis LLP
[_____]
[_____]
Attention: [_____]
Telecopy:  [_____
Telephone:  [_____

Borrowers:                          10 Boulevard Des Capucins
                                    Québec City,
                                    Québec G1J 3R4
                                    Attention:  Chief Financial Offer
                                    Telecopy:  (418) 524-2920
                                    Telephone: (418) 525-2912

                                    with a copy to

                                    White Birch Paper Holding Company
                                    80 Field Point Rd.
                                    Greenwich, Connecticut 06830
                                    Attention:  Jay Epstein
                                    Telecopy:  (203) 661-3349
                                    Telephone: (203) 661-3344

                                    with a copy to

                                    Kirkland & Ellis LLP
                                    [_____]
                                    [_____]
                                    Attention: [_____]
                                    Telecopy:  [_____
                                    Telephone:  [_____

US Collateral Agent:                [Credit Suisse AG, Cayman Islands Branch ]
                                    [Eleven Madison Avenue]
                                    [New York, NY 10010]
                                    Attention:  [Agency Group]
                                    Telecopy:  [(212) 325-9936]
                                    Telephone: [(212) 325-8304]

                                    with a copy to

                                    Latham & Watkins LLP
                                    885 Third Avenue, Suite 1000
                                    New York, New York  10022
                                    Attention:  [_____]

110

Telecopy:  (212) 751-4864
Telephone:  [_____]

and a copy to

Osler, Hoskin & Harcourt LLP
100 King Street West
1 First Canadian Place
Suite 6100, P.O. Box 50
Toronto, Ontario M5X 1B8
Attention:  Marc Wasserman and Scott
Horner
Telecopy:  (416) 862-6666
Telephone:  (416) 862-4908 and (416) 862-6596

Administrative Agent/
Lead Arranger:

Credit Suisse AG, Cayman Islands Branch
Eleven Madison Avenue
New York, NY 10010
Attention:  [_____]
Telecopy:  [_____]
Telephone:  [_____]

with copies to Latham & Watkins LLP and
Osler, Hoskin & Harcourt LLP as specified
above

Lead Arranger/
Syndication Agent:

Black Diamond Commercial Finance,
L.L.C.
100 Field Drive
Lake Forest, IL 60045-2580
Attention:  Hugo H. Gravenhorst
Telecopy:  (847) 615-9064
Telephone: (847) 582-9138

Canadian Collateral Agent:

[Credit Suisse, Toronto Branch]
[One Canadian Place]
[Suite 3000]
[P.O. Box 301]
[Toronto, Ontario M5X1C9]
[Canada]
Attention:  [Edith Chan]
Telecopy:  [(416) 352-4574]
Telephone: [(416) 352-4532]

111

provided that any notice, request or demand to or upon the Lead Arrangers, any Agent or any Lender shall not be effective until received; and provided, further, that any notices or deliveries required to be given to any Lender hereunder may be effected by delivery of notice to the Administrative Agent as provided above, followed by a distribution of such notice by the Administrative Agent to any Lender through IntraLinks (or any similar electronic system customarily used by financial institutions), to the extent such system is being used by the Administrative Agent, it being understood that the Administrative Agent shall bear no responsibility for any failure of any Lender to receive any such notice or delivery and the Borrowers shall remain responsible therefor.

       9.3    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of  any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

