| | |
|---|---|
| Jonathan L. Hauser<br>VSB No. 18688<br>TROUTMAN SANDERS LLP<br>222 Central Park Avenue<br>Suite 2000<br>Virginia Beach, VA 23462<br>Telephone: (757) 687-7768<br>Facsimile: (757) 687-1505 | Richard M. Cieri (*pro hac vice* pending)<br>Christopher J. Marcus (*pro hac vice* pending)<br>Michael A. Cohen (*pro hac vice* pending)<br>KIRKLAND & ELLIS LLP<br>601 Lexington Avenue<br>New York, New York 10022-4611<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900 |

*Proposed Attorneys for the Debtor and Debtor in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

| | |
|---|---|
| In re:<br><br>BEAR ISLAND PAPER COMPANY, L.L.C.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 10-31202 (__) |

## DECLARATION OF STEPHEN GOLDSTEIN IN SUPPORT OF DIP FINANCING

Pursuant to 28 U.S.C. § 1746, I, Stephen Goldstein, hereby declare as follows:

1. I am a Managing Director in the Restructuring Group of Lazard Frères & Co. ("Lazard"), where I have been employed since 2002. Lazard is the U.S. operating subsidiary of a preeminent international financial advisory and asset management firm. Lazard, together with its predecessors and affiliates, has been advising clients around the world for over 150 years. The current managing directors, directors, vice presidents and associates at Lazard have extensive experience working with financially troubled companies in complex financial restructurings out-of-court and in chapter 11 proceedings. Lazard and its principals have been involved as advisor to debtor, creditor and equity constituencies and government agencies in many reorganization

---

[1] The last four digits of the Debtor's federal tax identification number are 0914. The principal address for the Debtor is 10026 Old Ridge Road, Ashland, Virginia 23005.

cases. Since 1990, Lazard's professionals have been involved in over 250 restructurings, representing over $350 billion in debtor assets.

2. I have a broad range of experience in financial advisory assignments, including chapter 11 bankruptcies. Since joining Lazard in 2002, I have worked with companies in a wide variety of industries providing advice regarding in-court and out-of-court restructurings, recapitalizations, reorganizations and other transactions including public and private placements of debt, preferred and common equity securities as well as mergers and acquisitions. My work at Lazard has included preparing, and/or assisting various management teams in preparing valuations and hypothetical liquidation analyses. In addition, I have extensive experience in procuring, structuring and negotiating debtor-in-possession ("DIP") financing facilities

3. Prior to joining Lazard, I was a Vice President at Thomas Weisel Partners where I headed the firm's east coast Private Placement effort. Prior to joining Thomas Weisel Partners, I worked as an associate in the Investment Banking Group at NationBanc Montgomery Securities and as an attorney at Morgan, Lewis & Bockius where I specialized in securities law and mergers and acquisitions. I received my Bachelor of Arts degree from Cornell University in 1992. I received my Juris Doctor degree from New York University School of Law in 1995.

4. I am offering this declaration in support of the *Motion of Bear Island Paper Company, L.L.C. for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c), 364(d) and 364(e) and Fed. R. Bankr. P. 4001 and 9014 (A) Authorizing Debtor to Obtain Secured Postpetition Financing on Super-Priority Priming Lien Basis, Granting Adequate Protection for Priming and Modifying the Automatic Stay, (B) Authorizing Debtor to Use Cash Collateral of Existing Secured Lenders and Granting Adequate Protection for Use; (C) Authorizing Debtor to Repay Existing ABL Revolver Indebtedness Upon Interim Approval*

2

*and (D) Prescribing Form and Manner of Notice and Setting the Time for the Final Hearing* (the "DIP Motion").

5.  In providing the testimony set forth in herein, I have relied upon and/or considered, among other things, the following: (a) my experience in chapter 11 cases, including structuring and negotiating DIP financing facilities; (b) the DIP Motion and supporting law cited therein; (c) certain of the Debtors' financial statements and reports; (d) documents relating to the proposed DIP financing; (e) Lazard's analyses regarding the proposed DIP financing in this case and DIP financings in comparable chapter 11 cases; (f) discussions with the Debtors' management team concerning the Debtors' cash needs and requirements; and (g) ongoing meetings with prospective sources of DIP financing including detailed conversations and negotiations with potential lenders.

