# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| BEAR ISLAND PAPER COMPANY, L.L.C., | ) | Case No. 10-31202 (DOT) |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO ENTRY OF FINAL ORDER AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING AND USE CASH COLLATERAL

The Official Committee of Unsecured Creditors (the "Committee") of Bear Island Paper

Company, L.L.C. (the "Debtor") hereby objects (the "Objection") to *Motion of Bear Island*

*Paper Company, L.L.C. for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105,*

*361, 362, 363, 364(c), 364(d) and 364(e) and Fed. R. Bankr. P. 4001 and 9014: (A) Authoring*

*the Debtor to Obtain Secured Postpetition Financing on a Super-Priority Priming Lien Basis,*

*Granting Adequate Protection Related Thereto and Modifying the Automatic Stay; (B)*

*Authorizing the Debtor to Use Cash Collateral of Existing Secured Lenders and Granting*

*Adequate Protection for Use Thereof; (C) Authorizing the Debtor to Repay Existing Asset-*

*Backed Facility Indebtedness Upon Interim Approval; and (D) Prescribing the Form and*

Benjamin C. Ackerly, Esq.
Tyler P. Brown, Esq.
Jason W. Harbour, Esq.
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Tel:  (804) 788-8674
Fax: (804) 788-8218
backerly@hunton.com
tpbrown@hunton.com
jharbour@hunton.com

*Proposed Counsel for the Official Committee of Unsecured*
*Creditors of Bear Island Paper Company, L.L.C.*

*Manner of Notice for a Final Hearing* (the "Motion"). In support of the Objection, the

Committee respectfully states as follows:

**Preliminary Statement**

1.       The proposed Postpetition Facility[1] is overly expensive, and the related

relief to be provided to the Postpetition Lenders and the Prepetition Lenders is overreaching and

unwarranted. Thus, the Committee objects to the relief requested in the Motion for the reasons

set forth in this Objection. In particular, to date the Committee has not received sufficient

information to fully analyze the Postpetition Facility and the related relief requested in the

Motion. As a result, the Committee reserves the right to seek to continue the final hearing on the

Motion until the Committee has received sufficient information.

**Background**

2.       On February 24, 2010 (the "Petition Date") the Debtor filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code"). Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor is continuing to

operate its business and manage its property as a debtor in possession.

3.       On the Petition Date, (i) White Birch Paper Holding Company; (ii) White

Birch Paper Company; (iii) Stadacona General Partner Inc.; (iv) Black Spruce Paper Inc.; (v)

F.F. Soucy General Partner Inc.; (vi) 3120772 Nova Scotia Company; (vii) Arrimage de Gros

Cacouna Inc.; (viii) Papier Masson Ltée; (ix) Stadacona Limited Partnership; (x) F.F. Soucy

Limited Partnership; and (xi) F.F. Soucy, Inc. & Partners, Limited Partnership (collectively, the

"WB Canadian Group"), sought relief under the Companies' Creditors Arrangement Act in the

Quebec Superior Court of Justice (the "Canadian Court") in Montreal, Quebec, Canada (the

---

[1]       Capitalized terms used but not defined in the Preliminary Statement have the meanings identified elsewhere in the Objection.

"CCAA Cases"). Also on the Petition Date, the Canadian Court entered the Initial Order in the CCAA Cases.

4. In addition, on the Petition Date six (6) of the WB Canadian Group entities sought relief under chapter 15 of the Bankruptcy Code in this Court.

5. No trustee or examiner has been appointed in the Debtor's chapter 11 case.

6. On February 26, 2010, the Bankruptcy Court entered the *Interim Order (A) Authoring the Debtor to Obtain Postpetition Secured Financing pursuant to 11 U.S.C. Section 364, (B) Authorizing the Debtor's Limited Use of Cash Collateral pursuant to 11 U.S.C. Section 363, (C) Granting Adequate Protection to Prepetition Debt Lenders pursuant to 11 U.S.C. Sections 361, 362, 363, and 364, and (D) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001* (the "Interim Order"). The Interim Order authorized, among other things, the Debtor to enter into the Postpetition Facility (as defined in the Interim Order) and to grant liens and superpriority claims to the Postpetition Lenders (as defined in the Interim Order) and the Prepetition Debt Lenders (as defined in the Interim Order), on an interim basis. The Interim Order also schedules the final hearing on the Motion for March 22, 2010.

