Jonathan L. Hauser
VSB No. 18688
Heather H. Lockerman
VSB No. 65535
TROUTMAN SANDERS LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, VA 23462
Telephone:   (757) 687-7768
Facsimile:   (757) 687-1505

Richard M Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

*Proposed Attorneys for the Debtor and
Debtor in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| BEAR ISLAND PAPER COMPANY, L.L.C.,[1] | Case No. 10-31202 (DOT) |
| Debtor. | |

## RESPONSE OF BEAR ISLAND PAPER COMPANY, L.L.C. TO (I) THE MAJORITY SECOND LIEN LENDERS' STATEMENT IN CONNECTION WITH DEBTOR'S REQUEST FOR DIP FINANCING AND (II) LIMITED OBJECTION OF THE TORONTO-DOMINION BANK

Bear Island Paper Company, L.L.C., as debtor and debtor in possession (the "Debtor"), respectfully submits this response (the "Response") to: (a) the statement (the "Statement") of the Majority Second Lien Lenders (as defined in the Statement) in connection with the Debtor's motion to obtain postpetition financing (the "DIP Motion") and (b) the limited objection (the "Limited Objection") of The Toronto-Dominion Bank ("TD") to the Debtor's DIP Motion. In

---

[1]   The last four digits of the Debtor's federal tax identification number are 0914. The Debtor's principal address is 10026 Old Ridge Road, Ashland, Virginia 23005.

support of its Response, and in further support of the DIP Motion, the Debtor respectfully states as follows:[2]

**Preliminary Statement**

1. The Majority Second Lien Lenders (*i.e.*, Dune Capital LP and certain affiliated entities) do not object to the DIP Motion or the Court's approval of the DIP Facility.[3] They do not dispute the findings in the Interim DIP Order or proposed Final DIP Order that the financing provided under the DIP Facility is "vital to the preservation and maintenance of the going concern value of the Debtor's estate" or that such financing is in the best interests of the Debtor's estate and its stakeholders. They also do not object to the adequate protection the Debtor proposes to provide to the First Lien Term Lenders. Rather, the Majority Second Lien Lenders simply want more for themselves. They ask that, in addition to the adequate protection provided under the Interim and Final DIP Orders, the Court require the Debtor to pay their attorneys' fees on a current basis, before the Court has had the opportunity to determine whether they are entitled to such payment under the Bankruptcy Code. The Bankruptcy Code, however, does not require the Debtor to pay such fees, and the DIP Facility prohibits it.

2. The Debtor assumes, for purposes of the DIP Motion only, that the Majority Second Lien Lenders are entitled to adequate protection.[4] In light of that assumption, the

---

[2] This Response does not address the Objection of the Official Committee of Unsecured Creditors (the "Creditors' Committee") to the DIP Motion (the "Creditors' Committee Objection"). The Debtor and the DIP Lenders are engaged in ongoing negotiations with the Creditors' Committee to resolve the Creditors' Committee Objection, and the Debtor reserves all rights with respect thereto in the event that any or all of the Creditors' Committee Objection remain unresolved at the Final DIP Hearing.

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

[4] Indeed, unless the First Lien Term Lenders are *oversecured*, the Second Lien Term Lenders are not entitled to adequate protection as a matter of law, and absent the Majority Second Lien Lenders' incorrect and incomplete quotations of the Intercreditor Agreement, the Second Lien Term Lenders are not entitled to request additional adequate protection as a matter of contract.

2

Bankruptcy Code requires that the Debtor protect the Majority Second Lien Lenders from a diminution in the value of their interests in their collateral occasioned by the DIP Financing. However, nothing in the Bankruptcy Code or the rationale underlying the concept of adequate protection requires the Debtor to fund the Majority Second Lien Lenders' participation in this chapter 11 case.

