Jonathan L. Hauser
VSB No. 18688
TROUTMAN SANDERS LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, VA 23462
Telephone:     (757) 687-7768
Facsimile:      (757) 687-1505

Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

*Attorneys for the Debtor and
Debtor in Possession*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| BEAR ISLAND PAPER COMPANY, L.L.C.,[1] | ) Case No. 10-31202 (DOT) |
| Debtor. | ) Related to: Docket No. 208 |

## ORDER APPROVING THE DEBTOR'S SALE AND INVESTOR SOLICITATION PROCESS AND PROCEDURES RELATED THERETO

Upon consideration of the motion, dated April 16, 2010 (the "<u>Motion</u>"),[2] of Bear Island Paper Company, L.L.C., as a debtor and debtor in possession ("<u>Bear Island</u>" or the "<u>Debtor</u>"), for entry of an order (the "<u>Order</u>") approving the sale and investor solicitation process ("<u>SISP</u>") and procedures related thereto (the "<u>SISP Procedures</u>"), all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors and other parties in interest; and the

---

1    The last four digits of the Debtor's federal tax identification number are 0914. The principal address for the Debtor is 10026 Old Ridge Road, Ashland, Virginia 23005.

2      All capitalized terms not otherwise defined herein shall have the meaning set forth in the Motion.

Debtor having provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances and no other or further notice need be provided; and <u>the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and</u> after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted as set forth herein.

2. The SISP Procedures annexed as **Exhibit 1** hereto are approved in all respects.

3. The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

4. For the avoidance of doubt, nothing in this Order approves a stalking horse bid, bidding procedures, or a sale of any assets, nor does this Order preclude the Creditors' Committee, the Majority Second Lien Lenders, or other parties-in-interest from objecting to a motion made by the Debtor requesting approval of any bidding procedures, stalking horse arrangement, or to the proposed sale of any or all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code.

5. The Debtor shall keep the Creditors' Committee reasonably informed at appropriate times throughout the sale process, including, without limitation, providing counsel to the Creditors' Committee, on a "Professional Eyes Only" basis, as soon as practicable, copies of (a) Participation Documents (as defined in the SISP Procedures); (b) Initial Non-Binding Letters of Interest (as defined in the SISP Procedures); and (c) bids received by Phase 2 Qualified Bidders (as defined in the SISP Procedures) that the Debtor believes are appropriate to share with the Creditors' Committee.

6. Nothing in this Order or the SISP Procedures impairs or otherwise modifies any terms or conditions of the White Birch DIP Facility or the final order approving the same.

7. The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is hereby waived.

Dated: _____, 2010
      Richmond, Virginia

                                                  Chief Judge Douglas O. Tice, Jr.
                                                  United State Bankruptcy Judge

I ASK FOR THIS:

*/s/ Jonathan L. Hauser*
Jonathan L. Hauser
VSB No. 18688
**TROUTMAN SANDERS LLP**
222 Central Park Avenue
Suite 2000
Virginia Beach, VA 23462
Telephone:    (757) 687-7768
Facsimile:    (757) 687-1505

- and -

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Attorneys for the Debtor and
Debtor in Possession*

