## Exhibit A

## Asset Sale Agreement

ASSET SALE AGREEMENT

BY AND AMONG

WHITE BIRCH PAPER COMPANY

AND

THE OTHER ENTITIES IDENTIFIED HEREIN AS SELLERS

AND

BD WHITE BIRCH INVESTMENT LLC

DATED AS OF AUGUST 10, 2010

# TABLE OF CONTENTS

Page

ARTICLE I INTERPRETATION..................................................................................................2

    1.1      Definitions. ...................................................................................................................2
    1.2      Interpretation. ...........................................................................................................17

ARTICLE II PURCHASE AND SALE OF ASSETS.................................................................18

    2.1      Purchase and Sale. ...................................................................................................18
    2.2      Purchase Price. ..........................................................................................................27
    2.3      Closing. .......................................................................................................................28
    2.4      Designated Purchaser(s). .........................................................................................29

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER .................30

    3.1      Organization and Corporate Power. .....................................................................30
    3.2      Authorization; Binding Effect; No Breach. ...........................................................30
    3.3      Purchaser's Acknowledgments; Exclusivity of Representations and Warranties.......31
    3.4      Brokers. ......................................................................................................................32
    3.5      GST and QST Registration. .....................................................................................32

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLERS .........................33

    4.1      Organization and Corporate Power. .....................................................................33
    4.2      Subsidiaries and Investments. ................................................................................33
    4.3      Authorization; Binding Effect; No Breach. ...........................................................33
    4.4      Title to Tangible Assets; Sufficiency of Assets. ...................................................34
    4.5      Material Contracts. ...................................................................................................34
    4.6      Intellectual Property. ...............................................................................................35
    4.7      Litigation. ...................................................................................................................36
    4.8      Financial Statements. ...............................................................................................36
    4.9      Compliance with Laws; Consents. ........................................................................36
    4.10    Real Property. ............................................................................................................37
    4.11    Environmental Matters. ...........................................................................................38
    4.12    Labor and Employee Benefits Matters. .................................................................39
    4.13    Taxes. ..........................................................................................................................43
    4.14    Absence of Certain Developments. ........................................................................43
    4.15    No Undisclosed Liabilities. .....................................................................................43
    4.16    Customers and Suppliers. .......................................................................................44
    4.17    Affiliate Transactions. ..............................................................................................44
    4.18    Brokers; Advisors Fees. ...........................................................................................44
    4.19    Not a Non-Resident. ................................................................................................44
    4.20    GST and QST Registration. .....................................................................................44
    4.21    Location of Assets. ....................................................................................................45

**ARTICLE V COVENANTS AND OTHER AGREEMENTS** ....................................................... 45

    5.1     Bankruptcy Actions. ....................................................................................... 45
    5.2     Cooperation. ................................................................................................... 47
    5.3     Antitrust and Other Regulatory Approvals. ................................................. 50
    5.4     Pre-Closing Access to Information. ............................................................... 52
    5.5     Public Announcements ................................................................................... 53
    5.6     Further Actions. ............................................................................................. 54
    5.7     Conduct of Business. ..................................................................................... 54
    5.8     No Shop. ......................................................................................................... 57
    5.9     Transaction Expenses. ................................................................................... 57
    5.10    Confidentiality. .............................................................................................. 57
    5.11    Certain Payments or Instruments Received from Third Parties. ................. 57
    5.12    Deemed Consent. ........................................................................................... 58
    5.13    Post-Closing Assistance for Litigation. ......................................................... 58
    5.14    No Financing Out. .......................................................................................... 58
    5.15    Insurance Matters. ......................................................................................... 58
    5.16    Maintenance of Books and Records. ............................................................. 59
    5.17    Use of Cash. ................................................................................................... 60
    5.18    Wind-Down Amount. .................................................................................... 60
    5.19    Reserve Payment Amount. ............................................................................ 61
    5.20    Name Change .................................................................................................. 61

**ARTICLE VI TAX MATTERS** ....................................................................................... 61

    6.1     Transfer Taxes. ............................................................................................... 61
    6.2     Tax Elections. ................................................................................................. 62
    6.3     Withholding Taxes. ........................................................................................ 63
    6.4     Tax Characterization of Payments Under This Agreement. ......................... 63
    6.5     Records. .......................................................................................................... 63
    6.6     Property Tax Allocation .................................................................................. 64

**ARTICLE VII EMPLOYMENT MATTERS** .................................................................... 64

    7.1     Employment Obligations with Respect to Non-Union Employees ............... 64
    7.2     Employment Obligations with Respect to Union Employees. ...................... 66
    7.3     Excluded Employee Liabilities. ..................................................................... 67
    7.4     Other Employee Covenants. .......................................................................... 67
    7.5     No Obligation. ................................................................................................ 68

**ARTICLE VIII CONDITIONS TO THE CLOSING** ......................................................... 68

    8.1     Conditions to Each Party's Obligation. ........................................................ 68
    8.2     Conditions to Sellers' Obligation. ................................................................. 68
    8.3     Conditions to Purchaser's Obligation. .......................................................... 69

**ARTICLE IX TERMINATION** ........................................................................................... 71

9.1    Termination. ................................................................................................... 71
9.2    Break-Up Fee. ................................................................................................ 72
9.3    Expense Reimbursement. ............................................................................... 73
9.4    Effects of Termination. .................................................................................. 73

**ARTICLE X MISCELLANEOUS** ...................................................................................... 74

10.1   No Survival of Representations and Warranties or Covenants. .................. 74
10.2   Remedies. ...................................................................................................... 74
10.3   No Third-Party Beneficiaries. ...................................................................... 75
10.4   Consent to Amendments; Waivers. .............................................................. 75
10.5   Successors and Assigns. ................................................................................ 75
10.6   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial. ............ 75
10.7   Notices. ......................................................................................................... 76
10.8   Exhibits; Sellers Disclosure Letter. ............................................................. 78
10.9   Counterparts. ................................................................................................. 78
10.10  No Presumption. ........................................................................................... 78
10.11  Severability. ................................................................................................. 78
10.12  Entire Agreement. ........................................................................................ 79
10.13  Limitation on Liability. ................................................................................ 79
10.14  Damages. ...................................................................................................... 79
10.15  Bulk Sales Laws. .......................................................................................... 79

## EXHIBITS

| | |
|---|---|
| Exhibit A | White Birch Subsidiary Sellers |
| Exhibit B | List of Purchaser's Persons with Knowledge |
| Exhibit C | Relevant Antitrust Authorities |
| Exhibit D | Relevant Sellers |
| Exhibit E | Form of Deposit Escrow Agreement |
| Exhibit F | Form of Bidding Procedures |
| Exhibit G | Form of Canadian Order Approving the Agreement and the Bidding Procedures |
| Exhibit H | Form of U.S. Order Approving the Agreement and the Bidding Procedures |
| Exhibit I | Form of Canadian Sale Order |
| Exhibit J | Form of U.S. Sale Order |
| Exhibit K | Sellers' Projected Cash Balance |

# ASSET SALE AGREEMENT

This Asset Sale Agreement is dated as of August 10, 2010, among White Birch Paper Company, a company organized under the Laws of Nova Scotia ("**White Birch**"), the subsidiaries of White Birch listed in <u>Exhibit A</u> hereto (collectively, the "**Sellers**") and BD White Birch Investment LLC, a limited liability company organized under the Laws of Delaware (the "**Purchaser**").

## W I T N E S S E T H:

WHEREAS, the Sellers beneficially own and operate the Business (as defined below);

WHEREAS, on February 24, 2010 (the "**Petition Date**"), White Birch, the Sellers, White Birch Paper Holding Company, Black Spruce Paper Inc. and 3120772 Nova Scotia Company (collectively, the "**Canadian Debtors**") filed with the Quebec Superior Court, District of Montreal (the "**Canadian Court**") an application for protection under the *Companies' Creditors Arrangement Act* (the "**CCAA**") (the proceedings commenced by such application, the "**CCAA Cases**") and were granted certain initial creditor protection pursuant to an order issued by the Canadian Court on the same date (the "**Initial CCAA Order**") and was extended by further orders of the Canadian Court on March 26, 2010 and July 12, 2010, as the same may be amended and restated from time to time;

WHEREAS, Bear Island Paper Company, L.L.C., a limited liability company organized under the Laws of Virginia, is a debtor-in-possession (in such capacity, the "**U.S. Debtor**") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**U.S. Bankruptcy Code**") which commenced a voluntary proceeding (the "**Chapter 11 Case**") on the Petition Date by filing a petition for relief in the United States Bankruptcy Court for the Eastern District of Virginia (the "**U.S. Bankruptcy Court**");

WHEREAS the U.S. Bankruptcy Court granted recognition of the CCAA Cases as foreign main proceedings under Chapter 15 of Title 11 of the U.S. Bankruptcy Code (the "**Chapter 15 Cases**");

WHEREAS, the Sellers have agreed to transfer to the Purchaser or the Designated Purchasers, and the Purchaser has agreed to purchase and assume, and cause the Designated Purchasers to purchase and assume, the Assets and the Assumed Liabilities from the Sellers upon the terms and conditions set forth hereinafter (including the Auction);

NOW, THEREFORE, in consideration of the respective covenants, representations and warranties made herein, and of the mutual benefits to be derived hereby (the sufficiency of which are acknowledged), the Parties agree as follows:

# ARTICLE I
# INTERPRETATION

**1.1    Definitions.**

Capitalized terms used but not otherwise defined herein shall have the meanings set forth below:

"**Advance Ruling Certificate**" means an advance ruling certificate issued by the Commissioner pursuant to section 102 of the Competition Act with respect to the transactions contemplated by this Agreement.

"**Action**" means any litigation, action, suit, charge, binding arbitration or other legal, administrative or judicial proceeding.

"**Affiliate**" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, or is under common Control with, or is Controlled by, such Person.

"**Agreement**" means this Asset Sale Agreement, the Sellers Disclosure Letter and all Exhibits and Schedules attached hereto and thereto and all amendments hereto and thereto made in accordance with Section 10.4.

"**Allowed 503(b)(9) Claims**" has the meaning set forth in Section 2.1.3(a)(vii).

"**Alternative Transaction**" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation or other similar transaction, including a stand-alone plan of arrangement approved by the Canadian Court, a plan of reorganization or plan of arrangement approved by the U.S. Bankruptcy Court, or resulting from the Auction, of any material portion of the Assets, in a transaction or a series of transactions with one or more Persons other than the Purchaser and/or its Affiliates; provided, however, that an "Alternative Transaction" shall not include: (i) the sale, transfer or other disposition, directly or indirectly, of any portion of the Business or the Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers; or (ii) an arrangement sponsored by the Purchaser or any of its Affiliates.

"**Ancillary Agreements**" means, in each case in a form reasonably acceptable to the Sellers and the Purchaser: (i) a Bill of Sale for the assignment and conveyance of the Assets from Sellers to Purchaser; (ii) deeds transferring title to the Owned Real Property to Purchaser, including Local Sale Agreements; (iii) an Assignment and Assumption Agreement for the assignment and assumption of the Assumed Liabilities from the Sellers to the Purchaser; and (iv) instruments of assignment of the Patents, Trademarks, Copyrights, and any other assignments or instruments with respect to any Intellectual Property included in the Assets for which an assignment or instrument is required to assign, transfer, convey and deliver such Assets to the Purchaser or to record such assignment, transfer or conveyance with the appropriate government offices, domain name registrars or other similar authorities.

"Antitrust Approvals" means the HSR Approval, the Competition Act Approval, and the Mandatory Antitrust Approvals.

"Antitrust Laws" means the Competition Act, the HSR Act, and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"Asset Allocation Schedule(s)" has the meaning set forth in Section 2.2.3.

"Assets" has the meaning set forth in Section 2.1.1.

"Assigned Contracts" means all Designated Seller Contracts other than Non-Assigned Contracts.

"Assumed Liabilities" has the meaning set forth in Section 2.1.3(a).

"Assumed Trade Payables" has the meaning set forth in Section 2.1.3(a)(i).

"Auction" has the meaning set forth in Section 5.1(b).

"Audited Financial Statements" has the meaning set forth in Section 4.8.

"Bankruptcy Consents" has the meaning set forth in Section 4.1(a).

"Bankruptcy Court" means any or all of, as the context may require, the Canadian Court, the U.S. Bankruptcy Court and any other court before which Bankruptcy Proceedings are held.

"Bankruptcy Laws" means the CCAA, the *Bankruptcy and Insolvency Act* (Canada), the U.S. Bankruptcy Code and the other applicable insolvency Laws of any jurisdiction where Bankruptcy Proceedings are held.

"Bankruptcy Proceedings" means the CCAA Cases, the Chapter 11 Case and the Chapter 15 Cases, in each case, any proceedings thereunder, as well as any other voluntary or involuntary bankruptcy, insolvency, administration or similar judicial proceedings concerning any of the Sellers that are held from time to time.

"Bear Island Estate" means the estate of the U.S. Debtor.

"Bidding Procedures" has the meaning set forth in Section 5.1(b).

"Break-Up Fee" has the meaning set forth in Section 9.2(a).

"Business" means the current business of the Sellers, being the manufacture, production and sale of newsprint, directory, paperboard, finished lumber and woodchips, and all activities incidental thereto (including stevedoring operations of Arrimage de Gros Cacouna Inc.).

"**Business Day**" means a day on which the banks are opened for business (Saturdays, Sundays, statutory and civic holidays excluded) in (i) New York, New York, U.S. and (ii) Montreal, Quebec, Canada.

"**Business Information**" means all books, records, files, documentation and sales literature owned by Sellers and in the possession or under control of the Sellers that are used or held for use in connection with the Business, including information, policies and procedures, Owned Equipment manuals and materials and procurement documentation used in the Business and information received pursuant to Section 5.2(e)(ii), but excluding any Employee Records for Employees or former employees who are not Transferred Employees.

"**CAAF**" means a timber supply and forest management agreement subject to the *Forest Act* (Quebec).

"**Canadian Court**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Debtors**" has the meaning set forth in the recitals to this Agreement.

"**Canadian Wind-Down Amount**" means an amount equal to $3,000,000.

"**Cash Component**" has the meaning set forth in Section 2.2.1.

"**Cash Obligations**" means the amount of cash obligations of Purchaser at Closing equal to the sum of: (a) the Cash Component; (b) the Cure Costs; (c) filing fees in connection with any filing or application made in respect of obtaining Regulatory Approvals, (d) any Taxes (including Transfer Taxes) payable at Closing, (e) the Allowed 503(b)(9) Claims, (f) the Reserve Payment Amount, and (g) any other cash amounts required to be made by Purchaser to consummate the transactions contemplated hereby. For the avoidance of doubt, "**Cash Obligations**" shall not include the legal fees of Purchaser or its Affiliates or any fees in connection with obtaining indebtedness as described in Section 5.4(d).

"**CCAA**" has the meaning set forth in the recitals to this Agreement.

"**CCAA Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 11 Case**" has the meaning set forth in the recitals to this Agreement.

"**Chapter 15 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning set forth in section 101(5) of the U.S. Bankruptcy Code.

"**Cleanup**" means all actions required under Environmental Laws to: (i) cleanup, remove, treat or remediate Hazardous Materials in the indoor or outdoor environment; (ii) prevent the Release of Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations and post-remedial monitoring and care; or (iv) respond to any government requests for information or documents in any way relating to

cleanup, removal, treatment or remediation or potential cleanup, removal, treatment or remediation of Hazardous Materials in the indoor or outdoor environment.

"Closing" has the meaning set forth in Section 2.3.1.

"Closing Date" has the meaning set forth in Section 2.3.1.

"COBRA" has the meaning set forth in Section 7.1.2(e).

"Code" means the United States *Internal Revenue Code of 1986*, as amended.

"Collective Labor Agreement" means any agreement that a Person has entered into with any union or collective bargaining agent.

"Commissioner" means the Commissioner of Competition appointed under the Competition Act or any person duly authorized to exercise the powers and perform the duties of the Commissioner of Competition.

"Competition Act" means the *Competition Act* (Canada), as amended.

"Competition Act Approval" means: (i) the issuance of an Advance Ruling Certificate and such Advance Ruling Certificate has not been rescinded prior to Closing; or (ii) the Purchaser and the Sellers have given the notice required under section 114 of the Competition Act with respect to the transactions contemplated by this Agreement and the applicable waiting period under section 123 of the Competition Act has expired or has been terminated in accordance with the Competition Act; or (iii) the obligation to give the requisite notice has been waived pursuant to paragraph 113(c) of the Competition Act, and, in the case of (ii) or (iii), the Purchaser has been advised in writing by the Commissioner that, in effect, such person is of the view that sufficient grounds at that time do not exist to initiate proceedings before the Competition Tribunal under section 92 of the Competition Act with respect to the transactions contemplated by this Agreement and therefore the Commissioner, at that time, does not intend to make an application under section 92 of the Competition Act in respect of the transactions contemplated by this Agreement ("no-action letter"), and the form of and any terms and conditions attached to any such advice are acceptable to the Purchaser, acting reasonably, and such advice has not been rescinded prior to Closing.

"Competition Tribunal" means the Competition Tribunal established under the *Competition Tribunal Act* (Canada).

"Confidentiality Agreement" means the confidentiality agreement(s) between Black Diamond Capital Management, L.L.C., on behalf of their managed funds, on the one hand, and White Birch Paper Holding Company (and each of its Subsidiaries), on the other hand, dated June 2010.

"Consent" means any approval, authorization, consent, order, license, permission, permit, including any Environmental Permit and any CAAF granted pursuant to the *Forest Act* (Quebec), qualification, exemption or waiver by any Government Entity or other Third Party.

"**Contract**" means any legally binding contract, agreement, obligation, license, undertaking, instrument, lease, ground lease, commitment or other arrangement, whether written or oral.

"**Control**", including, with its correlative meanings, "Controlled by" and "under common Control with", means, in connection with a given Person, the possession, directly or indirectly, of the power to either (i) elect more than fifty percent (50%) of the directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, Contract or otherwise.

"**Copyrights**" means all U.S., Canadian and foreign copyrights and copyrightable subject matter, whether registered or unregistered, including all U.S. and Canadian copyright registrations and applications for registration and foreign equivalents, all moral rights and rights of attribution and integrity, all common law copyright rights, and all rights to register and obtain renewals and extensions of copyright registrations, together with all other copyright interests accruing by reason of any international copyright convention or treaty.

"**Courts**" has the meaning set forth in Section 10.6(b).

"**Covered Assets and Persons**" has the meaning set forth in Section 5.15(a).

"**CRA**" means the Canada Revenue Agency.

"**Cure Cost**" means, as applicable, (i) with respect to the U.S. Debtor, any amounts or assurances required by section 365(b)(1) of the U.S. Bankruptcy Code under any applicable Designated Seller Contract or (ii) with respect to any Canadian Debtor, any amounts required to satisfy monetary defaults in relation to the applicable Designated Seller Contract pursuant to section 11.3 of the CCAA.

"**Cure Cost Cap**" has the meaning set forth in Section 2.1.3(a)(ii).

"**D&O Charge Covered Claim**" has the meaning set forth in Section 5.2(g).

"**D&O Charge Covered Person**" has the meaning set forth in Section 5.2(g).

"**D&O Claims Procedure**" has the meaning set forth in Section 5.1(i).

"**Deposit**" has the meaning set forth in Section 2.2.2.

"**Deposit Escrow Agent**" has the meaning set forth in Section 2.2.2.

"**Deposit Escrow Agreement**" has the meaning set forth in Section 2.2.2.

"**Designated Purchaser**" has the meaning set forth in Section 2.4.

"**Designated Seller Contracts**" means all Contracts and Leases of each Seller that relate to the Business and which are listed in <u>Section 1.1(c) of the Sellers Disclosure Letter</u>; deleting from such Sellers Disclosure Letter such Contracts or Leases not to be assumed and assigned pursuant to Section 2.1.1.

"**DIP Credit Agreement**" means the $140,000,000 Senior Secured Super-Priority Debtor-in-Possession Term Loan Agreement, as amended, modified, supplemented or otherwise, as approved in the Initial CCAA Order and by an order of the Bankruptcy Court, dated March 31, 2010.

"**Effective Hire Date**" means the day on which the employment of an Employee commences with the Purchaser or its Affiliates as provided in this Agreement.

"**Employee**" means each employee of any of the Sellers or their respective Subsidiaries engaged in the Business.

"**Employee Information**" has the meaning set forth in Section 4.12(b).

"**Employee Records**" means books, records, files, or other documentation with respect to Employees or any former employee of any of the Sellers.

"**Employee Transfer Time**" means with respect to each jurisdiction where Employees will become Transferred Employees in accordance with this Agreement, 12:00 a.m. midnight local time in such jurisdiction immediately following the Closing.

"**Environmental Claim**" means any claim, Action, investigation, written notice, ministerial order, court order, notice of infraction, administrative penalty or statement of offence by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, Cleanup costs, Government Entity response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (i) the presence, Release or threatened Release of, or exposure to, any Hazardous Materials at any location, whether or not owned or operated by the Sellers, or (ii) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Environmental Law**" means any applicable Law relating to pollution or protection of the environment, natural resources or human health and safety, including without limitation, Laws relating to the exposure to, or Releases or threatened Releases of, Hazardous Materials or otherwise relating to the manufacture, presence, processing, distribution, use, treatment, storage, Release, transport or handling of Hazardous Materials and all Laws with regard to recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials.

"**Environmental Permit**" means any permit, approval, license, certificate, consent, registration, certificate of authorization and depollution attestation or other authorization required under any Environmental Law to (i) conduct the Business as currently conducted or (ii) in relation to the Assets.

"**ERISA**" means the *Employee Retirement Income Security Act* of 1974, as amended.

"**Excluded Assets**" has the meaning set forth in Section 2.1.2.

"**Excluded Employee Liabilities**" has the meaning set forth in Section 7.3.

"Excluded Liabilities" has the meaning set forth in Section 2.1.4.

"Excluded Seller Contract" means any Contract or Lease of the Sellers that is not a Designated Seller Contract.

"Expense Reimbursement" means all reasonable costs and expenses of the Purchaser and the Designated Purchasers incurred in connection with the development, execution, delivery and approval by the Bankruptcy Courts of this Agreement and the consummation of the transactions contemplated hereby (including, without limitation, reasonable expenses of counsel and other outside consultants and reasonable legal expenses related to the transactions contemplated hereby, preparing and negotiating this Agreement and documents related hereto, and investigating Sellers or the Assets) in an amount not to exceed the lesser of such actual costs and expenses and $2,500,000, which shall, subject to Bankruptcy Court approval, constitute (i) in the Chapter 11 Case, a super priority administrative expense under Section 503(b)(1) of the U.S. Bankruptcy Code, junior only to the claims of the lenders under the DIP Credit Agreement, any "Carve-Out" set forth in the order approving the DIP Credit Agreement and the Adequate Protection Senior Claim (as defined in the order approving the DIP Credit Agreement); and (ii) in the CCAA Cases, a priority charge against all of the assets of the Canadian Debtors ranking junior only to the DIP Charge, the Directors Charge and the Administration Charge (all as defined in the Initial CCAA Order), and shall in each of the Bankruptcy Proceedings be authorized to be paid by the Stalking Horse and Bidding Procedures Orders.

"Final Order" means an action taken or order issued by the applicable Government Entity as to which: (i) no request for stay of the action or order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or order, or protest of any kind, is pending before the Government Entity and the time for filing any such petition or protest is passed; (iii) the Government Entity does not have the action or order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or order is not then under judicial review, there is no notice of leave to appeal, appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Financial Statements" has the meaning set forth in Section 4.8.

"First Lien Credit Agreement" means that certain Second Amended and Restated First Lien Term Loan Credit Agreement, dated as of April 8, 2005, as amended, modified, supplemented or otherwise in effect from time to time, among White Birch Paper Holding Company, White Birch, as Borrower, Credit Suisse Securities (USA) LLC, as Syndication Agent and Documentation Agent and the Lenders party thereto, together with all attendant notes, instruments, agreements and other documents, as the same have been amended, modified or supplemented from time to time.

"GAAP" means the United States generally accepted accounting principles.

"Government Entity" means any U.S., Canadian, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority,

instrumentality, court, government or self-regulatory organization, bureau, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing having jurisdiction.

"GST" means goods and services tax, including harmonized sales tax, payable under Part IX of the *Excise Tax Act* (Canada).

"Hazardous Materials" means (i) petroleum, petroleum products, asbestos in any form that is friable, toxic mold, urea formaldehyde foam insulation, lead based paints, polychlorinated biphenyls or any other material or substance regulated pursuant to Environmental Laws, and (ii) any chemical, material or other substance which is regulated, defined or listed, alone or in any combination as "hazardous", "hazardous waste", "radioactive", "deleterious", "toxic", "caustic", "dangerous", a contaminant, a pollutant, a "waste", a "special waste", a "source of contamination" or "source of pollution", under any Environmental Law.

"HSR Act" means the *United States Hart-Scott-Rodino Antitrust Improvements Act* of 1976, as amended.

"HSR Approval" means expiration of all applicable waiting periods under the HSR Act (including any voluntary agreed extensions) or earlier termination thereof.

"ICA Approval" means that the Purchaser shall have received written evidence from the responsible Minister or Ministers under the Investment Canada Act, on terms and conditions acceptable to the Purchaser, that the Minister(s) are satisfied or are deemed to be satisfied pursuant to the Investment Canada Act that the transactions contemplated by this Agreement are likely to be of net benefit to Canada.

"Inactive Employees" means Employees, other than Employees whose employment transfers to Purchaser or a Designated Purchaser by operation of Law, who have accepted Purchaser's or Designated Purchaser's offer of employment as provided in Section 7.1 and are on a Seller's approved leave of absence as of the Employee Transfer Time.

"Initial CCAA Order" has the meaning set forth in the recitals to this Agreement.

"Intellectual Property" means all U.S., Canadian and foreign intellectual and industrial property rights of any kind, including all: (i) Trademarks; (ii) Patents; (iii) inventions, novel devices, processes, compositions of matter, methods, techniques, improvements, observations, discoveries, apparatuses, machines, designs, expressions, theories and ideas, whether or not patentable and whether or not a patent has been issued or a patent application has been made therefor; (iv) Copyrights; (v) mask works; (vi) Trade Secrets, Know-How, and other proprietary, confidential, technical or business information; (vii) Software and technology, (viii) rights of privacy and rights to personal information, (ix) all telephone, telex, and facsimile numbers and Internet protocol addresses, and (x) all rights in the foregoing and in other similar intangible assets, and all rights and remedies (including the right to sue for and recover damages, profits and any other remedy) for past, present, or future infringement, misappropriation, or other violation relating to any of the foregoing.

"Investment Canada Act" means the *Investment Canada Act* (Canada), as amended.

"IRS" means the United States Internal Revenue Service.

"Know-How" means scientific, engineering, mechanical, electrical, financial, marketing, practical and other similar knowledge or experience useful in the operation of the Business.

"Knowledge" or "aware of" or "notice of" or a similar phrase shall mean, with reference to the Sellers, the actual knowledge of those Persons listed on Section 1.1(a) of the Sellers Disclosure Letter, and, with reference to the Purchaser, the actual knowledge of those Persons listed on Exhibit B.

"Law" means any U.S., Canadian, foreign, domestic, federal, territorial, state, provincial, local or municipal statute, law, common law, ordinance, rule, regulation, order, writ, injunction, directive, judgment, decree or policy or guideline having the force of law.

"Leased Real Property" has the meaning set forth in Section 4.10(a).

"Leases" has the meaning set forth in Section 4.10(a).

"Legislative Proposals" has the meaning set forth in Section 6.2(d).

"Lender Owner" has the meaning set forth in Section 2.2.1.

"Liabilities" means debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or undeterminable, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability.

"Lien" means any lien, mortgage, pledge or security interest, hypothec (including legal hypothecs), encumbrance, servitude, easement, encroachment, right-of-way, restrictive covenant on real or immovable property, real property license, other real rights in favor of Third Parties, charge, prior claim, lease, occupancy agreement, leasing agreement, statutory or deemed trust or conditional sale arrangement.

"Local Sale Agreements" has the meaning set forth in Section 2.1.7.

"Management Services Agreement" means the Management and Administration Services Agreement dated April 8, 2005 between Brant Industries, Inc. and White Birch, as amended.

"Mandatory Antitrust Approvals" means a decision, in whatever form (including a declaration of lack of jurisdiction or a mere filing or notification, if the Closing can take place, pursuant to the applicable Antitrust Law, without a decision or the expiry of any waiting period) by any Government Entity under the Laws of any of the jurisdictions listed in Exhibit C or the expiry of the applicable waiting period, as applicable, under the Antitrust Laws of any of the jurisdictions listed in Exhibit C, authorizing or not objecting to the transactions contemplated by this Agreement, provided that any terms or conditions attached to such decision are acceptable to the Purchaser, acting reasonably.

"**Material Adverse Effect**" means any fact, condition, change, violation, inaccuracy, circumstance or event, individually or in the aggregate that (i) has, or is reasonably likely to have, a material adverse effect on the operations, results of operations or condition (financial or otherwise) of the Business, (ii) materially and adversely impairs the Assets or the Business (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole, or (iii) materially and adversely delays or impedes the consummation of the transactions contemplated by this Agreement, in each case except that any such fact, condition, change, violation, inaccuracy, circumstance or event results from or arises out of (a) changes in general economic conditions or changes affecting the industries and markets in which the Business operates (except to the extent that such changes have a disproportionate effect on the Assets or the Business), (b) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, acts of God, war, terrorism or hostilities, (c) the transactions contemplated hereby or any announcement hereof or the identity of the Purchaser or (d) the pendency of the Bankruptcy Proceedings and any action approved by, or motion made before, the Bankruptcy Courts.

"**Material Contracts**" has the meaning set forth in Section 4.5.

"**Monitor**" means Ernst & Young Inc., in its capacity as the Canadian Court-appointed Monitor in connection with the CCAA Cases.

"**MRQ**" has the meaning set forth in Section 6.2(a).

"**Non-Assignable Contracts**" has the meaning set forth in Section 2.1.6(b).

"**Non-Assigned Contracts**" means the Non-Assignable Contracts to the extent all applicable Consents to assignment thereof to the Purchaser or a Designated Purchaser have not been granted or obtained prior to the Closing Date.

"**Non-Union Employee**" means an Employee whose terms and conditions of employment are not governed by a Collective Labor Agreement.

"**Non-Union Plans**" has the meaning set forth in Section 7.1.2(f).

"**Order**" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Government Entity.

"**Ordinary Course**" means the ordinary course of the Business consistent with recent past practice, as such practice is, or may have been, modified as a result of the Bankruptcy Proceedings.

"**Owned Equipment**" means (a) those items of tangible personal or movable property owned by any Seller that are held or used in connection with the Business, and (b) the other items of tangible personal or movable property owned by the Sellers, excluding, in each case, any Owned Inventory, but including all express or implied warranties with respect thereto.

"**Owned Inventory**" means any inventories of raw materials, manufactured and purchased parts, work in process, packaging, stores and supplies and unassigned finished

goods inventories (which are finished goods not yet assigned to a specific customer order), in each case owned by any Seller and held or used in connection with the Business, including any of the above items which is owned by a Seller but remains in the possession or control of a Third Party.

"Owned Real Property" has the meaning set forth in Section 4.10(a).

"Party" or "Parties" means individually or collectively, as the case may be, the Sellers and the Purchaser.

"Patents" means all U.S., Canadian and foreign (whether national or multinational) statutory invention registrations, patents (including certificates of invention and other patent equivalents), patent applications, provisional patent applications and patents issuing therefrom, industrial designs, and industrial models, as well as all reissues, divisions, substitutions, continuations, continuations-in-part, patent disclosures, extensions and reexaminations, and all rights therein provided by multinational treaties or conventions.

"Periodic Taxes" has the meaning set forth in Section 6.6.

"Permitted Encumbrances" means (i) statutory Liens for Taxes or governmental assessments, charges or claims the payment of which is not yet due, or for Taxes which are being contested in good faith by appropriate proceedings, such contested Taxes set forth in Section 1.1(b) of the Sellers Disclosure Letter, provided any such statutory Liens shall be discharged pursuant to the Sale Orders to the extent permitted by Law; (ii) any Liens imposed by any Bankruptcy Court in connection with the Bankruptcy Proceedings that are to be discharged from the Assets at Closing pursuant to the terms of the Sale Orders; (iii) any other Liens set forth in Section 1.1(b) of the Sellers Disclosure Letter; and (iv) zoning, entitlement, building and land use regulations, minor defects of title, servitudes, easements, rights of way, restrictions and other similar charges or encumbrances which do not impair in any material respect the use or the value of the related assets in the Business as currently conducted.

"Person" means an individual, a partnership, a corporation, an association, a limited or unlimited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or other legal entity or Government Entity.

"Petition Date" has the meaning set forth in the recitals to this Agreement.

"Post-Closing Tax Period" has the meaning set forth in Section 6.6.

"Pre-Closing Tax Period" has the meaning set forth in Section 6.6.

"Products" means any and all products that are developed, manufactured, marketed or sold by or on behalf of the Sellers as part of the Business.

"Purchase Price" has the meaning set forth in Section 2.2.1.

"Purchased Deposits" means all deposits (including customer deposits and security deposits for rent, electricity and otherwise) and prepaid charges and expenses of Sellers,

including the right to receive any refund of any unutilized amounts thereof, other than any deposits or prepaid charges and expenses paid in connection with or relating exclusively to any Excluded Assets.

"Purchaser" has the meaning set forth in the preamble to this Agreement.

"Purchaser Employee Plan" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not covered by ERISA) and any other employee benefit or compensation plan, program or arrangement, whether written or oral, including any profit sharing, savings, bonus, performance awards, change of control, incentive compensation, deferred compensation, stock purchase, stock option, vacation, leave of absence, employee assistance, automobile leasing/subsidy/allowance, meal allowance, redundancy or severance, relocation, family support, pension, supplemental pension, retirement, retirement savings, post retirement, medical, health, hospitalization or life insurance, disability, sick leave, retention, education assistance, expatriate assistance, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy or death benefit plan, program or arrangement or any other similar plan, program, arrangement or policy that may be established by or on behalf of the Purchaser or any Designated Purchaser with respect to the Transferred Employees, other than government sponsored pension, health care, social security, employment insurance, workers compensation, parental insurance, prescription drugs and similar plans.

"QST" means Quebec sales taxes payable under an *Act respecting the Québec Sales Tax*.

"Regulatory Approvals" means the Antitrust Approvals and the ICA Approval.

"Release" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, disposal, dispersal, leaching or migration into the indoor or outdoor environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property.

"Reserve Payment Amount" means the amount of: (a) any source deduction claim in favor of the Ministry of Revenue (Quebec) and/or the Canada Revenue Agency arising from the failure to deduct, withhold or remit amounts under Tax Law (the "Source Deduction Claim") not to exceed $4,175,000; (b) any claim in favor of KSH Solutions Inc. in connection with the Superior Court of Quebec file numbers 200-17-007138-068 and 200-17-007328-065 not to exceed $2,700,000; and (c) any claim in favor of Service d'Impartition Industriel Inc. in connection with its notice of exercise of a hypothecary right against certain Owned Real Property to secure sums allegedly due for work on immovables located on such Owned Real Property not to exceed $1,750,000; provided, however, such payments are only to be made (i) if there has been compliance with the requirements of Section 5.19 and (ii) to the extent the Canadian Court finally determines by Closing that all or a portion of any such claims rank senior in priority to the claims of the lenders under the DIP Credit Agreement. For greater certainty, any amount of such claims, including the portion of the Source Deduction Claim relating to interest and/or penalties, that does not rank senior in priority to the claims of the lenders under the DIP Credit Agreement shall not form part of the Reserve Payment Amount.

"Reserve Payment Amount Matters" has the meaning set forth in Section 5.19.

"**Sale Hearing**" has the meaning set forth in Section 5.1(b).

"**Sale Motion**" has the meaning set forth in Section 5.1(b).

"**Sale Orders**" has the meaning set forth in Section 5.1(e).

"**Seller Employee Plan**" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not covered by ERISA) and any other employee benefit or compensation plan, program or arrangement, whether written or oral, including any profit sharing, savings, bonus, performance awards, change of control, incentive compensation, deferred compensation, stock purchase, stock option, vacation, leave of absence, employee assistance, automobile leasing/subsidy/allowance, meal allowance, redundancy or severance, relocation, family support, pension, supplemental pension, retirement, retirement savings, post retirement, medical, health, hospitalization or life insurance, disability, sick leave, retention, education assistance, expatriate assistance, compensation arrangement, including any base salary arrangement, overtime, on-call or call-in policy or death benefit plan, program or arrangement or any other similar plan, program, arrangement or policy that is maintained or otherwise contributed to, or required to be maintained or contributed to, by or on behalf of the Sellers or any of their Subsidiaries or Affiliates with respect to Employees, former Employees, retirees or their respective dependents or with respect to which any Seller or any Subsidiary of any Seller has any direct or contingent Liability, other than government sponsored pension, health care, social security, employment insurance, workers compensation, parental insurance, prescription drugs and similar plans.

"**Seller Insurance Policies**" has the meaning set forth in Section 5.15(a).

"**Sellers**" has the meaning set forth in the preamble to this Agreement.

"**Sellers Disclosure Letter**" means the disclosure schedule delivered by the Sellers to the Purchaser in accordance with Section 5.2(d).

"**Software**" means all computer software programs (whether in source code, object code, or other form) and software systems, including all websites, algorithms, databases, compilations and data, tool sets, compilers, higher level or "proprietary" languages, related documentation and technology, technical manuals and materials, and any rights relating to the foregoing.

"**Stalking Horse and Bidding Procedures Orders**" has the meaning set forth in Section 5.1(c).

"**Straddle Period**" has the meaning set forth in Section 6.6.

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Tax**" means any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by any Government Entity, including Transfer Taxes and the following taxes and impositions: net income, gross income, capital, value added, goods and services, gross receipts, sales, use, ad valorem, business rates, transfer, franchise, profits, business, environmental, real or immovable property, municipal, school, Quebec Pension Plan,

Canada Pension Plan, withholding, workers' compensation levies, payroll, employment, unemployment, employer health, occupation, social security, excise, stamp, customs, and all other taxes, fees, duties, assessments, deductions, contributions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto.

"Tax Act" means the *Income Tax Act* (Canada) and the regulations promulgated thereunder, as amended from time to time.

"Taxation Act" means the *Taxation Act* (Quebec) and the regulations promulgated thereunder, as amended from time to time.

"Tax Authority" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S., Canadian or other fiscal, customs or excise authority, body or officials anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

"Tax Returns" means all returns, reports (including elections, declarations, disclosures, schedules, estimates and information returns) and other information filed or required to be filed with any Tax Authority relating to Taxes.

"Third Party" means any Person that is neither a Party nor an Affiliate of a Party.

"Trade Secrets" means trade secrets and other confidential or proprietary ideas, concepts, methods, processes, formulae, models, methodologies, algorithms, reports, data, customer lists, mailing lists, business plans, market surveys, market research studies, information contained on drawings and other documents and information (including with respect to research, development and testing).

"Trademarks" means, together with the goodwill associated therewith, all U.S., Canadian, state, provincial and foreign trademarks, service marks, trade dress, logos, slogans, distinguishing guises and indicia, trade names (including all assumed or fictitious names under which the Business has been conducted), corporate names, business names, domain names, and any other indicia of source or sponsorship of goods or services, whether or not registered, including all common law rights, and registrations, applications for registration and renewals thereof, including all marks registered in the Canadian Intellectual Property Office, the United States Patent and Trademark Office, the trademark offices of the states and territories of the U.S., and the trademark offices of other nations throughout the world and all rights therein, including those provided by multinational treaties or conventions.

"Transaction Documents" means this Agreement, the Ancillary Agreements and all other ancillary agreements to be entered into, or documentation delivered by, any Party and/or any Designated Purchaser pursuant to this Agreement.

"Transfer Taxes" means all goods and services, sales, excise, use, transfer, gross receipts, documentary, filing, recordation, value-added, stamp, stamp duty reserve, and all other similar taxes, duties or other like charges, however denominated (including any real or immovable

property transfer taxes or duties (including duties pursuant to *An Act respecting duties on transfers of immovables* (Quebec)) and conveyance and recording fees).

"**Transferred Employee**" means (i) each Employee who accepts an offer of employment by, and commences employment with, the Purchaser or a Designated Purchaser in accordance with the terms of Section 7.1 or Section 7.2, and (ii) each Employee whose employment transfers by operation of Law.

"**Transferred Employee Plan**" means with respect to those Sellers (A) who are Canadian Debtors, any Seller Employee Plan to the extent expressly assumed (in whole or in part), as the same may be amended, in accordance with any amended or new Collective Labor Agreement under which the Purchaser or a Designated Purchaser may operate the Business after Closing (subject to Section 8.3(f)) and (B) who are U.S. Debtors, any Seller Employee Plan to the extent expressly assumed (in whole or in part).

"**Transferred Intellectual Property**" means all Intellectual Property owned, used, or held for use by or on behalf of a Seller in the Business (or in any product, service, technology or process currently or formerly manufactured, produced, marketed, distributed or offered for sale by or on behalf of a Seller or currently under development by or on behalf of a Seller), including (i) the Patents listed in <u>Section 1.1(d) of the Sellers Disclosure Letter</u>, (ii) the Trademarks set forth in <u>Section 1.1(e) of the Sellers Disclosure Letter</u>, and (iii) any other Intellectual Property set forth in <u>Section 1.1(f) of the Sellers Disclosure Letter</u>.

"**Union Employee**" means an Employee whose terms and conditions of employment are covered by a Collective Labor Agreement as specified in <u>Section 4.12(b) of the Sellers Disclosure Letter</u>.

"**U.S.**" means the United States of America.

"**U.S. Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Debtor**" has the meaning set forth in the recitals to this Agreement.

"**U.S. Wind-Down Amount**" means an amount equal to $600,000.

"**White Birch**" has the meaning set forth in the preamble to this Agreement.

"**Wholly-Owned Subsidiary**" means any Subsidiary all of the capital stock in which is held directly or indirectly by the Purchaser.

"**Wind-Down Amount**" means an amount equal to the sum of the Canadian Wind-Down Amount and the U.S. Wind-Down Amount to be used to fund the costs of winding-down the Sellers' estates and other Canadian Debtors' estates after the Closing, as set out in the Wind-Down Budget, which amount shall: (i) stand in lieu of the Administrative Charge (as defined in the Initial CCAA Order) which shall be expunged and discharged at Closing pursuant to the terms of the Sale Orders; and (ii) be held in trust and administered by the Monitor and the Bear

Island Estate, as applicable, in accordance with Section 5.18; provided that, any remaining amount of the Wind-Down Amount not required to fund the costs of winding-down such estates after Closing in accordance with Section 5.18 shall be promptly delivered by the Monitor or the Bear Island Estate, as applicable, to the Purchaser; provided, further, that the costs of winding-down the Bear Island Estate shall not be funded from the Canadian Wind-Down Amount and the costs of winding-down the estates of the Canadian Debtors shall not be funded from the U.S. Wind-Down Amount.

"**Wind-Down Budget**" means a budget for the post-Closing wind-down of the Sellers' estates and other Canadian Debtors' estates that details the costs permitted to be paid from the Wind-Down Amount, to be prepared by Sellers and delivered to Purchaser no later than five (5) days prior to the Sale Hearing, and to be approved by Purchaser in its reasonable discretion.

**1.2    Interpretation.**

**1.2.1.    Gender and Number.**

Any reference in this Agreement to gender includes all genders and words importing the singular include the plural and *vice versa*.

**1.2.2.    Certain Phrases and Calculation of Time.**

In this Agreement (i) the words "including" and "includes" mean "including (or includes) without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it, (ii) the terms "hereof", "herein", "hereunder" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, and Article, Section, paragraph, Exhibit and Schedule references are to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified, and (iii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding". If the last day of any such period is not a Business Day, such period will end on the next Business Day.

When calculating the period of time "within" which, "prior to" or "following" which any act or event is required or permitted to be done, notice given or steps taken, the date which is the reference date in calculating such period is excluded from the calculation. If the last day of any such period is not a Business Day, such period will end on the next Business Day.

**1.2.3.    Headings, etc.**

The inclusion of a table of contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

1.2.4. <u>Currency</u>.

All monetary amounts in this Agreement, unless otherwise specifically indicated, are stated in U.S. currency. All calculations and estimates to be performed or undertaken, unless otherwise specifically indicated, are to be expressed in U.S. currency. All payments required under this Agreement shall be paid in U.S. currency in immediately available funds, unless otherwise specifically indicated herein. Where another currency is to be converted into U.S. currency it shall be converted on the basis of the exchange rate published in the Wall Street Journal for the day in question.

1.2.5. <u>Statutory References</u>.

Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

1.2.6. <u>Exhibits and Schedules</u>.

All Exhibits and the Sellers Disclosure Letter annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set in full herein. Any capitalized terms used in any Exhibit or the Sellers Disclosure Letter but not otherwise defined therein shall be defined as set forth in this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

**2.1     Purchase and Sale.**

2.1.1. <u>Assets</u>.

Subject to the terms and conditions of this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, purchase or be assigned and assume from the relevant Sellers (as set forth in <u>Exhibit D</u>), and each Seller shall sell, transfer, assign, convey and deliver to the Purchaser or the relevant Designated Purchasers all of its right, title and interest in and to the properties and assets of Sellers (other than the Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business (herein collectively called the "Assets") free and clear of all Liens and Claims (other than Permitted Encumbrances, except for those Permitted Encumbrances that are to be expunged and discharged pursuant to the Sale Orders ) pursuant to the Sale Orders, when granted, including, but not limited to, all right, title and interest of each Seller in, to and under:

(a)     all cash and cash equivalents, including bank balances, term deposits, supplier deposits and similar instruments, including restricted cash supporting letters of credit;

(b)     accounts receivable, trade accounts, credit receivables, notes receivable, book debts and other debts due or accruing due to any Seller as of the Closing;

(c)     any refunds due from, or payments due on, claims with the insurers of any of the Sellers in respect of losses arising prior to the Closing;

(d)     the Owned Inventory;

(e)     the Owned Equipment;

(f)     the Owned Real Property;

(g)     the Assigned Contracts;

(h)     the Business Information, subject to Sections 2.1.2(c) and 2.1.2(d);

(i)     Employee Records, except Employee Records for Employees or former employees who are not Transferred Employees;

(j)     the Transferred Intellectual Property;

(k)     to the extent related to the Assets and except as set forth in Section 2.1.2(f) and Section 2.1.2(h), all rights, claims or causes of action of Sellers against Third Parties arising out of events occurring prior to the Closing, including and, for the avoidance of doubt, arising out of events occurring prior to the Petition Date, and including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Sellers;

(l)     any proprietary rights in Internet protocol addresses, ideas, concepts, methods, processes, formulae, models, methodologies, algorithms, reports, data, customer lists, mailing lists, business plans, market surveys, market research studies, websites, information contained on drawings and other documents, information relating to research, development or testing, and documentation and media constituting, describing or relating to the Intellectual Property, including memo-randa, manuals, technical specifications and other records wherever created throughout the world;

(m)     the Consents of Government Entities (including those listed in <u>Section 2.1.1(m) of the Sellers Disclosure Letter</u>) to the extent transferable at Law;

(n)     all Products, including all products in development by Sellers;

(o)     all pre-paid expenses of the Business, including any deposits, but not including any rights described in Section 2.1.2(n);

(p)     all telephone, telex and telephone facsimile numbers and other directory listings and e-mail and website addresses used in connection with the Business;

(q)     all Purchased Deposits;

(r)     all goodwill associated with the Business or the Assets, including (i) the right to carry on the Business under the names "White Birch", "Stadacona", "F.F. Soucy", "Arrimage de Gros Cacouna" and "Bear Island Paper", (ii) all domain names of the Sellers and (iii) all customer lists, files, data and information relating to past and present customers and prospective customers of the Business;

(s)     copies of Tax records related to the Assets and the Business;

(t)     the equity interests listed in Section 2.1.1(t) of the Sellers Disclosure Letter;

(u)     all membership interests in SP Newsprint Holdings LLC held by Sellers;

(v)     all amounts remaining in the trust accounts referred to in Section 2.1.2(l) following payments of the reasonable fees and disbursements contemplated by such Section;

(w)     with respect to the U.S. Debtors, all rights to Tax refunds, credits or similar benefits relating to the Assets or the Business;

(x)     all rights and assets under any Transferred Employee Plan; provided that the Transferred Employee Plans shall include only those Seller Employee Plans as Purchaser notifies Sellers in writing at least five (5) Business Days prior to Closing; and

(y)     all other assets (including manufacturing and intangible assets) of the Sellers not specifically included in the definition of Excluded Assets.

At any time at least five (5) Business Days prior to the Closing, the Purchaser, in its discretion by written notice to Sellers, may exclude from being assigned pursuant hereto any Contracts or Leases, and, in such circumstances, such Contracts or Leases shall not constitute Designated Seller Contracts and shall be Excluded Assets, and Purchaser shall not acquire any rights or assume any Liabilities with respect thereto pursuant to Section 2.1.3 hereof. Upon Purchaser's reasonable request, Sellers shall provide additional information as to the Liabilities under the Contracts and Leases sufficient for Purchaser to make an informed assessment whether to accept an assignment and assumption of such Contracts or Leases hereunder.

At any time at least three (3) Business Days prior to the date of the Auction, Purchaser may, in its discretion by written notice to Sellers, designate any of the Assets as additional Excluded Assets, which notice shall set forth in reasonable detail the Assets so designated; provided, however, Purchaser may designate any Owned Real Property as an Excluded Asset at any time at least five (5) Business Days prior to the Closing. Purchaser acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to designate any Assets as Excluded Assets. Notwithstanding any other provision hereof, the Liabilities of Sellers under or related to any Asset excluded under this paragraph will constitute Excluded Liabilities.

2.1.2.  Excluded Assets.

Notwithstanding anything in this Section 2.1 or elsewhere in this Agreement or in any of the Transaction Documents to the contrary, the Sellers shall retain their respective right, title and interest in and to, and the Purchaser and the Designated Purchasers shall have no rights with respect to the right, title and interest of the Sellers in and to, the following assets (collectively, the "Excluded Assets"):

(a)     except with respect to any Transferred Employee Plan, all rights and assets under any Seller Employee Plan;

(b)     other than the Assigned Contracts, any rights of the Sellers under any Contract or Lease (including, for the avoidance of doubt, the Excluded Seller Contracts and the Non-Assigned Contracts);

(c)     the minute books and stock ledgers of the Sellers;

(d)     (i) any books, records, files, documentation or literature other than the Business Information, (ii) the Employee Records for Employees or former employees who are not Transferred Employees, and (iii) such portion of the Business Information to the extent that the Sellers are required by Law, including Laws relating to privacy, not to disclose (provided that copies of such information shall be provided to the Purchaser to the extent permitted by applicable Law);

(e)     all rights of the Sellers under this Agreement and the Ancillary Agreements;

(f)     all rights and claims of the Sellers against any director, officer, or shareholder (direct or indirect) of the Sellers or any Affiliates of the Canadian Debtors or U.S. Debtors;

(g)     all intercompany rights and claims between any Sellers or any other Canadian Debtor;

(h)     (i) all of the rights and claims of the U.S. Debtor available to the U.S. Debtor under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code, and any related claims and actions arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing, and (ii) any equivalent rights and claims of Canadian Debtors or U.S. Debtor under the CCAA or other Laws;

(i)     all records prepared in connection with the sale of the Assets to the Purchaser and the Designated Purchasers;

(j)     subject to Sections 2.1.1(t) and 2.1.1(u), all shares, stock or other equity interests in any Person;

(k)     any assets set forth on Section 2.1.2(k) of the Sellers Disclosure Letter;

(l)    deposits held in trust accounts to secure payment of the reasonable fees and disbursements of the professional advisors of the Canadian Debtors and U.S. Debtor and of the Monitor;

(m)    following the Closing, copies of any book, record, literature, list and any other written or recorded information constituting Business Information (the original of which has already been assigned or transferred to Purchaser or a Designated Purchaser) to which the Sellers in good faith determine they are reasonably likely to need access for *bona fide* Tax or legal purposes; and

(n)    with respect to the Canadian Debtors, all rights to Tax refunds, credits or similar benefits relating to the Assets or the Business.

2.1.3.  <u>Assumed Liabilities.</u>

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall, and shall cause the relevant Designated Purchasers to, assume and become responsible for, and perform, discharge and pay when due, the following Liabilities (the "**Assumed Liabilities**"):

    (i)    all Liabilities of the Sellers in respect of all trade obligations of the Sellers arising in the Ordinary Course on or after the Petition Date and existing as of immediately prior to the Closing and that would be included in the line item "Accounts Payable" in a consolidated balance sheet of the Business as of immediately prior to the Closing prepared in accordance with GAAP and using the same accounting policies, principles and practices as were used to prepare the Financial Statements (the "**Assumed Trade Payables**"); provided, however, that Purchaser will not assume the obligations of the Sellers that are listed on <u>Section 2.1.3(a)(i) of the Sellers Disclosure Letter</u>, which obligations shall not constitute Assumed Trade Payables; for greater certainty, for the purposes of GST and QST, payments of the Assumed Trade Payables shall be paid on behalf of and for the account of the Sellers;

    (ii)    all Liabilities of the Sellers under the Assigned Contracts arising after the Closing and any Cure Costs payable pursuant to Section 2.1.6 (to the extent applicable); provided, however, that Purchaser's liability for Cure Costs is not expected to exceed and shall not exceed the aggregate amount set forth in <u>Section 2.1.3(a)(ii) of the Sellers Disclosure Letter</u>, the amount in such schedule not to exceed $27,000,000; provided, further, that such amount shall be decreased by the amount of the Cure Cost associated with any Contract or Lease listed on <u>Section 2.1.3(a)(ii) of the Sellers Disclosure Letter</u> that is not an Assigned Contract (such amount, as may be decreased, the "**Cure Cost Cap**") and Sellers' shall pay any overage of such amount;

    (iii)    all Liabilities for, or related to any obligation for, any Tax that the Purchaser or any Designated Purchaser bears under Article VI (including,

for the avoidance of doubt, Transfer Taxes imposed in connection with this Agreement and the transactions contemplated hereunder or any other Transaction Document and the transactions contemplated thereunder);

(iv)    capital leases not to exceed $1,600,000;

(v)    Liabilities under any Transferred Employee Plan;

(vi)    any obligation to provide continuation coverage pursuant to COBRA or any similar Law under any Purchaser Employee Plan or any Transferred Employee Plans that is a "group health plan" (as defined in Section 5000(b)(1) of the Code) to Transferred Employees and/or their qualified beneficiaries who have a qualifying event after such Transferred Employees' Employee Transfer Time or as otherwise required by applicable law; and

(vii)    the allowed administrative expense claims of the U.S. Debtors' pursuant to Section 503(b)(9) of the U.S. Bankruptcy Code from the list of potential claims set forth on Section 2.1.3(a)(vii) of the Sellers Disclosure Letter (the "Allowed 503(b)(9) Claims")

(b)    The Parties agree that the Purchaser shall be responsible for all Liabilities with respect to the post-Closing operation or ownership of the Assets.

2.1.4.  Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, other than the Assumed Liabilities, neither the Purchaser nor any of the Designated Purchasers shall assume or shall be obligated to assume or be obligated to pay, perform or otherwise discharge any Liability of Sellers or their Affiliates, and Sellers shall be solely and exclusively liable with respect to all Liabilities of Sellers, including the Excluded Employee Liabilities (collectively, the "Excluded Liabilities"). For the avoidance of doubt, the Excluded Liabilities include, but are not limited to, the following:

(a)    any Liability of Sellers or their directors, officers, stockholders or agents (acting in such capacities), arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, all finder's or broker's fees and expenses and any and all fees and expenses of any representatives of Sellers;

(b)    except as set forth in Sections 2.1.3(a)(i) and 2.1.3(a)(ii) (with respect to Cure Costs), any Liability relating to (i) events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing, or (ii) the ownership, possession, use, operation or sale or other disposition prior to the Closing of any Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing, with the Business);

(c)     to the extent permitted by Law and except as set forth in Section 8.3(f), any Liability to any Person at any time employed by Sellers or to any such Person's spouse, children, other dependents or beneficiaries, with respect to agreements entered into or applicable to or with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such Person's employment by Sellers, whenever such claims mature or are asserted, including, without limitation, all Liabilities arising (i) under the Seller Employee Plans, (ii) under any employment, wage and hour restriction, equal opportunity, discrimination, plant closing or immigration and naturalization laws, (iii) under any collective bargaining laws, agreements or arrangements or (iv) in connection with any workers' compensation or any other employee health, accident, disability or safety claims;

(d)     any Liability relating to the Assets based on events or conditions occurring or existing prior to the Closing Date and connected with, arising out of or relating to: (i) Hazardous Materials or Environmental Laws, (ii) claims relating to employee health and safety, including claims for injury, sickness, disease or death of any Person or (iii) compliance with any applicable Law relating to any of the foregoing; in each case except for any such Liability that may not be discharged by the Sale Orders;

(e)     any Liability of Sellers under Title IV of ERISA;

(f)     without impacting the scope of Section 2.1.4(c), any Liability of Sellers under Title IV of ERISA;

(g)     without impacting the scope of Section 2.1.4(c), any pension or retirement Liability of Sellers to their current or former employees which are accrued as of the Closing, whether or not under any Seller Employee Plans, except with respect to any Transferred Employee Plan;

(h)     any Liability for Taxes other than as set forth in Section 2.1.3(a)(i) and (iii);

(i)     any Liability incurred by Sellers or their respective directors, officers, stockholders, agents or employees (acting in such capacities) after the Closing;

(j)     any Liability of Sellers to any Person on account of any Action;

(k)     any Liability relating to or arising out of the ownership or operation of an Excluded Asset;

(l)     any Liability resulting from a Lien that is not a Permitted Encumbrance;

(m)    any Liability for professional fees or transaction fees owed to any party;

(n)     other than as specifically set forth herein, any indebtedness of any of the Sellers; and

(o)     all Liabilities of the Sellers that are included in the line item "Deferred Financing Costs" of the Financial Statements.

2.1.5.   <u>Assignment and Assumption of Designated Seller Contracts</u>.

(a)     Subject to Section 2.1.6(b), all the Designated Seller Contracts in force at the Closing shall be assigned by the Sellers to, and assumed by, the Purchaser or a Designated Purchaser at the Closing pursuant to Section 2.1.1(g).

(b)     The Parties shall use commercially reasonable efforts to obtain all Consents required to permit the assignment to the Purchaser or a Designated Purchaser of the Designated Seller Contracts. With respect to CAAFs granted to the Sellers pursuant to the *Forest Act* (Quebec), the Sellers shall cooperate with the Purchaser, to the extent permitted by Law, to ensure new CAAFs are granted to the Purchaser or Designated Purchasers prior to Closing. In the case of permits, licenses, certificates, approvals, authorizations, Leases, Contracts and other commitments included in the Assets (a) that cannot be transferred or assigned effectively without the consent of Third Parties, which consent has not been obtained prior to the Closing (after giving effect to the Sale Orders and the Bankruptcy Laws), Sellers shall, subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with Purchaser, at the sole cost and expense of Purchaser, in endeavoring to obtain such consent and, if any such consent is not obtained, Sellers shall, during the four month period following Closing, and subject to any approval of the Bankruptcy Court that may be required, cooperate with Purchaser in all reasonable respects and at Purchaser's sole cost and expense, to provide to Purchaser the benefits thereof in some other manner, or (b) that are otherwise not transferable or assignable (after giving effect to the Sale Orders and the Bankruptcy Laws), Sellers shall, during the four month period following Closing, and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with Purchaser, at the sole cost and expense of Purchaser, to provide to Purchaser the benefits thereof in some other manner (including the exercise of the rights of Sellers thereunder); <u>provided, however,</u> that nothing in this Section 2.1.5 shall require Purchaser to reimburse Sellers for any attorneys' fees and expenses, as such fees and expenses will be paid as part of the Wind-Down Amount.

2.1.6.   <u>Cure Costs; Non-Assignable Contracts; Adequate Assurance</u>.

(a)     To the extent that any Designated Seller Contract is subject to a Cure Cost, the Purchaser shall directly pay or otherwise provide for payment of such Cure Cost to the Contract or Lease party and Seller shall pay an overage amount as contemplated by Section 2.1.3(a)(ii), provided that the Purchaser shall not be obligated to pay any Cure Cost in respect of a Non-Assigned Contract.

(b)     To the extent that any Designated Seller Contract is not capable of being assigned under section 365 of the U.S. Bankruptcy Code or Section 11.3 of the CCAA (or, if inapplicable, pursuant to other applicable Laws or the terms of such Contract, Lease, or Consent) to the Purchaser or a Designated Purchaser at the Closing

without the Consent of the issuer thereof or the other party thereto or any Third Party (including a Government Entity), and such Consent has not been obtained (collectively, the **"Non-Assignable Contracts"**), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless any such Consent is obtained. Any payment to be made in order to obtain any Consent required by the terms of any Non-Assignable Contract shall be the sole responsibility of the Purchaser in its sole discretion.

(c)    Prior to the hearings for the entry of the Stalking Horse and Bidding Procedures Orders, the Purchaser shall take such actions as are reasonably requested to provide adequate assurances of its and the relevant Designated Purchasers' future performance under each applicable Designated Seller Contract to the parties thereto in satisfaction of section 365(f)(2)(B) of the U.S. Bankruptcy Code or section 11.3 of the CCAA, as applicable.

2.1.7.   <u>Local Sale Agreements</u>.

Subject to the terms and conditions hereof, to the extent necessary to effect the Closing on the terms hereof, the relevant Sellers shall, and the Purchaser shall, and shall cause the relevant Designated Purchasers to, enter into such agreements or instruments, including deeds of transfer for the Owned Real Property and bills of sale and/or assignment and assumption agreements (the **"Local Sale Agreements"**), providing for (i) the sale, transfer, assignment or other conveyance to the Purchaser and relevant Designated Purchasers, in accordance with the requirements of applicable local Law and this Agreement, and (ii) the assumption by the Designated Purchasers of any Assumed Liability that the Purchaser intends to allocate to them. Such Local Sale Agreements shall promptly be negotiated in good faith between the Sellers and the Purchaser, but Sellers shall not be required to give any representations, warranties or indemnities pursuant to such Local Sale Agreements which are greater in scope or liability than those provided for in this Agreement.

2.1.8.   <u>Non-Assignable Assets</u>.

Notwithstanding anything in this Agreement to the contrary, if the requisite Consent has not been obtained on or prior to Closing, then, unless such Consent is subsequently obtained, this Agreement shall not constitute an agreement to sell, transfer or assign, directly or indirectly, any Asset or any obligation or benefit arising thereunder if an attempted direct or indirect sale, transfer or assignment thereof, without the Consent of a Third Party (including a Government Entity), would constitute a breach, default, violation or other contravention of the rights of such Third Party or would be ineffective with respect to any party to a Contract concerning such Asset. For greater certainty, failure to obtain any such Consent, except as set forth in Section 8.3, shall not entitle the Purchaser to terminate this Agreement or fail to complete the transactions contemplated hereby or entitle the Purchaser to any adjustment of the Purchase Price.

**2.2    Purchase Price.**

**2.2.1.  Purchase Price.**

Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the sale of the Assets pursuant to the terms hereof, the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall (a) assume from the Sellers and become obligated to pay, perform and discharge, when due, the Assumed Liabilities, (b) pay to the Sellers an amount of cash equal to $90,000,000 (the "**Cash Component**"), (c) pay the Reserve Payment Amount, (d) pay all requisite filing fees in relation to any filing or application made in respect of obtaining Regulatory Approvals, and (e) deliver the Wind-Down Amount pursuant to Section 5.18 ((a), (b), (c), (d) and (e), collectively, the "**Purchase Price**"). The Wind-Down Amount shall be held in trust by the Monitor and the Bear Island Estate, as applicable.

To the extent any of the Cash Component of the Purchase Price will be paid to a lender under the First Lien Credit Agreement or the DIP Credit Agreement that is an investor in the Purchaser (a "**Lender Owner**"), the Purchaser may deduct from the Cash Component of the Purchase Price and be deemed as having paid to the Sellers such amount as otherwise would have been distributed in cash to such Lender Owner based upon the Asset Allocation Schedule(s) agreed to pursuant to Section 2.2.3. In the event of a dispute over the obligations owed to a Lender Owner under the First Lien Credit Agreement or the DIP Credit Agreement, the Purchaser shall have no obligation to otherwise fund the Cash Component of the Purchase Price with cash relating to such amount that would be paid to the Lender Owner until final resolution of any and all disputes over such obligations owed to such Lender Owner under the First Lien Credit Agreement or the DIP Credit Agreement, as applicable.

**2.2.2.  Deposit.**

Purchaser shall, within five (5) Business Days of entry of the Stalking Horse and Bidding Procedures Orders, deposit $5,000,000 in cash (the "**Deposit**") by wire transfer of immediately available funds to The Bank of New York Mellon or such other Person as may be mutually agreed upon by Sellers and Purchaser (the "**Deposit Escrow Agent**"). The Deposit Escrow Agent shall hold the Deposit in a segregated, interest-bearing account pursuant to an escrow agreement substantially in the form of <u>Exhibit E</u> (the "**Deposit Escrow Agreement**"). Moneys held pursuant to the Deposit Escrow Agreement shall be free and clear of all Liens. All interest or other earnings on amounts held pursuant to the Deposit Escrow Account shall automatically become a part of the Deposit as such interest or earnings accrue. The Deposit, plus all accrued interest or earnings thereon, shall be returned to Purchaser or paid to Sellers as provided for in Section 9.4(b).

**2.2.3.  Purchase Price Allocation.**

Prior to the Auction, Purchaser shall deliver to Sellers and to the Monitor for their respective review and approval allocation schedule(s) (the "**Asset Allocation Schedule(s)**") allocating the Purchase Price (including specific allocation of the Assumed Liabilities that are liabilities for federal income Tax purposes) on a dollar basis among Sellers and the Assets. The Asset Allocation Schedule(s) shall be reasonable and, to the extent applicable, shall be prepared

in accordance with Section 1060 of the Code and the regulations thereunder. Sellers agree that, following their approval of the Asset Allocation Schedule(s), such approval not to be unreasonably withheld, Sellers shall sign the Asset Allocation Schedule(s) and return an executed copy thereof to Purchaser prior to the Sale Hearing if Purchaser is the successful bidder at the Auction. Purchaser and Sellers will each file IRS Form 8594, to the extent applicable, and all Tax Returns, in accordance with the Asset Allocation Schedule(s). To the extent applicable, Purchaser, on the one hand, and Sellers, on the other hand, each agrees to provide the other promptly with any other information required to complete IRS Form 8594.

**2.3    Closing.**

2.3.1.    Closing Date.

The completion of the purchase and sale of the Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall take place at the offices of the Sellers' U.S. or Canadian counsel, commencing at 10:00 a.m. local time on a mutually agreed upon date no later than two (2) Business Days after the day upon which all of the conditions set forth under Article VIII (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions) have been satisfied or, if permissible, waived by the Sellers and/or the Purchaser (as applicable), or on such other place, date and time as shall be mutually agreed upon in writing by the Purchaser and the Sellers (the day on which the Closing takes place being the "**Closing Date**").

Legal title, equitable title and risk of loss with respect to the Assets will transfer to the Purchaser or the relevant Designated Purchaser, and the Assumed Liabilities will be assumed by the Purchaser and the relevant Designated Purchasers, at the Closing.

2.3.2.    Closing Actions and Deliveries.

At the Closing:

(a)    the Sellers and the Purchaser shall, and the Purchaser shall cause the Designated Purchasers to, deliver duly executed copies of and enter into the Ancillary Agreements to which it is contemplated that they will be parties, respectively;

(b)    the Sellers and the Purchaser shall, and the Purchaser shall cause the Designated Purchasers to, deliver the officer's certificates required to be delivered pursuant to Section 8.2(a), Section 8.2(b), Section 8.3(a), Section 8.3(b) and Section 8.3(d), as applicable.

(c)    the Purchaser shall deliver to (i) the Monitor, in the case of the Canadian Debtors, and (ii) the Bear Island Estate, in the case of the U.S. Debtor, as distribution agents for the Sellers, an amount equal to the Cash Component (minus amounts deemed paid pursuant to Section 2.2.1 and the Deposit which shall be disbursed to the Sellers pursuant to the terms of the Deposit Escrow Agreement) by wire transfer in immediately available funds to accounts designated at least two (2) Business Days prior to the Closing Date by the Sellers in a written notice to the Purchaser;  provided that the Wind-Down Amount

shall be delivered to and held in trust by the Monitor and the Bear Island Estate, as applicable;

(d)      the Sellers shall deliver (i) a certified copy of the Sale Orders and (ii) with respect to the Owned Real Property, any existing surveys, legal descriptions and title policies in the possession of Sellers;

(e)      upon the acquisition of the membership interests in SP Newsprint Holdings LLC described in Section 2.1.1(u), the Purchaser shall join the Amended and Restated Operating Agreement for SP Newsprint Holdings LLC, dated as of March 31, 2008;

(f)      any Seller transferring a "United States Real Property Interest" as defined by Section 897(c) of the Code shall deliver to Purchaser a duly executed and acknowledged certificate, in form and substance acceptable to Purchaser and in compliance with the Code and the treasury regulations thereunder, certifying such facts as to establish that the sale of the United States Real Property Interest is exempt from withholding under Section 1445 of the Code; and

(g)      each Party shall deliver, or cause to be delivered, to the other any other documents reasonably requested by such other Party in order to effect, or evidence the consummation of, the transactions contemplated herein or otherwise provided for under this Agreement.

**2.4      Designated Purchaser(s).**

The Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.4, one or more Wholly-Owned Subsidiaries or Affiliates to (i) purchase specified Assets (including specified Assigned Contracts), (ii) assume specified Assumed Liabilities, and/or (iii) employ specified Transferred Employees on and after the Closing Date (any such Wholly-Owned Subsidiary or Affiliate of the Purchaser that shall be properly designated by the Purchaser in accordance with this clause, a "**Designated Purchaser**"). No such designation shall relieve the Purchaser of any of its obligations hereunder, and the Purchaser and each Designated Purchaser shall be jointly and severally liable for any obligations assumed by any of them hereunder. Any reference to the Purchaser made in this Agreement in respect of any purchase, assumption or employment referred to in Section 2.4(i) to (iii) shall include reference to the appropriate Designated Purchaser, if any. Notwithstanding anything in this Agreement to the contrary, the right to acquire the membership interests in SP Newsprint Holdings LLC will be assigned by Purchaser to a Wholly-Owned Subsidiary prior to Closing and Purchaser will have no obligations with respect to SP Newsprint Holdings LLC.

The above designation shall be made by the Purchaser by way of a written notice to be delivered to the Sellers in no event later than the tenth (10th) Business Day prior to Closing which written notice shall contain appropriate information about the Designated Purchaser(s) and shall indicate which Assets, Assumed Liabilities and Transferred Employees (other than Employees which are transferred by operation of Law) the Purchaser intends such Designated Purchaser(s) to purchase, assume and/or employ, as applicable, hereunder and include a

signed counterpart to this Agreement in a form acceptable to the Sellers, agreeing to be bound by the terms of this Agreement and authorizing the Purchaser to act as such Designated Purchaser(s)' agent for all purposes hereunder.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Sellers as follows:

3.1    **Organization and Corporate Power.**

(a)    The Purchaser is duly organized and validly existing under the Laws of the jurisdiction in which it is organized. Each Designated Purchaser other than the Purchaser is (or will be if not yet formed or incorporated) duly organized and validly existing under the Laws of the jurisdiction in which it is organized. Each of the Purchaser and the Designated Purchasers has (or will have if not yet formed or incorporated) the requisite corporate power and authority to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party.

(b)    Each of the Designated Purchasers is (or will be if not yet formed or incorporated) qualified to do business as contemplated by this Agreement and the other Transaction Documents and to own or lease and operate its properties and assets, including the Assets, except to the extent that the failure to be so qualified would not materially hinder, delay or impair the Purchaser's or any such Designated Purchaser's ability to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is or will become a party.

3.2    **Authorization; Binding Effect; No Breach.**

(a)    The execution, delivery and performance of each Transaction Document to which the Purchaser or any of the Designated Purchasers is a party, or is to be a party to, have been duly authorized by the Purchaser and the relevant Designated Purchasers, as applicable, at the time of its execution and delivery. Assuming due authorization, execution and delivery by the relevant Sellers, each Transaction Document to which the Purchaser or any Designated Purchaser is a party constitutes, or upon execution thereof will constitute, a valid and binding obligation of the Purchaser or such Designated Purchaser, as applicable, enforceable against such Person in accordance with its respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of public policy.

(b)    The execution, delivery and performance by each of the Purchaser and the Designated Purchasers of the Transaction Documents to which the Purchaser or such Designated Purchaser is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions

of, constitute a default under, result in a violation of, or require any Consent (other than the Regulatory Approvals or other action by or declaration or notice to any Government Entity) pursuant to (i) the articles, charter, by-laws, partnership agreement or operating agreement of the Purchaser or the relevant Designated Purchaser, (ii) any Contract or other document to which the Purchaser or the relevant Designated Purchaser is a party or to which any of its assets is subject or (iii) any Laws to which the Purchaser, the Designated Purchaser, or any of their assets is subject, except, in the case of (ii) and (iii) above, for such defaults, violations, actions and notifications that would not individually or in the aggregate materially hinder, delay or impair the performance by the Purchaser or the Designated Purchasers of any of their obligations under any Transaction Document.

3.3    **Purchaser's Acknowledgments; Exclusivity of Representations and Warranties.**

(a)    The Purchaser is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement and the other Transaction Documents. In consultation with experienced counsel and advisors of its choice, the Purchaser has conducted its own independent review and analysis of the Business, the Assets, the Assumed Liabilities, and the rights and obligations it is acquiring and assuming under this Agreement and the other Transaction Documents. The Purchaser acknowledges that it and its representatives have been permitted such access to the books and records, facilities, equipment, Contracts and other properties and assets of the Business as it required to complete its review, and that it and its representatives have had an opportunity to meet with the officers and other employees of the Sellers to discuss the Business.

(b)    The Purchaser acknowledges and agrees that:

(i)    except for the representations and warranties expressly set forth in Article IV, the Purchaser has not relied on any representation or warranty from the Sellers or any Affiliate of any such Person or any employee, officer, director, accountant, financial, legal or other representative of the Sellers, in determining whether to enter into this Agreement;

(ii)    except for the representations and warranties expressly set forth in Article IV, none of the Sellers or any employee, officer, director, accountant, financial, legal or other representative of the Sellers, or any Affiliate of any such Person or has made any representation or warranty, express or implied, as to the Business (or the value or future thereof) or the Assets (including any implied representation or warranty as to the condition, merchantability, suitability or fitness for a particular purpose of any of the Assets, the Assumed Liabilities or any Affiliate of any such Person or the accuracy or completeness of any information regarding any of the foregoing that the Sellers or any other Person furnished or made available to the Purchaser and its representatives (including any

projections, estimates, budgets, offering memoranda, management presentations or due diligence materials));

(iii)    no Seller or any other Person shall have or be subject to any liability to the Purchaser, any Designated Purchaser or any other Person resulting from the distribution to the Purchaser or any Designated Purchaser, or the Purchaser's or any Designated Purchaser's use, of the information referred to in Section 3.3(b)(ii);

(iv)    except for the representations and warranties expressly set forth in Article IV, and subject to the terms of the Bankruptcy Consents, the Purchaser or any Designated Purchaser takes the Assets on an "as is" and "where is" basis without any warranty whatsoever, legal or conventional, at Purchaser's own risk;

(v)    the enforceability of this Agreement against the Sellers is subject to receipt of the Bankruptcy Consents; and

(vi)    notwithstanding anything to the contrary contained herein, the Purchaser's obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon the receipt of financing from any Person.

(c)    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE IV, PURCHASER ACKNOWLEDGES THAT SELLERS HAVE NOT GIVEN AND WILL NOT BE DEEMED TO HAVE GIVEN ANY OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY–OR FITNESS FOR A PARTICULAR PURPOSE.

**3.4     Brokers.**

Except for fees and commissions that will be paid by the Purchaser, no broker, finder or investment banker is entitled to any brokerage, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Purchaser or any of its Affiliates.

**3.5     GST and QST Registration.**

Purchaser, if it is acquiring Assets in Canada, and each Designated Purchaser that acquires Assets in Canada shall be duly registered for the purposes of the Tax imposed under Part IX of the *Excise Tax Act* (Canada) and under an *Act respecting the Québec Sales Tax* and shall provide to the Sellers its registration numbers under those statutes no later than ten (10) days prior to Closing.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except (a) as set forth in the Sellers Disclosure Letter or (b) as disclosed in the Financial Statements, each of the Sellers jointly and severally represents and warrants to the Purchaser as set forth in Sections 4.1 to 4.21:

**4.1    Organization and Corporate Power.**

(a)    Each Seller is duly organized and validly existing under the Laws of the jurisdiction in which it is organized. Each Seller is in good standing in each of the jurisdictions in which the ownership or leasing of its properties or the conduct of its businesses requires such qualification, except where the failure to so qualify or be licensed would not have a Material Adverse Effect. Subject to the entry of the Stalking Horse and Bidding Procedures Orders and the Sale Orders from the U.S. Bankruptcy Court and the Canadian Court in connection with the transactions contemplated hereby and in the other Transaction Documents (collectively, the "Bankruptcy Consents"), each of the Sellers has the requisite corporate or partnership power and authority to own or lease and to operate and use the Assets and carry on the Business as now conducted and to enter into, deliver and perform its obligations pursuant to each of the Transaction Documents to which it is or will become a party.

(b)    Each of the Sellers is qualified to do business and to own and operate its assets, including the Assets, as applicable in each jurisdiction in which its ownership of property or conduct of business relating to the Business requires it to so qualify, except to the extent that the failure to be so qualified would not have, or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**4.2    Subsidiaries and Investments.**

Except as set forth in <u>Section 4.2 of the Sellers Disclosure Letter</u>, Sellers do not, directly or indirectly, own, of record or beneficially, any outstanding voting securities, membership interests or other equity interest in any Person.

**4.3    Authorization; Binding Effect; No Breach.**

(a)    Subject to the receipt of the Bankruptcy Consents, the execution, delivery and performance of this Agreement by each Seller has been duly authorized by such Seller. Subject to receipt of the Bankruptcy Consents, and assuming due authorization, execution and delivery by the Purchaser, this Agreement will constitute, a legal, valid and binding obligation of each Seller, enforceable against it in accordance with its terms.

(b)    Except as set forth in <u>Section 4.3(b) of the Sellers Disclosure Letter</u>, the execution, delivery and performance by each Seller of the Transaction Documents to which such Seller is, or on the Closing Date will be, a party do not and will not conflict

with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, result in the creation or imposition of any Lien upon any of the Assets, or require any Consent (other than the Regulatory Approvals and the Bankruptcy Consents) or other action by or declaration or notice to any Government Entity pursuant to (i) the articles, charter, by-laws, partnership agreement or operating agreement of the relevant Sellers, (ii) any Material Contract to which the relevant Seller is a party or to which any of its assets is subject, (iii) any material Order to which any of the Sellers or any of the Assets are subject, or (iv) any material Laws to which any of the Sellers or any of the Assets are subject.

**4.4    Title to Tangible Assets; Sufficiency of Assets.**

(a)    Immediately prior to Closing, Sellers will have, and, upon delivery to Purchaser on the Closing Date of the instruments of transfer contemplated by Section 2.3.2, and subject to the terms of the Sale Orders, Sellers will thereby transfer to Purchaser good, legal, and valid title to, or, in the case of property leased or licensed by the Sellers, a valid leasehold or licensed interest in, all of the Assets, free and clear of all Liens, except (i) as set forth in <u>Section 4.4(a) of the Sellers Disclosure Letter</u>, (ii) for the Assumed Liabilities and (iii) for Permitted Encumbrances.

(b)    The Assets constitute the assets that are necessary and sufficient to conduct the Business substantially in the manner conducted as of the date hereof, except (i) the Management Services Agreement, (ii) Excluded Seller Contracts and (iii) the services of Employees who are not Transferred Employees.

**4.5    Material Contracts.**

<u>Section 4.5 of the Sellers Disclosure Letter</u> sets forth, as of the date hereof, a complete list of every Contract (other than standard purchase orders and invoices) or Lease and any Third Party or intercompany agreements, that:

(a)    in the most recent fiscal year of the Sellers resulted in, or is reasonably expected by its terms in the future to result in, the payment or receipt by the Business of more than $500,000 per annum in the aggregate;

(b)    materially restricts the Business from engaging in any business activity anywhere in the world;

(c)    is a material joint venture Contract or partnership or which otherwise involves the sharing of profits, losses, costs or liabilities in any material fashion with any other Person;

(d)    is a sale or distribution Contract involving the sale or distribution of Products valued at more than $500,000 per year,

(e)    entered into outside of the Ordinary Course;

(f)     has as a party thereto any officer or director of any Seller, any Affiliate of any such officer or director, or any Person in which any officer or director of any Seller has a material interest, other than the Management Services Agreement;

(g)     is an employment agreement (other than customary offer letters or unwritten employment agreements that do not contain direct severance terms) or severance agreement;

(h)     is a Contract relating to material Intellectual Property (including Contracts containing any grants of, or restrictions on, rights to use material Intellectual Property);

(i)     has as a party thereto any material customer or material supplier of any Seller; or

(j)     is a Consent issued in respect of any Asset located in the Province of Quebec pursuant to the *Forest Act* (Quebec),

(all the above, collectively, the "**Material Contracts**"). Except as set forth in Section 4.5(b) of the Sellers Disclosure Letter, each Material Contract is in full force and effect and is a valid and binding obligation of the Seller party thereto and, to Sellers' Knowledge, the other parties thereto, in accordance with its terms and conditions, except as such enforceability may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally. Upon entry of the Sale Orders and payment of any applicable Cure Costs, (i) no Seller will be in breach or default of its obligations under any of the Assigned Contracts (ii) no condition exists that with notice or lapse of time or both would constitute a default under any of the Assigned Contracts, and (iii) to the Seller's Knowledge, no other party to any of the Assigned Contracts or any other Material Contract is in breach or default thereunder.

**4.6    Intellectual Property.**

(a)     The Transferred Intellectual Property includes all of the Intellectual Property owned by the Sellers that, as at the Closing Date, is necessary and sufficient to conduct the Business substantially in the manner conducted as of the date hereof, in all material respects. The Sellers own, or have a valid right to use, free and clear of all Liens (other than Permitted Encumbrances), all material Intellectual Property used or held for use in, or necessary to conduct, the Business.

(b)     Section 4.6(b) of the Sellers Disclosure Letter sets forth a true, correct, and complete list of all material U.S., Canadian and foreign (i) issued Patents, and all pending applications for Patents; (ii) Trademarks, and all pending applications for Trademarks; (iii) Copyrights, and all pending applications for Copyrights, and (iv) domain names, in each case which is owned by a Seller. Sellers are the sole and exclusive beneficial and record owner of all of the Intellectual Property items set forth in Section 4.6(b) of the Sellers Disclosure Letter, and all such Intellectual Property is subsisting, valid, and enforceable.

(c)     Except as disclosed on Section 4.6(c) of the Sellers Disclosure Letter, to the Knowledge of the Sellers, (i) the conduct of the Business (including the products

and services of the Sellers) does not infringe, misappropriate, or otherwise violate, in any material respect, any Person's Intellectual Property rights, and there has been no such claim or Action asserted or threatened in the past three (3) years against any Sellers or, to the Knowledge of Sellers, any other Person, and (ii) no Person is infringing, misappropriating, or otherwise violating, in any material respect, any Intellectual Property owned, used, or held for use by Sellers in the conduct of the Business, and no such claims or Actions have been asserted or threatened against any Person by Sellers or any other Person, in the past three (3) years.

(d)     The Sellers have taken reasonable measures to protect the confidentiality of non-public Trade Secrets.

(e)     The consummation of the transactions contemplated by this Agreement will not result in the material loss or impairment of or payment of any additional material amounts with respect to, nor require the consent of any other Person in respect of, the Purchaser's or Designated Purchasers' right to own, use, or hold for use any of the Intellectual Property as owned, used, or held for use by Sellers in the conduct of the Business, except that the order entry and invoice system is owned by Brant Industries Inc.

**4.7     Litigation.**

As of the date hereof (and excluding the CCAA Cases, the Chapter 11 Case and the Chapter 15 Cases), there is no Action pending or, to the Knowledge of the Sellers, threatened before any Government Entity or arbitration tribunal against any Seller involving the Business or Assets, that would be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect, other than as set forth in Section 4.7 of the Sellers Disclosure Letter.

**4.8     Financial Statements.**

Sellers have made available to Purchaser copies of the Sellers' audited consolidated balance sheets as at December 31, 2009 and related consolidated audited statements of operations, shareholders' equity and cash flows (the "**Audited Financial Statements**") and the unaudited monthly management statements of results of operations of the Business for each monthly period starting after the Audited Financial Statements and ending May 31, 2010 (together with the Audited Financial Statements, the "**Financial Statements**"). The Audited Financial Statements were prepared in accordance with GAAP and consistently applied and maintained throughout the periods indicated, and in accordance with and consistent with Sellers' books and records, and present fairly, in all material respects, the consolidated financial position of the Sellers as at their respective dates and the consolidated results of their operations and cash flows for such periods, all as required and in conformity with GAAP.

**4.9     Compliance with Laws; Consents.**

(a)     No Seller is in violation of any applicable Law in connection with the Business, except where such violations, individually or in the aggregate, would not result, or would not reasonably be expected to result, in a Material Adverse Effect.

None of the Sellers has received any notice or written claims from any Government Entity within the last three (3) years preceding the date hereof relating to any non-compliance of the Business or the Assets with any applicable Law nor are there any such notice or claims pending or, based on the Knowledge of the Sellers, any such notice or claims threatened, except where such claims, individually or in the aggregate, would not result, or would not reasonably be expected to result, in a Material Adverse Effect.

(b)     (i) All the Consents of Government Entities necessary for the conduct of the Business as conducted on the date hereof, have been duly obtained and are in full force and effect, except where the absence of any of such Consents would not result, or would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect and (ii) the relevant Sellers are in compliance with the terms of each of such Consents, except where such non-compliance would not result, or would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect. None of the Sellers has received any notice or written claims from any Government Entity relating to any non-compliance of the Business or the Assets with such Consents, nor are there any such notice or claims pending or, based on the Knowledge of the Sellers, any such notice or claims threatened, except where such non-compliance would not result, or would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

**4.10    Real Property.**

(a)     Section 4.10(a) of the Sellers Disclosure Letter sets forth (i) all of the real and immovable property owned by Sellers (which are to be transferred to the Purchaser together with all existing servitudes, easements, licenses and appurtenances benefiting such owned real and immovable property, including all buildings, erections, improvements, fixtures, fittings and structures thereon, collectively, the "**Owned Real Property**"); (ii) all unexpired leases, licenses or other occupancy agreements (collectively, the "**Leases**") (or other property interests) for real and immovable property under which any Seller is a lessee, licensee or occupant (the "**Leased Real Property**"), (iii) all of the material written Contracts (and servitudes and easements and other accessory rights granted by or to Third Parties) pertaining to the Owned Real Property to which any Seller is a party, and each lease, license or occupancy agreement in favor of any Third Party affecting any Owned Real Property or Leased Real Property and (iv) all of the Actions currently pending by or against the Sellers which pertain to the Owned Real Property or Leased Real Property which would, individually or in the aggregate, have a Material Adverse Effect.

(b)     Sellers have received all Consents that are necessary or appropriate in connection with Sellers' occupancy, operation, ownership or leasing of the Owned Real Property and those pursuant to Leases, and the present use of the Owned Real Property or the Leased Real Property does not violate the Consents applicable

thereto, except where the failure to receive, or violation of, a Consent would not reasonably be expected to have a Material Adverse Effect.

(c)     No Seller has received written notice, nor is there pending or, to Sellers' Knowledge, is there any threatened (i) condemnation, eminent domain, expropriation or similar proceeding affecting the Owned Real Property or Leased Real Property except as set forth in Section 4.10(c) of the Sellers Disclosure Letter, (ii) proceeding to change the zoning classification of any portion of the Owned Real Property or Leased Real Property or (iii) imposition by a Government Entity of any special assessments for public betterments affecting the Owned Real Property or Leased Real Property, which in any case would reasonably be expected to have a Material Adverse Effect.

(d)     The present uses of the Owned Real Property and the Leased Real Property by Sellers are in compliance with, and not in default under or in violation of, any building, zoning, land use, public health, public safety, sewage, water, sanitation or other comparable Law, except for such noncompliance, default or violation that would not reasonably be expected to have a Material Adverse Effect.

(e)     Upon entry of the Sale Orders and payment of the Cure Costs, (i) no Seller will be in breach or default of its obligations under any of the Leases or other material Contracts or real rights appertaining to the Owned Real Property, (ii) no condition exists that with notice or lapse of time or both would constitute a default under any of such Contracts or real rights, and (iii) to the Sellers' Knowledge, no other party to any of such Contracts or real rights is in breach or default thereunder.

(f)     The Sellers have not given notice to, or received notice from, any landlords of any defaults in connection with the Leases.

(g)     To the Knowledge of the Sellers, there are no material defects or deficiencies in the buildings and other structures that are (i) either located on the Owned Real Property or subject to the Leases and (ii) necessary to conduct the Business in the Ordinary Course.

**4.11    Environmental Matters.**

Except as set forth in Section 4.11 of the Sellers Disclosure Letter:

(a)     the Business of the Sellers, the Owned Real Property and the Leased Real Property are in compliance with Environmental Laws and the Sellers have obtained and are in compliance with all Environmental Permits, required under applicable Environmental Laws, a list of which is set forth in Section 4.11 of the Sellers Disclosure Letter, except where failure to comply with Environmental Laws, or to obtain or comply with Environmental Permits, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Sellers have not received any written communication, whether from a Government Entity, citizens group, employee or otherwise, alleging that the

Business, the Owned Real Property or the Leased Real Property is not in such compliance, and, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there are no present or, to the Knowledge of the Sellers, past actions, activities, circumstances, conditions, events or incidents that may prevent or interfere with such compliance in the future under current Environmental Laws;

(b)     there are no Environmental Claims relating to the Business or the Assets pending or, to the Knowledge of the Sellers, threatened against any Seller or Person whose liability for any Environmental Claim the Sellers have or may have assumed contractually or by operation of law, in each case except those Environmental Claims that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. There are no present or, to the Knowledge of the Sellers, past actions, activities, circumstances, conditions, events or incidents, including, without limitation, the Release, threatened Release or presence of any Hazardous Material which could form the basis of any Environmental Claim relating to the Business or the Assets against the Sellers, or to the Knowledge of the Sellers, against any person or entity whose liability for any such Environmental Claim the Seller has or may have retained or assumed either contractually or by operation of Law, except which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(c)     no Hazardous Materials are present at, on or, to the Knowledge of the Sellers, under or adjacent to the Owned Real Property or the Leased Real Property that are reasonably anticipated to result in liabilities or obligations for investigation or remediation to any Seller pursuant to Environmental Laws, except those liabilities or obligations that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and

(d)     the Sellers have delivered or otherwise made available for inspection to Purchaser copies of all material reports, studies, audits, analyses, tests, monitoring data, Environmental Permits, or documents possessed by the Sellers pertaining to any environmental matter with respect to the Assets, Owned Real Property, Leased Real Property or Business.

4.12    **Labor and Employee Benefits Matters.**

(a)     Section 4.12(a) of the Sellers Disclosure Letter contains an accurate and complete list of all Seller Employee Plans. The Sellers have provided the Purchaser with a complete and current copy of the plan document of each Seller Employee Plan or, if such plan document does not exist, an accurate written summary of such Seller Employee Plan, together with all booklets and communications concerning the Seller Employee Plans having been provided to persons entitled to benefits under such plan and copies of all material documents relating to each Seller Employee Plan, including, as applicable: (i) all trust agreements, funding agreements, insurance contracts and policies, investment management agreements, subscription and participation agreements, benefit administration

contracts and any financial administration contracts; (ii) the most recent financial and accounting statements and reports, and all reports, statements, valuations, returns and correspondence for each of the last three years which affect premiums, contributions, refunds, deficits or reserves; (iii) the two most recent actuarial reports (whether or not such report were filed with a Government Entity) and any supplemental cost certificates filed with any Government Entity; (iv) the most recent annual information returns or other returns filed with, and significant correspondence with any Government Entity; (v) all amendments and other documents reflecting ad hoc increases, upgrades and improvements having been implemented within the last six years; and (vi) the Sellers have not received, in the last six years, any notice from any Person or Government Entity questioning or challenging such compliance, and the Sellers have no Knowledge of any such notice beyond the last six years.

(b)     The information contained in Section 4.12(b) of the Sellers Disclosure Letter in respect of the Employees (the "Employee Information") is accurate in all material respects as of the date hereof.

(c)     There has not been for a period of twenty-four (24) consecutive months prior to the date hereof, any actual, or to the Sellers' Knowledge, threatened strike, material arbitration, labor dispute or grievance under a Collective Labor Agreement, slowdown, lockout, picketing or work stoppage against or affecting the Sellers.

(d)     Section 4.12(d) of the Sellers Disclosure Letter lists all the Collective Labor Agreements that pertain to the Employees. For a period of twenty-four (24) consecutive months prior to the date hereof, no petition has been filed or proceedings instituted by a union, collective bargaining agent, employee or group of employees with any Government Entity seeking recognition or certification of a collective bargaining agent with respect to any Employees, and, to the Sellers' Knowledge, no such organizational effort is currently being made or has been threatened by or on behalf of any union, employee, group of employees or collective bargaining agent to organize any Employees. The Sellers have provided the Purchaser with a true and complete copy of the Collective Labor Agreements listed in Section 4.12(d) of the Sellers Disclosure Letter.

(e)     With respect to each Transferred Employee Plan, and to the extent it would not have a Material Adverse Effect: (i) if intended to qualify under Section 401(a), 401(k) or 403(a) of the Code, such plan and the related trust has received a favorable determination letter from the IRS that has not been revoked and to the Sellers' Knowledge there is no basis for the revocation of such letter; (ii) it is and has been established, registered, amended, funded (other than in respect of special payments that were suspended by the Initial CCAA Order) administered and invested in compliance with its terms applicable Law and any Collective Labor Agreements, as applicable, and the Sellers have not received any notice from any Person or Government Entity questioning or challenging such compliance; (iii) there is no investigation by a Government Entity nor any

pending or threatened claims in writing against, by or on behalf of any Transferred Employee Plan or the assets, fiduciaries or administrators thereof (other than routine claims for benefits); and to the Knowledge of the Sellers no fact exists which could reasonably be expected to give rise to any such investigation or claim; and (iv) all required employee and employer contributions (other than special amortization payments since the Petition Date to such plans that are Canadian registered pension plans), premiums and expenses, to or in respect of, such Transferred Employee Plans have been timely paid in full or, to the extent not yet due, have been adequately accrued.

(f)     Except as disclosed in <u>Section 4.12(f) of the Sellers Disclosure Letter</u>, the Sellers have no formal plan and have made no promise or commitment, whether legally binding or not, to create any additional Seller Employee Plan, or to improve or change the benefits provided under any Seller Employee Plan.

(g)     Except as set forth in <u>Section 4.12(g) of the Sellers Disclosure Letter</u>, no assets of any Transferred Employee Plan are invested in units of a unitized trust sponsored by a Seller, and where the assets of any Transferred Employee Plan are invested in units of a unitized trust sponsored by a Seller, no entity other than the Seller or a Person acting in relation to a Transferred Employee Plan holds units of any such unitized trust and the unitized trust has been established, qualified, invested and administered in accordance with the terms of such unitized trust and all applicable Law.

(h)     All data necessary to administer each Transferred Employee Plan is in the possession of the Sellers or their agents and is in a form which is sufficient for the proper administration of the Transferred Employee Plan in accordance with its terms and all Laws and such data is complete and correct.

(i)     Except as disclosed <u>Section 4.12(i) of the Sellers Disclosure Letter</u>, there are no unfunded liabilities in respect of any Transferred Employee Plans which Transferred Employee Plans would be required to be funded under applicable Law, as applicable, including going concern unfunded liabilities, wind-up deficiencies and solvency deficiencies.

(j)     There is no entity, other than the Sellers, participating in any of the Transferred Employee Plans.

(k)     No Seller Employee Plan is, or in the past six years was, subject to Title IV of ERISA.

(l)     Except as set forth in <u>Section 4.12(l) of the Sellers Disclosure Letter</u>, the consummation of the transactions contemplated by this Agreement (whether alone or together with any other event) will not entitle any Employee or former employee of the Business to severance pay, unemployment compensation or any other payment or accelerate the time of payment or vesting, or increase the amount of compensation due any such Employee or former employee.

(m)     Except as set forth in <u>Section 4.12(m) of the Sellers Disclosure Letter</u>, no Transferred Employee Plan provides benefits, including without limitation death or medical benefits (whether or not insured) beyond retirement or other termination of service, other than (i) coverage mandated solely by applicable Law, (ii) death benefits or retirement benefits under any "pension plan" (as defined in section 3(2) of ERISA or under any Canadian pension standards legislation), or (iii) benefits the full costs of which are borne by participants and not by the employer or sponsor.

(n)     The Business is in compliance in all material respects with all applicable Laws respecting employment and employment practices, including, without limitation, all laws respecting terms and conditions of employment, health and safety, wages and hours, worker classifications, child labor, immigration, employment discrimination, disability rights or benefits, equal opportunity, pay equity (including maintenance of pay equity), Government Entity sponsored plans, including pension, social security, parental insurance, prescriptions drugs and similar plans, plant closures and layoffs, affirmative action, workers' compensation, labor relations, employee leave issues and unemployment insurance.

(o)     Except as set forth on <u>Schedule 4.12(o) of the Sellers Disclosure Letter</u>, during the past five (5) years the Business has not received (i) notice of any unfair labor practice charge or of any complaint pending or threatened before the National Labor Relations Board or any other Government Entity against it, (ii) notice of any charge or complaint with respect to or relating to it pending before the Equal Employment Opportunity Commission or any other Government Entity responsible for the prevention of unlawful employment practices, (iii) notice of the intent of any Government Entity responsible for the enforcement of labor, employment, wages and hours of work, pay equity, human rights, worker classification, child labor, immigration, or occupational safety and health laws to conduct an inspection or investigation with respect to or relating to it or notice that such inspection or investigation is in progress, (iv) notice of violation, infringement, breach or lack of compliance by any Government Entity responsible for the enforcement of labor, employment, wages and hours of work, pay equity, human rights, worker classification, child labor, immigration, or occupational safety and health laws, or (v) notice of any complaint, lawsuit or other proceeding of any kind pending or threatened in any forum by any Government Entity, by any union or bargaining agent, or by or on behalf of any Employee or former employee, any applicant for employment or classes of the foregoing alleging breach of any express or implied contract of employment, any applicable Law governing labor, employment, wages and hours or work, pay equity, human rights, worker classification, child labor, immigration or occupation safety and health or the termination of employment or any discriminatory, wrongful or tortious conduct in connection with the employment relationship.

(p)    To the Knowledge of the Sellers, no Employee is in any respect in material violation of any nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, noncompetition agreement, restrictive covenant or other obligation to a former employer of any such employee relating (i) to the right of any such Employee to be employed by the Business or (ii) to the knowledge or use of trade secrets or proprietary information, or any obligations of the same nature contained in any employment agreement.

(q)    The Sellers have no Knowledge that any Employee whose annual salary exceeds $150,000 intends to terminate his or her employment other than retirement in the Ordinary Course.

(r)    The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any breach or other violation of any Collective Labor Agreement, employment agreement, consulting agreement or any other labor-related agreement.

**4.13    Taxes.**

Except as set forth in <u>Section 4.13 of the Sellers Disclosure Letter</u>, Sellers have (i) each timely filed all material Tax Returns required to be filed with the appropriate Government Entity in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted, or to be obtained on behalf of, the Sellers), and such Tax Returns were complete and accurate in all material respects; (ii) paid, collected and remitted all Taxes owed by, or required to be collected and remitted by, any of the Sellers, whether or not shown as due on any Tax Return; and (iii) duly and on a timely basis withheld from any amount paid or credited to any Person the amount of any Taxes required by Law to be withheld therefrom and have duly and on a timely basis remitted such amounts as required by Law. No material examination of any Tax Return of the Sellers is currently in progress by any Government Entity; no material unresolved adjustment has been proposed in writing with respect to any such Tax Returns by any Government Entity; no material unresolved claim has been made in writing by any Government Entity in a jurisdiction where the Sellers do not file Tax Returns that any Seller is or may be subject to Taxes by that jurisdiction for Taxes; and there are no Liens for Taxes, other than Permitted Encumbrances.

**4.14    Absence of Certain Developments.**

Except as required by Law or GAAP, since December 31, 2009: (a) Sellers have conducted the Business in the Ordinary Course; (b) there have not occurred any facts, conditions, changes, violations, inaccuracies, circumstances, effects or events that have constituted, or which would be reasonably likely to result in, individually or in the aggregate, a Material Adverse Effect; and (c) except as set forth in <u>Section 4.14 of the Sellers Disclosure Letter</u>, no Seller has taken any action in contravention of Section 5.7.

**4.15    No Undisclosed Liabilities.**

Sellers do not have any Liabilities, except Liabilities (a) provided for in the Financial Statements; (b) incurred in the Ordinary Course and not required under GAAP to be reflected

in the Financial Statements; (c) incurred in connection with the DIP Credit Agreement; (d) incurred since December 31, 2009 in the Ordinary Course or as required by applicable Law; (e) incurred in connection with this Agreement or the transactions contemplated hereby; or (f) which individually or in the aggregate (not including Liabilities referred to in clauses (a) through (e) above) would not reasonably be expected to have a Material Adverse Effect.

**4.16    Customers and Suppliers.**

Section 4.16 of the Sellers Disclosure Letter sets forth a true, complete and correct list of the Business' ten (10) largest customers and twenty (20) largest vendors for the fiscal year ended December 31, 2009.

**4.17    Affiliate Transactions.**

Except as disclosed in Section 4.17 of the Sellers Disclosure Letter, no Affiliate of any Seller (other than any other Seller) (a) is a competitor, creditor, debtor, customer, distributor, supplier or vendor of any Seller, (b) is a party to any Material Contract with any Seller that results in payment or receipt by the Business of more than $50,000 per annum in the aggregate, (c) has any Action against any Seller, (d) has a loan outstanding from any Seller or (e) owns any assets that are used in the Business.

**4.18    Brokers; Advisors Fees.**

    (a)    Except for fees and commissions that will be paid or otherwise settled or provided for by the Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Documents based upon arrangements made by or on behalf of the Sellers or any of their Affiliates.

    (b)    Section 4.18(b) of the Sellers Disclosure Letter sets forth all professional advisor (including, without limitation, investment banker, broker, legal, consulting and accounting) fees incurred, or to be incurred, in connection with the consummation of the transactions contemplated by this Agreement.

**4.19    Not a Non-Resident.**

Each Seller that is selling a "taxable Canadian property" within the meaning of subsection 248(1) of the Tax Act or a "taxable Quebec property" within the meaning of sections 1, 1094 and 1096 of the Taxation Act, is not a non-resident of Canada within the meaning of the Tax Act.

**4.20    GST and QST Registration.**

Each Seller that is selling Assets in Canada is duly registered for the purposes of the Tax imposed under Part IX of the *Excise Tax Act* and under an *Act respecting the Québec Sales Tax* under the numbers set forth in Section 4.20 of the Sellers Disclosure Letter.

**4.21    Location of Assets.**

All of the Assets that are situated in Canada are situated in the Provinces of Quebec and Nova Scotia.

**ARTICLE V**
**COVENANTS AND OTHER AGREEMENTS**

**5.1    Bankruptcy Actions.**

(a)    Sellers and Purchaser acknowledge that this Agreement and the transactions contemplated hereby are subject to Bankruptcy Court approval.

(b)    The Sellers shall (a) on or before August 10, 2010, file and properly serve motions in form and substance reasonably satisfactory to the Purchaser (together, the "**Sale Motion**"), which Sale Motion shall include copies of the Bidding Procedures and of the Stalking Horse and Bidding Procedures Orders, in form and substance reasonably satisfactory to the Purchaser, seeking Canadian Court and U.S. Bankruptcy Court approval of: (i) the sale of the Assets to the Purchaser pursuant to this Agreement, subject to higher or otherwise better offers under the Bidding Procedures; (ii) bidding procedures in connection with the sale of the Assets reasonably acceptable to Purchaser and substantially in the form of Exhibit F hereto (the "**Bidding Procedures**"); (iii) the Break-Up Fee and the Expense Reimbursement; and (iv) the scheduling of an auction and sale hearing with respect thereto (the "**Auction**" and "**Sale Hearing**", respectively) and (b) on or before August 22, 2010, properly serve each counterparty to a Designated Seller Contract with the U.S. Debtor, a notice, in form and substance reasonably satisfactory to the Purchaser, setting forth the amount necessary to satisfy any Cure Cost. The Sale Motion shall be served by Sellers' counsel or Court appointed claims agent on all parties whom the Purchaser's counsel requests be served.

(c)    Sellers shall use their commercially reasonable efforts to have each of the Canadian Court and the U.S. Bankruptcy Court enter on or before August 26, 2010 an order reasonably acceptable to Purchaser and substantially in the form of Exhibit G (in the case of the Canadian Court) and Exhibit H (in the case of the U.S. Bankruptcy Court) (i) approving the form of this Agreement and the Bidding Procedures; and (ii) scheduling the Auction and Sale Hearing (the "**Stalking Horse and Bidding Procedures Orders**"). Sellers shall use their commercially reasonable efforts to have the U.S. Bankruptcy Court enter an Order on or before August 26, 2010 in the Chapter 15 Cases recognizing the Stalking Horse and Bidding Procedures Order.

(d)    Sellers shall use their commercially reasonable efforts to conduct the Auction for the Assets on or before September 1, 2010.

(e)    Sellers shall use their commercially reasonable efforts to have each of the Canadian Court and the U.S. Bankruptcy Court enter on or before September 8,

2010 an order reasonably acceptable to Purchaser and substantially in the form of Exhibit I (in the case of the Canadian Court) and Exhibit J (in the case of the U.S. Bankruptcy Court) (the "Sale Orders") approving the sale of the Assets to the Purchaser pursuant to this Agreement or to the Person otherwise submitting the highest or otherwise best bid(s) for the Assets at the Auction, including by filing and properly serving a motion with the Canadian Court within one (1) Business Day of the completion of the Auction (which motion shall also be served on each party to a Designated Seller Contract with the Canadian Debtors and on all parties whom Purchaser's counsel requests be served). Sellers shall use their commercially reasonable efforts to have the U.S. Bankruptcy Court enter an Order on or before September 8, 2010 in the Chapter 15 Cases recognizing the Sale Order granted by the Canadian Court.

(f)     In the event leave to appeal is sought, an appeal is taken or a stay pending appeal is requested with respect to the Stalking Horse and Bidding Procedures Orders or the Sale Orders, Sellers shall promptly notify Purchaser of such leave to appeal, appeal or stay request and shall promptly provide to Purchaser a copy of the related notice(s) or order(s). Sellers shall also provide Purchaser with written notice of any motion or application filed in connection with any leave to appeal or appeal from such orders.

(g)     From and after the date hereof, Sellers shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Stalking Horse and Bidding Procedures Orders or, if the Purchaser is the successful bidder at the Auction, the Sale Orders.

(h)     From and after the date hereof, Sellers shall provide such prior notice as may be reasonable under the circumstances before filing any materials with the Bankruptcy Court that relate, in whole or in part, to this Agreement, the Purchaser or the Auction and shall consult in good faith with the Purchaser regarding the content of such materials prior to any such filing.

(i)     Promptly after Closing, the Canadian Debtors shall serve and file with the Canadian Court a notice of motion and motion record seeking the entry of an Order establishing procedures for the identification and adjudication of any claims against the directors and officers of the Canadian Debtors that would be covered by the D&O Charge (as defined in the Initial CCAA Order), which procedures shall be in form and substance reasonably satisfactory to the Purchaser and which procedures shall, for the avoidance of doubt, provide the Canadian Debtors, any affected director or officer and the Purchaser with full rights of participation and consultation in the procedures, which shall be administered by the Monitor, subject to the foregoing and in accordance with Section 5.2(g) (the "D&O Claims Procedure").

With respect to each Assigned Contract, Purchaser will satisfy any and all Cure Costs and provide adequate assurance of future performance on its behalf and on behalf of its Designated Purchasers as required under the U.S. Bankruptcy Code, including

section 365(f)(2)(B) thereof, and under section 11.3 of the CCAA and shall cause its Designated Purchasers to perform thereunder as required. Purchaser and Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under each Assigned Contract, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making Purchaser's and Sellers' employees and representatives available to testify before the Bankruptcy Court. Failure to perform all such actions and bear all such costs and expenses shall result in the relevant Designated Seller Contract being deemed to be a Non-Assigned Contract at Closing, unless otherwise agreed in writing by the Seller that is a party thereto.

5.2     Cooperation.

(a)     Prior to the Closing, upon the terms and subject to the conditions of this Agreement, each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement as soon as practicable, including the preparation and filing of all forms, registrations and notices required to be filed to consummate the Closing, negotiating Collective Labor Agreements with all applicable unions and collective bargaining agents, the taking of such actions as are necessary to obtain any requisite Consent, provided that the Sellers shall not be obligated to make any payment or deliver anything of value to any Third Party (other than filing with and payment of any application fees to Government Entities, all of which shall be paid or reimbursed by the Purchaser) in order to obtain any Consent.

(b)     Each of the Sellers and the Purchaser shall promptly notify the other of the occurrence, to such Party's knowledge, of any event or condition, or the existence, to such Party's knowledge, of any fact, that would reasonably be expected to result in (i) any of the conditions set forth in Article VIII not being satisfied or (ii) any of the representations and warranties in Article IV not being true and correct.

(c)     No later than one (1) Business Day prior to Closing, at the request of the Purchaser, the Sellers shall cause the Bear Island Paper Company LLC to become a multiple member limited liability company and be taxed as a partnership for purposes of U.S. Tax Laws.

(d)     The Sellers shall finalize and deliver to Purchaser promptly following the date hereof the Sellers Disclosure Letter. The Sellers shall reasonably cooperate with Purchaser to finalize such Sellers Disclosure Letter and resolve any questions associated therewith as promptly as reasonably possible and in any case prior to the first hearing to approve the Stalking Horse and Bidding Procedures Orders.

(e)     Sellers shall use their reasonable best efforts to:

(i) provide for the continued use of the order entry and invoice systems owned by Brant Industries Inc. and used in the Business for a total cost of no more than $75,000 per year; and

(ii) provide copies of all books, records, files, sales or invoice data, documentation and sales literature used or held for use in connection with the Business that are owned by, or in the possession of, Brant Industries Inc. or its Affiliates.

(f) Prior to Closing, Sellers shall use their reasonable best efforts to negotiate with the Ministry of Revenue (Quebec) and the Canada Revenue Agency as required in order to eliminate or satisfy any and all claims made by such agencies in respect of the failure of Sellers to withhold or remit amounts that should have been withheld or remitted under act relating to Taxes.

(g) Canadian Debtors shall use their reasonable best efforts to have the Canadian Court discharge the D&O Charge (as defined in the Initial CCAA Order), effective upon Closing, but conditional upon Purchaser's fulfillment of its obligations in this paragraph. If the Canadian Debtors obtain such a discharge as of such time, then Purchaser shall (i) indemnify and save each of the directors and officers of each of the Canadian Debtors since the date of the Initial CCAA Order (each a "D&O Charge Covered Person") harmless of, and from, and will pay for, all reasonable costs, charges, expenses, including reasonable professional fees and claims relating to any obligations or liabilities to the extent that would have been recoverable against the D&O Charge had it not been discharged, they may incur in relation to their respective capacities as directors or officers between the issuance of the Initial CCAA Order and the Closing and only for matters that would have been covered by the D&O Charge had it not been discharged, to a maximum of CDN$10,000,000, in the aggregate (each such matter a "D&O Charge Covered Claim") and (ii) establish a CDN$10,000,000 letter of credit at Closing issued by a US or Canadian financial institution reasonably acceptable to the Canadian Debtors (a Schedule I Canadian chartered bank, JP Morgan Chase, Bank of America, Deutsche Bank or Citibank being deemed to be acceptable) to secure such indemnification obligation. Pursuant to the D&O Claims Procedure: (i) the D&O Charge Covered Persons and the Purchaser shall be notified of any and all D&O Charge Covered Claims filed; (ii) the D&O Charge Covered Persons and the Purchaser shall be kept reasonably informed of, and shall participate in, the defense of all such claims; (iii) no D&O Charge Covered Claim may be allowed or settled without the consent of Purchaser, such consent not to be unreasonably withheld, and any such allowance or settlement entered into without such consent shall not be entitled to indemnification hereunder; and (iv) upon notice to any D&O Charge Covered Person, Purchaser shall be entitled to assume the defense of any such claim, provided that any D&O Charge Covered Person may engage in such circumstances its own counsel at its own cost and expense. The letter of credit may be drawn upon in an amount equal to, in the case of an allowance or a settlement, the allowed or settled amount (including all reasonable costs,

charges, expenses covered by this indemnity), or, in the case of a final order, the amount set forth in the final order (and all reasonable costs, charges, expenses covered by this indemnity), in either case only if (x) Purchaser has agreed to an allowance or settlement of such claim evidenced by a certificate from Purchaser to that effect or (y) (1) a final order of a court finding liability for a D&O Charge Covered Person is entered, (2) Purchaser has received a certificate certifying damages from the beneficiary of such order and (3) Purchaser was aware of such claim and was provided an opportunity to defend against it. Purchaser's obligations of indemnification provided herein (together with the obligation to have a letter of credit) shall expire at the end of the Canadian Debtors CCAA cases. At the bar date, the amount of the letter of credit shall be reduced at such time to the lesser of CDN$10,000,000 and the amount of the asserted claims at the bar date plus a reserve for reasonably anticipated costs and interest that could be incurred or awarded on any adverse judgment; provided further, the amount of the letter of credit shall be further reduced to the amount of the remaining asserted claims plus a reserve for reasonably anticipated costs and interest that could be incurred or awarded on any adverse judgment as claims are dismissed or otherwise resolved. In addition, in the event a D&O Charge Covered Claim is filed after the bar date and determined to be an allowed claim by the Canadian Court, the amount of the letter of credit shall be increased (or the letter of credit shall be promptly re-issued, as the case may be) by the amount of such allowed claim (up to a maximum letter of credit amount of CDN$10,000,000 in the aggregate), subject to future reductions as provided in the immediately proceeding sentence. For greater certainty, no D&O Charge Covered Person is required to consent to any settlement of a D&O Charge Covered Claim that would require restrictions on his activities, including the holding of office or the ownership of securities. Notwithstanding anything to the contrary contained above or in any applicable policy of insurance to the contrary, the foregoing shall only apply to the extent that the D&O Charge Covered Persons do not have sufficient coverage under any directors' and officers' insurance, which shall not be excess insurance to the D&O Charge. In respect of any D&O Charge Covered Claim against any of the D&O Charge Covered Persons, if such D&O Charged Covered Person do not receive confirmation from the applicable insurer within 21 days of delivery of notice of the D&O Charge Covered Claim to the applicable insurer, confirming that the applicable insurer will provide coverage for and indemnify the D&O Charge Covered Persons, then, without prejudice to the subrogation rights hereinafter referred to, such D&O Charge Covered Person may follow the procedures herein for recovery. The D&O Charge Covered Persons shall reimburse the Purchaser to the extent that they subsequently receive insurance benefits for the D&O Charge Covered Claim that were previously paid by a draw on the letter of credit or by the Purchaser. In addition, the Purchaser shall, upon payment or the drawing of the letter of credit of a D&O Covered Claim, be subrogated to the rights of the D&O Charge Covered Person to recover payment from the applicable insurer as if no such payment had been made. As a condition to receiving the benefits of this section, the D&O Charge Covered Person shall cooperate in any such subrogation and execute and documents reasonably requested. All D&O Charge Covered Persons shall be

intended third-party beneficiaries of this Section 5.2(g) and such right shall confer upon all D&O Charge Covered Persons any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Section 5.2(g).

5.3   **Antitrust and Other Regulatory Approvals.**

(a)   In furtherance and not in limitation of the provisions of Section 5.1(b), each of the Parties agrees to prepare and file as promptly as practicable: (i) all filings required and desirable to obtain Competition Act Approval; (ii) an appropriate filing of a Notification and Report Form pursuant to the HSR Act and request early termination of the waiting period under the HSR Act; and (iii) all other necessary documents, registrations, statements, petitions, filings and applications for other Antitrust Approvals, ICA Approval and any other Consent of any other Government Entities required to satisfy the condition set forth in Section 8.1(a).

(b)   If a Party or any of its Affiliates receives a request for information or documentary material from any Government Entity with respect to this Agreement or any of the transactions contemplated hereby, then such Party shall endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request.

(c)   The Parties shall keep each other apprised of the status of matters relating to the completion of the transactions contemplated by this Agreement and work cooperatively in connection with obtaining the Regulatory Approvals and other Consents of a Government Entity, including:

(i)   cooperating with each other in connection with filings required under the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement, and liaising with each other in relation to each step of the procedure before the relevant Government Entities and as to the contents of all communications with such Government Entities. Without limiting the generality of the foregoing, to the extent permitted by the relevant Government Entity and applicable Law, no Party will make any filing or submission in relation to the transactions contemplated hereunder without first providing the other Party (or in the case of the Investment Canada Act, the Sellers' external legal counsel) with a copy of such filing or submission in draft form and giving such other Party (or in the case of the Investment Canada Act, the Sellers' external legal counsel) a reasonable opportunity to discuss its content before it is filed with the relevant Government Entities, and such first Party shall consider and take account of all reasonable comments timely made by the other Party (or its external legal counsel) in this respect. To the extent that any such filing or submission contains information that is of a competitively sensitive nature, it may be provided to the other Party in a manner that omits such

information and to external counsel of the other Party on an external counsel only basis;

(ii)     furnishing to the other Party all information within its possession that is required for any application or other filing or submission to be made by the other Party pursuant to the applicable Antitrust Laws or any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement; provided, however, that the Purchaser will be permitted to limit any information with respect to any filing or submission made in connection with any Laws regulating foreign investment of any jurisdiction in connection with the transactions contemplated by this Agreement, including any such filing or submission required to obtain ICA Approval, to Sellers' external legal counsel and further provided that to the extent that any such information is of a competitively sensitive nature it may be provided only to external counsel of the other Party on an external counsel only basis;

(iii)    to the extent permitted by the relevant Government Entity and applicable Law, promptly notifying each other of any communications from or with any Government Entity with respect to the transactions contemplated by this Agreement and ensuring that each of the Parties is entitled to attend any meetings with or other appearances before, and participate in any discussions with, any Government Entity with respect to the transactions contemplated by this Agreement, except such meetings or other appearances related to obtaining ICA Approval which shall be attended by Sellers through Sellers' external legal counsel; and

(iv)    to the extent permitted by the relevant Government Entity and applicable Law, consulting and cooperating with one another in connection with all analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party in connection with proceedings under or relating to the Antitrust Laws.

(d)     In addition, the Purchaser shall, and shall cause each of the Designated Purchasers to, use its commercially reasonable efforts to satisfy (or cause the satisfaction of) the conditions precedent to the Purchaser's obligations hereunder as set forth in Section 8.1(a) to the extent the same is within its control and to take, or cause to be taken, all other action and to do, or cause to be done, all other things necessary, proper or advisable under all applicable Laws to consummate the transactions contemplated by this Agreement, including using its commercially reasonable efforts to obtain all Regulatory Approvals and any other Consent of a Government Entity required to be obtained in order for the Parties to consummate the transactions contemplated by this Agreement.

(e)     The Parties hereto understand and agree that the commercially reasonable efforts of any party hereto in relation to Antitrust Approvals under this Section 5.3 shall not be deemed to include: (i) entering into any settlement, undertaking, consent decree, consent agreement, consent order, stipulation or agreement with any

Government Entity in connection with the transactions contemplated hereby; or (ii) divesting or otherwise holding separate (including by establishing a trust or otherwise), or taking any other action (or otherwise agreeing to do any of the foregoing) with respect to the Purchaser or the Sellers or any of their respective subsidiaries, affiliates, businesses, assets or properties. Notwithstanding anything herein to the contrary, the Purchaser shall not be required to contest or defend any objections, challenges, applications or oppositions raised or filed by any Government Entity relating to the matters contemplated by this Agreement under any Antitrust Law, although it may, at its sole discretion, elect to do so.

(f)     For the avoidance of doubt, the covenants under this Section 5.3 shall not apply to any action, effort, filing, Consent, proceedings, or other activity or matter relating to the Bankruptcy Courts, the Bankruptcy Proceedings and/or the Bankruptcy Consents.

(g)     The Purchaser shall pay any requisite filing fees in relation to any filing or application made in respect of obtaining Regulatory Approvals.

5.4     Pre-Closing Access to Information.

(a)     Prior to the Closing, the Sellers shall (i) give the Purchaser and its authorized representatives, upon advance notice and during regular business hours, access to all books, records, reports, plans, certificates, files, documents and information related to the Assets, personnel, officers and other facilities and properties of the Business, (ii) permit the Purchaser to make such copies and inspections thereof, upon advance notice and during regular business hours, as the Purchaser may reasonably request and (iii) cause the officers of the Sellers to furnish the Purchaser with such unaudited financial and operating data and other information with respect to the Business as is regularly prepared in the Ordinary Course that the Purchaser may from time to time reasonably request; provided, however, that (1) any such access shall be conducted at Purchaser's expense, in accordance with Law (including any applicable Antitrust Law and Bankruptcy Law), under the supervision of the Sellers' personnel and in such a manner as to maintain confidentiality and not to interfere with the normal operations of the businesses of the Sellers and their Affiliates and (2) the Sellers will not be required to provide to the Purchaser access to or copies of any Employee Records to the extent such would be in violation of Laws relating to the protection of privacy.

(b)     Notwithstanding anything contained in this Agreement or any other agreement between the Purchaser and the Sellers executed on or prior to the date hereof, the Sellers shall not have any obligation to make available to the Purchaser or its representatives, or provide the Purchaser or its representatives with (i) any Tax Return filed by the Sellers or any of their Affiliates or predecessors, or any related material; (ii) more generally, any information if making such information available would (A) jeopardize any attorney-client, solicitor-client or other legal privilege or (B) potentially cause the Sellers to be found in contravention of any applicable Law or contravene any fiduciary duty or agreement (including any

confidentiality agreement to which the Sellers or any of their Affiliates are a party), it being understood that the Sellers shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to the Purchaser to occur without so jeopardizing privilege or contravening such Law, duty or agreement; or (iii) any information relating to other bids or potential bids for any of the Assets.

(c)     As requested by Purchaser from time to time, Sellers shall use commercially reasonable efforts to cooperate with Purchaser in connection with Purchaser and Sellers contacting suppliers and customers of the Business.

(d)     Sellers shall use reasonable efforts to cooperate and assist Purchaser with respect to the arrangement of any Purchaser indebtedness. Sellers agree to provide, and to cause their representatives to provide, on a timely basis, all reasonable cooperation in connection with the arrangement of any indebtedness as may be reasonably requested by Purchaser (provided, that such requested cooperation does not unreasonably interfere with the ongoing operations of Sellers), including (i) participation in meetings, drafting sessions and due diligence sessions led by Purchaser, (ii) furnishing Purchaser and any potential sources of indebtedness with financial and other pertinent information regarding the Sellers as may be reasonably requested by Purchaser, including without limitation all financial statements and financial data, (iii) assisting Purchaser and any potential sources of indebtedness and counsel in the preparation by Purchaser of an offering document or information memorandum relating to any potential indebtedness, (iv) reasonably cooperating with the marketing efforts, (v) coordinating and making the Owned Real Property available for appraisal and reasonable inspection, (vi) making senior officers and representatives of the Sellers reasonably available for presentations to ratings agencies and any questions, and (vii) reasonably facilitating the pledge of the Assets that may be used as collateral; provided, however, that nothing in this Section 5.4(d) shall require the Sellers to incur any binding obligations with respect to any such indebtedness.

(e)     Sellers, at their own expense, shall use commercially reasonable efforts to provide the Purchaser with updated or new surveys, title reports, and such other documents that are reasonably requested by Purchaser with respect to the Owned Real Property.

5.5     **Public Announcements.**

Subject to (i) the provisions of Section 7.4(a) with respect to communications and announcements to the Employees and the employees of the Purchaser and the Designated Purchasers and (ii) the Purchaser's disclosure obligations imposed by Law (including any obligations under any Bankruptcy Laws), the Purchaser shall, and shall cause each of the Designated Purchasers to, (a) cooperate reasonably with the Sellers in the development and distribution of all news releases, other public information disclosures and announcements, including announcements and notices to customers, and suppliers, with respect to this Agreement, or any of the transactions contemplated by this Agreement and the other

Transaction Documents and (b) not issue any such announcement or statement prior to consultation with, and the approval of, the Sellers (such approval not to be unreasonably withheld or delayed); provided that approval shall not be required where the Purchaser determines, based on advice of counsel and after advance notice to the Sellers, that such disclosure is required by Law.

**5.6    Further Actions.**

From and after the Closing Date, each of the Parties shall execute and deliver such documents and other papers and take such further actions as may reasonably be required to carry out the provisions of this Agreement and give effect to the transactions contemplated herein, including the execution and delivery of such assignments, deeds and other documents as may be necessary to transfer any Assets as provided in this Agreement; provided that, subject to Section 5.3, neither the Purchaser nor the Sellers shall be obligated to make any payment or deliver anything of value to any Third Party (other than filing with and payment of any application fees to Government Entities, all of which shall be paid or reimbursed by the Purchaser) in order to obtain any Consent to the transfer of Assets or the assumption of Assumed Liabilities.

**5.7    Conduct of Business.**

(a)    The Sellers covenant that, subject to any limitation imposed as a result of being subject to the Bankruptcy Proceedings and except as (i) the Purchaser may approve otherwise in writing as set forth below (such approval not to be unreasonably withheld or delayed), (ii) set forth in Section 5.7(a) of the Sellers Disclosure Letter, (iii) otherwise contemplated or permitted by this Agreement or another Transaction Document, (iv) required by Law (including any applicable Bankruptcy Law) or by any order of a Bankruptcy Court, or (v) relates to Excluded Assets or Excluded Liabilities, the Sellers shall (A) conduct the Business in the Ordinary Course and in accordance with the restrictions set forth in the DIP Credit Agreement and (B) abstain from any of the following actions:

(i)    make any capital expenditure with respect to the Business if, as a result thereof, the aggregate amount of capital expenditures made by Sellers from March 31, 2010 through such date would exceed $9,000,000;

(ii)    enter into any Contract or Lease for or relating to the Business that cannot be assigned to Purchaser or a Designated Purchaser, other than a Contract or a Lease with annual payments of less than $20,000;

(iii)    sell or otherwise dispose of Assets, other than dispositions of Inventory and obsolete or damaged Assets in the Ordinary Course that do not exceed $250,000 in the aggregate (other than Stadacona L.P.'s oil tanks and related land for not less than $3,000,000 less any costs for asbestos removal and closing costs);

(iv)    grant any Lien on any Assets other than Permitted Encumbrances or Liens that may arise by operation of Law;

(v)     other than in the Ordinary Course, grant or acquire from any Person or dispose of or permit to lapse any rights to any material Intellectual Property;

(vi)    increase the rate of cash compensation or other fringe, incentive, equity incentive, pension, welfare or other employee benefits payable to the Transferred Employees, other than increases required by applicable Law or Contracts other than Seller Employee Plans in effect as of the date hereof;

(vii)   change the compensation (including salary, bonus or incentive compensation) of the directors of, or independent contractors or consultants to, Sellers;

(viii)  other than as permitted by Section 5.7(a)(ix), voluntarily terminate or materially amend any Material Contract;

(ix)    enter into, terminate or amend any agreement (or incur any commitment) that involves or is reasonably likely to involve total annual expenditures by Sellers or total annual revenues to Sellers, in each case in excess of $500,000, except for fiber-related Contracts not to exceed $1,000,000 or pursuant to the capital expenditure budget of Sellers as set forth in Section 5.7(a)(i);

(x)     waive, release, assign, settle or compromise any material claim, litigation or arbitration relating to the Business to the extent that such waiver, release, assignment, settlement or compromise (i) imposes any binding obligation or restriction, whether contingent or realized, on the Business and/or the Designated Purchasers, or (ii) waives or releases any material rights or claims;

(xi)    institute any new, or increase (including any increase in coverage) any existing, profit-sharing, bonus, incentive, deferred compensation, severance, insurance, pension, retirement, medical, hospital, disability, welfare or other employee benefit plan with respect to current or former directors, officers or employees of Sellers;

(xii)   except as set forth in Section 8.3(f), enter into any collective bargaining, employment, deferred compensation, severance, consulting, independent contractor, nondisclosure, non-competition or similar agreement (or amend any such agreement) to which any Seller is party or involving any directors, officers or employees in his or her capacity as a director, officer or employee of Seller;

(xiii)  declare, set aside, make or pay any dividend or other distribution in respect of the capital stock, membership interests or other equity interests of Sellers, or repurchase, redeem or otherwise acquire any outstanding

shares of the capital stock, membership interests or other securities of, or other ownership interests in, Sellers;

(xiv)    except pursuant to the DIP Credit Agreement, incur any indebtedness for borrowed money (including any intra-group borrowings), enter into any material guarantee, indemnity or other agreement to secure any obligation of a Third Party or voluntarily create any Lien (other than Permitted Encumbrances) for the benefit of a third party over any of the Assets, except in the Ordinary Course;

(xv)    (1) except as set forth in Section 8.3(f), modify, reject or terminate any Contract or Lease (other than termination in the Ordinary Course), or (2) enter into or modify any Contract or Lease containing material penalties which would be payable as a result of, and upon the consummation of, the transaction contemplated by this Agreement ; or

(xvi)    authorize, or commit or agree to take, any of the foregoing actions.

If a Seller desires to take any action described in this Section 5.7(a), the Sellers may, prior to any such action being taken, request Purchaser's consent via an electronic mail or facsimile sent to the individuals and addresses listed in Section 10.7. The Purchaser shall be deemed to have consented to such action unless the Purchaser notifies the Sellers in writing by 11:59 p.m. (prevailing eastern time) on the third Business Day after delivery of such email or facsimile request that the Purchaser does not consent to such action.

(b)    Except (i) as expressly provided in this Agreement, (ii) as set forth in Section 5.7(b) of the Sellers Disclosure Letter or (iii) with the express written approval of Purchaser, Seller shall :

(i)    maintain in full force and effect any permits, licenses and agreements necessary to operate the Business in the Ordinary Course;

(ii)    maintain all of the Assets in a manner consistent with past practices and maintain the types and levels of insurance currently in effect in respect of the Assets;

(iii)    upon any damage, destruction or loss to any Asset, apply any insurance proceeds received with respect thereto to the prompt repair, replacement and restoration thereof to the condition of such Asset before such event or, if required, to such other (better) condition as may be required by applicable Law; and

(iv)    consult with Purchaser on all aspects of the Business as may be reasonably requested from time to time by Purchaser, including, but not limited to, personnel, accounting and financial functions, sales and marketing, and the development and implementation of business strategies, plans and objectives.

**5.8    No Shop.**

From the date hereof through the date upon which both the Canadian Court and the U.S. Bankruptcy Court enter the Stalking Horse and Bidding Procedures Orders, the Sellers shall not solicit any inquiries or proposals relating to an Alternative Transaction, plan of reorganization or plan of arrangement but shall be entitled to respond to any such inquiries or proposals that the Sellers determine in good faith would be a breach of fiduciary duties to fail to respond; provided, however, that the Sellers shall notify Purchaser of any such inquiries and provide Purchaser with any information provided to such Person that has not been previously provided to Purchaser.

**5.9    Transaction Expenses.**

Except as otherwise provided in this Agreement or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

**5.10    Confidentiality.**

The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference and as if the Purchaser and its Subsidiaries and Designated Purchasers were Recipients (as defined in the Confidentiality Agreement) thereunder, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Purchasers shall be at liberty to disclose the terms of this Agreement to Purchaser's officers, directors, bidding partners, advisors, investors and potential financing sources, provided such persons acknowledge the existence of these confidentiality obligations and agree to be bound thereby and provided that no such persons are direct or indirect competitors of Sellers, and any court or to any liquidator or in connection with any auction process approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns; provided the foregoing obligations shall terminate at Closing except with respect to Confidential Information of Sellers which are not related to the Assets, which shall terminate one year from the date hereof. Subject to the requirements of the Bankruptcy Laws or as may be imposed by any Bankruptcy Court or as otherwise required by applicable Law, from and after the Closing: (a) Sellers shall, and shall cause their Affiliates to, hold in confidence all information provided by the Purchaser, any of its First Lien Lender Owners, or their respective Affiliates; (b) in the event that Sellers or an Affiliate thereof shall be legally compelled to disclose any such information, Sellers shall provide Purchaser with prompt written notice of such requirement so that Purchaser may seek a protective order or other remedy; and (c) in the event that such protective order or other remedy is not obtained, Sellers or their Affiliates shall furnish only such information as is legally required to be provided.

**5.11    Certain Payments or Instruments Received from Third Parties.**

To the extent that, after the Closing Date, (a) the Purchaser or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of

this Agreement, the Purchaser shall, and shall cause the Designated Purchasers to promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser or any of the Designated Purchasers according to the terms of this Agreement or relates primarily to the Business, the Sellers shall promptly deliver such amount or instrument to the Purchaser or the relevant Designated Purchasers. All amounts due and payable under this Section 5.11 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use reasonable best efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

**5.12    Deemed Consent.**

For the purposes of this Agreement, the relevant Sellers shall be deemed to have obtained all required Consents in respect of the assignment of any Designated Seller Contract if, and to the extent that, pursuant to the Sale Orders, the Sellers are authorized to assume and assign to the Designated Purchasers such Designated Seller Contract pursuant to section 365 of the U.S. Bankruptcy Code or section 11.3 of the CCAA, as applicable, and any applicable Cure Cost has been satisfied as provided in Section 2.1.6.

**5.13    Post-Closing Assistance for Litigation.**

After the Closing, the Purchaser shall, upon the written request of the Sellers, and at no cost to the Sellers (other than reimbursement of out of pocket expenses), make the Transferred Employees available at reasonable times and cooperate in all reasonable respects with the Sellers and their Affiliates in the preparation for, and defense of, any lawsuit, arbitration or other Action (whether disclosed or not disclosed in the Sellers Disclosure Letter) filed or claimed against the Sellers or any of their Affiliates or any of the respective agents, directors, officers and employees of the Sellers and their Affiliates, whether currently pending or asserted in the future, concerning the operation or conduct of the Business prior to the Closing Date.

**5.14    No Financing Out.**

The Purchaser acknowledges and agrees that (i) its obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon receipt of financing from a Third Party, and (ii) failure to consummate the transactions contemplated herein as a result of the failure to obtain financing shall constitute a breach of this Agreement by the Purchaser (including its obligations pursuant to Section 2.3) and give rise, *inter alia*, to Sellers' recourse under Section 9.4(b).

**5.15    Insurance Matters.**

(a)    The Purchaser acknowledges and agrees that coverage of the assets, tangible or intangible property, Liabilities, ownership, activities, businesses, operations, current and former shareholders, and current and former directors, officers, employees and agents of, the Business (collectively with the Business, the "Covered Assets and Persons") under all current or previous insurance policies of the Sellers and their Affiliates, including, without limitation, all

environmental, directors' and officers' Liability, fiduciary Liability, property and casualty flood, ocean marine, contaminated products and all other insurance policies or programs arranged or otherwise provided or made available by the Sellers or their Affiliates that cover (or covered) any of the Covered Assets and Persons at any time prior to the Closing (the "Seller Insurance Policies") shall cease as of the Closing Date and the Covered Assets and Persons will be deleted in all respects as insured (or additional insured, as the case may be) under all Seller Insurance Policies. Notwithstanding anything herein to the contrary, the Sellers shall retain any rights to, including any right to any proceeds received in respect of, any claim pending as of the date hereof or made after the date hereof under any Seller Insurance Policy, even if such claims relates to the capital assets or properties of the Business.

(b)     If after the Closing Date the Purchaser or the Sellers (or any of their respective Affiliates) reasonably require any information regarding claim data or other information pertaining to a claim or an occurrence reasonably likely to give rise to a claim (including any pre-Closing claims under the Seller Insurance Policies that are to be covered under the retrospective component of the new insurance policy) in order to give notice to or make filings with insurance carriers or claims adjustors or administrators or to adjust, administer or otherwise manage a claim, then the Sellers or the Purchaser, as the case may be, shall cause such information to be supplied to the other (or their designee), to the extent such information is in their possession and control or can be reasonably obtained by the Sellers or the Purchaser (or their respective Affiliates), as applicable, promptly upon a written request therefor. If the Purchaser desires access to, and utilization of, claims data or information maintained by an insurance company or other Third Party in respect of any claim (including any pre-Closing claims under any Seller Insurance Policies that are covered under the retrospective component of the new insurance policies), the Purchaser shall be exclusively responsible for acquiring from such insurance company or Third Party, at the Purchaser's sole cost and expense, the rights necessary to permit them to obtain access to and utilization of such claims data or information. If any Third Party requires the consent of the Sellers or any of their Affiliates to the disclosure of such information, such consent shall not be unreasonably withheld.

5.16    Maintenance of Books and Records.

After the Closing, the Purchaser shall, and shall cause the Designated Purchasers to, preserve, until at least the sixth anniversary of the Closing Date, all pre-Closing Date records acquired hereby to the extent relating to the Business possessed or to be possessed by such Person and required by Law to be maintained. After the Closing Date and up until at least the sixth anniversary of the Closing Date, upon any reasonable request from the Sellers or their representatives, the Purchaser shall, and/or shall cause the Person holding such records to, (a) provide to the Sellers or their representatives reasonable access to such records during normal business hours without unreasonably interfering with the operations of the Business and (b) permit the Sellers or their representatives to make copies of such records.

**5.17    Use of Cash.**

Simultaneously with the Closing, all cash owned by the Sellers shall be used, first, to pay any overage on the Cure Cost Cap, second, to pay all professional fees and expenses then due and owing up to and including the Closing, third, to pay the Wind-Down Amount and, fourth, to pay amounts outstanding under the DIP Credit Agreement.

**5.18    Wind-Down Amount.**

On Closing, Sellers will deliver the Wind-Down Amount to the Monitor and the Bear Island Estate, as applicable, to be held in trust by the Monitor and the Bear Island Estate, as applicable, for the benefit of Persons entitled to be paid costs covered by the Wind-Down Amount in accordance with the Wind-Down Budget and the following provisions:

(a)    All claims for costs to be paid from the Wind-Down Amount pursuant to the Wind-Down Budget must be submitted to the Monitor or the Bear Island Estate, as applicable, and the Purchaser in writing.

(b)    Upon the submission of any such claims for costs to be paid from the Wind-Down Amount, the Purchaser shall have ten (10) days to object in writing to any such claim on the basis that it: (i) is not consistent in kind or amount with the Wind-Down Budget or (ii) is not reasonably necessary for the winding-down of the Sellers' estates and other Canadian Debtors' estates.

(c)    In the event that an objection is made by the Purchaser and an agreement cannot be reached between the claimant and the Purchaser, the amount of any such payment still in dispute shall be determined, on application by the Purchaser or the Monitor or the Bear Island Estate, as applicable, on notice to the Purchaser and any affected beneficiary of the Wind-Down Amount in each case, by Order of the applicable Court. The costs of any such application shall be paid: (i) in the case of the Monitor, from the Wind-Down Amount; (ii) in the case of the claimant, by the claimant unless the claimant is successful in defending their claim in which case the claimant's costs of the application shall be reimbursed from the Wind-Down Amount; and (iii) in the case of the Purchaser, by the Purchaser unless the Purchaser is successful in its complaint in which case its costs of the application shall be paid from the Wind-Down Amount.

(d)    Once the amount of any such claim has either been agreed to or determined by the applicable Court, as set forth above, the Monitor or the Bear Island Estate, as applicable, shall promptly pay such claim from the Wind-Down Amount.

(e)    Subsequent to Closing, the Monitor and the Bear Island Estate, as applicable, shall reduce the amount of the Wind-Down Amount as and to the extent that the Monitor or the Bear Island Estate, as applicable, may agree, or a Court determines, that it, or portions of it, are no longer required to fund the wind-down costs of the Sellers' estates and other Canadian Debtors' estates by distributing to Purchaser the amount of such reductions.

(f) Pursuant to the Sale Orders, all right, title and interest in and to any amounts in the Wind-Down Amount that are not used to pay costs associated with winding-down Sellers' estate and other Canadian Debtors' estates shall vest absolutely in the Purchaser as at the Closing Date and shall promptly be distributed to the Purchaser in accordance with this paragraph.

**5.19    Reserve Payment Amount.**

Purchaser shall be kept reasonably informed of, and shall have full rights of participation in, the determination by the Canadian Court of any and all of the matters identified in the definition of Reserve Payment Amount (the "**Reserve Payment Amount Matters**") and no Reserve Payment Amount Matter may be allowed or settled without the consent of Purchaser, such consent not to be unreasonably withheld, and any such allowance or settlement entered into without such consent shall not be entitled to payment from the Reserve Payment Amount.  Upon notice to the Canadian Debtors, Purchaser shall be entitled to assume the defense of any Reserve Payment Amount Matter.

**5.20    Name Change.**

Within ten (10) days after the Closing Date, Sellers and their Subsidiaries shall take such corporate and other actions necessary to change their corporate and company names to ones that are not similar to, or confusing with, their current names, including any necessary filings required by applicable Law.

**ARTICLE VI**
**TAX MATTERS**

**6.1    Transfer Taxes.**

(a) The Parties agree that the Purchase Price is exclusive of any Transfer Taxes. Subject to Section 6.2, the Purchaser (or the relevant Designated Purchaser) shall promptly pay directly to the appropriate Tax Authority, or promptly reimburse the Sellers upon demand and delivery of proof of payment, all applicable Transfer Taxes that are properly payable by Purchaser under applicable Law in connection with this Agreement and the transactions contemplated herein and the other Transaction Documents and the transactions contemplated therein.

(b) If the Purchaser or any Designated Purchaser wishes to claim any exemption relating to, or a reduced rate of, Transfer Taxes, in connection with this Agreement or the transactions contemplated herein or the other Transaction Documents and the transactions contemplated therein, the Purchaser or any Designated Purchaser, as the case may be, shall be solely responsible for ensuring that such exemption or election applies and, in that regard, shall provide the Sellers prior to Closing with its permit number, GST, QST or other similar registration numbers and/or any appropriate certificate of exemption, election and/or other document or evidence to support the claimed entitlement to such exemption or reduced rate by the Purchaser or such Designated

Purchaser, as the case may be. The Sellers shall make reasonable efforts to cooperate to the extent necessary to obtain any such exemption or reduced rate.

6.2    **Tax Elections.**

(a)    With respect to the sale of the Assets situated in Canada, at Purchaser's sole expense, Purchaser (or the relevant Designated Purchaser) and each Seller that is selling such Assets under this Agreement shall, where such election is available, jointly execute an election under Section 167 of Part IX of the *Excise Tax Act* (Canada) and under Section 75 of an *Act respecting the Quebec Sales Tax* in the forms prescribed for such purposes such that the sale of the Assets by such Canadian Debtors will take place without payment of any GST or QST. Purchaser (or the relevant Designated Purchaser) shall file the election forms referred to above with the proper Tax Authority, together with Purchaser's (or the relevant Designated Purchaser's) GST/QST return for its GST/QST reporting period during which the transaction of purchase and sale contemplated herein occurs. Notwithstanding such election, in the event that it is determined by the CRA or the Ministère du Revenu du Québec (the "MRQ") that there is a GST or QST liability of Purchaser (or the relevant Designated Purchaser) to pay GST or QST on all or part of the Assets sold pursuant to this Agreement, the Parties agree that such GST or QST, as the case may be, shall, unless already collected from Purchaser (or the relevant Designated Purchaser) and remitted by each Seller, be forthwith remitted by Purchaser (or the relevant Designated Purchaser) to the CRA or the MRQ, as the case may be, and Purchaser shall indemnify and save each Seller harmless with respect to any such GST or QST liability arising herein, as well as any interest and penalties related thereto. If it is determined that the elections are not available, the Sellers agree to provide reasonable cooperation to the Purchaser or the Designated Purchaser to expedite the Purchaser's or Designated Purchaser's claims for input tax credits, input tax refunds or rebates of GST and QST.

(b)    Purchaser (or the relevant Designated Purchaser) and each Seller, if applicable, shall jointly execute and file an election under subsection 20(24) of the Tax Act in the manner required by subsection 20(25) of the Tax Act and under the equivalent or corresponding provisions of any other applicable provincial or territorial statute, in the prescribed forms and within the time period permitted under the Tax Act and under any other applicable provincial or territorial statute, as to such amount paid by each Seller to Purchaser for assuming future obligations. In this regard, Purchaser (or the relevant Designated Purchaser) and each Seller, if applicable, acknowledge that a portion of the Assets transferred by each such Seller and having a value equal to the amount elected under subsection 20(24) of the Tax Act and the equivalent provisions of any applicable provincial or territorial statute is being transferred by each such Seller as a payment for the assumption of such future obligations by Purchaser.

(c)    Purchaser (or the relevant Designated Purchaser) and each Seller, if applicable, will in a timely fashion jointly execute and file an election under Section 22 of the

Tax Act and the corresponding sections of any other provincial statute and any regulations under such statutes in a manner consistent with the Purchase Price allocation under Section 2.2.3.

(d)     The Purchaser (or the relevant Designated Purchaser) and each Seller confirm that no portion of the Purchase Price is paid or allocated to a "restrictive covenant", as that term is defined for the purposes of Section 56.4 of the Tax Act as proposed by the Department of Finance (Canada) on July 16, 2010 (the "**Legislative Proposals**"). If any portion of the Purchase Price is deemed by CRA to be in respect of a "restrictive covenant" then, each Party agrees to execute and file any joint elections under section 56.4 of the Tax Act as per the Legislative Proposals as may be requested by any other Party in respect of any restrictive covenants given under this Agreement or in connection with the transactions contemplated by this Agreement. If any provincial taxing authority proposes a similar provision, then Purchaser (or the relevant Designated Purchaser) and each Seller shall make a similar provincial election.

## 6.3     Withholding Taxes.

Notwithstanding any other provision in this Agreement, Purchaser shall have the right to deduct and withhold Taxes from any payments to be made hereunder if such withholding is required by Law and to collect any necessary Tax forms, including IRS Forms W-8 or W-9, as applicable, or any similar information, from Sellers and any other recipients of payments hereunder. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been delivered and paid to Sellers or any such other recipient of payments in respect of which such deduction and withholding was made.

## 6.4     Tax Characterization of Payments Under This Agreement.

The Sellers and the Purchaser agree to treat all payments made either to or for the benefit of the other Party under this Agreement as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof to the extent permitted under applicable Tax Law.

## 6.5     Records.

Subject to the provisions of Section 5.4, (i) after the Closing Date, the Purchaser and the Designated Purchasers on the one hand, and the Sellers, on the other hand, will make available to the other, as reasonably requested, and to any Tax Authority, all information, records or documents relating to liability for Taxes with respect to the Assets, the Assumed Liabilities, the Business for all periods prior to or including the Closing Date, and will preserve such information, records or documents until the expiration of any applicable statute of limitations or extensions thereof, and (ii) in the event that one Party needs access to records in the possession of a second Party relating to any of the Assets, the Assumed Liabilities, the Business for purposes of preparing Tax Returns or complying with any Tax audit request, subpoena or other investigative demand by any Tax Authority, or for any other legitimate Tax-related purpose not injurious to the second Party, the second Party will allow representatives of the other Party access to such records during regular business hours at the second Party's place of business for

the sole purpose of obtaining information for use as aforesaid and will permit such other Party to make extracts and copies thereof as may be necessary or convenient. The obligation to cooperate pursuant to this paragraph shall terminate at the time the relevant applicable statute of limitations expires (giving effect to any extension thereof).

6.6     Property Tax Allocation.

        For purposes of Section 2.1.3(a)(iii), all real and personal property Taxes and similar ad valorem obligations levied with respect to the Assets, whether imposed or assessed before or after the Closing Date ("**Periodic Taxes**") for a taxable period that includes (but does not end on) the Closing Date (a "**Straddle Period**"), shall be apportioned between Sellers and Purchaser or the applicable Designated Purchaser as of the Closing Date based on the number of days of such taxable period included in the period ending with and including the Closing Date (together with periods ending before the Closing Date, the "**Pre-Closing Tax Period**"), and the number of days of such taxable period beginning after the Closing Date (together with any periods beginning after the Closing Date, the "**Post-Closing Tax Period**"). At the Closing, Periodic Taxes with respect to each Asset for the applicable Tax period shall be prorated in accordance with the foregoing provisions based on the Tax assessment for such Asset for the applicable Tax period, if available, or otherwise, based on the last available Tax assessment with respect to such Asset. Sellers shall be responsible for such Periodic Taxes attributable to Pre-Closing Tax Periods and the applicable Purchaser shall be responsible for such Periodic Taxes attributable to Post-Closing Tax Periods. At the Closing, (x) Sellers shall pay to the applicable Purchaser an amount equal to excess, if any, of the (i) unpaid Periodic Taxes attributable to Pre-Closing Tax Periods over (ii) Periodic Taxes paid by Sellers but apportioned hereunder to the applicable Purchaser for Straddle Periods (each determined in accordance with the foregoing principles), or (y) the applicable Purchaser shall pay to Sellers an amount equal to Periodic Taxes apportioned to the applicable Purchaser with respect to Straddle Periods but previously paid by Sellers, as applicable. The applicable Purchaser shall also be responsible for preparing and filing all Periodic Tax returns required to be filed after the Closing Date.

## ARTICLE VII
## EMPLOYMENT MATTERS

7.1     **Employment Obligations with Respect to Non-Union Employees.**

        The provisions of this Section 7.1 shall apply to Non-Union Employees.

7.1.1.  Employment Terms.

        Prior to the Closing, the Purchaser shall, or shall cause the relevant Designated Purchaser to:

        (a)     in the case of Non-Union Employees of the Seller which is the U.S. Debtor, which are all the Employees of such Seller, extend an offer of employment to those Non-Union Employees of the U.S. Debtor whom the Purchaser or Designated Purchaser has determined to offer employment to, with such employment to take effect under the terms stated herein as of the Effective Hire Date, as defined below. Such offers shall be for employment on terms and conditions

substantially the same, or more beneficial to the Non-Union Employee, with respect to their annual base salary or hourly wage, as applicable, as was in effect immediately prior to the Closing. Purchaser or Designated Purchaser shall provide Sellers with information that Sellers reasonably request to verify that such offers of employment are in compliance with this Section 7.1.1;

(b)     in the case of Non-Union Employees of those Sellers who are Canadian Debtors, on Closing all such Non-Union Employees shall have their employment transfer automatically to the Purchaser or relevant Designated Purchaser by operation of Law, such employment to be for substantially similar wages as provided by the relevant Seller and with the Purchaser Employee Plans to provide such Non-Union Employees with benefits substantially comparable, in the aggregate, to those provided prior to Closing under the relevant Seller Employee Plans; and

(c)     no Non-Union Employee's continued employment after the Employee Transfer Time with Purchaser or a Designated Purchaser shall be conditioned upon such Non-Union Employee satisfactorily completing a background investigation, drug test or other employment screening process and shall not include a probationary period; provided, however, that the Purchaser or Designated Purchaser may require Non-Union Employees to provide evidence that they are legally permitted to be employed by the Purchaser or a Designated Purchaser, as required by applicable Law. Any Employee who accepts an offer of employment and commences employment with Purchaser or Designated Purchaser pursuant to this Agreement, and any Employees whose employment transfers by operation of Law, shall all be deemed to be a Transferred Employee for all purposes of this Agreement. With respect to Non-Union Employees of the U.S. Debtor, Inactive Employees shall remain employed by the relevant Seller. The Effective Hire Date for any Non-Union Employee shall be the date corresponding to the Employee Transfer Time for all Non-Union Employees.

7.1.2.   Employee Benefits.

(a)     After the date hereof, the Sellers and the Purchaser shall cooperate promptly and in good faith in preparing the transition of the Transferred Employees as applicable from coverage under the Seller Employee Plans to coverage under the Purchaser Employee Plans effective as of the Transferred Employee's Effective Hire Date.

(b)     Purchaser shall assume and honor the amount of compensation with respect to the accrued and unused vacation days that is due and owing to the Transferred Employees up to their Effective Hire Date, to such Transferred Employees by the date required under applicable Law. The Purchaser will, and will cause the relevant Designated Purchasers to, honor such accrued and unused vacation days in the ordinary course.

(c)     Neither Section 7.1.1 nor this Section 7.1.2 restricts the right of the Purchaser to terminate the employment of any Transferred Employee after the Closing.

(d)     Purchaser and each applicable Seller hereby agree to follow the standard procedure for employment tax withholding as provided under applicable Law.

(e)     Following the Closing Date, Purchaser shall, or shall cause its Affiliates to, assume all obligations to provide continuation health care coverage in accordance with Section 4980B of the Code and Title I, Subtitle B, Part 6 of ERISA ("COBRA") to Transferred Employees and/or their qualified beneficiaries who have a qualifying event after such Transferred Employees' Employee Transfer Time or as otherwise required by applicable Law.

(f)     Purchaser shall, no later than five (5) days prior to Closing, deliver a notice to the Sellers indicating which of the Seller Employee Plans relating to Non-Union Employees, former Employees, retirees or their respective dependents of Sellers in Canada (the "Non-Union Plans") Purchaser will assume and which of the Non-Union Plans Purchaser will not assume. To the extent Purchaser elects not to assume any Non-Union Plans, Sellers shall take such actions as directed by Purchaser to deal with such Non-Union Plans prior to Closing.

7.2     **Employment Obligations with Respect to Union Employees.**

(a)     The provisions of this Section 7.2 shall apply only to Union Employees, all of whom are employed by Sellers who are Canadian Debtors.

(b)     As of the Closing Date, and provided that a sufficient number of Union Employees of the Canadian Debtors have by that time voted to ratify the terms of any amendments to existing Collective Labor Agreements or any new Collective Labor Agreements agreed to between, on the one hand, the Sellers for the benefit of the Purchaser or relevant Designated Purchaser and, on the other hand, the applicable collective bargaining agent as contemplated in Section 8.3(f), the Purchaser or relevant Designated Purchaser shall employ any Transferred Employee who is a Union Employee, and will be bound by the terms and obligations of the applicable amended or new Collective Labor Agreements (including any new retirement or other benefit plans replacing existing pension and benefit plans which are contemplated by such Collective Labor Agreement), all subject to Section 8.3(f) of this Agreement (until the expiration, termination or modification of such Collective Labor Agreements in accordance with applicable Law).

(c)     After Closing, the Purchaser or relevant Designated Purchaser will do or cause to be done, in cooperation with the Sellers, all things necessary under applicable Law to be recognized as the successor employer of the Union Employees including the filing of all forms, motions or notices with the appropriate Government Entity.

(d)     Any Seller Employee Plan relating to unionized Employees, former Employees, retirees or their respective dependents of Sellers in Canada shall, before Closing and at the written directions of the Purchaser, be terminated by Sellers effective no later than the day immediately preceding the Closing, upon the entering into

of new or modified Collective Labor Agreement and the requisite majority of members in each applicable union having voted to ratify and accept such Collective Labor Agreement and any notice required under applicable Law shall have been delivered.

**7.3     Excluded Employee Liabilities.**

For purposes of clarity, and notwithstanding any other provision in this Agreement, the Sellers shall retain, and neither the Purchaser nor any of the Designated Purchasers shall assume at the Closing, any of the following Liabilities of the Sellers (the "**Excluded Employee Liabilities**"):

(a)     the Seller Employee Plans (other than the Transferred Employee Plans) or any Liabilities thereunder;

(b)     the Sellers' or any of their Affiliates' obligations to make payments or provide benefits under any Seller Employee Plan or any Liabilities thereunder except with respect to Transferred Employee Plans;

(c)     any Liabilities arising under the Collective Labor Agreements which arise prior to or on the Closing Date; and

(d)     Liabilities resulting from any Action, or with respect to any potential or threatened Action which the Sellers have received notice of an intent to file, on or prior to the Closing Date, (i) by any Employee, or (ii) an applicant with respect to potential employment with any of the Sellers in the Business.

**7.4     Other Employee Covenants.**

(a)     After the date hereof, and subject to each Party's disclosure obligations imposed by Law or by Government Entities and each Party's obligations hereunder, the Purchaser shall not, and shall procure that the Designated Purchasers and any of the Purchaser's Affiliates shall not, issue any announcement or communication to their respective employees or the Employees, prior to consultation with, and the approval of, the Sellers (not to be unreasonably withheld or delayed) with respect to this Agreement or any of the transactions contemplated hereby. If requested, the Sellers shall cooperate with the Purchaser in respect of the development and distribution of any announcement and communication to the employees of the Sellers, including Employees, with respect to this Agreement or any of the transactions contemplated hereby.

(b)     The Purchaser undertakes to keep the Employee Information in confidence and that, until the relevant Employee Transfer Time:

(i)     the Purchaser shall, and shall cause the Designated Purchasers to, restrict the disclosure of the Employee Information only to such of its employees, agents and advisors as is necessary for the purposes of effectuating this Agreement prior to the Employee Transfer Time;

(ii) prior to the Employee Transfer Time, the Employee Information shall not be used except for effectuating this Agreement and shall be returned to the Sellers or destroyed, at the Sellers' election, if this Agreement is terminated; and

(iii) the Purchaser shall, and shall cause the Designated Purchasers to, comply with such additional obligations as may be reasonably required in any particular jurisdiction to comply with any applicable data privacy Laws.

(c) The Purchaser and the Sellers shall cooperate with each other to provide for an orderly transition of the Transferred Employees from the Sellers to the Purchaser or the Designated Purchasers, as applicable, and to minimize the disruption to the respective businesses of the Parties resulting from the transactions contemplated hereby.

## 7.5 No Obligation.

Other than as expressly set forth herein, nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Transferred Employee. No provision of this Agreement shall create any Third Party beneficiary rights in any Employee or former Employee of Sellers or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including without limitation, in respect of continued employment (or resumed employment) for any specified period.

## ARTICLE VIII
## CONDITIONS TO THE CLOSING

## 8.1 Conditions to Each Party's Obligation.

The Parties' obligation to effect, and, as to the Purchaser, to cause the relevant Designated Purchasers to effect, the Closing is subject to the satisfaction or the express written waiver of the Parties, at or prior to the Closing, of the following conditions:

(a) *Regulatory Approvals.* All Regulatory Approvals shall have been obtained.

(b) *No Injunctions or Restraints.* There shall be in effect no Law or Order in the U.S. or Canada prohibiting the consummation of the transactions contemplated hereby that has not been withdrawn or terminated.

## 8.2 Conditions to Sellers' Obligation.

The Sellers' obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Sellers), at or prior to the Closing, of each of the following additional conditions:

(a) *No breach of Representations and Warranties.* Except for any inaccuracy that has not had a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement or on the Sellers or any of their Affiliates, each representation and warranty contained in Article III (disregarding all materiality and material adverse effect qualifications contained therein) shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except in each case for any failure to be true and correct that has not had a Material Adverse Effect. Sellers shall have received a certificate of Purchaser to such effect signed by a duly authorized officer thereof.

(b) *No breach of Covenants.* The covenants contained in this Agreement to be complied with by the Purchaser on or before the Closing shall have been complied with and not been breached in any material respect. Sellers shall have received a certificate of Purchaser to such effect signed by a duly authorized officer thereof.

(c) *Closing Deliveries.* Each of the deliveries required to be made to Sellers pursuant to Section 2.3.2 shall have been so delivered.

(d) *Court Orders.* The Stalking Horse and Bidding Procedures Orders and the Sale Orders shall have been entered and shall not have been stayed as of the Closing.

**8.3 Conditions to Purchaser's Obligation.**

The Purchaser's obligation to effect, and to cause the relevant Designated Purchasers to effect, the Closing shall be subject to the fulfillment (or express written waiver by the Purchaser), at or prior to the Closing, of each of the following additional conditions:

(a) *No breach of Representations and Warranties.* Each of the representations and warranties set forth in Article IV, disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date, except in each case for any failure to be true and correct that has not had a Material Adverse Effect. Purchasers shall have received a certificate of each of the Sellers to such effect signed by a duly authorized officer thereof.

(b) *No breach of Covenants.* The covenants, obligations and agreements contained in this Agreement to be complied with by the Sellers on or before the Closing shall not have been breached in any material respect. Purchasers shall have received a certificate of each of the Sellers to such effect signed by a duly authorized officer thereof.

(c) *No Material Adverse Effect.* There shall not have occurred any changes, effects or circumstances constituting, or which would be reasonably likely to result in, individually or in the aggregate, a Material Adverse Effect.

(d)    *Cure Costs.* The Cure Costs shall not exceed the Cure Cost Cap, and Purchaser shall have received a certificate of each of the Sellers to such effect signed by a duly authorized officer thereof.

(e)    *Assigned Contracts Approval.* The Bankruptcy Court shall have approved and authorized the assumption and assignment of such Assigned Contracts with respect to which Purchaser shall have provided the requisite adequate assurance.

(f)    *Collective Labor Agreements.* Collective Labor Agreements (whether in the form of new agreements or modifications to existing or expired agreements) shall have been reached between, on the one hand, the Sellers for the benefit of the Purchaser or relevant Designated Purchaser and, on the other hand, all applicable unions and collective bargaining agents that are acceptable to the Purchaser, in its sole discretion (including, without limitation, as to pension and retiree matters after Closing and as to the Purchaser, its officers, directors, employees, agents or delegates not having any Liabilities with respect to the existing or expired Collective Labor Agreements), and that may be assumed by the Purchaser at Closing, and the requisite majority of members in each applicable union shall have voted to ratify and accept such Collective Labor Agreement.

(g)    *Closing Deliveries.* Each of the deliveries required to be made to Purchaser pursuant to Section 2.3.2 shall have been so delivered.

(h)    *Court Orders.* The Stalking Horse and Bidding Procedures Orders and the Sale Orders shall have been entered and the Sale Orders shall have become Final Orders.

(i)    *Maximum Purchaser Cash Outlay at Closing.* The Cash Obligations shall not exceed $132,000,000; provided, that such amount shall be decreased by the amount of the Cure Cost associated with any Contract or Lease listed on <u>Schedule 2.1.3(a)(ii) of the Sellers Disclosure Letter</u> that is not an Assigned Contract.

(j)    *Cash Flow Compliance.* If the Closing Date is on or before October 22, 2010, immediately prior to the Closing, Sellers' cash balance after payment of all professional fees and expenses then due and owing up to and including the Closing (but excluding, for greater certainty, the Wind-Down Amount) will not be less than the projected cash balance for each of Canada, the U.S. and on a consolidated basis as is projected for the Closing Date under the 13-week cash flow forecast, dated July 29, 2010, attached hereto as <u>Exhibit K</u>, minus $5,000,000. If the Closing Date is after October 22, 2010, immediately prior to the Closing, Sellers' cash balance after payment of all professional fees and expenses then due and owing up to and including the Closing (but excluding, for greater certainty, the Wind-Down Amount) will be no less than $42,000,000.

(k)    *Violations of Law.* No Seller has received any written notice or has Knowledge of a violation or violations of Law that would result in, individually or in the aggregate, Liabilities to Sellers in excess of $10,000,000.

(l)     *Third Party Consents.* All Consents listed in <u>Section 8.3(l) of the Sellers Disclosure Letter</u> or waivers thereof shall have been obtained.

(m)     *Order Entry and Invoice Systems.* Sellers shall have (i) entered into a definitive agreement with Brant Industries Inc. on the terms set forth in Section 5.2(e)(i) for a period of at least one (1) year following the Closing Date and (ii) provided Purchaser with the information set forth in Section 5.2(e)(ii) in all material respects.

(n)     *CCAA Charges.* The Administrative Charge (as defined in the Initial CCAA Order) shall have been discharged and replaced by the Wind-Down Amount and the D&O Charge (as defined in the Initial CCAA Order) shall have been discharged and replaced with a CDN$10,000,000 letter of credit established by Purchaser pursuant to Section 5.2(g).

**ARTICLE IX**
**TERMINATION**

9.1     **Termination.**

This Agreement may be terminated at any time prior to the Closing:

(a)     by either Party, upon written notice to the other:

        (i)     by mutual written consent of the Sellers and the Purchaser;

        (ii)     in the event of a material breach by such other Party of such other Party's representations, warranties, agreements or covenants set forth in this Agreement, which breach (i) would result in a failure of the conditions to Closing set forth in Section 8.2 or Section 8.3, as applicable, and (ii) is not cured within seven (7) days from receipt of a written notice from the non-breaching Party;

        (iii)     if a Government Entity issues an Order prohibiting the transactions contemplated hereby; or

        (iv)     upon the entry of an order by the Bankruptcy Court authorizing an Alternative Transaction;

(b)     by Purchaser, upon written notice to Sellers:

        (i)     if the Stalking Horse and Bidding Procedures Orders have not been entered by August 26, 2010 or do not contain approval of the Break-Up Fee and the Expense Reimbursement;

        (ii)     if the Sale Orders are not entered by September 8, 2010;

        (iii)     if the Closing does not take place by November 19, 2010;

(iv)    if Sellers withdraw or seek authority to withdraw the Sale Motion;

(v)    if Sellers announce any plan of liquidation or support any such plan filed by any other party in lieu of consummating this Agreement;

(vi)    upon the sale, transfer or other disposition, directly or indirectly, of any material portion of the Business or the Assets (other than as a going concern) in connection with the closure, liquidation or winding up of the Business or any of the Sellers;

(vii)    if the Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the U.S. Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for the U.S. Debtor and such trustee rejects the transactions contemplated by this Agreement;

(viii)    if the CCAA Cases are terminated or a trustee in bankruptcy or receiver is appointed in respect of any of the Canadian Debtors or their respective Assets, and such trustee in bankruptcy or receiver refuses to proceed with the transactions contemplated by this Agreement;

(ix)    if a Material Adverse Effect occurs; or

(x)    if the Sellers Disclosure Letter is unacceptable to the Purchaser, in its sole discretion; provided the right to terminate this Agreement under this Section 9.1(b)(x) shall be exercised prior to the first hearing to approve the Stalking Horse and Bidding Procedures Orders; or

(c)    by Sellers, upon ten (10) Business Days advance written notice to Purchaser if: (i) Purchaser is able to terminate this Agreement pursuant to Section 9.1(b)(iii); (ii) the condition set forth in Section 8.3(f) shall not have been satisfied; (iii) negotiations with the applicable unions and collective bargaining agents to satisfy the condition set forth in Section 8.3(f) are not occurring; and (iv) such negotiations have not been reestablished with such applicable unions and collective bargaining agents before the end of such ten (10) Business Day notice period.

provided, however, that the right to terminate this Agreement pursuant to Section 9.1(a)(ii), Section 9.1(b)(iii) and Section 9.3(c) shall not be available to any Party whose breach hereof has been the principal cause of, or has directly resulted in, the event or condition purportedly giving rise to a right to terminate this Agreement under such clauses.

9.2    **Break-Up Fee.**

(a)    In the event that (x) this Agreement is terminated pursuant to Section 9.1(a)(iv), then (y) the Sellers shall pay to the Purchaser, or to such Person as the Purchaser may direct, in immediately available funds a cash fee equal to $5,000,000 (the "Break-Up Fee") which shall be payable upon consummation of the Alternative

Transaction and otherwise subject to the Stalking Horse and Bidding Procedures Order.

(b)     The Break-Up Fee and the Expense Reimbursement, if paid, and the return of the Deposit, will be the sole and exclusive remedy as liquidated damages of the Purchaser, whether at Law or in equity, for any breach by the Sellers or any of their Affiliates of the terms and conditions of this Agreement.

(c)     The provision for payment of the Break-Up Fee is an integral part of this Agreement without which the Purchaser would not have entered into this Agreement. The Sellers' obligation to pay the Break-Up Fee pursuant to this Section 9.2 shall be joint and several among the Sellers and shall survive termination of this Agreement which shall, subject to Bankruptcy Court approval, constitute (i) in the Chapter 11 Case, a super priority administrative expense under Section 503(b)(1) of the U.S. Bankruptcy Code, junior only to the claims of the lenders under the DIP Credit Agreement and any "Carve-Out" set forth in the order approving the DIP Credit Agreement; and (ii) in the CCAA Cases, a priority charge against all of the assets of the Canadian Debtors ranking junior only to the DIP Charge, the Directors Charge and the Administration Charge (all as defined in the Initial CCAA Order), and shall in each of the Bankruptcy Proceedings be authorized to be paid by the Stalking Horse and Bidding Procedures Orders.

(d)     Notwithstanding anything to the contrary herein, the Sellers' obligation to pay the Break-Up Fee pursuant to this Section 9.2 is expressly subject to entry of the Stalking Horse and Bidding Procedures Orders.

9.3     **Expense Reimbursement.**

Notwithstanding anything in this Agreement to the contrary, Sellers agree to pay Purchaser, or to such Person as the Purchaser may direct, the Expense Reimbursement, with the Expense Reimbursement being paid by Sellers to Purchaser, or to such Person as the Purchaser may direct, upon the earlier to occur of (a) the entry of an order by the Bankruptcy Court approving an Alternative Transaction and (b) the termination of this Agreement in accordance with the terms set forth in Section 9.1 (except for any termination pursuant to Section 9.1(a)(i), 9.1(a)(ii) in the event of Purchaser's breach, 9.1(b)(i), 9.1(b)(ix), 9.1(b)(x) or 9.1(c)), provided that Purchaser shall be required to provide to Sellers such documentation as Sellers may reasonably request evidencing the expenses and fees in respect of which a request for reimbursement is made hereunder. The obligation of the Sellers to pay the Expense Reimbursement shall be joint and several among the Sellers. The provision for payment of the Expense Reimbursement is an integral part of this Agreement without which the Purchaser would not have entered into this Agreement.

9.4     **Effects of Termination.**

If this Agreement is terminated pursuant to Section 9.1:

(a)    all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of (i) Section 5.5 (Public Announcements), (ii) Section 5.9 (Transaction Expenses), (iii) Section 5.10 (Confidentiality), (iv) Section 7.4(b)(ii) (Other Employee Covenants), (v) Section 9.2 (Break-Up Fee), (vi) Section 9.3 (Expense Reimbursement), (vii) Section 9.4 (Effects of Termination), (viii) Section 10.5 (Successors and Assigns), (ix) Section 10.6 (Governing Law; Submission to Jurisdiction; Waiver of Jury Trial) and (x) Section 10.7 (Notices); provided, that nothing herein shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof and thereof;

(b)    in the case that this Agreement is terminated by the Sellers pursuant to Section 9.1(a)(ii), the Deposit shall be disbursed by the Deposit Escrow Agent to the Sellers in immediately available funds, to an account designated by the Sellers to the Deposit Escrow Agent in writing. In the case that this Agreement is terminated in any other circumstance, the Deposit shall be disbursed by the Deposit Escrow Agent to the Purchaser in immediately available funds, to an account designated by the Purchaser to the Deposit Escrow Agent in writing. The Deposit, if distributed to the Sellers, will be the sole and exclusive remedy as liquidated damages of the Sellers, whether at Law or in equity, for any breach by the Purchaser or any of its Affiliates of the terms and conditions of this Agreement;

(c)    the Purchaser shall return to the Sellers all documents, work papers and other material of any of the Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; and

(d)    the provisions of the Confidentiality Agreement will continue in full force and effect.

## ARTICLE X
## MISCELLANEOUS

**10.1    No Survival of Representations and Warranties or Covenants.**

No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date. Accordingly, no claim of any nature whatsoever for breach of such representations, warranties, covenants or agreements may be made, or Action instituted, after the Closing Date. Notwithstanding the foregoing, the covenants and agreements that by their terms are to be satisfied after the Closing Date shall survive until satisfied in accordance with their terms.

**10.2    Remedies.**

No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under

this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

**10.3     No Third-Party Beneficiaries.**

Except as set forth in Section 5.2(g), this Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**10.4     Consent to Amendments; Waivers.**

No Party shall be deemed to have waived any provision of this Agreement or any of the other Transaction Documents unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver. This Agreement and the Ancillary Documents shall not be amended, altered or qualified except by an instrument in writing signed by all the parties hereto or thereto, as the case may be.

**10.5     Successors and Assigns.**

Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement or any of the Ancillary Agreements by or on behalf of the Parties thereto will be binding upon and inure to the benefit of such Parties and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any Party without the prior written consent of the other Party, which consent may be withheld in such Party's sole discretion, except for (i) assignment to an Affiliate of a Party (provided that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Party), (ii) assignment by a U.S. Debtor to a succeeding entity following the U.S. Debtor's emergence from Chapter 11 of the U.S. Bankruptcy Code, and (iii) assignment by any of the Canadian Debtors pursuant to any plan of arrangement approved by the Canadian Court, which will not require the consent of the Purchaser.

**10.6     Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)     Any questions, claims, disputes, remedies or Actions arising from or related to this Agreement, and any relief or remedies sought by any Parties, shall be governed exclusively by the Laws of the State of New York without regard to the rules of conflict of laws applied therein or any other jurisdiction.

(b)     To the fullest extent permitted by applicable Law, each Party (i) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever arising out of, or in connection with, this Agreement or the transactions contemplated hereby shall be brought only in (A) the U.S. Bankruptcy Court, if brought prior to the entry of a final decree closing the Chapter 11 Case, with respect to the U.S. Debtor, (B) the Canadian Court, if brought prior to the entry of a final decree closing the CCAA Cases, with respect to the Canadian Debtors, or (C) in the federal courts in the Southern District of New York (collectively, the "Courts"), if

brought after entry of such final decree closing the Chapter 11 Case or CCAA Cases, *mutatis mutandis*, and shall not be brought, in any court in the United States of America, Canada, or any court in any other country, (ii) agrees to submit to the exclusive jurisdiction of the Courts, as applicable pursuant to the preceding clauses (i)(A), (B) and (C), for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such Action brought in such a court or any claim that any such Action brought in such a court has been brought in an inconvenient forum, (iv) agrees that mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 10.7 or any other manner as may be permitted by Law shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.6.

10.7    Notices.

All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by facsimile transmission with confirmation to the number specified below or personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address specified below, or at such address, to the attention of such other Person, and with such other copy, as the recipient Party has specified by prior written notice to the sending Party pursuant to the provisions of this Section 10.7.

If to the Purchaser to:

BD White Birch Investment LLC
c/o Black Diamond Capital Management, L.L.C.
100 Field Drive, Suite 300
Lake Forest, IL 60045
Attention: Les Meier
Facsimile: (847) 615-9064

With copies (that shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive
Suite 2700
Chicago, IL 60606
Attention: Kimberly A. deBeers
Facsimile: (312) 407-8576

Goodmans LLP
333 Bay Street, Suite 3400
Toronto, ON
M5H 2S7
Attention: L. Joseph Latham
Facsimile: (416) 979-1234

If to the Sellers, to:

White Birch Paper Company
80 Field Point Road
Greenwich, CT 06830

Attention: Ed Sherrick & Jay Epstein
Facsimile: (203) 661-3349

With copies (that shall not constitute notice) to:

Stikeman Elliott LLP
1155 René-Lévesque Blvd. West
40th Floor
Montréal, Quebec
H3B 3V2

Attention: Kevin Kyte & Jean Fontaine
Facsimile: (514) 397-3222

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York
10022-4611

Attention: Christopher J. Marcus
Facsimile: (212) 446-4900

Any such demand, notice, communication or report shall be deemed to have been given pursuant to this Agreement when delivered personally, when confirmed if by facsimile transmission, or on the calendar day after deposit with a reputable overnight courier service, as applicable.

10.8    Exhibits; Sellers Disclosure Letter.

      (a)    The Sellers Disclosure Letter and the Exhibits attached hereto constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein.

      (b)    For purposes of the representations and warranties of the Sellers contained in this Agreement, disclosure in any section of the Sellers Disclosure Letter of any facts or circumstances shall be deemed to be adequate response and disclosure of such facts or circumstances with respect to all representations or warranties by the Sellers calling for disclosure of such information, whether or not such disclosure is specifically associated with or purports to respond to one or more of such representations or warranties, if it is reasonably apparent from the Sellers Disclosure Letter that such disclosure is applicable. The inclusion of any information in any section of the Sellers Disclosure Letter or other document delivered by the Sellers pursuant to this Agreement shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

10.9    Counterparts.

      The Parties may execute this Agreement in two or more counterparts (no one of which need contain the signatures of all Parties), each of which will be an original and all of which together will constitute one and the same instrument.

10.10    No Presumption.

      The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of the Parties' negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

10.11    Severability.

      If any provision, clause, or part of this Agreement, or the application thereof under certain circumstances, is held invalid, illegal or incapable of being enforced in any jurisdiction, (i) as to such jurisdiction, the remainder of this Agreement or the application of such provision, clause or part under other circumstances, and (ii) as for any other jurisdiction, any provision of this Agreement, shall not be affected and shall remain in full force and effect, unless, in each case, such invalidity, illegality or unenforceability in such jurisdiction materially impairs the ability of the Parties to consummate the transactions contemplated by this Agreement. Upon such determination that any clause or other provision is invalid, illegal or incapable of being enforced in such jurisdiction, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable

manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible even in such jurisdiction.

10.12   **Entire Agreement.**

This Agreement, the Ancillary Agreements and the Confidentiality Agreement set forth the entire understanding of the Parties relating to the subject matter thereof, and all prior or contemporaneous understandings, agreements, representations and warranties, whether written or oral, are superseded by this Agreement, the Ancillary Agreements and the Confidentiality Agreement, and all such prior or contemporaneous understandings, agreements, representations and warranties are hereby terminated. In the event of any irreconcilable conflict between this Agreement and any of the Ancillary Agreements or the Confidentiality Agreement, the provisions of this Agreement shall prevail, regardless of the fact that certain Ancillary Agreements, such as the Local Sale Agreement, may be subject to different governing Laws (unless the Ancillary Agreement expressly provides otherwise).

10.13   **Limitation on Liability.**

In the event of the dissolution, liquidation, winding up (including, without limitation, being wound up as the term is used in Section 135 of the *Companies Act* (Nova Scotia) or any successor legislation) or termination of White Birch, no present or past shareholder or other member of White Birch shall be liable to make any contribution to the assets of White Birch pursuant to Section 135 of the *Companies Act* (Nova Scotia) for the purposes of satisfying any debts, liabilities or claims pursuant to this Agreement or any Ancillary Agreement such debts, liabilities or claims being restricted to the recourses that would be available had each of White Birch has been at all relevant times a company limited by shares. Nothing in this paragraph shall limit the obligations of any such Person arising pursuant to any agreement to which such Person is a party, or under which such Person has incurred obligations, or on any other basis or in any other capacity which in any such case is not described in Section 135 of the *Companies Act* (Nova Scotia).

10.14   **Damages.**

Under no circumstances shall any Party be liable for punitive damages or indirect, special, incidental, or consequential damages arising out of or in connection with this Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof, including damages alleged as a result of tortious conduct.

10.15   **Bulk Sales Laws.**

Each Party waives compliance by the other Party with any applicable bulk sales Law.

IN WITNESS WHEREOF, the Parties have duly executed this Asset Sale Agreement as of the date first written above.

WHITE BIRCH PAPER COMPANY

By: _____
Name: CHRISTOPHER M. BRANT / EDWARD D. SHERRICK
Title: PRESIDENT AND CHIEF OPERATING OFFICER/ SENIOR VICE-PRESIDENT AND CHIEF FINANCIAL OFFICER

STADACONA GENERAL PARTNER INC.

By: _____
Name: CHRISTOPHER M. BRANT / EDWARD D. SHERRICK
Title: PRESIDENT AND CHIEF OPERATING OFFICER/ EXECUTIVE VICE PRESIDENT, FINANCE, AND CHIEF FINANCIAL OFFICER

STADACONA L.P., by White Birch Paper Company, a General Partner

By: _____
Name: CHRISTOPHER M. BRANT / EDWARD D. SHERRICK
Title: PRESIDENT AND CHIEF OPERATING OFFICER/ SENIOR VICE-PRESIDENT AND CHIEF FINANCIAL OFFICER

F.F. SOUCY GENERAL PARTNER INC.

By: _____
Name: CHRISTOPHER M. BRANT / EDWARD D. SHERRICK
Title: PRESIDENT AND CHIEF OPERATING OFFICER/ VICE PRESIDENT

F.F. SOUCY, INC. & PARTNERS, LIMITED PARTNERSHIP, by White Birch Paper Company, a General Partner

By: _____
Name: CHRISTOPHER M. BRANT / EDWARD D. SHERRICK
Title: PRESIDENT AND CHIEF OPERATING OFFICER/ SENIOR VICE-PRESIDENT AND CHIEF FINANCIAL OFFICER

F.F. SOUCY L.P., by White Birch Paper Company, a
General Partner

By: _____

Name: CHRISTOPHER M. BRANT/EDWARD D. SHERRICK

Title: PRESIDENT AND CHIEF OPERATING OFFICER/
SENIOR VICE-PRESIDENT AND CHIEF FINANCIAL
OFFICER

ARRIMAGE DE GROS CACOUNA, INC.

By: _____

Name: CHRISTOPHER M. BRANT/EDWARD D. SHERRICK

Title: PRESIDENT AND CHIEF OPERATING OFFICER/
VICE PRESIDENT

PAPIER MASSON LTÉE

By: _____

Name: CHRISTOPHER M. BRANT/EDWARD D. SHERRICK

Title: PRESIDENT AND CHIEF OPERATING OFFICER/
SENIOR VICE-PRESIDENT AND CHIEF FINANCIAL
OFFICER

BEAR ISLAND PAPER COMPANY, L.L.C.

By: _____

Name: CHRISTOPHER M. BRANT/EDWARD D. SHERRICK

Title: PRESIDENT AND CHIEF OPERATING OFFICER/
SENIOR VICE-PRESIDENT AND CHIEF FINANCIAL OFFICER

BD WHITE BIRCH INVESTMENT LLC

By: _____

Name: Leslie A. Meier

Title: President, Managing Principal and Secretary

F.F. SOUCY L.P., by White Birch Paper Company, a
General Partner

By: _____
Name:
Title:

ARRIMAGE DE GROS CACOUNA INC.

By: _____
Name:
Title:

PAPIER MASSON LTÉE

By: _____
Name:
Title:

BEAR ISLAND PAPER COMPANY, L.L.C.

By: _____
Name:
Title:

BD WHITE BIRCH INVESTMENT LLC

By: _____
Name: Leslie A. Meier
Title: President, Managing Principal and Secretary

**Exhibit A**
**White Birch Subsidiary Sellers**

- Stadacona General Partner Inc.

- Stadacona L.P.

- F.F. Soucy General Partner Inc.

- F.F. Soucy, Inc. & Partners, Limited Partnership

- F.F. Soucy L.P.

- Arrimage de Gros Cacouna Inc.

- Papier Masson Ltée.

- Bear Island Paper Company, L.L.C.

**Exhibit B**
**List of Purchaser's Persons with Knowledge**

- Leslie Meier

- Scott Ziemke

- Steve Deckoff

- Chris Boyle

**Exhibit C**
**Relevant Antitrust Authorities**

- Canada

- United States of America

- Such other foreign jurisdictions as will be determined promptly upon debtor providing information on activities in foreign jurisdictions

**Exhibit D**
**Relevant Sellers**

- White Birch Paper Company

- Stadacona General Partner Inc.

- Stadacona L.P.

- F.F. Soucy General Partner Inc.

- F.F. Soucy, Inc. & Partners, Limited Partnership

- F.F. Soucy L.P.

- Arrimage de Gros Cacouna Inc.

- Papier Masson Ltée.

- Bear Island Paper Company, L.L.C.

**Exhibit E**
**Form of Deposit Escrow Agreement**

SEE ATTACHED

# FORM OF
## ESCROW AGREEMENT

ESCROW AGREEMENT, dated as of _____, 2010 (this "**Escrow Agreement**"), among White Birch Paper Company, a company organized under the Laws of Nova Scotia (a "**Seller**"), BD White Birch Investment LLC, a Delaware limited liability company (the "**Purchaser**") and _____ (in its capacity as escrow agent hereunder, the "**Escrow Agent**").

WHEREAS, this Escrow Agreement is entered into pursuant to that certain Asset Purchase Agreement, dated as of _____, 2010 (the "**Purchase Agreement**"), by and among the Seller, certain subsidiaries of the Seller and Purchaser, pursuant to which Purchaser has agreed, subject to the terms and conditions of the Purchase Agreement, to purchase certain assets from the Seller and certain of its subsidiaries;

WHEREAS, pursuant to Section 2.2.2 of the Purchase Agreement, Purchaser is required to transfer $5,000,000 (the "**Deposit**") to the Escrow Agent within five (5) business days of the entry of the Stalking Horse and Bidding Procedures Orders (as defined in the Purchase Agreement);

WHEREAS, the Escrow Agent has agreed to hold the Deposit, and all income and earnings thereon ("**Earnings**" and, together with the Deposit, the "**Escrowed Funds**"), and to disburse all such funds in accordance with the terms of this Escrow Agreement and the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## ESCROW

Section 1.1    Appointment of Escrow Agent.    The Seller and Purchaser hereby appoint and designate _____ as Escrow Agent.    The Escrow Agent hereby accepts such appointment and designation upon the terms, conditions and provisions provided in this Escrow Agreement.

Section 1.2    Establishment of the Escrow Fund.    The Escrow Agent has established a segregated account that shall be maintained, and from which funds shall be disbursed, in accordance with the terms and conditions of this Escrow Agreement (the "**Escrow Fund**").

Section 1.3    Purpose of the Escrow Fund.    The Escrow Fund has been established for the purpose of holding the Escrowed Funds, in contemplation of the

consummation of the transactions contemplated by the Purchase Agreement in accordance with its terms. The Escrowed Funds shall be maintained free and clear of all Liens whatsoever.

        Section 1.4  <u>Funding of the Escrow Fund</u>.  On the date of this Escrow Agreement, Purchaser shall deliver to the Escrow Agent the Deposit by wire transfer of immediately available funds, and the Escrow Agent shall deposit such amount into the Escrow Fund.

        Section 1.5  <u>No Offset</u>. The Escrowed Funds shall be held by the Escrow Agent in accordance with the terms of this Escrow Agreement and shall not be available to, and shall not be used by, the Escrow Agent to set-off any obligations owing to the Escrow Agent in any capacity.

# ARTICLE II

## DISBURSEMENT OF THE ESCROWED FUNDS

        Section 2.1  <u>Disbursement upon Closing</u>. Upon the receipt by the Escrow Agent of joint written instructions from Purchaser and the Seller that the closing under the Purchase Agreement has occurred, the Escrow Agent shall promptly deliver the entire amount of the Escrowed Funds to the Seller by wire transfer to such account or accounts as the Seller may designate to the Escrow Agent by written notice or in such instructions.

        Section 2.2  <u>Disbursement to the Seller upon Termination of Purchase Agreement</u>. Upon the receipt by the Escrow Agent of joint written instructions from Purchaser and the Seller that the Purchase Agreement has been terminated under circumstances requiring the Escrowed Funds to be disbursed to the Seller, the Escrow Agent shall promptly deliver the entire amount of the Escrowed Funds to the Seller by wire transfer to such account or accounts as the Seller may designate to the Escrow Agent by written notice or in such instructions.

        Section 2.3  <u>Disbursement to Purchaser upon Termination of Purchase Agreement</u>. Upon the receipt by the Escrow Agent of joint written instructions from Purchaser and the Seller that the Purchase Agreement has been terminated under circumstances requiring the Escrowed Funds to be returned to Purchaser, the Escrow Agent shall promptly deliver the entire amount of the Escrowed Funds to Purchaser by wire transfer to such account or accounts as Purchaser may designate to the Escrow Agent by written notice or in such instructions.

        Section 2.4  <u>Disbursement upon Court Order</u>. Upon the receipt by the Escrow Agent of a Court Order (as defined below) requiring all or any portion of the Escrowed Funds to be disbursed, the Escrow Agent shall promptly deliver such Escrowed Funds in accordance with such Court Order.

        Section 2.5  <u>Termination</u>. Upon (a) the disbursement of all of the Escrowed Funds or (b) the receipt by the Escrow Agent of joint written instructions from Purchaser and the Seller, this Escrow Agreement shall terminate and be of no further force and effect except that the provisions of Section 4.1(b), Section 4.3 and Section 4.4 hereof shall survive termination. In the event that this Escrow Agreement terminates prior to the distribution of all of the Escrowed

2

Funds, the Seller and Purchaser shall deliver joint written instructions to the Escrow Agent regarding the disposition of the Escrowed Funds.

Section 2.6   Reporting.   Other than reporting Earnings in accordance with Section 3.2, the Escrow Agent shall have no tax reporting duties with respect to any disbursements made pursuant to this Article 2.

Section 2.7   Tax Withholding.   Notwithstanding any contained herein, the Escrow Agent shall have the right to deduct and withhold taxes from any payments to be made hereunder if such withholding is required by applicable law. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Escrow Agreement as having been delivered and paid to the Seller or any such other recipient of payments in respect of which such deduction and withholding was made.

## ARTICLE III

## INVESTMENTS

Section 3.1   Investment of Escrow Fund.   The Escrow Agent is authorized and directed to deposit, transfer, hold and invest the Escrowed Funds in such investment or investments as Purchaser and the Seller shall jointly direct in writing.  In the absence of such direction, the Escrow Agent is hereby directed to invest in _____.
All Earnings shall become part of the Escrowed Funds and shall be disbursed in accordance with this Escrow Agreement.  The Escrow Agent is authorized to liquidate promptly any portion of the Escrow Fund consisting of investments to provide for payments required to be made under this Escrow Agreement.

Section 3.2   Taxes.   In the event of any Earnings on the Escrow Funds, or any portion thereof, the Purchaser will be treated as the owner of such Earnings, and Purchaser will report all such income in such proportions, in the taxable year or years in which such income is properly includible and pay any taxes attributable thereto. The Escrow Agent shall provide any necessary information reporting forms as required under the Income Tax Act (Canada) or the Income Tax Regulations promulgated thereunder, or for U.S. federal, state, and local purposes.

## ARTICLE IV

## ESCROW AGENT

Section 4.1   Responsibilities and Duties of the Escrow Agent.

(a)   The duties, responsibilities and obligations of the Escrow Agent shall be limited to those expressly set forth in this Escrow Agreement, and no duties, responsibilities or obligations shall be inferred or implied.  The Escrow Agent shall not be subject to, nor required to comply with, any other agreement among Purchaser or the Seller, even though reference thereto may be made herein, or to comply with any direction or instruction (other than those contained herein or delivered in accordance with this Escrow Agreement) from Purchaser or the Seller.  The Escrow Agent shall not be required to, and shall not, expend or risk any of its own funds or otherwise incur any financial liability in the performance of any of its duties

3

hereunder. The Escrow Agent is authorized to rely in good faith upon any instruction, notice, demand, certificate or document from Purchaser or the Seller believed by it to be genuine and to have been sent or given by Purchaser or the Seller.

(b)     The Escrow Agent shall not be liable for any action taken or omitted or for any loss or injury resulting from its actions or its performance or lack of performance of its duties hereunder in the absence of bad faith, gross negligence or willful misconduct. In no event shall the Escrow Agent be liable (i) for any consequential, punitive or special damages or (ii) for the acts or omissions of its nominees, correspondents, designees, subagents or subcustodians appointed with due care by the Escrow Agent.

(c)     The Escrow Agent may consult with legal counsel (with the reasonable fees and disbursements of such counsel to be paid as provided in Section 4.4) as to any matter relating to this Escrow Agreement, and the Escrow Agent shall not incur any liability in acting in good faith in accordance with any advice from such counsel.

(d)     The Escrow Agent shall provide to Purchaser and the Seller monthly statements identifying transactions, transfers or holdings of the Escrow Fund.

(e)     The Escrow Agent shall not be responsible in any respect for the form, execution, validity, value or genuineness of documents or securities deposited hereunder, or for any description therein, or for the identity, authority or rights of persons executing or delivering or purporting to execute or deliver any such document, security or endorsement.

(f)     In the event of any ambiguity or uncertainty hereunder or in any notice, instruction or other communication received by the Escrow Agent hereunder, the Escrow Agent may, in its sole discretion, refrain from taking any action other than retaining possession of the Escrow Fund, unless the Escrow Agent receives written instructions, signed by Purchaser and the Seller, which eliminates such ambiguity or uncertainty.

(g)     In the event of any dispute between or conflicting claims by or among Purchaser or the Seller with respect to the Escrow Fund, the Escrow Agent shall be entitled, in its sole discretion, to refuse to comply with any and all claims, demands or instructions with respect to the Escrow Fund so long as such dispute or conflict shall continue, and the Escrow Agent shall not be or become liable in any way for failure or refusal to comply with such conflicting claims, demands or instructions. The Escrow Agent shall be entitled to refuse to act until, in its sole discretion, either (i) such conflicting or adverse claims or demands shall have been determined by a final order, judgment or decree of a court of competent jurisdiction (a "**Court Order**"), which order, judgment or decree is not subject to appeal, or settled by agreement between the conflicting parties as evidenced in a writing reasonably satisfactory to the Escrow Agent or (ii) the Escrow Agent shall have received security or an indemnity reasonably satisfactory to it sufficient to hold it harmless from and against any and all losses which it may incur by reason of so acting. The Escrow Agent may, in addition, elect, in its sole discretion, to commence an interpleader action or seek other judicial relief or orders as it may deem, in its sole discretion, necessary.

4

Section 4.2   Removal; Resignation.  Purchaser and the Seller may jointly remove the Escrow Agent at any time by giving the Escrow Agent at least thirty (30) calendar days' prior written notice.   The Escrow Agent may resign as escrow agent at any time, by giving at least thirty (30) calendar days' prior written notice of such resignation to the Seller and Purchaser.  In either event, the Seller and Purchaser will jointly and promptly select a successor escrow agent, and the Seller and Purchaser will enter into an agreement with such successor escrow agent in substantially the form of this Escrow Agreement.  The removal or resignation of the Escrow Agent shall relieve the Escrow Agent of any responsibility or duty thereafter arising hereunder, but shall not relieve the Escrow Agent of responsibility to account to the Seller and Purchaser for funds received by the Escrow Agent prior to the effective date of such removal or resignation.  If a substitute for the Escrow Agent hereunder shall not have been selected prior to the expiration of sixty (60) calendar days following the date of the notice of removal or resignation, the Escrow Agent shall be entitled to petition any court of competent jurisdiction for the appointment of a substitute for it hereunder or, in the alternative, it may (i) transfer and deliver the Escrowed Funds to or upon the order of such court or (ii) keep safely all Escrowed Funds until it receives joint notice from the Seller and Purchaser of a substitute appointment.  The Escrow Agent shall be discharged from all subsequently arising duties hereunder upon acceptance by the substitute escrow agent of the Escrow Agent's duties hereunder or upon transfer and delivery of the funds in the escrow account to or upon the order of any court.

Section 4.3   Indemnification of the Escrow Agent.  The Seller and Purchaser each agree to hold the Escrow Agent harmless from and to indemnify the Escrow Agent against, any loss, liability, claim or demand arising out of or in connection with the performance of its obligations in accordance with the provisions of this Escrow Agreement, except to the extent such loss, liability, claim or demand arises from the bad faith, gross negligence or willful misconduct of the Escrow Agent.

Section 4.4   Fees and Expenses.  The reasonable fees for the services rendered by the Escrow Agent pursuant to the provisions of this Escrow Agreement with respect to the Escrow Fund, in accordance with the fee schedule attached hereto as Exhibit A, shall be paid by the Seller.  The Escrow Agent shall be entitled to receive all reasonable, out-of-pocket expenses, disbursements and advances incurred or made by the Escrow Agent in connection with this Escrow Agreement.  All such expenses, disbursements and advances shall be paid in cash to the Escrow Agent by the Seller. The Escrow Agent does not have and will not have any interest in the funds deposited hereunder but is serving only as escrow holder and having only possession thereof.

Section 4.5   Merger or Consolidation.   Any corporation or association into which the Escrow Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Escrow Agent is a party, shall be and become the successor escrow agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

5

# ARTICLE V

# MISCELLANEOUS

Section 5.1 <u>Notices</u>. Any notices, demands or other communication required to be sent or given hereunder by any of the parties shall in every case be in writing and shall be deemed properly served if (a) delivered personally to the recipient, (b) sent to the recipient by reputable express courier service (charges paid) or mailed to the recipient by registered or certified mail, return receipt requested and postage paid, or (c) sent to the recipient by facsimile, promptly followed by an original delivered in accordance with (a) or (b) above. Date of service of such notice shall be (w) the date such notice is personally delivered, (x) three (3) business days after the date of mailing if sent by certified or registered mail, (y) one (1) business day after date of delivery to the overnight courier if sent by overnight courier, or (z) the same day, if telecopied before 5:00 p.m. Chicago, Illinois time on a business day, and otherwise on the next business day after the date of transmittal by telecopy. Such notices, demands and other communications shall be sent to the addresses indicated below or such other address or to the attention of such other person as the recipient has indicated by prior written notice to the sending party in accordance with this Section 5.1:

(a)     If to the Seller:

White Birch Paper Company
80 Field Point Road
Greenwich, CT 06830
Attention: Ed Sherrick & Jay Epstein
Facsimile: (203) 661-3349


with a copy to:

Stikeman Elliott LLP
1155 René-Lévesque Blvd. West
40th Floor
Montréal, Quebec
H3B 3V2
Attention: Kevin Kyte & Jean Fontaine
Facsimile: (514) 397-3222

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York
10022-4611
Attention: Christopher J. Marcus
Facsimile: (212) 446-4900


(b)     If to Purchaser:

6

BD White Birch Investment LLC
c/o Black Diamond Capital Management, L.L.C.
100 Field Drive, Suite 300
Lake Forest, IL 60045
Attention: Les Meier
Facsimile: (847) 615-9064


with a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive
Suite 2700
Chicago, Illinois 60606
Attention: Kimberly A. deBeers, Esq.
Facsimile: (312) 407-8576


    (c)      If to the Escrow Agent:

        _____
        _____
        _____
        Attn:_____
        Facsimile:_____

        Section 5.2   <u>Severability</u>.  Whenever possible, each provision of this Escrow Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Escrow Agreement is held to be prohibited by or invalid under applicable law or rule in any jurisdiction, in any respect, such invalidity shall not affect the validity, legality and enforceability of any other provision or any other jurisdiction and, the remaining terms and provisions of this Escrow Agreement shall not in any way be affected or impaired thereby, all of which shall remain in full force and effect, and the affected term or provision shall be modified to the minimum extent permitted by law so as to achieve most fully the intention of this Escrow Agreement.

        Section 5.3   <u>Amendment and Waiver</u>.  This Escrow Agreement may be amended, or any provision of this Escrow Agreement may be waived, provided that any such amendment or waiver will be binding on a party only if such amendment or waiver is set forth in a writing executed by such party. The waiver by any party hereto of a breach of any provision of this Escrow Agreement shall not operate or be construed as a waiver of any other breach.

        Section 5.4   <u>Counterparts</u>.  This Escrow Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other.

7

Section 5.5    Construction.   This Escrow Agreement shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Escrow Agreement shall be governed by, the laws of the State of New York, without giving effect to provisions thereof regarding conflict of laws.

Section 5.6    Headings.  The Section captions used hereunder are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions.

Section 5.7    Parties in Interest; Assignment. This Escrow Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Other than pursuant to Section 4.5, neither this Escrow Agreement nor any of the rights interests or obligations hereunder shall be assigned by either of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other party, such consent not to be unreasonably withheld.

Section 5.8    Entire Agreement.    This Escrow Agreement (including the documents and the instruments referred to herein), and the Purchase Agreement constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

Section 5.9    No Strict Construction.    The language used in this Escrow Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any party hereto.

Section 5.10    Jurisdiction. Each party hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York or the New York State Court located in Manhattan, New York, in respect of any claim relating to the interpretation and enforcement of the provisions of this Escrow Agreement, and hereby waives, and agrees not to assert, as a defense in any action, suit or proceeding in which any such claim is made that it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in such courts or that the venue thereof may not be appropriate or that this Escrow Agreement or any such document may not be enforced in or by such courts.

Section 5.11    WAIVER OF JURY TRIAL. EACH PARTY HEREBY WAIVES (TO THE FULLEST EXTENT PERMITTED BY LAW) ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS ESCROW AGREEMENT.    THE PARTIES ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS ESCROW AGREEMENT. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS ESCROW AGREEMENT OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY. IN THE EVENT OF LITIGATION, THIS ESCROW AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

733034.05-Chicago Server 1A - MSW

IN WITNESS WHEREOF, the parties hereunto have duly caused this Escrow Agreement to be executed as of the date first above written.

WHITE BIRCH PAPER COMPANY


By: _____
Name:
Title:


BD WHITE BIRCH INVESTMENT LLC


By: _____
Name:
Title:


[ESCROW AGENT]


By: _____
Name:
Title:

**Exhibit F**
**Form of Bidding Procedures**

SEE ATTACHED

## Bidding Procedures

The bidding procedures contained herein (the "Bidding Procedures") are to be employed with respect to that certain Asset Sale Agreement, by and between White Birch Paper Company (together with certain subsidiaries, including Bear Island Paper Company, L.L.C., the "Sellers") and BD White Birch Investment LLC (the "Purchaser"), dated as of August 10, 2010 (as amended, modified or supplemented, the "Sale Agreement"), concerning, among other things, the sale, conveyance, assignment and transfer (the "Sale") of substantially all of the Sellers' assets (the "Assets"). Capitalized terms used herein but not defined have the meanings ascribed to them in the Sale Agreement.

The Sale is subject to competitive bidding as set forth herein (the "Bidding Process") and approval by the Superior Court of Québec (the "CCAA Court") and the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court," and together with the CCAA Court, the "Courts") at hearings (the "Sale Hearings") pursuant to the *Companies' Creditors Arrangement Act* (the "CCAA") and sections 105, 363 and 365 of title 11 of the United State Code (the "Bankruptcy Code"), respectively. Furthermore, the following Bidding Procedures and related bid protections provide a mechanism to reimburse Purchaser for its efforts and agreements to date and to facilitate a full and fair process seeking to maximize the value of the Assets for the benefit of the Sellers' estates, their creditors and other parties in interest.

## Background

Further to the orders issued by the CCAA Court and the Bankruptcy Court approving the Sale and Investor Solicitation Procedures (the "SISP Procedures" and the "SISP Orders") on April 28, 2010 and April 29, 2010, respectively, the Sellers, with the assistance of their advisors, have been engaged in a comprehensive marketing process to solicit proposals in connection with the Sale.

To this end, the Sellers' financial advisor contacted certain strategic and financial parties whom the financial advisor determined, in its reasonable professional judgment, may have an interest in acquiring all or any portion of the Assets. Such parties were provided with an initial offering summary and were invited to express their interest in making an offer to acquire all or substantially all of the Assets.

For those interested parties who then entered into a confidentiality agreement and were determined in the Sellers' business judgment to be capable of consummating the Sale (the "Phase I Qualified Bidders"), each received a confidential information memorandum and access to a virtual data room which contained information regarding the Assets.

By June 15, 2010, the Sellers had received four non-binding indications of interest regarding the purchase of all or any portion of the Assets. Upon an evaluation of these indications of interest, the Sellers invited two of these parties (each, a "Phase II Qualified Bidder") to perform due diligence with respect to the Assets, with the intention that one of the Phase II Qualified Bidders would serve as a stalking horse bidder at an auction of the Assets (the "Auction").

From June 15, 2010 through July 15, 2010, the Sellers engaged in active discussions with the Phase II Qualified Bidders and conducted site visits at the Sellers' facilities in an effort to complete a comprehensive due diligence process.

As of the July 15, 2010 deadline established pursuant to the SISP Procedures and the SISP Order, only the Purchaser had provided the Sellers with an offer to purchase the Assets. Accordingly:

(i)        on August 10, 2010, the Canadian Sellers filed a motion with the CCAA Court seeking an order for approval of (I) execution and delivery of the Sale Agreement by the Canadian Sellers, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the Sale Agreement, and (III) approval of the Bidding Procedures and Sale of the Canadian Sellers' rights, title and interests in and to the Assets pursuant to the procedures set forth herein (the "Canadian Stalking Horse and Bidding Procedures Order");

(ii)       on August [●], 2010, the CCAA Court entered the Canadian Stalking Horse and Bidding Procedures Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement to the Purchaser;

(iii)      on August 10, 2010, the U.S. Sellers filed the Motion of Bear Island Paper Company, L.L.C. for Entry of Orders Approving the (A) Form of the Purchase Agreement (B) Bidding Procedures (C) Form and manner of Notice of the Auction and Sale Hearing (D) Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (E) Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and (F)Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (the "U.S. Stalking Horse and Bidding Procedures Order," and together with the Canadian Stalking Horse and Bidding Procedures Order, the "Stalking Horse and Bidding Procedures Orders"); and

(iv)      on August [●], 2010, the Bankruptcy Court entered the U.S. Stalking Horse and Bidding Procedures Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement to the Purchaser.

### "Stalking Horse"

Pursuant to the SISP Procedures and the SISP Orders, the Purchaser has been designated by the Sellers to be the "Stalking Horse Bidder" for the Sale.

### Participation Requirements

Only those persons or entities that are or shall become Phase 1 Qualified Bidders pursuant to the SISP Procedures and the SISP Orders (including any lender under the DIP Credit

Agreement or the First Lien Credit Agreement) may participate in the Bidding Process. For all purposes herein, the Purchaser is deemed a Phase 1 Qualified Bidder.

## Due Diligence

Only Phase 1 Qualified Bidders may conduct due diligence and such due diligence must be completed by **5:00 p.m. (Eastern Time) on August 30, 2010**.

At the Sellers' discretion, due diligence access may include management presentations (as may be scheduled by the Sellers), access to physical and online data rooms, on-site inspections and such other matters that a Phase 1 Qualified Bidder may reasonably request and as to which Sellers, in their reasonable exercise of discretion, may agree.

The Sellers will designate employee(s) or other representative(s) to coordinate a Phase 1 Qualified Bidder's reasonable requests for additional information and due diligence access. In addition, the Sellers may, in their discretion, coordinate due diligence efforts such that multiple Phase 1 Qualified Bidders have simultaneous access to due diligence materials. Neither the Sellers nor any of their affiliates (nor any of their respective representatives) are obligated to furnish any information relating to all or any portion of the Assets to any person other than to Phase 1 Qualified Bidders.

## Bid Deadline

All bids must be submitted to the Sellers c/o Lazard Middle Market LLC, 10 South Wacker Drive, 33rd Floor, Chicago, IL 60606 (Attn.: Craig Korte, craig.korte@lazardmm.com), so as to be **actually received** by **5:00 p.m. (Eastern Time) on August 30, 2010** (the "Bid Deadline").

Copies of all bids shall be simultaneously provided by facsimile transmission, electronic mail, personal delivery or reliable overnight courier service to counsel to the Sellers, the Monitor in the CCAA Proceedings, counsel to the Purchaser and counsel to the Administrative Agent, Syndication Agent and Majority Lenders under the DIP Credit Agreement (the "DIP Parties").

## Qualified Bids

Only bids received from a Phase 1 Qualified Bidder before the Bid Deadline that include documents and satisfy each of the requirements set forth below (each a "Qualified Bid") will be considered at the Auction:

 (i)    must be received by the Bid Deadline (as may be extended pursuant to the conditions discussed below);

 (ii)   states that the applicable Phase 1 Qualified Bidder offers to purchase all or substantially all of the Assets upon the terms and conditions as substantially set forth in the Sale Agreement, including without limitation, with respect to certainty and timing of closing, or upon alternative terms and conditions that Sellers determine in their reasonable business judgment, after consultation

3

with their advisors and the Monitor, are no less favorable than the terms and conditions of the Sale Agreement;

(iii)     states that the applicable Phase 1 Qualified Bidder offers to purchase all or substantially all of the Assets for a purchase price or other value that is equal to or greater than the sum of the Purchase Price, plus (A) the amount of the Break-Up Fee, plus (B) an amount in respect of the Expense Reimbursement, plus (C) U.S. $1,000,000;

(iv)     must be irrevocable until the closing of the Sale if such Phase 1 Qualified Bidder is selected as either the winning bidder (the "Winning Bidder") or the alternative bidder (the "Alternative Bidder");

(v)     includes (A) a duly authorized and executed form of the Sale Agreement, including the purchase price for all or any portion of the Assets expressed in U.S. Dollars, together with all exhibits and schedules thereto, (B) to the extent required by the terms and conditions of such bid, any ancillary agreements as described in the Sale Agreement together with all exhibits and schedules thereto, (C) copies of such materials marked to show those amendments and ancillary modifications to the Sale Agreement (respectively, the "Marked Agreements" and "Marked Ancillary Agreements") and (D) proposed orders for the CCAA Court and Bankruptcy Court to approve the Sale;

(vi)     must be accompanied by a deposit (by means of a certified bank check from a U.S. bank or by wire transfer payable to White Birch Paper Company) of $5,000,000 (the "Deposit") to be dealt with as provided for under "Return of Deposits" below;

(vii)     is not conditioned on the outcome of unperformed due diligence by the Phase 1 Qualified Bidder and includes an acknowledgement and representation that the Phase 1 Qualified Bidder has had an opportunity to conduct any and all required due diligence prior to making its bid;

(viii)     must not be conditioned upon approval by the Bankruptcy Court or the CCAA Court of any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment;

(ix)     must include written evidence of a firm, irrevocable commitment for financing from a creditworthy bank or financial institution that will provide such financing without (A) alteration of conditions or (B) delays and that is not contingent as of the Auction, or, other evidence of ability, as determined in the Sellers' reasonable business judgment, to consummate the transaction contemplated by the Marked Agreements;

(x)     fully discloses the identity of each entity that will be bidding for all or any portion of the Assets or otherwise sponsoring or participating in connection

with such bid, and the complete terms of any such participation, including the identification of the Phase 1 Qualified Bidder's principal advisors;

(xi)     contains full details of the proposed number of Sellers' employees who will become employees of the Phase 1 Qualified Bidder and any proposed measures associated with (A) their continued employment and (B) the employment of all employees who will become employees of the Phase 1 Qualified Bidder;

(xii)    includes (A) an acknowledgment and representation that the Phase 1 Qualified Bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assumed and assigned pursuant to the Sale Agreement (or identifies, with particularity, which of such contracts and leases the Phase 1 Qualified Bidder does not wish to assume, or, alternatively, which additional contracts or leases the Phase 1 Qualified Bidder does wish to assume), (B) contains full details of the Phase 1 Qualified Bidder's proposal for the treatment of related cure costs and (C) identifies, with particularity, any contract or lease the assumption and assignment of which is a condition to closing;

(xiii)   includes an acknowledgement and representation that the Phase 1 Qualified Bidder (A) relied solely upon its own independent review, investigation and/or inspection of any documents and/or all or any portion of the Assets in making its bid and (B) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding all or any portion of the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreement or the Marked Ancillary Agreements;

(xiv)    includes evidence, in form and substance reasonably satisfactory to the Sellers, of authorization and approval from the Phase 1 Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(xv)     includes evidence, in form and substance reasonably satisfactory to the Sellers of compliance or anticipated compliance with all regulatory approvals (including, if applicable, anti-trust and Canadian regulatory approval), the anticipated time frame for such compliance and any anticipated impediments for obtaining such approvals;

(xvi)    includes evidence of the Phase 1 Qualified Bidder's ability to comply with Section 11.3 of the CCAA and Section 365 of the Bankruptcy Code (to the extent applicable), which includes providing adequate assurance of such Phase 1 Qualified Bidder's ability to perform the contracts and leases proposed in its bid to be assumed by, or subleased to, the Phase 1 Qualified

Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases; and

(xvii)   contains other information reasonably requested by the Sellers.

Whether a bid of a Phase 1 Qualified Bidder meets the foregoing requirements to become a Qualified Bid will be determined by the Sellers in their reasonable business judgment, after consultation with their advisors and the Monitor; provided that the Sellers, in evaluating such bids, may not waive substantial compliance with any of the requirements set forth above and may not waive strict compliance with the requirements set forth in (i), (ii), (iii), (iv), (v)(A), (vi), (viii) and (ix) above. The Sellers will notify the Purchaser, the DIP Parties and the applicable Phase 1 Qualified Bidder if they determine that a Phase 1 Qualified Bidder has submitted a Qualified Bid and provide a copy of that bid to the Purchaser and the DIP Parties, in each case on the day that any such determination is made. The Sale Agreement, as it may be amended, modified, or supplemented in accordance with its terms, shall constitute a Qualified Bid for all purposes.

The Sellers, in their reasonable business judgment, after consultation with their advisors and the Monitor, may reject any proposal (other than the Sale Agreement) that (a) does not meet any of the requirements set forth above, (b) is on terms that are more burdensome or conditional than the terms of the Sale Agreement, (c) entitles the Phase 1 Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or (d) is contrary to the best interests of the Sellers' estates, their creditors and other parties in interest.

If the Sellers do not receive any Qualified Bids other than the Sale Agreement by the Bid Deadline, the Auction shall be cancelled and the Sellers shall report the same to the Bankruptcy Court and the CCAA Court and shall proceed immediately with the Sale pursuant to the terms of the Sale Agreement.

### Auction, Bidding Increments and Bids Remaining Open

If, in addition to the Qualified Bid submitted by the Purchaser, the Sellers receive one or more other Qualified Bids, the Sellers shall conduct the Auction at the offices of Kirkland & Ellis, 601 Lexington Avenue, New York, New York 10022, beginning at **10:00 a.m. (Eastern Time) on September 1, 2010** or at such later time or other place as the Sellers will notify all Qualified Bidders.

At least two days prior to the Auction, the Sellers shall provide the Purchaser, the DIP Parties and all Qualified Bidders with complete copies of all Qualified Bids. The Auction shall run in accordance with the following procedures:

(i)   Only the Purchaser, Sellers, representatives of the DIP Parties and any Qualified Bidders (and the advisors to each of the foregoing) shall be entitled to attend the Auction and only the Purchaser and such Qualified Bidders shall be entitled to make any subsequent Qualified Bids at the Auction.

(ii) At the Auction, all Qualified Bidders shall be permitted to increase their Qualified Bids in accordance with the procedures set forth herein (each, a "Subsequent Bid"). All Subsequent Bids presented during the Auction shall be made and received in one room on an open basis. All participating Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each participating Qualified Bidder shall be fully disclosed to all other Qualified Bidders and that all material terms of each Subsequent Bid presented during the Auction will be fully disclosed to the Purchaser and all other participating Qualified Bidders throughout the entire Auction.

(iii) All Qualified Bidders at the Auction must have at least one individual representative with authority to bind such Qualified Bidder present in person at the Auction.

(iv) All proceedings at the Auction shall be conducted before and transcribed by a court stenographer.

(v) At least one (1) day prior to the Auction, Sellers will advise the Purchaser and all other Qualified Bidders which Qualified Bid the Sellers have determined in their reasonable business judgment, after consultation with their advisors and with the Monitor, constitutes the then highest or otherwise best offer for the Assets (the "Starting Bid").

(vi) Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round (i) at least one Subsequent Bid is submitted by a Qualified Bidder that improves upon such Qualified Bidder's immediately prior Qualified Bid and meets the overbid requirement set forth in paragraph (vii) below, and (ii) that the Sellers determine in their reasonable business judgment, after consultation with its advisors and with the Monitor, is a higher or otherwise better offer than the then current leading Qualified Bid.

(vii) Bidding at the Auction shall be in increments of $500,000 and shall continue until such time as the highest and best bid is determined by the Sellers in their reasonable business judgment after consultation with their advisors and with the Monitor. The Sellers, in their sole discretion, shall have the right to modify the bidding increments throughout the course of the Auction. For the purpose of evaluating the value of the consideration provided by each bid (including any Subsequent Bid by the Purchaser) presented at the Auction, the value will: (i) be deemed to be the net consideration payable to the Sellers after considering, *inter alia,* any break-up fee or expense reimbursement due to the Purchaser under the Sale Agreement; and (ii) take into account any additional liabilities to be assumed by a Qualified Bidder as well as any additional costs which may be imposed on the Sellers under any such bid.

(viii) After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the Qualified Bid or Subsequent Bid, as the case may

7

be, that the Sellers have determined in their reasonable business judgment after consultation with their advisors and with the Monitor to be the then highest or best bid (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had an opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

(ix)    At the conclusion of the Auction pursuant to paragraph (vii) above, the Sellers will announce the Qualified or Subsequent Bid which they have determined in their reasonable business judgment, after consultation with their advisors and the Monitor, to be the highest and best bid (the "Winning Bid") and such Winning Bid will be submitted to the Courts for approval at the Sale Hearings, along with the second highest and best Qualified Bid (the "Alternative Bid"). The Sellers will be deemed to have accepted any Qualified Bid only when such Qualified Bid is determined to be the Winning Bid and has been approved by the Courts.

(x)    At the Auction, the Sellers, after consultation with their advisors and with the Monitor, may employ and announce additional procedural rules that are fair and reasonable under the circumstances (e.g., the amount of time allotted to make subsequent bids) for conducting the Auction; provided, however, that such rules are (a) not inconsistent with the Bidding Procedures, the Bankruptcy Code, the CCAA, any order of the Courts or the CCAA Court entered in connection in connection with the Bidding Procedures and (b) disclosed to each Qualified Bidder at the Auction.

Notwithstanding anything herein to the contrary, the Sellers may not, without the written consent of the applicable agent under the DIP Credit Agreement, select a bid as the Winning Bid unless such bid provides for the payment, on the closing date of the transaction with the Winning Bidder, in full in cash all obligations under the DIP Credit Agreement.

## Credit Bidding

Notwithstanding anything herein to the contrary, the applicable agent under the DIP Credit Agreement and the applicable agent under the First Lien Credit Agreement shall each be entitled to credit bid pursuant to section 363(k) of the Bankruptcy Code and other applicable law.

## Break-up Fee and Expense Reimbursement

If the Sellers accept a Qualified Bid other than a bid of the Purchaser as the Winning Bid, then the Sellers shall pay to the Purchaser as compensation for Purchaser's efforts in connection with the negotiation and execution of the Sale Agreement and the transactions contemplated thereby an amount equal to the Break-Up Fee and the Expense Reimbursement due to the Purchaser pursuant to the terms of the Sale Agreement, as approved by the Courts under the Stalking Horse and Bidding Procedures Orders.

## The Sale Hearings

The Sale Hearings are to be held immediately following the Auction (if any), and in any event, the Sellers shall use commercially reasonable efforts to have the CCAA Court and the Bankruptcy Court issue orders approving the Sale by September 8, 2010. The Sale Hearing before the CCAA Court is not yet scheduled but is intended to be held on or before September 8, 2010. The Sale Hearing before the Bankruptcy Court is scheduled for **September 8, 2010 at 10:00 a.m. (prevailing Eastern Time)**. At the Sale Hearings, the Sellers will seek entry of the Sale Orders, which will, among other things, authorize and approve the Sale (i) to the Purchaser, if no other Qualified Bid is received and accepted as the Winning Bid and pursuant to the terms and conditions set forth in the Sale Agreement or (ii) to the Winning Bidder, if a Qualified Bid other than from the Purchaser is received and accepted by the Sellers as the Winning Bid in accordance with these Bidding Procedures and pursuant to the terms and conditions set forth in the Sale Agreement or marked form of the Sale Agreement submitted by that Winning Bidder. All Qualified Bids (other than the Winning Bid and the Alternative Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Winning Bid and the Alternative Bid by the Courts pursuant to the Sale Orders.

If, following the entry of the Sale Orders by the Courts, the Winning Bidder fails to consummate a transaction with Sellers in respect of such Winning Bid that is the result of a breach or failure to perform on the part of such Winning Bidder, then the Alternative Bid shall be deemed the Winning Bid and Sellers shall be authorized to consummate a transaction in respect of the Alternative Bid without further orders of the Courts.

## Failure to Consummate Purchase

If the Winning Bidder (other than Purchaser) fails to consummate the Sale, and such failure is the result of a breach by the Winning Bidder, the Winning Bidder's Deposit shall be forfeited to Sellers and, except to the extent provided in the Sale Agreement or Marked Agreement, the Sellers specifically reserve the right to seek all available damages from such person or entity.

## Return of Deposits

The Deposits of the Winning Bidder and the Alternative Bidder shall be retained by The Bank of New York Mellon and such Qualified Bids shall remain open until the closing of a transaction with the Winning Bidder regarding the Winning Bid. The Deposits of all other Qualified Bidders shall be promptly returned after entry of the Sale Orders. The Deposit of the Qualified Bidder submitting the Alternative Bid shall be promptly returned after the closing of the sale to the Winning Bidder.

## Modifications

The Sellers, after consultation with their advisors and the Monitor, may (a) determine, in their reasonable business judgment, which Qualified Bid, if any, is the highest or otherwise best offer, (b) reject, at any time before entry of orders of the Courts approving a Qualified Bid, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the

Bankruptcy Code, the CCAA, these Bidding Procedures or the terms and conditions of the Sale Agreement or (iii) contrary to the best interests of Sellers' estates, their creditors and other parties in interest, and (c) with the prior consent of Purchaser, extend the Bid Deadline, the date of Auction or the date of either of the Sale Hearings; provided, however, that if the Purchaser submits the only Qualified Bid, the terms provided in clauses (a) and (b) above shall be inoperative.

## Other

In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, the CCAA Court and the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.

**Exhibit G**
**Form of Canadian Order Approving the Agreement and the Bidding Procedures**

SEE ATTACHED

CANADA

SUPERIOR COURT
(Commercial Division)
The *Companies' Creditors
Arrangement Act*

PROVINCE OF QUÉBEC
DISTRICT OF MONTRÉAL
No.: 500-11-038474-108

MONTRÉAL, this _____ day of
_____, 2010

IN THE PRESENCE OF:
THE HONOURABLE

_____,

J.S.C.

IN THE MATTER OF THE PLAN OF
ARRANGEMENT                AND
COMPROMISE OF:

WHITE BIRCH PAPER HOLDING
COMPANY

-and-

WHITE BIRCH PAPER COMPANY

-and-

STADACONA GENERAL PARTNER
INC.

-and-

BLACK SPRUCE PAPER INC.

-and-

F.F. SOUCY GENERAL PARTNER
INC.

-and-

3120772 NOVA SCOTIA COMPANY

-and-

ARRIMAGE DE GROS CACOUNA
INC.

-and-

**PAPIER MASSON LTÉE**

**Debtors**

-and-

**ERNST & YOUNG INC.**

**Monitor**

-and-

**STADACONA**          **LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY, INC. & PARTNERS, LIMITED PARTNERSHIP**

**Mises en Cause**

---

## ORDER APPROVING THE STALKING HORSE BIDDER, APPROVING AN ASSET SALE AGREEMENT, APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL THE WB GROUP'S ASSETS AND SCHEDULING AN AUCTION AND SALE HEARING

**CONSIDERING** the Debtors' *"Motion to Approve a Stalking Horse Bidder, to Approve an Asset Sale Agreement, to Approve Bidding Procedures for the Sale of Substantially All the WB Group's Assets and to Schedule an Auction and Sale Hearing"* (the **"Motion"**); and its supporting exhibits;

**CONSIDERING** the submissions of counsel;

**GIVEN** the provisions of the Initial Order granted by this Court in this matter on February 24th, 2010 (the **"Initial Order"**);

**GIVEN** the provisions of the order of this Court approving the Sales and Investor Solicitation Process; and

**GIVEN** the provisions of the *Companies' Creditors Arrangement Act*, (R.S.C., 1985, c. C-36) as amended (the **"CCAA"**);

**WHEREFORE, THE COURT:**

[1]   **GRANTS** the present Motion;

[2]   **DECLARES** sufficient the service and notice of the present Motion;

[3]   **APPROVES** the Monitor's Report, Exhibit SM-1;

[4]   **APPROVES** as the Stalking Horse Agreement, the Asset Sale Agreement dated August 10th, 2010, Exhibit SM-2, by and between White Birch Paper Company (together with certain subsidiaries) and BD – White Birch Investment LLC (the **"Sale Agreement"**), including, without limitation, the obligations of the Sellers to pay the Break-Up Fee and the Expense Reimbursement (as such terms are defined in the Sale Agreement) to the Purchaser on the terms and conditions set forth in the Sale Agreement;

[5]   **APPROVES** the bidding procedures, as set out at Exhibit SM-3 (the **"Bidding Procedures"**), including, without limitation, the section entitled *"Break-Up Fee and Expense Reimbursement"*;

[6]   **ORDERS** that the capitalized terms used herein but not defined shall have the meanings ascribed to them in the Bidding Procedures or, if not defined therein, in the Initial Order;

[7]     **DECLARES** that BD White Birch Investment LLC ("**BD**") shall be the stalking horse bidder for the purposes of the competitive bidding process set out in the Bidding Procedures, Exhibit SM-3;

[8]     **AUTHORIZES AND ORDERS** the WB Group, its advisors and the Monitor to conduct the competitive bidding process set out in the Bidding Procedures, Exhibit SM-3, in accordance with the Bidding Procedures;

[9]     **ORDERS** that, to the extent a Qualified Bid, as defined in the Bidding Procedures, Exhibit SM-3, other than the bid received from BD White Birch Investment LLC, is received by no later than 5:00 pm (Eastern time) on August 30th, 2010, an auction for the Assets of the WB Group shall be held at the offices of Kirkland & Ellis, 601 Lexington Avenue, New York, New York, United States of America, 10022, beginning at 10:00 am (Eastern time) on September 1st, 2010; or at such later time or other place as the WB Group shall notify all Qualified Bidders in accordance with the terms of the Bidding Procedures;

[10]    **AUTHORIZES AND ORDERS** the WB Group and its advisors to carry out any such Auction in accordance with the Bidding Procedures;

[11]    **DECLARES** that a hearing shall take place before the Superior Court of Quebec, Commercial Division, on or prior to September 8th, 2010 in order to authorize and approve the sale of the WB Group's Assets, pursuant to the terms set out in the Asset Purchase Agreement, Exhibit SM-2, or pursuant to the terms of an alternative transaction with the winning bidder at the auction, as the case may be (the "**Sale Hearing**");

[12]   **ORDERS** that, in the event that no Qualified Bids other than the Qualified Bid submitted by BD are received pursuant to the terms of the Bidding Procedures, that the WB Group is authorized and ordered to (i) cancel the Auction and (ii) seek entry of the Canadian Sale Order (as defined in the Sale Agreement) in accordance with the Bidding Procedures;

[13]   **DECLARES** that, pursuant to the terms of the Sale Agreement and as security for the Debtors' and the Mises en Cause's obligation to pay the Break-Up Fee and the Expense Reimbursement to the Purchaser, as hereby approved under the terms and conditions set forth in the Sale Agreement and the Bidding Procedures, the Purchasers are hereby granted a hypothec on, mortgage of, lien on and security interest in the Property to the extent of the aggregate amount of the Break-Up Fee and the Expense Reimbursement (being seven million five hundred thousand United States dollars (US $7,500,000.00)), which charge shall be subordinate to the Administration Charge, the D&O Charge and the Interim Financing Charge, but shall otherwise be, and be deemed to be, an additional "CCAA Charge" under, and for the purposes of, the provisions of the Initial Order concerning the CCAA Charges;

[14]   **DECLARES** that, in the event that BD submits the Winning Bid (as defined in the Bidding Procedures), the provisions of the ASA that contemplate that at Closing the $10 million D&O Charge (as defined in the Initial Order) and the $3 million Administrative Charge (as defined in the Initial Order) will be discharged and expunged and replaced, in effect, with the $10 million letter of credit and the $3 million Wind-Down Amount, pursuant to the Canadian Sale Order (as defined in the ASA) and as provided for under Sections 5.2(g) and 5.18 of the ASA, respectively, are hereby approved;

[15]  **ORDERS** that, in connection with the Bidding Procedures and pursuant to clause 7(3)(c) of the Personal Information Protection and Electronic Documents Act (Canada), the Debtors and the Mises en Cause are authorized and permitted to disclose personal information of identifiable individuals to Qualified Bidders and their advisors, but only to the extent required in connection with the terms of the Bidding Procedures and the bidding and sale process to be conducted thereunder. Each such Qualified Bidder shall maintain and protect the privacy of such information and limit the use of such information to its participation in the Sale and, if it does not complete the Sale, shall return all such information to the Debtors and the Mises en Cause, or in the alternative, destroy all such information;

[16]  **REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States or elsewhere, including the United States Bankruptcy Court for the Eastern District of Virginia, to give effect to this Order and to assist the Debtors, the Mises en Cause and the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Debtors, the Mises en Cause and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Debtors, the Mises en Cause and the Monitor and their respective agents in carrying out the terms of this Order;

THE WHOLE _____ COSTS.

MONTRÉAL, this _____ day of _____, 2010

THE HONOURABLE _____,

J.S.C.

**Exhibit H**
**Form of U.S. Order Approving the Agreement and the Bidding Procedures**

SEE ATTACHED

Jonathan L. Hauser
VSB No. 18688
TROUTMAN SANDERS LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, Virginia 23462
Telephone:     (757) 687-7768
Facsimile:     (757) 687-1505

Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

*Attorneys for the Debtor and
Debtor in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BEAR ISLAND PAPER COMPANY, L.L.C.,[1] | ) | Case No. 10-31202 (DOT) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**ORDER APPROVING (A) THE FORM OF THE SALE
AGREEMENT, (B) THE BIDDING PROCEDURES, (C) THE SALE NOTICE
AND (D) THE ASSUMPTION PROCEDURES AND ASSUMPTION NOTICE**

Upon the motion, dated August 10, 2010 (the "Motion"),[2] of Bear Island Paper Company,

L.L.C., the debtor and debtor in possession in the above-captioned chapter 11 case ("Bear

Island" or "Debtor"), seeking, in part, entry of an order (this "Bidding Procedures Order")

pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy

Code") and Rules 2002 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), approving (a) the form of the Sale Agreement, (b) the Bidding Procedures,

(c) the Sale Notice and (d) the Assumption Procedures and Assumption Notice, all as more fully

---

[1]     The last four digits of the Debtor's federal tax identification number are 0914. The principal address for the
Debtor is 10026 Old Ridge Road, Ashland, Virginia 23005.

[2]     All capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the
Motion.

set forth in the Motion; and the Court having reviewed the Motion and heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

THE COURT HEREBY FINDS THAT:

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Notice of the Motion and proposed entry of this Bidding Procedures Order has been provided to:  (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Purchaser; (iv) counsel to the Postpetition Agent (as defined in the DIP Order); (v) counsel to the agent under the First Lien Term Loan Agreement; (v) counsel to the majority lenders under the Second Lien Term Loan Agreement; (vii) counsel to counterparties under the Swap Agreements; (viii) the Monitor appointed in the CCAA Cases; (ix) all non-debtor counterparties to the Debtor's executory contracts and unexpired leases; (x) all persons or entities that have requested notice of the proceedings in this chapter 11 case; (xi) all parties who are known to claim liens or other interests upon the Assets; (xii) the Internal Revenue Service and (xiii) all applicable federal, state and local taxing and regulatory authorities (the "Notice Parties").

C.      Additionally, the Sale Notice, substantially in the form attached hereto as **Exhibit 3**, has been published in the Herald-Progress newspaper in Ashland, Virginia and the Richmond Times-Dispatch in Richmond, Virginia.

2

D.     Under the circumstances, requisite notice of the Motion and the relief requested thereby and in this Bidding Procedures Order has been provided in accordance with Bankruptcy Rules 2002 and 9014, which notice is sufficient for all purposes under the Bankruptcy Code, including, without limitation, section 102(1) of the Bankruptcy Code, and no further notice of, or hearing on, the Motion with respect to this Bidding Procedures Order is necessary or required.

E.     The Debtor has articulated good and sufficient reasons for this Court to: (i) approve the form of the Sale Agreement, including the breakup fee (the "Breakup Fee") and expense reimbursement (together with the Breakup Fee, the "Bid Protections") to be paid to the Purchaser under the Sale Agreement; (ii) approve the Bidding Procedures; (iii) set the Sale Hearing and approve the manner and notice of the Auction and the Sale Hearing; (iv) approve the procedures (the "Assumption Procedures") for the assumption and assignment of executory contracts and unexpired leases that are to be assumed and assigned (respectively, the "Contracts" and "Leases"), including notice of proposed cure amounts (the "Assumption Notice").

F.     The Bid Protections (i) were negotiated in good-faith and at arm's-length between the Debtor and the Purchaser, (ii) are reasonable and appropriate given, among other things, the size and nature of the transaction and the efforts that have been expended and will continue to be expended by the Purchaser to enter into the Sale Agreement and (iii) are a material inducement for, and condition of, the Purchaser's entry into the Sale Agreement.

G.     The entry of this Bidding Procedures Order is in the best interests of the Debtor, its estate, creditors, and other parties in interest.

IT IS HEREBY ORDERED THAT:

1.     The Motion is granted to the extent provided herein.

3

2.    All objections, if any, to the Motion that have not been withdrawn, waived or settled as announced to the Court at, or prior to, the Hearing or by stipulation are hereby overruled.

3.    The form of the Sale Agreement, substantially in the form attached hereto as **Exhibit 1**, is hereby approved to be used at the Auction and is appropriate and reasonably calculated to enable the Debtor and other parties in interest to easily compare and contrast the differing terms of the bids presented at the Auction.

4.    The Bidding Procedures, substantially in the form attached hereto as **Exhibit 2**, are hereby approved.  The failure to specifically include or reference any particular provision, section or article of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such procedure, it being the Court's intent that the Bidding Procedures be authorized and approved in their entirety unless otherwise modified by this Order.

5.    The form of the Sale Notice, substantially in the form attached hereto as **Exhibit 3**, and service thereof, including by publication in the Herald-Progress newspaper in Ashland, Virginia and the Richmond Times-Dispatch newspaper in Richmond, Virginia (i) is hereby approved and (ii) constitutes good and sufficient notice of the Auction and Sale Hearing. No other or further notice is required.

6.    The Auction, if one is required, shall be conducted at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 commencing on **September 1, 2010 at 10:00 a.m. (prevailing Eastern Time)**.  In the event the Debtor does not receive any Qualified Bids except for the Qualified Bid of the Purchaser by the Bid Deadline, the Debtor will not hold the Auction and instead shall seek approval of the Sale Agreement at the Sale Hearing.

4

7.     The Bid Protections are hereby approved.

8.     If the Bid Protections are triggered, the Debtor shall pay the Bid Protections to the Purchaser pursuant to the terms and conditions set forth in the Sale Agreement and without need for further order of the Court.   The Debtor's obligations to pay the Bid Protections shall constitute superpriority administrative expense obligations under section 364(c)(1) of the Bankruptcy Code with priority over any and all expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject only to any Super-Priority Claim, the Carve-Out and the Adequate Protection Senior Claim, each as defined in the DIP Order and set forth therein.

9.     The form of the Assumption Notice, substantially in the form attached hereto as **Exhibit 4**, is hereby approved and the service of such notice upon counterparties to the Contracts and Leases to be assumed and assigned is appropriate and reasonably calculated to provide such counterparties with timely and proper notice and no other or further notice is required.

10.     Any objections to the assumption and/or assignment of any Contract or Lease identified on the Assumption Notice, including to the proposed cure amount set forth on Schedule A thereto, must be in writing, filed with the Court and be **actually received** on or before **September 3, 2010 at 5:00 p.m. (prevailing Eastern Time)** (the "Assumption and Cure Objection Deadline").   Subject to the terms of the Sale Agreement, the Debtor and the Purchaser reserve the right to delete any Contract or Lease from Schedule A to the Assumption Notice prior to the effective date of such assumption and assignment.

11.     If a counterparty to a Contract or Lease does not file and serve an objection prior to the Assumption and Cure Objection Deadline, that party (i) will be deemed to have stipulated that the cure amount(s), as determined by the Debtor and set forth on Schedule A, is correct; (ii) shall be forever barred, estopped and enjoined from asserting any additional cure amount

5

under the Contract(s) or Lease(s); and (iii) will be forever barred from objecting to the assignment of the Contract(s) or Lease(s) to the Purchaser (or the Winning Bidder (as defined below)) or to the Purchaser's (or Winning Bidder's) adequate assurance of future performance.

12.     If a timely Cure Objection is received and such Cure Objection cannot otherwise be resolved by the parties, the Court may hear such Cure Objection at the Sale Hearing. Otherwise, such objection may, at the discretion of the Debtor and the Winning Bidder, be heard at the subsequently scheduled omnibus hearing date or at any later date set by the Debtor.

13.     If additional Contracts or Leases are identified for assumption and assignment, counterparties to such Contractors or Leases shall be provided with a copy of the Assumption Notice and not less than ten days from the date of service thereof to object to such assumption and assignment or the cure amount. If objections are filed by counterparties to such subsequently identified Contracts or Leases that cannot be resolved by the parties thereto, such objection may be heard at the next omnibus hearing that occurs not less than three business days following the filing of such objection. The Debtor shall file and serve the modifications to the Assumption Notice in the same manner as it is required to serve the Assumption Notice.

14.     The Assumption Procedures are appropriate and fair to all Contract and Lease counterparties and comply in all respects with the Bankruptcy Code.

15.     If the Auction occurs, then on or before September 8, 2010, the Debtor shall file with this Court the Supplement, which shall report to the Court the results of the Auction. The Supplement shall identify, among other things: (a) the bidder that presented the highest or otherwise best offer (the "Winning Bidder"); (b) the bidder that presented the second highest or otherwise best offer (the "Alternative Bidder"); (c) the consideration to be paid for the Assets;

K&E 17480621

and (d) any additional executory contracts or leases to be assumed and assigned to the Winning Bidder in connection with the sale of the Assets.

16.     The Debtor will annex to the Supplement, as exhibits, (a) a copy of the respective asset sale agreements entered into by the Winning Bidder and the Alternative Bidder, and (b) a copy of the Sale Order. The Debtor will serve the Supplement on the Notice Parties.

17.     The Debtor will request that the Sale Hearing be held before the Honorable Douglas O. Tice, Jr., United States Bankruptcy Judge, in Courtroom 5100 of the United States Bankruptcy Court for the Eastern District of Virginia, 701 East Broad Street, Richmond, Virginia 23219, on **September 8, 2010 at 10:00 a.m. (prevailing Eastern Time)**. The Sale Hearing may be adjourned without further notice other than by announcement at the Sale Hearing.

18.     Objections to the entry of the Sale Order shall be in writing, filed and served so as to be **actually received** on or prior to **September 3, 2010 at 5:00 p.m. (prevailing Eastern time)** by (a) counsel to the Debtor, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn.: Christopher J. Marcus; (b) co-counsel to the Debtor, Troutman Sanders LLP, 222 Central Park Avenue, Suite 2000, Virginia Beach, VA 23462, Attn.: Jonathan L. Hauser; (c) the Office of the United States Trustee for the Eastern District of Virginia, 701 East Broad Street, Suite 4304, Richmond, VA 23219, Attn.: Robert B. Van Arsdale; (d) counsel to the Prepetition Agent (as defined in the DIP Order), Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022, Attn.: Keith A. Simon; (e) counsel to the Committee, Hunton & Williams LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, VA 23219, Attn.: Benjamin C. Ackerly; (f) counsel to the Purchaser, Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Suite 2700, Chicago, IL 60606, Attn.: Kimberly A. deBeers; and (g) all persons or entities that have requested notice of the proceedings in this Chapter 11 case.

7

19.     The Debtor's sole and exclusive remedy, if any, in connection with a breach by the Purchaser (or any of its Affiliates (as defined in the Sale Agreement) of the Sale Agreement shall be limited to the Deposit (as defined in the Sale Agreement), whether at Law or in equity, for any breach by the Purchaser or any of its Affiliates of the terms and conditions of the Sale Agreement.

20.     To the extent that any chapter 11 plan is confirmed in this case or any order confirming any such plan or any other order in this case (including any order entered after any conversion of this case to a case under chapter 7 of the Bankruptcy Code) alters, conflicts with or derogates from the provisions of this Bidding Procedures Order, the provisions of this Bidding Procedures Order shall control. The Debtor's obligations under this Bidding Procedures Order, the provision of this Bidding Procedures Order and the portions of the Sale Agreement pertaining to the Bidding Procedures shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Debtor, and the reorganized or reconstituted debtor, as the case may, after the effective date of a confirmed plan in the Debtor's case.

21.     This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Bidding Procedures Order, including, but not limited to, any matter, claim or dispute arising from or relating to the Bid Protections, the Bidding Procedures and the implementation of this Bidding Procedures Order.

K&E 17480621

22.     The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is hereby waived.

Dated: _____, 2010
       Richmond, Virginia

                                                                         
Chief Judge Douglas O. Tice, Jr.
United States Bankruptcy Judge

K&E 17480621

I ASK FOR THIS:

*/s/ Jonathan L. Hauser*
Jonathan L. Hauser
VSB No. 18688
**TROUTMAN SANDERS LLP**
222 Central Park Avenue
Suite 2000
Virginia Beach, Virginia 23462
Telephone:    (757) 687-7768
Facsimile:    (757) 687-1505

- and -

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Attorneys for the Debtor and
Debtor in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/ Jonathan L. Hauser*

K&E 17480621

**Exhibit I**
**Form of Canadian Sale Order**

SEE ATTACHED

CANADA

SUPERIOR COURT
(Commercial Division)
The *Companies' Creditors
Arrangement Act*

PROVINCE OF QUÉBEC
DISTRICT OF MONTRÉAL
No.: 500-11-038474-108

MONTRÉAL, this _____ day of
_____, 2010

IN THE PRESENCE OF:
THE HONOURABLE ROBERT
MONGEON, J.S.C.

IN THE MATTER OF THE PLAN OF
ARRANGEMENT                     AND
COMPROMISE OF:

WHITE BIRCH PAPER HOLDING
COMPANY

-and-

WHITE BIRCH PAPER COMPANY

-and-

STADACONA GENERAL PARTNER
INC.

-and-

BLACK SPRUCE PAPER INC.

-and-

F.F. SOUCY GENERAL PARTNER
INC.

-and-

3120772 NOVA SCOTIA COMPANY

-and-

ARRIMAGE DE GROS CACOUNA
INC.

-and-

**PAPIER MASSON LTÉE**

**Debtors**

-and-

**ERNST & YOUNG INC.**

**Monitor**

-and-

**STADACONA                    LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY, INC. & PARTNERS, LIMITED PARTNERSHIP**

**Mises en Cause**

---

## APPROVAL AND VESTING ORDER

**CONSIDERING** the Debtors' "*Motion to Approve the Sale of Substantially All the WB Group's Assets*" (the "**Motion**") in respect of a sale transaction contemplated by an asset sale agreement (the "**Sale Agreement**") dated August 10, 2010 amongst White Birch Paper Company and the other entities identified therein as sellers (collectively, the "**Sellers**"), as sellers, and BD White Birch Investment LLC (the "**Purchaser**") and such other Person(s) as it may designate (each, a

"**Designated Purchaser**"), as purchaser, for the sale of substantially all of the Assets of the Sellers, and all of its terms, conditions, schedules, exhibits and related and ancillary agreements (collectively, the "**Transaction**"), and the Report dated August 10, 2010 (the "**Report**") of Ernst & Young Inc. in its capacity as the monitor (the "**Monitor**") of the Debtors and the Mises en Cause;

**CONSIDERING** the representations made by counsel; and

**GIVEN** the provisions of the CCAA and, in particular, Section 36 thereof;

**WHEREFORE, THE COURT:**

[1]     **GRANTS** the Motion;

[2]     **DECLARES** sufficient the service and notice of the Motion and hereby dispenses with further service thereof;

[3]     **ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Sale Agreement;

[4]     **ORDERS AND DECLARES** that the Sale Agreement and all of its terms and conditions (including all schedules and exhibits thereto and related and ancillary agreements and all schedules and exhibits thereto) and the Transaction are hereby fully and finally approved. The execution, delivery and performance of the Sale Agreement and the Transaction (with any such amendments as the parties thereto may agree to in accordance with the terms thereof) by the Debtors and the Mises en Cause party thereto is hereby authorized and approved, and the Debtors and the Mises en Cause and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the

conveyance of the Debtors' and the Mises en Cause's right, title and interest in and to the Assets to the Purchaser or a Designated Purchaser;

[5] **ORDERS** that the Debtors and the Mises en Cause are authorized and directed to perform their obligations under the Sale Agreement and in respect of the Transaction;

[6] **ORDERS AND DECLARES** that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "**Monitor's Certificate**"), all of the Debtors' and the Mises en Cause's right, title, benefit and interest in and to the Assets shall vest absolutely in the Purchaser or a Designated Purchaser, free and clear of and from any and all right, title, interest, security interests (whether contractual, statutory, or otherwise), hypothecs (legal or contractual), prior claims, mortgages, pledges, deeds of trust, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens (statutory or otherwise), executions, levies, charges, or other financial or monetary claims, options, rights of first offer or first refusal, real property licenses, encumbrances, conditional sale arrangements, leasing agreements or other similar restrictions of any kind, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured, legal, possessory or otherwise (collectively, the "**Claims**"), including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Order of the Honourable Robert Mongeon, J.S.C. dated February 24, 2010 or any other Order of this Honourable Court in these proceedings; (ii) all charges, security interests or claims evidenced by registrations pursuant to the Registre des droits personnels et réels mobiliers (Québec), the Personal Property Security Act (Nova Scotia), the *Bank Act (Canada)* or any other personal property registry system, or recorded with the Canadian Intellectual Property Office

pursuant to the Trade-marks Act (Canada); (iii) all Excluded Liabilities; and (iv) all charges, security interests, liens or other claims specified on Schedule "●" (all of which are collectively referred to as the "**Encumbrances**", but excluding Permitted Encumbrances (other than those Permitted Encumbrances specified in clause (i) of the definition of Permitted Encumbrances in the Sale Agreement and any other Permitted Encumbrances specifically contemplated to be discharged by this Order)). For greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Assets shall, upon delivery of the Monitor's Certificate, be and are hereby expunged and discharged as against the Assets. Counsel for the Purchaser and any agents appointed by such counsel may, immediately following the Closing of the Transaction, proceed with the discharge of such Claims and Encumbrances including, without limitation, the electronic discharge of any financing statements, UCC registrations, mortgages or other registrations in respect thereof;

[7]     **ORDERS** that for the purposes of determining the nature and priority of Claims and Encumbrances, the proceeds from the sale of the Debtors' and the Mises en Cause's right, title and interest in and to the Assets (other than the Wind-Down Amount and the Reserve Payment Amount) shall stand in the place and stead of the Assets, and that from and after the delivery of the Monitor's Certificate, all Claims and Encumbrances (other than the D & O Charge and the Administrative Charge) shall attach to the proceeds from the sale of the Debtors' and the Mises en Cause's right, title and interest in and to the Assets (other than the Wind-Down Amount and the Reserve Payment Amount) with the same priority as they had with respect to the Assets immediately prior to the sale, as if the Debtors' and the Mises en Cause's right, title and interest in and to the

Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale;

[8]     **ORDERS** that the Monitor shall administer the Wind-Down Amount in accordance with the provisions of the Sale Agreement including, without limitation, Section 5.18 thereof;

[9]     **ORDERS** that: (i) all right, title and interest in and to any portion of the Wind-Down Amount that is not used to pay costs associated with winding-down the Sellers' estate in accordance with Section 5.18 of the Sale Agreement shall vest absolutely in the Purchaser as at the Closing Date and shall promptly be distributed to the Purchaser; and (ii) the Wind-Down Amount shall not be considered to be proceeds of sale of the Assets and the Claims and Encumbrances shall not attach to the Wind-Down Amount;

[10]    **ORDERS** that upon the delivery of the Monitor's Certificate to the Purchaser: (i) the Administration Charge provided for in the Initial Order be and is hereby released, expunged and discharged; and (ii) the D&O Charge provided for in the Initial Order be and is hereby released, expunged and discharged;

[11]    **ORDERS** the Land Registrar of the Land Registry Office for the Registry Division of Témiscouata, upon presentation of the Monitor's Certificate, in the form appended as Schedule "A" hereto, and a certified copy of this Order accompanied by the required application for registration and upon payment of the prescribed fees, to publish this Order and (i) to proceed with an entry on the index of immovables showing the Purchaser as the absolute owner in regards to the immovable listed in Schedule "B" hereto which are located in Rivière-du-Loup, in the Province of Québec (being hereinafter described the **"Rivière-du-Loup Property"**); and (ii) proceed with the reduction and cancellation of any and all Encumbrances but only

insofar as concerns the Rivière-du-Loup Property as described in Schedule "B", including, without limitation, the following registrations published at the said Land Registry Office for the Registration Division of Témiscouata:

(i)  a hypothec charging buildings only granted in favour of White Birch Paper Company by F.F. Soucy General Partner Inc./Commandité F.F. Soucy Inc. for an amount of $250,000,000 and registered at the office of the Registration Division of Témiscouata on April 7, 2005 under number 12 195 029;

(ii)  a hypothec granted for an amount of $250,000,000 in favour of White Birch Paper Company by F.F. Soucy, Inc. & Partners, Limited Partnership/F.F. Soucy, inc. & associés, Société en commandite and registered at the office of the Registration Division of Témiscouata on April 7, 2005 under number 12 195 030;

(iii)  a first hypothec granted for an amount of $550,000,000 and a second hypothec granted pursuant to the same deed for an amount of $250,000,000 granted in favour of Credit Suisse First Boston, Toronto Branch, by White Birch Paper Company and registered at the office of the Registration Division of Témiscouata on April 7, 2005 under number 12 195 031;

(iv)  a legal hypothec (construction) granted for an amount of $2,692,455.81 registered by Service d'impartition Industriel Inc. against F.F. Soucy S.E.C., as owner, and registered at the office of the Registration Division of Témiscouata on November 18, 2009 under number 16 731 954;

(v)    a legal hypothec (construction) granted for an amount of $2,692,455.81 registered by Service d'impartition Industriel Inc. against F.F. Soucy S.E.C., as owner, and registered at the office of the Registration Division of Témiscouata on November 27, 2009 under number 16 758 360;

(vi)    a hypothec on a universality of immovables granted for an amount of $200,000,000 in favour of Crédit Suisse AG, Toronto Branch, by White Birch Paper Company registered at the office of the Registration Division of Témiscouata on March 4, 2010 under number 16 979 262;

(vii)    a hypothec on the universality of immovables granted for an amount of $200,000,000 in favour of Crédit Suisse AG, Toronto Branch, by F.F. Soucy L.P./F.F. Soucy S.E.C. and registered at the office of the Registration Division of Témiscouata on March 4, 2010 under number 16 979 263; and

(viii)    a prior notice of the exercise of a sale under judicial authority registered by Service d'impartition Industriel Inc. against F.F. Soucy S.E.C., as owner, registered at the office of the Registration Division of Témiscouata on June 15, 2010 under number 17 281 485, which registration refers to the legal hypothecs registered under numbers 16 731 954 and 16 758 360 referred to above;

[12]    **ORDERS** the Land Registrar of the Land Registry Office for the Registry Division of Québec, upon presentation of the Monitor's Certificate, in the form appended as Schedule "A" hereto, and a certified copy of this Order accompanied by the required application for registration and upon payment of the prescribed fees, to publish this Order and (i) to proceed with an entry on the index of immovables showing the Purchaser as the

absolute owner in regards to the immovables listed in Schedule "C" hereto which are located in Québec City, in the Province of Québec (being hereinafter described the **"Quebec City Properties"**); and (ii) proceed with the reduction and cancellation of any and all Encumbrances but only insofar as concerns the Québec City Properties as described in Schedule C, including, without limitation, the following registrations published at the said Land Registry Office for the Registration Division of Quebec:

(i)     a hypothec on a universality of immovables granted for an amount of $550,000,000 in favour of Credit Suisse First Boston Toronto Branch by Stadacona L.P./Stadacona S.E.C. and Stadacona General Partner Inc./Commandité Stadacona Inc. pursuant to a deed registered at the office of the Registration Division on April 7, 2005 under number 12 195 317;

(ii)    a hypothec on a universality of immovables granted for an amount of $250,000,000 in favour of Credit Suisse First Boston Toronto Branch by Stadacona L.P./Stadacona S.E.C. and Stadacona General Partner Inc./Commandité Stadacona Inc. pursuant to a deed registered at the office of the Registration Division on April 7, 2005 under number 12 195 318;

(iii)   a legal hypothec (construction) for an amount of $2,067,704.24 in favour of KSH Solutions Inc. against Stadacona S.E.C. and Commandité Stadacona Inc. and registered at the office of the Registration Division on May 19, 2006 under number 13 298 021;

(iv)    a prior notice of the exercise of a sale by judicial authority in favour of OSLO Construction Inc. against Stadacona S.E.C., owner, and Commandité Stadacona Inc., owner, registered on August 2, 2006 under number 13 534 837, this prior notice being in reference to a

- 10 -

legal hypothec that was registered at the office of the Registration Division under number 13 126 592 which has been totally discharged;

(v)    a prior notice of the exercise of a sale by judicial authority in favour of KSH Solutions Inc. against Stadacona S.E.C. and Commandité Stadacona Inc. registered at the office of the Registration Division on October 20, 2006 under number 13 742 043, this prior notice being in reference of the legal hypothec registered under number 13 298 021 referred to in Section (iii) above;

(vi)    a hypothec on a universality of property granted for an amount of $200,000,000 in favour of Crédit Suisse AG, Toronto Branch by Stadacona General Partner Inc./Commandité Stadacona inc. pursuant to a deed registered at the office of the Registration Division on March 4, 2010 under number 16 977 835; and

(vii)    a hypothec on a universality of property granted for an amount of $200,000,000 in favour of Crédit Suisse AG, Toronto Branch by Stadacona L.P./Stadacona S.E.C. pursuant to a deed registered at the office of the Registration Division on March 4, 2010 under number 16 977 836;

[13]    **ORDERS** the Land Registrar of the Land Registry Office for the Registry Division of Papineau, upon presentation of the Monitor's Certificate, in the form appended as Schedule "A" hereto, and a certified copy of this Order accompanied by the required application for registration and upon payment of the prescribed fees, to publish this Order and (i) to proceed with an entry on the index of immovables showing the Purchaser as the absolute owner in regards to the immovables listed in Schedule "D" hereto which are located in Gatineau, in the Province of Québec (being

hereinafter described the **"Gatineau Property"**); and (ii) proceed with the reduction and cancellation of any and all Encumbrances but only insofar as concerns the Gatineau Property as described in Schedule D, including, without limitation, the following registrations published at the said Land Registry Office for the Registration Division of Papineau:

(i)   Hypothec in the amount of $550,000,000 by Papier Masson Ltée in favour of Crédit Suisse, Toronto Branch, in its quality of *"fondé de pouvoir"*, registered on January 25, 2006 under number 13 011 629;

(ii)  Hypothec in the amount of $250,000,000 by Papier Masson Ltée in favour of Crédit Suisse, Toronto Branch, in its quality of *"fondé de pouvoir"*, registered on January 25, 2006 under number 13 011 630;

(iii) Legal hypothec in the amount of $1,808,000 in favour of Hydro-Québec, registered on September 2, 2009 under number 16 512 303 against the part of the Property known as lot 2 469 374 and located at the civic address 2 Montreal Road West, City of Gatineau;

(iv)  Legal hypothec in the amount of $3,205,539.79 in favour of Hydro-Québec, registered on November 20, 2009 under number 16 737 683 against the part of the Property known as lot 2 469 374 and located at the civic address 2 Montreal Road West, City of Gatineau; and

(v)   Hypothec in the amount of $200,000,000 by Papier Masson Ltée in favour of Crédit Suisse AG, Toronto Branch, registered on March 4, 2010 under number 16 977 911;

[14]   **ORDERS** the Québec Personal and Movable Real Rights Registrar, upon presentation of the required form with a true copy of this Vesting Order and the Monitor's Certificate, to reduce the scope of the hypothecs listed in Schedule "E" hereto in connection with the Assets and to cancel, release and discharge all of the Assets Encumbrances in order to allow the transfer to the Purchaser of the Assets free and clear of any and all encumbrances created by those hypothecs;

[15]   **ORDERS** that, pursuant to section 11.3 of the CCAA, the Debtors and the Mises en Cause are authorized and directed to assign the contracts, leases and agreements and other arrangements of which the Buyer takes an assignment on Closing pursuant to and in accordance with the terms of the Sale Agreement (the "**Contracts**") and that such assignments are hereby approved and are valid and binding upon the counterparties notwithstanding any restriction or prohibition on assignment contained in any such Contracts;

[16]   **ORDERS** that, from and after the Closing Date, all Persons shall be deemed to have waived all defaults then existing or previously committed by the Debtors or the Mises en Cause under, or caused by the Debtors or the Mises en Cause under, and the non-compliance of the Debtors or the Mises en Cause with, any of the Contracts arising solely by reason of the insolvency of the Debtors or the Mises en Cause or as a result of any actions taken by the Debtors or the Mises en Cause pursuant to the Sale Agreement or in these proceedings, and all notices of default and demands given in connection with any such defaults under, or non-compliance with, any of the Contracts shall be deemed to have been rescinded and shall be of no further force or effect;

[17]  **ORDERS AND DIRECTS** the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof;

[18]  **ORDERS** that neither the Purchaser nor any Designated Purchaser nor any affiliate thereof shall assume or be deemed to assume any liabilities or obligations whatsoever of any of the Debtors or the Mises en Cause (other than as expressly assumed under the terms of the Sale Agreement), including without limitation, any liabilities or obligations in respect of, in connection with or in relation to: (i) any Seller Employee Plans (other than a Transferred Employee Plan); (ii) any and all termination, severance or related amounts which any current or former employee of the Debtors or the Mises en Cause (other than the Transferred Employees who become employees of the Purchaser or a Designated Purchaser on Closing as provided for in the Sale Agreement) could at any time assert against any of the Debtors or the Mises en Cause; or (iii) any and all former, current or future employees of the Debtors or the Mises en Cause (other than the Transferred Employees who become employees of the Purchaser or a Designated Purchaser on Closing as provided for in the Sale Agreement);

[19]  **ORDERS** that the Purchaser and any Designated Purchasers, and their respective affiliates and officers, directors, employees, delegates, agents and representatives shall, effective immediately upon Closing of the Transaction, be and be deemed to be irrevocably and unconditionally fully and finally released of and from any and all claims, obligations or liabilities whatsoever arising from any event, fact, matter or circumstance occurring or existing on or before the Closing Date in relation to or in connection with the Debtors or the Mises en Cause or their respective present or past businesses, properties or assets, including, without limitation, any and all claims, obligations or liabilities whatsoever, whether known, anticipated or

unknown, in relation to or in connection with the Seller Employee Plans (other than any Transferred Employee Plans) and the former, current or future employees of the Debtors and the Mises en Cause (other than any Transferred Employees who become employees of the Purchaser or a Designated Purchasers on Closing in accordance with the terms and conditions of the Sale Agreement) and provided that the foregoing shall not operate to release the Purchaser or any Designated Purchaser from any liabilities or obligations expressly assumed under the terms of the Sale Agreement;

[20]  **ORDERS** that, notwithstanding:

(i)  the pendency of these proceedings;

(ii)  any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Debtors or the Mises en Cause and any bankruptcy order issued pursuant to any such applications; and

(iii)  any assignment in bankruptcy made in respect of any of the Debtors or the Mises en Cause;

the provisions of the Sale Agreement and the Transaction, and the vesting of the Debtors' and the Mises en Cause's right, title and interest in and to the Assets in the Purchaser or a Designated Purchaser pursuant to this Order and all other transactions contemplated thereby shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Debtors or the Mises en Cause and shall not be void or voidable by creditors of any of the Debtors or the Mises en Cause, nor shall they constitute nor be deemed to be a settlement, fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue or other

challengeable, voidable or reviewable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall they constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation;

[21]   **ORDERS** that the Sale Agreement and any related or ancillary agreements shall not be repudiated, disclaimed or otherwise compromised in these proceedings;

[22]   **ORDERS** that, pursuant to clause 7(3)(c) of the Personal Information Protection and Electronic Documents Act (Canada) and any substantially similar legislation, the Debtors and the Mises en Cause are authorized and permitted to disclose and transfer to the Purchaser or any Designated Purchaser all Employee Records. The Purchaser or any Designated Purchaser shall maintain and protect the privacy of any personal information contained in the Employee Records and shall be entitled to collect and use the personal information provided to it for the same purpose(s) as such information was used by the Debtors and the Mises en Cause;

[23]   **ORDERS** that forthwith upon receipt of the proceeds from the sale of the Debtors' and the Mises en Cause's right, title and interest in and to the Assets, and prior to payment or repayment of any other claims, interests or obligations of or against the Debtors or the Mises en Cause, all outstanding Obligations (as defined in the Interim Financing Credit Agreement (as defined in the Initial Order of this Court dated February 24, 2010)) owed by the Debtors or the Mises en Cause under the Interim Financing Credit Agreement will be repaid in full and in cash from the proceeds of the sale of the Assets (other than the Wind-Down Amount and the Reserve Payment Amount) pursuant to the Sale Agreement;

[24] **ORDERS** that all Persons shall co-operate fully with the Debtors and the Mises en Cause, the Purchaser, any Designated Purchaser, their respective Affiliates and the Monitor and do all such things that are necessary or desirable for purposes of giving effect to and in furtherance of this Order, the Sale Agreement and the Transaction;

[25] **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States or elsewhere, including the United States Bankruptcy Court for the Eastern District of Virginia, to give effect to this Order and to assist the Debtors, the Mises en Cause and the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Debtors, the Mises en Cause and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Debtors, the Mises en Cause and the Monitor and their respective agents in carrying out the terms of this Order;

[26] **ORDERS** that this Order shall have full force and effect in all provinces and territories in Canada;

**THE WHOLE WITHOUT COSTS.**

MONTRÉAL, this _____ day of _____, 2010

_____
**THE HONOURABLE ROBERT**

MONGEON, J.S.C.

SCHEDULE "A"

FORM OF MONITOR'S CERTIFICATE

CANADA

SUPERIOR COURT
(Commercial Division)
The *Companies' Creditors Arrangement Act*

PROVINCE OF QUÉBEC
DISTRICT OF MONTRÉAL
No.: 500-11-038474-108

MONTRÉAL, this _____ day of
_____, 2010

IN THE PRESENCE OF:
THE HONOURABLE ROBERT
MONGEON, J.S.C.

IN THE MATTER OF THE PLAN OF
ARRANGEMENT                AND
COMPROMISE OF:

WHITE BIRCH PAPER HOLDING
COMPANY

-and-

WHITE BIRCH PAPER COMPANY

-and-

STADACONA GENERAL PARTNER
INC.

-and-

BLACK SPRUCE PAPER INC.

-and-

F.F. SOUCY GENERAL PARTNER
INC.

-and-

3120772 NOVA SCOTIA COMPANY

-and-

**ARRIMAGE DE GROS CACOUNA INC.**

-and-

**PAPIER MASSON LTÉE**

Debtors

-and-

**ERNST & YOUNG INC.**

Monitor

-and-

**STADACONA LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY, INC. & PARTNERS, LIMITED PARTNERSHIP**

Mises en Cause

---

## MONITOR'S CERTIFICATE

**RECITALS:**

A.    Pursuant to an Order of the Honourable Robert Mongeon, J.S.C. dated February 24, 2010, the Debtors commenced proceedings pursuant to the

*Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc. was appointed as the monitor (the "**Monitor**") of the Debtors and the Mises en Cause.

B.    Pursuant to an Order of the Court dated ●, the Court approved a sale transaction (the "**Transaction**") contemplated by an asset sale agreement (the "**Sale Agreement**") dated August 10, 2010 amongst White Birch Paper Company and the other entities identified therein as sellers (collectively, the "**Sellers**"), as sellers, and WB Acquisition LLC (the "**Purchaser**"), as purchaser, for the sale of substantially all of the Assets of the Sellers and provided for the vesting in the Purchaser or a Designated Purchaser of the Debtor's and the Mises en Cause's right, title and interest in and to the Assets, which vesting is to be effective with respect to the Assets upon the delivery by the Monitor to the Purchaser of a certificate confirming: (i) the payment by the Purchaser of the Purchase Price for the Assets; (ii) that the conditions to Closing as set out in Article VIII of the Sale Agreement have been satisfied or waived by the Purchaser and/or the Sellers, as applicable; and (iii) the Transaction has been completed to the satisfaction of the Monitor.

C.    Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

**THE MONITOR CERTIFIES** the following:

1.    The Purchaser has paid and the Monitor has received the Purchase Price for the Assets payable on the Closing Date pursuant to the Sale Agreement;

2.  The conditions to Closing as set out in Article VIII of the Sale Agreement have been satisfied or waived by the Purchaser and/or the Sellers, as applicable; and

3.  The Transaction has been completed to the satisfaction of the Monitor;

4.  This Certificate was delivered by the Monitor at      [TIME] on      [DATE].

**ERNST & YOUNG INC.**
**In its capacity as the monitor appointed by the Court in the matter of the proposed compromise and arrangement of White Birch Paper Holding Company *et al*.**

Per: _____

     Name:
     Title::

## SCHEDULE "B"

## THE RIVIÈRE-DU-LOUP PROPERTY

## SPECIFICALLY DESCRIBED IMMOVABLES

Immovables known and designated as being composed of lots FOUR MILLION FIFTY-SIX THOUSAND NINE HUNDRED AND THIRTY-TWO, FOUR MILLION FIFTY-SIX THOUSAND NINE HUNDRED AND THIRTY-FOUR, FOUR MILLION FIFTY-SIX THOUSAND NINE HUNDRED AND THIRTY-FIVE, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND SIXTY-THREE, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND SIXTY-NINE, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND SEVENTY-ONE, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND EIGHTY-FIVE, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND EIGHTY-SIX, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND EIGHTY-SEVEN, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND EIGHTY-EIGHT, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND NINETY-TWO and THREE MILLION SEVEN HUNDRED AND FORTY-NINE THOUSAND FIVE HUNDRED AND SEVENTY (4056932, 4056934, 4056935, 4058163, 4058169, 4058171, 4058185, 4058186, 4058187, 4058188, 4058192 and 3749570), all of the Cadastre du Québec, Registration Division of Témiscouata.

With all buildings, installations, structures, equipments and facilities erected and located in, under, on and over the said immovables including, without limitation, the buildings bearing civic numbers 152 and 191 Delage Street, and 1 Dionne Street, City of Rivière-du-Loup, Province of Québec, G5R 3P9, G5R 6E2 and G5R 2M3 and also 130, 275, 275A, 282 and 284 Delage Street and 277B Saint André Street, City of Rivière-du-Loup, Province of Québec.

As the said immovables now subsist with their respective rights, members and appurtenances, without exception or reserve of any kind, and together with and subject to all servitudes and other rights, continuous or discontinuous, apparent or unapparent, attached thereto, including without limitation, and more specifically, (i) any servitudes and other rights created pursuant to a Deed of Superficies and Servitudes, passed before Sheldon Merling, Notary, on April 10, 1979, registered at said Registration Division, under number 226914, as amended pursuant to (a) a Deed of Amendment, passed before Robert Alain, Notary, on December 15, 1999, registered at said Registration Division under number 351992, and (b) a Deed of Amendment passed under private writing, on April 6, 2005, registered at said Registration Division under number 12 196 553, and as same may be amended from time to time (collectively the **"Deed of Superficies"**) and (ii) any right, title and interest in and to the "common facilities" (within the meaning of the Conflicts of Interest Agreement, as defined in the Deed of Superficies).

SCHEDULE "C"

THE QUEBEC CITY PROPERTIES

SPECIFICALLY DESCRIBED IMMOVABLES

1.    **Property located at 10 des Capucins Boulevard, Quebec City**

Immovables known and designated as being composed of lots TWO MILLION THREE HUNDRED AND FORTY-SEVEN THOUSAND TWO HUNDRED AND TWENTY-THREE and FOUR MILLION THREE HUNDRED AND SEVENTY-EIGHT THOUSAND EIGHT HUNDRED AND TWENTY-ONE (2 347 223 and 4 378 821), all of the Cadastre du Québec, Registration Division of Québec.

With all buildings, installations, structures, equipments and facilities erected and located in, under, on and over the said immovables including, without limitation, the buildings bearing civic number 10, des Capucins Boulevard, Québec, Province of Québec, G1K 7H9.

As the said immovables now subsist with their respective rights, members and appurtenances, without exception or reserve of any kind, and together with and subject to all servitudes and other rights, continuous or discontinuous, apparent or unapparent, attached thereto.

2.    **Property located at 1200 Lapierre Street, Québec City**

Immovables known and designated as being composed of lots ONE MILLION ONE HUNDRED AND SIXTEEN THOUSAND SEVEN HUNDRED AND THIRTY-SIX, ONE MILLION ONE HUNDRED AND SIXTEEN THOUSAND EIGHT HUNDRED AND SIXTY-SIX, ONE MILLION ONE HUNDRED AND SEVENTEEN THOUSAND AND FORTY-FOUR, ONE MILLION ONE HUNDRED AND SEVENTEEN THOUSAND AND SEVENTY-ONE, ONE MILLION ONE HUNDRED AND SEVENTEEN THOUSAND THREE HUNDRED AND THIRTY-FOUR and ONE MILLION ONE HUNDRED AND NINETEEN THOUSAND TWO HUNDRED AND EIGHTY-FIVE (1 116 736, 1 116 866, 1 117 044, 1 117 071, 1

117 334 and 1 119 285), all of the Cadastre of Québec, Registration Division of Québec.

With all buildings, installations, structures, equipments and facilities erected and located in, under, on and over the said immovables including, without limitation, the buildings bearing civic number 1200, Lapierre Street, Québec, Province of Québec, G3E 1H8.

As the said immovables now subsist with their respective rights, members and appurtenances, without exception or reserve of any kind, and together with and subject to all servitudes and other rights, continuous or discontinuous, apparent or unapparent, attached thereto.

SCHEDULE "D"

THE GATINEAU PROPERTY

SPECIFICALLY DESCRIBED IMMOVABLES

Immovables known and designated as being composed of lots TWO MILLION FOUR HUNDRED AND SIXTY-NINE THOUSAND FOUR HUNDRED AND THIRTY-TWO, TWO MILLION FOUR HUNDRED AND SIXTY-NINE THOUSAND THREE HUNDRED AND SEVENTY-FOUR, TWO MILLION FOUR HUNDRED AND SEVENTY-ONE THOUSAND AND FIFTY-SIX and TWO MILLION FOUR HUNDRED AND SEVENTY-ONE THOUSAND AND FIFTY-FIVE (2 469 432, 2 469 374, 2 471 056 and 2 471 055), all of the Cadastre of Québec, Registration Division of Papineau.

With all buildings, installations, structures, equipments and facilities erected and located in, under, on and over the said immovables including, without limitation, the buildings bearing civic numbers 1 Montreal Road West, 2 Montreal Road West and vacant emplacements on Montreal Road West, City of Gatineau, Province of Québec.

As the said immovables now subsist with their respective rights, members and appurtenances, without exception or reserve of any kind, and together with and subject to all servitudes and other rights, continuous or discontinuous, apparent or unapparent, attached thereto.

SCHEDULE "E"

CHARGES TO BE RELEASED AND DISCHARGED AT THE REGISTRY OF
PERSONAL AND MOVABLE REAL RIGHTS

[NTD: to follow]

**Exhibit J**
**Form of U.S. Sale Order**

SEE ATTACHED

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BEAR ISLAND PAPER COMPANY, L.L.C.,[1] | ) | Case No. 10-31202 (DOT) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**ORDER (A) AUTHORIZING AND APPROVING THE SALE OF ASSETS FREE AND
CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS,
(B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE ASSIGNED
CONTRACTS AND (C) GRANTING RELATED RELIEF**

Upon the motion, dated August 10, 2010 (the "Sale Motion"), of Bear Island Paper

Company, L.L.C., the debtor and debtor in possession in the above-captioned chapter 11 case

("Bear Island" or the "Debtor"), for entry of an order (this "Sale Order") pursuant to sections 105,

363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002 and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (a) authorizing and

approving the sale (the "Sale") of the Assets[2] free and clear of all liens, claims, encumbrances and

other interests (excluding the Assumed Liabilities) pursuant to the terms and conditions of that

certain asset sale agreement (the "Sale Agreement"), dated August 10, 2010, by and between

White Birch Paper Company and certain of its subsidiaries, including the Debtor (collectively, the

"Sellers") and BD White Birch Investment LLC (the "Purchaser"); (b) authorizing and approving

the assumption and assignment of the Assigned Contracts; and (c) granting related relief; and the

---

[1]    The last four digits of the Debtor's federal tax identification number are 0914. The principal address for the
Debtor is 10026 Old Ridge Road, Ashland, Virginia 23005.

[2]    All capitalized terms used but not otherwise not defined herein shall have the meanings ascribed in the Sale
Agreement and the Sale Motion, as applicable. To the extent of any inconsistency, the Sale Agreement shall
govern.

Court having entered the *Order Approving (A) the Form of the Sale Agreement, (B) the Bidding Procedures, (C) the Sale Notice and (D) the Assumption and Assignment Procedures* on [•] [Docket No. [•]] (the "Bidding Procedures Order"); and upon adequate and sufficient notice of the Sale Motion, Auction, the hearing before the Court on September 8, 2010 (the "Sale Hearing") and any other related transactions having been given in the manner directed by the Court pursuant to the Bidding Procedures Order; and the Court having reviewed and considered (x) the Sale Motion and all relief related thereto, (y) the objections thereto, if any, and (z) the statements of counsel and evidence presented in support of the relief requested by the Debtor at the Sale Hearing; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtor, its estate and creditors and other parties in interest; and upon the record of the Sale Hearing and all other pleadings and proceedings in this chapter 11 case, including the Sale Motion; and after due deliberation thereon and good and sufficient cause appearing therefor,

THE COURT HEREBY FINDS AND DETERMINES THAT:[3]

## Jurisdiction, Final Order and Statutory Predicates

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are incorporated herein to the extent not inconsistent herewith. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     The statutory predicates for the relief requested in the Sale Motion are sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006, 9007 and 9014 of the Bankruptcy Rules.

C.     This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

### Notice of the Sale and Auction

D.     Actual written notice of the Sale Motion was provided to the following parties (the "Notice Parties"): (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Purchaser; (iv) counsel to the Postpetition Agent (as defined in the DIP Order); (v) counsel to the agent under the First Lien Term Loan Agreement; (v) counsel to the majority lenders under the Second Lien Term Loan Agreement; (vii) counsel to counterparties under the Swap Agreements; (viii) the Monitor appointed in the CCAA Cases; (ix) all non-debtor counterparties to the Debtor's executory contracts and unexpired leases; (x) all persons or entities that have requested notice of the proceedings in this chapter 11 case; (xi) all parties who are known to claim liens or other interests upon the Assets; (xii) the Internal Revenue Service and (xiii) all applicable federal, state and local taxing and regulatory authorities.

E.     Notice of the auction conducted for the Sale (the "Auction") and the Sale Hearing, served on the Notice Parties on August 10, 2010, was reasonably calculated to provide all interested parties with timely and proper notice of the Auction, Sale and Sale Hearing.

F.     As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate and sufficient notice of the Sale Motion, Auction, Sale, Sale Hearing and the transactions contemplated thereby, including the assumption and assignment of the Assigned Contracts to the Purchaser, was provided in accordance with orders previously issued by the Court, sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014.  The notices described herein were good, sufficient and appropriate under

the circumstances, and no other or further notice of the Sale Motion, Auction, Sale, Sale Hearing or the assumption and assignment of the Assigned Contracts to the Purchaser is or shall be required.

G.     The disclosures made by the Debtor concerning the Sale Motion, Sale Agreement, Auction, Sale, assumption and assignment of the Assigned Contracts to the Purchaser and Sale Hearing were good, complete and adequate.

H.     A reasonable opportunity to object and be heard with respect to the Sale Motion, Sale and the relief requested therein, including the assumption and assignment of Assigned Contracts to the Purchaser and any Cure Costs related thereto, has been afforded to all interested persons and entities, including the Notice Parties.

### Capital Structure and Credit Bidding

I.     The Sellers, including Bear Island, are indebted to certain lenders (the "First Lien Term Lenders") under that certain First Lien Term Loan Credit Agreement, dated on or about April 8, 2005 (as amended and restated on January 27, 2006 and May 8, 2007) by and between White Birch Paper Company and White Birch Paper Holding Company, as borrowers, Credit Suisse First Boston, as sole lead arranger, sole bookrunner, syndication agent and documentation agent, Credit Suisse First Boston Toronto Branch, as Canadian collateral agent and administrative agent, TD Securities (USA) LLC, as co-arranger and the lender parties thereto (the "First Lien Term Loan Agreement").

J.     In addition, the Sellers, including Bear Island, are indebted to certain lenders (the "DIP Lenders") under that certain $140,000,000 Senior Secured Super-Priority Debtor in Possession Term Loan Agreement, as amended, modified, supplemented or otherwise in effect from time to time, as approved by the Initial CCAA Order and by an order of this Court, dated

4

March 31, 2010 (the "DIP Credit Agreement," and, together with the First Lien Term Loan Agreement, the "Loan Documents").

## Good Faith of Purchaser

K.     The Sale Agreement was negotiated, proposed and entered into by the Sellers, including Bear Island, and the Purchaser without collusion, in good faith and from arms'-length bargaining positions.

L.     The Purchaser is not an "insider" or "affiliate" of the Debtor as those terms are defined in the Bankruptcy Code. Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Sale Agreement to be avoided under section 363(n) of the Bankruptcy Code. Specifically, the Purchaser has not acted in a collusive manner with any person and the aggregate price paid by Purchaser for the Assets (the "Purchase Price") was not controlled by any agreement among the bidders.

M.     The Purchaser is purchasing the Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code. Indeed, the Purchaser proceeded in good faith in connection with all aspects of the Sale, including: (i) the Bidding Procedures Order; (ii) neither inducing nor causing the Debtor's chapter 11 filing; and (iii) disclosing all payments to be made by the Purchaser in connection with the Sale. Accordingly, the Purchaser is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code

## Highest and Best Offer

N.     The Debtor conducted an auction process in accordance with, and has otherwise complied in all respects with, the Bidding Procedures Order. The auction process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Assets. The Auction was duly noticed

and conducted in a non-collusive, fair and good faith manner and a reasonable opportunity has been given to any interested party to make a higher or otherwise better offer for the Assets.

## No Fraudulent Transfer

O.   As evidenced by Debtor's extensive marketing efforts, the consideration provided by the Purchaser pursuant to the Sale Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Assets, (iii) will provide a greater recovery to the Debtor's estate than would be provided by any other available alternative and (iv) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia. No other person, entity or group of entities has offered to purchase the Assets for greater economic value to the Debtor's estate than the Purchaser. The Debtor's determination that the Sale Agreement constitutes the highest and best offer for the Assets constitutes a valid and sound exercise of the Debtor's business judgment. Approval of the Sale Motion and the Sale Agreement, and the consummation of the transactions contemplated thereby, is in the best interests of the Debtor, its estate, creditors and other parties in interest.

P.   The Purchaser is not a mere continuation of the Debtor or its estate and there is no continuity of enterprise between the Purchaser and the Debtor. The Purchaser is not holding itself out to the public as a continuation of the Debtor. The Purchaser is not a successor to the Debtor or its estate and the Sale does not amount to a consolidation, merger or *de facto* merger of Purchaser and the Debtor.

## Validity of Transfer

Q.   The Debtor has (i) full corporate power and authority to execute and deliver the Sale Agreement and all other documents contemplated thereby, (ii) all corporate authority

necessary to consummate the transactions contemplated by the Sale Agreement, and (iii) taken all corporate action necessary to authorize and approve the Sale Agreement and the consummation of the transactions contemplated thereby. The Sale has been duly and validly authorized by all necessary corporate action. No consents or approvals, other than those expressly provided for in the Sale Agreement, are required for the Debtor to consummate the Sale, the Sale Agreement or the transactions contemplated thereby.

R. The Sale Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia. Neither the Debtor nor the Purchaser is fraudulently entering into the transaction contemplated by the Sale Agreement.

S. The Debtor and the other Sellers have good and marketable title to the Assets and are the lawful owners of the Assets. Subject to section 363(f) of the Bankruptcy Code, the transfer the Assets to the Purchaser will be, as of the closing of the transactions contemplated by the Sale Agreement (the "Closing Date"), a legal, valid and effective transfer of the Assets, which transfer vests or will vest the Purchaser with all right, title and interest of the Sellers to the Assets free and clear of (i) all liens and encumbrances relating to, accruing or arising any time prior to the Closing Date (collectively, "Liens") and (ii) all debts arising under, relating to or in connection with any act of the Debtor or claims (as that term is defined in section 101(5) of the Bankruptcy Code and herein), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of this case, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, rights with respect to Claims (as defined below) and Liens (x) that purport to give to any party a right of setoff or recoupment against, or a right or

option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, the Debtor's or the Purchaser's interests in the Assets, or any similar rights, or (y) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, as defined in this clause (ii), "Claims"), relating to, accruing or arising any time prior to the Closing Date, with the exception of Permitted Encumbrances and Assumed Liabilities (as those terms are defined in the Sale Agreement).

### Section 363(f) is Satisfied

T.     The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtor may sell the Assets free and clear of any interest in the property. The Purchaser would not have entered into the Sale Agreement and would not consummate the transactions contemplated thereby if the Sale and the assumption of liabilities and obligations as set forth in the Sale Agreement by the Purchaser were not free and clear of all Liens and Claims, other than the Permitted Encumbrances and Assumed Liabilities.

U.     Unless otherwise expressly included in the Permitted Encumbrances or Assumed Liabilities, the Purchaser shall not be responsible for any Liens or Claims, including in respect of the following, unless otherwise prohibited by applicable law or statute:  (i) any labor or employment agreements; (ii) all mortgages, deeds of trust and security interests; (iii) intercompany loans and receivables between the Debtor and any non-debtor subsidiary, (iv) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the

8

Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (l) any other state or federal benefits or claims relating to any employment with the Debtor or any of its predecessors; (vi) Claims or Liens arising under any Environmental Laws with respect to any assets owned or operated by Debtor or any of its corporate predecessor at any time prior to the Closing Date and any of the Debtor's liabilities other than the Assumed Liabilities; (vii) any bulk sales or similar law; (vii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (ix) any theories of successor liability (as further defined in the Sale Agreement, the "Excluded Liabilities").

V.     The Debtor may sell the Assets free and clear of all Liens and Claims against the Debtor, its estate or any of the Assets (except the Assumed Liabilities and Permitted Encumbrances) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Liens or Claims against the Debtor, its estate or any of the Assets who did not object or who withdrew their objections to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

## Compelling Circumstances for an Immediate Sale

W.     Good and sufficient reasons for approval of the Sale Agreement and the Sale have been articulated. The relief requested in the Sale Motion is in the best interests of the Debtor, its estate, its creditors and other parties in interest. The Debtor has demonstrated (i) good, sufficient

9

and sound business purposes and justifications for approving the Sale Agreement and (ii) compelling circumstances for the Sale outside of (a) the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code and (b) a plan of reorganization, in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Debtor's estate and the Sale will provide the means for the Debtor to maximize distributions to its creditors.

X.     To maximize the value of the Assets and preserve the viability of the business to which the Assets relate, it is essential that the Sale occur within the time constraints set forth in the Sale Agreement. Time is of the essence in consummating the Sale.

Y.     Given all of the circumstances of this chapter 11 case and the adequacy and fair value of the Purchase Price under the Sale Agreement, the proposed Sale constitutes a reasonable and sound exercise of the Debtor's business judgment and should be approved.

Z.     The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The Sale neither impermissibly restructures the rights of Debtor's creditors nor impermissibly dictates a liquidating plan of reorganization for the Debtor.

AA.    The consummation of the Sale and the assumption and assignment of the Assigned Contracts is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m) and 365 thereof.

### Adequate Assurance of Future Performance

BB.    The Purchaser has demonstrated adequate assurance of future performance with respect to the Assigned Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

**General Provisions**

1.      The relief requested in the Sale Motion, including the Sale, is granted and approved to the extent set forth in this Sale Order.

2.      Any objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, settled by announcement during the Sale Hearing or by stipulation filed with the Court, including any and all reservations of rights included in such objections or otherwise, are hereby denied and overruled with prejudice.  Those parties who did not object or withdrew their objections to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

**Approval of the Sale Agreement**

3.      The Sale Agreement, all Ancillary Agreements and all of the terms and conditions thereof are hereby approved.

4.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtor is authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale pursuant to, and in accordance with, the terms and conditions of the Sale Agreement, (ii) close the Sale as contemplated in the Sale Agreement and this Sale Order, and (iii) execute and deliver, perform under, consummate, implement and fully close the Sale Agreement, including the assumption and assignment of the Assigned Contracts to the Purchaser, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale Agreement and the Sale.

5.      This Sale Order shall be binding in all respects upon (a) the Debtor, (b) its estate, (c) all creditors of, and holders of equity interests in, the Debtor, (d) any holders of Liens, Claims

11

or other interests in, against or on all or any portion of the Assets (whether known or unknown),

(e) the Purchaser and all successors and assigns of the Purchaser, (f) the Assets and (g) any trustees,

if any, subsequently appointed in the Debtor's chapter 11 case or upon a conversion of this case to

chapter 7 under the Bankruptcy Code. This Sale Order and the Sale Agreement shall inure to the

benefit of the Debtor, its estate and creditors, the Purchaser and the respective successors and

assigns of each of the foregoing.

### Transfer of the Assets

6.     Pursuant to sections 105(a), 363(b) and 363(f) of the Bankruptcy Code, the Debtor

is authorized to transfer the Assets to the Purchaser on the Closing Date and such transfer shall

constitute a legal, valid, binding and effective transfer of such Assets and shall vest Purchaser with

title to the respective Assets and, upon the Debtor's receipt of the Purchase Price, other than

Permitted Encumbrances and Assumed Liabilities, shall be free and clear of all Liens, Claims and

other interests of any kind or nature whatsoever, including successor or successor in interest

liability and Claims in respect of the Excluded Liabilities, with such Liens, Claims and interests to

attach to the proceeds of the Sale in the order of their priority, with the same validity, force and

effect which they now have as against the Assets. Upon the Closing, the Purchaser shall take title

to and possession of the Assets subject only to the Permitted Encumbrances and Assumed

Liabilities.

7.     Except with respect to Permitted Encumbrances and Assumed Liabilities, all

persons and entities that are in possession of some or all of the Assets on the Closing Date are

directed to surrender possession of such Assets to the Purchaser or its assignee at the Closing. The

provisions of this Sale Order authorizing the sale of the Assets free and clear of Liens, Claims and

other interests (other than the Permitted Encumbrances and Assumed Liabilities), shall be

self-executing and neither the Debtor nor the Purchaser shall be required to execute or file releases,

termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order.

8. The Debtor is hereby authorized to take any and all actions necessary to consummate the Sale Agreement, including any actions that otherwise would require further approval by shareholders or its board of directors without the need of obtaining such approvals.

9. A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any liens and other encumbrances of record except those Assumed Liabilities or Permitted Encumbrances.

10. If any person or entity which has filed statements or other documents or agreements evidencing Liens on, or interests in, all or any portion of the Assets (other than statements or documents with respect to Permitted Encumbrances) shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all liens or interests which the person or entity has or may assert with respect to all or any portion of the Assets, the Debtor is hereby authorized and directed, and the Purchaser is hereby authorized, on behalf of the Debtor and each of the Debtor's creditors, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Assets.

11. On the Closing Date, this Sale Order shall be construed, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Debtor's interests in the Assets. This Sale Order is and shall be effective as a determination that, on the Closing Date, all Liens, Claims and other interest of any kind or nature whatsoever existing as to the Assets prior to the Closing Date, other than Permitted Encumbrances and Assumed Liabilities,

shall have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; provided, that such Liens, Claims and other interests shall attach to the proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the Assets. This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Sale Agreement.

12.    To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtor with respect to the Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Purchaser as of the Closing Date.

13.    To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of the Debtor's chapter 11 case or the consummation of the transactions contemplated by the Sale Agreement.

**Prohibition of Actions Against the Purchaser**

14.     Except for the Permitted Encumbrances and Assumed Liabilities, or as otherwise expressly provided for in this Sale Order or the Sale Agreement, the Purchaser shall not have any liability or other obligation of the Debtor arising under or related to any of the Assets.

15.     Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Sale Agreement, and unless otherwise prohibited by applicable law or statute, the Purchaser shall not be liable for any Claims against the Debtor or any of its predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including pursuant to any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger, mere continuation or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including liabilities on account of warranties, intercompany loans and receivables between the Debtor and any non-debtor subsidiary, liabilities relating to or arising from any Environmental Laws, and any taxes arising, accruing or payable under, out of, in connection with or in any way relating to the operation of any of the Assets prior to the Closing.

16.     Except with respect to Permitted Encumbrances and Assumed Liabilities, all persons and entities, including all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding Liens, Claims or other interests of any kind or nature whatsoever against or in all or any portion of the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with or in any way relating to the Debtor, the Assets, the operation of the Debtor's business prior to the Closing Date or the transfer of the Assets to the Purchaser, hereby are forever

barred, estopped and permanently enjoined from asserting against the Purchaser, any of their affiliates, their successors or assigns, their property or the Assets, such persons' or entities' Liens, Claims or interests in and to the Assets, including, the following actions: (a) commencing or continuing in any manner any action or other proceeding against the Purchaser, any of its affiliates, its successors, assets or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Purchaser, any of its affiliates, its successors, assets or properties; (c) creating, perfecting or enforcing any Lien or other Claim against the Purchaser, any of its affiliates, its successors, assets or properties; (d) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Purchaser, any of its affiliates or successors; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order, other orders of the Court, the Sale Agreement or actions contemplated or taken in respect thereof; or (f) revoking, terminating, failing or refusing to transfer or renew any license, permit or authorization to operate any of the Assets or conduct any of the businesses operated with the Assets.

17.     On the Closing Date, or as soon as possible thereafter, each creditor is authorized and directed, and the Purchaser is hereby authorized, on behalf of each of the Debtor's creditors, to execute such documents and take all other actions as may be necessary to release Liens, Claims and other interests in or on the Assets (except Permitted Encumbrances and Assumed Liabilities), if any, as provided for herein, as such Liens may have been recorded or may otherwise exist.

18.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Assets to the Purchaser in accordance with the terms of the Sale Agreement and this Sale Order.

19.     The Purchaser has given substantial consideration under the Sale Agreement for the benefit of the Debtor, its estate and creditors.  The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Claims and Liens pursuant to this Sale Order, including under Paragraphs 14-18 hereof, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Liens against or interests in, or Claims against the Debtor or any of the Assets, other than holders of Liens or Claims relating to the Assumed Liabilities and Permitted Encumbrances.   The consideration provided by the Purchaser for the Assets under the Sale Agreement is fair and reasonable and accordingly the purchase may not be avoided under section 363(n) of the Bankruptcy Code.

20.     Effective as of the Closing, the Purchaser, its successors and assigns, shall be designated and appointed the Debtor's true and lawful attorney and attorneys, with full power of substitution, in the Debtor's name and stead, on behalf of and for the benefit of the Purchaser, its successors and assigns, for the sole and limited purposes as follows:  have the power to demand and receive from any third party any and all of the Assets and to give receipts and releases for and in respect of the Assets, or any part thereof, and from time to time to institute and prosecute against third parties for the benefit of the Purchaser, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Purchaser, its successors and assigns, may deem proper for the collection or reduction to possession of any of the Assets.

## Assumption and Assignment of Assigned Contracts

21.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale, the Debtor's assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Sale Agreement, of the Assigned

Contracts is hereby approved and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

22. The Debtor is hereby authorized and directed in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the Closing Date of the Sale, the Assigned Contracts free and clear of all Claims, Liens or other interests of any kind or nature whatsoever and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Purchaser.

23. The Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. In addition, pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to, and assumption by, the Purchaser, except as provided in the Sale Agreement.

24. All defaults or other obligations of the Debtor under the Assigned Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured pursuant to the terms of the Sale Agreement on the Closing Date or as soon thereafter as reasonably practicable.

25. To the extent a counterparty to an Assigned Contract failed to timely object to a Cure Amount, such Cure Amount shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality

of the Cure Amount at any time, and such Cure Amount, when paid, shall completely revive any Assigned Contract to which it relates. No sections or provisions of any Assigned Contract that purport to provide for additional payments, penalties, charges or other financial accommodations in favor of the non-debtor third party to the Assigned Contracts shall have any force and effect with respect to the Sale and assignments authorized by this Sale Order. Such provisions constitute unenforceable, anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code. No assignment of any Assigned Contract pursuant to the terms of the Sale Agreement shall in any respect constitute a default under any Assigned Contract. The non-debtor party to each Assigned Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code and the Purchaser shall enjoy all of the Debtor's rights and benefits under each such Assigned Contract as of the applicable date of assumption without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof.

26. With respect to objections to any Cure Amounts that remain unresolved as of the Sale Hearing, such objections shall be resolved in accordance with the procedures set forth in the Bidding Procedures Order.

27. Nothing in this Sale Order, the Sale Motion or in any notice or any other document is or shall be deemed an admission by the Debtor that any contract is an executory contract or must be assumed and assigned pursuant to the Sale Agreement or in order to consummate the Sale.

28. The failure of Debtor or Purchaser to enforce at any time one or more terms or conditions of any Contract shall not be a waiver of such terms or conditions or of the Debtor's and Purchaser's rights to enforce every term and condition of such Contract.

29.     All parties to the Assigned Contracts are forever barred and enjoined from raising or asserting against the Purchaser any assignment fee, default, breach, Claim, pecuniary loss or condition to assignment arising under or related to the Assigned Contracts existing as of the Closing or arising by reason of the Closing, except for any amounts that are Assumed Liabilities.

## Other Provisions

30.     This Sale Order, the Sale Agreement and the Ancillary Agreements shall be binding in all respects upon all creditors and equity-holders of the Debtor, all non-debtor parties to the Assigned Contracts, all successors and assigns of the Debtor and its affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Debtor's chapter 11 case or upon a conversion of this case to chapter 7 under the Bankruptcy Code. The Sale Agreement and the Ancillary Agreements shall not be subject to rejection or avoidance under any circumstances.

31.     The Sale Agreement and the Ancillary Agreements may be modified, amended or supplemented by the parties thereto, in a writing signed by the parties and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

32.     Except to the extent expressly included in the Assumed Liabilities, or by applicable law or statue, the Purchaser and its affiliates shall have no liability, obligation or responsibility under the WARN Act (29 U.S.C. §§ 210 *et seq*.), the Comprehensive Environmental Response Compensation and Liability Act or any foreign, federal, state or local labor, employment or Environmental Law by virtue of the Purchaser's purchase of the Assets or assumption of the Assumed Liabilities.

20

33. On the Closing Date, prior to payment or repayment of any other claims, interests or obligations of the Debtor, other than the Carve-Out (as defined under the DIP Credit Agreement) if triggered, all outstanding Obligations (as defined in the DIP Credit Agreement) owed by the Debtor under the DIP Credit Agreement will be paid in full and in cash from the proceeds of the Sale pursuant to the Sale Agreement.

34. The consideration provided by the Purchaser to the Debtor pursuant to the Sale Agreement for the Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

35. The transactions contemplated by the Sale Agreement are undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and such Sale are duly stayed pending such appeal. The Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

36. Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) this chapter 11 case, (b) any subsequent chapter 7 case into which this chapter 11 case may be converted or (c) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the Sale Agreement or the terms of this Sale Order.

37. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

38.     The failure to specifically include any particular provision of the Sale Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sale Agreement be authorized and approved in its entirety; provided, however, that this Sale Order shall govern if there is any inconsistency between the Sale Agreement (including all Ancillary Agreements) and this Sale Order. Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

39.     The Court shall retain jurisdiction to, among other things, interpret, implement and enforce the terms and provisions of this Sale Order and the Sale Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Assets to Purchaser; (b) interpret, implement and enforce the provisions of this Sale Order; (c) protect Purchaser against any Liens, Claims or other interest in or against the Debtor or the Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (d) enter any orders under section 363 or 365 of the Bankruptcy Code with respect to the Assigned Contracts.

40.     Any amounts payable by the Debtor under the Sale Agreement shall (a) be paid in the manner provided in the Sale Agreement without further order of this Court, (b) be allowed administrative claims in an amount equal to such payments in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, (c) have the other protections provided in the Bidding Procedures Order and (d) not be discharged, modified or otherwise affected by any reorganization plan for the Debtor, except by an express agreement with Purchaser, its successors or assigns.

41.    All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

42.    To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Sale Motion in this chapter 11 case, the terms of this Sale Order shall govern.

43.    The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Sale Motion is hereby waived.

Dated: _____, 2010
       Richmond, Virginia

_____
Chief Judge Douglas O. Tice, Jr.
United States Bankruptcy Judge

I ASK FOR THIS:

*/s/ Jonathan L. Hauser*
Jonathan L. Hauser
VSB No. 18688
**TROUTMAN SANDERS LLP**
222 Central Park Avenue

Suite 2000
Virginia Beach, Virginia 23462
Telephone:     (757) 687-7768
Facsimile:      (757) 687-1505

- and -

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

*Attorneys for the Debtor and*
*Debtor in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/ Jonathan L. Hauser*

**Exhibit K**
**Sellers' Projected Cash Balance**

SEE ATTACHED

# White Birch Paper Holding Company
## WB Canada Only
## 13-Week Cash Flow Forecast

Weeks Ending July 30 through October 22, 2010

Confidential

White Birch Paper Holding Company
Rolling Weekly Forecast - WB CANADA ONLY
Weeks Ended July 30, 2010-October 22, 2010

In $000's

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wk Ended | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | Wk Ending | 13 Week |
| | 7/30 | 8/6 | 8/13 | 8/20 | 8/27 | 9/3 | 9/10 | 9/17 | 9/24 | 10/1 | 10/8 | 10/15 | 10/22 | Total |
| **Operating Receipts** | | | | | | | | | | | | | | |
| Stadacona | 10,239 | 5,915 | 7,412 | 6,785 | 11,982 | 5,665 | 5,466 | 5,276 | 4,056 | 12,201 | 8,267 | 4,941 | 5,966 | 94,190 |
| F.F. Soucy | 3,620 | 2,288 | 3,006 | 2,921 | 4,963 | 5,595 | 2,574 | 3,227 | 2,228 | 2,598 | 5,052 | 2,660 | 1,957 | 42,688 |
| Papier Masson | 5,030 | 2,644 | 3,089 | 2,420 | 4,446 | 2,397 | 2,395 | 2,349 | 2,289 | 3,979 | 2,304 | 2,631 | 2,218 | 38,191 |
| **Total Operating Receipts** | 18,889 | 10,847 | 13,507 | 12,126 | 21,391 | 13,656 | 10,455 | 10,852 | 8,572 | 18,778 | 15,623 | 10,231 | 10,140 | 175,058 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Fiber | (2,859) | (2,653) | (2,592) | (2,927) | (2,927) | (2,927) | (2,924) | (2,927) | (3,002) | (3,002) | (3,002) | (3,002) | (3,002) | (37,558) |
| Chemicals | (653) | (539) | (610) | (540) | (600) | (540) | (600) | (541) | (619) | (550) | (590) | (561) | (590) | (7,534) |
| Electricity | (2,705) | (2,705) | (2,705) | (2,705) | (2,705) | (2,705) | (2,705) | (2,705) | (3,664) | (2,705) | (2,705) | (2,705) | (2,705) | (37,083) |
| Recycle Material | (1,025) | (1,075) | (1,025) | (1,075) | (1,025) | (1,075) | (1,025) | (1,075) | (1,025) | (1,025) | (1,025) | (1,075) | (1,025) | (13,625) |
| Cost of Materials and Other Utilities | (1,598) | (1,659) | (1,796) | (1,550) | (1,832) | (1,706) | (1,549) | (1,830) | (1,677) | (1,743) | (1,673) | (1,583) | (1,735) | (21,929) |
| Property Taxes | (23) | | (52) | | | | (113) | | | | | | | (188) |
| Salaried and Hourly Payroll- Gross | (838) | (1,727) | (1,025) | (1,422) | (966) | (1,523) | (1,027) | (1,455) | (952) | (1,488) | (1,023) | (1,455) | (937) | (15,948) |
| Pension Plan and Group Insurance | (327) | (203) | (2) | (810) | (227) | (98) | (107) | (3) | (777) | (423) | (107) | (799) | | (3,883) |
| Freight | (1,722) | (1,796) | (1,848) | (1,848) | (1,823) | (1,823) | (2,249) | (1,848) | (1,698) | (1,848) | (2,248) | (2,098) | (2,046) | (35,493) |
| Maintenance Equipment | (103) | (142) | (168) | (119) | (134) | (146) | (212) | (131) | (124) | (144) | (131) | (169) | (119) | (1,842) |
| Major Maintenance | (60) | (70) | (55) | (65) | (70) | (300) | (55) | (70) | (55) | (75) | (315) | (55) | (80) | (1,325) |
| Capital Expenditures | (53) | (50) | (250) | (50) | | | | | | | | | | (400) |
| Professional Fees | (102) | | | | | | | | | | | | | (778) |
| Leases | (50) | | | | | | | | | | | | | (254) |
| Other | | (1,602) | | | | | | | | | | | | (3,552) |
| Management Fee | (1,194) | | | | | | | | | | | | | (5,907) |
| Bankruptcy Impacts | | | | | | | | | | | | (2,500) | | (2,500) |
| **Total Operating Disbursements** | (13,362) | (14,286) | (12,882) | (13,852) | (13,570) | (14,421) | (12,874) | (13,376) | (13,969) | (14,462) | (13,020) | (16,659) | (13,367) | (180,100) |
| **Net Operating Cash Flow** | 5,527 | (3,439) | 625 | (1,726) | 7,821 | (765) | (2,419) | (2,524) | (5,397) | 4,316 | 2,603 | (6,428) | (3,226) | (5,031) |
| **Non Operating Cash Flow and Restructuring** | | | | | | | | | | | | | | |
| Restructuring Professional Fees | (454) | (535) | (622) | (730) | (389) | (20) | (984) | (250) | (664) | (2,285) | (639) | (413) | (489) | (8,472) |
| Restructuring Bank Fees and Other Expenses | | | | | | | | | | | | | | 0 |
| Intercompany Transfers | | | | | | | | | | | | | | 0 |
| Interest Payments | (131) | (827) | (59) | (85) | | (131) | (825) | (144) | | (132) | (828) | (144) | | (3,309) |
| **Total Non-Operating Cash Flow and Restructuring** | (585) | (1,362) | (681) | (816) | (389) | (151) | (1,809) | (394) | (664) | (2,417) | (1,467) | (557) | (489) | (11,781) |
| **Net Non-Operating Receipts (Disbursements)** | 4,941 | (4,801) | (56) | (2,541) | 7,433 | (916) | (4,228) | (2,918) | (6,061) | 1,899 | 1,136 | (6,984) | (3,715) | (16,813) |
| **BEG. BOOK CASH BALANCE - WBPC CANADA** | $ 53,754 | $ 58,695 | $ 53,894 | $ 53,838 | $ 54,755 | $ 62,187 | $ 61,271 | $ 57,043 | $ 54,125 | $ 48,064 | $ 49,963 | $ 51,099 | $ 44,114 | $ 53,754 |
| Net Receipts (Disbursements) | 4,941 | (4,801) | (56) | (2,541) | 7,433 | (916) | (4,228) | (2,918) | (6,061) | 1,899 | 1,136 | (6,984) | (3,715) | (16,813) |
| Net Term Loan Borrowings | | | | 3,458 | | | | | | | | | | 3,458 |
| GE ABL Repayment | | | | | | | | | | | | | | |
| **ENDING BOOK CASH BALANCE** | $ 58,695 | $ 53,894 | $ 53,838 | $ 54,755 | $ 62,187 | $ 61,271 | $ 57,043 | $ 54,125 | $ 48,064 | $ 49,963 | $ 51,099 | $ 44,114 | $ 40,399 | $ 40,399 |
| Unused DIP Commitment | 3,458 | 3,458 | 3,458 | 3,458 | 3,458 | 3,458 | 3,458 | 3,458 | 3,458 | 3,458 | 3,458 | 3,458 | 3,458 | 3,458 |
| **LIQUIDITY** | $ 62,153 | $ 57,352 | $ 57,296 | $ 58,213 | $ 65,645 | $ 64,729 | $ 60,501 | $ 57,583 | $ 51,522 | $ 53,421 | $ 54,557 | $ 47,572 | $ 43,857 | $ 43,857 |
| **DIP TERM LOAN BALANCE** | | | | | | | | | | | | | | |
| DIP Loan Balance at Beg. of Week | $ 117,955 | $ 117,955 | $ 117,955 | $ 117,955 | $ 121,413 | $ 121,413 | $ 121,413 | $ 121,413 | $ 121,413 | $ 121,413 | $ 121,413 | $ 121,413 | $ 121,413 | $ 117,955 |
| Net Term Loan Borrowings | | | | 3,458 | | | | | | | | | | 3,458 |
| DIP Term Loan Borrowings | | | | | | | | | | | | | | |
| DIP Loan Balance at End of Week | $ 117,955 | $ 117,955 | $ 117,955 | $ 121,413 | $ 121,413 | $ 121,413 | $ 121,413 | $ 121,413 | $ 121,413 | $ 121,413 | $ 121,413 | $ 121,413 | $ 121,413 | $ 121,413 |

# White Birch Paper
## Bear Island Paper Company LLC
### 13-Week Cash Flow Forecast

Weeks Ending July 30 through October 22, 2010

7/29/2010

**Confidential**

White Birch Paper Company
Rolling Weekly Forecast - Bear Island ONLY
Weeks Ended July 30, 2010-October 22, 2010

In $000's

| | 1 Wk Ended 7/30 | 2 Wk Ending 8/6 | 3 Wk Ending 8/13 | 4 Wk Ending 8/20 | 5 Wk Ending 8/27 | 6 Wk Ending 9/3 | 7 Wk Ending 9/10 | 8 Wk Ending 9/17 | 9 Wk Ending 9/24 | 10 Wk Ending 10/1 | 11 Wk Ending 10/8 | 12 Wk Ending 10/15 | 13 Wk Ending 10/22 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | |
| Bear Island | 5,214 | 2,695 | 1,907 | 3,395 | 2,445 | 3,345 | 1,700 | 2,500 | 3,350 | 3,270 | 1,900 | 2,400 | 3,100 | 37,222 |
| **Total Operating Receipts** | 5,214 | 2,695 | 1,907 | 3,395 | 2,445 | 3,345 | 1,700 | 2,500 | 3,350 | 3,270 | 1,900 | 2,400 | 3,100 | 37,222 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Fiber | (250) | (250) | (250) | (262) | (262) | (262) | (280) | (300) | (300) | (300) | (300) | (300) | (300) | (3,656) |
| Chemicals | (175) | (228) | (394) | (160) | (174) | (160) | (199) | (366) | (188) | (156) | (167) | (397) | (181) | (2,964) |
| Electricity | (725) | (720) | (557) | (545) | (715) | (545) | (635) | (552) | (540) | (125) | (645) | (545) | (557) | (7,406) |
| Recycle Material | (486) | (337) | (76) | (205) | (500) | (225) | (225) | (225) | (225) | (510) | (225) | (225) | (225) | (3,689) |
| Other Materials and Other Utilities | (305) | · | (600) | (237) | (279) | (197) | (257) | (226) | (271) | (189) | (240) | (266) | (220) | (3,279) |
| Property Taxes | - | (16) | - | - | - | - | - | (5) | - | - | - | (5) | (109) | (140) |
| Salaried and Hourly Payroll- Gross | (406) | (238) | (238) | (238) | (391) | (238) | (446) | (432) | (391) | (238) | (391) | (432) | (406) | (4,847) |
| Pension Plan and Group Insurance | (284) | (297) | (304) | (278) | (278) | (272) | (304) | (273) | (272) | (279) | (302) | (273) | (279) | (3,698) |
| Freight | (85) | (199) | (253) | (235) | (165) | (153) | (171) | (165) | (177) | (172) | (151) | (164) | (147) | (2,235) |
| Maintenance Equipment | (18) | (62) | (44) | (66) | (164) | (84) | (108) | - | (40) | (90) | - | (40) | (40) | (736) |
| Major Maintenance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Capital Expenditures | (11) | (15) | (10) | (1) | (5) | (13) | (8) | (34) | (20) | (3) | (8) | - | (8) | (83) |
| Professional Fees | 12 | (18) | (33) | (15) | (9) | (10) | (15) | - | (1) | - | - | - | (9) | (151) |
| Leases | - | - | (1) | (1) | - | - | - | - | - | - | - | - | - | - |
| Other | (192) | - | (142) | (142) | (142) | (142) | (142) | (142) | - | (192) | (137) | (192) | - | (1,054) |
| Management Fee | - | (192) | - | - | - | - | - | - | (192) | - | - | - | - | - |
| Bankruptcy Impacts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Disbursements** | (2,926) | (2,584) | (2,912) | (2,370) | (2,944) | (2,349) | (2,660) | (2,739) | (2,425) | (2,255) | (2,430) | (2,865) | (2,480) | (33,938) |
| **Net Operating Cash Flow** | 2,288 | 111 | (1,005) | 1,025 | (498) | 996 | (959) | (239) | 925 | 1,015 | (530) | (465) | 620 | 3,283 |
| **Non Operating Cash Flow and Restructuring** | | | | | | | | | | | | | | |
| Restructuring Professional Fees | (336) | (65) | (317) | (19) | (130) | (290) | (200) | - | - | (916) | (200) | - | - | (2,473) |
| Restructuring Bank Fees and Other Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Intercompany Transfers | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Payments | (23) | (138) | (9) | (15) | - | (23) | (140) | (25) | - | (22) | (137) | (25) | (8) | (555) |
| **Total Non-Operating Cash Flow and Restructuring** | (359) | (203) | (326) | (34) | (130) | (313) | (340) | (25) | - | (938) | (337) | (25) | (8) | (3,028) |
| **Net Operating Receipts (Disbursements)** | 1,929 | (92) | (1,331) | 991 | (628) | 683 | (1,299) | (264) | 925 | 77 | (866) | (490) | 620 | 255 |
| **BEG. BOOK CASH BALANCE** | 5,882 | 7,811 | 7,719 | 6,388 | 7,966 | 7,338 | 8,021 | 6,722 | 6,458 | 7,383 | 7,460 | 6,594 | 6,104 | 5,882 |
| Net Receipts (Disbursements) | 1,929 | (92) | (1,331) | 991 | (628) | 683 | (1,299) | (264) | 925 | 77 | (866) | (490) | 620 | 255 |
| DIP Term Loan Borrowings | - | - | - | 587 | - | - | - | - | - | - | - | - | - | 587 |
| GE ABL Repayment | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **ENDING BOOK CASH BALANCE** | 7,811 | 7,719 | 6,388 | 7,966 | 7,338 | 8,021 | 6,722 | 6,458 | 7,383 | 7,460 | 6,594 | 6,104 | 6,724 | 6,724 |
| Unused DIP Commitment | 587 | 587 | 587 | 587 | 587 | 587 | 587 | 587 | 587 | 587 | 587 | 587 | 587 | 587 |
| **LIQUIDITY** | 8,398 | 8,306 | 6,975 | 8,553 | 7,925 | 8,608 | 7,309 | 7,045 | 7,970 | 8,047 | 7,181 | 6,691 | 7,311 | 7,311 |
| **DIP TERM LOAN BALANCE** | | | | | | | | | | | | | | |
| DIP Loan Balance at Beg. of Week | - | - | - | - | 587 | 587 | 587 | 587 | 587 | 587 | 587 | 587 | 587 | - |
| DIP Term Loan Borrowings | - | - | - | 587 | - | - | - | - | - | - | - | - | - | 587 |
| DIP Loan Balance at End of Week | - | - | - | 587 | 587 | 587 | 587 | 587 | 587 | 587 | 587 | 587 | 587 | 587 |

# White Birch Paper

# 13-Week Cash Flow Forecast

## Weeks Ending July 30 through October 22, 2010

7/29/2010

Confidential

**White Birch Paper**
**13 Week Cash Flow Forecast**
**Weeks Ended July 30, 2010-October 22, 2010**

**Key Assumptions:**

1 - **Bankruptcy Filing:**
   - Petition Date was February 24, 2010
   - Prior service cost component of pension contributions in Canada of CAD $1.5 million are assumed suspended until emergence - savings of approximately $1.5 million CAD per month
   - Letters of Credit and Cash Deposits - Letters of credit outstanding on the filing date of (appx. $11.1 million) were cash collateralized in the repayment of loan balances to the ABL lender that occurred on March 1.
   - Projected cash balances should be viewed on a consolidated basis only
     Negative cash balances at certain of the locations could be covered by available cash at other locations through the Company's cash management process
   - No cash payments or other assumptions regarding emerging from CCAA and Chapter 11 Bankruptcy, or a 363 Sale of the Company, are reflected in the forecast
   - Restructuring professional fees includes an estimate of approximately $2.9 million during the week ended October 1 for estimated professional fees accrued and unpaid through September 30, 2010

2 - **Includes the Following DIP Financing Assumptions:**
   - Pre-petition ABL facility was replaced with a super priority delayed draw term loan facility of $140 million (DIP Facility) on March 1 with terms, as follows:
     - Interest at L+1,000 bps; 2% Libor floor
     - DIP facility priced with a 250bps arrangement fee, a 250bps commitment fee and $100k annual administrative fee
     - Interest on borrowings paid monthly as due
     - DIP loans paid or repaid may not be reborrowed
   - Aggregate reserves approximate $18.0 million for the D&O charge and the administrative charge, a carve-out for professional fees and a Canadian Priority Reserve
   - Liquidity reflected at any given week includes unused DIP commitment that is available for draw based on budgeted net disbursements, and/or borrowing base collateral, but has not yet been drawn
   - DIP borrowings and related Unused DIP Commitment, included in this forecast, are consistent with the Supplemental Approved Budget.
   - Forecast does not reflect repayment of loans in weeks when cash collections exceed budgeted net disbursements

3 - **Assumes spot rate of C$1.00 to US $1.00 throughout the forecast period**

4 - **Assumes full production at all mills based on latest production schedule**

5 - **Preliminary and subject to change**

White Bluff Paper
Rolling Weekly Forecast
Weeks Ended July 30, 2010–October 22, 2010

CONSOLIDATED
In $000's

| | 1 Wk Ended 7/30 | 2 Wk Ending 8/6 | 3 Wk Ending 8/13 | 4 Wk Ending 8/20 | 5 Wk Ending 8/27 | 6 Wk Ending 9/3 | 7 Wk Ending 9/10 | 8 Wk Ending 9/17 | 9 Wk Ending 9/24 | 10 Wk Ending 10/1 | 11 Wk Ending 10/8 | 12 Wk Ending 10/15 | 13 Wk Ending 10/22 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | |
| Bear Island | 5,214 | 2,695 | 1,907 | 3,395 | 2,445 | 3,345 | 1,700 | 2,500 | 3,350 | 3,270 | 1,800 | 2,400 | 3,100 | 37,222 |
| Shedacoa | 10,239 | 5,915 | 7,412 | 6,785 | 11,992 | 5,665 | 5,466 | 5,276 | 4,056 | 12,201 | 8,267 | 4,941 | 5,986 | 94,190 |
| F. F. Soucy | 3,620 | 2,288 | 3,006 | 2,321 | 4,483 | 5,595 | 2,574 | 3,227 | 2,228 | 2,598 | 5,052 | 2,650 | 1,957 | 42,588 |
| Paper Masson | 5,030 | 2,644 | 3,089 | 2,420 | 4,446 | 4,396 | 2,395 | 2,349 | 2,289 | 3,979 | 2,304 | 2,304 | 2,218 | 38,191 |
| **Total Operating Receipts** | 24,103 | 13,542 | 15,414 | 15,521 | 23,836 | 17,001 | 12,155 | 13,352 | 11,922 | 22,048 | 17,523 | 12,031 | 13,240 | 212,290 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Fiber | (3,109) | (2,913) | (2,854) | (3,189) | (3,189) | (3,207) | (3,214) | (3,227) | (3,302) | (3,302) | (3,302) | (3,302) | (3,302) | (41,414) |
| Chemicals | (828) | (765) | (1,005) | (774) | (774) | (700) | (600) | (927) | (807) | (807) | (757) | (848) | (771) | (10,499) |
| Electricity | (3,430) | (3,425) | (3,262) | (3,250) | (4,379) | (3,250) | (3,340) | (3,257) | (4,204) | (2,830) | (3,350) | (3,250) | (3,262) | (44,489) |
| Recycle Material | (1,511) | (1,283) | (1,230) | (1,323) | (1,323) | (1,300) | (1,300) | (1,300) | (1,250) | (1,565) | (1,913) | (1,300) | (1,250) | (17,316) |
| Other Materials and Other Utilities | (1,903) | (1,997) | (2,050) | (1,787) | (2,112) | (1,903) | (1,807) | (2,059) | (1,947) | (1,932) | (1,849) | (1,849) | (1,955) | (25,208) |
| Property Taxes | (23) | (16) | (67) | - | (35) | (115) | (113) | (6) | - | (50) | - | (5) | (109) | (328) |
| Salaried and Hourly Payroll Gross | (1,349) | (1,955) | (1,625) | (1,660) | (1,357) | (1,751) | (1,473) | (1,887) | (1,343) | (1,735) | (1,414) | (1,887) | (1,343) | (20,769) |
| Pension Plan and Group Insurance | (327) | (203) | (2) | (810) | (327) | (98) | (107) | (3) | (777) | (423) | (107) | (3) | (799) | (3,983) |
| Freight | (2,007) | (2,095) | (2,552) | (2,125) | (2,102) | (2,095) | (2,552) | (2,121) | (2,170) | (2,127) | (2,550) | (2,371) | (2,327) | (29,191) |
| Maintenance Equipment | (188) | (132) | (340) | (421) | (289) | (298) | (384) | (236) | (301) | (316) | (282) | (333) | (286) | (4,077) |
| Major Maintenance | (76) | (132) | (99) | (354) | (234) | (364) | (160) | (70) | (65) | (165) | (319) | (65) | (120) | (2,281) |
| Capital Expenditures | - | - | (250) | (50) | (50) | (50) | (50) | (50) | (70) | (50) | (50) | (50) | (58) | (400) |
| Professional Fees | (64) | (65) | (120) | (50) | (55) | (115) | (80) | (80) | (1) | (50) | - | - | - | (661) |
| Leases | 12 | (20) | (115) | (1) | (16) | (16) | (16) | (34) | (1) | (8) | (8) | (108) | (8) | (404) |
| Other | (102) | (1,602) | (152) | (152) | (152) | (277) | (127) | (127) | (127) | (152) | (152) | (127) | (277) | (3,552) |
| Management Fee | (1,387) | - | - | (707) | (707) | (1,387) | (1,387) | (707) | (1,387) | (1,387) | - | (1,387) | - | (6,991) |
| Bankruptcy Impacts | | | | | | | | | | | | | (2,500) | (2,500) |
| **Total Operating Disbursements** | (16,280) | (16,870) | (15,794) | (16,222) | (16,513) | (16,770) | (15,534) | (16,116) | (16,394) | (16,717) | (15,450) | (19,524) | (15,847) | (214,039) |
| **Net Operating Cash Flow** | 7,815 | (3,328) | (380) | (700) | 7,323 | 231 | (3,379) | (2,763) | (4,472) | 5,331 | 2,073 | (6,893) | (2,608) | (1,746) |
| **Non Operating Cash Flow and Restructuring** | | | | | | | | | | | | | | |
| Restructuring Professional Fees | (791) | (600) | (938) | (748) | (519) | (310) | (1,184) | (250) | (664) | (3,201) | (803) | (413) | (489) | (10,945) |
| Restructuring Bank Fees and Other Expenses | | | | | | | | | | | | | | |
| Intercompany Transfers | | | | | | | | | | | | | | |
| Interest Payments | (154) | (955) | (69) | (100) | (154) | (154) | (965) | (169) | (154) | (154) | (965) | (169) | (489) | (3,864) |
| Total Non-Operating Cash Flow and Restructuring | (945) | (1,555) | (1,007) | (849) | (519) | (464) | (2,149) | (419) | (664) | (3,355) | (1,804) | (582) | (489) | (14,809) |
| **Net Operating Receipts (Disbursements)** | 6,871 | (4,893) | (1,387) | (1,550) | 6,804 | (233) | (5,527) | (3,182) | (5,135) | 1,976 | 270 | (7,474) | (3,096) | (16,556) |
| | | | | | | | | | | | | | | |
| BEG. BOOK CASH BALANCE | 59,635 | 66,506 | 61,613 | 60,226 | 62,721 | 69,525 | 69,292 | 63,765 | 60,582 | 55,447 | 57,423 | 57,693 | 50,218 | 59,635 |
| Net Receipts (Disbursements) | 6,871 | (4,893) | (1,387) | (1,550) | 6,804 | (233) | (5,527) | (3,182) | (5,135) | 1,976 | 270 | (7,474) | (3,095) | (16,556) |
| DIP Term Loan Borrowing | | | | 4,045 | | | | | | | | | | 4,045 |
| ENDING BOOK CASH BALANCE | 66,506 | 61,613 | 60,226 | 62,721 | 69,525 | 69,292 | 63,765 | 60,582 | 55,447 | 57,423 | 57,693 | 50,218 | 47,123 | 47,123 |
| Unused DIP Commitment | 4,045 | 4,045 | 4,045 | - | - | - | - | - | - | - | - | - | - | - |
| **LIQUIDITY** | 70,551 | 65,658 | 64,271 | 62,721 | 69,525 | 69,292 | 63,765 | 60,582 | 55,447 | 57,423 | 57,693 | 50,218 | 47,123 | 47,123 |
| | | | | | | | | | | | | | | |
| **DIP TERM LOAN BALANCE** | | | | | | | | | | | | | | |
| DIP Loan Balance at Beg of Week | 117,955 | 117,955 | 117,955 | 117,955 | 122,000 | 122,000 | 122,000 | 122,000 | 122,000 | 122,000 | 122,000 | 122,000 | 122,000 | 117,955 |
| DIP Term Loan Borrowing | | | | 4,045 | | | | | | | | | | 4,045 |
| DIP Loan Balance at End of Week | 117,955 | 117,955 | 117,955 | 122,000 | 122,000 | 122,000 | 122,000 | 122,000 | 122,000 | 122,000 | 122,000 | 122,000 | 122,000 | 122,000 |

White Birch Paper
Rolling Weekly Forecast
Weeks Ended July 30, 2010-October 23, 2010

Bankruptcy Adjustments
In $000's

| Consolidated WBPC - DIP Adjustments | 1 Wk Ended 7/30 | 2 Wk Ending 8/6 | 3 Wk Ending 8/13 | 4 Wk Ending 8/20 | 5 Wk Ending 8/27 | 6 Wk Ending 9/3 | 7 Wk Ending 9/10 | 8 Wk Ending 9/17 | 9 Wk Ending 9/24 | 10 Wk Ending 10/1 | 11 Wk Ending 10/8 | 12 Wk Ending 10/15 | 13 Wk Ending 10/22 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Accounts Receivable Contraction | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Bankruptcy Impacts** | | | | | | | | | | | | | | |
| General Unsecured Claims | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Accounts Payable Contraction and Cash Deposits | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities Deposits/Hydro and Rappahannock | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Possessory Liens/Freight contraction | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pension adjustment for past service | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash Collateralized L/Cs and Cash Deposits | - | - | - | - | - | - | - | - | - | - | - | (2,500) | - | (2,500) |
| GST Tax Issue | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Bankruptcy Impacts | - | - | - | - | - | - | - | - | - | - | - | (2,500) | - | (2,500) |
| **Restructuring Bank Fees and Other Expenses** | | | | | | | | | | | | | | |
| Arrangement Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Commitment Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Restructuring Fee Adjustments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NOTE: TOTAL BANKRUPTCY ADJUSTMENTS | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (2,500) | $ - | $ (2,500) |

Page 4

White Birch Paper

Cash Flow Forecast - Variance Report
Actual Compared With 13-Week Supplemental Approved Budget (Dated May 14, 2010)

For the Weeks Ended July 23, 2010

7/29/2010

Confidential

Consolidated
In $000's

| | Current Week Variance to Supplemental Approved Budget | | | | Cumulative 12-Week Variance to Supplemental Approved Budget | | | |
|---|---|---|---|---|---|---|---|---|
| | Actual Wk Ended 7/23 | Budget Wk Ended 7/23 | B (W) than Budget 7/23 | Note Reference | Actual 5/7 Through 7/23 | Budget 5/7 Through 7/23 | B (W) than Budget 7/23 | Note Reference |
| **Operating Receipts** | | | | | | | | |
| Bear Island | $ 3,171 | $ 2,600 | $ 571 | A | $ 28,131 | $ 28,600 | $ (468) | 1 |
| Stadacona | 6,430 | 4,565 | 1,865 | B | 80,574 | 66,767 | 13,807 | 2 |
| F.F. Soucy | 2,204 | 2,267 | (63) | C | 29,611 | 34,660 | (5,049) | 3 |
| Papier Masson | 2,446 | 1,704 | 743 | D | 36,890 | 33,491 | 3,400 | 4 |
| **Total Operating Receipts** | 14,252 | 11,136 | 3,116 | | 176,207 | 164,518 | 11,690 | |
| | | | | | | | | |
| **Operating Disbursements** | | | | | | | | |
| Fiber | (2,564) | (2,814) | 250 | E | (36,032) | (36,272) | 240 | 5 |
| Chemicals | (691) | (750) | 59 | E | (9,434) | (9,520) | 86 | 5 |
| Electricity | (4,093) | (3,004) | (1,089) | F | (43,733) | (39,166) | (4,567) | 6 |
| Recycle Material | (1,107) | (1,250) | 143 | E | (15,146) | (15,526) | 380 | 5 |
| Other Materials and Other Utilities | (1,775) | (1,935) | 160 | E | (21,971) | (25,033) | 3,061 | 5 |
| Property Taxes | - | (6) | 6 | | (1,290) | (1,089) | (201) | 7 |
| Salaried and Hourly Payroll - Gross | (1,680) | (1,410) | (270) | G | (19,311) | (18,713) | (598) | 8 |
| Pension Plan and Group Insurance | (576) | (606) | 31 | H | (3,627) | (3,692) | 65 | 9 |
| Freight | (1,863) | (2,084) | 221 | H | (24,546) | (24,587) | 41 | 10 |
| Maintenance Equipment | (206) | (307) | 101 | I | (3,158) | (4,307) | 1,150 | 11 |
| Major Maintenance | (80) | (145) | 65 | I | (1,765) | (2,921) | 1,155 | 11 |
| Capital Expenditures | (180) | (106) | (74) | I | (223) | (725) | 502 | 11 |
| Professional Fees | (3) | (6) | 3 | I | (338) | (811) | 473 | 11 |
| Leases | (280) | (227) | (53) | I | (504) | (208) | (296) | 11 |
| Other | - | - | - | | (2,009) | (2,671) | 663 | 11 |
| Management Fee | - | - | - | | (4,934) | (3,875) | (1,059) | 11 |
| **Total Operating Disbursements** | (15,097) | (14,649) | (447) | | (188,020) | (189,116) | 1,096 | |
| | | | | | | | | |
| **Net Operating Cash Flow** | (845) | (3,514) | 2,668 | | (11,813) | (24,599) | 12,786 | |
| | | | | | | | | |
| **Non Operating Cash Flow and Restructuring** | | | | | | | | |
| Restructuring Professional Fees | - | (675) | 675 | J | (4,425) | (8,456) | 4,031 | 12 |
| Restructuring Bank Fees and Other Expenses | - | - | - | | (257) | (265) | 8 | |
| Intercompany Transfers | - | - | - | | - | - | - | |
| Interest Payments | - | - | - | | (3,678) | (3,147) | (531) | 13 |
| **Total Non-Operating Cash Flow and Restructuring** | - | (675) | 675 | | (8,360) | (11,868) | 3,508 | |
| | | | | | | | | |
| **Net Operating Receipts (Disbursements)** | $ (845) | $ (4,189) | $ 3,343 | | $ (20,173) | $ (38,467) | $ 16,294 | |

White Birch Paper Company
Explanations of Significant Weekly Variances
7/23/2010
in $000's

Current Week Actual vs. Supplemental Approved Budget

| | Note Reference | Weekly Variance | EXPLANATION OF WEEKLY VARIANCE |
|---|---|---|---|
| **Cash Collections** | | | |
| Bear Island | A | $ 571 | Favorable variance primarily due to higher than forecasted collections from Tribune of $0.5M, Mayer of $0.5M, and multiple other customers of $0.3M. These variances are partly offset by timing of receipts from Washington Post ($0.4M), which were received in prior weeks. |
| Stadacona | B | 1,865 | Favorable variance primarily due to higher than forecasted receipts from MPS of $0.2M and multiple other customers of $1.3M, earlier than forecasted collections from Supermedia of $0.6M and export customers of $0.1M, and timing of receipts from NY Post of $0.3M, Newsday of $0.1M, and Page of $0.1M (which were all forecasted to be received in prior weeks). These favorable variances are partly offset by lower than forecasted receipts from R.R. Donnelley ($0.3M), and delayed receipts from Dow Jones ($0.2M) and the sale of steam ($0.3M). |
| F.F. Soucy | C | (63) | Unfavorable variance primarily due to lower than forecasted receipts from multiple other customers ($1.1M), partly offset by timing of receipts from Fairworld of $1.0M, which were forecasted to be received in prior weeks. |
| Papier Masson | D | 743 | Favorable variance primarily due to higher than forecasted collections from AFL of $0.2M (due to higher volumes and continued efforts to reduce credit exposure with this customer) and from multiple other customers of $0.2M, and timing of receipts from 40 days customers of $0.2M and the Buffalo News of $0.2M (which were forecasted to be received in prior weeks). These variances are partly offset by lower than forecasted receipts from Media News ($0.1M). |
| **Total Variance - Cash Collections** | | $ 3,116 | |
| **Disbursements** | | | |
| Fiber, Chemicals, Recycle Material and Other Materials and Utilities | E | $ 612 | Favorable variance primarily due to lower than forecasted spending at Stadacona for fiber and recycle material of $0.3M, delayed fiber spending at Papier Masson of $0.2M, lower than forecasted spending at Papier Masson for other materials and utilities of $0.4M and for chemicals of $0.1M, and timing related to spending on other materials and utilities at F.F. Soucy of $0.1M (which was paid in previous weeks). These favorable variances are partly offset by higher than forecasted fiber spending at F.F. Soucy ($0.2M) and timing related to other materials and utilities spending at Stadacona ($0.3M), which was forecasted to be paid in the prior week. |
| Electricity | F | (1,089) | Unfavorable variance primarily due to timing of making payments for steam at Stadacona ($0.8M), which were forecasted to be paid in the prior week, and higher than forecasted weekly payments to the electricity provider in Canada ($0.3M), based upon an agreement to increase the weekly payments for utilization. |
| Property Taxes | | 5 | |
| Salaried and Hourly Payroll - Gross | G | (270) | Unfavorable variance primarily due to earlier than forecasted payments at F.F. Soucy. |
| Pension Plan and Group Insurance | | 31 | |
| Freight | H | 221 | Favorable variance primarily due to lower than forecasted payments at Papier Masson of $0.1M and timing of payments at Stadacona of $0.2M, which were forecasted to be paid in prior weeks. These favorable variances are partly offset by higher than forecasted payments at Bear Island ($0.1M). |
| Maintenance Equipment, Major Maintenance, Non-Restructuring Professional Fees, Leases and Other Disbursements | I | 42 | Favorable variance primarily due to lower than forecasted maintenance and related spending of $0.2M (primarily at Bear Island), partly offset by earlier than forecasted "other" spending ($0.2M). |
| **Total Variance - Operating Disbursements** | | $ (447) | |
| **Other Non-operating cash flow and restructuring** | | | |
| Restructuring Professional Fees | J | $ 675 | Favorable variance primarily due to a delay in payments to multiple service providers, which are forecasted to be paid in future weeks. |
| Restructuring Bank Fees and Other Expenses | | - | |
| Interest Payments | | - | |
| **Total Non-Operating Cash Flow and Restructuring** | | $ 675 | |
| **Total Net Variances in Operating Receipts and (Disbursements)** | | $ 3,343 | |

3

CONFIDENTIAL

White Birch Paper Company
Explanations of Significant Cumulative Variances
7/23/2010
In $000's

Cumulative 12-Week Actual vs. Supplemental Approved Budget

| Cumulative Cash Collections | Note Reference | Cumulative Variance | EXPLANATION OF CUMULATIVE VARIANCES - 12 WEEKS ENDED 7/23/2010 |
|---|---|---|---|
| Bear Island | 1 | $ (468) | Unfavorable variance primarily due to lower than forecasted collections from Richmond News ($0.2M) and Mayar ($1.9M), of which $1.6M is forecasted to be collected in future weeks, and delayed receipts from Garnett ($0.1M). These variances are partly offset by higher than forecasted collections from the Washington Post of $0.3M, Dow Jones of $0.2M, Tribune of $0.2M, and from multiple other customers of $1.0M. |
| Stadacona | 2 | 13,807 | Favorable variance includes $13.3M of permanent collection variances primarily related to higher than forecasted collections from Dow Jones of $3.3M, MPS of $1.2M, SuperMedia of $0.6M, Metroland of $1.3M, TransContinental of $1.9M, and multiple other customers of $8.5M, (all of which are primarily due to higher than forecasted receipts from Navada ($0.4M), partly offset by lower than forecasted receipts from Navada ($0.4M), J.B. Demaline ($0.7M), and World Color ($0.4M). In addition to these favorable permanent variances, there are $0.5M of net favorable timing variances, primarily due to earlier than forecasted receipts from SuperMedia of $0.5M and export customers of $0.3M, which are both partly offset by delayed receipts related to the sale of Jones ($0.3M). |
| F. F. Soucy | 3 | (5,049) | Unfavorable variance primarily due to delayed reimbursement of GST ($1.2M), and lower than forecasted receipts from Heinzel ($1.8M), from multiple other customers ($2.1M), and related to government subsidies ($0.5M). These variances are partly offset by higher than forecasted receipts from Dow Jones of $0.2M, EI Dia of $0.2M, Fairworld of $0.1M, and Garnett of $0.1M. |
| Papier Masson | 4 | 3,400 | Favorable variance primarily due to higher than forecasted receipts from export customers of $3.6M, several other customers of $2.6M, several other customers of $0.8M, and AFL of $0.2M (due to higher volumes and continued efforts to reduce credit exposure with this customer), and earlier than forecasted receipts from Journal Register of $0.1M. These favorable variances are partly offset by delayed receipts from Garnett ($0.2M), MPS ($0.2M), and Media News ($0.3M), and lower than forecasted receipts from Garnett ($0.2M), Hearst ($0.1M), Vertis ($0.2M), Media News ($0.3M), New House ($0.1M), and related to the reimbursement of GST ($0.5M). |
| **Total Variance - Cash Collections** | | **$ 11,690** | |

| Cumulative Disbursements | | | |
|---|---|---|---|
| Fiber, Chemicals, Recycle Material and Other Materials and Utilities | 5 | 3,768 | Favorable variance primarily due to lower than forecasted spending at Stadacona for fiber and recycle material of $3.6M and for chemicals of $0.9M, lower than forecasted spending at Bear Island for fiber of $0.2M and for chemicals of $0.4M, lower than forecasted spending at Papier Masson of $0.3M. These favorable variances are partly offset by higher than forecasted other materials and utilities of $3.3M, and delayed spending for fiber at Papier Masson of $0.3M (due to other materials and utilities and higher payments at F.F. Soucy, for wood chips needed to build inventory ($1.4M), for chemicals ($0.4M), and for other materials and utilities ($0.3M). |
| Electricity | 6 | (4,567) | Unfavorable variance primarily due to higher than forecasted payments to the electricity provider in Canada ($4.2M), based upon an agreement to increase the deposit and weekly payments for utilization (the deposit portion of this variance approximates $2.5M), and higher than forecasted consumption at Bear Island of ($0.4M). |
| Property Taxes | 7 | (201) | Unfavorable variance due to unforecasted property tax payments at Bear Island ($0.1M) and at F.F. Soucy ($0.1M). |
| Salaried and Hourly Payroll - Gross | 8 | (598) | Unfavorable variance primarily due to making cash payments for taxes instead of utilizing GST credits as previously forecasted and earlier than forecasted payments at F.F. Soucy ($0.2M). These variances are partly offset by a delay in payments at Bear Island of $0.3M (which is forecasted to be paid in future weeks). |
| Pension Plan and Group Insurance | 9 | 65 | Favorable variance primarily due to a delay in making payments at F.F. Soucy of $0.2M, offset by higher than forecasted benefit payments at Papier Masson ($0.1M). |
| Freight | 10 | 41 | Favorable variance primarily due to lower than forecasted payments at Papier Masson of $1.6M (due to lower than expected ocean freight), offset by higher than forecasted freight for export shipments at Stadacona ($0.5M) and at F.F. Soucy ($1.3M), due to a change in sales mix. |
| Maintenance Equipment, Major Maintenance, Non-Restructuring Professional Fees, Leases and Other Disbursements | 11 | 2,588 | Favorable variance primarily due to lower than forecasted maintenance and related spending at Bear Island of $1.5M, at Stadacona of $0.3M, and at F.F. Soucy of $0.5M, deferred CAPEX of $0.3M at F.F. Soucy, and lower than forecasted CAPEX of $0.2M at Bear Island, and lower than forecasted "other" spending of $1.9M, primarily at F.F. Soucy (which appears to be permanent). These variances are partly offset by making a onetime annual insurance premium payment during the week of 7/2 ($0.7M), that was forecasted to be financed and paid in monthly installments, higher than forecasted lease payments ($0.4M), and higher than forecasted management fees ($1.1M) due to higher than forecasted weeks reserve. |
| **Variance - Cumulative Operating Disbursements** | | **$ 1,096** | |

| Cumulative Other Non-operating cash flow and restructuring | | | |
|---|---|---|---|
| Restructuring Professional Fees | 12 | 4,031 | Favorable variance is primarily due to a delay in payment to multiple service providers, which are forecasted to be paid in future weeks. |
| Restructuring Bank Fees and Other Expenses | | 8 | |
| Interest Payments | 13 | (531) | Unfavorable and permanent variance related to unforecasted interest payments. |
| **Cumulative Non-Operating Cash Flow and Restructuring** | | **$ 3,508** | |
| **Cumulative Net Variances in Operating Receipts and (Disbursements)** | | **$ 16,294** | |

4