## Exhibit A-1

**Amendment No. 1 to the Asset Sale Agreement**

EXECUTION COPY

## AMENDMENT NO. 1 TO THE ASSET SALE AGREEMENT

THIS AMENDMENT No. 1 TO THE ASSET SALE AGREEMENT (this "**First Amendment**") is entered into as of August 23, 2010 by and among BD White Birch Investment LLC, a limited liability company organized under the Laws of Delaware ("**Purchaser**"), White Birch Paper Company, a company organized under the Laws of Nova Scotia ("**White Birch**"), and the subsidiaries of White Birch listed in <u>Exhibit A</u> hereto (together with White Birch, the "**Sellers**"). All capitalized terms not otherwise defined herein shall have such meanings as ascribed to them in the ASA (as defined below).

W I T N E S S E T H :

WHEREAS, Purchaser and Sellers have entered into that certain Asset Sale Agreement, dated as of August 10, 2010, relating to the purchase and sale of the Assets (the "ASA");

WHEREAS, the parties hereto wish to amend certain terms of the ASA prior to the hearings to approve the Stalking Horse and Bidding Procedures Orders, as set forth herein; and

NOW THEREFORE, in consideration of the premises and mutual covenants contained herein, the parties hereto hereby agree as follows:

1.    <u>Amendment</u>.

(a)    The definition of "Expense Reimbursement" in <u>Section 1.1</u> of the ASA is hereby amended by deleting the phrase "$2,500,000" and replacing it with the phrase "$3,000,000".

(b)    A new <u>Section 2.1.1(x)</u> of the ASA is hereby added (and, accordingly, <u>Sections 2.1.1(x)</u> and <u>2.1.1(y)</u> of the ASA hereby become <u>Sections 2.1.1(y)</u> and <u>2.1.1(z)</u>, respectively, of the ASA) as follows:

"(x)    all of the rights and claims of the U.S. Debtor available to the U.S. Debtor under the U.S. Bankruptcy Code, of whatever kind or nature, as set forth in sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the U.S. Bankruptcy Code with respect to trade payables, and any related claims and actions arising under such sections by operation of Law or otherwise, including any and all proceeds of the foregoing;"

(c)    <u>Section 2.1.2(h)</u> of the ASA is hereby amended by inserting the following clause at the beginning of such section: "except as set forth in Section 2.1.1(x) with respect to trade payables,"

(d)    <u>Section 5.1(b)</u> of the ASA is hereby amended by deleting the phrase "August 22, 2010" and replacing it with the phrase "August 27, 2010".

1

(e)     Section 5.1(c) of the ASA is hereby amended by deleting the phrase "August 26, 2010" in two instances and replacing it, in both instances, with the phrase "August 31, 2010".

(f)     Section 5.1(d) of the ASA is hereby amended by deleting the phrase "September 1, 2010" and replacing it with the phrase "September 7, 2010".

(g)     Section 5.1(e) of the ASA is hereby amended by deleting the phrase "September 8, 2010" in two instances and replacing it, in both instances, with the phrase "September 15, 2010".

(h)     Section 9.1(b)(i) of the ASA is hereby amended by deleting the phrase "August 26, 2010" and replacing it with the phrase "August 31, 2010".

(i)     Section 9.1(b)(ii) of the ASA is hereby amended by deleting the phrase "September 8, 2010" and replacing it with the phrase "September 15, 2010".

(j)     Section 9.1(b)(x) of the ASA is hereby amended by deleting the phrase "first" and replacing it with the phrase "last".

(k)     The proviso in Section 9.1 of the ASA is hereby amended by deleting the phrase "9.3(c)" and replacing it with the phrase "9.1(c)".

(l)     Section 9.2(a) of the ASA is hereby amended by deleting the phrase "$5,000,000" and replacing it with the phrase "$2,000,000".

(m)     The Form of Bidding Procedures attached to the ASA as Exhibit F is hereby deleted in its entirety and replaced with the Form of Bidding Procedures attached hereto as Exhibit B.

(n)     The Form of Canadian Order Approving the Agreement and the Bidding Procedures attached to the ASA as Exhibit G is hereby deleted in its entirety and replaced with the Form of Canadian Order Approving the Agreement and the Bidding Procedures attached hereto as Exhibit C.

(o)     The Form of U.S. Order Approving the Agreement and the Bidding Procedures attached to the ASA as Exhibit H is hereby deleted in its entirety and replaced with the Form of U.S. Order Approving the Agreement and the Bidding Procedures attached hereto as Exhibit D.

(p)     The Form of Canadian Sale Order attached to the ASA as Exhibit I is hereby deleted in its entirety and replaced with the Form of Canadian Sale Order attached hereto as Exhibit E.

(q)     The Form of U.S. Sale Order attached to the ASA as Exhibit J is hereby deleted in its entirety and replaced with the Form of U.S. Sale Order attached hereto as Exhibit F.

2.      <u>Full Force and Effect</u>.  The ASA shall not be amended or otherwise modified by this First Amendment except as set forth in Section 1 of this First Amendment.  Except as amended by this First Amendment, the ASA shall continue to be and shall remain in full force and effect in accordance with its terms, and the parties hereto hereby ratify and confirm the ASA in all respects, as amended hereby.  All references to the "Agreement," "herein," "hereof," "hereunder" or words of similar import in the ASA shall be deemed to include the ASA as amended by this First Amendment.

3.      <u>Miscellaneous</u>.  The provisions of Article X (Miscellaneous) of the ASA shall apply to this First Amendment as if such provisions were set out herein in full and as if each reference therein to "this Agreement" included a reference to this First Amendment.

[remainder of page intentionally left blank]

3

IN WITNESS WHEREOF, the parties have duly executed this First Amendment as of the date first above written.

WHITE BIRCH PAPER COMPANY

By: _____
Name: JAY EPSTEIN
Title: VP FINANCE


STADACONA GENERAL PARTNER INC.

By: _____
Name: JAY EPSTEIN
Title: SECRETARY


STADACONA L.P., by White Birch Paper
Company, a General Partner

By: _____
Name: JAY EPSTEIN
Title: VP FINANCE


F.F. SOUCY GENERAL PARTNER INC.

By: _____
Name: JAY EPSTEIN
Title: SECRETARY & TREASURER


F.F. SOUCY, INC. & PARTNERS, LIMITED
PARTNERSHIP, by White Birch Paper
Company, a General Partner

By: _____
Name: JAY EPSTEIN
Title: VP FINANCE

F.F. SOUCY L.P., by White Birch Paper
Company, a General Partner

By: _____
Name: JAY EPSTEIN
Title: VP FINANCE


ARRIMAGE DE GROS CACOUNA INC.

By: _____
Name: JAY EPSTEIN
Title: ASSISTANT SECRETARY


PAPIER MASSON LTÉE

By: _____
Name: JAY EPSTEIN
Title: VP & SECRETARY TREASURED


BEAR ISLAND PAPER COMPANY, L.L.C.

By: _____
Name: JAY EPSTEIN
Title: VP FINANCE


BD WHITE BIRCH INVESTMENT LLC

By: _____
Name:
Title:

F.F. SOUCY L.P., by White Birch Paper
Company, a General Partner

By:_____
Name:
Title:


ARRIMAGE DE GROS CACOUNA INC.

By:_____
Name:
Title:


PAPIER MASSON LTÉE

By:_____
Name:
Title:


BEAR ISLAND PAPER COMPANY, L.L.C.

By:_____
Name:
Title:


BD WHITE BIRCH INVESTMENT LLC

By:_____
Name:  Stephen H. Deckoff
Title:  Managing Principal

**Exhibit A**
**White Birch Subsidiaries**

- Stadacona General Partner Inc.

- Stadacona L.P.

- F.F. Soucy General Partner Inc.

- F.F. Soucy, Inc. & Partners, Limited Partnership

- F.F. Soucy L.P.

- Arrimage de Gros Cacouna Inc.

- Papier Masson Ltée.

- Bear Island Paper Company, L.L.C.

**Exhibit B**
**Form of Bidding Procedures**

SEE ATTACHED

## Amended Bidding Procedures

The bidding procedures contained herein (the "Bidding Procedures") are to be employed with respect to that certain Asset Sale Agreement, by and between White Birch Paper Company (together with certain subsidiaries, including Bear Island Paper Company, L.L.C., the "Sellers") and BD White Birch Investment LLC (the "Purchaser"), dated as of August 10, 2010 (as amended, modified or supplemented, the "Sale Agreement"), concerning, among other things, the sale, conveyance, assignment and transfer (the "Sale") of substantially all of the Sellers' assets (the "Assets"). Capitalized terms used herein but not defined have the meanings ascribed to them in the Sale Agreement.

The Sale is subject to competitive bidding as set forth herein (the "Bidding Process") and approval by the Superior Court of Québec (the "CCAA Court") and the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court," and together with the CCAA Court, the "Courts") at hearings (the "Sale Hearings") pursuant to the *Companies' Creditors Arrangement Act* (the "CCAA") and sections 105, 363 and 365 of title 11 of the United State Code (the "Bankruptcy Code"), respectively. Furthermore, the following Bidding Procedures and related bid protections provide a mechanism to reimburse Purchaser for its efforts and agreements to date and to facilitate a full and fair process seeking to maximize the value of the Assets for the benefit of the Sellers' estates, their creditors and other parties in interest.

## Background

Further to the orders issued by the CCAA Court and the Bankruptcy Court approving the Sale and Investor Solicitation Procedures (the "SISP Procedures" and the "SISP Orders") on April 28, 2010 and April 29, 2010, respectively, the Sellers, with the assistance of their advisors, have been engaged in a comprehensive marketing process to solicit proposals in connection with the Sale.

To this end, the Sellers' financial advisor contacted certain strategic and financial parties whom the financial advisor determined, in its reasonable professional judgment, may have an interest in acquiring all or any portion of the Assets. Such parties were provided with an initial offering summary and were invited to express their interest in making an offer to acquire all or substantially all of the Assets.

For those interested parties who then entered into a confidentiality agreement and were determined in the Sellers' business judgment to be capable of consummating the Sale (the "Phase 1 Qualified Bidders"), each received a confidential information memorandum and access to a virtual data room which contained information regarding the Assets.

By June 15, 2010, the Sellers had received four non-binding indications of interest regarding the purchase of all or any portion of the Assets. Upon an evaluation of these indications of interest, the Sellers invited two of these parties (each, a "Phase II Qualified Bidder") to perform due diligence with respect to the Assets, with the intention that one of the Phase II Qualified Bidders would serve as a stalking horse bidder at an auction of the Assets (the "Auction").

From June 15, 2010 through July 15, 2010, the Sellers engaged in active discussions with the Phase II Qualified Bidders and conducted site visits at the Sellers' facilities in an effort to complete a comprehensive due diligence process.

As of the July 15, 2010 deadline established pursuant to the SISP Procedures and the SISP Order, only the Purchaser had provided the Sellers with an offer to purchase the Assets. Accordingly:

(i)      on August 10, 2010, the Canadian Sellers filed a motion with the CCAA Court seeking an order for approval of (I) execution and delivery of the Sale Agreement by the Canadian Sellers, (II) payment of the Break-Up Fee and Expense Reimbursement in the circumstances provided for in the Sale Agreement, and (III) approval of the Bidding Procedures and Sale of the Canadian Sellers' rights, title and interests in and to the Assets pursuant to the procedures set forth herein (the "Canadian Stalking Horse and Bidding Procedures Order");

(ii)     on August [●], 2010, the CCAA Court entered the Canadian Stalking Horse and Bidding Procedures Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement to the Purchaser;

(iii)    on August 10, 2010, the U.S. Sellers filed the Motion of Bear Island Paper Company, L.L.C. for Entry of Orders Approving the (A) Form of the Purchase Agreement (B) Bidding Procedures (C) Form and manner of Notice of the Auction and Sale Hearing (D) Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (E) Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and (F) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (the "U.S. Stalking Horse and Bidding Procedures Order," and together with the Canadian Stalking Horse and Bidding Procedures Order, the "Stalking Horse and Bidding Procedures Orders"); and

(iv)     on August [●], 2010, the Bankruptcy Court entered the U.S. Stalking Horse and Bidding Procedures Order approving, among other things, the Bidding Procedures set forth herein and the payment, in certain circumstances, of the Break-Up Fee and Expense Reimbursement to the Purchaser.

## "Stalking Horse"

Pursuant to the SISP Procedures and the SISP Orders, the Purchaser has been designated by the Sellers to be the "Stalking Horse Bidder" for the Sale.

## Participation Requirements

Only those persons or entities that are or shall become Phase 1 Qualified Bidders pursuant to the SISP Procedures and the SISP Orders (including any lender under the DIP Credit

2

Agreement or the First Lien Credit Agreement) may participate in the Bidding Process.  For all purposes herein, the Purchaser is deemed a Phase 1 Qualified Bidder.

### Due Diligence

Only Phase 1 Qualified Bidders may conduct due diligence and such due diligence must be completed by **5:00 p.m. (Eastern Time) on September 3, 2010**.

At the Sellers' discretion, due diligence access may include management presentations (as may be scheduled by the Sellers), access to physical and online data rooms, on-site inspections and such other matters that a Phase 1 Qualified Bidder may reasonably request and as to which Sellers, in their reasonable exercise of discretion, may agree.

The Sellers will designate employee(s) or other representative(s) to coordinate a Phase 1 Qualified Bidder's reasonable requests for additional information and due diligence access.  In addition, the Sellers may, in their discretion, coordinate due diligence efforts such that multiple Phase 1 Qualified Bidders have simultaneous access to due diligence materials.  Neither the Sellers nor any of their affiliates (nor any of their respective representatives) are obligated to furnish any information relating to all or any portion of the Assets to any person other than to Phase 1 Qualified Bidders.

