## Exhibit A-3

**Amendment No. 3 to the Asset Sale Agreement**

# AMENDMENT NO. 3 TO THE ASSET SALE AGREEMENT

THIS AMENDMENT No. 3 TO THE ASSET SALE AGREEMENT (this "**Third Amendment**") is entered into as of September 22, 2010 by and among BD White Birch Investment LLC, a limited liability company organized under the Laws of Delaware (the "**Purchaser**"), White Birch Paper Company, a company organized under the Laws of Nova Scotia ("**White Birch**"), and the subsidiaries of White Birch listed in <u>Exhibit A</u> hereto (together with White Birch, the "**Sellers**"). All capitalized terms not otherwise defined herein shall have such meanings as ascribed to them in the ASA (as defined below).

W I T N E S S E T H :

WHEREAS, the Purchaser and the Sellers have entered into that certain Asset Sale Agreement, dated as of August 10, 2010, as amended by the First Amendment thereto, dated as of August 23, 2010, and the Second Amendment thereto, dated as of August 31, 2010, relating to the purchase and sale of the Assets (as amended, the "**ASA**");

WHEREAS, on September 21, 2010 the Auction for the Assets was concluded;

WHEREAS, at the conclusion of the Auction a proposal to effect the sale of the Assets pursuant to (i) a credit bid by Credit Suisse, Cayman Islands Branch, as United States collateral agent, and Credit Suisse, Toronto Branch, as Canadian collateral agent and administrative agent, on behalf of the First Lien Term Lenders, under the First Lien Credit Agreement solely with respect to the Assets located in Canada and pledged as security under the First Lien Credit Agreement, pursuant to an instruction letter annexed hereto as <u>Exhibit B</u> given by parties constituting the Majority Lenders (as defined in the First Lien Credit Agreement), consisting of certain Affiliates of the Purchaser, together with (ii) certain modified terms of the ASA proposed by the Purchaser as specifically set forth herein, was declared the winning bid; and

WHEREAS, the Parties wish to amend certain terms of the ASA to reflect the outcome of the Auction, as set forth herein.

NOW THEREFORE, in consideration of the premises and mutual covenants contained herein, the parties hereto hereby agree as follows:

1.    <u>Amendment</u>.

(a)    All references in the ASA to the Break-Up Fee and the payment thereof are hereby removed.

(b)    <u>Section 1.1</u> of the ASA is hereby amended by adding the following definitions in appropriate alphabetical order:

"**Agents**" means, collectively, Credit Suisse, Cayman Islands Branch, as United States collateral agent, and Credit Suisse, Toronto Branch, as Canadian collateral agent and administrative agent, under the First Lien Credit Agreement.

"**Bid Direction Letter**" means the instruction letter annexed hereto as <u>Exhibit L</u> given to the Agents by parties constituting the Majority Lenders, consisting of certain Affiliates of Purchaser.

"**Canadian Designated Purchasers**" has the meaning set forth in Section 5.21(b).

"**DIP Order**" means the Final Order (I) Authorizing the Debtor to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Debtor's Limited Use of Cash Collateral Pursuant to 11 U.S.C. § 363, and (III) Granting Adequate Protection to Prepetition Debt Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, entered by the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, on March 31, 2010.

"**First Lien Credit Bid**" has the meaning set forth in Section 2.2.1.

"**First Lien Term Lenders**" means the lenders under the First Lien Credit Agreement.

"**Fixed Asset Cash Amount**" means the amount of: (a) any claim in favor of KSH Solutions Inc. in connection with the Superior Court of Quebec file numbers 200-17-007138-068 and 200-17-007328-065 not to exceed CDN$2,727,585; (b) any claim in favor of Service d'Impartition Industriel Inc. in connection with its notice of exercise of a hypothecary right against certain Owned Real Property to secure sums allegedly due for work on immovables located on such Owned Real Property not to exceed CDN$1,748,857; and (c) for any excess amounts, the U.S. dollar amount equal to the amount, if any, by which $4,500,000 U.S. dollars exceeds the U.S. dollar equivalent of the amounts in (a) and (b), provided that for greater certainty, the total Fixed Asset Cash Amount is and shall not exceed $4,500,000 U.S. dollars.

"**Majority Lenders**" has the meaning set forth in the First Lien Credit Agreement.

"**Purchasers**" has the meaning set forth in Section 5.2(g).

"**Qualified Counterparties**" has the meaning set forth in the DIP Order.

