Jonathan L. Hauser
VSB No. 18688
TROUTMAN SANDERS LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, Virginia 23462
Telephone: (757) 687-7768
Facsimile: (757) 687-1505

Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Attorneys for the Debtor and
Debtor in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| BEAR ISLAND PAPER COMPANY, L.L.C.,[1] | Case No. 10-31202 (DOT) |
| Debtor. | |
| | Hearing Date: September 30, 2010 at 2:30 p.m. (ET) |

## OMNIBUS REPLY OF BEAR ISLAND PAPER COMPANY, L.L.C. TO THE (A) OBJECTION OF MINORITY FIRST LIEN LENDERS TO PROPOSED TERMS OF SALE OF ASSETS TO BD WHITE BIRCH INVESTMENT, LLC AND (B) RESPONSE OF MAJORITY SECOND LIEN LENDERS IN THEIR CAPACITY AS UNSECURED CREDITORS TO DEBTOR'S MOTION FOR ENTRY OF ORDER APPROVING SALE

Bear Island Paper Company, L.L.C., the debtor and debtor in possession in the above-captioned chapter 11 case ("Bear Island" or the "Debtor"),[2] files this omnibus reply (the

---

[1] The last four digits of the Debtor's federal tax identification number are 0914. The principal address for the Debtor is 10026 Old Ridge Road, Ashland, Virginia 23005.

[2] Capitalized terms used but not otherwise defined herein shall be ascribed the meanings provided in the *Motion of Bear Island Paper Company, L.L.C. for Entry of Orders Approving the (A) Form of the Sale Agreement, (B) Bidding Procedures, (C) Form and Manner of Notice of the Auction and Sale Hearing, (D) Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (E) Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and (F) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (the "Sale Motion") [Docket No. 403].

"Omnibus Reply") to (a) the *Objection of Minority First Lien Lenders[3] to Proposed Terms of Sale of Assets to BD White Birch Investment, LLC* (the "Minority First Lien Lenders Objection") [Docket No. 518] and (b) the *Response of Majority Second Lien Lenders[4] in Their Capacity as Unsecured Creditors to Debtor's Motion for Entry of Order Approving Sale* (the "Majority Second Lien Lenders Response") [Docket No. 517]. In support of the Omnibus Reply, the Debtor respectfully represents as follows:

**Jurisdiction and Venue**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

3. Certain relevant facts are set forth in the Sale Motion. Additional pertinent facts are set forth herein.

4. Prior to commencing this chapter 11 case, Bear Island and certain of its Canadian affiliates were indebted to the lenders under that First Lien Term Loan Credit Agreement, dated April 8, 2005 (as amended and restated on January 27, 2006 and May 8, 2007, the "First Lien Term Loan Credit Agreement"), in the principal amount of approximately $429 million, plus approximately $9.8 million in interest. Pursuant to that certain First Lien Security Agreement, dated as of April 8, 2005, between Bear Island Paper Company L.L.C. as Grantor and Credit

---

[3] The "Minority First Lien Lenders" are comprised of BlueMountain Long/Short Credit Master Fund, L.P., BlueMountain Credit Alternatives Master Fund L.P., BlueMountain Timberline Ltd., BlueMountain Distressed Master Fund LP., Lombard General Insurance Company of Canada, Macquarie Americas Corp., MFP Partners, L.P., Steelhead Navigator Master, L.P. and Wexford Capital LP.

[4] The "Majority Second Lien Lenders" are comprised of Dune Capital LP, Dune Capital International Ltd. and WTA Dune Limited.

Suisse First Boston as U.S. Collateral Agent (the "Security Agreement," and, together with the First Lien Term Loan Credit Agreement, the "Loan Documents"), obligations under the First Lien Term Loan Credit Agreement were secured by perfected, prepetition, first-priority liens on all of the assets that comprise the "Term Loan Collateral" as defined in the Security Agreement (the "Fixed Assets" or "Collateral"). Certain other of the Debtor and Canadian affiliates' assets are unencumbered (the "Current Assets").

