| | |
|---|---|
| Jonathan L. Hauser | Richard M. Cieri (admitted *pro hac vice*) |
| VSB No. 18688 | Christopher J. Marcus (admitted *pro hac vice*) |
| TROUTMAN SANDERS LLP | Michael A. Cohen (admitted *pro hac vice*) |
| 222 Central Park Avenue | KIRKLAND & ELLIS LLP |
| Suite 2000 | 601 Lexington Avenue |
| Virginia Beach, Virginia 23462 | New York, New York 10022-4611 |
| Telephone: (757) 687-7768 | Telephone: (212) 446-4800 |
| Facsimile: (757) 687-1505 | Facsimile: (212) 446-4900 |

*Attorneys for the Debtor and
Debtor in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BEAR ISLAND PAPER COMPANY, L.L.C.,[1] | ) Case No. 10-31202 (DOT) |
| | ) |
| Debtor. | ) |

## POST TRIAL BRIEF OF BEAR ISLAND PAPER COMPANY, L.L.C. IN SUPPORT OF ENTRY OF AN ORDER (A) AUTHORIZING AND APPROVING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE ASSIGNED CONTRACTS AND (C) GRANTING RELATED RELIEF

On September 30, 2010, this Court conducted a hearing (the "Sale Hearing") on the Debtor's Sale Motion.[2] At the conclusion of the Sale Hearing, and as clarified on a subsequent conference call, the Court requested a post trial brief (the "Post Trial Brief") addressing two questions: *first*, what is the basis for establishing that Black Diamond's Winning Bid provides a

---

[1] The last four digits of the Debtor's federal tax identification number are 0914. The principal address for the Debtor is 10026 Old Ridge Road, Ashland, Virginia 23005.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the *Motion of Bear Island Paper Company, L.L.C. for Entry of Orders Approving the (A) Form of the Sale Agreement, (B) Bidding Procedures, (C) Form and Manner of Notice of the Auction and Sale Hearing, (D) Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (E) Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and (F) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (the "Sale Motion") [Docket No. 403].

greater recovery to the Debtor's estate on account of the unencumbered assets than the estate would otherwise recover in a liquidation; and *second*, is Black Diamond's Winning Bid a proper credit bid on solely the fixed assets?

Before addressing the Court's questions, it is important to note that the Debtor commenced this sale process many months ago. From the beginning, the Bidding Procedures contemplated credit bidding by the First Lien Agent. In fact, the First Lien Agent's right to credit bid has been authorized by four separate orders entered by this Court and the Canadian Court. *See e.g.* Bidding Procedures at ¶ entitled "Credit Bidding." Proper notice was provided, and no party objected to the inclusion of the right to credit bid as part of the Bidding Procedures. The evidence establishes, and the Canadian Court has already confirmed, that the WB Group fully complied with the Bidding Procedures.

In accordance with the Bidding Procedures, Black Diamond included a credit bid component as part of its bids at the Auction. At the conclusion of the Auction, Black Diamond put forth an unconditional bid with the highest dollar amount. The Debtor, in its reasonable business judgment and in consultation with its advisors, determined that Black Diamond had the financial wherewithal to consummate the Sale, offered a bid that was not conditional, was no less certain to close than Sixth Avenue's lower valued bid and provided a greater recovery to all of the Debtor's creditors and thus, declared Black Diamond to be the Winning Bidder. Under the Court-approved Bidding Procedures, Black Diamond's Winning Bid is the highest and best bid.

The Minority First Lien Lenders are not the champions of all creditors, nor are they objecting to protect the Debtor's estate, which recovers more value under Black Diamond's Winning Bid. The Minority First Lien Lender group is actually a disgruntled bidder objecting (far too late in the process) to a credit bid that is consistent with the Bankruptcy Code, applicable

case law, the governing credit documents, the Monitor's reports, the U.S. and Canadian SISP Orders, and the U.S. and Canadian Bidding Procedures Order.

