IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BEAR ISLAND PAPER COMPANY, L.L.C.,[1] | ) | Case No. 10-31202 (DOT) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**ORDER (A) AUTHORIZING AND APPROVING THE SALE OF ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND
OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT
OF THE ASSIGNED CONTRACTS AND (C) GRANTING RELATED RELIEF**

Upon the *Motion of Bear Island Paper Company, L.L.C. for Entry of Orders Approving the (A) Form of the Sale Agreement, (B) Bidding Procedures, (C) Form and Manner of Notice of the Auction and Sale Hearing, (D) Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (E) Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and (F) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 403], dated August 10, 2010 (the "Sale Motion"), for entry of an order (this "Sale Order") pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"):  (a) authorizing and approving the sale of the assets free and clear of all liens, claims, encumbrances and other interests (excluding the Assumed Liabilities)[2] pursuant to the terms and conditions of that certain asset sale agreement, dated August

---

[1]  The last four digits of Bear Island Paper Company, L.L.C.'s ("Bear Island" or the "Debtor") federal tax identification number are 0914.  The principal address for the Debtor is 10026 Old Ridge Road, Ashland, Virginia 23005.

[2]  All capitalized terms used but not otherwise defined herein shall have the meanings ascribed in the Sale Agreement (as defined) and the Sale Motion, as applicable.  To the extent of any inconsistency, the Sale Agreement shall govern.

10, 2010, by and between White Birch Paper Company and certain of its subsidiaries, including the

Debtor and BD White Birch Investment LLC, as amended pursuant to *Amendment No. 1 to the*

*Asset Sale Agreement*, dated August 23, 2010 [Docket No. 437], *Amendment No. 2 to the Asset*

*Sale Agreement*, dated August 31, 2010 [Docket No. 460] and *Amendment No. 3 to the Asset Sale*

*Agreement*, dated September 22, 2010 [Docket No. 522] (as amended, the "Sale Agreement");

(b) authorizing and approving the assumption and assignment of the Assigned Contracts; and

(c) granting related relief; and the Court having entered the *Order Approving the Debtor's Sale and*

*Investor Solicitation Process and Procedures Related Thereto* on April 28, 2010 [Docket No. 234]

(the "SISP Order") and the *Order Approving (A) the Form of the Sale Agreement, (B) the Bidding*

*Procedures, (C) the Sale Notice and (D) the Assumption and Assignment Procedures* on September

1, 2010 [Docket No. 469] (the "Bid Procedures Order"); and upon adequate and sufficient notice

of the Sale Motion, Auction, the hearing held before the Court on September 30, 2010 (the "Sale

Hearing") and any other related transactions having been given in the manner directed by the Court

pursuant to the Bidding Procedures Order; and the Court having reviewed and considered (x) the

Sale Motion and all relief related thereto, (y) the objections and related responses thereto,

including the *Objection of Minority First Lien Lenders to Proposed Terms of Sale of Assets to*

*White Birch Investment LLC* [Docket No. 518], *Response of Majority Second Lien Lenders in*

*Their Capacity as Unsecured Creditors to Debtor's Motion for Entry of Order Approving Sale*

[Docket No. 517] and *Omnibus Reply of Bear Island Paper Company, L.L.C. to the (A) Objection*

*of Minority First Lien Lenders to Proposed Terms of Sale of Assets to BD White Birch Investment*

*LLC and (B) Response of Majority Second Lien Lenders in Their Capacity as Unsecured Creditors*

*to Debtor's Motion for Entry of Order Approving Sale* [Docket No. 526], and (z) the statements of

counsel and evidence presented in support of the relief requested by the Debtor at the Sale Hearing

and thereafter, including the *Post Trial Brief of Bear Island Paper Company, L.L.C. in Support of Entry of an Order (A) Authorizing and Approving the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of the Assigned Contracts and (C) Granting Related Relief* [Docket No. 548] and *Minority First Lien Lenders' Post-Hearing Submission Addressing the Issue of Credit Bidding for Unencumbered Assets* [Docket No. 549]; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtor, its estate and creditors and other parties in interest; and upon the record of the Sale Hearing and all other pleadings and proceedings in this chapter 11 case, including the Sale Motion; and after due deliberation thereon and good and sufficient cause appearing therefor,

THE COURT HEREBY FINDS AND DETERMINES THAT:[3]

## Jurisdiction, Final Order and Statutory Predicates

A.    This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief requested in the Sale Motion are sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006, 9007 and 9014 of the Bankruptcy Rules.

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  All findings of fact and conclusions of law announced by the Court at the Sale Hearing and the subsequent telephone conference held between the Court and parties in interest on October 13, 2010 at 9:00 a.m. prevailing Eastern Time in relation to the Sale Motion are incorporated herein to the extent not inconsistent herewith.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.    This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

**Notice of the Sale and Auction**

D.    Actual written notice of the Sale Motion was provided to the following parties (the "Notice Parties"):  (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to BD White Birch Investment LLC; (iv) counsel to the Postpetition Agent (as defined in the DIP Credit Agreement); (v) counsel to the agents under the First Lien Term Loan Credit Agreement; (v) counsel to the majority lenders under the Second Lien Term Loan Credit Agreement; (vii) counsel to counterparties under the Swap Agreements; (viii) the Monitor appointed in the CCAA Cases; (ix) all non-debtor counterparties to the Debtor's executory contracts and unexpired leases; (x) all persons or entities that have requested notice of the proceedings in this chapter 11 case; (xi) all parties who are known to claim liens or other interests upon the Assets; (xii) the Internal Revenue Service and (xiii) all applicable federal, state and local taxing and regulatory authorities.

E.    Notice of the auction conducted for the Sale (the "Auction") and the Sale Hearing, served on the Notice Parties on August 10, 2010, was reasonably calculated to provide all interested parties with timely and proper notice of the Auction, Sale and Sale Hearing.

F.    As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate and sufficient notice of the Sale Motion, Auction, Sale, Sale Hearing and the transactions contemplated thereby, including the assumption and assignment of the Assigned Contracts to BD White Birch Investment LLC, was provided in accordance with orders previously issued by the Court, sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014.  The notices provided by the Debtor are good, sufficient and appropriate under the circumstances, and no other or further notice of the Sale Motion,

Auction, Sale, Sale Hearing or the assumption and assignment of the Assigned Contracts to BD White Birch Investment LLC is or shall be required.

G.    The disclosures made by the Debtor concerning the Sale Motion, Sale Agreement, Auction, Sale, assumption and assignment of the Assigned Contracts to BD White Birch Investment LLC and Sale Hearing were good, complete and adequate.

H.    A reasonable opportunity to object and be heard with respect to the Sale Motion, Sale and the relief requested therein, including the assumption and assignment of Assigned Contracts to BD White Birch Investment LLC and any Cure Costs related thereto, has been afforded to all interested persons and entities, including the Notice Parties.

### This Chapter 11 Case and the Sale Process

#### *Bear Island's Business Operations and Commencement of this Chapter 11 Case*

I.    Bear Island is a Virginia limited liability company that was organized in 1997 as a wholly-owned subsidiary of White Birch Paper Company, which, along with certain other Canadian affiliates, constitutes the WB Group,[4] the second-largest newsprint producer in North America.  (*Declaration of Edward D. Sherrick, Senior Vice President and Chief Financial Officer for Bear Island Paper Company, L.L.C. in Support of the Chapter 11 Petition and First Day Pleadings* (the "Sherrick Decl.") ¶ 7 [Docket No. 4]).

J.    Bear Island employs approximately 200 of the WB Group's 1,300 total employees. (Sherrick Decl. ¶ 9).    Strategically located in Ashland, Virginia, Bear Island produces approximately 235 thousand metric tons of newsprint paper annually and services customers located in New York, Philadelphia, Baltimore and Washington, D.C.  (*Id.*).  Bear Island also

---

[4]    The WB Group consists of (a) White Birch Paper Company, (b) Stadacona General Partner Inc., (c) Stadacona Limited Partnership, (d) F.F. Soucy General Partner Inc., (e) Arrimage De Gros Cacouna Inc., (f) Papier Masson Ltee, (g) F.F. Soucy Limited Partnership, (h) F.F. Soucy Inc. & Partners, Limited Partnership and (i) Bear Island.

operates a paper machine, woodyard, pulping system, recycling facility, an on-site waste and water treatment facility, an industrial landfill for its on-site solid waste disposal, and storage and transportation facilities. (*Id.*). For the twelve months that ended December 31, 2009, Bear Island's net sales totaled approximately $125 million, which accounted for 19% of the WB Group's net sales for the same period. (*Id.*).

