**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| BEAR ISLAND PAPER COMPANY, L.L.C.,[1] | ) | Case No. 10-31202 (DOT) |
| | ) | |
| Debtor. | ) | **Hearing Date:  November [22], 2011** |
| | ) | **Objection Deadline:  November [14], 2011** |

**PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**THIS CHAPTER 11 PLAN IS BEING SUBMITTED FOR
APPROVAL BY THE BANKRUPTCY COURT.  THIS CHAPTER 11 PLAN
HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  ACCORDINGLY, THIS IS
NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE CHAPTER 11
PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE,
11 U.S.C. § 1125.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL
A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

**TROUTMAN SANDERS LLP**
222 Central Park Avenue
Suite 2000
Virginia Beach, Virginia 23462
Telephone:      (757) 687-7768
Facsimile:      (757) 687-1505

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022–4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Co-Counsel for the Debtor and Debtor in Possession

Dated:  August 24, 2011

---

[1] The last four digits of the Debtor's federal tax identification number are 0914.  The principal address for the Debtor is 10026 Old Ridge Road, Ashland, Virginia 23005.

# **TABLE OF CONTENTS**

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND
DEFINED TERMS ....................................................................................................................1
    A.      Rules of Interpretation, Computation of Time and Governing Law ..................................1
    B.      Defined Terms .................................................................................................................1

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS..........................9
    A.      Administrative Claims ....................................................................................................9
    B.      Priority Tax Claims .......................................................................................................10

ARTICLE III. CLASSIFICATION OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR ....................11
    A.      Summary ......................................................................................................................11
    B.      Classification and Treatment of Claims and Equity Interests .......................................11

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN .............................................13

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ...........................................13
    A.      Approval of Estate Allocation.......................................................................................13
    B.      Continuing Existence ....................................................................................................13
    C.      Vesting of Assets in Liquidating BIPCo .......................................................................13
    D.      Plan Administrator ........................................................................................................14
    E.      Fees and Expenses of Liquidating BIPCo .....................................................................17
    F.      Dissolution of Creditors' Committee ............................................................................18
    G.      Creation of the Wind Down Creditors' Committee .......................................................18
    H.      Fees and Expenses of the Wind Down Creditors' Committee .......................................18
    I.      Liability and Indemnification of the Wind Down Creditors' Committee .......................18
    J.      Preservation of the Remaining Causes of Action ..........................................................19
    K.      Directors and Officers ..................................................................................................19
    L.      Wind Down and Dissolution of the Debtor....................................................................19

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..............................................20
    A.      General Settlement of Claims .......................................................................................20
    B.      Initial Distribution Date ................................................................................................20
    C.      Interim Distributions on Account of Allowed Claims ....................................................20
    D.      Final Distributions on Allowed Claims..........................................................................20
    E.      Administrative Fund and Disputed Claims Reserve ......................................................20
    F.      Record Date for Distributions .......................................................................................21
    G.      Delivery of Distributions ..............................................................................................21
    H.      Surrender of Canceled Instruments and Securities.........................................................22
    I.      Manner of Cash Payments Under this Plan ...................................................................22
    J.      Time Bar to Cash Payments by Check............................................................................22
    K.      Compliance with Tax Requirements ..............................................................................23
    L.      Interest on Claims ........................................................................................................23
    M.      Setoff and Recoupment ................................................................................................23

ARTICLE VII. PROCEDURES FOR RESOLVING  CONTINGENT, UNLIQUIDATED AND
DISPUTED CLAIMS...............................................................................................................24
    A.      Resolution of Disputed Claims .....................................................................................24
    B.      Disallowance of Claims ................................................................................................25
    C.      Amendments to Claims .................................................................................................25
    D.      No Distributions Pending Allowance.............................................................................25
    E.      Distributions After Allowance ......................................................................................25

ARTICLE VIII. TREATMENT OF EXECUTORY  CONTRACTS AND UNEXPIRED LEASES ........................25
    A.    Rejection of Executory Contracts and Unexpired Leases ................................................25
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.......................26

ARTICLE IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ..........................................26
    A.    Conditions..........................................................................................................................26
    B.    Waiver of Conditions ........................................................................................................27

ARTICLE X. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS...................27
    A.    Compromise and Settlement .............................................................................................27
    B.    Releases .............................................................................................................................27
    C.    Exculpation .......................................................................................................................29
    D.    Injunction ..........................................................................................................................29

ARTICLE XI. BINDING NATURE OF PLAN ...................................................................................30

ARTICLE XII. RETENTION OF JURISDICTION................................................................................31

ARTICLE XIII. MISCELLANEOUS PROVISIONS ............................................................................32
    A.    Modification of Plan .........................................................................................................32
    B.    Revocation of Plan ............................................................................................................32
    C.    Successors and Assigns......................................................................................................32
    D.    Reservation of Rights ........................................................................................................32
    E.    Payment of Statutory Fees ................................................................................................32
    F.    Section 1125(e) Good-Faith Compliance .........................................................................32
    G.    Further Assurances............................................................................................................33
    H.    Severability .......................................................................................................................33
    I.    Service of Documents .......................................................................................................33
    J.    Filing of Additional Documents........................................................................................34

K&E 18129368.18

## EXHIBITS

**Exhibit A**          **Plan Administrator Agreement [TO COME]**

**Exhibit B**          **Estate Allocation [TO COME]**

i

---

**PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

Bear Island Paper Company, L.L.C., as the debtor and debtor in possession in the above-captioned Chapter 11 Case, hereby respectfully proposes the following plan of liquidation under chapter 11 of the Bankruptcy Code.

# ARTICLE I.

### RULES OF INTERPRETATION, COMPUTATION OF TIME,
### GOVERNING LAW AND DEFINED TERMS

*A.      Rules of Interpretation, Computation of Time and Governing Law*

1.      For purposes of this document:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words ''herein,'' ''hereof'' and ''hereto'' refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.      The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

3.      Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Virginia, without giving effect to the principles of conflict of laws thereof.

*B.      Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Administrative Claims*" means Claims that have been timely Filed before the Administrative Claims Bar Date for costs and expenses of administration under sections 507(a)(2) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the Debtor's business (such as wages, salaries or commissions for services and payments for goods and services); (b) Professional Fee Claims; (c) DIP Credit Facility Claims; and (d) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

2.      "*Administrative Claims Bar Date*" means the date that is thirty-five (35) days after the Effective Date, by which date the holders of Administrative Claims must file proof of such claims.

3.      "*Administrative Claims Bar Date Motion*" means the *Motion of Bear Island Paper Company L.L.C. for the Entry of an Order Pursuant to Bankruptcy Code Sections 105 and 503, and Bankruptcy Rules 2002, 3003 and 9007, (A) Setting an Administrative Claims Bar Date and Procedures for Filing and Objecting to Administrative Claims Requests, and (B) Approving the Form and Manner of Notice Thereof*, dated February 22, 2011 [Docket No. 719].

4. "*Administrative Claims Bar Date Order*" means the *Order Pursuant to Bankruptcy Code Sections 105 and 503, and Bankruptcy Rules 2002, 3003 and 9007, (A) Setting an Administrative Claims Bar Date and Procedures for Filing and Objecting to Administrative Claims Requests, and (B) Approving the Form and Manner of Notice Thereof*, entered on March 29, 2011 [Docket No. 774].

5. "*Administrative Fund*" means [●].

6. "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

7. "*Allowed*" means, with respect to any Claim, and except as otherwise provided herein, a Claim that: (a) the Debtor scheduled in a liquidated, undisputed and non-contingent amount; (b) is evidenced by a valid Proof of Claim and as to which the Debtor or other party in interest has not Filed an objection by the Claims Objection Bar Date; or (c) is Allowed pursuant to this Plan or any stipulation approved by, or order of, the Bankruptcy Court.

8. "ASA" means that certain *Asset Sale Agreement*, dated as of August 10, 2010 (as amended or modified from time to time), by and among BD White Birch Investment LLC, as purchaser, and the Debtor, White Birch Paper Company, Stadacona General Partner, Inc., Stadacona L.P., F.F. Soucy General Partner Inc., F.F. Soucy, Inc. & Partners, Limited Partnership, F.F. Soucy L.P., Arrimage de Gros Cacouna Inc. and Papier Masson Ltée, as sellers.

9. "*Assets*" means all of the rights, title and interest of Liquidating BIPCo in, to and under any and all of its remaining assets and property, whether tangible, intangible, real or personal, of any nature whatsoever, including all property of the Estate under and pursuant to section 541 of the Bankruptcy Code, including Cash, the Debtor's portion of the Estate Allocation, the Remaining Causes of Action, rights and interests in property, and files, books and records of the Estate, in each case other than the Purchased Assets.

10. "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code.

11. "*Ballot*" means such ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote on this Plan shall, among other things, indicate their acceptance or rejection of this Plan in accordance with this Plan and the procedures governing the solicitation process.

12. "*Bankruptcy Code*" means title 11 of the United States Code, as may be amended from time to time.

13. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division.

14. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to this Chapter 11 Case and the Bankruptcy Court's general, local and chambers rules.

15. "*Bar Date Order*" means that certain *Order (A) Establishing Bar Dates for Filing Proofs of Claim, Including for Claims Pursuant to Section 503(b)(9) of the Bankruptcy Code; (B) Approving the Form and Manner for Filing Proofs of Claim; and (C) Approving Notice of the Bar Dates*, entered on May 13, 2010 [Docket No. 260].

16. "*Brant Industries*" means Brant Industries, Inc. and its owners, officers, employees and affiliates.

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

2

18.     "*Canadian Sellers*" means, collectively, White Birch Paper Company, Stadacona General Partner Inc., Stadacona L.P., F.F. Soucy General Partner Inc., F.F. Soucy, Inc. & Partners, L.P., F.F. Soucy L.P., Arrimage de Gros Cacouna Inc. and Papier Masson Ltée.

19.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

20.     "*CCAA Cases*" means the proceedings commenced on February 24, 2010 by White Birch Paper Company, White Birch Paper Holding Company, Stadacona General Partners Inc., Stadacona L.P., F.F. Soucy General Partner Inc., F.F. Soucy, Inc. & Partners, Limited Partnership, F.F. Soucy L.P., Arrimage de Gros Cacouna Inc., Papier Masson Ltée, Black Spruce Paper Inc. and 3120772 Nova Scotia Company in the Quebec Superior Court, District of Montreal under the *Companies' Creditors Arrangement Act*.

21.     "*Certificate*" means any instrument evidencing a Claim or an Equity Interest.

22.     "*Chapter 11 Case*" means this chapter 11 case captioned, *In re Bear Island Paper Company, L.L.C.*, Case No. 10-31202 (DOT).

23.     "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

24.     "*Claims Objection Bar Date*" means the deadline for objecting to Claims, which shall be the date that is sixty (60) days after the Effective Date, unless extended by an order of the Bankruptcy Court upon notice and a hearing.