       9.4    Payment of Expenses.  The Borrowers shall, jointly and severally, (a) pay or reimburse the Lead Arrangers and the Agents for all their reasonable out-of-pocket costs and expenses incurred in connection with (i) the syndication of the DIP Facility and the development, preparation, execution and interpretation of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, (ii) the consummation and administration of the transactions contemplated hereby and thereby, (iii) efforts to monitor the Loans or any of the other Obligations, and evaluate, observe or assess any of the Loan Parties or their respective affairs, and verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral, (iv) the obtaining of approval of the Loan Documents by the Bankruptcy Court and Canadian Court, and (v) the preparation and review of pleadings, documents and reports related to any Case and any subsequent case under Chapter 7 of the Bankruptcy Code or similar proceeding in Canada, attendance at meetings, court hearings or conferences related to any Case and any subsequent case under Chapter 7 of the Bankruptcy Code or similar proceeding in Canada, and general monitoring of any Case and any subsequent case under Chapter 7 of the Bankruptcy Code or similar proceeding in Canada, including, in connection with the above, (A) the reasonable fees and disbursements of Latham & Watkins LLP, Osler, Hoskin & Harcourt LLP and such other local counsel as is reasonably determined appropriate by the Agents, (B) all reasonable fees, costs and expenses of the US Collateral Agent's and the Canadian Collateral Agent's advisors, consultants, appraisers and auditors, and (C) the charges of IntraLinks; provided that the Borrowers shall not be required to reimburse or pay the fees and disbursements of more than one U.S. counsel, one Canadian counsel and one local counsel for each applicable jurisdiction, (b) pay or reimburse each Lender, the Lead Arrangers and the Agents for all their reasonable costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any other documents prepared in connection herewith or therewith, provided that the Borrowers shall not be required to reimburse or pay the fees and disbursements of more than (x) one U.S. counsel, one Canadian counsel and one local counsel for each applicable jurisdiction for the Lead Arrangers and the

Administrative Agent and (y) one additional U.S. counsel and one additional Canadian counsel for all the Lenders (the "Legal Fee Limitations"), (c) jointly and severally pay, indemnify, or reimburse each Lender, the Lead Arrangers and the Agents for, and hold each Lender, the Lead Arrangers and the Agents harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and similar taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) jointly and severally pay, indemnify or reimburse each Lender, the Lead Arrangers, each Agent, their respective Affiliates, and their respective officers, directors, trustees, employees, Affiliates, shareholders, members, attorneys and other advisors, agents and controlling Persons (each, an "Indemnitee") for, and hold each Indemnitee harmless from and against, any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the Chapter 11 Cases, the other Loan Documents and any such other documents, including, without limitation, any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Company Group Member or any of the Mortgaged Properties of any Company Group Member or the use by unauthorized Persons of information or other materials sent through electronic, telecommunications or other information transmission systems that are intercepted by such Persons and the fees and disbursements and other reasonable charges of legal counsel in connection with claims, actions or proceedings by any Indemnitee against Holdings and the Borrowers hereunder (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided, that the Borrowers shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent a court of competent jurisdiction shall have determined on a final and non-appealable basis that such Indemnified Liabilities resulted directly from the gross negligence or willful misconduct of such Indemnitee or such Indemnitee's officers, directors, employees, controlling Persons or members.  No Indemnitee shall be liable for any damages arising from the use by unauthorized Persons of Information or other materials sent through electronic, telecommunications or other information transmission systems that are intercepted by such Persons (unless such damages are determined by a court of competent jurisdiction on a final and non-appealable basis to have resulted directly from the gross negligence or willful misconduct of such Indemnitee or such Indemnitee's officers, directors, employees, controlling Persons or members) or for any special, indirect, consequential or punitive damages in connection with this DIP Facility.  All amounts due under this Section 9.4 shall be payable not later than five (5) days after written demand therefor.  Statements reflecting amounts payable by the Loan Parties pursuant to this Section 9.4 shall be submitted to the address of the Company set forth in Section 9.2, or to such other Person or address as may be hereafter designated by the Company in a notice to the Administrative Agent.  The agreements in this Section 9.4 shall survive repayment of the Loans and all other amounts payable hereunder.

        9.5    Successors and Assigns; Participations and Assignments.  (a)  This Agreement shall be binding upon and inure to the benefit of Holdings, the Borrowers, the Lenders, the Lead Arrangers, the Agents, all future holders of the Loans and their respective successors and assigns.