6.  In June 2009, White Birch Paper Company and its affiliates and subsidiaries, including the Debtor (collectively, the "WB Group") retained Lazard to provide financial advisory services for the Debtors, including an assessment of the WB Group's capital structure and liquidity needs as well as to explore recapitalization and restructuring alternatives. Once retained, Lazard explored various financing options and restructuring solutions to address the WB Group's liquidity issues. These issues were particularly pronounced in light of the sharp decline in the newsprint industry, caused by both: (i) cyclical pressure in the industry resulting from adverse economic conditions and a downturn in the advertising market, leading to a tremendous drop in the price of newsprint; and (ii) a secular industry decline resulting from the migration of many newspaper readers from print to electronic media. As a result of these factors, the WB Group's existing debt obligations began to trade at distressed levels. This factor, coupled with certain contractual limitations imposed by its credit agreements, made it

impracticable for the WB Group to access incremental liquidity without commencing some type of restructuring initiative.

7. In early September, as it became clear that the WB Group was likely to breach certain financial covenants under its credit agreements and generally faced a constrained near-term liquidity outlook, Lazard assisted the WB Group in soliciting (i) forbearances under its existing first lien and second lien term loan credit agreements and certain interest rate swap agreements (the "Swap Agreements") and (ii) an amendment of, and continued borrowing access to, its asset-based revolving credit agreement (the "Existing ABL") with General Electric Capital Corporation ("GE") that would waive or eliminate certain potential events of default. To facilitate these requests, Lazard and the WB Group proposed that Credit Suisse, the first lien term loan administrative agent, form a steering committee (the "Steering Committee") consisting of significant holders of the first lien term loans. Lazard and representatives of the WB Group met with the Steering Committee on September 9, 2009 to provide a broad overview and outlook on the newsprint sector as well as a more specific presentation of the WB Group's current state and projected performance. Lazard and the WB Group also discussed the need for the forbearance and waiver with respect to the credit documents and asked that the Steering Committee propose DIP financing in the event that certain entities in the WB Group needed to commence insolvency proceedings in Canada and/or the United States. Shortly thereafter, on September 14, 2009, Lazard and the WB Group had similar, separate meetings with GE, the Existing ABL lender, and certain second lien term lenders who represented the majority of the second lien term loan debt outstanding. Lastly, Lazard and the WB Group had numerous phone conversations with the counterparties under the Swap Agreements during this period. The WB Group subsequently obtained forbearances from the first lien term loan lenders, GE and the

counterparties to its Swap Agreements but was unable to reach a forbearance agreement with the second lien term lenders. As a result of its limited and declining liquidity, on September 30, 2009 the WB Group failed to make certain interest payments on its first and second lien term loans as well as certain payments required under the Swap Agreements.

8.      These forbearances were subsequently extended on several occasions. The most recent forbearances are currently set to expire on February 26, 2010. With the most recent forbearances soon expiring and indications from the first lien term loan lenders that they will not be extended further, the WB Group has concluded, in consultation with Lazard and its other advisors, that the WB Group has an immediate need of financing in order to sustain its businesses as a going concern and to, among other things, continue the operation of its businesses in an orderly manner, maintain business relationships with vendors, suppliers and customers, pay employees and satisfy other working capital and operational needs. All of these tasks are critical to preserving and maintaining the WB Group's going-concern value and, ultimately, effectuating a successful reorganization for the benefit of all parties in interest. The WB Group has also concluded, in consultation with Lazard and its other advisors, that it is unlikely that the WB Group would be able to continue their operations for an extended period of time in reliance solely on their cash on hand.

9.      Recognizing the importance of securing additional liquidity to finance the WB Group's continued operations and its comprehensive cross-border restructuring, the WB Group and its advisors have engaged with its various creditor constituencies to obtain DIP financing. Lazard, on behalf of the WB Group, solicited potential DIP financing from various creditor constituencies, including GE and the Steering Committee. Lazard and the WB Group also

discussed the WB Group's need for DIP financing with the Swap Agreement counterparties, certain second lien lenders and the current equity owners of the WB Group.

10. Lazard also undertook a broader marketing process, and approached three global money-center banks (one of whom was an Swap Agreement counterparty and first lien term loan lender) and four active, non-bank DIP financing providers (collectively, the "Other Entities"). Although certain of these entities expressed interest in participating in the process, with several signing confidentiality agreements and some providing informal or formal DIP proposals, ultimately — for various reasons — none of the proposals received from these Other Entities were suitable in the judgment of the WB Group's executives and professional advisors. Some of the proposals were at a significantly higher cost than those in the proposal ultimately selected by the WB Group, and others did not provide enough additional liquidity to meet its liquidity needs. All were unwilling to propose a solution that would sufficiently protect the existing secured lenders, insisting instead that their proposals prime the existing lenders' liens, which would likely have resulted in an expensive and distracting "priming fight" that had no guarantee of success. In addition, each of these proposals from the Other Entities suffered from the additional disadvantage that the entities had limited background or experience with the WB Group or their collateral, unlike GE or the Steering Committee.