7. On March 3, 2010, the Office of the United States Trustee for the Eastern District of Virginia, Richmond Division (the "UST") appointed the Committee to represent all unsecured creditors of the Debtor pursuant to section 1102 of the Bankruptcy Code.

8. Prior to the Petition Date, the Debtor's principal secured debt obligations consisted of three major credit agreements: (a) the First Lien Term Loan Agreement; (b) the Second Lien Term Loan Agreement; and (c) the Revolving ABL Agreement (each as defined in the Motion). Bear Island was a guarantor under the First and Second Lien Term Agreements and

a borrower under the Revolving ABL Agreement. Certain of Bear Island's assets also may have been pledged in connection with the Swap Agreements (as defined in the Motion).

**Objection**

9. While approval of the proposed Postpetition Facility remains within the Court's "informed discretion," the Court must balance the interest of the Debtor and its creditors. That balance requires the Debtor to demonstrate that the Postpetition Facility comports with basic notions of fairness and equity and that it would ultimately inure to the benefit of its estate. *See In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); I*n re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990). In addition, the Debtor bears the burden to prove that the terms of the Postpetition Facility are fair and reasonable and in the best interests of the Debtor's estate and creditors. *See In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987). The burden is not sustained on the record of the Motion or the first day hearing.

10. Section 364 financing is not a "secured lenders act" allowing a secured creditor to undo the level "playing field" contemplated by the Bankruptcy Code. As the Court in *Ames* stated:

> Acknowledging that Congress, in Chapter 11, delicately balanced the hope of debtors to reorganize and the expectations of creditors for payment, the courts have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits.

11. *In re Ames,* 115 B.R. at 37; *see also In re Tenney Village Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989). The heavy terms, releases, restrictions and exorbitant pricing and fees, as well as its overall structure, all display the unfairness of this proposed Postpetition

Facility. In keeping with these principles, the Postpetition Facility should not be approved in its present form for the reasons set forth herein.

12.     The Postpetition Facility is being implemented primarily as a mechanism to ensure that select pre-petition indebtedness is shored up with post-petition liens and post-petition super-priority administrative claims at great expense to the Debtor's estate and creditors. Moreover, although the Committee has not obtained sufficient information to date on this issue, the Postpetition Facility also may be funding the WB Canadian Entities at the expense of the Debtor's estate.

13.     While the Committee is mindful of the Debtor's financial condition and cash needs, it appears that the Postpetition Facility grants inappropriate protections and unfair advantage for select lenders while carving a path for this case that may leave unsecured creditors with no distribution.

A.     **The Postpetition Facility Does Not Satisfy the Standards of Section 364**

14.     Section 364 of the Bankruptcy Code governs a debtor's ability to obtain post- petition credit and provides, in pertinent part, as follows:

> (c)     If the trustee [debtor-in-possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt --
>
> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.
>
> (d)     (1)     The Court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior

or equal lien on property of the estate that is subject to a lien only if –

> (A)     the trustee is unable to obtain such credit otherwise; and

> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(c) and (d).

15.     Generally, factors to be considered in connection with a request for approval of debtor-in-possession financing include:

> a.     That the proposed financing is an exercise of sound and reasonable business judgment;

> b.     That the financing is in the best interests of the estate and its creditors;

> c.     That the credit transaction is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the Debtors' businesses;

> d.     That the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender; and

> e.     That the financing agreement was negotiated in good faith and at arm's length between the Debtors, on the one hand, and the ... Lenders, on the other hand.

*Mid-State Raceway, Inc. v. Mid-State Dev. Corp. (In re Mid-State Raceway, Inc.)*, 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005) (citing *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003)).  The Postpetition Facility fails on multiple grounds.