3. The uncontroverted evidence demonstrates that the Debtor has adequately protected the Majority Second Lien Lenders from a diminution in the value of their interest in their collateral occasioned by the DIP Financing. In fact, the DIP Facility and adequate protection provided in the Interim and Final DIP Orders have *improved* the Majority Second Lien Lenders' position. The First Lien Term Loans (and the Swap Agreements) and Second Lien Term Loans are secured only by the WB Group's fixed assets (i.e., plant and equipment). Prior to the refinancing of the Revolving ABL pursuant to the Interim Order, the Revolving ABL was secured by the WB Group's working capital assets (i.e., inventory, accounts receivable, and cash). As of the Petition Date, the Revolving ABL obligations totaled approximately $51,000,000 and the working capital assets securing such obligations were valued at approximately $180,000,000—*more than three times* the amount of the Revolving ABL obligations.[5] As a result of the refinancing of the Revolving ABL debt obligations, the DIP Facility is secured by first priority liens on both fixed and working capital assets. More importantly, because of the refinancing of the Revolving ABL, the Debtor was able to grant the Second Lien Term Lenders adequate protection liens on the approximately $180,000,000 of

---

[5] *See* Declaration of Stephen Goldstein in Support of DIP Financing (the "Goldstein Declaration") [Docket No. 30] at ¶ 13.

working capital assets to the extent of any diminution in the value of their interest in the fixed assets as a result of the DIP Facility. The $180,000,000 of new collateral to support the Majority Second Lien Lenders' adequate protection liens more than offsets the $140,000,000 DIP Facility. Therefore, by definition, even if the DIP Facility causes a diminution in value of the Second Lien Term Lenders' collateral, for every dollar of diminution of value there is more than a dollar of working capital collateral to protect the Second Lien Term Lenders. This is more than adequate protection—it is total protection.

4. Nevertheless, the Majority Second Lien Lenders seek additional adequate protection, wholly unrelated to any diminution in value of their interest in their collateral, in the form of a blank check for any attorneys' fees they may incur performing investigations and participating in this chapter 11 case. Nowhere does the Bankruptcy Code provide such protection. The Majority Second Lien Lenders argue that payment of such fees is necessary to "ensure the Second Lien [Term] Lenders will no longer be deprived of an agent and the means to adequately monitor and protect their interests in the Debtor's chapter 11 case and ancillary proceedings."[6] Nothing in the DIP Facility or the Final DIP Order deprives the Majority Second Lien Lenders of their rights to participate in the chapter 11 case or conduct whatever investigations they believe are necessary to protect their claims in the Debtor's chapter 11 case—

---

[6] The Majority Second Lien Lenders also assert that "the Debtor has refused to provide the Second Lien Lenders with even the most basic information regarding their collateral and the Debtor's restructuring efforts." Statement at p. 2. While totally irrelevant to the instant request, this allegation is baseless and astonishing given that during the prepetition period the WB Group and Lazard met with Dune on September 22, 2009 and provided an overview of the WB Group's financial situation, communicated the WB Group's need for incremental funding and a comprehensive balance sheet restructuring, and requested a waiver by Dune of certain potential defaults. Shortly thereafter, Dune executed a confidentiality agreement and was granted access to an electronic data room created for any potential providers of DIP financing who signed similar confidentiality agreements and which contained hundreds of confidential documents regarding the WB Group's assets, liabilities, and operations. The software governing the electronic data room maintains a log of individuals visiting the data room and of which files such individuals reviewed. The log demonstrates that individuals at Dune visited the data room numerous times and reviewed hundreds of documents.

the Majority Second Lien Lenders just do not want to pay for it themselves (or advance such payments themselves in the unlikely event they can demonstrate that they are oversecured).

5. Moreover, the Majority Second Lien Lenders' assertion that they have been "deprived" of an agent is equally specious. The WB Group has agreed, and the DIP Lenders and First Lien Term Lenders have consented, to reimburse Wells Fargo[7] for its fees and expenses (including attorneys' fees) incurred in assuming the role as successor agent (estimated by Wells Fargo to be approximately $40,000) and to pay to Wells Fargo all annual agent fees (approximately $90,000). The Debtor has not been an impediment to Wells Fargo assuming the role of successor agent.

6. In addition to the lack of any Bankruptcy Code requirement that the Debtor pay the Majority Second Lien Lenders' legal fees, the DIP Facility prohibits the Debtor from using the proceeds thereof to pay the Majority Second Lien Lenders' attorneys' fees. Put differently, the DIP Facility to which the Majority Second Lien Lenders have not objected prohibits the very relief they are seeking.

7. Similar to the Majority Second Lien Lenders, TD objects to the adequate protection because it wants more for itself. TD, however, is a First Lien Term Lender that is receiving the very same adequate protection as every other First Lien Term Lender. TD is not entitled to its attorneys' fees under the governing documents and is contractually bound to the First Lien Agent's agreement to the adequate protection package in the Final DIP Order. For

---

[7] Wells Fargo is the proposed replacement agent selected by the Majority Second Lien Lenders.

these reasons, as described in greater detail herein, the Majority Second Lien Lenders' and TD's requests for more adequate protection should be denied.