**CERTIFICATION OF ENDORSEMENT
UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

                                                */s/ Jonathan L. Hauser*

**Exhibit 1 to Exhibit A**

**Proposed Sale and Investor Solicitation Process Procedures**

# FORM OF PROCEDURES FOR THE
# SALE AND INVESTOR SOLICITATION PROCESS

On February 24, 2010 (the "Petition Date"), White Birch Paper Holding Company, White Birch Paper Company, Stadacona General Partner Inc., Black Spruce Paper Inc., F.F. Soucy General Partner Inc., 3120772 Nova Scotia Company, Arrimage de Gros Cacouna Inc., Papier Masson Ltée, Stadacona L.P., F.F. Soucy L.P. and F.F. Soucy, Inc. & Partners, L.P. (the "Canadian Debtors") commenced proceedings (the "CCAA Proceedings") seeking relief under the *Companies' Creditors Arrangement Act* (the "CCAA") before the Superior Court of Québec, Commercial Division, in Montreal, Canada (the "CCAA Court"). On the same day, Bear Island Paper Company, L.L.C. (the "U.S. Debtor" and, together with the Canadian Debtors, the "WB Group") commenced a proceeding (the "U.S. Proceeding") under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia (the "U.S. Bankruptcy Court," and together with the CCAA Court, the "Courts"). The Canadian Debtors have also filed petitions and related pleadings under Chapter 15 in the U.S. Bankruptcy Court and, on March 26, 2010, the U.S. Bankruptcy Court entered an order recognizing the CCAA Proceedings as a "foreign main proceeding."

Immediately prior to the Petition Date, the WB Group finalized the terms of a $140,000,000 Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement (the "White Birch DIP Facility"). On February 24, 2010, the CCAA Court entered an order granting approval of the White Birch DIP Facility. On February 26, 2010, the U.S. Bankruptcy Court entered an order granting interim approval, and on March 31, 2010, the U.S. Bankruptcy Court entered an order granting final approval of the White Birch DIP Facility.

Pursuant to its approved terms, the White Birch DIP Facility prescribes that the WB Group shall meet certain milestones as part of the development of a joint plan of reorganization (the "Plan of Reorganization") in the CCAA Proceedings and the U.S. Proceeding. In parallel, the White Birch DIP Facility prescribes an alternative sale and investor solicitation process (the "SISP") whereby the WB Group will seek to sell all or substantially all of its assets (the "Assets") under the supervision of the Courts. On April 23, 2010 the Canadian Debtors filed a motion with the CCAA Court seeking an order for approval of the SISP and the procedures set forth herein (the "SISP Procedures"). On April 19, 2010, the U.S. Debtor filed a motion with the U.S. Bankruptcy Court for an order authorizing and approving the SISP Procedures.

On April __, 2010, following hearings of the Courts, the Courts each entered an order (together, the "SISP Order") approving the SISP and the SISP Procedures. The SISP Order, SISP and the SISP Procedures are to be followed with respect to the SISP for the WB Group.

## Summary of the Solicitation Process

1. The SISP Procedures set forth herein describe, among other things, the Assets available for sale, the manner in which prospective bidders will be solicited, the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets, the manner in which bidders and bids become qualified bids, the receipt and negotiation of bids received (collectively, the "Solicitation Process"), and the timeframe for additional steps which shall be carried out pursuant to a further order of the Courts, notably the

conduct of any subsequent Auction (as defined below), the ultimate selection of a successful bidder, and the CCAA Court and U.S. Bankruptcy Court's approval thereof.

2. WB Group, in consultation with its financial and legal advisors and Ernst & Young Inc. (the "Monitor") shall conduct the SISP Procedures and the Solicitation Process as outlined herein. Certain stages of the SISP Procedures may be conducted by the WB Group simultaneous to the preparation, solicitation or confirmation of a Plan of Reorganization. In addition, the closing of any sale may involve additional intermediate steps or transactions to facilitate consummation of such sale, including the additional Court filings and/or merger or other corporate transactions of subsidiaries and affiliates of the WB Group.

3. The following is a brief summary of the Solicitation Process and the timeline associated with the Solicitation Process (each step of which is described in greater detail below):

(a) The Solicitation Process will commence in April 2010 with the preparation by the WB Group, in conjunction with its advisors, including Lazard Freres & Co. LLC ("Lazard"), of a list of potential bidders (the "Potential Bidders") for the assets of the WB Group (the "Assets"). Such list will include both strategic and financial parties who, in Lazard's reasonable professional judgment, may be interested in acquiring the Assets. Concurrently, the WB Group and Lazard will prepare an initial offering summary (the "Teaser Letter") notifying Potential Bidders of the existence of the Solicitation Process and inviting the Potential Bidders identified to express their interest in making an offer to acquire all or substantially all of the Assets.