### Bid Deadline

All bids must be submitted to the Sellers c/o Lazard Middle Market LLC, 10 South Wacker Drive, 33rd Floor, Chicago, IL 60606 (Attn.: Craig Korte, craig.korte@lazardmm.com), so as to be **actually received** by **5:00 p.m. (Eastern Time) on September 3, 2010** (the "Bid Deadline").

Copies of all bids shall be simultaneously provided by facsimile transmission, electronic mail, personal delivery or reliable overnight courier service to counsel to the Sellers, the Monitor in the CCAA Proceedings, counsel to the Purchaser and counsel to the Administrative Agent, Syndication Agent and Majority Lenders under the DIP Credit Agreement (the "DIP Parties").

### Qualified Bids

Only bids received from a Phase 1 Qualified Bidder before the Bid Deadline that include documents and satisfy each of the requirements set forth below (each a "Qualified Bid") will be considered at the Auction:

(i)     must be received by the Bid Deadline (as may be extended pursuant to the conditions discussed below);

(ii)    states that the applicable Phase 1 Qualified Bidder offers to purchase all or substantially all of the Assets upon the terms and conditions as substantially set forth in the Sale Agreement, including without limitation, with respect to certainty and timing of closing, or upon alternative terms and conditions that Sellers determine in their reasonable business judgment, after consultation

3

with their advisors and the Monitor, are no less favorable than the terms and conditions of the Sale Agreement;

(iii)    states that the applicable Phase 1 Qualified Bidder offers to purchase all or substantially all of the Assets for a purchase price or other value that is equal to or greater than the sum of the Purchase Price, plus (A) the amount of the Break-Up Fee, plus (B) an amount in respect of the Expense Reimbursement, plus (C) U.S. $1,000,000;

(iv)    must be irrevocable until the closing of the Sale if such Phase 1 Qualified Bidder is selected as either the winning bidder (the "Winning Bidder") or the alternative bidder (the "Alternative Bidder");

(v)    includes (A) a duly authorized and executed form of the Sale Agreement, including the purchase price for all or any portion of the Assets expressed in U.S. Dollars, together with all exhibits and schedules thereto, (B) to the extent required by the terms and conditions of such bid, any ancillary agreements as described in the Sale Agreement together with all exhibits and schedules thereto, (C) copies of such materials marked to show those amendments and ancillary modifications to the Sale Agreement (respectively, the "Marked Agreements" and "Marked Ancillary Agreements") and (D) proposed orders for the CCAA Court and Bankruptcy Court to approve the Sale;

(vi)    must be accompanied by a deposit (by means of a certified bank check from a U.S. bank or by wire transfer payable to White Birch Paper Company) of $5,000,000 (the "Deposit") to be dealt with as provided for under "Return of Deposits" below;

(vii)    is not conditioned on the outcome of unperformed due diligence by the Phase 1 Qualified Bidder and includes an acknowledgement and representation that the Phase 1 Qualified Bidder has had an opportunity to conduct any and all required due diligence prior to making its bid;

(viii)    must not be conditioned upon approval by the Bankruptcy Court or the CCAA Court of any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment;

(ix)    must include written evidence of a firm, irrevocable commitment for financing from a creditworthy bank or financial institution that will provide such financing without (A) alteration of conditions or (B) delays and that is not contingent as of the Auction, or, other evidence of ability, as determined in the Sellers' reasonable business judgment, to consummate the transaction contemplated by the Marked Agreements;

(x)    fully discloses the identity of each entity that will be bidding for all or any portion of the Assets or otherwise sponsoring or participating in connection

4

with such bid, and the complete terms of any such participation, including the identification of the Phase 1 Qualified Bidder's principal advisors;

(xi)     contains full details of the proposed number of Sellers' employees who will become employees of the Phase 1 Qualified Bidder and any proposed measures associated with (A) their continued employment and (B) the employment of all employees who will become employees of the Phase 1 Qualified Bidder;

(xii)    includes (A) an acknowledgment and representation that the Phase 1 Qualified Bidder will assume the Sellers' obligations under the executory contracts and unexpired leases proposed to be assumed and assigned pursuant to the Sale Agreement (or identifies, with particularity, which of such contracts and leases the Phase 1 Qualified Bidder does not wish to assume, or, alternatively, which additional contracts or leases the Phase 1 Qualified Bidder does wish to assume), (B) contains full details of the Phase 1 Qualified Bidder's proposal for the treatment of related cure costs and (C) identifies, with particularity, any contract or lease the assumption and assignment of which is a condition to closing;

(xiii)   includes an acknowledgement and representation that the Phase 1 Qualified Bidder (A) relied solely upon its own independent review, investigation and/or inspection of any documents and/or all or any portion of the Assets in making its bid and (B) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding all or any portion of the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreement or the Marked Ancillary Agreements;

(xiv)    includes evidence, in form and substance reasonably satisfactory to the Sellers, of authorization and approval from the Phase 1 Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(xv)     includes evidence, in form and substance reasonably satisfactory to the Sellers of compliance or anticipated compliance with all regulatory approvals (including, if applicable, anti-trust and Canadian regulatory approval), the anticipated time frame for such compliance and any anticipated impediments for obtaining such approvals;

(xvi)    includes evidence of the Phase 1 Qualified Bidder's ability to comply with Section 11.3 of the CCAA and Section 365 of the Bankruptcy Code (to the extent applicable), which includes providing adequate assurance of such Phase 1 Qualified Bidder's ability to perform the contracts and leases proposed in its bid to be assumed by, or subleased to, the Phase 1 Qualified

Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases; and

(xvii)    contains other information reasonably requested by the Sellers.

Whether a bid of a Phase 1 Qualified Bidder meets the foregoing requirements to become a Qualified Bid will be determined by the Sellers in their reasonable business judgment, after consultation with their advisors and the Monitor; provided that the Sellers, in evaluating such bids, may not waive substantial compliance with any of the requirements set forth above and may not waive strict compliance with the requirements set forth in (i), (ii), (iii), (iv), (v)(A), (vi), (viii) and (ix) above.  The Sellers will notify the Purchaser, the DIP Parties and the applicable Phase 1 Qualified Bidder if they determine that a Phase 1 Qualified Bidder has submitted a Qualified Bid and provide a copy of that bid to the Purchaser and the DIP Parties, in each case on the day that any such determination is made.  The Sale Agreement, as it may be amended, modified, or supplemented in accordance with its terms, shall constitute a Qualified Bid for all purposes.

The Sellers, in their reasonable business judgment, after consultation with their advisors and the Monitor, may reject any proposal (other than the Sale Agreement) that (a) does not meet any of the requirements set forth above, (b) is on terms that are more burdensome or conditional than the terms of the Sale Agreement, (c) entitles the Phase 1 Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or (d) is contrary to the best interests of the Sellers' estates, their creditors and other parties in interest.

If the Sellers do not receive any Qualified Bids other than the Sale Agreement by the Bid Deadline, the Auction shall be cancelled and the Sellers shall report the same to the Bankruptcy Court and the CCAA Court and shall proceed immediately with the Sale pursuant to the terms of the Sale Agreement.

## Auction, Bidding Increments and Bids Remaining Open

If, in addition to the Qualified Bid submitted by the Purchaser, the Sellers receive one or more other Qualified Bids, the Sellers shall conduct the Auction at the offices of Kirkland & Ellis, 601 Lexington Avenue, New York, New York 10022, beginning at **1:00 p.m. (Eastern Time) on September 7, 2010** or at such later time or other place as the Sellers will notify all Qualified Bidders.

At least two days prior to the Auction, the Sellers shall provide the Purchaser, the DIP Parties and all Qualified Bidders with complete copies of all Qualified Bids.  The Auction shall run in accordance with the following procedures:

(i)    Only the Purchaser, Sellers, representatives of the DIP Parties and any Qualified Bidders (and the advisors to each of the foregoing) shall be entitled to attend the Auction and only the Purchaser and such Qualified Bidders shall be entitled to make any subsequent Qualified Bids at the Auction.

(ii)    At the Auction, all Qualified Bidders shall be permitted to increase their Qualified Bids in accordance with the procedures set forth herein (each, a "Subsequent

Bid"). All Subsequent Bids presented during the Auction shall be made and received in one room on an open basis. All participating Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each participating Qualified Bidder shall be fully disclosed to all other Qualified Bidders and that all material terms of each Subsequent Bid presented during the Auction will be fully disclosed to the Purchaser and all other participating Qualified Bidders throughout the entire Auction.

(iii)    All Qualified Bidders at the Auction must have at least one individual representative with authority to bind such Qualified Bidder present in person at the Auction.

(iv)    All proceedings at the Auction shall be conducted before and transcribed by a court stenographer.

(v)    At least one (1) day prior to the Auction, Sellers will advise the Purchaser and all other Qualified Bidders which Qualified Bid the Sellers have determined in their reasonable business judgment, after consultation with their advisors and with the Monitor, constitutes the then highest or otherwise best offer for the Assets (the "Starting Bid").

(vi)    Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round (i) at least one Subsequent Bid is submitted by a Qualified Bidder that improves upon such Qualified Bidder's immediately prior Qualified Bid and meets the overbid requirement set forth in paragraph (vii) below, and (ii) that the Sellers determine in their reasonable business judgment, after consultation with its advisors and with the Monitor, is a higher or otherwise better offer than the then current leading Qualified Bid.

(vii)    Bidding at the Auction shall be in increments of $500,000 and shall continue until such time as the highest and best bid is determined by the Sellers in their reasonable business judgment after consultation with their advisors and with the Monitor. The Sellers, in their sole discretion, shall have the right to modify the bidding increments throughout the course of the Auction. For the purpose of evaluating the value of the consideration provided by each bid (including any Subsequent Bid by the Purchaser) presented at the Auction, the value will: (i) be deemed to be the net consideration payable to the Sellers after considering, *inter alia,* any break-up fee or expense reimbursement due to the Purchaser under the Sale Agreement; and (ii) take into account any additional liabilities to be assumed by a Qualified Bidder as well as any additional costs which may be imposed on the Sellers under any such bid.

(viii)    After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the Qualified Bid or Subsequent Bid, as the case may be, that the Sellers have determined in their reasonable business judgment after consultation with their advisors and with the Monitor to be the then highest or

7

best bid (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had an opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

(ix)     At the conclusion of the Auction pursuant to paragraph (vii) above, the Sellers will announce the Qualified or Subsequent Bid which they have determined in their reasonable business judgment, after consultation with their advisors and the Monitor, to be the highest and best bid (the "Winning Bid") and such Winning Bid will be submitted to the Courts for approval at the Sale Hearings, along with the second highest and best Qualified Bid (the "Alternative Bid"). The Sellers will be deemed to have accepted any Qualified Bid only when such Qualified Bid is determined to be the Winning Bid and has been approved by the Courts.

(x)      At the Auction, the Sellers, after consultation with their advisors and with the Monitor, may employ and announce additional procedural rules that are fair and reasonable under the circumstances (e.g., the amount of time allotted to make subsequent bids) for conducting the Auction; provided, however, that such rules are (a) not inconsistent with the Bidding Procedures, the Bankruptcy Code, the CCAA, any order of the Courts or the CCAA Court entered in connection in connection with the Bidding Procedures and (b) disclosed to each Qualified Bidder at the Auction.

Notwithstanding anything herein to the contrary, the Sellers may not, without the written consent of the applicable agent under the DIP Credit Agreement, select a bid as the Winning Bid unless such bid provides for the payment, on the closing date of the transaction with the Winning Bidder, in full in cash all obligations under the DIP Credit Agreement.

## Credit Bidding

Notwithstanding anything herein to the contrary, the applicable agent under the DIP Credit Agreement and the applicable agent under the First Lien Credit Agreement shall each be entitled to credit bid pursuant to section 363(k) of the Bankruptcy Code and other applicable law.

## Break-up Fee and Expense Reimbursement

If the Sellers accept a Qualified Bid other than a bid of the Purchaser as the Winning Bid, then the Sellers shall pay to the Purchaser as compensation for Purchaser's efforts in connection with the negotiation and execution of the Sale Agreement and the transactions contemplated thereby an amount equal to the Break-Up Fee and the Expense Reimbursement due to the Purchaser pursuant to the terms of the Sale Agreement, as approved by the Courts under the Stalking Horse and Bidding Procedures Orders.

## The Sale Hearings

The Sale Hearings are to be held immediately following the Auction (if any), and in any event, the Sellers shall use commercially reasonable efforts to have the CCAA Court and the Bankruptcy Court issue orders approving the Sale by September 15, 2010. The Sale Hearing before the CCAA Court is not yet scheduled but is intended to be held on or before

September 8, 2010. The Sale Hearing before the Bankruptcy Court is scheduled for **September 15, 2010 at 2:00 p.m. (prevailing Eastern Time)**. At the Sale Hearings, the Sellers will seek entry of the Sale Orders, which will, among other things, authorize and approve the Sale (i) to the Purchaser, if no other Qualified Bid is received and accepted as the Winning Bid and pursuant to the terms and conditions set forth in the Sale Agreement or (ii) to the Winning Bidder, if a Qualified Bid other than from the Purchaser is received and accepted by the Sellers as the Winning Bid in accordance with these Bidding Procedures and pursuant to the terms and conditions set forth in the Sale Agreement or marked form of the Sale Agreement submitted by that Winning Bidder. All Qualified Bids (other than the Winning Bid and the Alternative Bid) shall be deemed rejected by the Sellers on and as of the date of approval of the Winning Bid and the Alternative Bid by the Courts pursuant to the Sale Orders.