(c)     The definition of "Cash Obligations" in <u>Section 1.1</u> of the ASA is hereby amended by inserting a new clause (f) (and accordingly, current clauses (f) and (g) of such definition hereby becomes clauses (g) and (h) of such definition, respectively) as follows:

"(f) the Fixed Asset Cash Amount,"

(d)     The definition of "Reserve Payment Amount" in <u>Section 1.1</u> of the ASA is hereby amended and restated in its entirety as follows:

740957.01-Chicago Server 1A - MSW

"**Reserve Payment Amount**" means the amount of any source deduction claim in favor of the Ministry of Revenue (Quebec) and/or the Canada Revenue Agency arising from the failure to deduct, withhold or remit amounts under Tax Law (the "**Source Deduction Claim**") not to exceed $4,175,000; provided, however, such payment is only to be made (i) if there has been compliance with the requirements of Section 5.19 and (ii) to the extent the Canadian Court finally determines by Closing that all or a portion of such claim ranks senior in priority to the claims of the lenders under the DIP Credit Agreement. For greater certainty, any amount of the Source Deduction Claim relating to interest and/or penalties that does not rank senior in priority to the claims of the lenders under the DIP Credit Agreement shall not form part of the Reserve Payment Amount."

(e)     The definition of "Wholly-Owned Subsidiary" in Section 1.1 of the ASA is hereby amended and restated in its entirety as follows:

"**Wholly-Owned Subsidiary**" means any Person all of the equity interests in which are held as of the Closing either (a) directly or indirectly by the Purchaser or (b) directly or indirectly by the Purchaser and/or the First Lien Term Lenders or their designees.

(f)     The first paragraph of Section 2.2.1 of the ASA is hereby amended and restated in its entirety as follows:

"Pursuant to the terms and subject to the conditions set forth in this Agreement, in consideration of the sale of the Assets pursuant to the terms hereof, the Purchaser, on its own behalf and as agent for the relevant Designated Purchasers, shall (a) cause (through certain of its equity owners or Affiliates thereof) the Majority Lenders under the First Lien Credit Agreement to direct the Agents (including through one or more subagent(s) pursuant to Section 9.2 of the First Lien Credit Agreement) to credit the amount of principal due under the Loans (as defined in the First Lien Credit Agreement) due under the First Lien Credit Agreement and the principal amount due to all Qualified Counterparties under the Specified Hedge Agreements as specified in paragraph D(a)(3)(iv) of the DIP Order by $78,000,000, solely with respect to the Assets located in Canada and pledged as security under the First Lien Credit Agreement, pursuant to the credit bid of such amount by the Agents (including through one or more subagent(s) pursuant to Section 9.2 of the First Lien Credit Agreement) on behalf of the First Lien Term Lenders pursuant to the Bid Direction Letter (the "**First Lien Credit Bid**"), (b) assume from the Sellers and become obligated to pay, perform and discharge, when due, the Assumed Liabilities, (c) pay to the Sellers an amount of cash equal to $90,000,000 (the "**Cash Component**"), (d) pay the Reserve Payment Amount, (e) pay the Fixed Asset Cash Amount in accordance with Section 5.22, (f) pay all requisite filing fees in relation to any filing or application made in respect of obtaining Regulatory Approvals, and (g) deliver the Wind-Down Amount pursuant to Section 5.18 ((a), (b), (c), (d), (e), (f) and (g), collectively, the "**Purchase Price**"). The Wind-Down Amount shall be held in trust by the Monitor and the Bear Island Estate, as applicable."

3

(g) <u>Section 2.3.2(c)</u> of the ASA is hereby amended and restated in its entirety as follows:

"The Purchaser shall deliver to the Monitor, in the case of the Canadian Debtors, and the Bear Island Estate, in the case of the U.S. Debtor, as distribution agents for the Sellers, (i) an amount equal to the Cash Component (minus amounts deemed paid pursuant to Section 2.2.1 and the Deposit which shall be disbursed to the Sellers pursuant to the terms of the Deposit Escrow Agreement) by wire transfer in immediately available funds to accounts designated at least two (2) Business Days prior to the Closing Date by the Sellers in a written notice to the Purchaser; provided that the Wind-Down Amount shall be delivered to and held in trust by the Monitor and the Bear Island Estate, as applicable and (ii) evidence, in form and substance reasonably satisfactory to Sellers, that the amount of principal due under the Loans due under the First Lien Credit Agreement and the principal amount due to all Qualified Counterparties under the Specified Hedge Agreements as specified in paragraph D(a)(3)(iv) of the DIP Order have been credited by $78,000,000;"

(h) <u>Section 2.4</u> of the ASA is hereby amended and restated in its entirety as follows:

"In connection with the Closing, the Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.4, one or more Wholly-Owned Subsidiaries or Affiliates to (i) purchase specified Assets (including specified Assigned Contracts) and pay the corresponding Purchase Price amount and Cure Amounts, as applicable, (ii) assume specified Assumed Liabilities, and/or (iii) employ specified Transferred Employees on and after the Closing Date (any such Wholly-Owned Subsidiary or Affiliate of the Purchaser that shall be properly designated by the Purchaser in accordance with this clause, a "**Designated Purchaser**"). At the Closing, Purchaser shall, or shall cause its Designated Purchasers to, honor their obligations at the Closing. Any reference to the Purchaser made in this Agreement in respect of any purchase, assumption or employment referred to in Section 2.4(i) to (iii) shall include reference to the appropriate Designated Purchaser, if any. After the Closing, except as set forth in Section 5.2(g), all obligations of Purchaser and its Designated Purchasers under this Agreement shall be several and not joint. Notwithstanding anything in this Agreement to the contrary, the right to acquire the membership interests in SP Newsprint Holdings LLC will be assigned by Purchaser to a Wholly-Owned Subsidiary prior to Closing and Purchaser will have no obligations with respect to SP Newsprint Holdings LLC.