5. Since the Petition Date, Bear Island has taken numerous steps to ensure compliance with the sale milestones contained in the $140,000,000 Senior Secured Super-Priority Debtor-In-Possession Term Loan Credit Agreement, dated March 1, 2010 (the "DIP Credit Agreement"), as approved by this Court in the *Final Order (I) Authorizing the Debtor to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Debtor's Limited Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (III) Granting Adequate Protection to Prepetition Debt Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364* [Docket No. 171] (the "DIP Order").

6. Among other things, pursuant to the terms of the DIP Credit Agreement, on April 19, 2010, the Debtor filed the *Motion of Bear Island Paper Company, L.L.C. for Entry of an Order Approving the Sale and Investor Solicitation Process and Procedures Related Thereto* (the "SISP Procedures") [Docket No. 208]. The SISP Procedures describe, among other things, the process the Debtor would follow to sell all or substantially all of its Assets. Notably, the SISP Procedures also provide that the agents under the DIP Credit Agreement and the First Lien Term Loan Credit Agreement were deemed "Qualified Bidders" and permitted to "credit bid up to the full amount of any allowed secured claims under the [DIP Credit Agreement] and the [First Lien Term Loan Credit Agreement], respectively, to the extent permitted under section 363(k) of the

3

Bankruptcy Code and other applicable law."

7.  On April 28, 2010, this Court entered the *Order Approving the Debtor's Sale and Investor Solicitation Process and Procedures Related Thereto* [Docket No. 234] (the "SISP Order"). The Canadian Court entered the SISP Procedures on April 29, 2010.

8.  Following entry of the SISP Order, the Debtor worked diligently in compliance with the SISP Order toward maximizing the value of the Assets. As a result of such efforts,[5] on August 10, 2010, the WB Group entered into that certain Asset Sale Agreement (the "Asset Sale Agreement"),[6] by and between the WB Group and BD White Birch Investment, LLC.[7] Pursuant to the terms of the Asset Sale Agreement, BD White Birch Investment LLC would, among other things, acquire the Assets for $90 million in cash and the assumption of the Assumed Liabilities (as defined in the Asset Sale Agreement).

9.  Contemporaneously with the Debtor's entry into the Asset Sale Agreement, Bear Island filed the Sale Motion. On August 31, 2010, Judge Huennekens held a hearing with respect to the approval of (a) the form of the Asset Sale Agreement, (b) the stalking horse bid protections and (c) the bid procedures (the "Bid Procedures"). The Bid Procedures, among other things, permitted the agents under the DIP Credit Agreement and the First Lien Term Loan Credit Agreement to credit bid for the Collateral. On September 1, 2010, Judge Huennekens

---

[5] A detailed description of the WB Group's efforts to market the Sale and sell the Assets is provided in the Sale Motion.

[6] The Asset Sale Agreement was amended on August 23 and August 31, 2010, respectively [Docket Nos. 437 and 468].

[7] BD White Birch Investment, LLC ("Black Diamond") is comprised of Black Diamond Capital Management, LLC and its affiliates, Credit Suisse Loan Funding LLC and its affiliates, and Caspian Capital Advisors, LLC and its affiliates (collectively, the "Majority First Lien Lenders"). The Majority First Lien Lenders hold, in the aggregate, approximately 65.5% of the debt under the First Lien Term Loan Credit Agreement. Accordingly, the Majority First Lien Lenders are "Majority Lenders" as that term is defined in Section 1.1 of the First Lien Term Loan Credit Agreement.

entered the *Order Approving (A) the Form of the Sale Agreement, (B) the Bidding Procedures, (C) the Sale Notice and (D) the Assumption Procedures and Assumption Notice* (the "Bid Procedures Order") [Docket No. 469] and on September 10, 2010, the Canadian Court entered an order approving the Bid Procedures.

10. On September 17, 2010, certain of the Minority First Lien Lenders[8] presented a Qualified Bid for the Assets that consisted, in part, of a cash purchase price of $100,000,000. In its reasonable business judgment, the WB Group determined that this bid was higher and otherwise better than the bid proposed in connection with the Asset Sale Agreement -- the only other Qualified Bid received before the bid deadline. On September 20, 2010, the WB Group informed Black Diamond and Sixth Avenue that the Sixth Avenue Qualified Bid would be the starting bid at the auction (the "Auction").