Turning to the Court's first question, the uncontroverted evidence proves that the net liquidation value of the unencumbered assets of the WB Group is no greater than $83 million. Sixth Avenue argues that the liquidation value of the unencumbered assets is approximately $160 million. This assertion is incorrect. It is based upon a valuation that improperly includes approximately $77 million in cash that the WB Group maintains on its balance sheet. That $77 million in cash should be removed from Sixth Avenue's inflated liquidation value because Black Diamond is not actually acquiring the cash; rather, all of the cash on the WB Group's balance sheet will be distributed to the creditors when the sale of the Assets to Black Diamond closes.[3] Once the $77 million is appropriately removed, it is clear that Black Diamond's Winning Bid (and even its stalking horse bid of $90 million in cash), which allocates up to $94.5 million in cash towards the unencumbered non-cash assets, exceeds the $83 million liquidation value of the non-cash unencumbered assets and provides a greater recovery to all of the Debtor's creditors.[4]

In response to the Court's second question, Sixth Avenue's arguments that the $78 million credit bid component of Black Diamond's Winning Bid (i) should not receive dollar for dollar value and (ii) was allocated to the unencumbered assets are wholly without merit. Once the Debtor is recovering at least liquidation value for the unencumbered assets, then a going-

---

[3] In accordance with Section 5.17 of the Sale Agreement, simultaneously with the closing, all cash owned by the Sellers will be used (i) to pay overage on the Cure Cost Cap (as that term is defined in the Sale Agreement); (ii) to pay all professional fess and expenses then due and owing up to and including the closing; (iii) to pay the Wind-Down Amount (as that term is defined in the Sale Agreement; and (iv) to pay amounts outstanding under that certain Senior Secured Super-Priority Debtor-In-Possession Term Loan Credit Agreement, dated March 1, 2010 (the "DIP Credit Agreement").

[4] Black Diamond's Winning Bid allocates between $90 million and $94.5 million in cash towards the unencumbered non-cash assets. At the Auction, Black Diamond increased the cash component of its bid from $90 million to $94.5 million. After payment to certain Canadian reserves, if any, all of the $94.5 million is allocated to the unencumbered assets (in no event will less than $90 million be allocable to the unencumbered assets).

concern sale is a superior alternative to liquidation. And in a going-concern sale, assets are worth what a willing buyer will pay for them — they are not automatically "worth" book value. Moreover, as discussed below, the unencumbered assets have no value above liquidation value unless they are being deployed with the fixed assets as part of the going concern business. Sixth Avenue's allegation that the unencumbered assets are "worth" book value and that Black Diamond's credit bid is therefore capturing this value is backward. It is the purchase of the fixed assets, together with the unencumbered assets, that <u>gives</u> additional value to the unencumbered assets. Once the threshold of liquidation value is surpassed, a "dollar for dollar" credit bid on the fixed assets is legally warranted and economically justified. Black Diamond's overall bid of $172.5 million returns the highest value for all assets and, therefore, should be confirmed as the Winning Bid.

**I. Black Diamond's Winning Bid Provides A Greater Recovery To Bear Island Than A Liquidation**

A. The Portion of Black Diamond's Winning Bid Attributable to the Unencumbered Assets is Greater Than Liquidation Value

1. The Canadian Monitor performed a liquidation analysis of the WB Group, including Bear Island, which provided a liquidation value for the unencumbered assets as of May 31, 2010 (the "<u>Monitor's First Report</u>"). The Court admitted the Monitor's First Report into evidence at the Sale Hearing. In addition, Mr. Jay Epstein, Bear Island's Vice President, Treasurer and Secretary, who assisted the Canadian Monitor in the preparation of this liquidation analysis, testified that while he generally agrees with the analysis, "there are certain assumptions that the Monitor made that [he] found to be aggressive and overly optimistic." (Sale Hearing Transcript ("<u>Sale Hrg. Tr.</u>") 17:13-17). This is the <u>only</u> evidence regarding liquidation value in the record and this evidence unambiguously shows that the WB Group had $155 million in non-

cash unencumbered assets and $72 million in realization costs, totaling $83 million in liquidation value for the non-cash unencumbered assets.[5] Moreover, it is fair for the Court to conclude that the $83 million is actually too high in light of Mr. Epstein's testimony regarding the aggressive and overly optimistic nature of the Monitor's liquidation analysis.