K.     On February 24, 2010 (the "Petition Date"), Bear Island filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. (*Official Form 1* [Docket No. 1]). Bear Island continued to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On March 3, 2010, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee for the Eastern District of Virginia (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") [Docket No. 90], which was reconstituted on April 6, 2010 [Docket No. 184].

L.     Simultaneously with the commencement of Bear Island's chapter 11 case, its indirect parent -- White Birch Paper Holding Company ("WB Holding") -- and ten of WB Holding's direct and indirect Canadian subsidiaries (collectively, the "CCAA Applicants")[5] sought relief under the *Companies' Creditors Arrangement Act* in the Quebec Superior Court of Justice (the "Canadian Court") in Montreal, Quebec, Canada (the "CCAA Cases"). Contemporaneously therewith, six of the CCAA Applicants sought relief under chapter 15 of the Bankruptcy Code in a matter styled, *In re White Birch Paper Company, et al.*, Case No. 10-31234 (DOT).[6]

### *Bear Island's Capital Structure*

---

[5]     The CCAA Applicants include (a) WB Holding, (b) White Birch Paper Company, (c) Stadacona General Partner Inc., (d) Black Spruce Paper Inc., (e) F.F. Soucy General Partner Inc., (f) 3120772 Nova Scotia Company, (g) Arrimage De Gros Cacouna Inc., (h) Papier Masson Ltee, (i) Stadacona Limited Partnership, (j) F.F. Soucy Limited Partnership and (k) F.F. Soucy Inc. & Partners, Limited Partnership.

[6]     The six chapter 15 debtors are (a) White Birch Paper Company, (b) Stadacona General Partner Inc., (c) Stadacona Limited Partnership, (d) F.F. Soucy Limited Partnership, (e) F.F. Soucy Inc. & Partners, Limited Partnership and (f) Papier Masson Ltee.

M.      As of the Petition Date, the WB Group, including Bear Island, owed the following

amounts under its respective credit and swap agreements:

1.      Approximately $428.3 million in principal and approximately $9.8 million
in interest under that certain First Lien Term Loan Credit Agreement, dated
on or about April 8, 2005 (as amended and restated on January 27, 2006 and
May 8, 2007, the "First Lien Term Loan Credit Agreement"), between
White Birch Paper Company and WB Holding, as borrowers, Credit Suisse
Securities (USA) LLC, as sole lead arranger, sole bookrunner, syndication
agent and documentation agent, Credit Suisse AG, Toronto Branch, as
Canadian collateral agent and administrative agent (the "Canadian First
Lien Term Loan Agent"), Credit Suisse AG, Cayman Islands Branch, as
U.S. collateral agent (the "U.S. First Lien Term Loan Collateral Agent,"
and, together with the Canadian First Lien Term Loan Agent, the "First Lien
Agents"), TD Securities (USA) LLC, as co-arranger and the lender parties
thereto.

2.      Approximately $100 million in principal and $4 million in interest under
that certain Second Lien Term Loan Credit Agreement, dated on or about
April 8, 2005 (as amended and restated on January 27, 2006 and May 8,
2007, the "Second Lien Term Loan Credit Agreement"), between White
Birch Paper Company and WB Holding, as borrowers, Credit Suisse
Securities (USA) LLC, as sole lead arranger, sole bookrunner, syndication
agent and documentation agent, Credit Suisse AG, Toronto Branch, as
Canadian collateral agent and administrative agent, Credit Suisse AG,
Cayman Islands Branch, as U.S. collateral agent,[7] TD Securities (USA)
LLC, as co-arranger and the lender parties thereto.

3.      Approximately $50.6 million outstanding under that certain Revolving
Credit Agreement, dated on or about March 29, 2005 (as amended and
restated on January 27, 2006 and February 26, 2008, the "Revolving ABL
Agreement"), between White Birch Paper Company, WB Holding,
Stadacona Limited Partnership, F.F. Soucy Limited Partnership, Papier
Masson Ltee and Bear Island (collectively, the "ABL Borrowers"), GE
Capital Markets Inc., as lead arranger and syndication agent, General
Electric Capital Corporation, as administrative agent, U.S. collateral agent
and documentation agent, GE Canada Finance Holding Company, as
Canadian agent and Canadian collateral agent, and the lender parties
thereto.

4.      Approximately $57.6 million outstanding under the Swap Agreements,
which consisted of (i) the ISDA 2002 Master Agreement, dated as of May
16, 2005, between White Birch Paper Company and The Toronto-
Dominion-Bank, (ii) the ISDA Master Agreement, dated as of April 13,

---

[7]      Effective as of October 2009, Credit Suisse Securities (USA) LLC, Credit Suisse AG, Toronto Branch and
Credit Suisse AG, Cayman Islands Branch, resigned as lead agent, Canadian agent and U.S. agent, respectively.

2005, between White Birch Paper Company and Credit Suisse First Boston International, and (iii) the ISDA Master Agreement, dated as of May 8, 2007, between White Birch Paper Company and Merrill Lynch Capital Services, Inc.

(Sherrick Decl. ¶¶ 11-18). Bear Island, among others, guaranteed the borrowers' obligations under the First Lien Term Loan Credit Agreement, the Second Lien Term Loan Credit Agreement and the Swap Agreements. (*Id*. ¶¶ 12, 14, 18).

N.      Specifically, pursuant to that certain First Lien Security Agreement, dated as of April 8, 2005, between Bear Island as Grantor and Credit Suisse AG, Cayman Islands Branch (F/k/ a Credit Suisse First Boston) as U.S. Collateral Agent (the "Security Agreement"), and the other Loan Documents (as defined in the First Lien Term Loan Credit Agreement), obligations under the First Lien Term Loan Credit Agreement were secured by perfected, prepetition, first-priority liens on all of the assets that comprise the "Term Loan Collateral" as defined in the Security Agreement (the "Fixed Assets" or "Collateral"). (*Id*. ¶ 12). Obligations under the Revolving ABL Agreement were secured by first priority liens and security interests on, among other things, Bear Island's inventory, accounts receivable and cash (the "Revolving ABL Collateral" or "Current Assets"). (*Id*. ¶ 16). The Swap Agreements were secured by the Collateral and liens on such collateral ranked *pari passu* with the lenders' liens under the First Lien Term Loan Credit Agreement. (*Id*. ¶ 18).[8]

### *Bear Island's Debtor in Possession Financing and Related Restructuring Milestones*

O.      Shortly after commencing this chapter 11 case, Bear Island filed the *Motion of Bear Island Paper Company, L.L.C. for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363, 364(c), 364(d) and 364(e) of the Bankruptcy Code and Rules 4001 and 9014 of the*

---

[8]      Nothing in this paragraph N or otherwise in the Sale Order shall affect the outstanding issues addressed in the *Motion of the Official Committee of Unsecured Creditors to Amend DIP Order* [Docket No. 357].

*Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtor to Obtain Secured Postpetition Financing on Super-Priority Priming Lien Basis, Granting Adequate Protection for Priming and Modifying the Automatic Stay, (B) Authorizing the Debtor to Use Cash Collateral of Prepetition Secured Lenders and Granting Adequate Protection for Use Thereof, (C) Authorizing the Debtor to Repay Existing ABL Revolver Indebtedness Upon Interim Approval and (D) Prescribing the Form and Manner of Notice and Setting the Time for the Final Hearing* (the "DIP Motion") [Docket No. 26], whereby Bear Island sought the authority to enter into that certain *$140,000,000 Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement*, dated as of March 1, 2010 (the "DIP Credit Agreement").

P.      The DIP Credit Agreement would provide a $140,000,000 delayed-draw postpetition term loan facility that would allow Bear Island and the CCAA Applicants to satisfy their obligations under the Revolving ABL Agreement as well as provide Bear Island and the CCAA Applicants with the necessary financing to operate during the course of this chapter 11 case and CCAA Cases.  (DIP Motion ¶ 20).

Q.      On March 31, 2010, the Court approved the DIP Credit Agreement and entered the *Final Order (I) Authorizing the Debtor to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Debtor's Limited Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (III) Granting Adequate Protection to Prepetition Debt Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364* [Docket No. 171] (the "DIP Order").  Following entry of the DIP Order, the WB Group, including Bear Island, satisfied its obligations under the Revolving ABL Agreement.

R.      Since entry of the DIP Order, Bear Island undertook affirmative steps to restructure its operations in accordance with the related milestones contained in the DIP Credit Agreement.

Such milestones governed Bear Island's dual-track restructuring, which required that Bear Island contemporaneously pursue (i) a chapter 11 plan of reorganization in conjunction with a plan of arrangement for the CCAA Applicants (collectively, the "Cross-Border Plan") and (ii) a going-concern sale of all or substantially all of the WB Group's assets pursuant to section 363 of the Bankruptcy Code (the "Sale").  (DIP Credit Agreement ¶ 5.19).