25.     "*Claims Register*" means the claims register maintained by the Voting and Claims.

26.     "*Class*" means a category of Holders of Claims or Equity Interests pursuant to section 1122(a) of the Bankruptcy Code.

27.     "*Confirmation*" means the entry of the Confirmation Order on the docket of this Chapter 11 Case, subject to satisfaction or waiver of all conditions specified therein.

28.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of this Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

29.     "*Confirmation Hearing*" means the hearing before the Bankruptcy Court on the motion for entry of the Confirmation Order.

30.     "*Confirmation Hearing Notice*" means the written notice provided to Holders of Claims and Equity Interests which includes, among other things:  (a) the Record Date; (b) procedures for the temporary allowance of Claims; (c) the Plan Objection Deadline; and (d) the date and time of the Confirmation Hearing.

31.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

32.     "*Creditors' Committee*" means the official committee of unsecured creditors for this Chapter 11 Case appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code on March 3, 2010, which was reconstituted on April 6, 2010.

33.     "*Creditors' Committee Avoidance Causes of Action*" means those claims and causes of action for which the Creditors' Committee obtained standing to assert on behalf of the Estate pursuant to that certain *Stipulated Order Granting the Official Committee of Unsecured Creditors Standing to Prosecute Actions on Behalf of the Debtor's Estate*, entered on December 23, 2010 [Docket No. 653].

3

34.     "*Creditor Fund*" means:  (a) the Debtor's share of the Estate Allocation; (b) proceeds, if any, from the settlement or prosecution of the Creditors' Committee Avoidance Causes of Action; (c) proceeds, if any, from the sale, settlement or prosecution of the Remaining Causes of Action; and (d) proceeds, if any, from the Wind Down; provided, however, that neither the Prepetition Senior Collateral nor the proceeds thereof shall constitute or be deemed to constitute any portion of the Creditor Fund, and all such proceeds of the Prepetition Senior Collateral shall be distributed to the First Lien Credit Facility Agent in accordance with Article III.B.2 hereof.

35.     "*Debtor*" or "*Debtor in Possession*" means Bear Island Paper Company, L.L.C.

36.     "*DIP Agent*" means Credit Suisse AG, Toronto Branch, as administrative agent and Canadian collateral agent under the DIP Credit Facility.

37.     "*DIP Credit Facility*" means that certain $140,000,000 *Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement*, dated as of March 1, 2010 (as amended or modified from time to time), by and among White Birch Paper Holding Company, as guarantor, White Birch Paper Company, Stadacona L.P., F.F. Soucy L.P., Papier Masson Ltée, and Bear Island Paper Company, L.L.C., as borrowers, Credit Suisse AG, Toronto Branch, as administrative agent and Canadian collateral agent, Black Diamond Commercial Finance, L.L.C., as syndication agent, Credit Suisse AG, Toronto Branch and Black Diamond Commercial Finance, L.L.C., as lead arrangers, Credit Suisse AG, as U.S. collateral agent, and the several lender parties thereto.

38.     "*DIP Credit Facility Claim*" means a Claim arising under or in connection with the DIP Credit Facility.

39.     "*DIP Lenders*" mean, collectively, the lenders under the DIP Credit Facility.

40.     "*Disclosure Statement*" means the disclosure statement relating to this Plan, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

41.     "*Disclosure Statement Order*" means the Final Order of the Bankruptcy Court approving the Disclosure Statement.

42.     "*Disputed*" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest: (a) listed on the Schedules as unliquidated, Disputed or contingent, unless a Proof of Claim has been timely Filed; (b) as to which the Debtor or Liquidating BIPCo has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules; or (c) otherwise Disputed by the Debtor or Liquidating BIPCo in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

43.     "*Disputed Claim*" means any Claim that is not yet Allowed.

44.     "*Disputed Claims Reserve*" means the reserve established from the Creditor Fund and maintained by Liquidating BIPCo or the Plan Administrator, as applicable, to hold Cash to be distributed to Holders of Allowed Claims pending resolution of Disputed Claims.

45.     "*Distribution*" means the distribution of Cash or other Assets, as the case may be, by the Debtor, Liquidating BIPCo or the Plan Administrator, as applicable, in accordance with this Plan.

46.     "*Distribution Date*" means the date on which a Distribution is effected.

47.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to the Effective Date have been either satisfied or waived.

48.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

4

49.    "*Equity Interest*" means any share of common stock, preferred stock or other instrument evidencing an ownership interest in the Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in the Debtor that existed immediately prior to the Effective Date.

50.    "*Estate*" means the estate of the Debtor created on the Petition Date by section 541 of the Bankruptcy Code.

51.    "*Estate Allocation*" means the allocations set forth on **Exhibit B** hereto, which allocates (a) the proceeds from the Sale Closing to the Canadian Sellers and the Estate, and (b) repayment obligations under the DIP Facility between the debtors in the CCAA Cases and the Debtor.

52.    "*Exculpated Parties*" means, collectively, the Debtor, the Debtor's officers, directors and direct or indirect equity holders as of the Petition Date, the DIP Agent, the DIP Lenders, the First Lien Credit Facility Agent, the Prepetition Lenders, any other agent or lender under the DIP Credit Facility, the First Lien Credit Facility or Second Lien Credit Facility, the Prepetition Debt Agents (as defined in the Final DIP Order), the Prepetition Debt Lenders (as defined in the Final DIP Order), the Purchaser, the Creditors' Committee and the individual members thereof, the Plan Administrator, and each of their respective Representatives (each of the foregoing in its individual capacity as such).

53.    "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection pursuant to section 365 of the Bankruptcy Code.

54.    "*File*" or "*Filed*" means any pleading that has been entered on the docket of this Chapter 11 Case and properly served in accordance with the Bankruptcy Rules.

55.    "*Final DIP Order*" means the *Final Order (I) Authorizing the Debtor to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Debtor's Limited Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (III) Granting Adequate Protection to Prepetition Debt Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364,* entered on March 31, 2010 [Docket No. 171].

56.    "*Final Distribution Date*" means the date on which Liquidating BIPCo shall make its final Distribution, which shall be a date selected by the Plan Administrator as soon as reasonably practicable after the Effective Date.

57.    "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in this Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has passed without any such appeal, petition for certiorari or motion, or as to which any appeal that has been taken or any petition for certiorari or motion for a new trial, reargument or rehearing that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing will have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

58.    "*First Lien Claim*" means a Claim against the Debtor arising under or in connection with the First Lien Credit Facility.

59.    "*First Lien Credit Facility*" means that certain *Second Amended and Restated First Lien Term Loan Credit Agreement,* dated as of April 8, 2005 (as amended or modified from time to time), by and among White Birch Paper Company and White Birch Paper Holding Company, as borrowers, Credit Suisse AG, Toronto Branch, as administrative agent and as Canadian collateral agent, Credit Suisse, Cayman Islands Branch, as US Collateral Agent, and the lender parties thereto.

5

60.     "*First Lien Credit Facility Agent*" means Credit Suisse AG, Toronto Branch, as administrative agent under the First Lien Credit Facility.

61.     "*General Bar Date*" means, as established pursuant to the Bar Date Order, 5:00 p.m. prevailing Eastern Time on July 6, 2010.

62.     "*General Unsecured Claims*" means Claims against the Debtor that are not Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims, First Lien Claims, Swap Agreement Claims, Second Lien Claims or Intercompany Claims, the Allowed amount of which shall be reduced by the amount assumed by the Purchaser, if any.

63.     "*Governmental Bar Date*" means, as established pursuant to the Bar Date Order, 5:00 p.m. prevailing Eastern Time on August 23, 2010.

64.     "*Holder*" means the beneficial holder of a Claim or Equity Interest, and, when used in conjunction with a Class or type of Claim or Equity Interest, the beneficial holder of a Claim or Equity Interest in such Class or of such type.

65.     "*Impaired*" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

66.     "*Initial Distribution Date*" means the date on which Liquidating BIPCo shall make its initial Distribution, which shall be a date selected by the Plan Administrator as soon as reasonably practicable after the Effective Date.

67.     "*Intercompany Claim*" means any Claim against the Debtor held by an Affiliate.

68.     "*Interim Compensation Procedures Order*" means that certain *Order Under Sections 105(a) and 331 of the Bankruptcy Code Establishing Procedures for Interim Compensation*, entered on March 25, 2010 [Docket No. 156].

69.     "*Lender Owner*" shall have the meaning ascribed to such term in the ASA.

70.     "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

71.     "*Liquidating BIPCo*" means Bear Island Paper Company L.L.C. on or after the Effective Date.

72.     "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules for the Bankruptcy Court.

73.     "*Petition Date*" means February 24, 2010, the date on which the Debtor Filed this Chapter 11 Case.

74.     "*Plan*" means this plan of liquidation under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules or herewith, as the case may be.

75.     "*Plan Administrator*" means AP Services, LLC, who shall serve pursuant to the terms of the Plan Administrator Agreement.

76.     "*Plan Administrator Agreement*" means the agreement, established as of the Effective Date, setting forth the terms and conditions of the employment of the Plan Administrator, in substantially the form of **Exhibit A** to this Plan.

77.     "*Plan Objection*" means an objection timely Filed to the conformation of this Plan and in accordance with the procedures described herein.

6

78.     "*Plan Objection Deadline*" means, as established by the Disclosure Statement Order, 5:00 p.m. prevailing Eastern Time on November [14], 2011.

79.     "*Prepetition Intercreditor Agreement*" has the meaning set forth in the Final DIP Order.

80.     "*Prepetition Lenders*" means, collectively, the lenders under the First Lien Credit Facility and the Second Lien Credit Facility.

81.     "*Prepetition Senior Collateral*" has the meaning set forth in the Final DIP Order.

82.     "*Priority Claims*" means, collectively, Priority Non-Tax Claims and Priority Tax Claims.

83.     "*Priority Non-Tax Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority payment under section 507(a) of the Bankruptcy Code.

84.     "*Priority Tax Claims*" means any and all Claims of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

85.     "*Professional*" means an Entity:  (a) retained in this Chapter 11 Case pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code, and that is compensated for services rendered prior to the Effective Date pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

86.     "*Professional Fee Claim*" means any Allowed Administrative Claim for the compensation of a Professional, and the reimbursement of expenses incurred by such Professional, through and including the Effective Date.

87.     "*Proof of Claim*" means a proof of Claim Filed against the Debtor in this Chapter 11 Case.

88.     "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim in a particular Class (or several Classes taken as a whole) bears to (b) the aggregate Allowed amount of all Claims in such Class (or several Classes taken as a whole), unless this Plan expressly provides otherwise.

89.     "*Purchased Assets*" means those assets and property transferred, or to be transferred, to the Purchaser pursuant to the ASA.

90.     "*Purchased Causes of Action*" means those claims and causes of action that the Purchaser purchased from the Debtor pursuant to the ASA.

91.     "*Purchaser*" means BD White Birch Investment LLC, in its capacity as purchaser under the ASA, and any Designated Purchaser (as defined in the ASA).