(b)    Any Lender may, without the consent of Holdings, the Borrowers or any other Person, in accordance with applicable law, at any time sell to one or more banks or financial institutions (each, a "Participant") participating interests in any Loan owing to such Lender, any Commitment of such Lender or any other interest of such Lender hereunder and under the other Loan Documents.  In the event of any such sale by a Lender of a participating interest to a Participant, such Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Lender shall remain solely responsible for the performance thereof, such Lender shall remain the holder of any such Loan for all purposes under this Agreement and the other Loan Documents, and the Borrowers and the Agents shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents.  In no event shall any Participant under any such participation have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom, except to the extent that such amendment, waiver or consent relates to the consent of all Lenders as required under Section 9.1(a)(i) or 9.1(a)(ii)(C) or (D).  Holdings and each of the Borrowers agree that if amounts outstanding under this Agreement and the Loans are due or unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall, to the maximum extent permitted by applicable law, be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement, provided that, in purchasing such participating interest, such Participant shall be deemed to have agreed to share with the Lenders the proceeds thereof as provided in Section 9.7(a) as fully as if such Participant were a Lender hereunder.  Each of Holdings and the Borrowers also agrees that each Participant shall be entitled to the benefits of Sections 2.12, 2.13 and 2.14 (subject to the limitations and requirements thereof) with respect to its participation in the Commitments and the Loans outstanding from time to time as if such Participant were a Lender; provided that, in the case of Section 2.14, such Participant shall have complied with the requirements of said Section 2.14, and provided, further, that no Participant shall be entitled to receive any greater amount pursuant to any such Section 2.12, 2.13 or 2.14 than the transferor Lender would have been entitled to receive in respect of the amount of the participation transferred by such transferor Lender to such Participant had no such transfer occurred.

If and to the extent that a Non-US Lender sells a participating interest to a Participant, and such Participant seeks to obtain the benefits of Section 2.14, then such Lender shall promptly provide the Company and the Administrative Agent with documentation reflecting the portion of its Loan, Commitment and/or any other interest of such Lender hereunder and under the other Loan Documents sold pursuant to such participating interest on a properly completed and duly executed Internal Revenue Service Form W-8IMY (or any subsequent versions thereof or successors thereto) and the portion of its Loan, Commitment and/or any other interest of such Lender hereunder and under the other Loan Documents retained on a properly completed and duly executed Internal Revenue Service Form W-8BEN or Form W-8ECI (or any subsequent versions thereof or successors thereto).

(c)    Any Lender (an "Assignor") may, in accordance with applicable law and upon written notice to the Administrative Agent, at any time and from time to time assign to any Lender or any affiliate, Related Fund or Control Investment Affiliate thereof or, with the consent

114

of the Administrative Agent (not to be unreasonably withheld or delayed) and the Borrowers (not to be unreasonably withheld or delayed; provided that the consent of the Borrowers shall be required to any such assignment (i) during the continuance of an Event of Default or (ii) during the period following the funding in full of the total amount of the Interim Date commitments and the Delayed Draw Commitments to a bank or financial institution (an "<u>Assignee</u>") of all or any part of its rights and obligations under this Agreement pursuant to an Assignment and Acceptance, substantially in the form of Exhibit E (an "<u>Assignment and Acceptance</u>"), executed by such Assignee and such Assignor (and, where the consent of the Administrative Agent and the Borrowers is required pursuant to the foregoing provisions, by the Administrative Agent and the Borrowers) and delivered to the Administrative Agent for its acceptance and recording in the Register; <u>provided</u>, that each assignment [(i) be in accordance with Section 9.5(g) below and (ii)] to an Assignee (other than any Lender or any Affiliate thereof) shall be in an aggregate principal amount of $1,000,000 or an integral multiple thereof (other than in the case of an assignment of all of a Lender's interests under this Agreement)), unless otherwise agreed by the Company and the Administrative Agent and Related Funds shall be treated as one Assignee for purposes of this proviso. Upon such execution, delivery, acceptance and recording, from and after the effective date determined pursuant to such Assignment and Acceptance, (x) the Assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Acceptance, have the rights and obligations of a Lender hereunder with Commitments and/or Loans as set forth therein, and (y) the Assignor thereunder shall, to the extent provided in such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of an Assignor's rights and obligations under this Agreement, such Assignor shall cease to be a party hereto, except as to Section 2.13, 2.14, 2.15, 8.12 and 9.5 in respect of the period prior to such effective date). For purposes of the minimum assignment amounts set forth in this paragraph, multiple assignments by two or more Related Funds or Control Investment Affiliates shall be aggregated.