11. As a result of its dialogue with existing creditors, the WB Group received separate DIP proposals from GE and certain members of the Steering Committee. The WB Group did not receive a firm proposal from the counterparties to the Swap Agreements, any second lien term lenders or the WB Group's equity owners. GE was willing to provide an ABL DIP facility on economic terms similar to the Existing ABL, but it would have provided the WB Group with minimal incremental liquidity and, thus, needed to be supplemented by a smaller, separate term

loan DIP facility. Such a package would maintain the WB Group's prepetition capital structure of having bifurcated collateral for its distinct secured credit facilities. While Lazard and the WB Group solicited such a supplemental term loan DIP facility to sit alongside a GE ABL DIP, ultimately none of the parties approached were willing to provide such a loan. The WB Group also received an initial proposal from certain members of the Steering Committee for a term loan DIP facility that would both repay the Existing ABL and provide modest incremental liquidity.

12. Through multiple rounds of negotiations, including the review of detailed term sheets, the WB Group along with members of Lazard, including myself, carefully evaluated the financial terms and costs associated with the potential financing alternatives available. Lazard also compared the financial aspects of these potential financing alternatives to other DIP financing agreements provided in similar circumstances in other chapter 11 proceedings.

13. On February 17, 2010, the Steering Committee submitted a larger term loan DIP financing proposal (the "Proposed DIP") that would repay the Existing ABL and also provide substantial incremental liquidity. Credit Suisse, the administrative agent under the WB Group's first lien term loan, would also serve as administrative agent on the Proposed DIP. Shortly thereafter, and after some additional negotiation, the WB Group elected to proceed with the Proposed DIP, which, as more fully described in the DIP Motion, is a $140 million delayed draw term loan with a nine-month maturity, subject to a three-month extension. To the extent available per the terms of the DIP Credit Agreement, the full amount of the Proposed DIP may be drawn by the Debtor or certain Canadian borrowers. Approximately $50 million of the initial draw will be used to retire the Existing ABL. Thereafter, the Existing ABL collateral (consisting of accounts receivable, inventory, and cash collectively valued at approximately $180 million)

will be allocated to secure a substantial portion of the DIP obligations, which will minimize the amount by which existing term lenders are primed.

14. In sum, the DIP Proposal would provide the Debtor with postpetition financing on the best available economic terms in light of all of the circumstances, and the WB Group, in consultation with Lazard and its other advisors, projects that it will provide sufficient liquidity throughout the WB Group's cross-border restructuring.

15. I understand that the DIP Proposal has the support of the Steering Committee members, who are believed to represent more than 50% of the total first lien term loan debt outstanding, thereby avoiding a potentially distracting and expensive "priming fight" with the WB Group's existing first lien term lenders.

16. Lazard has concluded that the DIP Proposal will provide the most advantageous and flexible terms to the Debtors' estate. Specifically, the key financial terms of the DIP Proposal are consistent with market terms and the DIP Proposal provides the greatest amount of liquidity on the best economic terms as compared to other proposals.

17. It is apparent from the process that led to the DIP Proposal that its improved and advantageous terms came about as the result of the marketing process.

18. Following the WB Group's determination that the DIP Proposal was the best financing alternative available to the Debtors, Lazard, the WB Group, and their attorneys have negotiated with Credit Suisse and certain members of the Steering Committee at arm's-length and in "good faith" as that term is used in section 364(e) of the Bankruptcy Code. The result of these negotiations was the DIP Credit Agreement, a copy of which is attached to the DIP Motion as **Exhibit B**. I believe that approval of the DIP Credit Agreement is in the best interests of the Debtor and the WB Group as a whole, their estates, and their stakeholders.

19. The WB Group (including the Debtor) have sought the authority, in the DIP Motion and the initial CCAA Petition, to borrow up to $104 million under the DIP Facility on an interim basis pending a final DIP hearing. I have reviewed the WB Group's interim cash forecast and, in my judgment, it urgently needs access to that amount of financing and will be irreparably harmed if they do not have immediate access to the financing. In particular, the WB Group needs additional liquidity to meet their working capital needs, including, without limitation, to retire the Existing ABL, to meet payroll obligations, to pay professional fees, and to remain current on other expected and necessary postpetition obligations arising in the ordinary course. Further, I believe that the Debtors' request for interim authority is appropriately sized and tailored to cover their minimal operational and other needs pending a final hearing. Absent interim or final approval of the DIP Credit Agreement, the Debtor and the WB Group may have to curtail or even terminate their business operations to the material detriment of all stakeholders.

20. I declare under penalty of perjury that to the best of my knowledge, the foregoing is true and correct.

Executed on this 25th day of February, 2010.

By: _____
Name:   Stephen Goldstein
Title:   Managing Director, Restructuring Group
         Lazard Frères & Co. LLC