16.     First, the Motion and the evidence at the first day hearing is insufficient to establish that the Postpetition Facility is an exercise of sound and reasonable business judgment, that the financing is in the best interests of the Debtor's estate and its creditors, or that the terms of the transaction are fair, reasonable and adequate.  In particular, the pricing and cost of the

Postpetition Facility are incredibly high. For example, the Postpetition Facility (i) *has an interest rate of a minimum of 12%*; (ii) *contains up-front fees of $6.35 million*; and (iii) *may require millions of additional fees in the form of pre-payment penalties*. In addition, the Postpetition Facility, through the Approved Budget (as defined in the Interim Order), authorizes payment of a Management Fee (as defined in the Postpetition Credit Agreement) of over $5 million during 13 weeks to an entity controlled by insiders of the Debtor and the WB Canadian Entities. When combined with the fact that the Approved Budget indicates that the Debtor and the WB Canadian Entities on a consolidated basis are expected to lose over $50 million during the 13 weeks at issue, paying the Management Fee of over $5 million to insiders is inherently objectionable. Thus, the Committee leaves the Debtor to its burden of proof concerning whether the Postpetition Facility is an exercise of sound and reasonable business judgment, the financing is in the best interests of the Debtor's estate and its creditors, and that the terms of the transaction are fair, reasonable and adequate.

17. Second, absent sufficient demonstration that the financing was extended in good faith, the lenders are not entitled to the protections of a good faith lender under Section 364(e) of the Bankruptcy Code, that:

> "[t]he reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

18. An express finding of good faith is required before the protections of Section 364(e) are applicable. *See In re Revco D.S., Inc.,* 901 F.2d 1359 (6th Cir. 1990). The Bankruptcy Code, however, does not define good faith. The concept of good faith is derived from former Bankruptcy Rule 805. *See 3 Collier on Bankruptcy* ¶ 364.06[2] (15th ed. rev.

2007) (good faith requirement under Rule 805 speaks to integrity of the parties' conduct during the course of the proceeding (citing *In re Suchy*, 786 F.2d 900 (9th Cir. 1985))). Factors such as the parties' subjective beliefs that the financing agreement was negotiated at arms-length and that the financing would be in the best interest of the estate and its creditors are considered in connection with a good faith finding. *See, e.g., In re Cooper Commons, LLC*, 430 F.3d 1215, 1220 (9th Cir. 2005). Significantly, a lender fails to act in good faith where it acts with an ulterior, economically "interested" purpose. *See In re EDC Holding Co.*, 676 F.2d 945, 949 (7th Cir. 1982) (holding that the DIP lender was not a disinterested lender but a settling litigant that saw an opportunity to reduce the cost of settlement). The Committee leaves the Debtor to its burden of proof concerning good faith.

## B.    Liens on Avoidance Actions Proceeds Are Inappropriate

19.    The Interim Order[2] provides that the Debtor will grant the Postpetition Lenders and the Prepetition Debt Lenders liens on substantially all property of the Debtor, including proceeds of causes of action under Chapter 5 of the Bankruptcy Code (collectively, the "Avoidance Actions"). It is inequitable and unjustified to grant the Postpetition Lenders and the Prepetition Debt Lenders a lien or super-priority administrative expense claim on the proceeds of the Avoidance Actions (the "Avoidance Action Proceeds"). It is well established that Avoidance Actions are designed to ensure equality of payment among unsecured creditors; they should not be used to improve the position of secured creditors. *See, e.g., In re Qualtech Steel Corp.*, 276 F.3d 245, 248 (7th Cir. 2001); *Mellon Bank v. Glick*, 69 B.R. 901, 905 (D.N.J. 1987) (even if security interest attached to preference action, allowing secured creditor the right to recovery

---

[2]    As of the date of this Objection, the Committee has not been provided with a proposed form of a Final Order approving the Motion and the Postpetition Facility, accordingly, the Committee objects to the entry of a Final Order based on the terms and conditions set forth in the Interim Order.

would "frustrate the policy of equal treatment of creditors under the Code and would contradict the plain meaning of section 551 of the Bankruptcy Code").

20.     Numerous courts severely restrict a debtor in possession's ability to pledge Avoidance Actions as security for post-petition financing. *See Official Comm. of Unsecured Creditors v. Goold Electronics Corp. (In re Goold Electronics Corp.)*, 1993 WL 408366, at *3-4 (N.D. Ill. Sept. 22, 1993) (vacating bankruptcy court order approving post-petition financing "to the extent that the order assigns to the bank a security interest in the debtor's preference actions"). This is because Avoidance Actions are not property of a debtor's estate. *See Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics, Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000) (avoidance actions are not property of the estate, but are essentially rights held by the estate for the benefit of creditors); *In re Sweetwater*, 55 B.R. 724, 731 (D. Utah 1985) ("The avoiding powers are not 'property' but a statutorily created power to recover property"), *rev'd on other grounds*, 884 F.2d 1323 (10th Cir. 1989).