I. **Response to Statement of the Majority Second Lien Lenders**

   A. **The Interim and Final DIP Orders Provide the Second Lien Term Lenders with Adequate Protection**

   8. Adequate protection exists solely to protect against the diminution in the value of a secured creditor's interest in collateral as a result of the use of such collateral or of postpetition financing. *See, e.g., In re Nice*, 355 B.R. 554, 563 (Bankr. N.D. W. Va. 2006) (noting that the sole function of adequate protection is to preserve the value of secured claims); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (the purpose of adequate protection is to protect "the secured creditor from diminution in value of its [interests in] collateral during the reorganization process"). Whether adequate protection has been provided in any particular situation is highly fact dependent, and any such determination must be made on a case-by-case basis. *Id.* at 289; *see also In re O'Connor*, 808 F.2d 1393, 1397 (10th Cir. 1987). Nonetheless, "[w]hether protection is adequate depends directly on how effectively it compensates the secured creditor for loss of value caused by the superpriority given to the post-petition loan." *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994). Therefore, "the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." *Id.*

   9. The Debtor has, in fact, provided the Majority Second Lien Lenders with *greater* protection than if there had been no DIP Facility by giving the Second Lien Term Lenders junior adequate protection liens on the $180,000,000 worth of replacement collateral that previously

secured the Debtor's obligations under the Revolving ABL.[8] Therefore, for every $1.00 of DIP Financing on account of which the Debtor has given the DIP Lenders a priming lien on the Second Lien Term Lenders' collateral, the Second Lien Term Lenders are receiving a security interest in more than $1.25 of replacement collateral. This is all (and likely more than) the Majority Second Lien Lenders are entitled to.

### B. 506(b) Does Not Require the Debtor to Pay the Majority Second Lien Lenders' Attorneys' Fees

10. Section 506(b) of the Bankruptcy Code provides that an allowed secured claim may include, among other things, reasonable attorneys' fees incurred during a chapter 11 case only "[t]o the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim." 11 U.S.C. §506(b). In other words, the Second Lien Term Lenders are entitled to *accrue* and add to their secured claim their attorneys' fees only if they are *oversecured*. Section 506(b) does not entitle the Majority Second Lien Lenders to receive *current* cash payments from the Debtor's estate to pay their legal bills even if they are oversecured. Although the Debtor does not believe the Second Lien Term Lenders are oversecured, the Final DIP Order preserves the Second Lien Term Lenders' rights to assert whatever claims they may have under section 506(b).

---

[8] There is no evidence that the Second Lien Term Lenders' collateral is diminishing in value. Indeed, the evidence from the First Day Hearing and the evidence that will be offered at the Final Hearing demonstrate that the DIP Facility preserves and maximizes the value of such collateral. Nevertheless, so as to eliminate the need for a valuation hearing at this stage of the case, the Debtor has assumed, to the benefit of the Second Lien Term Lenders, that the Second Lien Term Lenders are entitled to adequate protection.

### C. 507(b) Does Not Require the Debtor to Pay the Majority Second Lien Lenders' Attorneys' Fees

11. The Majority Second Lien Lenders also assert that "current payment of the Second Lien Fees and Expenses is necessary in order for the Second Lien [Term] Lenders to preserve their rights under Bankruptcy Code section 507(b)." Statement ¶ 15. That argument is the *opposite* of what the Bankruptcy Code provides. Section 507(b) simply provides that if the adequate protection provided to the Second Lien Term Lenders ultimately proves to be inadequate, the Second Lien Term Lenders have an administrative priority claim to make up the difference. *See* 11 U.S.C. § 507(b). Section 507(b) cannot be interpreted as requiring the Debtor to reimburse the Majority Second Lien Lenders' attorneys' fees on a current basis so that they can preserve a claim under section 507(b), and the Majority Second Lien Lenders cite no case authority to support such an assertion.