(b) On or prior to May 3, 2010, Lazard shall undertake to distribute to Potential Bidders the Teaser Letter as well as a draft confidentiality agreement (a "Confidentiality Agreement") that is satisfactory to the WB Group, its advisors and the Monitor, and which shall inure to the benefit of any purchaser of the Assets.

(c) Beginning on May 3, 2010 and until no later than June 15, 2010, Lazard shall undertake to distribute to all Phase 1 Qualified Bidders (as defined below) a detailed memorandum (the "Confidential Information Memorandum") describing the opportunity to acquire all or substantially all of the Assets.

(d) By no later than June 15, 2010 at 12:00 pm (prevailing Eastern Time), any Phase 1 Qualified Bidder interested in bidding on the Assets must submit to the Notice Parties (as defined below) an Initial Non-Binding Letter of Interest (as defined below) that identifies, inter alia, an initial purchase price range for the Assets. As promptly as possible thereafter, the WB Group and its advisors will notify all Phase 1 Qualified Bidders whether they have been selected as Phase 2 Qualified Bidders (as defined below).

(e) The Phase 2 Qualified Bidders will thereafter be invited to complete a due diligence process with regard to the Assets. The parameters of such due diligence process are set out at Paragraph 11 below.

(f) By no later than July 15, 2010 at 12:00 pm (prevailing Eastern Time), any Phase 2

3

Qualified Bidder must submit a Phase 2 Qualified Bid (as defined below) that complies with the requirements of Paragraph 13 below.

(g) By no later than August 2, 2010, after comprehensive evaluation of the Phase 2 Qualified Bidders and Phase 2 Qualified Bids and in consultation with their advisors, the WB Group shall, in its sole discretion, select a Stalking Horse Bidder (as defined below) and file motions with the Courts seeking approval of the Stalking Horse Documentation (as defined below), the sale of the Assets, bidding procedures and a scheduling of the Auction and sale hearing.

### Assets to Be Sold

4. The WB Group is offering for sale all or substantially all of the Assets, as set forth in the Confidential Information Memorandum to be made available by the WB Group to Potential Bidders that have submitted the Participation Documents described in Paragraph 7 below and otherwise qualify as Phase 1 Qualified Bidders (as defined below).

### "As Is, Where Is"

5. The sale of the Assets will be on an "as is, where is" basis and without surviving representations, warranties or indemnities of any kind, nature or description by the WB Group, the Monitor or any of their respective directors, officers, employees, agents, estates, advisors, professionals or otherwise, except to the extent set forth in the relevant sale agreement ultimately approved by the Courts.

### Free Of Any And All Claims And Interests

6. If approved by the respective Courts, after notice and a hearing, all of the rights, title and interests of the WB Group in and to the Assets, or any portion thereof, to be acquired will be sold free and clear of all security, charges, pledges, liens, encumbrances, claims or other restrictions thereon and there against (collectively, the "Charges") as permitted by section 36(6) of the CCAA and, with respect to Assets owned by the U.S. Debtor, the U.S. Debtor will, subject to approval by the U.S. Bankruptcy Court and after notice and a hearing, request authorization to sell such Assets pursuant to, *inter alia*, sections 363 and 365 of the Bankruptcy Code, with a request that such Charges attach to the net proceeds of the sale of such Assets (without prejudice to any claims or causes of action regarding the priority, validity or enforceability thereof).