If, following the entry of the Sale Orders by the Courts, the Winning Bidder fails to consummate a transaction with Sellers in respect of such Winning Bid that is the result of a breach or failure to perform on the part of such Winning Bidder, then the Alternative Bid shall be deemed the Winning Bid and Sellers shall be authorized to consummate a transaction in respect of the Alternative Bid without further orders of the Courts.

## Failure to Consummate Purchase

If the Winning Bidder (other than Purchaser) fails to consummate the Sale, and such failure is the result of a breach by the Winning Bidder, the Winning Bidder's Deposit shall be forfeited to Sellers and, except to the extent provided in the Sale Agreement or Marked Agreement, the Sellers specifically reserve the right to seek all available damages from such person or entity.

## Return of Deposits

The Deposits of the Winning Bidder and the Alternative Bidder shall be retained by The Bank of New York Mellon and such Qualified Bids shall remain open until the closing of a transaction with the Winning Bidder regarding the Winning Bid. The Deposits of all other Qualified Bidders shall be promptly returned after entry of the Sale Orders. The Deposit of the Qualified Bidder submitting the Alternative Bid shall be promptly returned after the closing of the sale to the Winning Bidder.

## Modifications

The Sellers, after consultation with their advisors and the Monitor, may (a) determine, in their reasonable business judgment, which Qualified Bid, if any, is the highest or otherwise best offer, (b) reject, at any time before entry of orders of the Courts approving a Qualified Bid, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the CCAA, these Bidding Procedures or the terms and conditions of the Sale Agreement or (iii) contrary to the best interests of Sellers' estates, their creditors and other parties in interest, and (c) with the prior consent of Purchaser, extend the Bid Deadline, the date of Auction or the date of either of the Sale Hearings; provided, however, that if the Purchaser submits the only Qualified Bid, the terms provided in clauses (a) and (b) above shall be inoperative.

**Other**

In the event that the Sellers and any party disagree as to the interpretation or application of these Bidding Procedures, the CCAA Court and the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.

**Exhibit C**
**Form of Canadian Order Approving the Agreement and the Bidding Procedures
Order**

SEE ATTACHED

CANADA

SUPERIOR COURT
(Commercial Division)
The *Companies' Creditors
Arrangement Act*

PROVINCE OF QUÉBEC
DISTRICT OF MONTRÉAL
No.: 500-11-038474-108

MONTRÉAL, this _____ day of
_____, 2010

IN THE PRESENCE OF:
THE HONOURABLE

_____,
J.S.C.

IN THE MATTER OF THE PLAN OF
ARRANGEMENT           AND
COMPROMISE OF:

WHITE BIRCH PAPER HOLDING
COMPANY

-and-

WHITE BIRCH PAPER COMPANY

-and-

STADACONA GENERAL PARTNER
INC.

-and-

BLACK SPRUCE PAPER INC.

-and-

F.F. SOUCY GENERAL PARTNER
INC.

-and-

3120772 NOVA SCOTIA COMPANY

-and-

ARRIMAGE DE GROS CACOUNA
INC.

- 2 –

-and-

**PAPIER MASSON LTÉE**

**Debtors**

-and-

**ERNST & YOUNG INC.**

**Monitor**

-and-

**STADACONA                         LIMITED
PARTNERSHIP**

-and-

**F.F. SOUCY LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY, INC. & PARTNERS,
LIMITED PARTNERSHIP**

**Mises en Cause**

---

**ORDER APPROVING THE STALKING HORSE BIDDER,
APPROVING AN ASSET SALE AGREEMENT,
APPROVING BIDDING PROCEDURES FOR THE SALE OF
SUBSTANTIALLY ALL THE WB GROUP'S ASSETS
AND SCHEDULING AN AUCTION
AND SALE HEARING**

**CONSIDERING** the Debtors' *"Motion to Approve a Stalking Horse Bidder, to
Approve an Asset Sale Agreement, to Approve Bidding Procedures for the Sale
of Substantially All the WB Group's Assets and to Schedule an Auction and Sale
Hearing"* (the **"Motion"**); and its supporting exhibits;

- 3 –

CONSIDERING the submissions of counsel;

GIVEN the provisions of the Initial Order granted by this Court in this matter on February 24th, 2010 (the **"Initial Order"**);

GIVEN the provisions of the order of this Court approving the Sales and Investor Solicitation Process; and

GIVEN the provisions of the *Companies' Creditors Arrangement Act*, (R.S.C., 1985, c. C-36) as amended (the **"CCAA"**);

**WHEREFORE, THE COURT:**

[1]     **GRANTS** the present Motion;

[2]     **DECLARES** sufficient the service and notice of the present Motion;

[3]     **APPROVES** the Monitor's Report, Exhibit SM-1;

[4]     **APPROVES** as the Stalking Horse Agreement, the Asset Sale Agreement dated August 10th, 2010, as amended on August 23rd, 2010, Exhibit SM-2, by and between White Birch Paper Company (together with certain subsidiaries) and BD – White Birch Investment LLC (the **"Sale Agreement"**), including, without limitation, the obligations of the Sellers to pay the Break-Up Fee and the Expense Reimbursement (as such terms are defined in the Sale Agreement) to the Purchaser on the terms and conditions set forth in the Sale Agreement;

[5]     **APPROVES** the bidding procedures, as set out at Exhibit SM-3 (the "**Bidding Procedures**"), including, without limitation, the section entitled *"Break-Up Fee and Expense Reimbursement"*;

- 4 -

[6]     **ORDERS** that the capitalized terms used herein but not defined shall have the meanings ascribed to them in the Bidding Procedures or, if not defined therein, in the Initial Order;

[7]     **DECLARES** that BD White Birch Investment LLC ("**BD**") shall be the stalking horse bidder for the purposes of the competitive bidding process set out in the Bidding Procedures, Exhibit SM-3;

[8]     **AUTHORIZES AND ORDERS** the WB Group, its advisors and the Monitor to conduct the competitive bidding process set out in the Bidding Procedures, Exhibit SM-3, in accordance with the Bidding Procedures;

[9]     **ORDERS** that, to the extent a Qualified Bid, as defined in the Bidding Procedures, Exhibit SM-3, other than the bid received from BD White Birch Investment LLC, is received by no later than 5:00 pm (Eastern time) on September 3rd, 2010, an auction for the Assets of the WB Group shall be held at the offices of Kirkland & Ellis, 601 Lexington Avenue, New York, New York, United States of America, 10022, beginning at 1:00 pm (Eastern time) on September 7th, 2010; or at such later time or other place as the WB Group shall notify all Qualified Bidders in accordance with the terms of the Bidding Procedures;

[10]    **AUTHORIZES AND ORDERS** the WB Group and its advisors to carry out any such Auction in accordance with the Bidding Procedures;

[11]    **DECLARES** that a hearing shall take place before the Superior Court of Quebec, Commercial Division, on or prior to September 15th, 2010 in order to authorize and approve the sale of the WB Group's Assets, pursuant to the terms set out in the Asset Purchase Agreement, Exhibit SM-2, or pursuant to the terms of an

- 5 –

alternative transaction with the winning bidder at the auction, as the case may be (the "**Sale Hearing**");

[12] **ORDERS** that, in the event that no Qualified Bids other than the Qualified Bid submitted by BD are received pursuant to the terms of the Bidding Procedures, that the WB Group is authorized and ordered to (i) cancel the Auction and (ii) seek entry of the Canadian Sale Order (as defined in the Sale Agreement) in accordance with the Bidding Procedures;

[13] **DECLARES** that, pursuant to the terms of the Sale Agreement and as security for the Debtors' and the Mises en Cause's obligation to pay the Break-Up Fee and the Expense Reimbursement to the Purchaser, as hereby approved under the terms and conditions set forth in the Sale Agreement and the Bidding Procedures, the Purchasers are hereby granted a hypothec on, mortgage of, lien on and security interest in the Property to the extent of the aggregate amount of the Break-Up Fee and the Expense Reimbursement (being five million United States dollars (US $5,000,000.00)), which charge shall be subordinate to the Administration Charge, the D&O Charge and the Interim Financing Charge, but shall otherwise be, and be deemed to be, an additional "CCAA Charge" under, and for the purposes of, the provisions of the Initial Order concerning the CCAA Charges;

[14] **DECLARES** that, in the event that BD submits the Winning Bid (as defined in the Bidding Procedures), the provisions of the ASA that contemplate that at Closing the $10 million D&O Charge (as defined in the Initial Order) and the $3 million Administrative Charge (as defined in the Initial Order) will be discharged and expunged and replaced, in effect, with the $10 million letter of credit and the $3 million Wind-Down Amount, pursuant to the Canadian

#10581900 v8

Sale Order (as defined in the ASA) and as provided for under Sections 5.2(g) and 5.18 of the ASA, respectively, are hereby approved;

[15]   **ORDERS** that, in connection with the Bidding Procedures and pursuant to clause 7(3)(c) of the Personal Information Protection and Electronic Documents Act (Canada), the Debtors and the Mises en Cause are authorized and permitted to disclose personal information of identifiable individuals to Qualified Bidders and their advisors, but only to the extent required in connection with the terms of the Bidding Procedures and the bidding and sale process to be conducted thereunder.  Each such Qualified Bidder shall maintain and protect the privacy of such information and limit the use of such information to its participation in the Sale and, if it does not complete the Sale, shall return all such information to the Debtors and the Mises en Cause, or in the alternative, destroy all such information;

[16]   **REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States or elsewhere, including the United States Bankruptcy Court for the Eastern District of Virginia, to give effect to this Order and to assist the Debtors, the Mises en Cause and the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Debtors, the Mises en Cause and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Debtors, the Mises en Cause and the Monitor and their respective agents in carrying out the terms of this Order;

**THE WHOLE _____ COSTS**.

**MONTRÉAL**, **this** _____ **day** **of**
_____, **2010**

_____

**THE HONOURABLE**
_____,
**J.S.C.**

**Exhibit D**
**Form of U.S. Order Approving the Agreement and the Bidding Procedures Order**

SEE ATTACHED

Jonathan L. Hauser
VSB No. 18688
TROUTMAN SANDERS LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, Virginia 23462
Telephone:     (757) 687-7768
Facsimile:      (757) 687-1505

Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

*Attorneys for the Debtor and
Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| BEAR ISLAND PAPER COMPANY, L.L.C.,[1] | ) Case No. 10-31202 (DOT) |
| Debtor. | ) |

## AMENDED ORDER APPROVING (A) THE FORM OF THE SALE AGREEMENT, (B) THE BIDDING PROCEDURES, (C) THE SALE NOTICE AND (D) THE ASSUMPTION PROCEDURES AND ASSUMPTION NOTICE

Upon the motion, dated August 10, 2010 (the "Motion"),[2] of Bear Island Paper Company,

L.L.C., the debtor and debtor in possession in the above-captioned chapter 11 case ("Bear

Island" or "Debtor"), seeking, in part, entry of an order (this "Bidding Procedures Order")

pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy

Code") and Rules 2002 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), approving (a) the form of the Sale Agreement, (b) the Bidding Procedures,

(c) the Sale Notice and (d) the Assumption Procedures and Assumption Notice, all as more fully

---

[1]   The last four digits of the Debtor's federal tax identification number are 0914.  The principal address for the Debtor is 10026 Old Ridge Road, Ashland, Virginia 23005.

[2]   All capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the Motion.

set forth in the Motion; and the Court having reviewed the Motion and heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

THE COURT HEREBY FINDS THAT:

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Notice of the Motion and proposed entry of this Bidding Procedures Order has been provided to: (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Purchaser; (iv) counsel to the Postpetition Agent (as defined in the DIP Order); (v) counsel to the agent under the First Lien Term Loan Agreement; (v) counsel to the majority lenders under the Second Lien Term Loan Agreement; (vii) counsel to counterparties under the Swap Agreements; (viii) the Monitor appointed in the CCAA Cases; (ix) all non-debtor counterparties to the Debtor's executory contracts and unexpired leases; (x) all persons or entities that have requested notice of the proceedings in this chapter 11 case; (xi) all parties who are known to claim liens or other interests upon the Assets; (xii) the Internal Revenue Service and (xiii) all applicable federal, state and local taxing and regulatory authorities (the "Notice Parties").

C.      Additionally, the Sale Notice, substantially in the form attached hereto as **Exhibit 3**, has been published in the Herald-Progress newspaper in Ashland, Virginia and the Richmond Times-Dispatch in Richmond, Virginia.

3

D.     Under the circumstances, requisite notice of the Motion and the relief requested thereby and in this Bidding Procedures Order has been provided in accordance with Bankruptcy Rules 2002 and 9014, which notice is sufficient for all purposes under the Bankruptcy Code, including, without limitation, section 102(1) of the Bankruptcy Code, and no further notice of, or hearing on, the Motion with respect to this Bidding Procedures Order is necessary or required.

E.     The Debtor has articulated good and sufficient reasons for this Court to: (i) approve the form of the Sale Agreement, including the breakup fee (the "Breakup Fee") and expense reimbursement (together with the Breakup Fee, the "Bid Protections") to be paid to the Purchaser under the Sale Agreement; (ii) approve the Bidding Procedures; (iii) set the Sale Hearing and approve the manner and notice of the Auction and the Sale Hearing; (iv) approve the procedures (the "Assumption Procedures") for the assumption and assignment of executory contracts and unexpired leases that are to be assumed and assigned (respectively, the "Contracts" and "Leases"), including notice of proposed cure amounts (the "Assumption Notice").