The above designation shall be made by the Purchaser by way of a written notice to be delivered to the Sellers in no event later than the fifth (5th) Business Day prior to Closing which written notice shall contain appropriate information about the Designated Purchaser(s) and shall indicate which Assets, Assumed Liabilities and Transferred Employees (other than Employees which are transferred by operation of Law) the Purchaser intends such Designated

4

Purchaser(s) to purchase, assume and/or employ, as applicable, hereunder and include a signed counterpart to this Agreement in a form acceptable to the Sellers, agreeing to be bound by the terms of this Agreement as it relates to such Designated Purchaser and authorizing the Purchaser to act as such Designated Purchaser(s)' agent for all purposes hereunder."

(i)     New Section 3.6 of the ASA is hereby added as follows:

"3.6     First Lien Credit Agreement.

The Agents, on behalf of the First Lien Term Lenders, have been directed pursuant to the terms of the First Lien Credit Agreement to make a credit bid (including through one or more subagent(s) pursuant to Section 9.2 of the First Lien Credit Agreement) pursuant to Section 363 of the U.S. Bankruptcy Code or other applicable Law in order to pay the First Lien Credit Bid portion of the Purchase Price. A copy of the Bid Direction Letter is attached hereto as Exhibit L."

(j)     Section 5.1(c) of the ASA is hereby amended by deleting the phrase "September 9, 2010" in two instances and replacing it, in both instances, with the phrase "September 11, 2010".

(k)     Section 5.1(d) of the ASA is hereby amended by deleting the phrase "September 15, 2010" and replacing it with the phrase "September 21, 2010".

(l)     Section 5.1(e) of the ASA is hereby amended by deleting the phrase "September 22, 2010" in two instances and replacing it, in both instances, with the phrase "September 30, 2010".

(m)     Section 5.2(g) of the ASA is hereby amended and restated in its entirety as follows:

"(g)     Canadian Debtors shall use their reasonable best efforts to have the Canadian Court discharge the D&O Charge (as defined in the Initial CCAA Order), effective upon Closing, but conditional upon the Purchaser and the Designated Purchasers (the "**Purchasers**") fulfilling their obligations in this paragraph. If the Canadian Debtors obtain such a discharge as of such time, then the Purchasers shall jointly and severally (i) indemnify and save each of the directors and officers of each of the Canadian Debtors since the date of the Initial CCAA Order (each a "**D&O Charge Covered Person**") harmless of, and from, and will pay for, all reasonable costs, charges, expenses, including reasonable professional fees and claims relating to any obligations or liabilities to the extent that would have been recoverable against the D&O Charge had it not been discharged, they may incur in relation to their respective capacities as directors or officers between the issuance of the Initial CCAA Order and the Closing and only for matters that would have been covered by the D&O Charge had it not been discharged, to a maximum of CDN$10,000,000, in the aggregate (each such matter a "**D&O Charge Covered Claim**") and (ii) establish a CDN$10,000,000

5

letter of credit at Closing issued by a U.S. or Canadian financial institution reasonably acceptable to the Canadian Debtors (a Schedule I Canadian chartered bank, JP Morgan Chase, Bank of America, Deutsche Bank or Citibank being deemed to be acceptable) to secure such indemnification obligation. Pursuant to the D&O Claims Procedure: (i) the D&O Charge Covered Persons and the Purchasers shall be notified of any and all D&O Charge Covered Claims filed; (ii) the D&O Charge Covered Persons and the Purchasers shall be kept reasonably informed of, and shall participate in, the defense of all such claims; (iii) no D&O Charge Covered Claim may be allowed or settled without the consent of the Purchasers, such consent not to be unreasonably withheld, and any such allowance or settlement entered into without such consent shall not be entitled to indemnification hereunder; and (iv) upon notice to any D&O Charge Covered Person, the Purchaser designated by Purchasers indemnifying party shall be entitled to assume the defense of any such claim, provided that any D&O Charge Covered Person may engage in such circumstances its own counsel at its own cost and expense. The letter of credit may be drawn upon in an amount equal to, in the case of an allowance or a settlement, the allowed or settled amount (including all reasonable costs, charges, expenses covered by this indemnity), or, in the case of a final order, the amount set forth in the final order (and all reasonable costs, charges, expenses covered by this indemnity), in either case only if (x) the Purchasers have agreed to an allowance or settlement of such claim evidenced by a certificate from the Purchasers to that effect or (y) (1) a final order of a court finding liability for a D&O Charge Covered Person is entered, (2) the Purchasers have received a certificate certifying damages from the beneficiary of such order and (3) the Purchasers were aware of such claim and was provided an opportunity to defend against it. The Purchasers' obligations of indemnification provided herein (together with the obligation to have a letter of credit) shall expire at the end of the Canadian Debtors CCAA cases. At the bar date, the amount of the letter of credit shall be reduced at such time to the lesser of CDN$10,000,000 and the amount of the asserted claims at the bar date plus a reserve for reasonably anticipated costs and interest that could be incurred or awarded on any adverse judgment; provided further, the amount of the letter of credit shall be further reduced to the amount of the remaining asserted claims plus a reserve for reasonably anticipated costs and interest that could be incurred or awarded on any adverse judgment as claims are dismissed or otherwise resolved. In addition, in the event a D&O Charge Covered Claim is filed after the bar date and determined to be an allowed claim by the Canadian Court, the amount of the letter of credit shall be increased (or the letter of credit shall be promptly re-issued, as the case may be) by the amount of such allowed claim (up to a maximum letter of credit amount of CDN$10,000,000 in the aggregate), subject to future reductions as provided in the immediately proceeding sentence. For greater certainty, no D&O Charge Covered Person is required to consent to any settlement of a D&O Charge Covered Claim that would require restrictions on his activities, including the holding of office or the ownership of securities. Notwithstanding anything to the contrary contained above or in any applicable policy of insurance to the contrary, the foregoing shall only apply to the extent that the D&O Charge Covered