11. On September 21, 2010, the WB Group commenced the Auction for the sale of the Assets. At the conclusion of the Auction, the WB Group selected Black Diamond's bid of $172.5 million (the "Black Diamond Bid") as the highest and otherwise best bid. This bid consists of $94.5 million in cash, a $78 million credit bid[9] and the assumption of the Assumed

---

[8] This sub-group of the Minority First Lien Lenders is comprised of BlueMountain Capital Management and its affiliates, Steelhead Partners, LLC and its affiliates, Lombard General Insurance Company of Canada and its affiliates, Macquarie Bank Limited and its affiliates, and MFP Partners, L.P. and its affiliates (collectively, "Sixth Avenue"). Sixth Avenue collectively holds, in the aggregate, approximately 10% of the debt under the First Lien Term Loan Credit Agreement.

[9] On September 21, 2010, the Majority First Lien Lenders sent a direction letter (the "Direction Letter") to Credit Suisse AG, Cayman Islands Branch (f/k/a Credit Suisse, Cayman Islands Branch) and Credit Suisse AG, Toronto Branch (f/k/a Credit Suisse, Toronto Branch) (collectively, the "Agents") in their respective capacities as Administrative Agent, U.S. Collateral Agent and Canadian Collateral Agent under the First Lien Term Loan Credit Agreement and the other Loan Documents directing the Agents to (a) credit bid up to the full amount of the WB Group's outstanding debt under the First Lien Term Loan Credit Agreement in order to acquire all or any portion of the Collateral at any sale thereof pursuant to the SISP Order and SISP Procedures and (b) appoint BD White Birch Investment, LLC as their agent and attorney-in-fact in order to make a credit bid at any sale of the Collateral. The Agents countersigned the Direction Letter thereby acknowledging that they were appointing Black Diamond as their agent with respect to the credit bid. Black Diamond also signed the Direction Letter
(Continued…)

Liabilities. The Debtor also determined that Sixth Avenue's bid of $175 million in cash was the second highest and otherwise best bid, and thus, the alternative bid under the Bid Procedures (the "Sixth Avenue Bid" or the "Alternative Bid").

12.     On September 23, 2010, Ernst & Young, which the Canadian Court appointed as the monitor in the CCAA Cases (the "Monitor"), submitted a report to the Canadian Court (the "Final Report"). The Final Report, which is attached hereto as **Exhibit A**, states that as long as a bid contains a cash component that at least equals the approximate $90 million liquidation value of the Current Assets, then a credit bit would be allowed on account of all or a portion of the Fixed Assets. (Exhibit A at ¶ 20.1). The Final Report also states that "the Monitor concurs with the [WB Group's] assessment that the [Black Diamond Bid] represents the highest and best offer." (*Id*. at ¶ 36).

13.     On September 24, 2010, the Canadian Court conducted a hearing regarding approval of the Black Diamond Bid. At the conclusion of that hearing, and over the objections of the Minority First Lien Lenders and the Majority Second Lien Lenders, the Canadian Court approved the Black Diamond Bid.

## Argument

### I.    The Minority First Lien Lenders, As Unsecured Bidders, Do Not Have Standing To Challenge The Debtor's Business Judgment

14.     An unsuccessful bidder in a sale under section 363 of the Bankruptcy Code lacks standing to challenge approval of the transaction, except when challenging the "intrinsic fairness" of the sale process. *See In re Colony Hill Assoc.*, 111 F.3d 269, 273 (2d Cir. 1997)

---

thereby accepting the appointment. Acting pursuant to the authority the Agents conferred upon it, Black Diamond credit bid $78 million of the debt under the First Lien Term Loan Credit Agreement for the Collateral.