2. In arguing that the liquidation value of the WB Group's unencumbered assets is $160 million, Sixth Avenue improperly includes the $77 million in cash contained on the WB Group's May 31, 2010 balance sheet. (*See* Monitor's First Report at Appendix B, page 1). This cash cannot, and should not, be included in any bid comparison because Black Diamond will not acquire this cash when it purchases the Assets. While § 2.1.1. of the Sale Agreement includes "all cash and cash equivalents" in the definition of purchased assets in connection with the Sale, it is clear from § 5.17 of the Sale Agreement that Black Diamond will not actually acquire any of the cash on the WB Group's balance sheet on account of the Sale. This is because all of that cash is going to be distributed to creditors at closing. Section 5.17 of the Sale Agreement provides that, simultaneously with the closing, all cash owned by the Sellers will be used to (i) pay overage on the Cure Cost Cap (as that term is defined in the Sale Agreement; (ii) pay all professional fees and expenses then due and owing at closing; (iii) pay the Wind-Down Amount (as that term is defined in the Sale Agreement; and (iv) pay amounts outstanding under the DIP Credit Agreement. Irrespective of who purchases the assets, and just as the Debtor must do in a hypothetical liquidation, the Debtor will utilize the cash on its balance sheet to satisfy its obligations under the DIP Credit Agreement and to pay other priority claims. Therefore it is

---

[5] These numbers are all approximations of the numbers as contained in the Monitor's First Report. The exact denominations reported in the Monitor's First Report are: (i) non-cash unencumbered assets totaling $155,960,140; and (ii) realization costs totaling $72,541,388.

misleading to consider that cash when calculating the net liquidation value of the unencumbered assets and comparing it to Black Diamond's Winning Bid.

3. The relevant comparison is between the liquidation value of the non-cash unencumbered assets, minus any liquidation costs and the cash component of Black Diamond's Winning Bid. The net liquidation value is $83 million. The cash component of Black Diamond's Winning Bid allocable to the unencumbered assets is between $90 million and $94.5 million. This is demonstrated as follows:

**Sixth Avenue's Argument (which includes cash on the balance sheet)**



| $155 million | (-) | $72 million | (+) | $77 million | (=) | $160 million |

Non-cash unencumbered assets — Realization costs — Cash on balance sheet — Liquidation Value of all current assets

**Monitor's Liquidation Value of the Assets that Black Diamond is Buying (i.e. accounts receivable and inventory)**



$155 million (-) $72 million (=) $83 million

Non-cash unencumbered assets — Realization costs — Liquidation Value of non-cash unencumbered assets

**Black Diamond's Winning Bid on the Unencumbered Assets**



$90 million (+) $4.5 million (=) $94.5 million

Stalking horse bid for non-cash unencumbered assets — Additional cash bid at Auction — Total cash bid for non-cash unencumbered assets

4. Black Diamond's Winning Bid, which allocates up to $94.5 million in cash for the non-cash unencumbered assets, exceeds the liquidation value for those same assets.

5. Additionally, at the Bid Procedures Hearing held before Judge Huennekens on August 31, 2010, Mr. Epstein testified that Black Diamond's stalking horse bid of $90 million in cash for the unencumbered assets was a better alternative for the WB Group and its creditors than a piecemeal liquidation. (Transcript of Bid Procedures Hearing 40:9-17: "The debtor, with the assistance of its advisors, and the Canadian monitor, analyzed potential returns to creditors and the impact of a piecemeal liquidation on vendors and employees. As the result of such analysis, the debtor determined that by entering into the stalking horse agreement, the company was able to avoid the uncertainty of the impact on creditor recoveries in a piecemeal liquidation and preserve jobs, business relationships, and the value of the assets as a going concern").