S.      Despite management's good-faith efforts since the Petition Date to negotiate the terms of a Cross-Border Plan, Bear Island and the CCAA Applicants were unable to satisfy the milestones under the DIP Credit Agreement related thereto, which required entry into a lock-up and plan support agreement by June 15, 2010 with lenders holding at least two-thirds of the obligations under the First Lien Term Loan Credit Agreement that was, in form and substance, acceptable to the agents and a majority of lenders under the DIP Credit Agreement.  (DIP Credit Agreement ¶ 5.19(a)(v)).  Accordingly, to comply with the terms of the DIP Credit Agreement, including the milestones regarding the Sale, Bear Island moved forward with meeting the milestones towards consummating the Sale.  (DIP Credit Agreement ¶ 5.19(b)).

### *Events Leading to Bear Island's Entry Into its Stalking Horse Agreement*

T.      On April 19, 2010, Bear Island filed the *Motion of Bear Island Paper Company, L.L.C. for Entry of an Order Approving Sale and Investor Solicitation Process and Procedures Related Thereto* (the "SISP Procedures Motion") [Docket No. 208].  The SISP Procedures Motion described, among other things, (i) the Fixed Assets and the Current Assets (collectively, the "Assets"), (ii) the process by which prospective bidders would be solicited and provided with access to due diligence materials concerning the Assets, (iii) the criteria bidders and bids must satisfy to become qualified and (iv) the manner in which bids would be solicited and negotiated. The SISP Procedures specifically provided that the agents under the First Lien Term Loan Credit

Agreement and the DIP Credit Agreement, on behalf of their respective lenders, were permitted, in their sole discretion, "to credit bid up to the full amount of any allowed secured claims under the [First Lien Term Loan Credit Agreement and DIP Credit Agreement], respectively, to the extent permitted under section 363(k) of the Bankruptcy Code and other applicable law."  (SISP Procedures ¶ "Credit Bid").

U.     On April 28, 2010, this Court entered the SISP Order.  Following entry of the SISP Order, Bear Island worked diligently towards maximizing the value of the Assets.  To that end, Bear Island, in conjunction with its advisors, including Lazard Freres & Co., LLC ("Lazard"), prepared a list of potential bidders (the "Potential Bidders") for the Assets.  Such list included both strategic and financial parties who, in Lazard's reasonable professional judgment, may have been interested in acquiring the Assets.  Bear Island and Lazard also prepared an initial offering summary (the "Teaser Letter") to notify Potential Bidders of the existence of the Sale and invite Potential Bidders to express their interest by submitting an offer to acquire all or substantially all of the Assets.  In all, Bear Island and Lazard contacted 52 Potential Bidders and provided each with a Teaser Letter and a draft confidentiality agreement (each, a "Confidentiality Agreement").

V.     From May 3, 2010 through June 30, 2010, 36 parties expressed interest in the Sale. Sixteen parties executed Confidentiality Agreements and the WB Group, including Bear Island, determined that fourteen such parties were capable of consummating the Sale (each, a "Phase I Qualified Bidder").  Each of the Phase I Qualified Bidders then received a confidential information memorandum and access to a virtual data room that contained information regarding the Assets.

W.     By June 15, 2010, the WB Group had received non-binding indications of interest from four of the Phase I Qualified Bidders regarding the purchase of all, or any portion of, the Assets.  The WB Group, including Bear Island, and its advisors evaluated these indications of

interest, and, based upon such analysis, invited two such parties (each, a "Phase II Qualified Bidder") to participate in further discussions and complete a due diligence process with respect to the Assets, with the intention that one of these parties would serve as a stalking horse bidder.

X.      From June 15, 2010 through July 15, 2010, the WB Group and its advisors engaged in active discussions with the Phase II Qualified Bidders as they conducted additional due diligence.  Each of the Phase II Qualified Bidders met with the WB Group's management and participated in site visits at various WB Group facilities in an effort to complete a comprehensive due diligence process.

Y.      By July 15, 2010, the WB Group had received one offer from BD White Birch Investment LLC[9] to purchase all or substantially all of the Assets.  This bid consisted of, *inter alia*, $90 million in cash to be allocated to the non-cash Current Assets and the assumption of certain liabilities.

Z.      From July 15, 2010 through August 10, 2010, the WB Group, with the assistance of its advisors, negotiated in good faith and at arms-length with BD White Birch Investment LLC regarding, among other things:  (i) the purchase price and net value (including assumed liabilities and other obligations to be performed or assumed by BD White Birch Investment LLC); (ii) assets to be included and excluded from the bid; (iii) issues surrounding the post-closing employment of certain of the WB Group's management and by BD White Birch Investment LLC and the terms and conditions of such employment; (iv) issues pertaining to ongoing management and operations of the business post-closing; (v) the transition services required from the WB Group post-closing and any related costs; and (vi) the likelihood and timing of consummating the Sale.

---

[9]      BD White Birch Investment, LLC (the "Purchaser") is comprised of Black Diamond Capital Management, LLC and its affiliates, Credit Suisse Loan Funding LLC and its affiliates, and Caspian Capital Advisors, LLC and its affiliates (collectively, the "Majority First Lien Lenders").  The Majority First Lien Lenders hold, in the aggregate, approximately 65.5% of the debt under the First Lien Term Loan Credit Agreement.  Accordingly, the Majority First Lien Lenders are "Majority Lenders" as that term is defined in Section 1.1 of the First Lien Term Loan Credit Agreement.

AA.    The Committee was an active participant throughout the course of these negotiations, which resulted in certain concessions on the part of BD White Birch Investment LLC and an increase in the recovery to the Bear Island estate.

BB.    Also during this time, Bear Island retained Mr. Alan Holtz, a managing director in the Turnaround and Restructuring Services division of AlixPartners, LLP, an international corporate consulting and advisory firm, to serve as an independent advisor to the Debtor's board of directors and assist the Debtor's board with its evaluation of the bids received during this process.

CC.    At the conclusion of such negotiations, on August 10, 2010, the WB Group, including Bear Island, with the support of the Committee, entered into that certain Asset Sale Agreement (the "Stalking Horse Agreement") with BD White Birch Investment LLC. Contemporaneously with the execution of the Stalking Horse Agreement, Bear Island filed the Sale Motion.

### Events Leading Up to the Bid Procedures Hearing

DD.    On August 26, 2010, the WB Group received a letter (the "August 26 Letter") from counsel for a subset of lenders[10] under the First Lien Term Loan Credit Agreement proposing to serve as the stalking horse bidder on the same terms as those embodied in the Stalking Horse Agreement, except for the following:  (i) a purchase price that included a $100 million cash component; (ii) elimination of the $2 million break-up fee; (iii) reduction of the expense reimbursement from $3 million to $1.5 million; and (iv) a four-month extension of the deadline to consummate the Sale.  This subset of lenders also proposed to replace the DIP Credit Agreement with new postpetition financing.

EE.    On August 27, 2010, the WB Group, including Bear Island, provided a letter in response to the August 26 Letter, whereby the WB Group stated that the offer provided in the

---

[10]    These lenders subsequently formed Sixth Avenue.

August 26 Letter was outside the scope of the SISP Order and that to pursue such an offer would not only cause the WB Group to be in breach of the SISP Order, but also the Stalking Horse Agreement.

FF.    Shortly thereafter, Sixth Avenue Investment Co., LLC ("Sixth Avenue"), an entity comprised of certain lenders under the First Lien Term Loan Credit Agreement, filed the *Objection of Sixth Ave. Investment Co., LLC to Motion of Bear Island Paper Company, L.L.C. for Entry of Orders Approving the (A) Form of the Sale Agreement, (B) Bidding Procedures, (C) Form and Manner of Notice of the Auction and Sale Hearing, (D) Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (E) Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and (F) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (the "Sixth Avenue Objection") [Docket No. 447], which opposed the expense reimbursement and break-up fee provided in the Stalking Horse Agreement and supported the offer provided in the August 26 Letter.[11]

### *The Bid Procedures Hearing*

GG.    On August 31, 2010, Judge Kevin R. Huennekens, sitting in for Chief Judge Douglas O. Tice, conducted a hearing (the "Bid Procedures Hearing") with respect to the approval of (i) the form of the Stalking Horse Agreement, (ii) the stalking horse bid protections, including the expense reimbursement and break-up fee, and (iii) the bid procedures (the "Bid Procedures").

HH.    The Bid Procedures sought to establish, among other things (i) the process by which a potential buyer may submit a bid to be considered at the Auction, (ii) the deadline for the submission of such bids, (iii) the time and place of, and procedures governing, the Auction, and

---

[11]    The members of Sixth Avenue are BlueMountain Capital Management and its affiliates, Steelhead Partners, LLC and its affiliates, Lombard General Insurance Company of Canada and its affiliates, Macquarie Bank Limited and its affiliates, and MFP Partners, L.P. and its affiliates.  The members of Sixth Avenue collectively own approximately 10% of the outstanding debt under the First Lien Term Loan Credit Agreement.