92.     "*Quarterly Distribution Date*" means the first Business Day after the end of each quarterly calendar period (*i.e.*, March 31, June 30, September 30 and December 31 of each calendar year).

93.     "*Record Date*" means October [5], 2011.

94.     "*Released Parties*" means, collectively, the Debtor, the Debtor's officers, directors and direct or indirect equity holders as of the Petition Date, the DIP Agent, the DIP Lenders, the First Lien Credit Facility Agent, the Prepetition Lenders, any other agent or lender under the DIP Credit Facility, the First Lien Credit Facility or Second Lien Credit Facility, the Prepetition Debt Agents (as defined in the Final DIP Order), the Prepetition Debt Lenders (as defined in the Final DIP Order), the Purchaser, the Creditors' Committee and the individual members thereof, the Plan Administrator, and each of their respective Representatives (each of the foregoing in its individual capacity as such).

7

95. "*Releasing Parties*" means, collectively, the Released Parties and Holders of Claims voting to accept this Plan.

96. "*Remaining Causes of Action*" means, except for the Creditors' Committee Avoidance Causes of Action and the Purchased Causes of Actions, all other actions, causes of action, claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims of the Debtor or the Estate, whether Disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing as of the Effective Date or thereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of this Chapter 11 Case, including through the Effective Date, that shall vest, as of the Effective Date, with Liquidating BIPCo.

97. "*Representatives*" means, with respect to an Entity, such Entity's officers, directors, employees, members (including *ex officio* members) managers, advisors, attorneys, professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including its respective officers, directors, employees, members and professionals).

98. "*Sale*" means the sale of all or substantially all of the Debtor's assets to BD White Birch Investment LLC pursuant to the ASA.

99. "*Sale Closing*" means the "Closing" as defined in the ASA.

100. "*Sale Closing Date*" means the "Closing Date" as defined in the ASA.

101. "*Sale Order*" means the *Order (A) Authorizing and Approving the Sale of Assets Free and Clean of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of the Assigned Contracts and (C) Granting Related Relief*, entered on November 3, 2010 [Docket No. 582].

102. "*Sale Post-Closing Obligations*" means those obligations of the Debtor or Plan Administrator, as applicable, under the ASA, after the Sale Closing, including obligations identified in Article V of the ASA.

103. "*Schedules*" mean the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs the Debtor Filed on March 31, 2010 [Docket No. 172] and amended on January 26, 2011 [Docket No. 689] pursuant to section 521 of the Bankruptcy Code.

104. "*Second Lien Claim*" means a Claim against the Debtor arising under or in connection with the Second Lien Credit Facility.

105. "*Second Lien Credit Facility*" means that certain *Second Lien Term Loan Credit Agreement*, dated on or about April 8, 2005, as amended and restated on January 27, 2006 and May 8, 2007, by and among White Birch Paper Company and White Birch Paper Holding Company, as borrowers, Credit Suisse First Boston, as sole lead arranger, sole bookrunner, syndication agent and documentation agent, Credit Suisse First Boston Toronto Branch, as Canadian collateral, TD Securities (USA) LLC, as co-arranger and the lender parties thereto.

106. "*Secured Claim*" means any Claim (a) to the extent reflected in the Schedules or upon a Proof of Claim as a Secured Claim, which is secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or (b) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

107. "*SISP Procedures and SISP Order*" means the *Order Approving the Debtor's Sale and Investor Solicitation Process and Procedures Related Thereto*, entered on April 28, 2010 [Docket No. 234] and the procedures approved thereby.

108. "*Swap Agreements*" mean, collectively: (a) that certain *ISDA 2002 Master Agreement*, dated as of May 16, 2005, between White Birch Paper Company and The Toronto-Dominion-Bank; (b) that certain *ISDA*

*Master Agreement*, dated as of April 13, 2005, between White Birch Paper Company and Credit Suisse First Boston International; and (c) that certain *ISDA Master Agreement*, dated as of May 8, 2007, between White Birch Company and Merrill Lynch Capital Services, Inc.

109.    "*Swap Agreement Claims*" means any Claim against the Debtor arising under or in connection with the Swap Agreements.

110.    "*Unexpired Lease*" means a lease of non-residential real property to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

111.    "*Unimpaired*" means a Class of Claims or Equity Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

112.    "*U.S. Trustee*" means the United States Trustee appointed under Article 591 of title 28 of the United States Code to serve in the Eastern District of Virginia.

113.    "*Voting and Claims Agent*" means The Garden City Group, Inc.

114.    "*Voting Classes*" means Classes 2, 3, 4 and 5.

115.    "*Voting Deadline*" means, as established by the Disclosure Statement Order, 5:00 p.m. prevailing Eastern Time on November [14], 2011, which shall be the deadline for, among other things, voting to accept or reject this Plan.

116.    "*Voting Record Date*" means the date set forth in the Disclosure Statement Order for determining the Holders of Claims entitled to vote to accept or reject this Plan.

117.    "*Wind Down*" means, as set forth in Article V.L hereof, the wind down and dissolution of Liquidating BIPCo following the Effective Date.

118.    "*Wind Down Amount*" means the "U.S. Wind-Down Amount" as defined in the ASA.

119.    "*Wind Down Creditors' Committee*" means the committee described in Article V.G hereof.

# ARTICLE II.

## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

A.    *Administrative Claims*

1.    Payment of Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtor or the Plan Administrator, as applicable, each Holder of an Allowed Administrative Claim (other than any Professional Fee Claim) shall receive, in full and final satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim either:  (a) on the Effective Date; (b) if the Administrative Claim is not Allowed as of the Effective Date, as soon as reasonably practicable after the date on which (i) the Plan Administrator, in its sole discretion, determines that such Administrative Claim shall be Allowed or (ii) the Court determines that such Administrative Claim shall be Allowed; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim.

K&E 18129368.18

2.    DIP Credit Facility Claims

The DIP Credit Facility Claims shall be indefeasibly paid in full in Cash on the Effective Date in full satisfaction thereof and in accordance with the terms and conditions of the DIP Credit Facility; provided, however, that any Claim of a Lender Owner shall be treated in accordance with Article VI.M hereof.  Notwithstanding the above, any expense reimbursement or indemnity provisions contained in the DIP Credit Facility or any loan document governing or entered into in connection with the DIP Credit Facility shall survive such payment in the manner and to the extent set forth therein.

3.    Professional Compensation

(a)    Final Fee Applications

All final requests for payment of Professional Fee Claims, including any amounts held back pursuant to the Interim Compensation Procedures Order, must be Filed with the Bankruptcy Court and served on the Plan Administrator and the U.S. Trustee no later than thirty-five (35) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in this Chapter 11 Case, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court and paid by the Estate, Liquidating BIPCo or the Plan Administrator; provided, however, that amounts necessary to satisfy all Professional Fee Claims incurred as of the Sale Closing Date, which have not yet been approved by the Bankruptcy Court, shall be deposited into an escrow account for the benefit of such Professionals for the payment of such Professional Fee Claims once approved by the Bankruptcy Court.  Any amounts remaining in the escrow account five months following the Sale Closing Date shall be returned to the Purchaser.  On and after the Effective Date, the Plan Administrator shall administer such escrow.

(b)    Post-Effective Date Professional Fees and Expenses

Except as otherwise specifically provided in this Plan, from and after the Effective Date, the Plan Administrator shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash from the Administrative Fund the reasonable legal, professional or other fees and expenses of Liquidating BIPCo, the Plan Administrator, the Wind Down Creditors' Committee or their respective Representatives, related to the implementation and consummation of this Plan and the transactions contemplated herein.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Liquidating BIPCo, the Plan Administrator or the Wind Down Creditors' Committee may employ and pay any Professional in the ordinary course of business from the Administrative Fund without any further notice to or action, order or approval of the Bankruptcy Court; provided, however, that to the extent the Plan Administrator seeks to use any of the Wind Down Amount to satisfy the fees and expenses discussed in this Article II.A.3.b, the Plan Administrator and such person or Entity requesting payment shall comply with section 5.18 of the ASA.

B.    Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of its Allowed Priority Tax Claim:  (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; or (2) at the option of the Debtor or the Plan Administrator, as applicable, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period not more than five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

K&E 18129368.18

# ARTICLE III.

### CLASSIFICATION OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR

*A.*      *Summary*

1.      Except for the Claims addressed in Article II above (or as otherwise set forth herein), all Claims against the Debtor are placed in Classes.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified the Administrative Claims and Priority Tax Claims described in Article II.

2.      Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Equity Interests in the Debtor.  This Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent the Claim or Equity Interest is within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest is within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

3.      Summary of Classification and
Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting |
|-------|-------|--------|--------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | First Lien Claims and Swap Agreement Claims | Impaired | Yes |
| 3 | Second Lien Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Intercompany Claims | Impaired | Yes |
| 6 | Equity Interests | Impaired | No (deemed to reject) |

*B.*      *Classification and Treatment of Claims and Equity Interests*

1.      Class 1—Priority Non-Tax Claims

   (a)      *Classification*:  Class 1 consists of Priority Non-Tax Claims.

   (b)      *Voting*:  Class 1 is Unimpaired, and Holders of Class 1 Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan.

   (c)      *Treatment*:  Except to the extent that a Holder of an Allowed Priority-Non Tax Claim agrees to a less favorable treatment, in full and final satisfaction of each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash on the later of the Effective Date or the date such Priority Non-Tax Claim becomes Allowed, or as soon as practicable thereafter.

11

2.   Class 2—First Lien Claims and Swap Agreement Claims

    (a)   *Classification*:  Class 2 consists of First Lien Claims and Swap Agreement Claims.

    (b)   *Voting*:  Class 2 is Impaired and Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

    (c)   *Treatment*:  On the Initial Distribution Date, each applicable Quarterly Distribution Date thereafter and the Final Distribution Date, in full and final satisfaction of each Allowed First Lien Claim and Allowed Swap Agreement Claim, each Holder of such Allowed First Lien Claim and Allowed Swap Agreement Claim shall receive (i) such Holder's *Pro Rata* share of the Creditor Fund and (ii) such Holder's *Pro Rata* share of all proceeds of the Prepetition Senior Collateral.  Any Distribution described above shall be made by Liquidating BIPCo or the Plan Administrator, as applicable, to the First Lien Credit Facility Agent, and shall be applied by the First Lien Credit Facility Agent, in each case in accordance with the terms and conditions of the First Lien Credit Facility, and any expense reimbursement or indemnity provisions contained in the First Lien Credit Facility or any loan document governing or entered into in connection with the First Lien Credit Facility shall survive in the manner and to the extent set forth therein; <u>provided</u>, <u>however</u>, that any Claim of a Lender Owner shall be treated in accordance with Article VI.M hereof.

3.   Class 3—Second Lien Claims

    (a)   *Classification*:  Class 3 consists of Second Lien Claims.