(d)     The Administrative Agent shall, on behalf of the Borrowers and each Guarantor, maintain at its address referred to in Section 9.2 a copy of each Assignment and Acceptance delivered to it and a register (the "<u>Register</u>") for the recordation of the names and addresses of the Lenders and the Commitment of, and principal amount of the Loans owing to, each Lender from time to time. The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrowers, each Agent and the Lenders shall treat each Person whose name is recorded in the Register as the owner of the Loans and any Notes evidencing such Loans recorded therein for all purposes of this Agreement. Any assignment of any Loan, whether or not evidenced by a Note, shall be effective only upon appropriate entries with respect thereto being made in the Register (and each Note shall expressly so provide). Any assignment or transfer of all or part of a Loan evidenced by a Note shall be registered on the Register only upon surrender for registration of assignment or transfer of the Note evidencing such Loan, accompanied by a duly executed Assignment and Acceptance; thereupon one or more new Notes in the same aggregate principal amount shall be issued to the designated Assignee, and the old Notes shall be returned by the Administrative Agent to the Borrowers marked "canceled". The Register shall be available for inspection by (i) the Borrowers and the Syndication Agent and (ii) any Lender at any reasonable time and from time to time upon reasonable prior notice, (with respect to any entry relating to such Lender's Loans).

NY\1620408.3

(e)    Upon its receipt of an Assignment and Acceptance executed by an Assignor and an Assignee (and, in any case where the consent of any other Person is required by Section 9.5(c), by each such other Person) together, in the event such Assignment and Acceptance is not electronically executed and delivered to the Administrative Agent via an electronic settlement system then acceptable to the Administrative Agent (which system shall initially be ClearPar LLC), with payment by the Assignor or Assignee to the Administrative Agent of a registration and processing fee of $3,500 (treating multiple, simultaneous assignments by or to two or more Related Funds as a single assignment) (except that no such registration and processing fee shall be payable in the case of an Assignee which is already a Lender or is an Affiliate, Related Fund or Control Investment Affiliate of a Lender or a Person under common management with a Lender), the Administrative Agent shall (i) promptly accept such Assignment and Acceptance and (ii) on the effective date determined pursuant thereto record the information contained therein in the Register and give notice of such acceptance and recordation to the Company.  On or prior to such effective date, the Borrowers, at their own expense, upon request, shall execute and deliver to the Administrative Agent (in exchange for the Note of the assigning Lender) a new Note to the order of such Assignee in an amount equal to the Commitment and/or Loan assumed or acquired by it pursuant to such Assignment and Acceptance and, if the Assignor has retained a Commitment or Loan, upon request, a new Note to the order of the Assignor in an amount equal to the Commitment or Loan retained by it hereunder.  Such new Note or Notes shall be dated the Closing Date and shall otherwise be in the form of the Note or Notes replaced thereby.

(f)    For the avoidance of doubt, the parties to this Agreement acknowledge that the provisions of this Section 9.5 concerning assignments of Loans and Notes relate only to absolute assignments and that such provisions do not prohibit assignments creating security interests in Loans and Notes, including, without limitation, any pledge or assignment by a Lender of any Loan or Note to any Federal Reserve Bank in accordance with applicable law.

(g)    [In the case of any assignment of Interim Date Loan Commitments, Interim Date Loans, Delayed Draw Commitments or Delayed Draw Loans, such Assignor must also assign an equal, pro rata portion of its Interim Date Loan Commitments, Interim Date Loans, Delayed Draw Commitments or Delayed Draw Loans, as applicable, to the applicable Assignee.]

9.6    Replacements of Lenders under Certain Circumstances.  The Borrowers (at its sole cost and expense) shall be permitted to replace any Lender that requests (for itself or on behalf of any Participant to which it has granted a participation in its Loans or Commitments) reimbursement for amounts owing pursuant to Section 2.13 or 2.14 with a replacement bank or other financial institution (but in the case of a participation, only to the extent thereof), provided that (i) such replacement does not conflict with any Requirement of Law, (ii) no Event of Default shall have occurred and be continuing at the time of such replacement, (iii) the replacement bank or institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender prior to the date of replacement, the replacement bank or institution, if not already a Lender, and the terms and conditions of such replacement, shall be reasonably satisfactory to the Administrative Agent, (iv) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 9.5 (provided that the Borrowers shall be obligated to pay the registration and processing fee referred to therein) and (v) any such replacement shall not

116

be deemed to be a waiver of any rights that the Borrowers or any Agent, Lead Arranger or Lender shall have against the replaced Lender. In connection with any such replacement, if the replaced Lender does not execute and deliver to the Administrative Agent a duly completed Assignment and Acceptance reflecting such replacement within five Business Days of the date on which the replacement Lender executes and delivers such Assignment and Acceptance to the replaced Lender, then such replaced Lender shall be deemed to have executed and delivered such Assignment and Acceptance for all purposes of the this Agreement and the other Loan Documents.