21.     Because of the unique nature of Avoidance Actions, courts have recognized that, at least with respect to proceeds recovered pursuant to Section 544(b) of the Code, "empowering the trustee or debtor in possession to avoid a transaction by pursuing an individual creditor's cause of action is a method of forcing that creditor to share its valuable right with other unsecured creditors." *Cybergenics*, 226 F.3d at 244; *see also Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer").

22.     As the Avoidance Actions are not property of the Debtor's estate, there is no legal basis for this Court to grant the Postpetition Lenders and the Prepetition Debt Lenders liens and superpriority claims on the Avoidance Action Proceeds. Accordingly, the Avoidance Action Proceedss should be excluded from the Postpetition Collateral (as defined in the Interim Order) and reserved solely for the benefit of the Debtor's unsecured creditors.

## C.     The Section 506(c) Waiver Is Unwarranted

23.     The Committee objects to the waiver of the Debtor's rights to recover the reasonable and necessary costs and expenses of preserving or disposing of property securing an allowed secured claim of the Postpetition Agent (as defined in the Interim Order), the Postpetition Lenders, the Prepetition Debt Agents (as defined in the Interim Order), or the Prepetition Debt Lenders (collectively, the "Lenders"). The Debtor's estate should not be forced to bear such a burden, particularly when it appears from the Postpetition Credit Agreement (as defined in the Interim Order) that the Postpetition Lenders are attempting to take advantage of the chapter 11 process to benefit their claims as Prepetition Lenders. Instead, the burden should remain with the Lenders.

24.     Congress' intent in enacting Section 506(c) was to ensure that the debtor-in-possession would be entitled to recover expenses from its secured lender to the extent that those expenses are necessarily and reasonably associated with preserving or disposing of the lender's collateral. *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325-26 (3d Cir. 1995) (discussing the Congressional Record, 124 Cong.Rec. 32,398 (Sept. 28, 1978) (statement of Rep. Edwards). Section 506(c) is thus designed to prevent "a windfall to the secured creditor at the expense of the claimant." *Id.* (citing *IRS v. Boatmen's First Nat'l Bank*, 5 F.3d 1157, 1159 (8th Cir. 1993)).

25.     Without the rights under section 506(c), the Debtor's estate would be required to pay for any and all expenses associated with the preservation and disposition of the Lenders' collateral.  Such immunizing provisions have been found unenforceable on the basis that they "operate as a windfall to the secured creditor at the expense of the administrative claimants."  *In re Lockwood Corp.*, 223 B.R. 170 (B.A.P 8th Cir. 1998).

26.     The Supreme Court has held that such waivers should never be lightly granted, nor may the management of a debtor-in-possession agree to such a waiver for any but the most compelling of reasons, because immunizing provisions such as these are binding on all parties in interest.  *See Hartford Underwriters Ins. v. Union Planters Bank N.A.*, 530 U.S. 1, 12 (2000) (debtor's decision to waive rights under Section 506(c) must be made in a manner consistent with its obligations "to seek recovery under the section whenever his fiduciary duties so require").  The Committee objects to granting the Lenders the proposed section 506(c) waiver under these circumstances.

**D.     Adequate Protection, Including Cross-Collateralization, Is Not Warranted**

27.     The Interim Order grants the Prepetition Senior Lenders (as defined in the Interim Order) and the Prepetition Junior Lenders (as defined in the Interim Order) adequate protection liens on the Postpetition Collateral.  Interim Order, ¶¶ 17 and 18.  The Postpetition Collateral, however, includes inventory, accounts receivable and cash, which prior to the Petition Date were not subject to the Prepetition Senior Liens (as defined in the Interim Order) or the Prepetition Junior Liens (as defined in the Interim Order).  Instead, prior to the Petition Date, inventory, accounts receivable and cash only secured the $50 million Revolving ABL Agreement (as defined in the Motion).  Importantly, Paragraph 43.3 of the *Report of Proposed Monitor* filed in the CCAA Cases states that the "margining value allocated to the accounts receivable and inventories in the context of the ABL loan (and, similarly, in the context of the interim financing

offer) is approximately US $70 million.  The carrying value of the inventories and accounts

receivable is estimated to be approximately US $160 million."  Accordingly, prior to the Petition

Date the inventory and accounts receivable, without even including the cash, represented

unencumbered property worth between $20 million and $110 million that could have been used

to provide a distribution to unsecured creditors.