### D. The Second Lien Term Loan Agreement Does Not Require The Debtor to Pay the Majority Second Lien Lenders' Attorneys' Fees

12. The Majority Second Lien Lenders also assert that payment of their attorneys' fees and expenses is required under the Second Lien Term Loan Agreement. However, that agreement is a prepetition agreement. Therefore, any purported obligation of the Debtor to pay the Majority Second Lien Lenders' attorneys' fees contained therein is only enforceable against the Debtor through filing of a proof of claim. *See In re SNTL Corp.*, 380 B.R. 204, 221 (B.A.P. 9th Cir. 2007) ("[T]he parties' execution of a prepetition agreement containing an attorneys' fees provision gives rise to a contingent unliquidated attorney-fee claim."); *In re United Merchants & Mfrs. Inc.*, 674 F.2d 134, 137-38 (2d Cir. 1982); *In re Loewen Group Int'l, Inc.*, 274 B.R. 427, 445 n.36 (Bankr. D. Del. 2002) ("Although a contractual provision providing for the recovery of

attorneys' fees and costs may enable an unsecured creditor to pursue recovery of such fees and costs in an action in state court, in the context of bankruptcy, the creditor's right to assert such claims is limited by the provisions of the Bankruptcy Code.").

13. The Majority Second Lien Lenders also assert that they are entitled to payment of attorneys' fees and expenses during this chapter 11 case as a result of the "waterfall" structure set forth in section 2.15(g) of the Second Lien Term Loan Agreement. This, too, is incorrect. Section 2.15(g) of the Second Lien Term Loan Agreement addresses only the priority of payment of proceeds of collateral—it does not create payment obligations, and certainly does not trump the provisions of the DIP Facility or the Bankruptcy Code.

### E. The DIP Facility Prohibits Payment of the Majority Second Lien Lenders' Ongoing Legal Fees and Expenses

14. Payment of the Majority Second Lien Lenders' requested fees and expenses would cause a default under the DIP Facility. Specifically, section 7 of the DIP Facility provides that the Debtor's failure to observe or perform "any agreement contained in . . . Section 5.10 . . . or Section 6 of this Agreement" constitutes an "Event of Default." Final DIP Credit Agreement, attached hereto as **Exhibit A**, § 7(c). Section 5.10(b), in turn, provides that the Debtor may "[n]ot use the proceeds of the Loans or the proceeds of Collateral: (i) for the payment of any Prepetition Junior Obligation . . . except for amounts approved by the Bankruptcy Court and Canadian Court in the First Day Orders and the Initial CCAA Order, as applicable . . . ." *Id.* at § 5.10(b)(i). Payment of the Majority Second Lien Lenders' attorneys' fees is clearly a payment of a "Prepetition Junior Obligation" and is was not the subject of court approval either in the First Day Orders or the Initial CCAA Order. Moreover, section 6.9(f) of the DIP Facility also provides that the Debtor "shall not . . . make any adequate protection or other payments or

9

transfers on account of any Prepetition Indebtedness or other obligations or any Liens related to Prepetition Indebtedness, except to the extent provided in the Applicable Orders with respect to the Prepetition Senior Obligations." *Id.* at § 6.9(f). Therefore, any payments by the Debtor to the Second Lien Term Lenders during the chapter 11 case—especially to bankroll the Majority Second Lien Lenders' participation—would trigger a default under the DIP Facility and jeopardize the Debtor's (and its Canadian affiliates') restructuring process and efforts to maximize value for all stakeholders.

## II. Response to TD's Limited Objection

15. TD also objects to the DIP Facility because it, too, wants more. However, much like the Majority Second Lien Lenders, TD is requesting protection to which it is not entitled. As an initial matter, TD is receiving the same senior adequate protection liens and claims as the First Lien Term Lenders despite its assertion to the contrary. The Debtor's obligations under the TD Swap Agreement are First Lien Obligations (as such term is defined in the Prepetition Intercreditor Agreement), and as such, have the same priority as the Debtor's obligations to the First Lien Term Lenders. In addition, just like the individual First Lien Term Lenders (as opposed to the First Lien Agent), TD is not entitled to current payment of its attorneys' fees and expenses for at least the following two reasons.