### Phase 1 Participation Requirements

7. Unless otherwise determined by the WB Group, in order to participate in the Solicitation Process, each Potential Bidder must deliver to the Notice Parties (as defined below, at the addresses provided below) the following documents (such documents, the "Participation Documents"):

(a) an executed Confidentiality Agreement;

(b) current audited financial statements and latest unaudited financial statements of the Potential Bidder or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements and latest unaudited

financial statements of the equity holders or sponsors of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the WB Group and the Notice Parties to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the sale of the Assets (the "Sale");

(c) a letter setting forth the identity of the Potential Bidder (and, if applicable, its sponsor), the contact information for such Potential Bidder and its principal advisors, and full disclosure of any pre-petition or post-petition affiliations that the Potential Bidder has or may have with (i) the WB Group, (ii) any affiliates of the WB Group, (iii) any creditor of the WB Group, (iv) any holder of equity securities of the WB Group and (v) any current or former officers, managers or directors of the WB Group or its affiliates; and

(d) any other information reasonably requested by Lazard, in consultation with the Monitor and the WB Group.

### Determination of Phase 1 Qualified Bidders and Distribution of Confidential Information Memoranda

8. As promptly as practicable after a Potential Bidder delivers the Participation Documents, a Potential Bidder that delivers the required Participation Documents, whose financial information and credit quality support or enhancement demonstrate to the WB Group's satisfaction the financial capability of the Potential Bidder to consummate the sale, that has executed a Confidentiality Agreement, and that the WB Group determine in its reasonable business judgment, after consultation with its advisors and the Monitor, is likely (based on availability of financing, experience and other considerations, including regulatory approvals) to be able to consummate the sale will be deemed a "Phase 1 Qualified Bidder." Contemporaneous with such determination, Lazard will undertake to provide the Phase 1 Qualified Bidder with a Confidential Information Memorandum. All Phase 1 Qualified Bidders will be invited to submit an Initial Non-Binding Letter of Interest pursuant to the terms of Paragraph 9 below.

### Submission of Initial Non-Binding Letters of Interest and Determination of Phase 2 Qualified Bidders

9. A Phase 1 Qualified Bidder that desires to participate in due diligence shall deliver by no later than June 15, 2010 at 12:00 pm (prevailing Eastern Time) written copies of a non-binding indication of interest (an "Initial Non-Binding Letter of Interest") to the Notice Parties. All Initial Non-Binding Letters of Interest shall identify (i) the purchase price for the Assets (including liabilities to be assumed by the Phase 1 Qualified Bidder), (ii) the structure and financing of the transaction, including, but not limited to, the sources of financing for the purchase price, evidence of the availability of such financing and the steps necessary and associated timing to obtain the financing and any related contingencies, as applicable), (iii) an indication of the allocation of purchase price between the Canadian Debtors and the U.S. Debtor, (iv) conditions of employment to the extent employment will be offered to employees, including any incentive plans, (v) any anticipated corporate, shareholder, internal or regulatory approvals required to close the

5

transaction and the anticipated time frame and any anticipated impediments for obtaining such approvals, (vi) additional due diligence required or desired to be conducted, (vii) any conditions to closing that the Phase 1 Qualified Bidder wishes to impose, and (viii) any other terms or conditions of the purchase proposal which the Phase 1 Qualified Bidder believes are material to the transaction.

10. As promptly as practicable, if a Phase 1 Qualified Bidder delivers an Initial Non-Binding Letter of Interest that the WB Group, after consultation with its advisors and the Monitor, determines in its reasonable business judgment is reasonably likely (based on the terms and conditions described in the Non-Binding Letter of Interest and other considerations, including regulatory approvals) to result in a sale, such Phase 1 Qualified Bidder will be deemed a "<u>Phase 2 Qualified Bidder</u>." Contemporaneous with such determination, such Phase 2 Qualified Bidder will be invited to complete a due diligence process pursuant to Paragraph 11 below.

### **<u>Due Diligence</u>**

11. The WB Group may in its reasonable business judgment, and subject to competitive and other business and legal considerations, afford each Phase 2 Qualified Bidder such due diligence access to materials and information relating to the Assets as the WB Group deem appropriate. Due diligence access may include management presentations as may be scheduled by the WB Group, access to electronic data rooms, property tours, and other matters which a Phase 2 Qualified Bidder may reasonably request and as to which the WB Group, in its reasonable business judgment, may agree. The WB Group will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such parties.