F.     The Bid Protections (i) were negotiated in good-faith and at arm's-length between the Debtor and the Purchaser, (ii) are reasonable and appropriate given, among other things, the size and nature of the transaction and the efforts that have been expended and will continue to be expended by the Purchaser to enter into the Sale Agreement and (iii) are a material inducement for, and condition of, the Purchaser's entry into the Sale Agreement.

G.     The entry of this Bidding Procedures Order is in the best interests of the Debtor, its estate, creditors, and other parties in interest.

IT IS HEREBY ORDERED THAT:

1.     The Motion is granted to the extent provided herein.

4

2.     All objections, if any, to the Motion that have not been withdrawn, waived or settled as announced to the Court at, or prior to, the Hearing or by stipulation are hereby overruled.

3.     The form of the Sale Agreement, substantially in the form attached hereto as **Exhibit 1**, is hereby approved to be used at the Auction and is appropriate and reasonably calculated to enable the Debtor and other parties in interest to easily compare and contrast the differing terms of the bids presented at the Auction.

4.     The Bidding Procedures, substantially in the form attached hereto as **Exhibit 2**, are hereby approved.  The failure to specifically include or reference any particular provision, section or article of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such procedure, it being the Court's intent that the Bidding Procedures be authorized and approved in their entirety unless otherwise modified by this Order.

5.     The form of the Sale Notice, substantially in the form attached hereto as **Exhibit 3**, and service thereof, including by publication in the Herald-Progress newspaper in Ashland, Virginia and the Richmond Times-Dispatch newspaper in Richmond, Virginia (i) is hereby approved and (ii) constitutes good and sufficient notice of the Auction and Sale Hearing. No other or further notice is required.

6.     The Auction, if one is required, shall be conducted at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 commencing on **September 7, 2010 at 1:00 p.m. (prevailing Eastern Time)**.  In the event the Debtor does not receive any Qualified Bids except for the Qualified Bid of the Purchaser by the Bid Deadline, the Debtor will not hold the Auction and instead shall seek approval of the Sale Agreement at the Sale Hearing.

5

7.      The Bid Protections are hereby approved.

8.      If the Bid Protections are triggered, the Debtor shall pay the Bid Protections to the

Purchaser pursuant to the terms and conditions set forth in the Sale Agreement and without need

for further order of the Court.   The Debtor's obligations to pay the Bid Protections shall

constitute superpriority administrative expense obligations under section 364(c)(1) of the

Bankruptcy Code with priority over any and all expenses of the kind specified in sections 503(b)

and 507(b) of the Bankruptcy Code, subject only to any Super-Priority Claim, the Carve-Out and

the Adequate Protection Senior Claim, each as defined in the DIP Order and set forth therein.

9.      The form of the Assumption Notice, substantially in the form attached hereto as

**Exhibit 4**, is hereby approved and the service of such notice upon counterparties to the Contracts

and Leases to be assumed and assigned is appropriate and reasonably calculated to provide such

counterparties with timely and proper notice and no other or further notice is required.

10.     Any objections to the assumption and/or assignment of any Contract or Lease

identified on the Assumption Notice, including to the proposed cure amount set forth on

Schedule A thereto, must be in writing, filed with the Court and be **actually received** on or

before **September 10, 2010 at 5:00 p.m. (prevailing Eastern Time)** (the "Assumption and Cure

Objection Deadline").  Subject to the terms of the Sale Agreement, the Debtor and the Purchaser

reserve the right to delete any Contract or Lease from Schedule A to the Assumption Notice prior

to the effective date of such assumption and assignment.

11.     If a counterparty to a Contract or Lease does not file and serve an objection prior

to the Assumption and Cure Objection Deadline, that party (i) will be deemed to have stipulated

that the cure amount(s), as determined by the Debtor and set forth on Schedule A, is correct;

(ii) shall be forever barred, estopped and enjoined from asserting any additional cure amount

6

under the Contract(s) or Lease(s); and (iii) will be forever barred from objecting to the assignment of the Contract(s) or Lease(s) to the Purchaser (or the Winning Bidder (as defined below)) or to the Purchaser's (or Winning Bidder's) adequate assurance of future performance.

12.    If a timely Cure Objection is received and such Cure Objection cannot otherwise be resolved by the parties, the Court may hear such Cure Objection at the Sale Hearing. Otherwise, such objection may, at the discretion of the Debtor and the Winning Bidder, be heard at the subsequently scheduled omnibus hearing date or at any later date set by the Debtor.

13.    If additional Contracts or Leases are identified for assumption and assignment, counterparties to such Contractors or Leases shall be provided with a copy of the Assumption Notice and not less than ten days from the date of service thereof to object to such assumption and assignment or the cure amount.    If objections are filed by counterparties to such subsequently identified Contracts or Leases that cannot be resolved by the parties thereto, such objection may be heard at the next omnibus hearing that occurs not less than three business days following the filing of such objection.    The Debtor shall file and serve the modifications to the Assumption Notice in the same manner as it is required to serve the Assumption Notice.

14.    The Assumption Procedures are appropriate and fair to all Contract and Lease counterparties and comply in all respects with the Bankruptcy Code.

15.    If the Auction occurs, then on or before September 15, 2010, the Debtor shall file with this Court the Supplement, which shall report to the Court the results of the Auction.    The Supplement shall identify, among other things:    (a) the bidder that presented the highest or otherwise best offer (the "Winning Bidder"); (b) the bidder that presented the second highest or otherwise best offer (the "Alternative Bidder"); (c) the consideration to be paid for the Assets;

7

and (d) any additional executory contracts or leases to be assumed and assigned to the Winning Bidder in connection with the sale of the Assets.

16.     The Debtor will annex to the Supplement, as exhibits, (a) a copy of the respective asset sale agreements entered into by the Winning Bidder and the Alternative Bidder, and (b) a copy of the Sale Order. The Debtor will serve the Supplement on the Notice Parties.

17.     The Debtor will request that the Sale Hearing be held before the Honorable Douglas O. Tice, Jr., United States Bankruptcy Judge, in Courtroom 5100 of the United States Bankruptcy Court for the Eastern District of Virginia, 701 East Broad Street, Richmond, Virginia 23219, on **September 15, 2010 at 2:00 p.m. (prevailing Eastern Time)**. The Sale Hearing may be adjourned without further notice other than by announcement at the Sale Hearing.

18.     Objections to the entry of the Sale Order shall be in writing, filed and served so as to be **actually received** on or prior to **September 10, 2010 at 5:00 p.m. (prevailing Eastern time)** by (a) counsel to the Debtor, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn.: Christopher J. Marcus; (b) co-counsel to the Debtor, Troutman Sanders LLP, 222 Central Park Avenue, Suite 2000, Virginia Beach, VA 23462, Attn.: Jonathan L. Hauser; (c) the Office of the United States Trustee for the Eastern District of Virginia, 701 East Broad Street, Suite 4304, Richmond, VA 23219, Attn.: Robert B. Van Arsdale; (d) counsel to the Prepetition Agent (as defined in the DIP Order), Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022, Attn.: Keith A. Simon; (e) counsel to the Committee, Hunton & Williams LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, VA 23219, Attn.: Benjamin C. Ackerly; (f) counsel to the Purchaser, Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Suite 2700, Chicago, IL 60606, Attn.: Kimberly A. deBeers; and (g) all persons or entities that have requested notice of the proceedings in this Chapter 11 case.

K&E 17552609

19.     The Debtor's sole and exclusive remedy, if any, in connection with a breach by the Purchaser (or any of its Affiliates (as defined in the Sale Agreement) of the Sale Agreement shall be limited to the Deposit (as defined in the Sale Agreement), whether at Law or in equity, for any breach by the Purchaser or any of its Affiliates of the terms and conditions of the Sale Agreement.

20.     To the extent that any chapter 11 plan is confirmed in this case or any order confirming any such plan or any other order in this case (including any order entered after any conversion of this case to a case under chapter 7 of the Bankruptcy Code) alters, conflicts with or derogates from the provisions of this Bidding Procedures Order, the provisions of this Bidding Procedures Order shall control.  The Debtor's obligations under this Bidding Procedures Order, the provision of this Bidding Procedures Order and the portions of the Sale Agreement pertaining to the Bidding Procedures shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Debtor, and the reorganized or reconstituted debtor, as the case may, after the effective date of a confirmed plan in the Debtor's case.

21.     This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Bidding Procedures Order, including, but not limited to, any matter, claim or dispute arising from or relating to the Bid Protections, the Bidding Procedures and the implementation of this Bidding Procedures Order.

K&E 17552609

22.     The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum

of law in connection with the Motion is hereby waived.


Dated: _____, 2010
        Richmond, Virginia                          _____
                                                    Chief Judge Douglas O. Tice, Jr.
                                                    United States Bankruptcy Judge

10

I ASK FOR THIS:

*/s/ Jonathan L. Hauser*
Jonathan L. Hauser
VSB No. 18688
**TROUTMAN SANDERS LLP**
222 Central Park Avenue
Suite 2000
Virginia Beach, Virginia 23462
Telephone:     (757) 687-7768
Facsimile:      (757) 687-1505

- and -

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

*Attorneys for the Debtor and*
*Debtor in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/ Jonathan L. Hauser*

11

**Exhibit E**
**Form of Canadian Sale Order**

SEE ATTACHED

**CANADA**

**SUPERIOR COURT**
**(Commercial Division)**
**The *Companies' Creditors***
***Arrangement Act***

**PROVINCE OF QUÉBEC**
**DISTRICT OF MONTRÉAL**
**No.: 500-11-038474-108**

MONTRÉAL, this _____ day of
_____, 2010

IN THE PRESENCE OF:
THE HONOURABLE ROBERT
MONGEON, J.S.C.

IN THE MATTER OF THE PLAN OF
ARRANGEMENT              AND
COMPROMISE OF:

WHITE BIRCH PAPER HOLDING
COMPANY

-and-

WHITE BIRCH PAPER COMPANY

-and-

STADACONA GENERAL PARTNER
INC.

-and-

BLACK SPRUCE PAPER INC.

-and-

F.F. SOUCY GENERAL PARTNER
INC.

-and-

3120772 NOVA SCOTIA COMPANY

-and-

ARRIMAGE DE GROS CACOUNA
INC.

- 2 -

-and-

**PAPIER MASSON LTÉE**

**Debtors**

-and-

**ERNST & YOUNG INC.**

**Monitor**

-and-

**STADACONA                    LIMITED
PARTNERSHIP**

-and-

**F.F. SOUCY LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY, INC. & PARTNERS,
LIMITED PARTNERSHIP**

**Mises en Cause**

---

## APPROVAL AND VESTING ORDER

**CONSIDERING** the Debtors' *"Motion to Approve the Sale of Substantially All the WB Group's Assets"* (the "**Motion**") in respect of a sale transaction contemplated by an asset sale agreement (the "**Sale Agreement**") dated August 10, 2010 and amended on August 23, 2010, amongst White Birch Paper Company and the other entities identified therein as sellers (collectively, the "**Sellers**"), as sellers, and BD White Birch Investment LLC (the **"Purchaser"**) and such other

- 3 -

Person(s) as it may designate (each, a **"Designated Purchaser"**), as purchaser, for the sale of substantially all of the Assets of the Sellers, and all of its terms, conditions, schedules, exhibits and related and ancillary agreements (collectively, the **"Transaction"**), and the Report dated August 10, 2010 (the **"Report"**) of Ernst & Young Inc. in its capacity as the monitor (the **"Monitor"**) of the Debtors and the Mises en Cause;

**CONSIDERING** the representations made by counsel; and

**GIVEN** the provisions of the CCAA and, in particular, Section 36 thereof;

**WHEREFORE, THE COURT:**

[1]   **GRANTS** the Motion;

[2]   **DECLARES** sufficient the service and notice of the Motion and hereby dispenses with further service thereof;

[3]   **ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Sale Agreement;

[4]   **ORDERS AND DECLARES** that the Sale Agreement and all of its terms and conditions (including all schedules and exhibits thereto and related and ancillary agreements and all schedules and exhibits thereto) and the Transaction are hereby fully and finally approved.  The execution, delivery and performance of the Sale Agreement and the Transaction (with any such amendments as the parties thereto may agree to in accordance with the terms thereof) by the Debtors and the Mises en Cause party thereto is hereby authorized and approved, and the Debtors and the Mises en Cause and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the

- 4 -

conveyance of the Debtors' and the Mises en Cause's right, title and interest in and to the Assets to the Purchaser or a Designated Purchaser;

[5]     **ORDERS** that the Debtors and the Mises en Cause are authorized and directed to perform their obligations under the Sale Agreement and in respect of the Transaction;

[6]     **ORDERS AND DECLARES** that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "**Monitor's Certificate**"), all of the Debtors' and the Mises en Cause's right, title, benefit and interest in and to the Assets shall vest absolutely in the Purchaser or a Designated Purchaser, free and clear of and from any and all right, title, interest, security interests (whether contractual, statutory, or otherwise), hypothecs (legal or contractual), prior claims, mortgages, pledges, deeds of trust, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens (statutory or otherwise), executions, levies, charges, or other financial or monetary claims, options, rights of first offer or first refusal, real property licenses, encumbrances, conditional sale arrangements, leasing agreements or other similar restrictions of any kind, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured, legal, possessory or otherwise (collectively, the "**Claims**"), including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Order of the Honourable Robert Mongeon, J.S.C. dated February 24, 2010 or any other Order of this Honourable Court in these proceedings; (ii) all charges, security interests or claims evidenced by registrations pursuant to the Registre des droits personnels et réels mobiliers (Québec), the Personal Property Security Act (Nova Scotia), the *Bank Act (Canada)* or any other personal property registry system, or recorded with the Canadian Intellectual Property Office