6

Persons do not have sufficient coverage under any directors' and officers' insurance, which shall not be excess insurance to the D&O Charge. In respect of any D&O Charge Covered Claim against any of the D&O Charge Covered Persons, if such D&O Charged Covered Person does not receive confirmation from the applicable insurer within 21 days of delivery of notice of the D&O Charge Covered Claim to the applicable insurer, confirming that the applicable insurer will provide coverage for and indemnify the D&O Charge Covered Persons, then, without prejudice to the subrogation rights hereinafter referred to, such D&O Charge Covered Person may follow the procedures herein for recovery. The D&O Charge Covered Persons shall reimburse the Purchasers to the extent that they subsequently receive insurance benefits for the D&O Charge Covered Claim that were previously paid by a draw on the letter of credit or by the Purchasers. In addition, the Purchasers shall, upon payment or the drawing of the letter of credit of a D&O Covered Claim, be subrogated to the rights of the D&O Charge Covered Person to recover payment from the applicable insurer as if no such payment had been made. As a condition to receiving the benefits of this section, the D&O Charge Covered Person shall cooperate in any such subrogation and execute and documents reasonably requested. All D&O Charge Covered Persons shall be intended third-party beneficiaries of this Section 5.2(g) and such right shall confer upon all D&O Charge Covered Persons any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Section 5.2(g)."

(n)     New Section 5.2(h) of the ASA is hereby added as follows:

"(h) The Parties agree to cooperate to identify and take all steps necessary to permit the consummation of the transactions contemplated hereby in the most tax efficient manner."

(o)     Section 5.15(a) of the ASA is hereby amended and restated in its entirety as follows: "RESERVED".

(p)     New Section 5.21 of the ASA is hereby added as follows:

**"5.21    First Lien Term Lenders.**

(a)     The Purchaser (or certain of its equity owners or Affiliates thereof) shall direct and cause the Agents (including through one or more subagent(s) pursuant to Section 9.2 of the First Lien Credit Agreement) on or prior to the Closing Date to credit the principal amount of the Loans due under the First Lien Credit Agreement and the principal amount due to all Qualified Counterparties under the Specified Hedge Agreements as specified in paragraph D(a)(3)(iv) of the DIP Order in the amount of the First Lien Credit Bid and effect the other transactions contemplated by this Section 5.21. In addition, the Parties shall take such other actions as they deem necessary or desirable, and the Purchaser (or certain of its equity owners or Affiliates thereof) shall cause the Agents (including through one or more subagent(s) pursuant to Section 9.2 of the First Lien Credit

Agreement) to take such other actions, on behalf of the First Lien Term Lenders, as reasonably agreed between the Sellers and the Purchaser to give effect, under Section 363 of the U.S. Bankruptcy Code or other applicable Law or otherwise, to the First Lien Credit Bid.

(b)    The Purchaser shall establish one or more Designated Purchaser(s) (the "**Canadian Designated Purchasers**") to receive in connection with the Closing the Assets located in Canada and pledged as security under the First Lien Credit Agreement, assume the payment of obligations for the Fixed Asset Cash Amount, and if determined by Purchaser any other designations in accordance with Section 2.4. In connection with the Closing, the Canadian Designated Purchasers shall make arrangements for the benefit of the First Lien Term Lenders and the Qualified Counterparties (or their designees) for equity securities of the Canadian Designated Purchasers to be distributed to the First Lien Term Lenders and the Qualified Counterparties in accordance with the First Lien Credit Agreement and applicable Law.