(stating that, in the absence of fraud, mistake or unfairness, an unsuccessful bidder whose only loss is speculative profits from the property auctioned lacks standing to challenge the sale); *In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997) ("[U]nsuccessful bidders usually lack standing to challenge a bankruptcy court's approval of a sale.").[10]

15. Although the Minority First Lien Lenders purport to object as creditors, their arguments demonstrate a clear intent to advance their own bid -- as bidders. To the extent that the Minority First Lien Lenders are objecting as a disgruntled bidder, the Minority First Lien Lenders lack standing to present such arguments.

## II. The Black Diamond Bid Is The Highest And Best Bid

### A. *Contrary to the Minority First Lien Lenders' Argument, the Monitor's Report Supports a Dollar for Dollar Value of Black Diamond's Credit Bid*

16. After a full and fair Auction process, the Debtor determined, in its reasonable business judgment, that the Black Diamond Bid is the highest and best bid. The Minority First Lien Lenders argue that the Black Diamond Bid is not the highest and best bid because Black Diamond's credit bid should not be given dollar for dollar credit. The Minority First Lien Lenders fail, however, to cite a single case that even purports to permit a debtor to discount a credit bid. In fact, the weight of authority requires that credit bids be afforded dollar for dollar value up to the full face amount of a secured creditor's claim. *See Cohen v. KB Mezzanine Fund II LP* (*In re SubMicron Sys. Corp.*), 432 F.3d 448, 459-60 (3d Cir. 2006) ("[T]he plain language

---

[10] *See also Cello Bag Co., Inc. v. Champion International Corp. (In re Atlanta Packaging Products, Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988) (finding that frustrated bidders lack standing to object to sales of property); *In re Planned Systems, Inc.*, 82 B.R. 919 (Bankr. S.D. Ohio 1988) (same); *Big Shanty Land Corp. v. Comer Properties, Inc.*, 61 B.R. 272 (N.D. Ga. 1985) (same); *In re NEPSCO*, 36 B.R. 25 (Bankr. D. Me. 1983) (same); *In re Jewel Terrace Corp.*, 10 B.R. 1008 (E.D.N.Y. 1981) (same).

7

of [section 363(k)] makes clear that the secured creditor may credit bid its *entire claim,* including any unsecured deficiency portion thereof . . . . In fact, logic demands that § 363(k) be interpreted in this way; interpreting it to cap credit bids at the economic value of the underlying collateral is theoretically nonsensical.") (quoting *In re Morgan House Gen. P'ship,* 1997 WL 50419, at *1 (E.D. Pa. Feb. 7, 1997) (emphasis in original)).[11]

17.     Instead, the Minority First Lien Lenders rely only on the Monitor's August 10, 2010 report (the "First Report") (and completely ignore the Final Report, which contradicts the Minority First Lien Lenders) and argue that a credit bid should not be valued on a dollar for dollar basis until a bidder provides enough cash to pay for the carrying value of the Current Assets, without requiring the same bidder to attribute any value towards the purchase of the Fixed Assets. (Minority First Lien Lenders Objection at ¶ 17).

18.     Although the First Report suggests that the value of any bid for the Assets should first be allocated to the Current Assets up to its carrying value and then to the Fixed Assets -- thereby applying zero value to the Fixed Assets and discounting the Majority First Lien Lenders' right to credit bid -- the Monitor has since changed its position.  In the Final Report, the Monitor explained that during the period between August 10 and September 21, 2010 -- the date of the Auction -- the WB Group, its advisors and the Monitor engaged in numerous discussions regarding the problems associated with the Monitor's position presented in the First Report, which included:

---

[11] *See also In re Midway Invs., Ltd.,* 187 B.R. 382, 391 n. 12 (Bankr. S.D. Fla.1995) ("[A] secured creditor may bid in the full amount of the creditor's allowed claim, including the secured portion and any unsecured portion thereof.") (citing legislative history) (alteration in original) (internal quotation marks omitted).

a. The inequity in valuing the Current Assets above their liquidation value based upon a going-concern without recognizing any going-concern value for the Fixed Assets;

b. An inconsistency with the Bid Procedures Order, which specifically provided for the right to credit bid as well as a discretionary allocation of value between the Current Assets and the Fixed Assets;

c. The inherent flaw in assigning zero value to the Fixed Assets given a credit bid would require an allocation of value to the Fixed Assets;

d. The impossibility of ignoring an allocation presented by bidders as a condition of an offer made during the Auction, especially when such offer encompasses a credit bid;

e. The failure to acknowledge that a credit bid at the Auction represents valuable consideration for the WB Group through the elimination of secured debt; and

f. The likelihood that an auction process that did not account full value for a credit bid would be unable to obtain approval from this Court.