6. Mr. Alan Holtz, an independent advisor to the Debtor's board of directors and a Managing Director of AlixPartners, LLP, the Debtor's restructuring advisor, testified to the same effect. (Transcript of Bid Procedures Hearing 35:24-36:8: "[B]ased on [my] involvement and [] understanding of the other alternatives available to the company as of the deadline for submission of phase two qualified bids, those being a rejection of the stalking horse bid, the resulting default under the DIP facility, and likely piecemeal liquidation of the assets, [I], in [my] independent judgment, believed that entering into the stalking horse agreement was in the best interests of the debtor's estate, and would position the debtor to maximize the value of the assets").

7. Although Sixth Avenue appeared at the Bid Procedures Hearing to object to Black Diamond's stalking horse bid and had the opportunity to cross-examine Messrs. Epstein and Holtz, it was unable to provide any evidence or offer any witness that contradicted the

superiority of Black Diamond's stalking horse bid when compared to liquidation. Accordingly, Judge Huennekens approved the stalking horse bid over Sixth Avenue's objection. *See Order Approving (A) the Form of the Sale Agreement, (B) the Bidding Procedures, (C) the Sale Notice and (D) the Assumption Procedures and Assumption Notice*, entered on September 1, 2010 [Docket No. 469].

        B.        Bear Island's Unsecured Creditors Receive a Greater
                 Recovery Under Black Diamond's Winning Bid Than Liquidation

8. Sixth Avenue's "best interest" argument is inapposite, but even if it were applicable, is also without merit. The "best interest" test, applicable under a plan proposed pursuant to section 1129 of the Bankruptcy Code, requires that creditors who vote to reject a plan must receive under a plan "not less than the amount" such creditor would receive in a hypothetical liquidation. 11 U.S.C. § 1129(a)(7). The Monitor's First Report (see chart inserted below) demonstrates that, in a liquidation scenario, Bear Island's non-priority unsecured creditors would receive zero dollars. (Monitor's First Report, Appendix B, page 1, column entitled "Bear Island"). Bear Island's unsecured creditors, therefore, <u>cannot</u> receive less than they would recover in a hypothetical liquidation.

**WHITE BIRCH PAPER COMPANY**
**ESTIMATED POSITION OF CREDITORS**
Based on a <mark>theoretical liquidation</mark> carried out at or near May 31, 2010