(iv) the procedures for the WB Group's selection of the winning bid.  The Bid Procedures also permitted the agents under the DIP Credit Agreement and the First Lien Term Loan Credit Agreement to credit bid for their respective collateral.

II.     Judge Huennekens overruled the Sixth Avenue Objection and granted Bear Island's motion.  The grounds for Judge Huenneken's ruling included (i) the importance of preserving the integrity of the procedures approved under the SISP Order, which Judge Huennekens found to provide a "fair and open process" that Bear Island had "rigorously adhered to" (Bid Pro. Hrg. Tr. 95:22-23), (ii) the potential costs that Bear Island would incur if it accepted the proposal offered in the August 26 Letter (Bid Pro. Hrg. Tr. 96:4-7), (iii) finding that the break-up fee and expense reimbursement provided under the Stalking Horse Agreement (a) brought value to the Sale by inducing the offer provided in the August 26 Letter and (b) satisfied the standard set forth in *Calpine Corp. v. O'Brien Environ. Energy, Inc. (In re O'Brien Environ. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999) (Bid Pro. Hrg. Tr. 96:13-25, 97:1-8), and (d) "the overwhelming support of the [Committee], and the fact that the [C]ommittee has looked at this, the [C]ommittee is satisfied with it, and the [C]ommittee wants to go forward . . . ."  (Bid Pro. Hrg. Tr. 97:10-12).[12]

JJ.     Accordingly, on September 1, 2010, Judge Huennekens entered the Bid Procedures Order.

### The Auction for the Sale of the Assets
### and Events Leading to the Sale Hearing

KK.     Upon entry of the Bid Procedures Order, Bear Island prepared to conduct an Auction that would maximize the value of the Assets.

LL.     In connection therewith, on September 17, 2010, Sixth Avenue presented a qualified bid for the Assets that consisted, in part, of a cash purchase price of $100 million.  In its

---

[12]     In the CCAA Cases, the Canadian Court did not approve the break-up fee provided in the Stalking Horse Agreement, and thus, such amount was not accounted for when considering bids at the auction for the Sale.

reasonable business judgment, and upon consultation with its advisors, Bear Island determined that

the Sixth Avenue bid was higher and otherwise better than the bid proposed in connection with the

Stalking Horse Agreement -- the only other qualified bid received before the September 17, 2010

bid deadline.  On September 20, 2010, Bear Island informed BD White Birch Investment LLC and

the Sixth Avenue that the Sixth Avenue qualified bid would be the starting bid at the Auction.

MM.    On September 21, 2010, Bear Island commenced the Auction for the sale of the

Assets.  The Auction was conducted in accordance, and otherwise complied in all respects, with

the Bid Procedures Order.  The Auction was duly noticed and conducted in a non-collusive, fair

and good faith manner and afforded a full, fair and reasonable opportunity for any person or entity

to make a higher or otherwise better offer to purchase the Assets.

NN.    At the conclusion of the Auction, Bear Island selected BD White Birch Investment

LLC's bid of $172.5 million (the "Black Diamond Bid" or "Winning Bid") as the highest and

otherwise best bid.  The Black Diamond Bid consisted of, *inter alia*, (a) $90 million in cash to be

allocated to the Current Assets,[13] (b) $4.5 million in cash to satisfy certain construction liens

identified in the CCAA Cases to the extent that such liens are valid,[14] (c) a $78 million credit bid,

pursuant to the First Lien Term Loan Credit Agreement, the Loan Documents and the Direction

---

[13]    Section 5.17 of the Sale Agreement provides that, simultaneously with the closing, all cash owned by the
WB Group would be used to:  (i) pay overage on the Cure Cost Cap (as that term is defined in the Sale
Agreement; (ii) pay all professional fees and expenses then due and owing at closing; (iii) pay the Wind-Down
Amount (as that term is defined in the Sale Agreement); and (iv) pay amounts outstanding under the DIP Credit
Agreement.  (Sale Agreement § 5.17).  In addition, for the avoidance of doubt, under the Sale Agreement, BD
White Birch Investment LLC is not acquiring any portion of the Cash Component of the Purchase Price.

[14]    To the extent that the construction liens are not valid, or that the entire $4.5 million is not required to satisfy
such liens, the remaining amount will be allocated to the Current Assets.

Letter,[15] to be allocated to the Fixed Assets in Canada and (d) the assumption of the Assumed Liabilities (as defined in the Stalking Horse Agreement).

OO.    Bear Island also determined that the Sixth Avenue's final bid of $175 million in cash, which, after accounting for the expense reimbursement provided to Black Diamond under the Stalking Horse Agreement, provided a net total value to the estate of $172 million, was the second highest and otherwise best bid, and thus, the alternative bid under the Bid Procedures (the "Sixth Avenue Bid"). The Sixth Avenue Bid provided that it was to be first allocated up to the book value of the Current Assets, with the remainder of the bid to be allocated to the Fixed Assets. The results of the Auction were filed with the Court in the *Notice of Winning and Alternative Bidders Pursuant to Bidding Procedures*, dated September 22, 2010 [Docket No. 503] and *Bear Island Paper Company, L.L.C.'s Supplement to the Sale Motion*, dated September 27, 2010 [Docket No. 522].

PP.    On September 24, 2010, certain lenders under the First Lien Term Loan Credit Agreement (the "Minority First Lien Lenders")[16] filed the *Objection of Minority First Lien Lenders to Proposed Terms of Sale of Assets to BD White Birch Investment LLC* [Docket No. 518].[17]

---

[15]    On September 21, 2010, the Majority First Lien Lenders sent a direction letter (the "Direction Letter") to the First Lien Agents directing the First Lien Agents to (a) credit bid up to the full amount of the WB Group's outstanding debt under the First Lien Term Loan Credit Agreement in order to acquire all or any portion of the Collateral at any sale thereof pursuant to the SISP Order and (b) appoint BD White Birch Investment, LLC as their agent and attorney-in-fact in order to execute the duties described in the Direction Letter and any duties incidental thereto, in each case with respect to making a credit bid. The First Lien Agents countersigned the Direction Letter thereby acknowledging that they were appointing BD White Birch Investment LLC as their agent and attorney in fact pursuant to the First Lien Credit Agreement and the Direction Letter. BD White Birch Investment LLC also signed the Direction Letter thereby accepting the appointment.

[16]    The Minority First Lien Lenders include BlueMountain Long/Short Credit Master Fund L.P., Blue Mountain Credit Alternatives Master Fund L.P., BlueMountain Timberline Ltd., BlueMountain Distressed Master Fund L.P., Lombard General Insurance Company of Canada, Macquarie Americas Corp., MFP Partners, L.P., Steelhead Navigator Master, L.P. and Wexford Capital LP. The Minority First Lien Lenders hold approximately $96.5 million (or 22%) of the term loans under the First Lien Term Loan Credit Facility.

[17]    Contemporaneously therewith, the "Majority Second Lien Lenders" filed the *Response of Majority Second Lien Lenders in Their Capacity as Unsecured Creditors to Debtor's Motion for Entry of Order Approving Sale* [Docket

QQ.    In response thereto, on September 28, 2010, Bear Island filed the *Omnibus Reply of Bear Island Paper Company, L.L.C. to the (A) Objection of Minority First Lien Lenders to Proposed Terms of Sale of Assets to BD White Birch Investment LLC and (B) Response of Majority Second Lien Lenders in Their Capacity as Unsecured Creditors to Debtor's Motion for Entry of Order Approving Sale* [Docket No. 526].  The next day, the Minority First Lien Lenders filed the *Supplement Objection of Minority First Lien Lenders to Proposed Terms of Sale of Assets to BD White Birch Investment, LLC* [Docket No. 532].

### The Sale Hearing

RR.    On September 30, 2010, the Court conducted the Sale Hearing to approve this Sale Order, which sought the authority to allow Bear Island to enter into the Sale Agreement.

SS.    At the conclusion of the Sale Hearing, and as further clarified on a subsequent telephone conference held on October 1st between the Court and the parties in interest, the Court requested additional briefing from Bear Island and the Minority First Lien Lenders regarding the allocation of the credit bid portion of the Black Diamond Bid.  Accordingly, on October 12, 2010, Bear Island filed the *Post Trial Brief of Bear Island Paper Company, L.L.C. in Support of Entry of an Order (A) Authorizing and Approving the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of the Assigned Contracts and (C) Granting Related Relief* [Docket No. 548] and the Minority First Lien Lenders filed the *Minority First Lien Lenders' Post-Hearing Submission Addressing the Issue of Credit Bidding for Unencumbered Assets* [Docket No. 549].