    (b)   *Voting*:  Class 3 is Impaired and Holders of Class 3 Claims are entitled to vote to accept or reject this Plan.

    (c)   *Treatment*:  On the Initial Distribution Date, each applicable Quarterly Distribution Date thereafter and the Final Distribution Date, in full and final satisfaction of each Allowed Second Lien Claim, each Holder of such Allowed Second Lien Claim shall receive such Holder's *Pro Rata* share of the Creditor Fund to the extent permitted by the Prepetition Intercreditor Agreement.

4.   Class 4—General Unsecured Claims

    (a)   *Classification*:  Class 4 consists of General Unsecured Claims.

    (b)   *Voting*:  Class 4 is Impaired by this Plan and Holders of Class 4 Claims are entitled to vote to accept or reject this Plan.

    (c)   *Treatment*:  On the Initial Distribution Date, each applicable Quarterly Distribution Date thereafter and the Final Distribution Date, in full and final satisfaction of each Allowed General Unsecured Claim, each Holder of such Allowed General Unsecured Claim shall receive such Holder's *Pro Rata* share of the Creditor Fund.

5.   Class 5—Intercompany Claims

    (a)   *Classification*:  Class 5 consists of Intercompany Claims.

    (b)   *Voting*:  Class 5 is Impaired by this Plan and Holders of Class 5 Claims are entitled to vote to accept or reject this Plan.

K&E 18129368.18

(c)   *Treatment*:  On the Initial Distribution Date, each applicable Quarterly Distribution Date thereafter and the Final Distribution Date, in full and final satisfaction of each Allowed Intercompany Claim, each Holder of such Allowed Intercompany Claim shall receive such Holder's *Pro Rata* share of the Creditor Fund.

6.   Class 6—Equity Interests

(a)   *Classification:*  Class 6 consists of all Equity Interests.

(b)   *Voting*:  Class 6 is Impaired and Holders of Class 6 Claims are deemed to reject this Plan.

(c)   *Treatment*:  Holders of Equity Interests shall neither receive nor retain any property under this Plan.

# ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

The Debtor reserves the right to seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code.  To the extent that any Class votes to reject this Plan, the Debtor further reserves the right to modify this Plan in accordance with Article XIII.A.

# ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.   *Approval of Estate Allocation*

The Bankruptcy Court's entry of the Disclosure Statement Order shall constitute the Bankruptcy Court's approval of the Estate Allocation, attached hereto as **Exhibit B**.  The Debtor's portion of the Estate Allocation shall vest in the Estate upon entry of the Confirmation Order and vest in Liquidating BIPCo upon the Effective Date.

B.   *Continuing Existence*

From and after the Effective Date, Liquidating BIPCo shall continue in existence solely for the purposes consistent with the terms of this Plan, which include (1) effectuating the Wind Down, (2) liquidating the Assets, (3) enforcing and prosecuting Claims, interests, rights and privileges of Liquidating BIPCo and the Estate, including the Remaining Causes of Action, (4) resolving Disputed Claims, (5) administering this Plan and taking such actions as are necessary to effectuate this Plan, and (6) filing appropriate tax returns.  Officers and employees of the Debtor, whose assistance the Plan Administrator requires to effectuate the liquidation and Wind Down of the Estate, shall continue as officers and employees of Liquidating BIPCo, whose fees and expenses shall be satisfied by amounts maintained in the Administrative Fund.  Liquidating BIPCo shall also maintain those books, records and bank accounts necessary to effectuate the liquidation and Wind Down of the Estate.

C.   *Vesting of Assets in Liquidating BIPCo*

Except as otherwise provided in this Plan or in any agreement, instrument or other document relating thereto, pursuant to section 1141 of the Bankruptcy Code, on or after the Effective Date, all Assets of the Estate and any Assets acquired by the Debtor pursuant hereto shall vest in Liquidating BIPCo, free and clear of all Liens, Claims, charges or other encumbrances; provided, however, that all proceeds of the Prepetition Senior Collateral shall be distributed to the First Lien Credit Facility Agent in accordance with Article III.B.2 hereof.  For the avoidance of doubt, the Purchased Assets, including the Purchased Causes of Action, shall be transferred to the Purchaser upon the Sale Closing Date in accordance with the ASA and shall not vest in Liquidating BIPCo.  Except as may be provided in this Plan or the Confirmation Order, on and after the Effective Date, Liquidating BIPCo may use, acquire or dispose of Assets, and compromise or settle any Claims, without supervision or approval by the

13

Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, however, that all proceeds of the Prepetition Senior Collateral shall be distributed to the First Lien Credit Facility Agent in accordance with Article III.B.2 hereof.

D.      *Plan Administrator*

1.      Appointment of the Plan Administrator

As of the Effective Date, the Plan Administrator shall be responsible for implementing the liquidation and Wind Down contemplated by this Plan, including monetizing or abandoning any Assets, pursuing, settling or abandoning all Remaining Causes of Action, resolving all Claims and distributing Cash pursuant to this Plan, and causing Liquidating BIPCo to comply with the ASA. On the Effective Date, the Plan Administrator shall succeed to such powers as would have been applicable to the Debtor's officers, directors and shareholders, and Liquidating BIPCo shall be authorized to be (and, upon the conclusion of the Wind Down, shall be) dissolved by the Plan Administrator. All Assets of the Estate not Distributed to the Holders of Claims on the Effective Date shall be transferred to Liquidating BIPCo and managed and Distributed by the Plan Administrator pursuant to the terms of this Plan, and shall be held in the name of Liquidating BIPCo free and clear of all Liens, Claims, charges or other encumbrances against the Debtor, and Equity Interests in the Debtor, except for rights to such Distributions provided to Holders of Allowed Claims as provided herein.

2.      Actions Against the Plan Administrator

The Confirmation Order shall state that, without permission of the Bankruptcy Court, no judicial, administrative, arbitral or other action or proceeding shall be commenced against the Plan Administrator in its official capacity, with respect to its status, duties, powers, acts or omissions as Plan Administrator in any forum other than the Bankruptcy Court.

3.      Term and Compensation of the Plan Administrator

The Plan Administrator shall serve for the term set forth in, and be compensated from the Administrative Fund in accordance with the terms of, the Plan Administrator Agreement.

4.      Powers of the Plan Administrator

(a)      The Plan Administrator shall be a fiduciary of Liquidating BIPCo and shall have all powers, authority and responsibilities specified in this Plan and the Plan Administrator Agreement. In particular, the Plan Administrator's rights, duties and powers shall include the following:

(i)      The Plan Administrator shall succeed to all such powers as would have been applicable to any of the Debtor's officers, directors, managers or shareholders with like effect as if authorized, exercised and taken by unanimous action of such officers, directors, managers and shareholders.

(ii)      The Plan Administrator shall be authorized to take all steps necessary to effectuate the Wind Down and to take such other actions as the Plan Administrator determines are in the best interests of the Holders of Claims.

(iii)      The Plan Administrator, in its reasonable business judgment, in an expeditious and orderly manner, and only to the extent necessary, shall cause Liquidating BIPCo to liquidate, and convert all of the Assets to Cash and make all Distributions in accordance with this Plan. The liquidation of the Assets may be accomplished either through the sale of the Assets (in whole or in combination), including the sale of Remaining Causes of Action, or through prosecution or settlement of any Remaining Causes of Action, or otherwise.

14

(b)     The Plan Administrator shall be expressly authorized to do the following:

(i)     cause Liquidating BIPCo to institute, prosecute, collect, compromise and settle any Remaining Causes of Actions in accordance herewith and without further approval or application to the Bankruptcy Court, except as otherwise provided herein, including, prosecuting and/or settling the Remaining Causes of Action pending in any court of appropriate jurisdiction;

(ii)    cause Liquidating BIPCo to participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding and litigate or settle such Remaining Causes of Action on behalf of the Liquidating BIPCo or the Estate, or to pursue such Remaining Causes of Actions to settlement or judgment;

(iii)   to the extent necessary, open and maintain bank accounts in the name of Liquidating BIPCo, draw checks and drafts thereon by the sole signature of the Plan Administrator and terminate such accounts as the Plan Administrator deems appropriate;

(iv)    cause Liquidating BIPCo to make Distributions and take other actions consistent with this Plan and the implementation hereof, including the establishment, reevaluation, adjustment and maintenance of appropriate reserves in accordance with this Plan;

(v)     cause Liquidating BIPCo to collect and liquidate all Assets pursuant to this Plan and to administer the Wind Down and closing of this Chapter 11 Case;

(vi)    cause Liquidating BIPCo to file, prosecute or object to any Claims (Disputed or otherwise), and compromise or settle any Claims prior to or after objection, without supervision or approval of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the U.S. Trustee guidelines and requirements, other than those restrictions expressly imposed by this Plan, or to seek Bankruptcy Court approval for any Claims settlements made after objection;

(vii)   cause Liquidating BIPCo to retain or engage professionals, employees and consultants, and to pay the from the Administrative Fund the reasonable fees and charges incurred by the Plan Administrator and Liquidating BIPCo's professionals, employees and consultants that relate to the implementation of this Plan, without application to the Bankruptcy Court;

(viii)  cause Liquidating BIPCo to seek a determination from the Bankruptcy Court of tax liability under section 505 of the Bankruptcy Code and to pay from the Administrative Fund taxes, if any, related to the Liquidating BIPCo and for all returns filed for or on behalf of Liquidating BIPCo for all taxable periods through the closing of this Chapter 11 Case;

(ix)    cause Liquidating BIPCo to invest Cash or moneys received by Liquidating BIPCo or otherwise held by Liquidating BIPCo in accordance with this Plan (which shall be in compliance with section 345 of the Bankruptcy Code);

(x)     execute any documents or pleadings and take any other actions related to, or in connection with, the liquidation of the Assets and the exercise of the Plan Administrator's powers granted herein, including the exercise of Liquidating BIPCo's rights to conduct discovery and oral examination of any party under

15

Bankruptcy Rule 2004;

(xi)      enter into any agreement or execute any document required by or consistent with this Plan, and perform all of the obligations thereunder;

(xii)      cause Liquidating BIPCo to abandon in any commercially reasonable manner any Assets that the Plan Administrator determines are of no benefit to Liquidating BIPCo;

(xiii)      cause Liquidating BIPCo to preserve Liquidating BIPCo's documents, as necessary, to pursue Remaining Causes of Action and conduct the Wind Down, and to abandon or destroy documents upon the Plan Administrator's determination that the documents are no longer necessary or beneficial to Liquidating BIPCo;

(xiv)      cause Liquidating BIPCo to purchase and maintain all insurance policies and pay from the Administrative Fund all insurance premiums and costs that the Plan Administrator deems necessary or advisable;

(xv)      cause Liquidating BIPCo to take any and all actions necessary to satisfy the Sale Post-Closing Obligations;

(xvi)      administer payouts from the Professional Fee Claim escrow upon Bankruptcy Court approval of Professional Fee Claims; and

(xvii)      take all other actions not inconsistent with the provisions of this Plan, which the Plan Administrator deems reasonably necessary or desirable with respect to administering this Plan.