        9.7   <u>Adjustments; Set-off</u>. (a) Notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court or the Canadian Court but subject in all cases to the Applicable Order, except to the extent that this Agreement provides for payments to be allocated to a particular Lender, if any Lender (a "<u>Benefited Lender</u>") shall at any time receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, in its capacity as secured party or otherwise) or any proceeds from Collateral (whether pursuant to the exercise of the rights of any Secured Party under the Security Documents or under law or otherwise), in a greater proportion than any such payment to or collateral or proceeds of Collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment, benefits of such collateral or proceeds from Collateral ratably with each of the Lenders; <u>provided</u>, <u>however</u>, that if all or any portion of such excess payment or benefits or proceeds is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. The provisions of this paragraph are intended to apply to all Lenders and to all payments, Collateral or proceeds of Collateral received by such Lenders in respect of the Obligations of the Borrowers hereunder.

        (b)   In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrowers, any such notice being expressly waived by the Borrowers to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrowers hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrowers, as the case may be. Each Lender agrees to notify promptly the Borrowers and the Administrative Agent after any such setoff and application made by such Lender, <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

        9.8   <u>Counterparts</u>. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement or of a Lender Addendum by facsimile transmission

NY\1620408.3

shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrowers and the Administrative Agent.

       9.9   <u>Severability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

       9.10   <u>Integration</u>.  This Agreement and the other Loan Documents represent the entire agreement of Holdings, the Borrowers, the other Loan Parties, the Agents, the Lead Arrangers and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Lead Arrangers, any Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

       **9.11**   **<u>GOVERNING LAW</u>.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE LOAN DOCUMENTS, IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THE LOAN DOCUMENTS AND THE OBLIGATIONS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE) AND THE CCAA. EACH LOAN PARTY HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT (AND, IN THE CASE OF THE CANADIAN LOAN PARTIES, THE CANADIAN COURT) SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE LOAN PARTIES, AGENTS, THE LEAD ARRANGERS AND LENDERS PERTAINING TO THE FACILITY OR ANY OF THE OTHER LOAN DOCUMENTS RELATED TO THE FACILITY OR TO ANY MATTER ARISING OUT OF OR RELATING TO THE FACILITY OR ANY OF THE OTHER LOAN DOCUMENTS RELATED TO THE FACILITY ; PROVIDED, THAT AGENTS, THE LEAD ARRANGERS, LENDERS AND THE LOAN PARTIES ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT (OR THE CANADIAN COURT) MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT (OR CANADIAN COURT); PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE AGENTS AND THE LEAD ARRANGERS FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF AGENTS AND THE LEAD ARRANGERS. EACH LOAN PARTY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH LOAN PARTY HEREBY WAIVES ANY OBJECTION THAT SUCH LOAN PARTY MAY HAVE BASED UPON LACK OF PERSONAL**

NY\1620408.3

**JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.  EACH LOAN PARTY HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH LOAN PARTY AT THE ADDRESS SET FORTH IN SECTION 9.2 OF THIS AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF SUCH LOAN PARTY'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE UNITED STATES OR CANADIAN MAILS, PROPER POSTAGE PREPAID.**

9.12    <u>Submission to Jurisdiction; Waivers</u>.  Each of Holdings and the Borrowers hereby irrevocably and unconditionally:

(a)    submits for itself and its Property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of New York located in the County of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to Holdings or the Borrowers at the addresses set forth in Section 9.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 9.12 any special, exemplary, punitive or consequential damages.