28.     The Prepetition Senior Lenders and the Prepetition Junior Lenders should

not be allowed to cross-collateralize the Prepetition Senior Liens or the Prepetition Junior Liens

with adequate protection liens on inventory, accounts receivable and cash, because, among other

things, the effect of such liens would be to inappropriately disenfranchise unsecured creditors

which, prior to the Petition Date, could have recovered between $20 million and $110 million

from the unencumbered inventory and accounts receivable.

29.     Moreover, there is no evidence in the record that the Prepetition Senior

Collateral (as defined in the Interim Order) or the Prepetition Junior Collateral (as defined in the

Interim Order) is decreasing in value such that the Prepetition Senior Lenders or the Prepetition

Junior Lenders should receive any adequate protection.  *See, e.g., In re Deico Elecs., Inc.*, 139

B.R. 945 (B.A.P. 9th Cir. 1992) (noting that adequate protection must equal depreciation of

collateral).  Specifically, the Prepetition Senior Lenders and the Prepetition Junior Lenders

should not receive the Adequate Protection Term Loan Claims (as defined in the Interim Order).

**E.     Current Payment of the Prepetition Senior Agent's Expenses Is Not Warranted**

30.     The Committee objects to the current payment of the fees, costs, expenses

and charges of the Prepetition Senior Agent (as defined in the Interim Order).  Paragraph 17(c)

of the Interim Order requires the Debtor to pay the Prepetition Senior Agent all

> accrued and outstanding fees, costs, expenses and charges payable under the
> Prepetition Senior Loan Documents, including without limitation, the reasonable
> attorneys' and other professional fees, costs and expenses of the Prepetition

Senior Agent, whether accrued prepetition or postpetition, all without further notice, motion or application to, order of, or hearing before, this Court.

Interim Order, ¶ 17(c).

31.    Section 506(b) of the Bankruptcy Code provides that secured creditors are entitled to reasonable fees, costs or charges to the extent that the value of the property securing their claim is greater than the amount of the claim, after any section 506(c) surcharge is applied. 11 U.S.C. § 506(b); *see also United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 484 U.S. 365 (1988) (holding that undersecured creditors are not entitled to interest under section 506(b)).  Neither the Motion nor the record at the first day hearing establish that the Prepetition Senior Liens (as defined in the Interim Order) are oversecured.  Thus, there is insufficient evidence in the record to establish that the Prepetition Senior Agent is entitled to payment of its fees, costs, expenses and charges (collectively, the "Expenses").  As a result, the Committee objects to the current payment of the Expenses to the Prepetition Senior Agent.[3]

32.    Further, to the extent the Prepetition Senior Agent is entitled to receive any Expenses, any such Expenses must be reasonable to be allowed, and should be subject to review by the Committee, the U.S. Trustee and the Court.  *See* 11 U.S.C. § 506(b).

33.    Moreover, although section 506(b) addresses the allowance of claims such as the Expenses, section 506(b) does not require the current payment of such claims.  *See* 11

---

[3]    On March 15, 2010, Dune Capital LP, Dune Capital International Ltd., and WTA Dune Limited (collectively, the "Majority Second Lien Lenders") filed the *Majority Second Lien Lenders' (A) Statement in Connection with Debtor's Request for DIP Financing and (B) Request for Additional Adequate Protection* (the "Statement").  Among other things, in the Statement the Majority Second Lien Lenders request current payment of their fees and expenses.  As with the Expenses of the Prepetition Senior Agent, there is insufficient evidence in the record to establish that the Majority Second Lien Lenders are entitled to payment of their fees and expenses, and the Committee objects to the current payment of such fees and expenses.

U.S.C. § 506(b); *Florida Partners Corp. v. Southeast Co. (In re Southeast Co.)*, 868 F.2d 335, 340 (9th Cir. 1989) ("Nothing in section 506(b) requires the current payment of fee awards."). Thus, even if the Prepetition Senior Agent obtains allowed claims for the Expenses, such Expenses should not be paid until the confirmation of a chapter 11 plan, at which time parties in interest will know whether the Prepetition Senior Liens are oversecured.