16. *First*, the Debtor's (and the WB Group's) payment of the fees and expenses of the First Lien Agent is the product of a consensual adequate protection agreement reached with the First Lien Agent and the majority of First Lien Term Lenders that avoids a priming and adequate protection fight with the First Lien Agent (which represents holders of well over $480,000,000

10

worth of senior secured debt claims).[9] Accordingly, the "package" of adequate protection provided to the First Lien Term Lenders was not the result of a judicial determination of what they were entitled to, but the product of an agreement that the Debtor and First Lien Term Lenders entered into for the benefit of the estate. *See* Fed. R. Bankr. P. 4001(d)(1)(A) (permitting a debtor to enter into agreements with a secured party pursuant to which such "entity consents to the creation of a lien senior or equal to the entity's lien or interest in such property," and the debtor provides it with agreed upon adequate protection). TD cannot simply point to an agreement with another party as a basis for its claim that it is entitled to the exact same adequate protection package as a matter of law. Additionally, the First Lien Term Loan Agreement does not obligate the Debtor to pay the legal fees and expenses of each individual lender. *See* First Lien Term Loan Agreement, attached hereto as **Exhibit B**. at § 10.4.

17. ***Second***, TD is contractually bound by the First Lien Agent's decisions with respect to interests in the Term Loan Collateral, which include the agreements with the Debtor regarding adequate protection and the allowance of priming liens. Specifically, the First Lien Term Loan Agreement provides that if a "Hedge Agreement" (such as the TD Swap Agreement) is secured by the Term Loan Collateral, the counterparty thereto "shall have agreed that (a) the [First Lien Agent] . . . shall act as its agent . . . for all matters in respect of the Collateral, (b) matters in respect of the Collateral, including such counterparty's rights in respect thereof, shall be governed by the Term Loan Intercreditor Agreement[10] . . . and (d) such counterparty shall not

---

[9] TD's claim represents less than two percent of the first lien obligations.

[10] The Term Loan Intercreditor Agreement contains a corresponding provision that requires counterparties to Hedge Agreements secured by first priority liens in the Term Loan Collateral to, among other things, agree to permit the First Lien Agent to act as its agent with respect to all matters concerning interests in the Term Loan Collateral.

be permitted to vote on matters in respect of the Collateral prior to the payment in full of the Obligations." *See* Ex. B, at p. 26. In exchange for *pari passu* status with the First Lien Term Lenders in the Term Loan Collateral, TD agreed to appoint the First Lien Agent to also act as its own agent. TD, therefore, is bound by the adequate protection agreement embodied in the Final DIP Order.

18. TD also asserts that the Debtor must make current cash payments to TD of postpetition interest at the default rate (Limited Objection ¶ 25). Importantly, not even the First Lien Term Lenders were provided with such "protection." Nevertheless, TD is only entitled to accrue postpetition interest under section 506(b) of the Bankruptcy Code to the extent TD can demonstrate that it is **oversecured**, which TD has not even attempted to do here. As described above, the Final DIP Order preserves TD's rights to assert whatever claims it may have under section 506(b), but section 506(b) does not require the Debtor to pay TD postpetition interest on a current basis.

WHEREFORE, for the reasons set forth herein, in the DIP Motion, and in the Goldstein Declaration, the Debtor respectfully requests that the Court: (a) deny the Majority Second Lien Lenders' request for additional adequate protection; (b) overrule TD's Limited Objection; and (c) grant such other and further relief as is just and proper.

Dated: March 19, 2010
      Richmond, Virginia

BEAR ISLAND PAPER COMPANY, L.L.C.

By: /s/ *Jonathan L. Hauser*
      Of Counsel

Jonathan L. Hauser, Esquire
VSB No. 18688
Troutman Sanders LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, VA 23462
Telephone:  (757) 687-7768
Facsimile:  (757) 687-1505

- and -

Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

*Proposed Attorneys for the Debtor and Debtor in Possession*

WHEREFORE, for the reasons set forth herein, in the DIP Motion, and in the Goldstein Declaration, the Debtor respectfully requests that the Court: (a) deny the Majority Second Lien Lenders' request for additional adequate protection; (b) overrule TD's Limited Objection; and (c) grant such other and further relief as is just and proper.

Dated: March 19, 2010
Richmond, Virginia

BEAR ISLAND PAPER COMPANY, L.L.C.

By: /s/ *Heather H. Lockerman*
Of Counsel

Jonathan L. Hauser, Esquire
VSB No. 18688
Heather H. Lockerman, Esquire
VSB No. 65535
Troutman Sanders LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, VA 23462
Telephone:  (757) 687-7768
Facsimile:  (757) 687-1505

- and -

Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

*Proposed Attorneys for the Debtor and Debtor in Possession*