12. Neither the WB Group nor any of its affiliates (or any of their respective representatives) will be obligated to furnish any information relating to the Assets to any person other than to Phase 2 Qualified Bidders. The Monitor, Lazard and the WB Group make no representation or warranty as to the information or the materials provided, except, in the case of the WB Group, to the extent contemplated under any definitive sale agreement with a Successful Bidder executed and delivered by the applicable WB Group entities.

### **<u>Phase 2 Qualified Bids</u>**

13. A bid will be considered a "<u>Phase 2 Qualified Bid</u>" only if the bid is submitted by a Phase 1 Qualified Bidder, pursuant to the previous paragraph and complies with all of the following so as to be received **not later than July 15, 2010** at 12:00 pm (prevailing Eastern Time):

(a) it states that the applicable Phase 2 Qualified Bidder offers to purchase all or substantially all of the Assets upon the terms and conditions substantially as set forth in the form of purchase agreement developed by the WB Group in consultation with its advisors and the Monitor (the "<u>Purchase Agreement</u>"), including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure (including, without limitation, an offer conditioned upon confirmation of a Plan of Reorganization proposed by the WB Group either individually or in collaboration with such Phase 2 Qualified Bidder) or upon

alternative terms and conditions that the WB Group determine are no less favorable than the terms and conditions of the Purchase Agreement;

(b) it includes a letter stating that the Phase 2 Qualified Bidder's offer is irrevocable at least until the completion of the Auction;

(c) it includes a duly authorized and executed Purchase Agreement, including the purchase price for the Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto and, to the extent required by the terms and conditions of such bid, any ancillary agreements as described in the Purchase Agreement with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and ancillary modifications to the Purchase Agreement ("Marked Agreements"), and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed orders to approve the sale by the CCAA Court and U.S. Bankruptcy Court, proposed by the Phase 2 Qualified Bidder;

(d) it provides a full description of all applicable proposed expense reimbursements and break-up fees that would be applicable were the Phase 2 Qualified Bidder to be selected as a Stalking Horse Bidder (as defined below);

(e) it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the sale, that will allow the WB Group, is advisors and the Monitor to make a reasonable determination as to the Phase 2 Qualified Bidder's financial and other capabilities to consummate the sale contemplated by the Marked Agreements and the Marked Ancillary Agreements;

(f) it is not conditioned on (i) the outcome of unperformed due diligence by the Phase 2 Qualified Bidder (and includes an acknowledgement and representation that the Phase 2 Qualified Bidder has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer) or (ii) obtaining financing;

(g) it fully discloses the identity of the entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(h) it includes an acknowledgment and representation that the Phase 2 Qualified Bidder will assume the WB Group's obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Purchase Agreement (or identifies with particularity which of such contracts and leases of the WB Group that the Phase 2 Qualified Bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases of the WB Group that the Phase 2 Qualified Bidder wishes to assume), contains full details of the Phase 2 Qualified Bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)     it includes an acknowledgement and representation that the Phase 2 Qualified Bidder: (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid and (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreement or the Marked Ancillary Agreements;

(j)     it includes evidence, in form and substance reasonably satisfactory to the WB Group, of authorization and approval from the Phase 2 Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)     it includes evidence, in form and substance reasonably satisfactory to the WB Group, of compliance or anticipated compliance with all regulatory approvals (including, if applicable, anti-trust and Investment Canada approvals), the anticipated time frame and any anticipated impediments for obtaining such approvals;

(l)     it contains full details of the proposed number of employees of the WB Group who will become employees of the Phase 2 Qualified Bidder and any proposed measures associated with the continued employment and associated with the employment of all employees who will become employees of the Phase 2 Qualified Bidder;

(m)     it includes evidence of the Phase 2 Qualified Bidder's ability to comply with Section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Phase 2 Qualified Bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by or subleased to the Phase 2 Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

(n)     it identifies the Phase 2 Qualified Bidder's principal advisors;

(o)     it contains other information reasonably requested by the WB Group; and

(p)     it is received by July 15, 2010 at 12:00 pm (prevailing Eastern Time).