- 5 -

pursuant to the Trade-marks Act (Canada); (iii) all Excluded Liabilities; and
(iv) all charges, security interests, liens or other claims specified on
Schedule "●" (all of which are collectively referred to as
the "**Encumbrances**", but excluding Permitted Encumbrances (other than
those Permitted Encumbrances specified in clause (i) of the definition of
Permitted Encumbrances in the Sale Agreement and any other Permitted
Encumbrances specifically contemplated to be discharged by this Order)).
For greater certainty, this Court orders that all of the Encumbrances
affecting or relating to the Assets shall, upon delivery of the Monitor's
Certificate, be and are hereby expunged and discharged as against the
Assets. Counsel for the Purchaser and any agents appointed by such
counsel may, immediately following the Closing of the Transaction,
proceed with the discharge of such Claims and Encumbrances including,
without limitation, the electronic discharge of any financing statements,
UCC registrations, mortgages or other registrations in respect thereof;

[7]   **ORDERS** that for the purposes of determining the nature and priority of
Claims and Encumbrances, the proceeds from the sale of the Debtors'
and the Mises en Cause's right, title and interest in and to the Assets
(other than the Wind-Down Amount and the Reserve Payment Amount)
shall stand in the place and stead of the Assets, and that from and after
the delivery of the Monitor's Certificate, all Claims and Encumbrances
(other than the D & O Charge and the Administrative Charge) shall attach
to the proceeds from the sale of the Debtors' and the Mises en Cause's
right, title and interest in and to the Assets (other than the Wind-Down
Amount and the Reserve Payment Amount) with the same priority as they
had with respect to the Assets immediately prior to the sale, as if the
Debtors' and the Mises en Cause's right, title and interest in and to the

- 6 -

Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale;

[8]   **ORDERS** that the Monitor shall administer the Wind-Down Amount in accordance with the provisions of the Sale Agreement including, without limitation, Section 5.18 thereof;

[9]   **ORDERS** that: (i) all right, title and interest in and to any portion of the Wind-Down Amount that is not used to pay costs associated with winding-down the Sellers' estate in accordance with Section 5.18 of the Sale Agreement shall vest absolutely in the Purchaser as at the Closing Date and shall promptly be distributed to the Purchaser; and (ii) the Wind-Down Amount shall not be considered to be proceeds of sale of the Assets and the Claims and Encumbrances shall not attach to the Wind-Down Amount;

[10]  **ORDERS** that upon the delivery of the Monitor's Certificate to the Purchaser: (i) the Administration Charge provided for in the Initial Order be and is hereby released, expunged and discharged; and (ii) the D&O Charge provided for in the Initial Order be and is hereby released, expunged and discharged;

[11]  **ORDERS** the Land Registrar of the Land Registry Office for the Registry Division of Témiscouata, upon presentation of the Monitor's Certificate, in the form appended as Schedule "A" hereto, and a certified copy of this Order accompanied by the required application for registration and upon payment of the prescribed fees, to publish this Order and (i) to proceed with an entry on the index of immovables showing the Purchaser as the absolute owner in regards to the immovable listed in Schedule "B" hereto which are located in Rivière-du-Loup, in the Province of Québec (being hereinafter described the **"Rivière-du-Loup Property"**); and (ii) proceed with the reduction and cancellation of any and all Encumbrances but only

- 7 -

insofar as concerns the Rivière-du-Loup Property as described in Schedule "B", including, without limitation, the following registrations published at the said Land Registry Office for the Registration Division of Témiscouata:

(i)    a hypothec charging buildings only granted in favour of White Birch Paper Company by F.F. Soucy General Partner Inc./Commandité F.F. Soucy Inc. for an amount of $250,000,000 and registered at the office of the Registration Division of Témiscouata on April 7, 2005 under number 12 195 029;

(ii)    a hypothec granted for an amount of $250,000,000 in favour of White Birch Paper Company by F.F. Soucy, Inc. & Partners, Limited Partnership/F.F. Soucy, inc. & associés, Société en commandite and registered at the office of the Registration Division of Témiscouata on April 7, 2005 under number 12 195 030;

(iii)    a first hypothec granted for an amount of $550,000,000 and a second hypothec granted pursuant to the same deed for an amount of $250,000,000 granted in favour of Credit Suisse First Boston, Toronto Branch, by White Birch Paper Company and registered at the office of the Registration Division of Témiscouata on April 7, 2005 under number 12 195 031;

(iv)    a legal hypothec (construction) granted for an amount of $2,692,455.81 registered by Service d'impartition Industriel Inc. against F.F. Soucy S.E.C., as owner, and registered at the office of the Registration Division of Témiscouata on November 18, 2009 under number 16 731 954;

- 8 -

(v)    a legal hypothec (construction) granted for an amount of $2,692,455.81 registered by Service d'impartition Industriel Inc. against F.F. Soucy S.E.C., as owner, and registered at the office of the Registration Division of Témiscouata on November 27, 2009 under number 16 758 360;

(vi)    a hypothec on a universality of immovables granted for an amount of $200,000,000 in favour of Crédit Suisse AG, Toronto Branch, by White Birch Paper Company registered at the office of the Registration Division of Témiscouata on March 4, 2010 under number 16 979 262;

(vii)    a hypothec on the universality of immovables granted for an amount of $200,000,000 in favour of Crédit Suisse AG, Toronto Branch, by F.F. Soucy L.P./F.F. Soucy S.E.C. and registered at the office of the Registration Division of Témiscouata on March 4, 2010 under number 16 979 263; and

(viii)    a prior notice of the exercise of a sale under judicial authority registered by Service d'impartition Industriel Inc. against F.F. Soucy S.E.C., as owner, registered at the office of the Registration Division of Témiscouata on June 15, 2010 under number 17 281 485, which registration refers to the legal hypothecs registered under numbers 16 731 954 and 16 758 360 referred to above;

[12]    **ORDERS** the Land Registrar of the Land Registry Office for the Registry Division of Québec, upon presentation of the Monitor's Certificate, in the form appended as Schedule "A" hereto, and a certified copy of this Order accompanied by the required application for registration and upon payment of the prescribed fees, to publish this Order and (i) to proceed with an entry on the index of immovables showing the Purchaser as the

- 9 -

absolute owner in regards to the immovables listed in Schedule "C" hereto which are located in Québec City, in the Province of Québec (being hereinafter described the **"Quebec City Properties"**); and (ii) proceed with the reduction and cancellation of any and all Encumbrances but only insofar as concerns the Québec City Properties as described in Schedule C, including, without limitation, the following registrations published at the said Land Registry Office for the Registration Division of Quebec:

(i)     a hypothec on a universality of immovables granted for an amount of $550,000,000 in favour of Credit Suisse First Boston Toronto Branch by Stadacona L.P./Stadacona S.E.C. and Stadacona General Partner Inc./Commandité Stadacona Inc. pursuant to a deed registered at the office of the Registration Division on April 7, 2005 under number 12 195 317;

(ii)    a hypothec on a universality of immovables granted for an amount of $250,000,000 in favour of Credit Suisse First Boston Toronto Branch by Stadacona L.P./Stadacona S.E.C. and Stadacona General Partner Inc./Commandité Stadacona Inc. pursuant to a deed registered at the office of the Registration Division on April 7, 2005 under number 12 195 318;

(iii)   a legal hypothec (construction) for an amount of $2,067,704.24 in favour of KSH Solutions Inc. against Stadacona S.E.C. and Commandité Stadacona Inc. and registered at the office of the Registration Division on May 19, 2006 under number 13 298 021;

(iv)    a prior notice of the exercise of a sale by judicial authority in favour of OSLO Construction Inc. against Stadacona S.E.C., owner, and Commandité Stadacona Inc., owner, registered on August 2, 2006 under number 13 534 837, this prior notice being in reference to a

- 10 -

legal hypothec that was registered at the office of the Registration Division under number 13 126 592 which has been totally discharged;

(v)    a prior notice of the exercise of a sale by judicial authority in favour of KSH Solutions Inc. against Stadacona S.E.C. and Commandité Stadacona Inc. registered at the office of the Registration Division on October 20, 2006 under number 13 742 043, this prior notice being in reference of the legal hypothec registered under number 13 298 021 referred to in Section (iii) above;

(vi)    a hypothec on a universality of property granted for an amount of $200,000,000 in favour of Crédit Suisse AG, Toronto Branch by Stadacona General Partner Inc./Commandité Stadacona inc. pursuant to a deed registered at the office of the Registration Division on March 4, 2010 under number 16 977 835; and

(vii)    a hypothec on a universality of property granted for an amount of $200,000,000 in favour of Crédit Suisse AG, Toronto Branch by Stadacona L.P./Stadacona S.E.C. pursuant to a deed registered at the office of the Registration Division on March 4, 2010 under number 16 977 836;

[13]   **ORDERS** the Land Registrar of the Land Registry Office for the Registry Division of Papineau, upon presentation of the Monitor's Certificate, in the form appended as Schedule "A" hereto, and a certified copy of this Order accompanied by the required application for registration and upon payment of the prescribed fees, to publish this Order and (i) to proceed with an entry on the index of immovables showing the Purchaser as the absolute owner in regards to the immovables listed in Schedule "D" hereto which are located in Gatineau, in the Province of Québec (being

- 11 -

hereinafter described the **"Gatineau Property"**); and (ii) proceed with the reduction and cancellation of any and all Encumbrances but only insofar as concerns the Gatineau Property as described in Schedule D, including, without limitation, the following registrations published at the said Land Registry Office for the Registration Division of Papineau:

(i)   Hypothec in the amount of $550,000,000 by Papier Masson Ltée in favour of Crédit Suisse, Toronto Branch, in its quality of *"fondé de pouvoir"*, registered on January 25, 2006 under number 13 011 629;

(ii)   Hypothec in the amount of $250,000,000 by Papier Masson Ltée in favour of Crédit Suisse, Toronto Branch, in its quality of *"fondé de pouvoir"*, registered on January 25, 2006 under number 13 011 630;

(iii)   Legal hypothec in the amount of $1,808,000 in favour of Hydro-Québec, registered on September 2, 2009 under number 16 512 303 against the part of the Property known as lot 2 469 374 and located at the civic address 2 Montreal Road West, City of Gatineau;

(iv)   Legal hypothec in the amount of $3,205,539.79 in favour of Hydro-Québec, registered on November 20, 2009 under number 16 737 683 against the part of the Property known as lot 2 469 374 and located at the civic address 2 Montreal Road West, City of Gatineau; and

(v)   Hypothec in the amount of $200,000,000 by Papier Masson Ltée in favour of Crédit Suisse AG, Toronto Branch, registered on March 4, 2010 under number 16 977 911;

- 12 -

[14]   **ORDERS** the Québec Personal and Movable Real Rights Registrar, upon presentation of the required form with a true copy of this Vesting Order and the Monitor's Certificate, to reduce the scope of the hypothecs listed in Schedule "E" hereto in connection with the Assets and to cancel, release and discharge all of the Assets Encumbrances in order to allow the transfer to the Purchaser of the Assets free and clear of any and all encumbrances created by those hypothecs;

[15]   **ORDERS** that, pursuant to section 11.3 of the CCAA, the Debtors and the Mises en Cause are authorized and directed to assign the contracts, leases and agreements and other arrangements of which the Buyer takes an assignment on Closing pursuant to and in accordance with the terms of the Sale Agreement (the "**Contracts**") and that such assignments are hereby approved and are valid and binding upon the counterparties notwithstanding any restriction or prohibition on assignment contained in any such Contracts;

[16]   **ORDERS** that, from and after the Closing Date, all Persons shall be deemed to have waived all defaults then existing or previously committed by the Debtors or the Mises en Cause under, or caused by the Debtors or the Mises en Cause under, and the non-compliance of the Debtors or the Mises en Cause with, any of the Contracts arising solely by reason of the insolvency of the Debtors or the Mises en Cause or as a result of any actions taken by the Debtors or the Mises en Cause pursuant to the Sale Agreement or in these proceedings, and all notices of default and demands given in connection with any such defaults under, or non-compliance with, any of the Contracts shall be deemed to have been rescinded and shall be of no further force or effect;

- 13 -

[17]  **ORDERS AND DIRECTS** the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof;

[18]  **ORDERS** that neither the Purchaser nor any Designated Purchaser nor any affiliate thereof shall assume or be deemed to assume any liabilities or obligations whatsoever of any of the Debtors or the Mises en Cause (other than as expressly assumed under the terms of the Sale Agreement), including without limitation, any liabilities or obligations in respect of, in connection with or in relation to:  (i) any Seller Employee Plans (other than a Transferred Employee Plan); (ii) any and all termination, severance or related amounts which any current or former employee of the Debtors or the Mises en Cause (other than the Transferred Employees who become employees of the Purchaser or a Designated Purchaser on Closing as provided for in the Sale Agreement) could at any time assert against any of the Debtors or the Mises en Cause; or (iii) any and all former, current or future employees of the Debtors or the Mises en Cause (other than the Transferred Employees who become employees of the Purchaser or a Designated Purchaser on Closing as provided for in the Sale Agreement);