(c)    The Canadian Designated Purchasers shall pay the fees and expenses of the Agents pursuant to Section 10.4 of the First Lien Credit Agreement to the extent that such fees are not paid by Sellers (in accordance with the First Lien Credit Agreement) with respect to the transactions contemplated by this Section 5.21."

(q)    New Section 5.22 of the ASA is hereby added as follows:

"**5.22    Fixed Asset Cash Amount.**

The Fixed Asset Cash Amount shall be first allocated to the Owned Real Property to which the claims comprising such amount relate and be used to satisfy such claim, if determined payable, in accordance herewith. Such claims shall be paid to the extent the Canadian Court finally determines by Closing that all or a portion of such claims rank senior in priority to the claims of the lenders under the First Lien Credit Agreement. If any claim is unresolved at Closing, such Fixed Asset Cash Amount shall be deposited into escrow pending resolution thereof. To the extent that (a) any portion of the Fixed Asset Cash Amount is determined not to be senior in priority to the claims of the lenders under the First Lien Credit Agreement or (b) it is finally determined that a claimant is entitled to a recovery of less than the full amount of such claim, such portion of the Fixed Asset Cash Amount shall be disbursed from the escrow to the Sellers as part of the Cash Component hereunder."

(r)    Section 9.1(b)(i) of the ASA is hereby amended by deleting the phrase "September 9, 2010" and replacing it with the phrase "September 11, 2010."

(s)    Section 9.1(b)(ii) of the ASA is hereby amended by deleting the phrase "September 22, 2010" and replacing it with the phrase "September 30, 2010."

(t)    A new clause (ii) to <u>Section 10.5</u> of the ASA is hereby added (and, accordingly, clauses (ii) and (iii) of <u>Section 10.5</u> of the ASA hereby becomes clauses (iii) and (iv) of <u>Section 10.5</u>, respectively, of the ASA) as follows:

"(ii) designations by the Purchaser to a Designated Purchaser pursuant to Section 2.4,"

(u)    A new <u>Exhibit L</u> to the ASA is hereby added, the content of which is attached hereto as <u>Exhibit B</u>.

2.    <u>Full Force and Effect</u>.  The ASA shall not be amended or otherwise modified by this Third Amendment except as set forth in Section 1 of this Third Amendment.  Except as amended by this Third Amendment, the ASA shall continue to be and shall remain in full force and effect in accordance with its terms, and the parties hereto hereby ratify and confirm the ASA in all respects, as amended hereby.  All references to the "Agreement," "herein," "hereof," "hereunder" or words of similar import in the ASA shall be deemed to include the ASA as amended by this Third Amendment.

3.    <u>Miscellaneous</u>.  The provisions of Article X (Miscellaneous) of the ASA shall apply to this Third Amendment as if such provisions were set out herein in full and as if each reference therein to "this Agreement" included a reference to this Third Amendment.

[remainder of page intentionally left blank]

740957.01-Chicago Server 1A - MSW

IN WITNESS WHEREOF, the parties have duly executed this Third Amendment as of the date first above written.

WHITE BIRCH PAPER COMPANY

By: _____
Name:
Title:


STADACONA GENERAL PARTNER INC.

By: _____
Name:
Title:


STADACONA L.P., by White Birch Paper Company, a General Partner

By: _____
Name:
Title:


F.F. SOUCY GENERAL PARTNER INC.

By: _____
Name:
Title:


F.F. SOUCY, INC. & PARTNERS, LIMITED PARTNERSHIP, by White Birch Paper Company, a General Partner

By: _____
Name:
Title:

F.F. SOUCY L.P., by White Birch Paper
Company, a General Partner

By:_____
Name:
Title:


ARRIMAGE DE GROS CACOUNA INC.

By:_____
Name:
Title:


PAPIER MASSON LTÉE

By:_____
Name:
Title:


BEAR ISLAND PAPER COMPANY, L.L.C.

By:_____
Name:
Title:


BD WHITE BIRCH INVESTMENT LLC


By:_____
Name:
Title:

F.F. SOUCY L.P., by White Birch Paper
Company, a General Partner

By:_____
Name:
Title:


ARRIMAGE DE GROS CACOUNA INC.


By:_____
Name:
Title:


PAPIER MASSON LTÉE


By:_____
Name:
Title:


BEAR ISLAND PAPER COMPANY, L.L.C.


By:_____
Name:
Title:


BD WHITE BIRCH INVESTMENT LLC

By: _____
Name: Leslie A. Meier
Title: President and Secretary

**Exhibit A**
**White Birch Subsidiaries**

- Stadacona General Partner Inc.
- Stadacona L.P.
- F.F. Soucy General Partner Inc.
- F.F. Soucy, Inc. & Partners, Limited Partnership
- F.F. Soucy L.P.
- Arrimage de Gros Cacouna Inc.
- Papier Masson Ltée.
- Bear Island Paper Company, L.L.C.