(Exhibit A at ¶ 19).

19. In light of the foregoing issues, the Monitor concluded in the Final Report that it was not necessary for a bidder to first allocate value up to the carrying value of the Current Assets. Rather, so long as an offer's cash component at least equals the approximate $90 million liquidation value of the Current Assets, then credit bids are allowed on account of all or a portion of the Fixed Assets. (Exhibit A at ¶ 20). The Black Diamond Bid complies with the Final Report by first allocating $90 million in cash to the Current Assets and $4.5 million in cash to the Fixed Assets before allocating the credit bid. On September 24, 2010, the Canadian Court approved the Monitor's position as presented in the Final Report together with the Black Diamond Bid.

20. As noted, the Minority First Lien Lenders base their argument on only a portion of the Monitor's conclusions and fail to accurately or completely present the Monitor's position as currently reflected in the Final Report. If the Minority First Lien Lenders believe that it is still

appropriate to rely upon the Monitor's report to advance arguments in this Court, they must, at a minimum, acknowledge the entire report and the Monitor's final conclusions, which contradict the Minority First Lien Lenders' assertions.

> B. *Discounting or Eliminating Black Diamond's Right to Credit Bid Would Have Precluded the Debtor From Satisfying Sections 363(e) and 363(f) of the Bankruptcy Code*

21. If the Debtor "discounted" or eliminated Black Diamond's right to credit bid, essentially allocating all value to the Current Assets while continuing to include the Fixed Assets in the Sale, the Debtor would not have been able to provide the first lien lenders with adequate protection under section 363(e) of the Bankruptcy Code or sell the Fixed Assets free and clear of liens and encumbrances under section 363(f) of the Bankruptcy Code.

22. Section 363(e) of the Bankruptcy Code provides, in pertinent part, that "[n]otwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). If the Debtor had prohibited Black Diamond from credit bidding and allowed Sixth Avenue to purchase the Fixed Assets without allocating any value to those assets, the Debtor would have failed to provide Black Diamond with the adequate protection it is entitled to receive under section 363(e) of the Bankruptcy Code. The same result would have also occurred had the Debtor allowed Sixth Avenue to purchase the Fixed Assets for an amount that was less than the amount Black Diamond had bid on the Fixed Assets, which the Sixth Avenue Bid attempted to accomplish.

23. Additionally, section 363(f) of the Bankruptcy Code provides that "[t]he trustee may sell property under subsection (b) and (c) of this section free and clear of any interest in such property of an entity other than the estate, only if (1) applicable nonbankruptcy law permits

sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in a bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f). Section 363(f)(2) appears to be the only subsection upon which the Debtor can rely. If, however, the Debtor discounted or eliminated Black Diamond's right to credit bid, Black Diamond, and therefore the agent under the First Lien Term Loan Credit Agreement, would not have consented to the sale of the Fixed Assets free and clear of its liens. .

24. Based on the above, the Black Diamond Bid provides more value than the Alternative Bid.[12] In addition, had the Debtor adopted the methodology advocated by the Minority First Lien Lenders, it would have been unable to provide Black Diamond with adequate assurance on account of its property rights and secure this Court's approval of a sale free and clear of liens and encumbrances. Accordingly, the Debtor properly exercised its reasonable business judgment in selecting the Black Diamond bid as the highest and best bid.