| | | Estimated Liquidation Value | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ASSETS | Carrying value | White Birch | Stadacona | FFSI | FFSA | Papier Masson | <mark>Bear Island</mark> | Total |
| Cash | 77,486,546 | 40,240,381 | 7,652,955 | 2,279,240 | 18,776,928 | 2,878,969 | 5,460,073 | 77,485,546 |
| Cash Collateral | 11,651,142 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Trade accts receivable | 91,076,117 | | 33,597,333 | 6,423,982 | 13,093,423 | 14,897,591 | 10,623,671 | 77,436,200 |
| Other accts receivable | 9,111,300 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Inventory | | | | | | | | 0 |
| Raw Materials and stores | 50,514,228 | 0 | 25,544,642 | 77,758 | 11,903,297 | 10,786,075 | 10,452,545 | 56,764,327 |
| Finished goods | 21,399,062 | 0 | 9,939,547 | 962,471 | 4,016,947 | 415,934 | 2,854,303 | 18,189,202 |
| Prepaid expenses | 13,321,894 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Timber deeds | 1,000 | | | | | | 0 | 0 |
| R&D tax credit receivable | 449,226 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Due from Brant Industries | 1,257,300 | 35,478 | 927,264 | 30,212 | 0 | 264,347 | 0 | 1,257,300 |
| Due from Brant Paper | 1,702 | 0 | 0 | 0 | 0 | 0 | 1,702 | 1,702 |
| Due from related companies | | 235,911 | 11,034 | 84,464 | 0 | | 0 | 311,409 |
| | | | | | | | | 0 |
| Property, plant and equipment | 1,151,721,634 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Acc. Depreciation | (863,158,652) | | | | | | | 0 |
| | | | | | | | | 0 |
| Long term investment | 537,638 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other long term asset | 1,292,842 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Investment SP Newsprint | 29,918,919 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deferred financing costs | 5,245,838 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 795,8837,738 | 40,511,770 | 77,872,785 | 6,838,127 | 47,790,595 | 29,040,915 | 29,392,495 | 233,446,687 |
| ESTIMATED REALIZATION COSTS | | | | | | | | |
| Operating disbursements - 1 month | | 0 | (24,755,858) | 0 | (11,259,504) | (10,745,938) | (5,007,124) | (51,768,522) |
| Professional fees and costs - say 10% | | (27,139) | (9,477,569) | (655,889) | (4,027,327) | (3,690,986) | (2,893,955) | (20,772,856) |
| Net asset value - estimated | 795,837,736 | 40,494,632 | 43,639,358 | 8,182,238 | 32,503,555 | 14,603,990 | 21,491,416 | 180,905,299 |
| | | | | | | | | |
| LIABILITIES | | | | | | | | |
| Employee claims (sec. 81.3, 81.4 BIA) | 2,062,616 | 7,646 | 1,185,192 | 497,245 | 16,976 | 355,558 | 0 | 2,062,616 |
| Employee claims (potential D&O claim) | 5,195,787 | | 2,373,133 | 2,315,053 | 79,034 | 1,428,566 | | 6,195,787 |
| Government claims | 0 | | 2,202,245 | | | 1,586,663 | | 3,788,908 |
| Interim financing (DIP loan) | 117,955,000 | 34,340,094 | 32,135,821 | 4,555,780 | 27,494,190 | 9,530,089 | 15,499,026 | 123,555,000 |
| Reclamation payable (509(b)(9)) | 3,222,571 | | | | | | 3,222,571 | 3,222,571 |
| Post petition Accts Payable | 8,554,467 | | | | | | 2,769,819 | 2,789,819 |
| KSH and S3i | 4,278,584 | | 0 | | 0 | | | |
| Capital leases | 1,556,585 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1st Lien secured creditor | 428,293,961 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Derivative contracts | 51,807,858 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accrued interest and service charges | 24,594,761 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accrued interest and service charges | 5,742,496 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2nd Lien secured creditor | 100,000,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total secured and preferential claims | 754,264,706 | 34,347,741 | 37,895,391 | 7,368,078 | 27,590,200 | 12,900,876 | 21,491,415 | 141,594,701 |
| | | | | | | | | |
| <mark>Amount available for distribution</mark> | | 41,573,029 | 5,136,691 | 5,742,967 | 814,160 | 4,913,465 | 1,703,115 | (0) | 19,310,597 |

9.  Moreover, the evidence demonstrates unsecured creditors will fare *far better* under Black Diamond's Winning Bid than in a liquidation. *First*, the Asset Sale Agreement itself confirms that unsecured creditors will receive a greater recovery than in a liquidation. For example, Black Diamond is assuming approximately up to $27 million of cure claims. (*See* Asset Sale Agreement at § 2.1.3(a)(ii)). These claims would be prepetition unsecured claims in a liquidation and would receive zero recovery. Under Black Diamond's Winning Bid, however, they are paid in full.

10. *Second*, the avoidance of the uncertainty of a fire sale liquidation, coupled with the preservation of jobs and trade relationships, indisputably demonstrates Black Diamond's Winning Bid is superior to a liquidation in which unsecured creditors can expect nothing. Indeed, at the Sale Hearing, Mr. Epstein testified as follows:

> Q: So in your opinion are the U.S. unsecured creditors better or worse off in the Black Diamond bid as compared to the liquidation analysis?
>
> A: It's my opinion that they're better off with the Black Diamond bid than with the liquidation.