TT.    Upon the Court's review of evidence presented during the Sale Hearing and above-referenced post-trial briefs, on October 13, 2010, the Court conducted a telephonic conference

---

No. 517], asserting that the Sixth Avenue Bid was better than the Black Diamond Bid because it provided a greater recovery to unsecured creditors.  The Majority Second Lien Lenders are comprised of Dune Capital LP, Dune Capital International Ltd. and WTA Dune Limited.

whereby the Court granted the Sale Motion over the objections of the Minority First Lien Lenders

and the Majority Second Lien Lenders .

### 1. The Cash Component of the Black Diamond Bid Should Be Measured Against the Liquidation Value of the Non-Cash Current Assets

UU.      Ernst & Young, the monitor appointed by the Canadian Court in the CCAA Cases (the "Monitor"), filed its final report, dated September 23, 2010 (the "Final Report"), which, together with the First Report (defined below), was submitted by the Minority First Lien Lenders into evidence during the Sale Hearing.  In the Final Report, the Monitor stated that "[a]rguably, an enhancement in value in the Current Assets, over their liquidation value, has to be associated with a going concern, which means that the enhancement of value over the liquidation value could be attributed to the Fixed Assets component of the business."  (Final Report ¶ 19.1).

VV.      Given that the Final Report is the "best evidence" in the record before the Court (Transcript of October 13, 2010 Telephone Conference 5:7), it is appropriate to value the non-cash Current Assets at liquidation value when valuing the Black Diamond Bid.

### 2. The Cash Component of the Black Diamond Bid Exceeds Liquidation Value of the Non-Cash Current Assets

WW.      During the Sale Hearing, the Minority First Lien Lenders introduced into evidence the Monitor's August 10, 2010 report (the "First Report"), which contained a liquidation analysis of the non-cash Current Assets.  (Sale Hearing Transcript ("Sale Hrg. Tr.") 25:15-16). This liquidation analysis, which, together with testimony from Mr. Epstein was the only evidence of record concerning the liquidation value of the non-cash Current Assets, established that, as of May 31, 2010, the WB Group maintained approximately $155 million in non-cash Current Assets, which, after accounting for approximately $72 million in realization costs, nets approximately, and no more than, $83 million in liquidation value for non-cash Current Assets.  (First Report, Appendix B, page 1).

XX.       Because the cash component of the Black Diamond Bid exceeds the approximately $83 million liquidation value of the non-cash Current Assets, the Black Diamond Bid is superior to liquidation.

YY.       Additionally, the Black Diamond Bid allows Bear Island to avoid the uncertainty of a liquidation and preserve jobs and trade relationships, thereby benefiting Bear Island.

ZZ.       Counsel to the Committee also supported the Court's approval of the Black Diamond Bid as being in the best interests of the Bear Island estate and its unsecured creditors. (Sale Hrg. Tr. 76:20-22, 79:3-4).

AAA.       Based on the evidence presented, the Court concludes, consistent with the Monitor's Final Report, that the recovery to Bear Island's creditors is greater under the Black Diamond Bid than under a liquidation scenario and is in the best interests of the Bear Island estate and its creditors.

**3.       The First Lien Agents Had the Right to Credit Bid**

BBB.       Section 363(k) of the Bankruptcy Code provides that "[a]t a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchase such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).

CCC.       Here, the Court found no cause to preclude the First Lien Agents from credit bidding on some or all of the collateral under the First Lien Term Loan Credit Agreement and Loan Documents.  In fact, as referenced in paragraphs T and HH above, both the SISP Order and the Bid

Procedures Order provided the First Lien Agents with the right to credit bid pursuant to Section 363(k) of the Bankruptcy Code.

DDD.    Additionally, section 7.1(a) of the Security Agreement provides, in pertinent part, that "[i]f any Event of Default shall have occurred and be continuing, the U.S. Collateral Agent may exercise in respect of the Term Loan Collateral, *in addition to all other rights and remedies provided for herein or otherwise available to it at law or in equity* . . . all the rights and remedies of the U.S. Collateral Agent on default under the UCC (whether or not the UCC applies to the affected Term Loan Collateral) to collect, enforce or satisfy any Secured Obligations then owing, whether by acceleration or otherwise . . . ."  (Security Agreement § 7.1(a) at 24 (emphasis added)).  The Security Agreement also provides that the First Lien Agents may, "to the fullest extent permitted by applicable law . . . sell, assign, lease, license (on an exclusive or nonexclusive basis) or otherwise dispose of the Term Loan Collateral or any part thereof . . . ."  (*Id.*, § 7.1(a)(iv) at 24).

EEE.    Section 7.1(a) of the Security Agreement empowers the U.S. Collateral Agent to credit bid against the Term Loan Collateral (as defined in the First Lien Term Loan Credit Agreement).  The First Lien Agents, at the direction of the Majority First Lien Lenders, appointed BD White Birch Investment LLC as their agent and attorney in fact to credit bid at the Auction under section 9.2 of the First Lien Term Loan Credit Agreement.  BD White Birch Investment LLC submitted a credit bid at the Auction.  The credit bid was a valid and proper offer pursuant to sections 363(b) and 363(k) of the Bankruptcy Code.

4.    **The Credit Bid Component of the Black Diamond Bid Was Proper**

(i)    *The Credit Bid Was Solely on the Fixed Assets*

FFF.    BD White Birch Investment LLC credit bid on the Fixed Assets in Canada, not

the Current Assets.  (Transcript of the Auction Proceeding at 49 ("We increase the credit bid

amount to *$78,000,000 to the credit bid allocable to the fixed assets in Canada*") (emphasis

added); Transcript of the Auction Proceeding at 52 ("The Debtors in their business judgment and

after consultation with their advisors and the Monitor have selected as the highest and best bid,

BD's bid of $90,000,000 in cash allocable to the current assets, $4.5 million in cash allocable to

the fixed assets,[18] and *$78,000,000 credit bid allocable to all of the fixed assets in Canada.*")

(emphasis added); Section 2.2.1 of Black Diamond's Winning Bid, entitled "Purchase Price," states

that "the Purchaser . . . shall (a) cause . . . the Majority Lenders under the First Lien Credit

Agreement to direct the Agents . . . to credit the amount of principal due under the Loans . . . due

under the First Lien Credit Agreement . . . by *$78,000,000, solely with respect to the Assets located

in Canada and pledged as security under the First Lien Credit Agreement* . . . ." (emphasis

added)).

(ii)    *Bear Island Properly Valued BD
White Birch Investment LLC's Credit Bid*

GGG.    Bear Island valued a dollar of the credit bid component of the Black Diamond

Bid at a dollar of cash.  The weight of authority requires that credit bids be afforded dollar for

dollar value up to the full face amount of a secured creditor's claim.  *See Cohen v. KB Mezzanine

Fund II LP* (*In re SubMicron Sys. Corp.*), 432 F.3d 448, 459-60 (3d Cir. 2006) ("[T]he plain

language of [section 363(k)] makes clear that the secured creditor may credit bid its *entire claim,*

including any unsecured deficiency portion thereof . . . .  In fact, logic demands that § 363(k) be

---

[18]    As noted above and on the record at the Sale Hearing, the Committee requested, and BD White Birch
Investment LLC agreed, to allocate the additional $4.5 million of cash to the Current Assets to the extent not
used to pay certain priority liens in Canada.

interpreted in this way; interpreting it to cap credit bids at the economic value of the underlying collateral is theoretically nonsensical.") (quoting *In re Morgan House Gen. P'ship*, 1997 WL 50419, at *1 (E.D. Pa. Feb. 7, 1997) (emphasis in original)); *In re Midway Invs., Ltd.*, 187 B.R. 382, 391 n. 12 (Bankr. S.D. Fla. 1995) ("[A] secured creditor may bid in the full amount of the creditor's allowed claim, including the secured portion and any unsecured portion thereof.") (citing legislative history) (alteration in original) (internal quotation marks omitted).

HHH.    The Monitor determined that "[t]he cash component of an offer would need to be at least equal to the estimated liquidation value of the [non-cash] Current Assets, which was estimated by the Companies to be approximately US$90 million and accordingly allocated firstly to the [non-cash] Current Assets.  This value is consistent with the liquidation value referred to in the Monitor's report dated August 10, 2010, in Appendix B thereof . . . ."  (Final Report ¶ 20.1.). Given that the cash component of the Black Diamond Bid provides up to $94.5 million -- and, under no circumstances less than $90 million -- in cash to be allocated to the non-cash Current Assets, Bear Island was correct in providing BD White Birch Investment LLC with the opportunity to credit bid on the Fixed Assets and value a dollar of such credit bid at a dollar for cash.