5.     Resignation or Removal of Plan Administrator

In the event of the dissolution, bankruptcy, insolvency or removal of the Plan Administrator, a successor trustee may be appointed in accordance with the Plan Administrator Agreement. The Plan Administrator may resign at any time upon 30 days' notice to the Bankruptcy Court, Liquidating BIPCo's counsel and the Wind Down Creditors' Committee's counsel. Any party in interest may move the Bankruptcy Court for the removal of the Plan Administrator for cause upon providing notice to Liquidating BIPCo's counsel; provided, however, that if Liquidating BIPCo or any other party in interest shall object to such removal within 21 days of such notice, such removal shall not be effective until approved by the Bankruptcy Court. No successor Plan Administrator hereunder shall in any event have any liability or responsibility for the acts or omissions of any of his, her or its predecessors. Every successor Plan Administrator appointed pursuant hereto shall execute, acknowledge and deliver to the Bankruptcy Court an instrument in writing accepting such appointment. Thereupon, such successor Plan Administrator, without any further action required, shall become fully vested with all of the rights, powers, duties and obligations of his, her or its predecessor.

Notwithstanding any other provision in this Plan, upon the resignation or removal of a Plan Administrator, a Plan Administrator shall continue to serve in such capacity until such time as (a) a successor Plan Administrator is identified and accepts the appointment on substantially the same terms as the resigning Plan Administrator, and (b) notice is provided to the Bankruptcy Court of such successor Plan Administrator pursuant to this Article V.D.5.

6.     Retention of Professionals

(a)      As of and after the Effective Date, the Plan Administrator may cause Liquidating BIPCo to retain professionals, including attorneys, accountants, investment or other financial advisors, auditors, disbursing agents, professionals from the Plan Administrator's own firm, if any, and other agents on behalf of Liquidating BIPCo, as necessary or desirable to carry out the actions necessary to effectuate the Wind Down and close this

Chapter 11 Case.  More specifically, as of and after the Effective Date, the Plan Administrator may cause Liquidating BIPCo to retain counsel in any matter related to the Estate, including counsel that has acted as counsel for the Debtor or the Creditors' Committee.

(b)    Following the Effective Date, the Plan Administrator may cause Liquidating BIPCo to pay from the Administrative Fund, without application to the Bankruptcy Court or any other court of competent jurisdiction, professionals retained by Liquidating BIPCo as of and after the Effective.

7.    Compliance with Sale Post-Closing Obligations

The Plan Administrator shall be required to take any and all actions, and shall cause Liquidating BIPCo to take any and all actions, necessary to comply with and satisfy the Sale Post-Closing Obligations.

8.    Liability, Indemnification

As of and after the Effective Date, neither Liquidating BIPCo, its designees or professionals, any duly designated agent or Representative of Liquidating BIPCo, including the Plan Administrator, nor any of its employees, including those employees of the Debtor assisting Liquidating BIPCo and the Plan Administrator with the Wind Down, shall be liable for the act or omission of any other designee, agent or Representative of Liquidating BIPCo, nor shall such parties be liable for any act or omission taken or omitted to be taken in such capacity other than for specific acts or omissions resulting from such parties' willful misconduct, gross negligence or fraud.

Liquidating BIPCo and any duly designated agent or Representative of Liquidating BIPCo, including the Plan Administrator and employees of the Debtor assisting Liquidating BIPCo and the Plan Administrator with the Wind Down, may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with Liquidating BIPCo's attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing (other than for specific acts or omissions resulting from such parties' willful misconduct, gross negligence or fraud).  Notwithstanding such authority, Liquidating BIPCo and any duly designated agent or Representative of Liquidating BIPCo, including the Plan Administrator and employees of the Debtor assisting Liquidating BIPCo and the Plan Administrator with the Wind Down, shall not be under any obligation to consult with Liquidating BIPCo's attorneys, accountants, financial advisors or agents, and such parties determination not to do so shall not result in the imposition of liability on any such party, unless such determination is based on such party's willful misconduct, gross negligence or fraud.

Liquidating BIPCo shall indemnify and hold harmless any duly designated agent or Representative of Liquidating BIPCo, including the Plan Administrator, its designees and professionals, all duly designated agents and Representatives thereof, and those employees of the Debtor assisting Liquidating BIPCo and the Plan Administrator with the Wind Down, from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including reasonable attorneys' fees, disbursements and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Estate or this Plan, or the discharge of their duties under the Plan Administrator Agreement or hereunder; provided, however, that no such indemnification shall be made to such persons for actions or omissions as a result of willful misconduct, gross negligence or fraud.  Any such indemnification payments shall be made from the Administrative Fund.

E.    *Fees and Expenses of Liquidating BIPCo*

Except as otherwise ordered by the Bankruptcy Court, after the Effective Date, any of Liquidating BIPCo or the Plan Administrator's reasonable fees or expenses, as applicable (including the reasonable fees and expenses of professionals retained by Liquidating BIPCo or the Plan Administrator), shall be paid from the Administrative Fund in the ordinary course of business without further order of the Bankruptcy Court.

K&E 18129368.18

F.      *Dissolution of Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve and its respective members shall be released from all further authority, duties, responsibilities and obligations relating to this Chapter 11 Case; provided, however, that the Creditors' Committee shall continue to have a right to be heard with respect to any and all (1) applications for Professional Fee Claims and (2) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code, if applicable.

G.      *Creation of the Wind Down Creditors' Committee*

As of and after the Effective Date, the Wind Down Creditors' Committee shall be created solely to oversee the prosecution and/or settlement of the Creditors' Committee Avoidance Causes of Action.  The Wind Down Creditors' Committee shall consist of three members.  The First Lien Credit Facility Agent shall be entitled to select two members to serve on the Wind Down Creditors' Committee.  The Creditors' Committee shall select any members not appointed by the First Lien Credit Facility Agent to serve on the Wind Down Creditors' Committee. Hunton & Williams LLP, counsel for the Creditors' Committee, shall serve as counsel for the Wind Down Creditors' Committee.  The Wind Down Creditors' Committee may retain professionals, including additional attorneys, accountants or financial advisors, and other agents on behalf of the Wind Down Creditors' Committee as necessary or desirable to carry out the actions of the Wind Down Creditors' Committee hereunder.

All rights to commence, pursue and/or settle the Creditors' Committee Avoidance Causes of Action, as appropriate and in the best interests of Liquidating BIPCo, shall, as of the Effective Date, vest in the Wind Down Creditors' Committee.  The proceeds, if any, from the Creditors' Committee Avoidance Causes of Action shall vest in Liquidating BIPCo for Distribution by the Plan Administrator to Holders of Allowed Claims in accordance with this Plan.  The Wind Down Creditors' Committee shall have the exclusive right, authority and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment the Creditors' Committee Avoidance Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

H.      *Fees and Expenses of the Wind Down Creditors' Committee*

Except as otherwise ordered by the Bankruptcy Court, any of the Wind Down Creditors' Committee's reasonable fees or expenses, as applicable (including the reasonable fees and expenses of professionals and other agents and representatives retained by the Wind Down Creditors' Committee), shall be paid from the Administrative Fund by Liquidating BIPCo of the Plan Administrator without further order of the Bankruptcy Court.

I.      *Liability and Indemnification of the Wind Down Creditors' Committee*

As of and after the Effective Date, neither the Wind Down Creditors' Committee, its members, designees or professionals, nor any duly designated agent or Representative of the Wind Down Creditors' Committee, shall be liable for the act or omission of any other member, designee, agent or Representative of the Wind Down Creditors' Committee, nor shall such parties be liable for any act or omission taken or omitted to be taken in such capacity other than for specific acts or omissions resulting from such parties' willful misconduct, gross negligence or fraud.

The Wind Down Creditors' Committee, its members and any duly designated agent or Representative of the Wind Down Creditors' Committee may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with the Wind Down Creditors' Committee's attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advise or opinions are provided in writing.  Notwithstanding such authority, the Wind Down Creditors' Committee, its members and any duly designated agent or Representative of the Wind Down Creditors' Committee shall not be under any obligation to consult with the Wind Down Creditors' Committee's attorneys, accountants, financial advisors or agents, and such parties determination not to do so shall not result in the imposition of liability on any such party, unless such determination is based on such party's willful misconduct, gross negligence or fraud.

18

Liquidating BIPCo shall indemnify and hold harmless the Wind Down Creditors' Committee, its members and any duly designated agent or representative of the Wind Down Creditors' Committee from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation of the Plan, or the discharge of their duties hereunder; provided, however, that no such indemnification shall be made to such persons for actions or omissions as a result of willful misconduct, gross negligence or fraud.

J.      Preservation of the Remaining Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, as of the Effective Date, all rights related to the Remaining Causes of Action shall vest in Liquidating BIPCo, which such rights may be enforced by the Plan Administrator whether arising before or after the Petition Date.  The Plan Administrator's right to commence, prosecute or settle such Remaining Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Plan Administrator may pursue such Remaining Causes of Action, as appropriate, in accordance with the best interests of the Estate and Liquidating BIPCo.  No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement with respect to any Remaining Cause of Action against them as any indication that the Plan Administrator will not pursue any and all available Remaining Causes of Action against such Entity.  Unless any Remaining Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in this Plan or a Bankruptcy Court order, the Plan Administrator expressly reserves the right to prosecute all Remaining Causes of Action, for later adjudication, and therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Remaining Causes of Action upon, after or as a consequence of Confirmation or consummation of this Plan.

The Plan Administrator reserves and shall retain the to prosecute, settle or otherwise dispose of all of the Remaining Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during this Chapter 11 Case or pursuant to this Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Remaining Causes of Action that the Debtor may hold against any Entity shall vest in the Plan Administrator, as the case may be.  The Plan Administrator shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Remaining Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

K.      Directors and Officers

On the Effective Date, the persons acting as directors and officers of the Debtor prior to the Effective Date shall be released from all further authority, duties, responsibilities and obligations relating to and arising from operations of the Debtor or this Chapter 11 Case.  Upon such release and discharge, the Plan Administrator shall be charged with the authority, duties, responsibilities and obligations relating to and arising from operations of Liquidating BIPCo and this Chapter 11 Case.

L.      Wind Down and Dissolution of the Debtor

As soon as practicable after the Effective Date, the Plan Administrator shall:  (1) take any action reasonably necessary to effectuate the Wind Down; (2) file a certificate of dissolution for Liquidating BIPCo, together with all other necessary corporate and company documents, to effect the dissolution of Liquidating BIPCo under applicable non-bankruptcy law; (3) complete and file all of the Debtor and Liquidating BIPCo's final or otherwise required federal, state and local tax returns, as applicable; (4) pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination for any of the Debtor, its Estate or Liquidating BIPCo's unpaid tax liability regarding any tax incurred during the administration of this Chapter 11 Case, as determined under applicable tax laws; (5) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of this Plan; and (6) comply with any regulatory requirements imposed on Liquidating BIPCo under applicable law.