9.13    <u>Acknowledgments</u>.  Each of Holdings and the Borrowers hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

NY\1620408.3

(b)        neither the Lead Arrangers, any Agent nor any Lender has any fiduciary relationship with or duty to Holdings or the Borrowers arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Lead Arrangers, the Agents and the Lenders, on one hand, and Holdings and the Borrowers, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)        no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lead Arrangers, the Agents and the Lenders or among Holdings, the Borrowers and the Lenders.

9.14    <u>Confidentiality</u>.  Each of the Lead Arrangers, the Agents and the Lenders agrees to keep confidential all information provided to it by any Loan Party pursuant to this Agreement that is designated by such Loan Party as confidential; <u>provided</u> that nothing herein shall prevent the Lead Arrangers, any Agent or any Lender from disclosing any such information (a) to the Lead Arrangers, any Agent, any other Lender or any Affiliate of any thereof, (b) to any pledgee referred to in Section 9.5(f) or to any Participant, pledgee or Assignee (each, a "<u>Transferee</u>") or prospective Transferee that agrees to comply with the provisions of this Section 9.14 or substantially equivalent provisions, (c) to any of its employees, directors, agents, attorneys, accountants and other professional advisors (it being understood that the persons to whom such disclosure is made shall be informed of the confidential nature of such information and instructed to keep such information confidential), (d) to any financial institution that is a direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section 9.14), (e) upon the request or demand of any Governmental Authority having jurisdiction over it, (f) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (g) if requested or required to do so in connection with any litigation or similar proceeding, (h) that has been publicly disclosed other than in breach of this Section 9.14, (i) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (j) in connection with the exercise of any remedy hereunder or under any other Loan Document. Notwithstanding anything to the contrary in the foregoing sentence or any other express or implied agreement, arrangement or understanding, the parties hereto hereby agree that, from the commencement of discussions with respect to the financing provided hereunder, any party hereto (and each of its employees, representatives, or agents) is permitted to disclose to any and all persons, without limitation of any kind, the tax structure and tax aspects of the transactions contemplated hereby, and all materials of any kind (including opinions or other tax analyses) related to such tax structure and tax aspects.

9.15    <u>Release of Collateral and Guarantee Obligations</u>.

(a)        Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrowers in connection with any Disposition of Property by any Company Group Member permitted by the Loan Documents, the US Collateral Agent or the Canadian Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Lender, any Affiliate of any Lender, or any other Person) take such actions as shall be required

120

to release its security interest in any Collateral being Disposed of in such Disposition, and to release any Guarantee Obligations under any Loan Document of any Person being Disposed of in such Disposition, to the extent necessary to permit consummation of such Disposition in accordance with the Loan Documents; <u>provided</u> that (i) the Borrowers shall have delivered to such Agent, at least five Business Days prior to the date of the proposed release (or such shorter period agreed to by such Agent), a written request for release identifying the relevant Collateral being Disposed of in such Disposition, together with a certification by the Borrowers stating that such transaction is in compliance with this Agreement and the other Loan Documents, that no Default or Event of Default has occurred and is continuing, and that the proceeds of such Disposition will be applied in accordance with this Agreement and the other Loan Documents and (ii) with respect to any Disposition or series of related Dispositions, in each case permitted hereunder, for consideration of not more than $100,000, (x) the Borrowers is hereby authorized by the Administrative Agent to make such filings or recordings under the UCC or the Personal Property Security Legislation (including amendments or terminations of Financing Statements) or other relevant law to release the Lien on the assets subject to such Disposition or series of related Dispositions and (y) the request and certification described in clause (i) shall not be required.

(b)     Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations have been paid in full and all Commitments have terminated or expired, upon request of the Company, the US Collateral Agent or the Canadian Collateral Agent, as applicable, shall take such actions as shall be required to release its security interest in all Collateral, and to release all Guarantee Obligations provided for in any Loan Document.  Any such release of Guarantee Obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrowers or any other Loan Party, or upon or as a result of the appointment of a receiver, interim receiver, receiver–manager, intervenor or conservator of, or trustee or similar officer for, the Borrowers or any other Loan Party or any substantial part of its property, or otherwise, all as though such payment had not been made.