## F. **The Milestones Must Be Extended**

34.     Paragraph 15 of the Interim Order requires the Debtor to comply with the expedited milestone covenants and deadlines (collectively, the "Milestones") set forth in the Postpetition Credit Agreement for, among other things, filing a chapter 11 plan or selling substantially all of the Debtor's assets.  Specifically, the Milestones in the Postpetition Credit Agreement include, without limitation, the following:

a.    April 23, 2010.  Deadline to file a sale and investor solicitation process motion.

b.    May 1, 2010.  Deadline for Court approval of the investor solicitation process motion.

c.    June 15, 2010.  Deadline for parties in interest to submit non-binding letter of interest to the Loan Parties (as defined in the Postpetition Credit Agreement).

d.    June 15, 2010.  Deadline for the Loan Parties to have entered into a lock-up and plan support agreement.

e.    June 30, 2010.  Deadline to file a chapter 11 plan and disclosure statement.

f.    July 15, 2010.  Deadline for parties in interest to submit binding commitment letters to purchase substantially all of the assets of the Debtor and the WB Canadian Entities.

g.    August 2, 2010.  Deadline for entry of an order approving the disclosure statement.

h.    September 15, 2010.  Deadline for entry of confirmation order regarding chapter 11 plan.

i. September 27, 2010.  Deadline for effective date of the chapter 11 plan and for the transactions contemplated by the plan to be substantially consummated.

Postpetition Credit Agreement, § 5.19.

35.     If the Debtor fails to meet the June 15, 2010, lock-up and plan support agreement deadline or the June 30, 2010 chapter 11 plan and disclosure statement deadline, then the Postpetition Credit Agreement requires the Debtor to conduct a fast-tracked sale process with the following Milestones:

a. August 2, 2010.  Deadline to enter into a stalking horse asset purchase agreement for all or substantially all of the assets of the Debtor and the WB Canadian Entities.

b. August 2, 2010.  Deadline to file a sale and bidding procedures motion with the Court.

c. August 16, 2010.  Deadline to obtain Court approval of the sale procedures requested in the sale and bidding procedures motion.

d. August 23, 2010.  Deadline to conduct an auction for all or substantially all of the assets of the Debtor and the WB Canadian Entities.

e. August 26, 2010.  Deadline to obtain Court approval of the sale of all or substantially all of the assets of the Debtor and the WB Canadian Entities.

f. September 11, 2010.  Deadline for the consummation of the sale of for all or substantially all of the assets of the Debtor and the WB Canadian Entities.

*Id.*

36.     The Milestones must be substantially extended to provide the Debtor with an adequate opportunity to attempt to reorganize.  If the Milestones are not extended, the Debtor and its stakeholders likely will not have a sufficient opportunity to reorganize and the Debtor will be faced with having to sell substantially all of its assets, which may provide no return whatsoever to unsecured creditors and would not be in the best interests of the Debtor's estate.

37.     As a result, the Committee objects to the Milestones and requests that the Milestones be extended for at least six months to provide the Debtor and the Debtor's stakeholders with an adequate opportunity to reorganize.

**G.     Additional Information**

38.     As of the date of this Objection, the Committee and the Committee's proposed professionals have received only limited information from the Debtor.  In order to properly analyze the Postpetition Facility, the Approved Budget and the relief requested in the Motion, the Debtor must provide the Committee and the Committee's proposed professionals with substantial additional information, including, without limitation,

    a.    complete financial information and projections that identify the contributions and expenses of the Debtor and the WB Canadian Entities on a consolidated and a non-consolidated basis, including, without limitation, (i) information concerning EBITDA and liquidity covenants on a consolidated and a non-consolidated basis, (ii) weekly budgets to actual on a consolidated and a non-consolidated basis, (iii) monthly budgets on a consolidated and a non-consolidated basis, (iv) weekly cash flow statements on a consolidated and a non-consolidated basis and (v) monthly financial statements on a consolidated and a non-consolidated basis;

    b.    complete information concerning the intercompany transactions between the Debtor and the WB Canadian Entities;

    c.    complete information concerning the apportionment and payment of the Management Fee by the Debtor and the WB Canadian Entities;

    d.    the names and respective interests of the Postpetition Lenders and the Prepetition Debt Lenders;

    e.    the Prepetition Debt Credit Agreements, the Prepetition Debt Loan Documents and related documents;

    f.    the final version of the Postpetition Credit Agreement and related documents; and

g.    the separate financials for the Debtor and the WB Canadian Entities referred to in the *Report of Proposed Monitor* filed in the CCAA Cases.