14.     The WB Group will determine, in their reasonable business judgment whether to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Phase 2 Qualified Bids. The WB Group shall notify any Phase 2 Qualified Bidders in writing as to whether or not their bid constitutes a Phase 2 Qualified Bid promptly after receipt of the bid.

**Evaluation of Competing Bids and Selection of "Stalking Horse"**

15. A Phase 2 Qualified Bid will be valued based upon several factors including, without limitation, items such as the purchase price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the bidder) provided by such bid, the claims likely to be created by such bid in relation to other bids, the counterparties to the sale proposed by the Phase 2 Qualified Bidder, the proposed revisions to the Purchase Agreement, the effect of the proposed sale on the value of the ongoing businesses of the WB Group (including ongoing relationships with customers and suppliers), other factors affecting the speed, certainty and value of the proposed Sale (including regulatory or other approvals required to close the Sale), any assets excluded from the bid, the estimated number of employees of the WB Group to be offered post-closing employment by the Phase 2 Qualified Bidder and any proposed measures associated with the continued employment of all employees who will become the employees of the Phase 2 Qualified Bidder, the transition services required from the WB Group post-closing and any related restructuring costs, and the likelihood and timing of consummating such Sale, each as determined by the WB Group, in consultation with its advisors and the Monitor. The WB Group reserves the right, taking into account all other factors set forth herein (including execution risk), to choose a successful bidder that did not offer the highest purchase price for the Assets. Following their review of the Phase 2 Qualified Bids and in consultation with its advisors and the Monitor, the WB Group shall, in its sole discretion, select a Phase 2 Qualified Bidder to serve as the stalking horse bidder (the "Stalking Horse Bidder"). The WB Group shall (i) execute definitive transaction documentation (the "Stalking Horse Documentation"), subject to CCAA Court and U.S. Bankruptcy Court approval and (ii) file motions with the Courts to approve the Stalking Horse Documentation by **no later than August 2, 2010**.

### No Qualified Bids

16. If the WB Group does not receive any Phase 2 Qualified Bids or an insufficient number of Phase 2 Qualified Bids, the WB Group reserves the right, in consultation with its advisors to (i) extend the deadlines set forth in the SISP Procedures without further notice, and (ii) withdraw from sale, in whole or in part, any Assets at any time and to make subsequent attempts to market the same.

### Additional Steps

17. As noted above, the SISP is to be conducted pursuant to the terms of the White Birch DIP Facility. By virtue thereof, the SISP constitutes an alternative to and shall be carried out in parallel to a process aimed at filing a joint Plan of Reorganization. The WB Group must file such a joint Plan of Reorganization on or prior to June 30, 2010 under the terms of the White Birch DIP Facility. If this is done, the SISP process shall be discontinued and all Phase 2 Qualified Bidders shall be informed thereof. However, should no joint Plan of Reorganization be filed by that date, pursuant to the White Birch DIP Facility, the WB Group must pursue the SISP process and must complete certain additional steps leading to the sale of the Assets.

18. In particular, pursuant to the terms of the White Birch DIP Facility, once a Stalking Horse Bidder has been identified, as noted above, the WB Group must seek and obtain approvals of the Courts of the Stalking Horse Documentation.

19. Concurrently, the terms of the White Birch DIP Facility provide that (i) the WB Group must obtain approval of the Courts for bidding procedures ending in an auction of all the

Assets (the "Auction"); (ii) details of the bidding procedures and the Auction shall be set out in forthcoming documentations submitted to the Courts prior to the August 2, 2010 deadline mentioned above; (iii) the Courts must issue a bidding procedures order (the "Bidding Procedures Order") on or prior to August 16, 2010; and (iv) the Auction must then be held on or prior to August 23, 2010.