[19]  **ORDERS** that the Purchaser and any Designated Purchasers, and their respective affiliates and officers, directors, employees, delegates, agents and representatives shall, effective immediately upon Closing of the Transaction, be and be deemed to be irrevocably and unconditionally fully and finally released of and from any and all claims, obligations or liabilities whatsoever arising from any event, fact, matter or circumstance occurring or existing on or before the Closing Date in relation to or in connection with the Debtors or the Mises en Cause or their respective present or past businesses, properties or assets, including, without limitation, any and all claims, obligations or liabilities whatsoever, whether known, anticipated or

- 14 -

unknown, in relation to or in connection with the Seller Employee Plans (other than any Transferred Employee Plans) and the former, current or future employees of the Debtors and the Mises en Cause (other than any Transferred Employees who become employees of the Purchaser or a Designated Purchasers on Closing in accordance with the terms and conditions of the Sale Agreement) and provided that the foregoing shall not operate to release the Purchaser or any Designated Purchaser from any liabilities or obligations expressly assumed under the terms of the Sale Agreement;

[20]   **ORDERS** that, notwithstanding:

(i)     the pendency of these proceedings;

(ii)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Debtors or the Mises en Cause and any bankruptcy order issued pursuant to any such applications; and

(iii)   any assignment in bankruptcy made in respect of any of the Debtors or the Mises en Cause;

the provisions of the Sale Agreement and the Transaction, and the vesting of the Debtors' and the Mises en Cause's right, title and interest in and to the Assets in the Purchaser or a Designated Purchaser pursuant to this Order and all other transactions contemplated thereby shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Debtors or the Mises en Cause and shall not be void or voidable by creditors of any of the Debtors or the Mises en Cause, nor shall they constitute nor be deemed to be a settlement, fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue or other

- 15 -

challengeable, voidable or reviewable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall they constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation;

[21] **ORDERS** that the Sale Agreement and any related or ancillary agreements shall not be repudiated, disclaimed or otherwise compromised in these proceedings;

[22] **ORDERS** that, pursuant to clause 7(3)(c) of the Personal Information Protection and Electronic Documents Act (Canada) and any substantially similar legislation, the Debtors and the Mises en Cause are authorized and permitted to disclose and transfer to the Purchaser or any Designated Purchaser all Employee Records. The Purchaser or any Designated Purchaser shall maintain and protect the privacy of any personal information contained in the Employee Records and shall be entitled to collect and use the personal information provided to it for the same purpose(s) as such information was used by the Debtors and the Mises en Cause;

[23] **ORDERS** that forthwith upon receipt of the proceeds from the sale of the Debtors' and the Mises en Cause's right, title and interest in and to the Assets, and prior to payment or repayment of any other claims, interests or obligations of or against the Debtors or the Mises en Cause, all outstanding Obligations (as defined in the Interim Financing Credit Agreement (as defined in the Initial Order of this Court dated February 24, 2010)) owed by the Debtors or the Mises en Cause under the Interim Financing Credit Agreement will be repaid in full and in cash from the proceeds of the sale of the Assets (other than the Wind-Down Amount and the Reserve Payment Amount) pursuant to the Sale Agreement;

- 16 -

[24] **ORDERS** that all Persons shall co-operate fully with the Debtors and the Mises en Cause, the Purchaser, any Designated Purchaser, their respective Affiliates and the Monitor and do all such things that are necessary or desirable for purposes of giving effect to and in furtherance of this Order, the Sale Agreement and the Transaction;

[25] **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States or elsewhere, including the United States Bankruptcy Court for the Eastern District of Virginia, to give effect to this Order and to assist the Debtors, the Mises en Cause and the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Debtors, the Mises en Cause and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Debtors, the Mises en Cause and the Monitor and their respective agents in carrying out the terms of this Order;

[26] **ORDERS** that this Order shall have full force and effect in all provinces and territories in Canada;

**THE WHOLE WITHOUT COSTS.**

**MONTRÉAL,   this   _____   day   of**
**_____, 2010**

_____
**THE HONOURABLE ROBERT**

- 17 -

_____

**MONGEON, J.S.C.**

## SCHEDULE "A"

## FORM OF MONITOR'S CERTIFICATE

CANADA

SUPERIOR COURT
(Commercial Division)
The *Companies' Creditors
Arrangement Act*

PROVINCE OF QUÉBEC
DISTRICT OF MONTRÉAL
No.: 500-11-038474-108

MONTRÉAL,  this  _____  day  of
_____, 2010

IN THE PRESENCE OF:
THE HONOURABLE ROBERT
MONGEON, J.S.C.

IN THE MATTER OF THE PLAN OF
ARRANGEMENT                AND
COMPROMISE OF:

WHITE BIRCH PAPER HOLDING
COMPANY

-and-

WHITE BIRCH PAPER COMPANY

-and-

STADACONA GENERAL PARTNER
INC.

-and-

BLACK SPRUCE PAPER INC.

-and-

F.F. SOUCY GENERAL PARTNER
INC.

-and-

3120772 NOVA SCOTIA COMPANY

- 2 -

-and-

**ARRIMAGE DE GROS CACOUNA INC.**

-and-

**PAPIER MASSON LTÉE**

**Debtors**

-and-

**ERNST & YOUNG INC.**

**Monitor**

-and-

**STADACONA LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY LIMITED PARTNERSHIP**

-and-

**F.F. SOUCY, INC. & PARTNERS, LIMITED PARTNERSHIP**

**Mises en Cause**

## MONITOR'S CERTIFICATE

### RECITALS:

A.   Pursuant to an Order of the Honourable Robert Mongeon, J.S.C. dated February 24, 2010, the Debtors commenced proceedings pursuant to the

- 3 -

Companies' Creditors Arrangement Act (Canada) and Ernst & Young Inc. was appointed as the monitor (the "**Monitor**") of the Debtors and the Mises en Cause.

B.    Pursuant to an Order of the Court dated ●, the Court approved a sale transaction (the "**Transaction**") contemplated by an asset sale agreement (the "**Sale Agreement**") dated August 10, 2010 and amended on August 23, 2010, amongst White Birch Paper Company and the other entities identified therein as sellers (collectively, the "**Sellers**"), as sellers, and WB Acquisition LLC (the "**Purchaser**"), as purchaser, for the sale of substantially all of the Assets of the Sellers and provided for the vesting in the Purchaser or a Designated Purchaser of the Debtor's and the Mises en Cause's right, title and interest in and to the Assets, which vesting is to be effective with respect to the Assets upon the delivery by the Monitor to the Purchaser of a certificate confirming: (i) the payment by the Purchaser of the Purchase Price for the Assets; (ii) that the conditions to Closing as set out in Article VIII of the Sale Agreement have been satisfied or waived by the Purchaser and/or the Sellers, as applicable; and (iii) the Transaction has been completed to the satisfaction of the Monitor.

C.    Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

**THE MONITOR CERTIFIES** the following:

1.    The Purchaser has paid and the Monitor has received the Purchase Price for the Assets payable on the Closing Date pursuant to the Sale Agreement;

- 4 -

2.    The conditions to Closing as set out in Article VIII of the Sale Agreement have been satisfied or waived by the Purchaser and/or the Sellers, as applicable; and

3.    The Transaction has been completed to the satisfaction of the Monitor;

4.    This Certificate was delivered by the Monitor at     [TIME] on     [DATE].

> **ERNST & YOUNG INC.**
> **In its capacity as the monitor appointed by the Court in the matter of the proposed compromise and arrangement of White Birch Paper Holding Company *et al*.**
>
> _____
>
> Per: _____
>       Name:
>       Title::

## SCHEDULE "B"

## THE RIVIÈRE-DU-LOUP PROPERTY

## SPECIFICALLY DESCRIBED IMMOVABLES

Immovables known and designated as being composed of lots FOUR MILLION FIFTY-SIX THOUSAND NINE HUNDRED AND THIRTY-TWO, FOUR MILLION FIFTY-SIX THOUSAND NINE HUNDRED AND THIRTY-FOUR, FOUR MILLION FIFTY-SIX THOUSAND NINE HUNDRED AND THIRTY-FIVE, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND SIXTY-THREE, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND SIXTY-NINE, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND SEVENTY-ONE, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND EIGHTY-FIVE, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND EIGHTY-SIX, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND EIGHTY-SEVEN, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND EIGHTY-EIGHT, FOUR MILLION FIFTY-EIGHT THOUSAND ONE HUNDRED AND NINETY-TWO and THREE MILLION SEVEN HUNDRED AND FORTY-NINE THOUSAND FIVE HUNDRED AND SEVENTY (4056932, 4056934, 4056935, 4058163, 4058169, 4058171, 4058185, 4058186, 4058187, 4058188, 4058192 and 3749570), all of the Cadastre du Québec, Registration Division of Témiscouata.

With all buildings, installations, structures, equipments and facilities erected and located in, under, on and over the said immovables including, without limitation, the buildings bearing civic numbers 152 and 191 Delage Street, and 1 Dionne Street, City of Rivière-du-Loup, Province of Québec, G5R 3P9, G5R 6E2 and G5R 2M3 and also 130, 275, 275A, 282 and 284 Delage Street and 277B Saint André Street, City of Rivière-du-Loup, Province of Québec.

- 2 -

As the said immovables now subsist with their respective rights, members and appurtenances, without exception or reserve of any kind, and together with and subject to all servitudes and other rights, continuous or discontinuous, apparent or unapparent, attached thereto, including without limitation, and more specifically, (i) any servitudes and other rights created pursuant to a Deed of Superficies and Servitudes, passed before Sheldon Merling, Notary, on April 10, 1979, registered at said Registration Division, under number 226914, as amended pursuant to (a) a Deed of Amendment, passed before Robert Alain, Notary, on December 15, 1999, registered at said Registration Division under number 351992, and (b) a Deed of Amendment passed under private writing, on April 6, 2005, registered at said Registration Division under number 12 196 553, and as same may be amended from time to time (collectively the **"Deed of Superficies"**) and (ii) any right, title and interest in and to the "common facilities" (within the meaning of the Conflicts of Interest Agreement, as defined in the Deed of Superficies).

## SCHEDULE "C"

## THE QUEBEC CITY PROPERTIES

## SPECIFICALLY DESCRIBED IMMOVABLES

**1.     Property located at 10 des Capucins Boulevard, Quebec City**

Immovables known and designated as being composed of lots TWO MILLION THREE HUNDRED AND FORTY-SEVEN THOUSAND TWO HUNDRED AND TWENTY-THREE and FOUR MILLION THREE HUNDRED AND SEVENTY-EIGHT THOUSAND EIGHT HUNDRED AND TWENTY-ONE (2 347 223 and 4 378 821), all of the Cadastre du Québec, Registration Division of Québec.

With all buildings, installations, structures, equipments and facilities erected and located in, under, on and over the said immovables including, without limitation, the buildings bearing civic number 10, des Capucins Boulevard, Québec, Province of Québec, G1K 7H9.

As the said immovables now subsist with their respective rights, members and appurtenances, without exception or reserve of any kind, and together with and subject to all servitudes and other rights, continuous or discontinuous, apparent or unapparent, attached thereto.

**2.     Property located at 1200 Lapierre Street, Québec City**

Immovables known and designated as being composed of lots ONE MILLION ONE HUNDRED AND SIXTEEN THOUSAND SEVEN HUNDRED AND THIRTY-SIX, ONE MILLION ONE HUNDRED AND SIXTEEN THOUSAND EIGHT HUNDRED AND SIXTY-SIX, ONE MILLION ONE HUNDRED AND SEVENTEEN THOUSAND AND FORTY-FOUR, ONE MILLION ONE HUNDRED AND SEVENTEEN THOUSAND AND SEVENTY-ONE, ONE MILLION ONE HUNDRED AND SEVENTEEN THOUSAND THREE HUNDRED AND THIRTY-FOUR and ONE MILLION ONE HUNDRED AND NINETEEN THOUSAND TWO HUNDRED AND EIGHTY-FIVE (1 116 736, 1 116 866, 1 117 044, 1 117 071, 1

- 2 -

117 334 and 1 119 285), all of the Cadastre of Québec, Registration Division of Québec.

With all buildings, installations, structures, equipments and facilities erected and located in, under, on and over the said immovables including, without limitation, the buildings bearing civic number 1200, Lapierre Street, Québec, Province of Québec, G3E 1H8.

As the said immovables now subsist with their respective rights, members and appurtenances, without exception or reserve of any kind, and together with and subject to all servitudes and other rights, continuous or discontinuous, apparent or unapparent, attached thereto.

## SCHEDULE "D"

## THE GATINEAU PROPERTY

## SPECIFICALLY DESCRIBED IMMOVABLES

Immovables known and designated as being composed of lots TWO MILLION FOUR HUNDRED AND SIXTY-NINE THOUSAND FOUR HUNDRED AND THIRTY-TWO, TWO MILLION FOUR HUNDRED AND SIXTY-NINE THOUSAND THREE HUNDRED AND SEVENTY-FOUR, TWO MILLION FOUR HUNDRED AND SEVENTY-ONE THOUSAND AND FIFTY-SIX and TWO MILLION FOUR HUNDRED AND SEVENTY-ONE THOUSAND AND FIFTY-FIVE (2 469 432, 2 469 374, 2 471 056 and 2 471 055), all of the Cadastre of Québec, Registration Division of Papineau.

With all buildings, installations, structures, equipments and facilities erected and located in, under, on and over the said immovables including, without limitation, the buildings bearing civic numbers 1 Montreal Road West, 2 Montreal Road West and vacant emplacements on Montreal Road West, City of Gatineau, Province of Québec.