**Exhibit B**
**Bid Direction Letter**

SEE ATTACHED

September 21, 2010

Credit Suisse AG, Cayman Islands Branch (f/k/a Credit Suisse, Cayman Islands Branch)
Eleven Madison Avenue
New York, New York 10010
Attention: Agency Group

Credit Suisse AG, Toronto Branch (f/k/a Credit Suisse, Toronto Branch)
One First Canadian Place
Suite 3000
P.O. Box 301
Toronto, Ontario M5X 1C9
Canada
Attention: Edith Chan

RE:    Letter of Direction

To Whom It May Concern:

The undersigned entities are Lenders under that certain Second Amended and Restated First Lien Term Loan Credit Agreement, dated as of May 8, 2007, among White Birch Paper Holding Company, as Holdings, White Birch Paper Company, as Borrower, the Lenders from time to time party thereto, Credit Suisse Securities (USA) LLC, as Lead Arranger, Syndication Agent and Documentation Agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated, as Co-Arranger, Credit Suisse AG (f/k/a Credit Suisse), Cayman Islands Branch, as US Collateral Agent, and Credit Suisse AG (f/k/a Credit Suisse), Toronto Branch, as Canadian Collateral Agent and Administrative Agent (as amended, modified, supplemented or otherwise in effect from time to time, the "**First Lien Credit Agreement**"). Reference is also hereby made to (i) that certain First Lien Security Agreement, dated as of April 8, 2005, between Bear Island Paper Company L.L.C. and the US Collateral Agent (as amended, modified, supplemented or otherwise in effect from time to time, the "**First Lien Security Agreement**"), (ii) that certain General Security Agreement, dated as of April 8, 2005, between White Birch Paper Company and the Canadian Collateral Agent (as amended, modified, supplemented or otherwise in effect from time to time, the "**Company General Security Agreement**"), (iii) that certain General Security Agreement, dated as of January 27, 2006, between 3120772 Nova Scotia Company and the Canadian Collateral Agent (as amended, modified, supplemented or otherwise in effect from time to time, the "**3120772 General Security Agreement**"), (iv) those certain General Security Agreements, each dated as of April 8, 2005, between, respectively, Stadacona L.P. / Stadacona S.E.C. and Stadacona General Partner Inc. and, in each case, the Canadian Collateral Agent (collectively, as amended, modified, supplemented or otherwise in effect from time to time, the "**Stadacona General Security Agreements**") and (v) those certain General Security Agreements, each dated as of April 8, 2005, between, respectively, F.F. Soucy L.P., F.F. Soucy, Inc. & Partners, Limited Partnership and F.F. Soucy General Partner Inc. and, in each case, White Birch Paper Company (collectively, as amended, modified, supplemented or otherwise in effect from time to time, the "**Other Subsidiary General Security Agreements**"). Capitalized terms used herein without definition shall have the meanings assigned to them in the First Lien Credit Agreement.

Collectively, the undersigned Lenders hold a majority of the aggregate principal amount of the total Loans outstanding as of the date hereof under the First Lien Credit Agreement. Accordingly, we constitute "Majority Lenders" thereunder.

On February 24, 2010, Holdings and certain of its direct and indirect subsidiaries (the "**Canadian Debtors**") commenced insolvency proceedings (the "**Canadian Proceedings**") in Canada in the Superior Court for the Province of Quebec, Commercial Division, Judicial District of Montreal, Canada (the "**Canadian Bankruptcy Court**") under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended. Simultaneously with the filing of the Canadian Proceedings, Bear Island Paper Company, L.L.C. also filed a voluntary petition for relief (the "**Chapter 11 Proceedings**") under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the Bankruptcy Court for the Eastern District of Virginia (the "**U.S. Bankruptcy Court**"). The Canadian Debtors also filed petitions and related pleadings (the "**Chapter 15 Proceedings**," and together with the Canadian Proceedings and the Chapter 11 Proceedings, the "**Bankruptcy Proceedings**") under Chapter 15 of the Bankruptcy Code in the U.S. Bankruptcy Court and, on March 26, 2010, the U.S. Bankruptcy Court entered an order recognizing the Canadian Proceedings as a "foreign main proceeding." Under the First Lien Credit Agreement, the voluntary filings of the Bankruptcy Proceedings constituted an Event of Default, which triggers certain automatic remedies and permits the commencement of certain other remedies provided for under the Loan Documents and at law (subject to the automatic stay and applicable law).