### III. Black Diamond Has The Right To Credit Bid Under the First Lien Term Loan Credit Agreement, Security Agreement, SISP Procedures and Bid Procedures

25. Black Diamond is vested with the requisite authority to credit bid. The Minority First Lien Lenders' argument that Black Diamond lacks the authority to credit bid ignores both the plain text of the Loan Documents and a well-developed body of caselaw regarding credit

---

[12] The Minority First Lien Lenders and Majority Second Lien Lenders argue that the Black Diamond Bid is not the highest or otherwise best bid because the Sixth Avenue Bid provides a greater recovery to unsecured creditors (Minority First Lien Lenders Objection at ¶¶ 18-19; Majority Second Lien Lenders Response at ¶ 10). The test, however, is the highest or otherwise best bid for the estate, not just for unsecured creditors. The Debtor is also entitled to consider, as part of its business judgment, risks or conditions that may prevent the debtor from confirming the transaction.

bidding rights for the following four reasons.

26. *First*, the Minority First Lien Lenders and Majority Second Lien Lenders have had no less than four opportunities to object to a credit bid by the U.S. Collateral Agent -- the U.S. SISP Hearing, the CCAA SISP Hearing, the U.S. Bid Procedures Hearing and the CCAA Bid Procedures Hearing -- and failed to do so. Having sat on their rights while the rules of the Sale were heavily negotiated by the parties and authorized by this Court and the Canadian Court, the Minority First Lien Lenders and the Majority Second Lien Lenders have no legal entitlement to now object to credit bidding.[13]

27. *Second*, the Minority First Lien Lenders contend that Black Diamond did not have the right to credit bid because section 7.1(b) of the Security Agreement does not contain the particular language that the courts in *In re GWLS Holdings, Inc.*, 2009 WL 453110 (Bankr. D. Del. Feb. 23, 2009) and *In re Metaldyne Corp.*, 409 B.R. 671 (Bankr. S.D.N.Y. 2009) relied upon in finding that the agents in those cases were authorized to credit bid under U.S. bankruptcy law. (Minority First Lien Lenders Objection at ¶¶ 23-24). The Minority First Lien Lenders, however, ignore the plain language of section 7.1(a) of the Security Agreement, which, in fact, does contain as broad, if not broader, rights than the language at issue in *GWLS* and *Metaldyne*. Section 7.1(a) of the Security Agreement provides, in pertinent part, that "[i]f any Event of Default shall have occurred and be continuing, the U.S. Collateral Agent may exercise in respect

---

[13] In addition, the Majority Second Lien Lenders previously relinquished their right to object to the U.S. Collateral Agent's right to credit bid. As stated in section 3.1(b) of that certain Second Amended and Restated Intercreditor Agreement, dated as of May 8, 2007, "[u]ntil the Discharge of First Lien Obligations has occurred, whether or not an Insolvency or Liquidation proceeding has been commenced by or against the Company or any other Grantor, subject to Section 3.1(a)(1), the First Lien Collateral Agent and the First Lien Claimholders shall have the right to enforce rights, exercise remedies (including set-off and *the right to credit bid their debt*) and make determinations regarding the release (subject to section 5.1), disposition, or restrictions with respect to the Collateral without any consultation with or the consent of the Second Lien Collateral Agent or any Second Lien Claimholder" (emphasis added).

12

of the Term Loan Collateral, *in addition to all other rights and remedies provided for herein or otherwise available to it at law or in equity . . . .*" *Id*. § 7.1(a) at 24 (emphasis added).

28. Given the breadth of rights provided to the U.S. Collateral Agent under section 7.1(a) of the Security Agreement, which cannot be read to exclude or limit the right to credit bid, Black Diamond had the right to direct the agent under the First Lien Term Loan Credit Agreement to credit bid and properly effectuated a credit bid during the Auction. *See In re Chrysler LLC,* 576 F.3d 108, 119 (2d Cir. 2009) (holding that, notwithstanding dissent of minority lenders, the collateral agent was authorized to sell assets free and clear of liens and encumbrances given the clear terms of the loan agreement provided that (a) the lenders assigned an agent to act on their behalf, (b) the agent was empowered, upon request from the majority lenders, to direct the trustee to act, and (c) the trustee was empowered, at the direction of the agent, to sell the collateral in the event of a bankruptcy); *GWLS*, 2009 WL 453110, at *5-6 (holding that the first lien agent had the authority to credit bid in accordance with section 363(k) of the Bankruptcy Code on behalf of the first lien lenders); *see also Metaldyne*, 409 B.R. at 679-80 (same).