(Sale Hrg. Tr. 25:6-10). Sixth Avenue elicited no contrary testimony from Mr. Epstein, nor offered any evidence or testimony of its own, to contradict this statement.

11. In short, every piece of evidence in the record demonstrates that, (a) the cash allocable to the unencumbered assets in Black Diamond's Winning Bid exceeds the liquidation value of those assets, and (b) Bear Island's unsecured creditors receive a greater recovery under Black Diamond's Winning Bid than a liquidation. Sixth Avenue has failed to offer this Court a shred of evidence to establish otherwise.

## II. Black Diamond's Winning Bid Contains A Valid Credit Bid Solely For The Fixed Assets

12. Black Diamond's Winning Bid, which totals $172.5 million, is comprised of a $94.5 million cash component (of which between $90 million and $94.5 million is allocable to the unencumbered assets) and a $78 million credit bid component allocable solely to the fixed assets. As the Debtor noted during both the Sale Hearing and the Auction, and as identified in the terms of Black Diamond's Winning Bid, Black Diamond *did not* credit bid on the unencumbered assets. (Transcript of the Auction Proceeding at 49 ("We increase the credit bid amount to *$78,000,000 to the credit bid allocable to the fixed assets in Canada*") (emphasis added); Transcript of the Auction Proceeding at 52 ("The Debtors in their business judgment and

after consultation with their advisors and the Monitor have selected as the highest and best bid, BD's bid of $90,000,000 in cash allocable to the current assets, $4.5 million in cash allocable to the fixed assets,[6] and *$78,000,000 credit bid allocable to all of the fixed assets in Canada.*") (emphasis added); Section 2.2.1 of Black Diamond's Winning Bid, entitled "Purchase Price," states that "the Purchaser … shall (a) cause … the Majority Lenders under the First Lien Credit Agreement to direct the Agents … to credit the amount of principal due under the Loans … due under the First Lien Credit Agreement … by *$78,000,000, solely with respect to the Assets located in Canada and pledged as security under the First Lien Credit Agreement* …." (emphasis added)).[7]

13. Sixth Avenue's arguments notwithstanding, permitting Black Diamond to credit bid on the fixed assets as part of a sale of all of the assets does <u>not</u> result in Black Diamond effectively credit bidding for unencumbered assets. *First*, the Debtor is legally required to permit Black Diamond to credit bid at any sale of the fixed assets and every dollar of such "credit" must equal a dollar of cash. *Second*, an economic analysis of the "dollar for dollar" credit bid demonstrates that credit bidding for the fixed assets does not "capture" value from

---

[6] As noted above and on the record at the Sale Hearing, the Creditors' Committee requested, and Black Diamond agreed, to allocate the additional $4.5 million of cash to the unencumbered assets to the extent not used to pay certain priority liens in Canada.

[7] Even Sixth Avenue and the majority second lien lenders recognized as much in their oppositions to the Court's approval of the Sale Motion. *Objection of Minority First Lien Lenders to Proposed Terms of Sale of Assets to BD White Birch Investment, LLC* [Docket No. 518], at ¶ 13 ("The Debtor closed the Auction after selecting the Black Diamond Group's bid … consisting of the following: (i) $90 million cash payment, allocated to the Current Assets, (ii) $4.5 million cash payment, allocated to Fixed Assets owned by the Debtor's Canadian affiliates, and (iii) *a $78 million credit bid allocated to Fixed Assets owned by the Debtor's Canadian affiliates*.") (emphasis added); *Response of Majority Second Lien Lenders in their Capacity as Unsecured Creditors to Debtor's Motion for Entry of Order Approving Sale* [Docket No. 517], at ¶ 6 (describing the composition of Black Diamond's final bid as "$90 million in cash attributable to current assets; $4.5 million in cash attributable to fixed assets; and a $78 million 'credit bid' for the purchase of *certain fixed assets*.") (emphasis added). Thus, Sixth Avenue's argument that Black Diamond's credit bid was somehow an improper credit bid on the unencumbered assets is inconsistent with admissions contained in its own pleadings. Moreover, it mischaracterizes the nature of Black Diamond's Winning Bid.

unencumbered assets; rather, purchasing the fixed assets together with the unencumbered assets is what actually <u>increases</u> the value of the unencumbered assets.