III.    The Court concludes that Bear Island properly exercised its reasonable business judgment in selecting the Black Diamond Bid as the highest and best bid.

**Good Faith of Purchaser**

JJJ.    The Sale Agreement was negotiated, proposed and entered into by the WB Group, including Bear Island, and the Purchaser without collusion, in good faith and from arms-length bargaining positions.

KKK.    The Purchaser is not an "insider" or "affiliate" of the Debtor as those terms are defined in the Bankruptcy Code.  Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Sale Agreement to be avoided under section 363(n) of the

Bankruptcy Code.  Specifically, the Purchaser has not acted in a collusive manner with any person and the aggregate price paid by Purchaser for the Assets (the "Purchase Price") was not controlled by any agreement among the bidders.

LLL.    The Purchaser is purchasing the Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code.  Accordingly, the Purchaser is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code.  Neither the Debtor nor the Purchaser has engaged in conduct that would permit costs and damages to be imposed under Section 363(n) of the Bankruptcy Code.

### No Fraudulent Transfer

MMM.    As evidenced by Debtor's extensive marketing efforts, the consideration provided by the Purchaser pursuant to the Sale Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Assets, (iii) will provide a greater recovery to the Debtor's estate than would be provided by any other available alternative and (iv) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.  No other person, entity or group of entities has offered to purchase the Assets for greater economic value to the Debtor's estate than the Purchaser. The Debtor's determination that the Sale Agreement constitutes the highest and best offer for the Assets constitutes a valid and sound exercise of the Debtor's business judgment.  Approval of the Sale Motion and the Sale Agreement, and the consummation of the transactions contemplated thereby, is in the best interests of the Debtor, its estate, creditors and other parties in interest.

NNN.    The Purchaser is not a mere continuation of the Debtor or its estate and there is no continuity of enterprise between the Purchaser and the Debtor.  The Purchaser is not holding

itself out to the public as a continuation of the Debtor.  The Purchaser is not a successor to the Debtor or its estate and the Sale does not amount to a consolidation, merger or *de facto* merger of Purchaser and the Debtor.

**Validity of Transfer**

OOO.      The Debtor has (i) full corporate power and authority to execute and deliver the Sale Agreement and all other documents contemplated thereby, (ii) all corporate authority necessary to consummate the transactions contemplated by the Sale Agreement, and (iii) taken all corporate action necessary to authorize and approve the Sale Agreement and the consummation of the transactions contemplated thereby.  The Sale has been duly and validly authorized by all necessary corporate action.  No consents or approvals, other than those expressly provided for in the Sale Agreement, are required for the Debtor to consummate the Sale, the Sale Agreement or the transactions contemplated thereby.

PPP.      The Sale Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.  Neither the Debtor nor the Purchaser is fraudulently entering into the transaction contemplated by the Sale Agreement.

QQQ.      The Debtor and other members of the WB Group have good and marketable title to the Assets and are the lawful owners of the Assets.  Subject to section 363(f) of the Bankruptcy Code, the transfer the Assets to the Purchaser will be, as of the closing of the transactions contemplated by the Sale Agreement (the "Closing Date"), a legal, valid and effective transfer of the Assets, which transfer vests or will vest the Purchaser with all right, title and interest of the WB Group to the Assets free and clear of (i) all liens and encumbrances relating to, accruing or arising any time prior to the Closing Date (collectively, "Liens") and (ii) all debts arising under, relating to or in connection with any act of the Debtor or claims (as that term is defined in section

101(5) of the Bankruptcy Code and herein), liabilities, obligations, demands, guaranties, options,

rights, contractual commitments, restrictions, interests and matters of any kind and nature, whether

arising prior to or subsequent to the commencement of this case, and whether imposed by

agreement, understanding, law, equity or otherwise (including, without limitation, rights with

respect to Claims (as defined below) and Liens (x) that purport to give to any party a right of setoff

or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing

interest, right of first refusal, purchase or repurchase right or option, or termination of, the Debtor's

or the Purchaser's interests in the Assets, or any similar rights, or (y) in respect of taxes,

restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including any

restriction of use, voting, transfer, receipt of income or other exercise of any attributes of

ownership) (collectively, as defined in this clause (ii), "Claims"), relating to, accruing or arising

any time prior to the Closing Date, with the exception of Permitted Encumbrances and Assumed

Liabilities (as those terms are defined in the Sale Agreement).

### Section 363(f) is Satisfied

RRR.     The conditions of section 363(f) of the Bankruptcy Code have been satisfied in

full; therefore, the Debtor may sell the Assets free and clear of any interest in the property.   The

Purchaser would not have entered into the Sale Agreement and would not consummate the

transactions contemplated thereby if the Sale and the assumption of liabilities and obligations as

set forth in the Sale Agreement by the Purchaser were not free and clear of all Liens and Claims,

other than the Permitted Encumbrances and Assumed Liabilities.

SSS.     Unless otherwise expressly included in the Permitted Encumbrances or

Assumed Liabilities, the Purchaser shall not be responsible for any Liens or Claims, including in

respect of the following, unless otherwise prohibited by applicable law or statute:   (i) any labor or

employment agreements; (ii) all mortgages, deeds of trust and security interests; (iii) intercompany

loans and receivables between the Debtor and any non-debtor subsidiary, (iv) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (l) any other state or federal benefits or claims relating to any employment with the Debtor or any of its predecessors; (vi) Claims or Liens arising under any Environmental Laws with respect to any assets owned or operated by Debtor or any of its corporate predecessor at any time prior to the Closing Date and any of the Debtor's liabilities other than the Assumed Liabilities; (vii) any bulk sales or similar law; (vii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (ix) any theories of successor liability (as further defined in the Sale Agreement, the "Excluded Liabilities").

TTT.     The Debtor may sell the Assets free and clear of all Liens and Claims against the Debtor, its estate or any of the Assets (except the Assumed Liabilities and Permitted Encumbrances) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Liens or Claims against the

Debtor, its estate or any of the Assets who did not object or who withdrew their objections to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

**Compelling Circumstances for an Immediate Sale**

UUU.      Good and sufficient reasons for approval of the Sale Agreement and the Sale have been articulated.  The relief requested in the Sale Motion is in the best interests of the Debtor, its estate, its creditors and other parties in interest.   The Debtor has demonstrated (i) good, sufficient and sound business purposes and justifications for approving the Sale Agreement and (ii) compelling circumstances for the Sale outside of (a) the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code and (b) a plan of reorganization, in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Debtor's estate and the Sale will provide the means for the Debtor to maximize distributions to its creditors.

VVV.      To maximize the value of the Assets and preserve the viability of the business to which the Assets relate, it is essential that the Sale occur within the time constraints set forth in the Sale Agreement.  Time is of the essence in consummating the Sale.

WWW.      Given all of the circumstances of this chapter 11 case and the adequacy and fair value of the Purchase Price under the Sale Agreement, the proposed Sale constitutes a reasonable and sound exercise of the Debtor's business judgment and should be approved.

XXX.      The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.  The Sale neither impermissibly restructures the rights of Debtor's creditors nor impermissibly dictates a liquidating plan of reorganization for the Debtor.

YYY.     The consummation of the Sale and the assumption and assignment of the Assigned Contracts is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m) and 365 thereof.

## Adequate Assurance of Future Performance

ZZZ.     The Purchaser has demonstrated adequate assurance of future performance with respect to the Assigned Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

## General Provisions

1.     The relief requested in the Sale Motion, including the Sale, is granted and approved to the extent set forth in this Sale Order.

2.     Any objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, settled by announcement during the Sale Hearing or by stipulation filed with the Court, including any and all reservations of rights included in such objections or otherwise, are hereby denied and overruled with prejudice.  Those parties who did not object or withdrew their objections to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

## Approval of the Sale Agreement

3.     The Sale Agreement, all Ancillary Agreements and all of the terms and conditions thereof are hereby approved.  The credit bid by BD White Birch Investment is hereby approved and shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

4.     Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtor is authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale pursuant to, and in accordance with, the terms and conditions of the Sale Agreement,

(ii) close the Sale as contemplated in the Sale Agreement and this Sale Order, and (iii) execute and deliver, perform under, consummate, implement and fully close the Sale Agreement, including the assumption and assignment of the Assigned Contracts to the Purchaser, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale Agreement and the Sale.

5.      This Sale Order shall be binding in all respects upon (a) the Debtor, (b) its estate, (c) all creditors of, and holders of equity interests in, the Debtor, (d) any holders of Liens, Claims or other interests in, against or on all or any portion of the Assets (whether known or unknown), (e) the Purchaser and all successors and assigns of the Purchaser, (f) the Assets and (g) any trustees, if any, subsequently appointed in the Debtor's chapter 11 case or upon a conversion of this case to chapter 7 under the Bankruptcy Code.  This Sale Order and the Sale Agreement shall inure to the benefit of the Debtor, its estate and creditors, the Purchaser and the respective successors and assigns of each of the foregoing.