K&E 18129368.18

Filing of Liquidating BIPCo's certificate of dissolution by the Plan Administrator shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including any action by the Debtor or Liquidating BIPCo's stockholders or the board of directors, as applicable.

# ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.     *General Settlement of Claims*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classifications, Distributions, releases and other benefits provided under this Plan, upon the Effective Date, the Plan provisions shall constitute a good-faith compromise and settlement of all Claims, Equity Interests and controversies resolved pursuant to this Plan.  Subject to Article VI, all Distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final, subject to the terms and conditions of the Prepetition Intercreditor Agreement.

B.     *Initial Distribution Date*

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Plan Administrator shall make, or shall in the Plan Administrator's sole discretion make adequate reserves for, the Distributions required to be made under Article III of this Plan.  Reserves, if any, shall be distributed at the sole discretion of the Plan Administrator and shall not be subject to Bankruptcy Court approval.

C.     *Interim Distributions on Account of Allowed Claims*

In accordance herewith, the Plan Administrator may (but shall not be required to) make a Distribution on a Quarterly Distribution Date if the Plan Administrator deems it appropriate and shall have the right to make more frequent interim Distributions to Holders of Allowed Claims if the Plan Administrator determines in its sole discretion that such additional interim Distributions are warranted and economical; provided, however, that any such Quarterly or other interim Distribution shall only be made if in the Plan Administrator's sole discretion, the Plan Administrator retains amounts reasonably necessary to make all Distributions pursuant to Article III of this Plan, meet contingent liabilities, maintain the value of the Assets during liquidation, and satisfy other liabilities or expenses Liquidating BIPCo or the Plan Administrator incurs in accordance with this Plan or the Plan Administrator Agreement.

D.     *Final Distributions on Allowed Claims*

Notwithstanding anything herein to the contrary, upon (1) the settlement and satisfaction, or disallowance, of all Administrative, Professional Fee and Priority Claims, (2) the completion and prosecution and/or settlement of all objections to all other Claims and Remaining Causes of Action, (3) the liquidation of all Assets and (4) the completion of all matters necessary to effectuate the Wind Down, the Plan Administrator shall distribute, as soon thereafter as reasonably practicable, all remaining Assets and proceeds thereof pursuant to the terms of this Plan.  To the extent that the foregoing can be accomplished by the Initial Distribution Date, the Plan Administrator may effectuate all required Distributions on the Initial Distribution Date.

E.     *Administrative Fund and Disputed Claims Reserve*

1.     Administrative Fund

[•]

2. Disputed Claims Reserve

On the Initial Distribution Date, and after making all Distributions required to be made on such date under this Plan, the Plan Administrator shall establish a separate Disputed Claims Reserve for Disputed Claims, which shall be administered by the Plan Administrator. The Plan Administrator shall reserve in Cash or other Assets, for Distribution on account of each Disputed Claim, the full asserted amount (or such lesser amount as may be estimated by the Court in accordance with Article VII.A.3) with respect to each Disputed Claim.

To the extent that the Assets placed in a Disputed Claims Reserve consist of Cash, such Cash shall be deposited in an interest-bearing account. Liquidating BIPCo shall hold Assets in the Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed. The Disputed Claims Reserve shall be closed and extinguished by the Plan Administrator when all Distributions and other dispositions of Cash or other Assets required to be made hereunder shall have been made in accordance with the terms of this Plan. Upon closure of the Disputed Claims Reserve, all Cash or other Assets held in the Disputed Claims Reserve shall revest in and become the Assets of Liquidating BIPCo; provided, however, that all proceeds of the Prepetition Senior Collateral shall be distributed to the First Lien Credit Facility Agent in accordance with Article III.B.2 hereof. All funds or other Assets that vest or revest in Liquidating BIPCo pursuant to this paragraph shall be (a) used to pay the reasonable fees and expenses of the Plan Administrator as and to the extent set forth in this Plan and the Plan Administrator Agreement, and (b) thereafter, distributed to Holders of Allowed Claims in accordance with this Plan; provided, however, that all proceeds of the Prepetition Senior Collateral shall be distributed to the First Lien Credit Facility Agent in accordance with Article III.B.2 hereof.

F.      Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date shall be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date. The Plan Administrator shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. In making any Distribution with respect to any Claim, the Plan Administrator shall instead be entitled to recognize and deal with, for all purposes hereunder, only such Entity that is listed on the Proof of Claim Filed with respect thereto, or listed on the Schedules, as the Holder thereof as of the close of business on the Record Date, and upon such other evidence, record of transfer or assignment that are known to the Plan Administrator as of the Record Date; provided, however, that all proceeds of the Prepetition Senior Collateral shall be distributed to the First Lien Credit Facility Agent in accordance with Article III.B.2 hereof.

G.      Delivery of Distributions

1. General Provisions; Undeliverable Distributions; DIP Credit Facility and First Lien Credit Facility

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the Holders of Allowed Claims shall be made by the Plan Administrator at (a) the address of each Holder as set forth in the Schedules, unless superseded by the address set forth on Proofs of Claim Filed by such Holder, or (b) the last known address of such Holder if no Proof of Claim is Filed or if the Debtor has been notified in writing of a change of address; provided, however, that all proceeds of the Prepetition Senior Collateral shall be distributed to the First Lien Credit Facility Agent in accordance with Article III.B.2 hereof. If any Distribution is returned as undeliverable, the Plan Administrator may, in its discretion and as the Plan Administrator deems appropriate, take such efforts to determine the current address of the Holder of the Claim with respect to such Distribution; provided, however, that no Distribution to any Holder shall be made unless and until the Plan Administrator has determined the then-current address of the Holder, at which time the Plan Administrator shall make such Distribution to such Holder without interest.

Amounts in respect of any undeliverable Distributions made by the Plan Administrator shall be returned to, and held in trust by, Liquidating BIPCo until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code as set forth in Article VI.G.3 below. The Plan Administrator shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible;

21

provided, however, that the Plan Administrator's discretion may not be exercised in a manner inconsistent with any of this Plan's express requirements.

Notwithstanding anything in this Plan to the contrary, (x) any expense reimbursement or indemnity provisions contained in the First Lien Credit Facility or DIP Credit Facility, or any loan document governing or entered into in connection with the First Lien Credit Facility or DIP Credit Facility, shall survive in the manner and to the extent set forth therein, (y) any Distribution with respect to the First Lien Credit Facility or DIP Credit Facility shall be made by the Debtor, Liquidating BIPCo or the Plan Administrator, as applicable, to the First Lien Credit Facility Agent or DIP Agent, as applicable, and shall be applied by such agent in accordance with the terms and conditions of the First Lien Credit Facility or DIP Credit Facility, as applicable, except as otherwise provided in Article VI.M hereof, and (z) nothing in this Plan, including the releases provided in Article X hereof, shall impair or otherwise limit the obligation of any Affiliate of the Debtor or any other guarantor under the First Lien Credit Facility to pay in full in Cash the First Lien Claims to the extent and manner set forth in the First Lien Credit Facility or any loan document governing or entered into in connection with the First Lien Credit Facility.

2.   Minimum Distributions

Notwithstanding anything herein to the contrary, if a Distribution to be made to a Holder of an Allowed Claim on the Initial Distribution Date or any subsequent date for Distributions (other than the final Distribution Date) totals $50 or less in the aggregate, no such Distribution shall be made to that Holder unless a request therefor is made in writing to the Plan Administrator.

3.   Unclaimed Property

Except with respect to Assets held in the Disputed Claims Reserve, Distributions that are not claimed within the expiration of one year from the applicable Distribution Date shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in Liquidating BIPCo. The Claims upon which such Distributions are based shall be automatically canceled and expunged. After the expiration of one year from the initial Distribution Date, the Claim of any Entity to those Distributions shall be released and forever barred. Nothing contained in this Plan shall require the Plan Administrator to attempt to locate any Holder of an Allowed Claim. All funds or other Assets that vests or revests in Liquidating BIPCo pursuant to this Article shall be distributed by the Plan Administrator to the other Holders of Allowed Claims in accordance with the provisions of this Plan.

H.   *Surrender of Canceled Instruments and Securities*

On the Effective Date, or as soon as reasonably practicable thereafter, each Holder of a Certificate, to the extent that any exist, shall be deemed to have surrendered such Certificate to the Plan Administrator. Such surrendered Certificate shall be canceled solely with respect to the Debtor, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding anything herein to the contrary, this paragraph shall not apply to Certificates evidencing Claims that are rendered Unimpaired under this Plan.

I.   *Manner of Cash Payments Under this Plan*

Cash payments made pursuant to this Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Plan Administrator or by wire transfer from a domestic bank, at the option of the Plan Administrator.

J.   *Time Bar to Cash Payments by Check*

Checks issued by the Plan Administrator on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to this Article VI.J shall be made directly to the Plan Administrator by the Holder of the Allowed Claim to whom the check was originally issued. Any Claim in respect of such voided check shall be made

22

in writing on or before the later of the first anniversary of the Initial Distribution Date or the first anniversary of the date on which the Claim at issue became an Allowed Claim.  After such date, all Claims in respect of void checks shall be released and forever barred.  The proceeds of such checks shall revest in and become the property of Liquidating BIPCo as unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed in accordance with Article VI.G.3.

K.      Compliance with Tax Requirements

        In connection with making Distributions under this Plan, to the extent applicable, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit.  All Distributions pursuant to this Plan shall be subject to such withholding and reporting requirements.  The Plan Administrator may withhold an entire Distribution due to any Holder of an Allowed Claim until such time as such Holder provides the necessary information to comply with any withholding requirements of any governmental unit.  Any property so withheld will then be paid by the Plan Administrator to the appropriate authority.  If the Holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six months from the date the Holder was first notified of the need for such information, or for the Cash necessary to comply with any applicable withholding requirements, then such Holder's Distribution shall be treated as an undeliverable Distribution in accordance with Article VI.G.1.

L.      Interest on Claims

        Except as specifically provided for in this Plan the Confirmation Order or other Final Order of the Bankruptcy Court (including the Final DIP Order), interest shall not accrue on Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.  Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Petition Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim.  Except as expressly provided herein, or in a Final Order of the Bankruptcy Court or other court of competent jurisdiction, no prepetition Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

M.      Setoff and Recoupment

        1.      By the Plan Administrator

        The Plan Administrator may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to this Plan in respect thereof, any claims or defenses of any nature whatsoever that any of the Debtor, the Estate, Liquidating BIPCo or the Plan Administrator may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim under this Plan shall constitute a waiver or release by the Debtor, the Estate, Liquidating BIPCo or the Plan Administrator of any right of setoff or recoupment that any such Entity may have against the Holder of any Claim.