9.16   <u>Accounting Changes</u>.  [In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then the Borrowers and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating the Borrowers' and their respective Subsidiaries' financial condition shall be the same after such Accounting Change as if such Accounting Change had not been made. Until such time as such an amendment shall have been executed and delivered by Holdings, the Borrowers, the Administrative Agent and the Majority Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred.  "<u>Accounting Change</u>" refers to any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC].

9.17   Delivery of Lender Addenda.  Each Lender not a Lender as of the Closing Date and not an Assignee as of the Closing Date shall become a party to this Agreement by delivering to the Administrative Agent a Lender Addendum duly executed by such Lender, the Borrowers and the Administrative Agent.

**9.18   WAIVERS OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

9.19   Judgment Currency.  (a)   If, for the purpose of obtaining or enforcing judgment against a Loan Party in any court in any jurisdiction, it becomes necessary to convert into any other currency (such other currency being hereinafter in this Section 9.19 referred to as the "Judgment Currency") an amount due under any Loan Document in any currency (the "Obligation Currency") other than the Judgment Currency, the conversion shall be made at the rate of exchange prevailing on the Business Day immediately preceding the date of actual payment of the amount due, in the case of any proceeding in the courts of the State of New York or in the courts of any other jurisdiction that will give effect to such conversion being made on such date, or the date on which the judgment is given, in the case of any proceeding in the courts of any other jurisdiction (the applicable date as of which such conversion is made pursuant to this Section 9.19 being hereinafter in this Section 9.19 referred to as the "Judgment Conversion Date").

(b)   If, in the case of any proceeding in the court of any jurisdiction referred to in Section 9.19(a), there is a change in the rate of exchange prevailing between the Judgment Conversion Date and the date of actual receipt of the amount due in immediately available funds, the Loan Party shall pay such additional amount (if any, but in any event not a lesser amount) as may be necessary to ensure that the amount actually received in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of the Obligation Currency which could have been purchased with the amount of the Judgment Currency stipulated in the judgment or judicial order at the rate of exchange prevailing on the Judgment Conversion Date.  Any amount due from any Loan Party under this Section 9.19 shall be due as a separate debt and shall not be affected by judgment being obtained for any other amounts due under or in respect of any of the Loan Documents.  The term "rate of exchange" in this Section 9.19 means the rate of exchange at which the Administrative Agent, on the relevant date at or about 12:00 noon (New York time), would be prepared to sell, in accordance with its normal course foreign currency exchange practices, the Obligation Currency against the Judgment Currency.

9.20   Limitation on Liability.  In the event of the dissolution, liquidation, winding up or termination of Holdings or the Borrowers, no present or past shareholder or other member of Holdings or the Borrowers shall be liable to make any contribution to the assets of Holdings or the Borrowers pursuant to section 135 of the Companies Act (Nova Scotia) for the purposes of satisfying any debts, liabilities or claims pursuant to this Agreement, any Security Documents or any other Loan Documents, such debts, liabilities or claims being restricted to the recourses that would be available had each of Holdings and the Borrowers has been at all relevant times a company limited by shares.  Nothing in this paragraph shall limit the obligations

122

of any such Person arising pursuant to any agreement to which such person is a party, or under which such Person has incurred obligations, or on any other basis or in any other capacity which in any such case is not described in section 135 of the Companies Act (Nova Scotia).

9.21    Parties Including Trustees; Bankruptcy Court Proceedings.  This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Loan Party, the bankruptcy estate of each Loan Party, and any trustee, other bankruptcy estate representative or any successor in interest of any Loan Party in each Case and any subsequent case commenced under Chapter 7 of the Bankruptcy Code or similar proceeding in Canada, and shall not be subject to Section 365 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Agents and Lenders and their respective assigns, transferees and endorsees.  The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation of any Case or conversion of any Case to a case under Chapter 7 of the Bankruptcy Code or a similar proceeding in Canada or in the event of dismissal of any Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court or the Canadian Court for any reason, without the necessity that the Administrative Agent files financing statements or otherwise perfect its Liens under applicable law.  No Loan Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of each Agent and each Lender.  Any such purported assignment, transfer, hypothecation or other conveyance by any Loan Party without the prior express written consent of the Agents and Lenders shall be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Loan Party, Agents, the Lead Arrangers and Lenders with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