39.    Until the Committee receives such information and any other information the Committee may subsequently identify as critical to the Committee's analysis of the Postpetition Facility, the Committee will not be able to properly analyze the propriety of the Postpetition Facility. As a result, the Committee objects to the approval of the Postpetition Facility at this time and until the Committee has received the requested information from the Debtor and has had and appropriate opportunity to analyze the information.

**H.    The Committee Must Be Afforded Adequate Opportunity To Investigate the Prepetition Debt Lenders' Role in the Debtor's Bankruptcy**

40.    The Interim Order attempts to limit any investigation by the Committee of the Prepetition Debt Lenders. Pursuant to paragraph 31 of the Interim Order, the Committee must initiate an adversary proceeding concerning the Prepetition Debt Obligations (as defined in the Interim Order) and the Prepetition Debt Liens (as defined in the Interim Order) within no more than sixty (60) days following the appointment of the Committee.

41.    The Committee respectfully submits that a ninety (90) day investigation period that begins on the date that the Court enters an order approving the retention of the Committee's counsel, and that is subject to further extension by agreement of the parties or by subsequent order of the Court, should be sufficient to allow the Committee to investigate the Prepetition Debt Obligations and the Prepetition Debt Liens, provided that the Prepetition Debt Lenders provide counsel to the Committee with copies of all pre-petition loan documents and evidence of perfection prior to the commencement of the investigation period.

42.    Moreover, there is no justifiable reason to limit the statute of limitations for the Committee to investigate the roles and relationships of the Lenders in the Debtor's

bankruptcy. The investigation of the acts, conduct and operation of the Debtor's businesses and other matters relevant to this case are an essential part of the enumerated duties given to official committees pursuant to section 1103(c)(2) of the Bankruptcy Code and should not be curtailed. In light of these circumstances, equity requires that the Committee be provided with a full and fair opportunity to investigate the claims of the Prepetition Debt Lenders.

43. Thus, the Committee also objects to having unreasonable time bars (other than statutory limitations) to bring any other claims or causes of action against the Prepetition Debt Lenders, including, without limitation, causes of action against the Prepetition Debt Lenders based on theories including fraudulent conveyance, recharacterization and equitable subordination. Accordingly, the Committee respectfully asks that the Court disapprove those provisions curtailing the Committee's ability to investigate, and, if necessary, commence actions against the Prepetition Debt Lenders.

44. In addition, the proposed $50,000 budget to investigate the Lenders is entirely insufficient and also compares unfavorably to those other Virginia cases where an investigatory budget was imposed. *See, e.g., Movie Gallery, Inc. I* (providing for no limitation on the use of cash collateral to conduct an investigation into claims and defenses against prepetition lenders); *S&K Famous Brands, Inc.*, (allowing for the use of up to $150,000 in postpetition loan funds to perform the investigations into any prepetition lender claims); *Circuit City Stores, Inc.* (providing for no cap on use of cash collateral to conduct investigation).

45. Further, because the Debtor has waived any role in investigating or pursuing the Lenders due to their stipulations and admissions in the Interim Order, standing should be vested automatically in the Committee to pursue all such estate claims. This will

avoid, among other things, the expense and additional time constraints resulting from pre-complaint motion practice concerning standing.[4]

## I.     Modification of the Carve Out

46.     The Carve-Out (as defined in the Interim Order) should be modified to provide that all fees and expenses incurred prior to the Carve-Out Trigger Date (as defined in the Interim Order) are included in the Pre-Carve-Out Trigger Date Amount, regardless of whether such fees and expenses comply with the Approved Budget. In addition, the Post-Carve-Out Trigger Date Amount should be increased because the current amount of $2,800,000 likely will not be sufficient to wind-down the Debtor's estate based on the fees and expenses identified in the Approved Budget.

47.     Further, the Carve-Out should clarify that the Carve-Out is to be used only in connection with the Debtor's chapter 11 case and that the Carve-Out will not be reduced by payments to professionals in the CCAA cases, including, without limitation, payments to professionals of the WB Canadian Entities.