20. At the conclusion of the Auction, the terms of the White Birch DIP Facility provide that (i) a winning bidder shall have been identified (the "Winning Bidder"); (ii) the WB Group shall request that, by August 26, 2010, orders be entered by the Courts approving the sale of the Assets to the Winning Bidder(s); and (iii) a transaction consummating the winning bid will then be concluded, which transaction shall be fully consummated on or prior to September 13, 2010, or, if the Winning Bidder is not the Stalking Horse Bidder and the only condition that has not been satisfied or waived is applicable regulatory approval, September 27, 2010.

### Notice Parties

21. As used herein, the "**Notice Parties**" include all of the following: (i) White Birch Paper Company, Attn: Jay Epstein, Vice President – Finance, Treasurer & Secretary, 80 Field Point Road, Greenwich, CT 06830, Facsimile: (203) 661-3349; (ii) Debtors' U.S. counsel: Kirkland & Ellis, Attn: Christopher Marcus, 601 Lexington Avenue, New York, NY 10022, Facsimile: (212) 446-4900; (iii) Debtors' Canadian counsel: Stikeman Elliott LLP, Attn. Kevin Kyte & Jean Fontaine, 1155 René-Lévesque Blvd. W., Suite 4000, Montreal, Quebec, Canada, H3B 3V2, Facsimile: (514) 397-3222; (iv) Debtors' financial advisors: Lazard Frères & Co., Attn: Stephen Goldstein, 30 Rockefeller Plaza, New York, NY 10020, Facsimile: (212) 332-8670 and (v) the Monitor: Ernst & Young Inc., Attn: Martin Rosenthal, 800 René-Lévesque Blvd. West, Suite 1900 Montreal, Quebec, Canada H38 1X9, Facsimile: (514) 879-2600.

### Reservation of Rights

22. The WB Group, after consultation with its advisors: (a) may reject, at any time, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the CCAA, the SISP Procedures, or any other orders applicable to one or more Debtors, or the terms and conditions of the Sale or (iii) contrary to the best interests of the WB Group, their estates, and stakeholders as determined by the WB Group; (b) may impose additional terms and conditions and otherwise seek to modify the SISP Procedures at any time; (c) may withdraw from sale any Assets at any time and make subsequent attempts to market the same; (d) may accept bids not in conformity with the SISP Procedures to the extent the WB Group determines, in their reasonable business judgment, that doing so would benefit the Debtors' estates; and (e) may reject all bids.

23. These SISP Procedures do not, and shall not be interpreted to, create any contractual or other legal relationship between any member of the WB Group and any Potential Bidder, Phase 1 Qualified Bidder or Phase 2 Qualified Bidder, other than as specifically set forth in definitive agreements that may be signed with the WB Group.

### Credit Bid

24. Notwithstanding anything herein to the contrary, including without limitation, the bidding requirements herein, the agent under the White Birch DIP Facility (the "<u>DIP Agent</u>") and the agent to the WB Group's first lien term loan lenders (the "<u>First Lien Term Agent</u>"), on behalf of the lenders under White Birch DIP Facility and the WB Group's first lien term loan lenders, respectively, shall be deemed Qualified Bidders and any bid submitted by such agents on behalf of the respective lenders in respect of all or a portion of the Assets shall be deemed both Phase 1 Qualified Bids and Phase 2 Qualified Bids. The DIP Agent and First Lien Term Agent, on behalf of the lenders under the White Birch DIP Facility and the WB Group's first lien term loan lenders, respectively, shall be permitted, in their sole discretion, to credit bid up to the full amount of any allowed secured claims under the White Birch DIP Facility and the first lien term loan agreement, respectively, to the extent permitted under section 363(k) of the Bankruptcy Code and other applicable law.