As the said immovables now subsist with their respective rights, members and appurtenances, without exception or reserve of any kind, and together with and subject to all servitudes and other rights, continuous or discontinuous, apparent or unapparent, attached thereto.

## SCHEDULE "E"

## CHARGES TO BE RELEASED AND DISCHARGED AT THE REGISTRY OF PERSONAL AND MOVABLE REAL RIGHTS

**[NTD: to follow]**

**Exhibit F**
**Form of U.S. Sale Order**

SEE ATTACHED

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BEAR ISLAND PAPER COMPANY, L.L.C.,[1] | ) | Case No. 10-31202 (DOT) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## ORDER (A) AUTHORIZING AND APPROVING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE ASSIGNED CONTRACTS AND (C) GRANTING RELATED RELIEF

Upon the motion, dated August 10, 2010 (the "Sale Motion"), of Bear Island Paper Company, L.L.C., the debtor and debtor in possession in the above-captioned chapter 11 case ("Bear Island" or the "Debtor"), for entry of an order (this "Sale Order") pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (a) authorizing and approving the sale (the "Sale") of the Assets[2] free and clear of all liens, claims, encumbrances and other interests (excluding the Assumed Liabilities) pursuant to the terms and conditions of that certain asset sale agreement (the "Sale Agreement"), dated August 10, 2010, by and between White Birch Paper Company and certain of its subsidiaries, including the Debtor (collectively, the "Sellers") and BD White Birch Investment LLC (the "Purchaser"); (b) authorizing and approving the assumption and assignment of the Assigned Contracts; and (c) granting related relief; and the

---

[1]   The last four digits of the Debtor's federal tax identification number are 0914.  The principal address for the Debtor is 10026 Old Ridge Road, Ashland, Virginia 23005.

[2]   All capitalized terms used but not otherwise not defined herein shall have the meanings ascribed in the Sale Agreement and the Sale Motion, as applicable.  To the extent of any inconsistency, the Sale Agreement shall govern.

Court having entered the *Order Approving (A) the Form of the Sale Agreement, (B) the Bidding Procedures, (C) the Sale Notice and (D) the Assumption and Assignment Procedures* on [•] [Docket No. [•]] (the "Bidding Procedures Order"); and upon adequate and sufficient notice of the Sale Motion, Auction, the hearing before the Court on September 15, 2010 (the "Sale Hearing") and any other related transactions having been given in the manner directed by the Court pursuant to the Bidding Procedures Order; and the Court having reviewed and considered (x) the Sale Motion and all relief related thereto, (y) the objections thereto, if any, and (z) the statements of counsel and evidence presented in support of the relief requested by the Debtor at the Sale Hearing; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtor, its estate and creditors and other parties in interest; and upon the record of the Sale Hearing and all other pleadings and proceedings in this chapter 11 case, including the Sale Motion; and after due deliberation thereon and good and sufficient cause appearing therefor,

THE COURT HEREBY FINDS AND DETERMINES THAT:[3]

## Jurisdiction, Final Order and Statutory Predicates

A.     This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are incorporated herein to the extent not inconsistent herewith.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      The statutory predicates for the relief requested in the Sale Motion are sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006, 9007 and 9014 of the Bankruptcy Rules.

C.      This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

### Notice of the Sale and Auction

D.      Actual written notice of the Sale Motion was provided to the following parties (the "Notice Parties"): (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Purchaser; (iv) counsel to the Postpetition Agent (as defined in the DIP Order); (v) counsel to the agent under the First Lien Term Loan Agreement; (v) counsel to the majority lenders under the Second Lien Term Loan Agreement; (vii) counsel to counterparties under the Swap Agreements; (viii) the Monitor appointed in the CCAA Cases; (ix) all non-debtor counterparties to the Debtor's executory contracts and unexpired leases; (x) all persons or entities that have requested notice of the proceedings in this chapter 11 case; (xi) all parties who are known to claim liens or other interests upon the Assets; (xii) the Internal Revenue Service and (xiii) all applicable federal, state and local taxing and regulatory authorities.

E.      Notice of the auction conducted for the Sale (the "Auction") and the Sale Hearing, served on the Notice Parties on August 10, 2010, was reasonably calculated to provide all interested parties with timely and proper notice of the Auction, Sale and Sale Hearing.

F.      As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate and sufficient notice of the Sale Motion, Auction, Sale, Sale Hearing and the transactions contemplated thereby, including the assumption and assignment of the Assigned Contracts to the Purchaser, was provided in accordance with orders previously issued by the Court, sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014. The notices described herein were good, sufficient and appropriate under

3

the circumstances, and no other or further notice of the Sale Motion, Auction, Sale, Sale Hearing

or the assumption and assignment of the Assigned Contracts to the Purchaser is or shall be

required.

G.      The disclosures made by the Debtor concerning the Sale Motion, Sale Agreement,

Auction, Sale, assumption and assignment of the Assigned Contracts to the Purchaser and Sale

Hearing were good, complete and adequate.

H.      A reasonable opportunity to object and be heard with respect to the Sale Motion,

Sale and the relief requested therein, including the assumption and assignment of Assigned

Contracts to the Purchaser and any Cure Costs related thereto, has been afforded to all interested

persons and entities, including the Notice Parties.

### Capital Structure and Credit Bidding

I.      The Sellers, including Bear Island, are indebted to certain lenders (the "First Lien

Term Lenders") under that certain First Lien Term Loan Credit Agreement, dated on or about

April 8, 2005 (as amended and restated on January 27, 2006 and May 8, 2007) by and between

White Birch Paper Company and White Birch Paper  Holding Company, as borrowers, Credit

Suisse First Boston, as sole lead arranger, sole bookrunner, syndication agent and documentation

agent, Credit Suisse First Boston Toronto Branch, as Canadian collateral agent and administrative

agent, TD Securities (USA) LLC, as co-arranger and the lender parties thereto (the "First Lien

Term Loan Agreement").

J.      In addition, the Sellers, including Bear Island, are indebted to certain lenders (the

"DIP Lenders") under that certain $140,000,000 Senior Secured Super-Priority Debtor in

Possession Term Loan Agreement, as amended, modified, supplemented or otherwise in effect

from time to time, as approved by the Initial CCAA Order and by an order of this Court, dated

4

March 31, 2010 (the "DIP Credit Agreement," and, together with the First Lien Term Loan Agreement, the "Loan Documents").

## Good Faith of Purchaser

K.      The Sale Agreement was negotiated, proposed and entered into by the Sellers, including Bear Island, and the Purchaser without collusion, in good faith and from arms'-length bargaining positions.

L.      The Purchaser is not an "insider" or "affiliate" of the Debtor as those terms are defined in the Bankruptcy Code. Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Sale Agreement to be avoided under section 363(n) of the Bankruptcy Code. Specifically, the Purchaser has not acted in a collusive manner with any person and the aggregate price paid by Purchaser for the Assets (the "Purchase Price") was not controlled by any agreement among the bidders.

M.      The Purchaser is purchasing the Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code. Indeed, the Purchaser proceeded in good faith in connection with all aspects of the Sale, including: (i) the Bidding Procedures Order; (ii) neither inducing nor causing the Debtor's chapter 11 filing; and (iii) disclosing all payments to be made by the Purchaser in connection with the Sale. Accordingly, the Purchaser is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code

## Highest and Best Offer

N.      The Debtor conducted an auction process in accordance with, and has otherwise complied in all respects with, the Bidding Procedures Order. The auction process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Assets. The Auction was duly noticed

5

and conducted in a non-collusive, fair and good faith manner and a reasonable opportunity has been given to any interested party to make a higher or otherwise better offer for the Assets.

## No Fraudulent Transfer

O.      As evidenced by Debtor's extensive marketing efforts, the consideration provided by the Purchaser pursuant to the Sale Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Assets, (iii) will provide a greater recovery to the Debtor's estate than would be provided by any other available alternative and (iv) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.   No other person, entity or group of entities has offered to purchase the Assets for greater economic value to the Debtor's estate than the Purchaser.   The Debtor's determination that the Sale Agreement constitutes the highest and best offer for the Assets constitutes a valid and sound exercise of the Debtor's business judgment.   Approval of the Sale Motion and the Sale Agreement, and the consummation of the transactions contemplated thereby, is in the best interests of the Debtor, its estate, creditors and other parties in interest.

P.      The Purchaser is not a mere continuation of the Debtor or its estate and there is no continuity of enterprise between the Purchaser and the Debtor.   The Purchaser is not holding itself out to the public as a continuation of the Debtor.   The Purchaser is not a successor to the Debtor or its estate and the Sale does not amount to a consolidation, merger or *de facto* merger of Purchaser and the Debtor.

## Validity of Transfer

Q.      The Debtor has (i) full corporate power and authority to execute and deliver the Sale Agreement and all other documents contemplated thereby, (ii) all corporate authority

necessary to consummate the transactions contemplated by the Sale Agreement, and (iii) taken all corporate action necessary to authorize and approve the Sale Agreement and the consummation of the transactions contemplated thereby. The Sale has been duly and validly authorized by all necessary corporate action. No consents or approvals, other than those expressly provided for in the Sale Agreement, are required for the Debtor to consummate the Sale, the Sale Agreement or the transactions contemplated thereby.

R.    The Sale Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia. Neither the Debtor nor the Purchaser is fraudulently entering into the transaction contemplated by the Sale Agreement.

S.    The Debtor and the other Sellers have good and marketable title to the Assets and are the lawful owners of the Assets. Subject to section 363(f) of the Bankruptcy Code, the transfer the Assets to the Purchaser will be, as of the closing of the transactions contemplated by the Sale Agreement (the "Closing Date"), a legal, valid and effective transfer of the Assets, which transfer vests or will vest the Purchaser with all right, title and interest of the Sellers to the Assets free and clear of (i) all liens and encumbrances relating to, accruing or arising any time prior to the Closing Date (collectively, "Liens") and (ii) all debts arising under, relating to or in connection with any act of the Debtor or claims (as that term is defined in section 101(5) of the Bankruptcy Code and herein), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of this case, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, rights with respect to Claims (as defined below) and Liens (x) that purport to give to any party a right of setoff or recoupment against, or a right or

7

option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, the Debtor's or the Purchaser's interests in the Assets, or any similar rights, or (y) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, as defined in this clause (ii), "Claims"), relating to, accruing or arising any time prior to the Closing Date, with the exception of Permitted Encumbrances and Assumed Liabilities (as those terms are defined in the Sale Agreement).

### Section 363(f) is Satisfied

T.      The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtor may sell the Assets free and clear of any interest in the property.  The Purchaser would not have entered into the Sale Agreement and would not consummate the transactions contemplated thereby if the Sale and the assumption of liabilities and obligations as set forth in the Sale Agreement by the Purchaser were not free and clear of all Liens and Claims, other than the Permitted Encumbrances and Assumed Liabilities.

U.      Unless otherwise expressly included in the Permitted Encumbrances or Assumed Liabilities, the Purchaser shall not be responsible for any Liens or Claims, including in respect of the following, unless otherwise prohibited by applicable law or statute:  (i) any labor or employment agreements; (ii) all mortgages, deeds of trust and security interests; (iii) intercompany loans and receivables between the Debtor and any non-debtor subsidiary, (iv) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the

8

Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (l) any other state or federal benefits or claims relating to any employment with the Debtor or any of its predecessors; (vi) Claims or Liens arising under any Environmental Laws with respect to any assets owned or operated by Debtor or any of its corporate predecessor at any time prior to the Closing Date and any of the Debtor's liabilities other than the Assumed Liabilities; (vii) any bulk sales or similar law; (vii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (ix) any theories of successor liability (as further defined in the Sale Agreement, the "Excluded Liabilities").

V.      The Debtor may sell the Assets free and clear of all Liens and Claims against the Debtor, its estate or any of the Assets (except the Assumed Liabilities and Permitted Encumbrances) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Liens or Claims against the Debtor, its estate or any of the Assets who did not object or who withdrew their objections to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

## Compelling Circumstances for an Immediate Sale

W.      Good and sufficient reasons for approval of the Sale Agreement and the Sale have been articulated. The relief requested in the Sale Motion is in the best interests of the Debtor, its estate, its creditors and other parties in interest. The Debtor has demonstrated (i) good, sufficient

9

and sound business purposes and justifications for approving the Sale Agreement and (ii) compelling circumstances for the Sale outside of (a) the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code and (b) a plan of reorganization, in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Debtor's estate and the Sale will provide the means for the Debtor to maximize distributions to its creditors.

X.    To maximize the value of the Assets and preserve the viability of the business to which the Assets relate, it is essential that the Sale occur within the time constraints set forth in the Sale Agreement. Time is of the essence in consummating the Sale.

Y.    Given all of the circumstances of this chapter 11 case and the adequacy and fair value of the Purchase Price under the Sale Agreement, the proposed Sale constitutes a reasonable and sound exercise of the Debtor's business judgment and should be approved.

Z.    The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The Sale neither impermissibly restructures the rights of Debtor's creditors nor impermissibly dictates a liquidating plan of reorganization for the Debtor.

AA.    The consummation of the Sale and the assumption and assignment of the Assigned Contracts is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m) and 365 thereof.

## Adequate Assurance of Future Performance

BB.    The Purchaser has demonstrated adequate assurance of future performance with respect to the Assigned Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code.

10

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

### General Provisions

1.     The relief requested in the Sale Motion, including the Sale, is granted and approved to the extent set forth in this Sale Order.