Each undersigned Lender hereby directs you, in your respective capacities as Administrative Agent, US Collateral Agent and Canadian Collateral Agent under the First Lien Credit Agreement and the other Loan Documents, pursuant to (i) the exercise of remedies provisions in, *inter alia,* Section 8 of the First Lien Credit Agreement, Section 7 of the First Lien Security Agreement, Section 14 of the Company General Security Agreement, Section 14 of the 3120772 General Security Agreement, Section 14 of each of the Stadacona General Security Agreements and Section 14 of each of the Other Subsidiary General Security Agreements and (ii) the Agent direction provision in Section 9.5 of the First Lien Credit Agreement, to credit bid (pursuant to Section 363(k) of the Bankruptcy Code as contemplated by paragraph 24 of the Form of Procedures for the Sale and Investor Solicitation Process and Amended Bidding Procedures, each as approved by the Canadian Bankruptcy Court and the U.S. Bankruptcy Court (the "**SISP**")) up to the full amount of the Obligations in order to acquire all or any portion of the Collateral of the Loan Parties at any sale thereof pursuant to the SISP.

Each undersigned Lender hereby further directs you, in your respective capacities as Administrative Agent, US Collateral Agent and Canadian Collateral Agent under the First Lien Credit Agreement and the other Loan Documents, pursuant to Section 9.2 of the First Lien Credit Agreement, to appoint BD White Birch Investment LLC ("**BDWB**") as your agent and attorney-in-fact in order to execute the duties described herein and directed hereby, as well as those duties incidental thereto, in each case with respect to the making of such credit bid. By their countersignatures hereunder, the Agents, in reliance on the direction provided herein, appoint BDWB as their agent with respect to the making of such credit bid, and BDWB hereby accepts such appointment. Pursuant to the foregoing, BDWB, in its capacity as an agent of the Agents, shall be entitled, and the Majority Lenders hereby direct the Agents to permit BDWB, to credit

2

bid without any further action on the part of the Agents. Notwithstanding the foregoing, such agency may be terminated at any time by the Majority Lenders, the Agents or BDWB in accordance with the Loan Documents and applicable law; provided that such termination shall not alter, amend or limit the rights or ability of the Majority Lenders to provide a subsequent direction letter to the Agents with respect to the making of a credit bid or otherwise. Each of the Agents shall have fully complied with all obligations set forth in this Letter of Direction upon the appointment of BDWB as set forth in this paragraph and shall have no further obligations under or in connection with this Letter of Direction, any credit bid or any transactions related to or arising in connection with such credit bid.

Each undersigned Lender, on behalf of itself and its successors and assigns, hereby agrees to, and shall, indemnify each Agent in its capacity as such and BDWB (in its capacity as an agent thereof) and each of their respective Affiliates, officers, directors, employees, agents and advisors (each, an "**Indemnified Person**") (to the extent not reimbursed by the Loan Parties and without limiting the obligation of the Loan Parties to do so), ratably according to their respective Pro Rata Share (as defined below) of the Commitments or the Loans, as applicable, in effect on the date on which indemnification is sought hereunder (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Pro Rata Share of the Loans immediately prior to such date), for, and to save each Indemnified Person harmless from and against, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever (including, without limitation, reasonable counsel fees, charges and disbursements) that may at any time (including, without limitation, at any time following the repayment of the Loans) be imposed on, incurred by or asserted against such Indemnified Person in any way relating to or arising out of this Letter of Direction, any credit bid or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted to be taken by such Indemnified Person under or in connection with any of the foregoing or otherwise at the request or direction of the undersigned Lenders; provided that no undersigned Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted directly from such Indemnified Person's gross negligence or willful misconduct. This indemnity shall survive the payment, discharge, release, sale or transfer of the Loans and all other amounts payable under the First Lien Credit Agreement and the other Loan Documents. As used herein, the term "**Pro Rata Share**" shall be determined based on such undersigned Lender's share of the aggregate principal amount of the Obligations held by all undersigned Lenders as of the applicable date of determination.

Any action taken or omitted to be taken by any Agent in its capacity as such or BDWB (in its capacity as an agent thereof) in reliance on this Letter of Direction shall be entitled to the limitations of liability, exculpations, reimbursements, indemnities and other protections set forth in the First Lien Credit Agreement as if this Letter of Direction were a "Loan Document."

Without limiting the foregoing, (i) each undersigned Lender hereby agrees that no Indemnified Person shall be liable as a result of such Indemnified Person's taking any of the actions directed herein or otherwise acting or refraining from acting, in each case in furtherance thereof or in

furtherance of the direction provided herein (except to the extent that any of the foregoing are found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted directly from such Person's own gross negligence or willful misconduct) and (ii) each undersigned Lender hereby agrees that it shall not assert, and each hereby irrevocably and conclusively waives for all time, any claim against the Indemnified Persons for special, indirect, consequential or punitive damages in connection with the transactions contemplated hereby.

Each undersigned Lender represents and warrants that it is a Lender under the First Lien Credit Agreement and that it has the power and authority to direct the Agent (together with the other Lenders constituting Majority Lenders) to take the actions with respect thereto as are specified herein.

Nothing in this Letter of Direction shall alter, limit or waive any rights, remedies, limitations of liability, exculpations, reimbursements, indemnities and other protections of the Indemnified Persons or any agent thereof under the First Lien Credit Agreement or the other Loan Documents, all of which are hereby reserved.