29. *Third,* the Security Agreement states that the Agents may, "to the fullest extent permitted by applicable law . . . sell, assign, lease, license (on an exclusive or nonexclusive basis) or otherwise dispose of the Term Loan Collateral or any part thereof . . . ." (Security Agreement, § 7.1(a)(iv) at 24). In *GWLS*, Judge Walsh relied upon nearly identical language in support of his holding that the agent had the right to credit bid. *GWLS*, 2009 WL 453110, at *5 (pointing to language in the collateral agreement stating that the agent there could "dispose of or deliver the Collateral or any part thereof" and holding that that language "allows the First Lien Agent to enter into the proposed credit bid on behalf of the First Lien Lenders").

13

30. *Fourth,* the Minority First Lien Lenders argue that allowing the Agents to credit bid would require an amendment or modification of the Security Agreement. (Minority First Lien Lenders Objection at ¶¶ 29-30). The Minority First Lien Lenders, however, misread the Loan Documents. The Security Agreement contains various remedies that the Agents may exercise in the event of default. Those remedies include the right to credit bid. Therefore, directing the Agents to exercise one of the remedies that is set out in the Security Agreement does not require an amendment, supplement, or modification of the First Lien Term Loan Credit Agreement. The *Chrysler* and *Metaldyne* courts, interpreting language similar to the language in the Loan Documents, expressly rejected this precise argument. *Chrysler*, 576 F.3d at 120 ("The § 363(b) Sale did not entail amendment of any loan document."); *Metaldyne*, 409 B.R. at 678 ("[T]he sale through a credit bid does not involve or require amendment or modification of the loan documents."); *see also GWLS*, 2009 WL 453110, at *5.

31. Finally, the Minority First Lien Lenders argue that the Black Diamond Bid is not in the best interests of lenders under the First Lien Term Loan Credit Agreement because the non-cash consideration to be received as a result of Black Diamond's credit bid (a) will have no liquid market in which to be traded, (b) is without minority protections, (c) will only have recourse against the Fixed Assets located in Canada and (d) may be reduced depending on the capital structure of the purchasing entity. (Minority First Lien Lenders Objection at ¶¶ 20-22).

32. Notwithstanding the fact that these alleged infirmities are purely hypothetical given that, by the Minority First Lien Lenders' own admission, Black Diamond has yet to provide them with the terms of the proceeds they will receive on account of the credit bid (Minority First Lien Lenders Objection at ¶ 21), courts have previously determined that such intercreditor disputes are not within a bankruptcy court's jurisdiction. *See GWLS*, 2009 WL

453110, at *5-6 (declining to determine whether minority lien holder had causes of action against majority lien holders or agent on account of distribution of proceeds from sale); *Metaldyne*, 409 B.R. at 679-80 (finding that dispute over the consideration minority lenders were to receive "raises issues concerning an intercreditor dispute or a dispute between [minority lender] and the Agent, neither of which is properly before this Court at this time, if they ever could properly be brought before this Court.").

### **Waiver of Memorandum of Points and Authorities**

33. The Debtor respectfully requests that this Court treat this Omnibus Reply as a written memorandum of points and authorities or waive any requirement that this Omnibus Reply be accompanied by a written memorandum of points and authorities as described in Local Bankruptcy Rule 9013-1(G).

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court deny the Minority First Lien Lenders Objection and the Majority Second Lien Lenders Response and grant the Debtor such other and further relief as is just and reasonable.

**BEAR ISLAND PAPER COMPANY, L.L.C.**

Dated: September 28, 2010  By: */s/ Jonathan L. Hauser*
Richmond, Virginia  Of Counsel

Jonathan L. Hauser, Esquire
VSB No. 18688
Troutman Sanders LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, Virginia 23462
Telephone: (757) 687-7768
Facsimile: (757) 687-1505

- and -

Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Attorneys for the Debtor and
Debtor in Possession*