14. With respect to Black Diamond's legal entitlement to credit bid, as noted in the Omnibus Reply and on the record of the Sale Hearing, the Credit Agreement, SISP Order, Bid Procedures Order and section 363(k) of the Bankruptcy Code all authorize Black Diamond to credit bid at the Auction — a right that was never previously objected to. In addition, if the Debtor precluded Black Diamond from credit bidding on the fixed assets, it would be unable to, (a) provide Black Diamond with the adequate protection it is entitled to receive under section 363(e) of the Bankruptcy Code, and (b) sell the fixed assets free and clear of Black Diamond's liens pursuant to section 363(f) of the Bankruptcy Code.

15. Once the right to credit bid is established, the weight of authority requires that the Debtor afford dollar for dollar value to Black Diamond's credit bid up to the full face amount of the First Lien Lenders' claim. *See Cohen v. KB Mezzanine Fund II LP* (*In re SubMicron Sys. Corp.*), 432 F.3d 448, 459-60 (3d Cir. 2006) ("[T]he plain language of [section 363(k)] makes clear that the secured creditor may credit bid its *entire claim,* including any unsecured deficiency portion thereof . . . . In fact, logic demands that § 363(k) be interpreted in this way; interpreting it to cap credit bids at the economic value of the underlying collateral is theoretically nonsensical.") (*quoting In re Morgan House Gen. P'ship,* 1997 WL 50419, at *1 (E.D. Pa. Feb. 7, 1997) (emphasis in original)); *see also In re Midway Invs., Ltd.,* 187 B.R. 382, 391 n. 12 (Bankr. S.D. Fla. 1995) ("[A] secured creditor may bid in the full amount of the creditor's allowed claim, including the secured portion and any unsecured portion thereof.") (citing legislative history) (alteration in original) (internal quotation marks omitted).

16.     Credit bidding on the fixed assets simply does not equate to a *de facto* credit bid for the unencumbered assets.  Sixth Avenue's allegation that the unencumbered assets are "worth" their book value is economically irrational (not to mention legally unsupportable).  In a going-concern sale, assets are only worth what a purchaser is willing to pay for them -- assets are not, and cannot be, automatically "worth" book value.  In fact, the unencumbered assets have no value above their liquidation value <u>unless</u> they are coupled with the continued operations of the fixed assets.  For example, many raw materials are worth pennies on the dollar until they are processed into, and sold as, finished products.  Collectability of accounts receivable increases as the business continues to operate because customers know that Bear Island, as an ongoing enterprise, will enforce remedies if accounts receivable are not paid and will refuse to ship new products in the future.

17.     Mr. Epstein testified to these very facts at the Sale Hearing when explaining why the Monitor's assumptions underlying the liquidation analysis are overly optimistic.  (Transcript at Sale Hearing 20:4-12:  "Raw materials are a lot more difficult to liquidate than the finished good product would be.  And [the Monitor's] assumption, again, that we would be able to run for that 60 days, convert all the raw material that we had to finished goods, buy whatever additional raw materials were needed to balance it out and then simply close the doors 60 days later.  What they didn't take into account is how difficult it would be to maintain operations after announcing that we were liquidating and closing the business.").  In fact, any incremental value of the unencumbered assets that exceeds liquidation value is a result of selling the unencumbered assets as part of a going-concern enterprise with the fixed assets.