**Transfer of the Assets**

6.      Pursuant to sections 105(a), 363(b) and 363(f) of the Bankruptcy Code, the Debtor is authorized to transfer the Assets to the Purchaser on the Closing Date and such transfer shall constitute a legal, valid, binding and effective transfer of such Assets and shall vest Purchaser with title to the respective Assets and, upon the Debtor's receipt of the Purchase Price, other than Permitted Encumbrances and Assumed Liabilities, shall be free and clear of all Liens, Claims and other interests of any kind or nature whatsoever, including successor or successor in interest liability and Claims in respect of the Excluded Liabilities, with such Liens, Claims and interests to attach to the proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the Assets.  Upon the Closing, the Purchaser shall take title

to and possession of the Assets subject only to the Permitted Encumbrances and Assumed Liabilities.

7.      Except with respect to Permitted Encumbrances and Assumed Liabilities, all persons and entities that are in possession of some or all of the Assets on the Closing Date are directed to surrender possession of such Assets to the Purchaser or its assignee at the Closing.  The provisions of this Sale Order authorizing the sale of the Assets free and clear of Liens, Claims and other interests (other than the Permitted Encumbrances and Assumed Liabilities), shall be self-executing and neither the Debtor nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order.

8.      The Debtor is hereby authorized to take any and all actions necessary to consummate the Sale Agreement, including any actions that otherwise would require further approval by shareholders or its board of directors without the need of obtaining such approvals.

9.      A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any liens and other encumbrances of record except those Assumed Liabilities or Permitted Encumbrances.

10.     If any person or entity which has filed statements or other documents or agreements evidencing Liens on, or interests in, all or any portion of the Assets (other than statements or documents with respect to Permitted Encumbrances) shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all liens or interests which the person or entity has or may assert with respect to all or any portion of the Assets, the Debtor is hereby

authorized and directed, and the Purchaser is hereby authorized, on behalf of the Debtor and each

of the Debtor's creditors, to execute and file such statements, instruments, releases and other

documents on behalf of such person or entity with respect to the Assets.

11.     On the Closing Date, this Sale Order shall be construed, and shall constitute for any

and all purposes, a full and complete general assignment, conveyance and transfer of the Debtor's

interests in the Assets.  This Sale Order is and shall be effective as a determination that, on the

Closing Date, all Liens, Claims and other interest of any kind or nature whatsoever existing as to

the Assets prior to the Closing Date, other than Permitted Encumbrances and Assumed Liabilities,

shall have been unconditionally released, discharged and terminated, and that the conveyances

described herein have been effected; provided, that such Liens, Claims and other interests shall

attach to the proceeds of the Sale in the order of their priority, with the same validity, force and

effect which they now have as against the Assets.  This Sale Order is and shall be binding upon and

govern the acts of all persons and entities, including all filing agents, filing officers, title agents,

title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state and local officials, and all

other persons and entities who may be required by operation of law, the duties of their office or

contract, to accept, file, register or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any lease; and each of the

foregoing persons and entities is hereby directed to accept for filing any and all of the documents

and instruments necessary and appropriate to consummate the transactions contemplated by the

Sale Agreement.

12.     To the greatest extent available under applicable law, the Purchaser shall be

authorized, as of the Closing Date, to operate under any license, permit, registration and

governmental authorization or approval of the Debtor with respect to the Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Purchaser as of the Closing Date.

13.    To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of the Debtor's chapter 11 case or the consummation of the transactions contemplated by the Sale Agreement.

## Prohibition of Actions Against the Purchaser

14.    Except for the Permitted Encumbrances, Assumed Liabilities and rights of lenders under the First Lien Term Loan Credit Agreement as set forth in paragraph 42 herein, or as otherwise expressly provided for in this Sale Order or the Sale Agreement, the Purchaser shall not have any liability or other obligation of the Debtor arising under or related to any of the Assets.

15.    Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Sale Agreement, and unless otherwise prohibited by applicable law or statute, the Purchaser shall not be liable for any Claims against the Debtor or any of its predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including pursuant to any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger, mere continuation or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including liabilities on account of warranties, intercompany loans and receivables between the Debtor and any non-debtor subsidiary, liabilities relating to or arising from any Environmental Laws, and any taxes arising, accruing or payable under, out of, in connection with or in any way relating to the operation of any of the Assets prior to the Closing.

16.     Except with respect to Permitted Encumbrances, Assumed Liabilities and rights of lenders under the First Lien Term Loan Credit Agreement as set forth in paragraph 42 herein, all persons and entities, including all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding Liens, Claims or other interests of any kind or nature whatsoever against or in all or any portion of the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with or in any way relating to the Debtor, the Assets, the operation of the Debtor's business prior to the Closing Date or the transfer of the Assets to the Purchaser, hereby are forever barred, estopped and permanently enjoined from asserting against the Purchaser, any of their affiliates, their successors or assigns, their property or the Assets, such persons' or entities' Liens, Claims or interests in and to the Assets, including, the following actions:  (a) commencing or continuing in any manner any action or other proceeding against the Purchaser, any of its affiliates, its successors, assets or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Purchaser, any of its affiliates, its successors, assets or properties; (c) creating, perfecting or enforcing any Lien or other Claim against the Purchaser, any of its affiliates, its successors, assets or properties; (d) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Purchaser, any of its affiliates or successors; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order, other orders of the Court, the Sale Agreement or actions contemplated or taken in respect thereof; or (f) revoking, terminating, failing or refusing to transfer or renew any license, permit or authorization to operate any of the Assets or conduct any of the businesses operated with the Assets.

17.     On the Closing Date, or as soon as possible thereafter, each creditor is authorized and directed, and the Purchaser is hereby authorized, on behalf of each of the Debtor's creditors, to execute such documents and take all other actions as may be necessary to release Liens, Claims and other interests in or on the Assets (except Permitted Encumbrances and Assumed Liabilities), if any, as provided for herein, as such Liens may have been recorded or may otherwise exist.

18.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Assets to the Purchaser in accordance with the terms of the Sale Agreement and this Sale Order.

19.     The Purchaser has given substantial consideration under the Sale Agreement for the benefit of the Debtor, its estate and creditors.  The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Claims and Liens pursuant to this Sale Order, including under Paragraphs 14-18 hereof, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Liens against or interests in, or Claims against the Debtor or any of the Assets, other than holders of Liens or Claims relating to the Assumed Liabilities and Permitted Encumbrances.  The consideration provided by the Purchaser for the Assets under the Sale Agreement is fair and reasonable and accordingly the purchase may not be avoided under section 363(n) of the Bankruptcy Code.

20.     Effective as of the Closing, the Purchaser, its successors and assigns, shall be designated and appointed the Debtor's true and lawful attorney and attorneys, with full power of substitution, in the Debtor's name and stead, on behalf of and for the benefit of the Purchaser, its successors and assigns, for the sole and limited purposes as follows:  have the power to demand and receive from any third party any and all of the Assets and to give receipts and releases for and in respect of the Assets, or any part thereof, and from time to time to institute and prosecute against

third parties for the benefit of the Purchaser, its successors and assigns, any and all proceedings at

law, in equity or otherwise, which the Purchaser, its successors and assigns, may deem proper for

the collection or reduction to possession of any of the Assets.

### Assumption and Assignment of Assigned Contracts

21.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and

conditioned upon the closing of the Sale, the Debtor's assumption and assignment to the Purchaser,

and the Purchaser's assumption on the terms set forth in the Sale Agreement, of the Assigned

Contracts is hereby approved and the requirements of section 365(b)(1) of the Bankruptcy Code

with respect thereto are hereby deemed satisfied.

22.     The Debtor is hereby authorized and directed in accordance with sections 105(a),

363 and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the

Closing Date of the Sale, the Assigned Contracts free and clear of all Claims, Liens or other

interests of any kind or nature whatsoever and (b) execute and deliver to the Purchaser such

documents or other instruments as may be necessary to assign and transfer the Assigned Contracts

to the Purchaser.

23.     The Assigned Contracts shall be transferred to, and remain in full force and effect

for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any

provision in any such Assigned Contract (including those of the type described in sections 365(b)

(2) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or

transfer.   In addition, pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be

relieved from any further liability with respect to the Assigned Contracts after such assignment to,

and assumption by, the Purchaser, except as provided in the Sale Agreement.

24.    All defaults or other obligations of the Debtor under the Assigned Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured pursuant to the terms of the Sale Agreement on the Closing Date or as soon thereafter as reasonably practicable.