        2.      By the Purchaser

        Notwithstanding anything herein to the contrary, pursuant to and in accordance with section 2.2.1 of the ASA, any Distribution to a Lender Owner on account of (a) such Lender Owner's Claim as a lender under the First Lien Credit Facility pursuant to Article III.B.2 hereof and (b) such Lender Owner's Claim as a DIP Lender under the DIP Credit Facility pursuant to Article II.A.2 hereof shall be offset against the Cash Component (as defined in the ASA) of the Purchase Price (as defined in the ASA), such that the Cash Component shall be reduced by the amount of such Lender Owner's Claims in lieu of a Distribution of Cash or other Assets by the Plan Administrator to the Lender Owner.

K&E 18129368.18

# ARTICLE VII.

## PROCEDURES FOR RESOLVING
## CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.      *Resolution of Disputed Claims*

    1.      Allowance of Claims

After the Effective Date, the Plan Administrator shall maintain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan or other Final Order of the Bankruptcy Court.   Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case (including the Confirmation Order and Final DIP Order), no Claim shall become an Allowed Claim unless and until the Plan Administrator determines, in its sole discretion, that such Claim shall be Allowed or such Claim is Allowed pursuant to Final Order of the Bankruptcy Court.   All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court under Bankruptcy Rule 9019, or otherwise, shall be binding on all parties.

    2.      Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date until the applicable Claims Objection Bar Date, the Plan Administrator, shall maintain the exclusive authority to file objections to Claims and settle, compromise, withdraw or litigate to judgment such objections.   From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.   The Plan Administrator shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

    3.      Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date, the Plan Administrator, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law, and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Plan Administrator has previously objected to such Claim, or whether the Bankruptcy Court has ruled on any such objection.   The Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during any litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.

Notwithstanding any other provision in this Plan, a Claim that the Plan Administrator has expunged from the Claims Register, but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.   All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.   Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

    4.      Expungement or Adjustment of Claims Without Objection

Any Claim that has been fully or partially paid, satisfied or superseded may be expunged or adjusted on the Claims Register by the Plan Administrator.   Any Claim that has been amended may be adjusted on the Claims Register by the Plan Administrator.   The Plan Administrator is authorized to take the foregoing action in this Article VII.A.4 without requiring that a claims objection be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

K&E 18129368.18

5.    Deadline to File Objections to Claims

Any objections to Claims shall be filed no later than the applicable Claims Objection Bar Date.

B.    *Disallowance of Claims*

All Claims of any Entity from which the Debtor, Liquidating BIPCo, the Plan Administrator or the Wind Down Creditors' Committee seek return of property under sections 542, 543, 550 or 553 of the Bankruptcy Code, or that the Debtor, Liquidating BIPCo, the Plan Administrator or the Wind Down Creditors' Committee allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be disallowed if (1) the Entity, on the one hand, and the Debtor, Liquidating BIPCo, the Plan Administrator or the Wind Down Creditors' Committee, as applicable, on the other hand, agree, or the Bankruptcy Court has determined by Final Order, that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code, and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

C.    *Amendments to Claims*

Except as otherwise provided herein, on or after the Effective Date, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Plan Administrator.  To the extent such prior authorization is not received, any such new or amended Filed Claim shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

D.    *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is filed prior to the Effective Date, no payment or Distribution provided under this Plan shall be made on account of such Claim, or portion thereof, unless and until such Disputed Claim becomes an Allowed Claim pursuant to a Final Order.

E.    *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions, if any, shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator shall provide the Distribution to which such Holder is entitled under this Plan as of the Effective Date, if any, to the Holder of such Allowed Claim without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

# ARTICLE VIII.

## TREATMENT OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES

A.    *Rejection of Executory Contracts and Unexpired Leases*

Except with respect to those Executory Contracts and Unexpired Leases assumed and assigned, or to be assumed and assigned by the Debtor in accordance with the terms of the ASA, this Plan shall constitute a motion to reject all of the Executory Contracts and Unexpired Leases that remain with the Estate, if any, for which the Debtor shall have no further liability.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a finding that such rejections are in the best interest of the Debtor, its Estate and all parties in interest in this Chapter 11 Case.

The Debtor reserves the right to assume and assign any Executory Contract or Unexpired Lease not assumed and assigned in accordance with the terms of the ASA.  In the event that the Debtor determines that it is in the best interests of the Estate to assume and assign an Executory Contract or Unexpired Lease, the Debtor shall

File, at least ten (10) days prior to the Confirmation Hearing an exhibit to this Plan identifying those Executory Contracts and Unexpired Leases that the Debtor intends to assume and assign.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Claims created by the rejection of Executory Contracts and Unexpired Leases pursuant to Article VIII.A of this Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be Filed with the Bankruptcy Court and served on the Debtor no later than 30 days after the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to Article VIII.A for which Proofs of Claim are not timely Filed will be forever barred from assertion against the Debtor, the Estate, Liquidating BIPCo, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided hereto. All such Claims shall, as of the Effective Date, be subject to the releases and permanent injunction set forth in Article X. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely Filed as provided herein shall be treated as General Unsecured Claims under this Plan and shall be subject to all of the provisions of this Plan.

# ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.      *Conditions*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B.

1.      All actions, documents, certificates and agreements necessary implement this Plan, including documents contained in any supplement hereto, shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; provided, however, that each document, instrument and agreement must be acceptable to the Debtor. All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements;

2.      The Sale Closing shall have occurred; and

3.      The Confirmation Order shall have become a Final Order.

K&E 18129368.18

B.       *Waiver of Conditions*

Notwithstanding the foregoing, but subject to Section 1127 of the Bankruptcy Code, the Debtor reserves the right to waive the occurrence of any condition precedent to the Effective Date or to modify any of the foregoing conditions precedent; provided, however, that the Debtor may not waive or modify the conditions precedent set forth in Article IX.A.2 above, though the Debtor does reserve the right to continue any scheduled Confirmation Hearing if the Sale has not closed by the date scheduled for the Confirmation Hearing. Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate this Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

# ARTICLE X.

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.       *Compromise and Settlement*

Notwithstanding anything herein to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective Distributions and treatments hereunder takes into account and conforms to the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code, or otherwise. As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant hereto (other than those set forth in the Prepetition Intercreditor Agreement, which shall survive the Effective Date). The Confirmation Order shall constitute the Bankruptcy Court's finding and determination that the settlements reflected in this Plan are (a) in the best interests of the Debtor, its Estate and all Holders of Claims, (b) fair, equitable and reasonable, (c) made in good-faith and (d) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019. The Confirmation Order shall approve the releases by all Entities of all such contractual, legal and equitable subordination rights or Remaining Causes of Action that are satisfied, compromised and settled pursuant hereto (other than those set forth in the Prepetition Intercreditor Agreement, which shall survive the Effective Date).

B.       *Releases*

1.       Releases by the Debtor

*PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN, INCLUDING, BUT NOT LIMITED TO, THE CREDITORS' COMMITTEE AVOIDANCE CAUSES OF ACTION, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE SALE AND THE IMPLEMENTATION OF THE LIQUIDATION CONTEMPLATED BY THIS PLAN, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED RELEASED BY THE DEBTOR, THE PLAN ADMINISTRATOR, CREDITORS' COMMITTEE AND THE ESTATE FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT THE DEBTOR, THE PLAN ADMINISTRATOR, THE CREDITORS' COMMITTEE OR THE ESTATE WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR EQUITY INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THIS CHAPTER 11 CASE AND THE CCAA CASES, SALE, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS*

27

PRIOR TO OR IN THIS CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE SALE, THIS PLAN, THE DISCLOSURE STATEMENT OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED WILLFUL MISCONDUCT, GROSS NEGLIGENCE, FRAUD, BREACH OF FIDUCIARY DUTY OR A CRIMINAL ACT; *PROVIDED, HOWEVER,* THAT NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, NOTHING HEREIN SHALL BE DEEMED TO RELEASE ANY ENTITY FROM THE PURCHASED CAUSES OF ACTION OR FROM ANY SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER ASSOCIATED THEREWITH.

      2.   Releases by Holders of Claims and Equity Interests

AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT WHERE OTHERWISE EXPRESSLY SET FORTH IN THIS PLAN, INCLUDING THE CREDITORS' COMMITTEE AVOIDANCE CAUSES OF ACTION, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST, EXCEPT WITH RESPECT TO THOSE HOLDERS OF CLAIMS OR EQUITY INTERESTS WHO VOTE TO REJECT THIS PLAN OR ARE DEEMED TO REJECT THIS PLAN, SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED THE DEBTOR, THE PLAN ADMINISTRATOR AND THE OTHER RELEASED PARTIES FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT SUCH HOLDER WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THIS CHAPTER 11 CASE AND THE CCAA CASES, THE SALE, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR (OR ANY OF ITS AFFILIATES) AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR DURING THIS CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE SALE, THIS PLAN, THE DISCLOSURE STATEMENT OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER RELATED OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED WILLFUL MISCONDUCT, GROSS NEGLIGENCE, FRAUD, BREACH OF FIDUCIARY DUTY OR A CRIMINAL ACT.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH DIRECTLY ABOVE DOES NOT RELEASE:  (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY UNDER THIS PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT EXECUTED TO IMPLEMENT THIS PLAN; (B) ANY OF THE AFOREMENTIONED RELEASED PARTIES FROM PERSONAL LIABILITY ON ACCOUNT OF ANY STATUTORY VIOLATION OF APPLICABLE TAX LAWS OR BAR ANY RIGHT OF ACTION ASSERTED BY A GOVERNMENTAL TAXING AUTHORITY AGAINST THE AFOREMENTIONED RELEASED PARTY FOR ANY STATUTORY VIOLATION OF APPLICABLE TAX LAWS; (C) ANY OBLIGATION OF ANY AFFILIATE OF THE DEBTOR OR ANY OTHER GUARANTOR TO PAY IN FULL IN CASH THE FIRST LIEN CLAIMS TO THE EXTENT AND MANNER SET FORTH IN THE FIRST LIEN CREDIT FACILITY OR ANY LOAN DOCUMENT GOVERNING OR ENTERED INTO IN CONNECTION WITH THE FIRST LIEN CREDIT FACILITY; OR (D) ANY ENTITY FROM THE PURCHASED CAUSES OF ACTION OR FROM ANY SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER  ASSOCIATED THEREWITH.