9.22    Prepetition Senior Loan Documents.  Borrowers and the other Loan Parties hereby acknowledge and agree that (i) this Agreement and each other Loan Document is separate and distinct from the Prepetition Senior Loan Documents, (ii) the Prepetition Senior Loan Documents are in full force and effect, (iii) by entering into this Agreement and each other Loan Document, none of the Agents, Lead Arrangers or Lenders waives, and each expressly reserves, any and all claims, causes of action, defenses, rights and remedies it has or may have pursuant to any or all of the Prepetition Senior Loan Documents, the Prepetition Intercreditor Agreement, any other inter-creditor or subordination agreement, the Bankruptcy Code, the CCAA and/or under applicable law against or with respect to any Loan Party and any other Person or entity; (iv) the Obligations of the Loan Parties, and the rights, benefits, privileges, remedies, claims, Liens, security interests and priorities of the Agents, Lead Arrangers and Lenders arising under or in connection with this Agreement, each other Loan Document and the Applicable Orders, are in addition to, and are not intended as a waiver or substitution for, the rights, benefits, privileges, remedies, claims, liens, security interests and priorities granted to such parties under any or all of the Prepetition Senior Loan Documents, the Prepetition Intercreditor Agreement, any other inter-creditor or subordination agreement, the Bankruptcy Code, the CCAA and/or under applicable law, all of which are expressly reserved by the Agents, Lead Arrangers and Lenders.

[*Signature pages follow*]

IN WITNESS WHEREOF, the parties hereto have caused this Credit Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

WHITE BIRCH PAPER COMPANY

By: _____
      Name:
      Title:

WHITE BIRCH PAPER HOLDING COMPANY

By: _____
      Name:
      Title:

STADACONA L.P., by one of its general partners,
WHITE BIRCH PAPER COMPANY

By: _____
      Name:
      Title:

F.F. SOUCY L.P., by one of its general partners,
WHITE BIRCH PAPER COMPANY

By: _____
      Name:
      Title:

BEAR ISLAND PAPER COMPANY, L.L.C.

By: _____
      Name:
      Title:

PAPIER MASSON LTÉE

NY\1620408.3

By: _____
    Name:
    Title:

BLACK DIAMOND COMMERCIAL FINANCE, L.L.C.,
as a Lead Arranger and Syndication Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

[_____],
as US Collateral Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent [and Canadian Collateral Agent] and a Lead Arranger

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

127

Solely for purposes of making the acknowledgment in the last sentence of Section 8.1(d);

STADACONA GENERAL PARTNER INC.

By: _____
    Name:
    Title:

128

SCHEDULE 1.1(a)

FIRST DAY ORDERS

SCHEDULE 1.1(b)

INITIAL APPROVED BUDGET

SCHEDULE 1.1(c)

MATERIAL AGREEMENTS

NY\1620408.3

SCHEDULE 2.1

INTERIM DATE COMMITMENTS/DELAYED DRAW COMMITMENT

132

SCHEDULE 3.6

MATERIAL LITIGATION EVENTS

NY\1620408.3

SCHEDULE 3.10

TAXES

NY\1620408.3

SCHEDULE 3.15(a)

SUBSIDIARIES

SCHEDULE 3.17

ENVIRONMENTAL MATTERS

NY\1620408.3

SCHEDULE 3.19

## FILING JURISDICTIONS UNDER PERSONAL PROPERTY SECURITY LEGISLATION

| Loan Party | Filing Office |
| --- | --- |

Company to list name of each Loan Party which is a party to any Security Document and each filing office and jurisdiction in which a Financing Statement under applicable Personal Property Security Legislation must be filed in respect of such Loan Party and its collateral

137

SCHEDULE 3.22

OWNED AND LEASED PROPERTY

SCHEDULE 4.1(k)

ENVIRONMENTAL ASSESSMENTS

NY\1620408.3

SCHEDULE 5,16

DESIGNATED AGREEMENTS

NY\1620408.3

SCHEDULE 6.2(d)

EXISTING INDEBTEDNESS

NY\1620408.3

SCHEDULE 6.3(f)

EXISTING LIENS

NY\1620408.3

SCHEDULE 6.8

EXISTING INVESTMENTS

NY\1620408.3