## J.     Multiple Other Provisions of the Interim Order and Postpetition Facility Are Inequitable to Unsecured Creditors

48.     Many additional provisions of the Interim Order and Postpetition Facility are unfair and disadvantageous to the Debtor's estate and creditors. Those provisions should be denied. In an effort to resolve these objectionable provisions, a summary of the additional material objections are as follows:

---

[4]     The practice of conferring standing upon creditors' committees to pursue actions on behalf of a bankruptcy estate is a widely followed and accepted practice. *See e.g., Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chancery*, 330 F.3d 548, 568 (3d Cir. 2003) (holding that the "ability to confer derivative standing upon creditors' committees is a straightforward application of bankruptcy court's equitable powers.").

- <u>Financial Information, Reports, Notices, etc.</u>  The Committee should receive copies of all financial statements, reports, notices and information required to be furnished to the Lenders, the Debtor or the WB Canadian Entities.

- <u>Preservation of avoided liens and security interests</u>.  Liens and security interests that are avoided should be preserved for the benefit of the Debtor's estate pursuant to Section 551 of the Bankruptcy Code.

- <u>Priority and Liens</u>.  Liens in the Debtor's assets should only be provided to the extent of any loan proceeds actually received by the Debtor.

- <u>Joint and Several Liability</u>.  The Debtor should only be liable to the extent of any loan proceeds actually received by the Debtor and should not be liable for loan proceeds received by the WB Canadian Entities.

- <u>Approved Budget</u>.  The Approved Budget should be in form and substance reasonably acceptable to the Committee.

- <u>Representation and Warranties in the Postpetition Credit Agreement</u>.  The Committee needs an opportunity to confirm the various representations which the Lenders are relying upon, especially where the breach of any such representation or warranty by the foreign WB Canadian Entities constitutes an Event of Default.

- <u>Financial Condition and Operations</u>.  The Committee needs an opportunity to review the EBITDA and other financial requirements imposed upon the Debtor.

- <u>Non-Performance of Certain Covenants and Obligations and Default on Other Indebtedness</u>.  Actions by the WB Canadian Entities over which the Debtor has no control should not constitute Events of Default.

- <u>Waivers, Amendments, etc</u>.  No amendment, modification or waiver should be permitted absent the written consent of the Committee.

- <u>Indemnification</u>.  Indemnification should be limited to the extent of loan proceeds actually received by the Debtors.

49.     The Committee reserves all of its rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, to seek discovery, and to raise additional objections during the final hearing on the Motion.

### Waiver of Memorandum of Law

50.     Pursuant to Local Rule 9013-1(H), because there are no novel issues of law presented herein, the Committee respectfully requests that the Court waive the requirement that the Committee file a memorandum of law in support of this Objection.

**WHEREFORE**, for the reasons discussed herein, the Committee respectfully requests that this Court (a) sustain this Objection; (b) condition final approval of the Motion on modifications to the proposed form of final order that address the concerns raised herein; and (c) grant the Committee such other and further relief as is just and proper.

Dated: March 16, 2010

HUNTON & WILLIAMS LLP

*/s/ Jason W. Harbour*
Benjamin C. Ackerly, Esq. (VSB No. 09120)
Tyler P. Brown, Esq. (VSB No. 28072)
Jason W. Harbour, Esq. (VSB No. 68220)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Tel:  (804) 788-8674
Fax: (804) 788-8218

*Proposed Counsel for the Official Committee of Unsecured Creditors of Bear Island Paper Company, LLC*

## CERTIFICATE OF SERVICE

I hereby certify on this 16th day of March, 2010, a copy of the foregoing was delivered (i) by electronic means to all parties who receive notice in this case pursuant to the Court's CM/ECF system, and/or (ii) by first class mail, postage prepaid and/or by electronic mail to all necessary parties pursuant to the Order Establishing Certain Notice, Case Management and Administrative Procedures [Docket No. 59] entered in this case.

_/s/ Jason W. Harbour_
Jason W. Harbour, Esq. (VSB No. 68220)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Tel:  (804) 788-8674
Fax: (804) 788-8218

*Proposed Counsel for the Official Committee of Unsecured Creditors of Bear Island Paper Company, LLC*