2.     Any objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, settled by announcement during the Sale Hearing or by stipulation filed with the Court, including any and all reservations of rights included in such objections or otherwise, are hereby denied and overruled with prejudice.  Those parties who did not object or withdrew their objections to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

### Approval of the Sale Agreement

3.     The Sale Agreement, all Ancillary Agreements and all of the terms and conditions thereof are hereby approved.

4.     Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtor is authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale pursuant to, and in accordance with, the terms and conditions of the Sale Agreement, (ii) close the Sale as contemplated in the Sale Agreement and this Sale Order, and (iii) execute and deliver, perform under, consummate, implement and fully close the Sale Agreement, including the assumption and assignment of the Assigned Contracts to the Purchaser, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale Agreement and the Sale.

5.     This Sale Order shall be binding in all respects upon (a) the Debtor, (b) its estate, (c) all creditors of, and holders of equity interests in, the Debtor, (d) any holders of Liens, Claims

11

or other interests in, against or on all or any portion of the Assets (whether known or unknown),
(e) the Purchaser and all successors and assigns of the Purchaser, (f) the Assets and (g) any trustees,
if any, subsequently appointed in the Debtor's chapter 11 case or upon a conversion of this case to
chapter 7 under the Bankruptcy Code.  This Sale Order and the Sale Agreement shall inure to the
benefit of the Debtor, its estate and creditors, the Purchaser and the respective successors and
assigns of each of the foregoing.

### Transfer of the Assets

6.      Pursuant to sections 105(a), 363(b) and 363(f) of the Bankruptcy Code, the Debtor
is authorized to transfer the Assets to the Purchaser on the Closing Date and such transfer shall
constitute a legal, valid, binding and effective transfer of such Assets and shall vest Purchaser with
title to the respective Assets and, upon the Debtor's receipt of the Purchase Price, other than
Permitted Encumbrances and Assumed Liabilities, shall be free and clear of all Liens, Claims and
other interests of any kind or nature whatsoever, including successor or successor in interest
liability and Claims in respect of the Excluded Liabilities, with such Liens, Claims and interests to
attach to the proceeds of the Sale in the order of their priority, with the same validity, force and
effect which they now have as against the Assets.  Upon the Closing, the Purchaser shall take title
to and possession of the Assets subject only to the Permitted Encumbrances and Assumed
Liabilities.

7.      Except with respect to Permitted Encumbrances and Assumed Liabilities, all
persons and entities that are in possession of some or all of the Assets on the Closing Date are
directed to surrender possession of such Assets to the Purchaser or its assignee at the Closing.  The
provisions of this Sale Order authorizing the sale of the Assets free and clear of Liens, Claims and
other interests (other than the Permitted Encumbrances and Assumed Liabilities), shall be
self-executing and neither the Debtor nor the Purchaser shall be required to execute or file releases,

termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order.

8.     The Debtor is hereby authorized to take any and all actions necessary to consummate the Sale Agreement, including any actions that otherwise would require further approval by shareholders or its board of directors without the need of obtaining such approvals.

9.     A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any liens and other encumbrances of record except those Assumed Liabilities or Permitted Encumbrances.

10.     If any person or entity which has filed statements or other documents or agreements evidencing Liens on, or interests in, all or any portion of the Assets (other than statements or documents with respect to Permitted Encumbrances) shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all liens or interests which the person or entity has or may assert with respect to all or any portion of the Assets, the Debtor is hereby authorized and directed, and the Purchaser is hereby authorized, on behalf of the Debtor and each of the Debtor's creditors, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Assets.

11.     On the Closing Date, this Sale Order shall be construed, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Debtor's interests in the Assets. This Sale Order is and shall be effective as a determination that, on the Closing Date, all Liens, Claims and other interest of any kind or nature whatsoever existing as to the Assets prior to the Closing Date, other than Permitted Encumbrances and Assumed Liabilities,

shall have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; provided, that such Liens, Claims and other interests shall attach to the proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the Assets. This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Sale Agreement.

12.   To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtor with respect to the Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Purchaser as of the Closing Date.

13.   To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of the Debtor's chapter 11 case or the consummation of the transactions contemplated by the Sale Agreement.

**Prohibition of Actions Against the Purchaser**

14

14.     Except for the Permitted Encumbrances and Assumed Liabilities, or as otherwise expressly provided for in this Sale Order or the Sale Agreement, the Purchaser shall not have any liability or other obligation of the Debtor arising under or related to any of the Assets.

15.     Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Sale Agreement, and unless otherwise prohibited by applicable law or statute, the Purchaser shall not be liable for any Claims against the Debtor or any of its predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including pursuant to any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger, mere continuation or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including liabilities on account of warranties, intercompany loans and receivables between the Debtor and any non-debtor subsidiary, liabilities relating to or arising from any Environmental Laws, and any taxes arising, accruing or payable under, out of, in connection with or in any way relating to the operation of any of the Assets prior to the Closing.

16.     Except with respect to Permitted Encumbrances and Assumed Liabilities, all persons and entities, including all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding Liens, Claims or other interests of any kind or nature whatsoever against or in all or any portion of the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with or in any way relating to the Debtor, the Assets, the operation of the Debtor's business prior to the Closing Date or the transfer of the Assets to the Purchaser, hereby are forever

15

barred, estopped and permanently enjoined from asserting against the Purchaser, any of their affiliates, their successors or assigns, their property or the Assets, such persons' or entities' Liens, Claims or interests in and to the Assets, including, the following actions: (a) commencing or continuing in any manner any action or other proceeding against the Purchaser, any of its affiliates, its successors, assets or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Purchaser, any of its affiliates, its successors, assets or properties; (c) creating, perfecting or enforcing any Lien or other Claim against the Purchaser, any of its affiliates, its successors, assets or properties; (d) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Purchaser, any of its affiliates or successors; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order, other orders of the Court, the Sale Agreement or actions contemplated or taken in respect thereof; or (f) revoking, terminating, failing or refusing to transfer or renew any license, permit or authorization to operate any of the Assets or conduct any of the businesses operated with the Assets.

17.    On the Closing Date, or as soon as possible thereafter, each creditor is authorized and directed, and the Purchaser is hereby authorized, on behalf of each of the Debtor's creditors, to execute such documents and take all other actions as may be necessary to release Liens, Claims and other interests in or on the Assets (except Permitted Encumbrances and Assumed Liabilities), if any, as provided for herein, as such Liens may have been recorded or may otherwise exist.

18.    All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Assets to the Purchaser in accordance with the terms of the Sale Agreement and this Sale Order.

19.     The Purchaser has given substantial consideration under the Sale Agreement for the benefit of the Debtor, its estate and creditors.  The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Claims and Liens pursuant to this Sale Order, including under Paragraphs 14-18 hereof, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Liens against or interests in, or Claims against the Debtor or any of the Assets, other than holders of Liens or Claims relating to the Assumed Liabilities and Permitted Encumbrances.   The consideration provided by the Purchaser for the Assets under the Sale Agreement is fair and reasonable and accordingly the purchase may not be avoided under section 363(n) of the Bankruptcy Code.

20.     Effective as of the Closing, the Purchaser, its successors and assigns, shall be designated and appointed the Debtor's true and lawful attorney and attorneys, with full power of substitution, in the Debtor's name and stead, on behalf of and for the benefit of the Purchaser, its successors and assigns, for the sole and limited purposes as follows:  have the power to demand and receive from any third party any and all of the Assets and to give receipts and releases for and in respect of the Assets, or any part thereof, and from time to time to institute and prosecute against third parties for the benefit of the Purchaser, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Purchaser, its successors and assigns, may deem proper for the collection or reduction to possession of any of the Assets.

**Assumption and Assignment of Assigned Contracts**

21.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale, the Debtor's assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Sale Agreement, of the Assigned

17

Contracts is hereby approved and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

22.    The Debtor is hereby authorized and directed in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the Closing Date of the Sale, the Assigned Contracts free and clear of all Claims, Liens or other interests of any kind or nature whatsoever and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Purchaser.

23.    The Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer.  In addition, pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to, and assumption by, the Purchaser, except as provided in the Sale Agreement.

24.    All defaults or other obligations of the Debtor under the Assigned Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured pursuant to the terms of the Sale Agreement on the Closing Date or as soon thereafter as reasonably practicable.

25.    To the extent a counterparty to an Assigned Contract failed to timely object to a Cure Amount, such Cure Amount shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality

18

of the Cure Amount at any time, and such Cure Amount, when paid, shall completely revive any Assigned Contract to which it relates. No sections or provisions of any Assigned Contract that purport to provide for additional payments, penalties, charges or other financial accommodations in favor of the non-debtor third party to the Assigned Contracts shall have any force and effect with respect to the Sale and assignments authorized by this Sale Order. Such provisions constitute unenforceable, anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code. No assignment of any Assigned Contract pursuant to the terms of the Sale Agreement shall in any respect constitute a default under any Assigned Contract. The non-debtor party to each Assigned Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code and the Purchaser shall enjoy all of the Debtor's rights and benefits under each such Assigned Contract as of the applicable date of assumption without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof.

26.     With respect to objections to any Cure Amounts that remain unresolved as of the Sale Hearing, such objections shall be resolved in accordance with the procedures set forth in the Bidding Procedures Order.

27.     Nothing in this Sale Order, the Sale Motion or in any notice or any other document is or shall be deemed an admission by the Debtor that any contract is an executory contract or must be assumed and assigned pursuant to the Sale Agreement or in order to consummate the Sale.

28.     The failure of Debtor or Purchaser to enforce at any time one or more terms or conditions of any Contract shall not be a waiver of such terms or conditions or of the Debtor's and Purchaser's rights to enforce every term and condition of such Contract.

29.    All parties to the Assigned Contracts are forever barred and enjoined from raising or asserting against the Purchaser any assignment fee, default, breach, Claim, pecuniary loss or condition to assignment arising under or related to the Assigned Contracts existing as of the Closing or arising by reason of the Closing, except for any amounts that are Assumed Liabilities.

## Other Provisions

30.    This Sale Order, the Sale Agreement and the Ancillary Agreements shall be binding in all respects upon all creditors and equity-holders of the Debtor, all non-debtor parties to the Assigned Contracts, all successors and assigns of the Debtor and its affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Debtor's chapter 11 case or upon a conversion of this case to chapter 7 under the Bankruptcy Code. The Sale Agreement and the Ancillary Agreements shall not be subject to rejection or avoidance under any circumstances.

31.    The Sale Agreement and the Ancillary Agreements may be modified, amended or supplemented by the parties thereto, in a writing signed by the parties and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

32.    Except to the extent expressly included in the Assumed Liabilities, or by applicable law or statue, the Purchaser and its affiliates shall have no liability, obligation or responsibility under the WARN Act (29 U.S.C. §§ 210 *et seq*.), the Comprehensive Environmental Response Compensation and Liability Act or any foreign, federal, state or local labor, employment or Environmental Law by virtue of the Purchaser's purchase of the Assets or assumption of the Assumed Liabilities.

20

33.     On the Closing Date, prior to payment or repayment of any other claims, interests or obligations of the Debtor, other than the Carve-Out (as defined under the DIP Credit Agreement) if triggered, all outstanding Obligations (as defined in the DIP Credit Agreement) owed by the Debtor under the DIP Credit Agreement will be paid in full and in cash from the proceeds of the Sale pursuant to the Sale Agreement.

34.     The consideration provided by the Purchaser to the Debtor pursuant to the Sale Agreement for the Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

35.     The transactions contemplated by the Sale Agreement are undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and such Sale are duly stayed pending such appeal.  The Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

36.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) this chapter 11 case, (b) any subsequent chapter 7 case into which this chapter 11 case may be converted or (c) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the Sale Agreement or the terms of this Sale Order.

37.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

21

38.    The failure to specifically include any particular provision of the Sale Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sale Agreement be authorized and approved in its entirety; provided, however, that this Sale Order shall govern if there is any inconsistency between the Sale Agreement (including all Ancillary Agreements) and this Sale Order.  Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

39.    The Court shall retain jurisdiction to, among other things, interpret, implement and enforce the terms and provisions of this Sale Order and the Sale Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Assets to Purchaser; (b) interpret, implement and enforce the provisions of this Sale Order; (c) protect Purchaser against any Liens, Claims or other interest in or against the Debtor or the Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (d) enter any orders under section 363 or 365 of the Bankruptcy Code with respect to the Assigned Contracts.

40.    Any amounts payable by the Debtor under the Sale Agreement shall (a) be paid in the manner provided in the Sale Agreement without further order of this Court, (b) be allowed administrative claims in an amount equal to such payments in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, (c) have the other protections provided in the Bidding Procedures Order and (d) not be discharged, modified or otherwise affected by any reorganization plan for the Debtor, except by an express agreement with Purchaser, its successors or assigns.

22

41.    All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

42.    To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Sale Motion in this chapter 11 case, the terms of this Sale Order shall govern.

43.    The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Sale Motion is hereby waived.


Dated: _____, 2010
           Richmond, Virginia


                                        _____
                                        Chief Judge Douglas O. Tice, Jr.
                                        United States Bankruptcy Judge

I ASK FOR THIS:

*/s/ Jonathan L. Hauser*
Jonathan L. Hauser
VSB No. 18688
**TROUTMAN SANDERS LLP**
222 Central Park Avenue

Suite 2000
Virginia Beach, Virginia 23462
Telephone:    (757) 687-7768
Facsimile:    (757) 687-1505

- and -

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Attorneys for the Debtor and*
*Debtor in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/ Jonathan L. Hauser*