If any provision of this Letter of Direction is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Letter of Direction will remain in full force and effect. Any provision of this Letter of Direction held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

This Letter of Direction may be executed in any number of counterparts, each of which, when taken together, shall constitute an original. Facsimile or electronically transmitted signature pages shall constitute originals for all purposes.

EACH UNDERSIGNED LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT IT MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS LETTER OF DIRECTION OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

This Letter of Direction shall be construed in accordance with and governed by the laws of the State of New York. Each undersigned Lender irrevocably and unconditionally submits to and accepts the exclusive jurisdiction of any New York State or United States Federal court sitting in New York County for any action, suit, or proceeding arising out of or based upon this Letter of Direction or any matter relating to it, and waives any objection that it may have to the laying of venue in any such court or that such court is an inconvenient forum or does not have personal jurisdiction over it.

4

No term or provision of this Letter of Direction may be amended, modified or waived without the prior written consent of all parties hereto.

cc: Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, New York 10022
Attention: Eugene Mazzaro

cc: Osler, Hoskin & Harcourt LLP
1000 de La Gauchetière Street West
Suite 2100
Montréal, Québec
Canada H3B 4W5
Attention: Etienne Massicotte

NY\1686569.9

Very truly yours,

BDCM OPPORTUNITY FUND II, L.P., *as a Lender*
By: BDCM OPPORTUNITY FUND II
ADVISER, L.L.C., its Investment
Manager

By: _____
Name: **Stephen H. Deckoff**
Title: **Managing Principal**

BLACK DIAMOND CLO 2005-1 LTD., *as a Lender*
By: BLACK DIAMOND CLO 2005-1
ADVISER, L.L.C., its Collateral
Manager

By: _____
Name: **Stephen H. Deckoff**
Title: **Managing Principal**

BLACK DIAMOND CLO 2005-2 LTD., *as a Lender*
By: BLACK DIAMOND CLO 2005-2
ADVISER, L.L.C., its Collateral
Manager

By: _____
Name: **Stephen H. Deckoff**
Title: **Managing Principal**

BLACK DIAMOND CLO 2006-1, *as a Lender*
(CAYMAN) LTD.
By: BLACK DIAMOND CLO 2006-1
ADVISER, L.L.C., its Collateral
Manager

By: _____
Name: **Stephen H. Deckoff**
Title: **Managing Principal**

BLACK DIAMOND INTERNATIONAL
FUNDING, LTD., *as a Lender*
By:    BDCM FUND ADVISER, L.L.C., its
        Portfolio Manager

By: _____
Name:   **Stephen H. Deckoff**
Title:    **Managing Principal**

BDC FINANCE, L.L.C., *as a Lender*
By:    BDCM FUND ADVISER, L.L.C., its
        Investment Manager

By: _____
Name:
Title:    **Stephen H. Deckoff**
         **Managing Principal**

[Signature Page to First Lien Letter of Direction]

CREDIT SUISSE LOAN FUNDING LLC, *as a Lender*

By: _____
Name:
Title:   Ronald Gotz
Authorized Signatory

Ian Landow
Authorized Signatory

MARINER LDC, as a Lender

By: _____
Name:    Adam B. Cohen
Title:    Principal, Mariner Investment Group,
           as Investment Manager

CASPIAN CAPITAL PARTNERS, L.P., as a Lender

By: _____
Name:    Adam S. Cohen
Title:    Principal, Mariner Investment Group,
           as Investment Manager

CASPIAN SELECT CREDIT MASTER
FUND, LTD., as a Lender

By: _____
Name:    Adam S. Cohen
Title:    Principal, Mariner Investment Group,
           as Investment Manager

CASPIAN CORPORATE LOAN FUND,
LLC, as a Lender

By: _____
Name:    Adam S. Cohen
Title:    Principal, Mariner Investment Group,
           as Investment Manager

CASPIAN ALPHA LONG CREDIT FUND,
L.P., as a lender

By: _____
Name:    Adam S. Cohen
Title:    Principal, Mariner Investment Group,
           as Investment Manager

CASPIAN SOLITUDE MASTER FUND,
L.P., as a lender

By: _____
Name:    Adam S. Cohen
Title:    Principal, Mariner Investment Group,
           as Investment Manager

[Signature Page to First Lien Letter of Direction]

Agreed and Accepted:

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as US Collateral Agent

By: _____
Name:  **Didier Siffer**
Title:  **Authorized Signatory**

By: _____
Name:
Title:  **Adam Zausmer**
  **Authorized Signatory**

CREDIT SUISSE AG, TORONTO BRANCH,
as Administrative Agent and Canadian Collateral Agent

By: _____
Name:  **Alain Daoust**
Title:  Director

By: _____
Name:
Title:  Bruce F. Wetherly
  Director and
  Principal Officer

Agreed and Accepted:

BD WHITE BIRCH INVESTMENT LLC

By:
Name:    **Stephen H. Deckoff**
Title:    **Managing Principal**