18.     Therefore, it cannot be the case, as Sixth Avenue argues, that Black Diamond's Winning Bid "captures" the value of the unencumbered assets with its credit bid.  In a situation

like the one here — where (i) collateral and unencumbered assets are being sold together and (ii) a secured lender seeks to submit a bid that contains both cash and credit bid components — the seller must determine a minimum amount of cash that must be allocated to the unencumbered assets. Once the purchaser meets or exceeds that minimum, there is no basis to deny the secured lender/purchaser's right to submit a credit bid for the collateral. Here, the Debtor, the Monitor and the WB Group determined that $90 million in value was the minimum amount that would have to be allocated to the unencumbered assets (in order to exceed the liquidation value of those assets) in any bid. Monitor's Final Report, at 6 ¶ 21.1.[8]

19. Black Diamond's Winning Bid contains a cash component of between $90 million and $94.5 million allocable to the unencumbered assets and thereby exceeds the liquidation value of such assets. Accordingly, there is no economic justification to require Black Diamond to continue allocating the remainder of its bid towards the unencumbered assets and there is no legal justification to prevent Black Diamond for credit bidding for its collateral. Rather, Black Diamond had the right to credit bid on the fixed assets, which, contrary to Sixth Avenue's argument, actually contributed value to the unencumbered assets. Sixth Avenue simply has it backwards.

20. In light of the foregoing, the combination of cash and credit under Black Diamond's Winning Bid, which totals $172.5 million, is higher and better than Sixth Avenue's bid of $172 million.[9] Mr. Holtz testified to this when describing his recommendation to the

---

[8] It was appropriate to establish the liquidation value of the unencumbered assets as the minimum amount that had to be bid and allocated to the unencumbered assets in any bid. This is because liquidation value is the most the sellers could reasonably expect to receive on account of the unencumbered assets if those assets were sold separate from the fixed assets.

[9] While Sixth Avenue offered a bid of $175 million, all parties agree that it must be reduced by $3 million to account for the expense reimbursement approved for Black Diamond under the stalking horse bid, for an overall value to the estate of only $172 million.

Debtor's board of directors. (Transcript of Sale Hearing 40:10-11: "I only recommended in terms of what the highest and best offer was, in terms of total value;" Transcript of Sale Hearing 40:24-25: "From the perspective of higher, the Black Diamond bid was the better of the two."). Sixth Avenue provided no evidence nor did it call a single witness regarding why their $172 million bid is higher or otherwise better than Black Diamond's $172.5 million bid.

21. Accordingly, Sixth Avenue's assertions that Black Diamond "credit bid for unencumbered assets" (i) mischaracterizes Black Diamond's Winning Bid, (ii) has no evidentiary support in the record before this Court and (iii) finds no support under the Bankruptcy Code, applicable case law or economic rationale. The Debtor, the Official Committee of Unsecured Creditors and the Canadian Monitor all support Black Diamond's bid and all agree that Sixth Avenue mischaracterized the credit bid. Further, the Canadian Court has approved Black Diamond's Winning Bid over similar objections raised by Sixth Avenue in the CCAA Cases. We ask this Court to approve Black Diamond's Winning Bid as well.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, for the reasons set forth herein, as well as in the Sale Motion, Omnibus Reply, and on the record at the Sale Hearing, the Debtor respectfully requests that the Court enter the order substantially in the form attached hereto as **Exhibit A** and grant the Debtor such other and further relief as the Court deems just and proper.

**BEAR ISLAND PAPER COMPANY, L.L.C.**

Dated: October 8, 2010　　　　　　　　By: */s/ Jonathan L. Hauser*
Richmond, Virginia　　　　　　　　　　　　　Of Counsel

Jonathan L. Hauser, Esquire
VSB No. 18688
Troutman Sanders LLP
222 Central Park Avenue
Suite 2000
Virginia Beach, Virginia 23462
Telephone:　(757) 687-7768
Facsimile:　(757) 687-1505

- and -

Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:　(212) 446-4800
Facsimile:　(212) 446-4900

*Attorneys for the Debtor and
Debtor in Possession*

## **CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the foregoing pleading was sent either electronically or by first class mail, postage prepaid, this 8th day of October, 2010, to all necessary parties.

                                                   _/s/ Jonathan L. Hauser_