25.    To the extent a counterparty to an Assigned Contract failed to timely object to a Cure Amount, such Cure Amount shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the Cure Amount at any time, and such Cure Amount, when paid, shall completely revive any Assigned Contract to which it relates.  No sections or provisions of any Assigned Contract that purport to provide for additional payments, penalties, charges or other financial accommodations in favor of the non-debtor third party to the Assigned Contracts shall have any force and effect with respect to the Sale and assignments authorized by this Sale Order.  Such provisions constitute unenforceable, anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code.  No assignment of any Assigned Contract pursuant to the terms of the Sale Agreement shall in any respect constitute a default under any Assigned Contract.  The non-debtor party to each Assigned Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code and the Purchaser shall enjoy all of the Debtor's rights and benefits under each such Assigned Contract as of the applicable date of assumption without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof.

26.      With respect to objections to any Cure Amounts that remain unresolved as of the Sale Hearing, such objections shall be resolved in accordance with the procedures set forth in the Bidding Procedures Order.

27.      Nothing in this Sale Order, the Sale Motion or in any notice or any other document is or shall be deemed an admission by the Debtor that any contract is an executory contract or must be assumed and assigned pursuant to the Sale Agreement or in order to consummate the Sale.

28.      The failure of Debtor or Purchaser to enforce at any time one or more terms or conditions of any Contract shall not be a waiver of such terms or conditions or of the Debtor's and Purchaser's rights to enforce every term and condition of such Contract.

29.      All parties to the Assigned Contracts are forever barred and enjoined from raising or asserting against the Purchaser any assignment fee, default, breach, Claim, pecuniary loss or condition to assignment arising under or related to the Assigned Contracts existing as of the Closing or arising by reason of the Closing, except for any amounts that are Assumed Liabilities.

### Other Provisions

30.      This Sale Order, the Sale Agreement and the Ancillary Agreements shall be binding in all respects upon all creditors and equity-holders of the Debtor, all non-debtor parties to the Assigned Contracts, all successors and assigns of the Debtor and its affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Debtor's chapter 11 case or upon a conversion of this case to chapter 7 under the Bankruptcy Code.  The Sale Agreement and the Ancillary Agreements shall not be subject to rejection or avoidance under any circumstances.

31.      The Sale Agreement and the Ancillary Agreements may be modified, amended or supplemented by the parties thereto, in a writing signed by the parties and in accordance with the

terms thereof, without further order of the Court, provided that any such modification, amendment

or supplement does not have a material adverse effect on the Debtor's estate.

32.    Except to the extent expressly included in the Assumed Liabilities, or by applicable

law or statue, the Purchaser and its affiliates shall have no liability, obligation or responsibility

under the WARN Act (29 U.S.C. §§ 210 *et seq.*), the Comprehensive Environmental Response

Compensation and Liability Act or any foreign, federal, state or local labor, employment or

Environmental Law by virtue of the Purchaser's purchase of the Assets or assumption of the

Assumed Liabilities.

33.    On the Closing Date, prior to payment or repayment of any other claims, interests

or obligations of the Debtor, other than the Carve-Out (as defined under the DIP Credit Agreement)

if triggered, all outstanding Obligations (as defined in the DIP Credit Agreement) owed by the

Debtor under the DIP Credit Agreement will be paid in full and in cash from the proceeds of the

Sale pursuant to the Sale Agreement (expressly excluding any prepayment fee contemplated under

the DIP Credit Agreement).

34.    The consideration provided by the Purchaser to the Debtor pursuant to the Sale

Agreement for the Assets constitutes reasonably equivalent value and fair consideration under the

Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and

under the laws of the United States, any state, territory, possession or the District of Columbia.

35.    The transactions contemplated by the Sale Agreement are undertaken by the

Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the

Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization

provided herein to consummate the Sale shall not affect the validity of the Sale, unless such

authorization and such Sale are duly stayed pending such appeal.  The Purchaser is a good faith

buyer within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

36.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) this chapter 11 case, (b) any subsequent chapter 7 case into which this chapter 11 case may be converted or (c) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the Sale Agreement or the terms of this Sale Order.

37.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

38.     The failure to specifically include any particular provision of the Sale Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sale Agreement be authorized and approved in its entirety; provided, however, that this Sale Order shall govern if there is any inconsistency between the Sale Agreement (including all Ancillary Agreements) and this Sale Order.   Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

39.     The Court shall retain jurisdiction to, among other things, interpret, implement and enforce the terms and provisions of this Sale Order and the Sale Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Assets to Purchaser, (b) interpret, implement and enforce the provisions of this Sale Order, (c) protect Purchaser against any Liens, Claims or other interest in or against the Debtor or the

Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (d) enter any

orders under section 363 or 365 of the Bankruptcy Code with respect to the Assigned Contracts.

40.    Any amounts payable by the Debtor under the Sale Agreement shall (a) be paid in

the manner provided in the Sale Agreement without further order of this Court, (b) be allowed

administrative claims in an amount equal to such payments in accordance with sections 503(b) and

507(a)(2) of the Bankruptcy Code, (c) have the other protections provided in the Bidding

Procedures Order and (d) not be discharged, modified or otherwise affected by any reorganization

plan for the Debtor, except by an express agreement with Purchaser, its successors or assigns.

41.    Nothing in this Sale Order or the Sale Agreement releases, nullifies, precludes or

enjoins the enforcement of any liability to a governmental unit under police or regulatory statutes

or regulations that any entity would be subject to as the owner or operator of property after the date

of entry of this Sale Order.   Nothing in this Sale Order or the Sale Agreement authorizes the

transfer to the Purchaser of any license, permit, registration or government authorization or

approval without the Purchaser's compliance with all applicable legal requirements under non-

bankruptcy law governing such transfers.

42.    Except for claims or causes of action specifically challenging (a) the right of the

First Lien Agents and the Purchaser to credit bid the claims of all lenders under the First Lien Term

Loan Credit Agreement pursuant to the First Lien Term Loan Credit Agreement, the Loan

Documents and the Direction Letter and (b) the sale and transfer of the Assets to the Purchaser free

and clear of any liens and interests and in accordance with the Sale Agreement, nothing in the Sale

Agreement (including Ancillary Agreements), or this Sale Order, is intended to limit or in any way

impair the rights or remedies of any of the agents or lenders under the First Lien Term Loan Credit

Agreement or DIP Credit Agreement, including, without limitation, each of the Minority First Lien

Lenders with respect to potential claims and causes of action against the Postpetition Agent, any agent under the First Lien Term Loan Credit Agreement, the other lenders under the First Lien Term Loan Credit Agreements, the Purchaser and/or its affiliates (or the defenses and counterclaims of such parties).

43.    Nothing in the Sale Agreement (including Ancillary Agreements), or this Sale Order, is intended to limit or in any way impair the indemnification and exculpation rights of the First Lien Agents under the First Lien Term Loan Credit Agreement, the Loan Documents and Direction Letter and of the Pospetition Agent and other agents under the DIP Credit Agreement, related loan documents and the DIP Order.

44.    Nothing in the Sale Agreement (including Ancillary Agreements) or this Sale Order shall dictate how the proceeds from or equity in the Assets should be distributed among the lenders under the First Lien Term Loan Credit Agreement.

45.    Pursuant to the Bid Procedures Order, the Deposit of the Alternative Bidder shall be promptly returned to the Alternative Bidder upon the earlier of (i) the closing of the sale contemplated by the Sale Agreement to the Winning Bidder, and in any event within four business days thereafter, and (ii) the withdrawal of the assets for sale thereunder by the Debtor and the other members of the WB Group.

46.    All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

47.    Pursuant to Bankruptcy Rules 6004(h) and 6006(d), effectiveness of this Sale Order is stayed for a period of 14 days from the date on which this Sale Order is entered.

48.    To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Sale Motion in this chapter 11 case, the terms of this Sale Order shall govern.

49.     The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of

law in connection with the Sale Motion is hereby waived.


Dated: _____, 2010
          Richmond, Virginia

                                        _____
                                        Chief Judge Douglas O. Tice, Jr.
                                        United States Bankruptcy Judge

I ASK FOR THIS:

 /s/ Jonathan L. Hauser
Jonathan L. Hauser
VSB No. 18688
**TROUTMAN SANDERS LLP**
222 Central Park Avenue

Suite 2000
Virginia Beach, Virginia 23462
Telephone:      (757) 687-7768
Facsimile:      (757) 687-1505

- and -

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (admitted *pro hac vice*)
Christopher J. Marcus (admitted *pro hac vice*)
Michael A. Cohen (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

*Attorneys for the Debtor and
Debtor in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

    /s/ Jonathan L. Hauser