3.   Approval of the Releases

*ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES SET FORTH IN THIS ARTICLE X.B AND ITS FINDING THAT THE RELEASES ARE:  (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, REPRESENTING A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION THEREBY RELEASED; (B) IN THE BEST INTERESTS OF THE DEBTOR, ITS ESTATE AND ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO ANY OF THE DEBTOR, ITS ESTATE, THE PLAN ADMINISTRATOR OR CREDITORS' COMMITTEE TO ASSERT ANY CLAIM OR CAUSE OF ACTION THEREBY RELEASED.*

C.    Exculpation

*UPON AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE EXCULPATED PARTIES WILL ALL BE DEEMED TO HAVE SOLICITED ACCEPTANCES OF THIS PLAN IN GOOD-FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING SECTION 1125(E) OF THE BANKRUPTCY CODE.*

*EXCEPT WITH RESPECT TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THIS PLAN OR RELATED DOCUMENTS, INCLUDING THE CREDITORS' COMMITTEE AVOIDANCE CAUSES OF ACTION AND ONLY TO THE EXTENT OF THE CREDITORS' COMMITTEE AVOIDANCE CAUSES OF ACTION, THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR, ANY LIABILITY TO ANY ENTITY FOR ANY PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, ARISING FROM OR RELATING IN ANY WAY TO, THIS CHAPTER 11 CASE, INCLUDING (A) THE OPERATION OF THE DEBTOR'S BUSINESS DURING THE PENDENCY OF THIS CHAPTER 11 CASE, (B) FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING AND/OR EFFECTING THE SALE, THE DISCLOSURE STATEMENT OR THIS PLAN (INCLUDING ANY RELATED CONTRACT, INSTRUMENT, RELEASE, OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION THEREWITH), (C) THE SOLICITATION OF VOTES FOR THIS PLAN AND THE PURSUIT OF CONFIRMATION OF THIS PLAN, (D) THE ADMINISTRATION OF THIS PLAN AND/OR THE ASSETS TO BE DISTRIBUTED UNDER THIS PLAN, AND (E) ANY OTHER PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR IN CONTEMPLATION OF, THE DEBTOR'S LIQUIDATION.  IN ALL RESPECTS, EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER OR ITS RESPECTIVE DUTIES UNDER, PURSUANT TO OR IN CONNECTION WITH, THIS PLAN.*

*NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE FOREGOING SHALL NOT EXCULPATE ANY ENTITY FROM ANY LIABILITY RESULTING FROM (I) ANY ACT OR OMISSION CONSTITUTING FRAUD, WILLFUL MISCONDUCT, GROSS NEGLIGENCE, CRIMINAL CONDUCT, MALPRACTICE OR MISUSE OF CONFIDENTIAL INFORMATION THAT CAUSES DAMAGES OR ULTRA VIRES ACT AS DETERMINED BY A FINAL ORDER, OR (II) THE PURCHASED CAUSES OF ACTION.*

D.    Injunction

*FROM AND AFTER THE EFFECTIVE DATE, EXCEPT WHERE OTHERWISE EXPRESSLY SET FORTH IN THIS PLAN, INCLUDING THE CREDITORS' COMMITTEE AVOIDANCE CAUSES OF ACTION AND THE PURCHASED CAUSES OF ACTION, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE DEBTOR, LIQUIDATING BIPCO, THE PLAN ADMINISTRATOR, EACH RELEASED PARTY, EACH OF THEIR REPRESENTATIVES, THEIR SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION,*

*INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER.*

*EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO, INCLUDING, BUT NOT LIMITED TO, THE CREDITORS' COMMITTEE AVOIDANCE CAUSES OF ACTION AND THE PURCHASED CAUSES OF ACTION, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTOR, THE ESTATE, LIQUIDATING BIPCO, THE PLAN ADMINISTRATOR, EACH RELEASED PARTY, EACH OF THEIR REPRESENTATIVES, ANY OF THEIR SUCCESSORS AND ASSIGNS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS (INCLUDING EX OFFICIO MEMBERS), OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, ATTORNEYS, FINANCIAL ADVISORS, ACCOUNTANTS, MANAGED FUNDS, INVESTMENT BANKERS, INVESTMENT ADVISORS, ACTUARIES, PROFESSIONALS, AGENTS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), AND THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE THAT RELATE, IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, TO THE DEBTOR OR THIS CHAPTER 11 CASE.*

*THE RIGHTS AFFORDED IN THIS PLAN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS HEREIN SHALL BE IN EXCHANGE FOR, AND IN COMPLETE SATISFACTION OF, CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTOR OR ANY OF ITS ASSETS, PROPERTY OR ESTATE. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR SHALL BE FULLY RELEASED AS PROVIDED IN THIS PLAN.*

*EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR SHALL BE FULLY RELEASED, AND THE DEBTOR'S LIABILITY WITH RESPECT THERETO, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE, SHALL BE DEEMED SATISFIED.*

*EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO, INCLUDING THE CREDITORS' COMMITTEE AVOIDANCE CAUSES OF ACTION AND THE PURCHASED CAUSES OF ACTION, ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTOR, THE ESTATE, LIQUIDATING BIPCO, THE PLAN ADMINISTRATOR, EACH RELEASED PARTY, THEIR REPRESENTATIVES, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE THAT RELATE, IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, TO THE DEBTOR OR THIS CHAPTER 11 CASE.*

## ARTICLE XI.

### BINDING NATURE OF PLAN

THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THIS PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THIS CHAPTER 11 CASE, OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THIS PLAN OR VOTED (OR IS DEEMED TO HAVE VOTED) TO REJECT THIS PLAN.

# ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain the maximum legally permissible jurisdiction over this Chapter 11 Case and all Entities with respect to all matters related to this Chapter 11 Case, the Debtor and this Plan, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim, the resolution of any and all objections to the allowance or priority of any Claim, and the resolution of any and all issues related to the release of Liens upon payment of a Secured Claim;

2. for periods ending on or before the Effective Date, grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan;

3. resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable; and to adjudicate and, if necessary, liquidate, any Claims arising therefrom;

4. ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

5. decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the date hereof or that may be commenced in the future, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Plan Administrator after the Effective Date; provided, however, that the Plan Administrator shall reserve the right to commence actions in all appropriate forums and jurisdictions;

6. enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan or the Disclosure Statement;

7. resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

8. hear and determine all Remaining Causes of Action and Creditors' Committee Avoidance Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

9. issue injunctions and enforce them, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of this Plan, except as otherwise provided in this Plan;

10. resolve any cases, controversies, suits or disputes with respect to the releases by the Debtor, the exculpation and other provisions contained in Article X, and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

11. enter and implement such orders, or take such other actions as may be necessary or appropriate, if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

12. resolve any matters that may arise in connection with or relate to the Sale or the Sale Order, or any contract, instrument, other agreement or document adopted in connection with the Sale or the Sale Order, and to enter orders in connection therewith;

31

13.      resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

14.      enter an order concluding this Chapter 11 Case.

# ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

*A.      Modification of Plan*

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (1) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and in consultation with the Creditors' Committee, to amend or modify this Plan before the entry of the Confirmation Order; and (2) after the entry of the Confirmation Order, the Debtor or the Plan Administrator, as applicable, may, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission, or reconcile any inconsistency in, this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

*B.      Revocation of Plan*

The Debtor reserves the right to revoke or withdraw this Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtor revokes or withdraws this Plan, or if Confirmation or the Effective Date does not occur, then:  (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, if any, and any document or agreement executed pursuant hereto, shall be deemed null and void; and (3) nothing contained in this Plan shall (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity, (b) prejudice the Debtor or any other Entity's rights in any manner, or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtor or any other Entity.

*C.      Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, such Entity's heir, executor, administrator, successor or assign.

*D.      Reservation of Rights*

Except as expressly set forth herein, including with respect to votes cast on Ballots, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor or any other Entity with respect to this Plan, shall be, or shall be deemed to be, an admission or waiver of any rights of:  (1) the Debtor with respect to the Holders of Claims against, or Equity Interests in, the Debtor, or other Entity; or (2) any Holder of a Claim or an Equity Interest, or other Entity, before the Effective Date.

*E.      Payment of Statutory Fees*

The Plan Administrator shall pay from the Administrative Fund all fees payable pursuant to section 1930(a) of the Judicial Code for each quarter (including any fraction thereof) until this Chapter 11 Case is closed.

*F.      Section 1125(e) Good-Faith Compliance*

The Debtor, Liquidating BIPCo, the Plan Administrator and the other Released Parties, and each of their respective Representatives, shall be deemed to have acted in "good-faith" under section 1125(e) of the Bankruptcy Code in connection with the confirmation and consummation of this Plan.

G.      *Further Assurances*

The Debtor or Liquidating BIPCo, as applicable, all Holders of Claims receiving Distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents, and take any other actions as may be reasonably necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

H.      *Severability*

If, before Confirmation, any term or provision hereof is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted; provided, however, that any such alteration or interpretation must be in form and substance reasonably acceptable to the Debtor and, to the extent such alteration or interpretation affects the rights or treatment of Holders of General Unsecured Claims, the Creditors' Committee or its members, and, to the extent such alteration or interpretation affects the rights or treatments of Holders of First Lien Claims, the First Lien Credit Facility Agent; provided further, however, that the Debtor may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing.  Notwithstanding any such order, alteration or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

I.      *Service of Documents*

Any pleading, notice or other document required by this Plan to be served on or delivered to the Debtor shall be sent by overnight mail to each of the following individuals:

> White Birch Paper Company
> 80 Field Point Road
> Greenwich, Connecticut 06830
> Attn.:  Edward Sherrick
>
> with a copy to:
>
> Troutman Sanders LLP
> 222 Central Park Avenue, Suite 2000
> Virginia Beach, Virginia 23462
> Attn.:  Jonathan L. Hauser
>
> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Attn.:  Christopher J. Marcus
>
> Hunton & Williams LLP
> Riverfront Plaza, East Tower
> 951 E. Byrd Street
> Richmond, Virginia 23219
> Attn.:  Tyler Brown
>
> Office of the U.S. Trustee
> 701 East Broad Street, Suite 4304
> Richmond, Virginia 23219
> Attn.:  Robert Van Arsdale

33

J.        *Filing of Additional Documents*

On or before the Effective Date, the Debtor may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

[*Remainder of Page Intentionally Left Blank*]

34

Dated:    August 24, 2011

Respectfully submitted,

BEAR ISLAND PAPER COMPANY, L.L.C.,

By:     /s/ *Edward D. Sherrick*
Its:    Edward D. Sherrick
        Senior Vice President and Chief Financial Officer

Prepared by:

**TROUTMAN SANDERS LLP**                    **KIRKLAND & ELLIS LLP**
Jonathan L. Hauser                          Richard M. Cieri (admitted *pro hac vice*)
VSB No. 18688                               Christopher J. Marcus (admitted *pro hac vice*)
222 Central Park Avenue                     Richard M. Goldman (admitted *pro hac vice*)
Suite 2000                                  601 Lexington Avenue
Virginia Beach, Virginia 23462              New York, New York 10022-4611
Telephone:      (757) 687-7768              Telephone:      (212) 446-4800
Facsimile:      (757) 687-1505              Facsimile:      (212) 446-4900

Co-Counsel for the Debtor and Debtor in Possession

K&E 18129368.18

**<u>Exhibit A</u>**

**Plan Administrator Agreement**

**[TO COME]**

**Exhibit B**

**Estate Allocation**

**[TO COME]**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was sent either electronically or by first class mail, postage prepaid, this 24th day of August, 2011, to all necessary parties.


/s/ Jonathan L. Hauser