**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| BEAR ISLAND PAPER COMPANY, L.L.C.,[1] | ) | Case No. 10-31202 (DOT) |
| | ) | |
| Debtor. | ) | **Hearing Date:  October 5, 2011** |
| | ) | **Objection Deadline:  September 28, 2011** |

**DISCLOSURE STATEMENT FOR THE PLAN**
**OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR
APPROVAL BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT
HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  ACCORDINGLY, THIS IS NOT A
SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN WITHIN THE MEANING
OF SECTION 1125 OF THE BANKRUPTCY CODE.  ACCEPTANCES OR REJECTIONS MAY
NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE
BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS
SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL
ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**TROUTMAN SANDERS LLP**
222 Central Park Avenue
Suite 2000
Virginia Beach, Virginia 23462
Telephone:      (757) 687-7768
Facsimile:      (757) 687-1505

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022–4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Co-Counsel for the Debtor and Debtor in Possession

Dated:  August 24, 2011

---

[1]   The last four digits of the Debtor's federal tax identification number are 0914.  The principal address for the Debtor is 10026 Old Ridge Road, Ashland, Virginia 23005.

## DISCLAIMER

BEAR ISLAND PAPER COMPANY, L.L.C., THE DEBTOR AND DEBTOR IN POSSESSION IN THE ABOVE-CAPTIONED CHAPTER 11 CASE, IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO THE HOLDERS OF CLAIMS AND EQUITY INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (THE "PLAN").  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THE DEBTOR EXPECTS TO SEEK AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION" AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE, WHICH DETERMINATION DOES NOT CONSTITUTE A RECOMMENDATION OR APPROVAL OF THE PLAN.

UNLESS OTHERWISE SPECIFICALLY NOTED, THE DEBTOR IS MAKING THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF.  ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED.  HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY UPON THEIR OWN EVALUATION OF THE DEBTOR AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH OR REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT OF 1933 (AS AMENDED, THE "SECURITIES ACT"), OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES LAW.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE," OR THE NEGATIVE THEREOF, OTHER VARIATIONS THEREON OR ANY OTHER COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.

THE CONTENTS OF THIS DISCLOSURE STATEMENT MAY NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE.  THE DEBTOR URGES EACH HOLDER OF A CLAIM OR EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE DISCLOSURES CONTAINED IN THIS DISCLOSURE

STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT IS, OR SHALL BE DEEMED TO BE, AN ADMISSION OR STATEMENT AGAINST AN INTEREST BY THE DEBTOR FOR PURPOSES OF ANY PENDING OR FUTURE LITIGATION MATTER OR PROCEEDING.

ALTHOUGH THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTOR HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS REGARDING FINANCIAL, BUSINESS AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTOR, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.   THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTOR SHALL HAVE NO LIABILITY FOR THE INFORMATION IN THIS DISCLOSURE STATEMENT.

THE DEBTOR HAS NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.   THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.   CLAIMANTS AND EQUITY HOLDERS SHOULD NOT RELY UPON ANY INFORMATION, REPRESENTATIONS OR OTHER INDUCEMENTS THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS.   ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, YOU SHOULD READ THE PLAN IN ITS ENTIRETY.   IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, OR THE OTHER DOCUMENTS OR FINANCIAL INFORMATION TO BE INCORPORATED HEREIN BY REFERENCE, THE PLAN, OR SUCH OTHER DOCUMENTS, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES.   ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE DEBTOR PROVIDES NO ASSURANCE THAT THIS DISCLOSURE STATEMENT (AND THE EXHIBIT HERETO) THAT ARE ULTIMATELY APPROVED IN THIS CHAPTER 11 CASE (A) WILL CONTAIN ANY OF THE TERMS IN THIS CURRENT DOCUMENT, OR (B) WILL NOT CONTAIN DIFFERENT, ADDITIONAL OR MATERIAL TERMS THAT DO NOT APPEAR IN THIS CURRENT DOCUMENT.   THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBIT ATTACHED HERETO SHOULD NOT BE RELIED UPON IN MAKING INVESTMENT DECISIONS WITH RESPECT TO THE DEBTOR OR ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THIS CHAPTER 11 CASE.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS **5:00 P.M. PREVAILING EASTERN TIME ON NOVEMBER [14], 2011**, UNLESS EXTENDED BY THE DEBTOR.  TO BE COUNTED, THE NOTICE AND CLAIMS AGENT MUST **ACTUALLY RECEIVE** YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.

# TABLE OF CONTENTS

**Page**

I.      PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT ......................................................1

II.     SHORT SUMMARY OF THE PLAN AND THE CONFIRMATION PROCESS ......................................1
        A.      Overview of Chapter 11 ..............................................................................................................2
        B.      Purpose and Effect of the Plan ...................................................................................................2
        C.      Summary Treatment of Claims and Equity Interests Under the Plan............................................2
        D.      Entities Entitled to Vote on the Plan ..........................................................................................4
        E.      Voting Procedures.......................................................................................................................5
        F.      Confirmation Hearing .................................................................................................................5
        G.      Confirmation and Consummation of the Plan .............................................................................6
        H.      Risk Factors ................................................................................................................................6

III.    BACKGROUND OF THE CHAPTER 11 CASE.................................................................................7
        A.      WB Group and Bear Island's Organizational Structure and Business Operations........................7
        B.      Summary of WB Group and Bear Island's Prepetition Capital Structure ....................................8

IV.     EVENTS LEADING TO THE CHAPTER 11 CASE .........................................................................9

V.      SIGNIFICANT EVENTS OF THE CHAPTER 11 CASE ...............................................................10
        A.      Initial Motions and Certain Related Relief ...............................................................................10
        B.      Unsecured Creditors..................................................................................................................11
        C.      The Debtor's Restructuring Efforts and Sale of Assets.............................................................12
        D.      Chapter 11 Case Administration ...............................................................................................14

VI.     THE PLAN........................................................................................................................................15
        A.      Classification and Treatment of Claims and Equity Interests ...................................................15
        B.      Acceptance or Rejection of the Plan .........................................................................................18
        C.      Other Key Aspects of the Plan ..................................................................................................19
        D.      Retention of Jurisdiction ...........................................................................................................36
        E.      Miscellaneous Provisions of the Plan........................................................................................37

VII.    CONFIRMATION PROCEDURES...................................................................................................39
        A.      Confirmation Hearing ...............................................................................................................39
        B.      Statutory Requirements for Confirmation of the Plan...............................................................40
        C.      Best Interests Test .....................................................................................................................41
        D.      Feasibility..................................................................................................................................41
        E.      Confirmation Without Acceptance by All Impaired Classes .....................................................41
        F.      Contact for More Information ....................................................................................................42

VIII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES...............................................................42
        A.      Federal Income Tax Consequences of the Plan.........................................................................42

IX.     PLAN-RELATED RISK FACTORS ................................................................................................44
        A.      Certain Bankruptcy Law Considerations ..................................................................................44

X.      ALTERNATIVES TO THE CONFIRMATION AND CONSUMMATION OF THE PLAN ...................46
        A.      Liquidation Under Chapter 7 ....................................................................................................46
        B.      Alternative Plan(s) of Liquidation ............................................................................................46

XI.     GLOSSARY OF DEFINED TERMS ...............................................................................................46
        A.      Defined Terms ...........................................................................................................................46

XII.    CONCLUSION AND RECOMMENDATION ............................................................................................55

## **EXHIBIT**

**Exhibit A**          Plan of Liquidation Under Chapter 11 of the Bankruptcy Code

## I.    PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT

This Disclosure Statement is submitted by the Debtor, who is a proponent of the Plan.  The purpose of this Disclosure Statement is to provide Holders of Claims and other parties in interest who are entitled to vote on the Plan with sufficient information to enable them to make an informed decision as to whether to vote to accept or reject the Plan.  The purpose of the Plan is to effect a liquidation of the Debtor's assets in a manner that will maximize recoveries for Holders of Allowed Claims.[2]

This Disclosure Statement:

- describes the Debtor's capital structure (Article III, "Background of the Chapter 11 Case");

- describes the background and events leading to the Debtor's decision to commence the Chapter 11 Case (Article IV, "Events Leading to the Chapter 11 Case");

- describes the significant events that have occurred during the Chapter 11 Case (Article V, "Significant Events of the Chapter 11 Case");

- summarizes the Plan and the proposed treatment of Holders of Claims and Equity Interests under the Plan (Article VI, "The Plan");

- describes the procedures for soliciting and casting votes on and confirming the Plan (Article VII, "Confirmation Procedures");

- describes certain U.S. Federal Income Tax Considerations resulting from the Plan (Article VIII, "Certain Federal Income Tax Considerations");

- outlines certain factors creditors should consider before voting (Article IX, "Plan-Related Risk Factors"); and

- sets forth the alternatives to Confirmation of the Plan (Article X, "Alternatives to the Confirmation and Consummation of the Plan").

## II.    SHORT SUMMARY OF THE PLAN AND THE CONFIRMATION PROCESS

Pursuant to section 1125 of the Bankruptcy Code, the Debtor submits this Disclosure Statement to Holders of Claims and Equity Interests in connection with:  (a) the solicitation of votes to accept or reject the Plan, which was Filed by the Debtor with the Bankruptcy Court; and (b) the Confirmation Hearing, which is scheduled for **November [22], 2011 at 2:00 p.m. prevailing Eastern Time**.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan provides for the treatment of the debtor's debt in accordance with the terms of the confirmed plan.

Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical investor to make an informed judgment regarding acceptance of the chapter 11 plan.  This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

---

[2]    All capitalized terms used but not defined herein shall have the meanings set forth in the glossary set forth in Article XI.  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the glossary set forth in Article XI are inconsistent, the definition included in the glossary set forth in Article XI shall control.

The following summary is qualified in its entirety by the more detailed information and statements contained elsewhere in this Disclosure Statement and **Exhibit A** hereto.

**A.      Overview of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes fair and equitable treatment for similarly-situated creditors and similarly-situated equity interest holders subject to the priority of distributions prescribed by the Bankruptcy Code.

**B.      Purpose and Effect of the Plan**

The Plan is a liquidating plan.  The Plan provides for the termination of the Debtor's business operations and the liquidation of the Debtor's assets.  Subject to the rights of certain parties in interest to object to the allowance and/or priority of such claims as expressly set forth in the Plan, the Plan provides for the payment in full to holders of Allowed Administrative Claims and Allowed Priority Claims.  The Plan further provides for a recovery to holders of Allowed General Unsecured Claims.  Confirmation of the Plan is contingent upon the satisfaction of all the conditions precedent set forth in Article IX.A of the Plan, unless waived pursuant to Article IX.B of the Plan.

**C.      Summary Treatment of Claims and Equity Interests Under the Plan**

THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN, AND THE POTENTIAL DISTRIBUTIONS THEREUNDER.  THE AMOUNTS SET FORTH BELOW ARE ESTIMATES ONLY.  REFERENCE SHOULD BE MADE TO THIS ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS. THE RECOVERIES SET FORTH BELOW ARE PROJECTED RECOVERIES AND ARE THEREFORE SUBJECT TO CHANGE.  THE ALLOWANCE OF CLAIMS MAY BE SUBJECT TO LITIGATION OR OTHER ADJUSTMENTS, AND ACTUAL ALLOWED CLAIM AMOUNTS MAY DIFFER MATERIALLY FROM THESE ESTIMATED AMOUNTS.

| SUMMARY OF EXPECTED RECOVERIES FROM THE DEBTOR | | | |
|---|---|---|---|
| **Class/Type of Claim or Equity Interest** | **Projected Claims** | **Plan Treatment of Class** | **Projected Recovery Under Plan** |
| Class 1 -- Priority Non-Tax Claims | $0 | Except to the extent that a Holder of an Allowed Priority-Non Tax Claim agrees to a less favorable treatment, in full and final satisfaction of each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash on the later of the Effective Date or the date such Priority Non-Tax Claim becomes Allowed, or as soon as practicable thereafter. | 100% |

**SUMMARY OF EXPECTED RECOVERIES FROM THE DEBTOR**

| Class/Type of Claim or Equity Interest | Projected Claims | Plan Treatment of Class | Projected Recovery Under Plan |
|---|---|---|---|
| Class 2 -- First Lien Claims and Swap Agreement Claims | $424,897,392 | On the Initial Distribution Date, each applicable Quarterly Distribution Date thereafter and the Final Distribution Date, in full and final satisfaction of each Allowed First Lien Claim and Allowed Swap Agreement Claim, each Holder of such Allowed First Lien Claim and Allowed Swap Agreement Claim shall receive (a) such Holder's *Pro Rata* share of the Creditor Fund and (b) such Holder's *Pro Rata* share of all proceeds of the Prepetition Senior Collateral. Any Distribution described above shall be made by Liquidating BIPCo or the Plan Administrator, as applicable, to the First Lien Credit Facility Agent, and shall be applied by the First Lien Credit Facility Agent, in each case in accordance with the terms and conditions of the First Lien Credit Facility, and any expense reimbursement or indemnity provisions contained in the First Lien Credit Facility or any loan document governing or entered into in connection with the First Lien Credit Facility shall survive in the manner and to the extent set forth therein; provided, however, that any Claim of a Lender Owner shall be treated in accordance with Article VI.M of the Plan. | N/A [3] |
| Class 3-- Second Lien Claims | $105,078,888 | On the Initial Distribution Date, each applicable Quarterly Distribution Date thereafter and the Final Distribution Date, in full and final satisfaction of each Allowed Second Lien Claim, each Holder of such Allowed Second Lien Claim shall receive such Holder's *Pro Rata* share of the Creditor Fund to the extent permitted by the Prepetition Intercreditor Agreement. | N/A [4] |
| Class 4 -- General Unsecured Claims | $1,407,421 | On the Initial Distribution Date, each applicable Quarterly Distribution Date thereafter and the Final Distribution Date, in full and final satisfaction of each Allowed General Unsecured Claim, each Holder of such Allowed General Unsecured Claim shall receive such Holder's *Pro Rata* share of the Creditor Fund. | N/A [5] |
| Class 5 -- Intercompany Claims | $135,920,395 | On the Initial Distribution Date, each applicable Quarterly Distribution Date thereafter and the Final Distribution Date, in full and final satisfaction of each Allowed Intercompany Claim, each Holder of such Allowed Intercompany Claim shall receive such Holder's *Pro Rata* share of the Creditor Fund. | N/A [6] |

---

[3]   The Debtor does not believe that it can accurately estimate the projected recovery for Class 2 in view of the liquidating nature of the Plan, the uncertainty regarding the amount of recoveries, if any, from the Creditors' Committee Avoidance Causes of Action and the Remaining Causes of Action, and the costs involved in obtaining such estimation.

[4]   The Debtor does not believe that it can accurately estimate the projected recovery for Class 3 in view of the liquidating nature of the Plan, the uncertainty regarding the amount of recoveries, if any, from the Creditors' Committee Avoidance Causes of Action and the Remaining Causes of Action, and the costs involved in obtaining such estimation.

[5]   The Debtor does not believe that it can accurately estimate the projected recovery for Class 4 in view of the liquidating nature of the Plan, the uncertainty regarding the amount of recoveries, if any, from the Creditors' Committee Avoidance Causes of Action and the Remaining Causes of Action, and the costs involved in obtaining such estimation.

| SUMMARY OF EXPECTED RECOVERIES FROM THE DEBTOR | | | |
|---|---|---|---|
| Class/Type of Claim or Equity Interest | Projected Claims | Plan Treatment of Class | Projected Recovery Under Plan |
| Class 6 -- Equity Interests | $0 | Holders of Equity Interests shall neither receive nor retain any property under the Plan. | 0% |

## D.    Entities Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against and interests in a debtor are entitled to vote on a chapter 11 plan.  Holders of Claims that are not Impaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.

The Classes of Claims and Equity Interests are classified into separate Classes for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or an Equity Interest to be classified in a particular Class only to the extent that the Claim or the Equity Interest is within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of the Claim or Equity Interest is within the description of a different Class.

The following sets forth the Classes that are entitled to vote on the Plan and the Classes that are not entitled to vote on the Plan:

| SUMMARY OF STATUS AND VOTING RIGHTS | | | |
|---|---|---|---|
| Class | Claim | Status | Voting Rights |
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | First Lien Claims and Swap Agreement Claims | Impaired | Entitled to vote Claims |
| 3 | Second Lien Claims | Impaired | Entitled to vote Claims |
| 4 | General Unsecured Claims | Impaired | Entitled to vote Claims |
| 5 | Intercompany Claims | Impaired | Entitled to vote Claims |
| 6 | Equity Interests | Impaired | No (deemed to reject) |

The Debtor is **NOT** seeking votes from the Holders of Claims in Class 1 because that Class, and the Claims of any Holders in that Class, are Unimpaired under the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, those Classes are conclusively presumed to have accepted the Plan.

The Debtor is **NOT** seeking votes from the Holders of Equity Interests in Class 6.  Instead, the Debtor requests Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to Class 6.  Holders of Equity Interests in Class 6 are Impaired and will receive no distribution under the Plan.  Pursuant to section 1126(g) of the Bankruptcy Code, Class 6 is presumed to have rejected the Plan.

The Debtor **IS** soliciting votes to accept or reject the Plan from Holders of Claims in Classes 2, 3, 4 and 5 because Claims in the Voting Classes are Impaired under the Plan and may receive distributions under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

For a detailed description of the Classes of Claims and the Equity Interests, as well as their respective treatment under the Plan, see Article III of the Plan.

---

6    The Debtor does not believe that it can accurately estimate the projected recovery for Class 5 in view of the liquidating nature of the Plan, the uncertainty regarding the amount of recoveries, if any, from the Creditors' Committee Avoidance Causes of Action and the Remaining Causes of Action, and the costs involved in obtaining such estimation.

4

E.     **Voting Procedures**

1.     <u>Voting Record Date</u>

**The Record Date is October [5], 2011**.  The Record Date is the date that will determine:  (a) the Holders of Claims entitled to receive the Solicitation Package in accordance with the solicitation procedures attached to the Disclosure Statement Order (the "<u>Solicitation Procedures</u>"); (b) the Holders of Claims entitled to vote to accept or reject the Plan; and (c) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of such Claim.

2.     <u>Voting Deadline</u>

**The Voting Deadline is 5:00 p.m. prevailing Eastern Time on November [14], 2011**.  To ensure that a vote is counted, Holders of Allowed Claims must:  (a) complete the Ballot; (b) indicate a decision either to accept or reject the Plan; and (c) sign and return the Ballot to the address set forth on the pre-addressed envelope provided in the Solicitation Package, or by delivery by first-class mail, overnight courier or personal delivery, so that all Ballots are **actually received** by The Garden City Group, Inc., the Voting and Claims Agent, no later than the Voting Deadline.

The following Ballots will **not** be counted when determining whether the Plan has been accepted or rejected:  (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (b) any Ballot cast by an Entity that does not hold a Claim in a Class that is entitled to vote on the Plan; (c) any Ballot cast for a Claim scheduled as contingent, unliquidated or Disputed for which the applicable Claims Bar Date has passed and no Proof of Claim was timely Filed; (d) any unsigned Ballot; (e) any Ballot not marked to accept or reject the Plan, or marked both to accept and reject the Plan; and (f) any Ballot submitted by any Entity not entitled to vote pursuant to the Solicitation Procedures.

3.     <u>Voting Instructions for Holders of Claims</u>

Under the Plan, Holders of Claims in Voting Classes are entitled to vote to accept or reject the Plan, and may do so by completing and returning a Ballot so that it is **actually received** on or before the Voting Deadline by the Voting and Claims Agent at:  (a) (if by regular mail) WBP Bankruptcy Administration c/o GCG, PO Box 9550, Dublin, OH 43017-4850; or (b) (if by personal delivery or overnight courier) WBP Bankruptcy Administration, c/o GCG, 5151 Blazer Parkway, Suite A, Dublin, OH 43017.

**IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT WHEN SUBMITTING A VOTE.  IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTOR, IN ITS DISCRETION, DETERMINES OTHERWISE.  ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED.**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN, AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTOR THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIMS HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATE THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.**

F.     **Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to hold a hearing on Confirmation of a plan filed under chapter 11 of the Bankruptcy Code.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of a proposed plan.

1.      Confirmation Hearing Date

**The Confirmation Hearing will commence on November [22], 2011 at 2:00 p.m. prevailing Eastern Time**, before the Honorable Chief Justice Douglas O. Tice, Jr., United States Bankruptcy Judge, in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, Courtroom 5100, United States Bankruptcy Court, 701 East Broad Street, Richmond, Virginia 23219. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the Core Group, the 2002 List (each as defined in the *Order Establishing Certain Notice, Case Management and Administrative Procedures*, entered on February 26, 2010 [Docket No. 59]) and the Entities who have filed Plan Objections, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

2.      Plan Objection Deadline

**The Plan Objection Deadline is November [14], 2011 at 2:00 p.m. prevailing Eastern Time**. All Plan Objections must be filed with the Bankruptcy Court and served on the Debtor and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline. In accordance with the Confirmation Hearing Notice Filed with the Bankruptcy Court, Plan Objections or requests for modifications to the Plan, if any, must:

- be in writing;

- conform to the Bankruptcy Rules and the Local Bankruptcy Rules;

- state the name and address of the objecting Entity and the amount and nature of such Entity's Claim or Equity Interest;

- state, with particularity, the basis and nature of the Plan Objection, and, if practicable, a proposed modification to the Plan that would resolve such Plan Objection; and

- be Filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** by the notice parties identified in the Confirmation Hearing Notice on or prior to the Plan Objection Deadline.

The Debtor's proposed schedule for the voting and Confirmation of the Plan will provide Entities sufficient notice of the Plan Objection Deadline, which will be no less than 28 days required by Bankruptcy Rule 2002(b). The Debtor believes that the Plan Objection Deadline will afford the Bankruptcy Court, the Debtor and other parties in interest reasonable time to consider the Plan Objections prior to the Confirmation Hearing.

**THE BANKRUPTCY COURT WILL NOT CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

**G.      Confirmation and Consummation of the Plan**

It will be a condition to Confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan. Following Confirmation, the Plan will be consummated on the Effective Date.

**H.      Risk Factors**

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IN A VOTING CLASS SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN, ENTITLED "PLAN-RELATED RISK FACTORS."**

## III.   BACKGROUND OF THE CHAPTER 11 CASE

**A.   WB Group and Bear Island's Organizational Structure and Business Operations**

   1.   <u>WB Group's Business Operations</u>

   White Birch Paper Holding Company ("<u>WB Holding</u>") is a Nova Scotia limited liability company, which, as depicted on the following organizational structure chart, directly or indirectly owns 100% of its 17 subsidiaries, including Bear Island (collectively, the "<u>WB Group</u>").



   Notably, WB Holding is owned by:  (a) 3095809 Nova Scotia Company, a Nova Scotia company wholly-owned by (i) Mr. Peter Brant and (ii) PB-RF, Inc., a Delaware corporation, 100% owned by Mr. Peter Brant; (b) RF White Birch L.P., a Delaware limited partnership, 50% of which is owned by White Birch Investor I and White Birch Investor II LLC, respectively; and (c) Brant Paper, Inc. (directly and through a wholly-owned subsidiary, Soucy Partners Newsprint, Inc.), a Delaware corporation, 100% owned by Mr. Peter Brant.

   2.   <u>The WB Group's Business Operations</u>

   In addition to the Bear Island mill located in Ashland Virginia, the WB Group operates three pulp and paper mills in the province of Quebec, Canada, respectively situated in Quebec City (the "<u>Stadacona Mill</u>"), Riviere-du-Loup (the "<u>Soucy Mill</u>") and Masson-Angers, Quebec (the "<u>Papier Masson Mill</u>").   The WB Group is the second-largest newsprint producer in North America.  As of December 31, 2009, the WB Group held a 12% share of the North American newsprint market and employed approximately 1,300 individuals.  For the twelve months ended

December 31, 2009, the WB Group maintained an annual production capacity of approximately 1.3 million metric tons of newsprint and directory paper, up to 50% of which consists of recycled content, and achieved net sales of approximately $667 million.

3.     <u>Bear Island's Business Operations</u>

Bear Island's history dates back to April 1978 when its predecessor, Bear Island Paper Company, L.P. ("<u>Bear Island Predecessor</u>"), was formed as a limited partnership owned by White Birch Paper Company ("<u>White Birch Company</u>"), as general partner, and subsidiaries of The Washington Post Company ("<u>The Washington Post</u>") and Dow Jones & Company ("<u>Dow Jones</u>"), as limited partners. In 1997, White Birch Company redeemed The Washington Post and Dow Jones's respective 35% limited partnership interests in the Bear Island Predecessor. As a result of these acquisitions and related transactions, White Birch Company became the sole owner of Bear Island.

Bear Island employs approximately 200 (or 15%) of the WB Group's approximately 1,300 total employees. On an annual basis, Bear Island maintains a production capacity of approximately 235,000 tons of newsprint paper for sale to customers throughout New York, Philadelphia, Baltimore and Washington, D.C. In addition to its newsprint production, Bear Island also operates a woodyard, pulping system, recycling facility, water treatment facility, industrial landfill for its on-site solid waste disposal and related utility, storage and transportation facilities. For the twelve months ended December 31, 2009, Bear Island's net sales totaled approximately $125 million, which accounted for 19% of WB Group's net sales for the same period.

**B.     Summary of WB Group and Bear Island's Prepetition Capital Structure**

1.     <u>WB Group's Capital Structure</u>

Prior to the Petition Date, the WB Group's principal debt obligations consisted of the following three major credit agreements, each of which is more fully described below: (a) the First Lien Credit Facility; (b) the Second Lien Credit Facility; and (c) the Revolving ABL Agreement   Bear Island serves as a guarantor under the First and Second Lien Credit Facilities and a borrower under the Revolving ABL Agreement. In addition, White Birch Company is a party to the Swap Agreements, which, as of the Petition Date, were out of the money by approximately $51.5 million in the aggregate.

a.     First Lien Credit Facility

On or about April 8, 2005, White Birch Company and WB Holding, as borrowers, entered into that certain First Lien Credit Facility. As of the Petition Date, approximately $428 million in principal and $9.8 million in interest remained outstanding under the First Lien Credit Facility. Bear Island, among others, guarantees the borrowers' obligations under the First Lien Credit Facility. To secure their obligations under the First Lien Credit Facility, the WB Group granted first priority liens and security interests in substantially all of their assets, including Bear Island's assets, other than assets that are pledged to the lenders under the Revolving ABL Agreement (the "<u>Term Loan Collateral</u>").

b.     Second Lien Credit Facility

On or about April 8, 2005, White Birch Company and WB Holding, as borrowers, entered into that certain Second Lien Credit Facility. As of the Petition Date, approximately $100 million in principal and $4 million in interest remained outstanding under the Second Lien Credit Facility. Bear Island, among others, guarantees the borrowers' obligations under the Second Lien Credit Facility. To secure their obligations under the Second Lien Credit Facility, the WB Group granted second priority liens and security interests in the Term Loan Collateral.

c.     Revolving ABL Agreement

On or about March 29, 2005, the ABL Borrowers entered into that certain Revolving ABL Agreement. As of the Petition Date, approximately $50 million remained outstanding under the Revolving ABL Agreement, including undrawn letters of credit. To secure their obligations under the Revolving ABL Agreement, the WB

Group granted first priority liens and security interests on, among other things, their inventory, accounts receivable and cash (the "Revolving ABL Collateral").[7]

> d.    The Swap Agreements

Prior to the Petition Date, White Birch Company entered into certain transactions pursuant to the Swap Agreements.  As of the Petition Date, the interest rate swap transactions under the Swap Agreements were terminated and payments of approximately $51.5 million remained outstanding under the Swap Agreements.  Bear Island, among others, guarantees the borrowers' obligations under the Swap Agreements.  The Swap Agreements are secured by the Term Loan Collateral, including Bear Island's assets, and the Swap Agreement lenders' liens in such collateral rank *pari passu* with the lenders under the First Lien Term Credit Facility.

> e.    Trade Debt

As of January 31, 2010, Bear Island had incurred in the ordinary course of business approximately $9.5 million of trade debt and accrued liabilities that remained due and owing.

## IV.    EVENTS LEADING TO THE CHAPTER 11 CASE

For more than a year prior to the Petition Date, the WB Group was confronted with an unprecedented combination of negative economic circumstances, including:  (a) the overall decline in the world economy and its impact on demand for, and price and inventories of, newsprint; (b) the fundamental decline in demand for newsprint as consumers established greater reliance on electronic alternatives; (c) the increased strength of the Canadian dollar and corresponding weakness of the U.S. dollar; (d) the WB Group's significant debt service obligations; and (e) the detrimental effect of low floating interest rates on the WB Group's position in under the Swap Agreements.

Specifically, the worldwide economic downturn caused newsprint prices to drop nearly $330 per metric ton between the fourth quarter 2008 through the third quarter 2009, resulting in the WB Group losing approximately $380 million in revenue.  Moreover, because most of the WB Group's clients are located in the U.S. and remit payment in U.S. currency, yet most of the WB Group's expenses are payable in Canadian currency, the increased strength of the Canadian dollar and the weakness of the U.S. dollar contributed to the WB Group's financial decline.

In response to the impact these factors had on the WB Group's finances, and in an effort to maximize value and efficiency during this difficult time, the WB Group, beginning in 2009 and through early January 2010, significantly increased its cost-cutting efforts and reduced output at all of the WB Group's mills.  As part of these cost-cutting efforts, the WB Group shutdown production at each of its mills for the following extended periods of time:  (a) Stadacona Mill - 107,000 metric tons (75 days); (b) Papier Masson Mill - 452,000 metric tons (76 days); (c) Bear Island Mill - 30,000 metric tons (46 days); and (d) Soucy Mill - 20,000 metric tons (28 days).

In addition to these output reductions, the WB Group took various other cost-cutting measures, most notably:  (a) reducing capital expenditures to the bare minimum required to continue operating the WB Group's mills; (b) imposing restrictions on travel and other related expenses; and (c) suspending the corporate policy of matching U.S. employees' 401(k) contributions through December 31, 2009.  Unfortunately, these cost-cutting measures were not sufficient to combat the increasing severity of the WB Group's liquidity crisis.  As a result of its liquidity issues, on September 30, 2009, the WB Group failed to make certain payments pursuant to its First and Second Lien Term Credit Facilities, and Swap Agreements, including:  (a) an interest payment of approximately $3.7 million under the First Lien Credit Facility; (b) an interest payment of approximately $1.4 million under the Second Lien Credit Facility; and (c) payments of approximately $51.5 million under the Swap Agreements.

In light of the WB Group's continued financial difficulties, in September 2009, management approached the lenders under the First Lien Credit Facility and counterparties to the Swap Agreements in an effort to seek a comprehensive waiver and forbearance that would provide the WB Group with an opportunity to negotiate a consensual restructuring.  To that end, on or about September 30, 2009, the WB Group executed forbearance

---

[7]    The summary descriptions of the Term Loan Collateral and the Revolving ABL Collateral are qualified entirely by reference to the collateral descriptions in the respective loan and collateral agreements.

agreements with the agent and lenders under the First Lien Credit Facility, and the counterparty under the CS Swap Agreement, respectively, pursuant to which the agent and lenders, and swap counterparty, agreed to forbear from exercising their rights and remedies through and including October 30, 2009. Such forbearance agreements were amended on three separate occasions, extending these forbearance periods through and including February 26, 2010.

In addition, on or about October 5, 2009, the WB Group entered into forbearance agreements with the lenders under the Revolving ABL Agreement and the counterparty under the ML Swap Agreement, pursuant to which such lenders and counterparty agreed to forbear from exercising their rights and remedies through and including October 30, 2009. Such forbearance agreements were similarly amended on three separate occasions, extending these forbearance periods through and including February 26, 2010.

Then, on or about October 30, 2009, the WB Group entered into a forbearance agreement with the counterparty under the TD Swap Agreement, pursuant to which The Toronto-Dominion Bank agreed to forbear from exercising its and rights and remedies through and including November 30, 2009. Such forbearance agreement was similarly amended on two separate occasions, extending this forbearance period through and including February 26, 2010.

Finally, the WB Group engaged in discussions with certain lenders under the Second Lien Credit Facility regarding entry into a forbearance agreement. Unfortunately, the WB Group and such lenders were unable to agree upon the terms of a forbearance. Notwithstanding this result, the lenders under the Second Lien Credit Facility were subject to a 180-day standstill pursuant to the Prepetition Intercreditor Agreement, dated as of May 8, 2007, and thus, were precluded from exercising their rights or remedies related to the WB Group's missed payment under the Second Lien Credit Facility through and including the end of March 2010.

During the forbearance periods described above, the WB Group participated in arms-length and good faith negotiations to reach an out-of-court arrangement with certain of its stakeholders. Unfortunately, no out-of-court restructuring could be reached. Accordingly, the WB Group determined that commencing this chapter 11 case, the related chapter 15 cases and the CCAA Cases, was in the best interests of its stakeholders.

## V.   SIGNIFICANT EVENTS OF THE CHAPTER 11 CASE

### A.   Initial Motions and Certain Related Relief

On February 24, 2010, Bear Island filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Bear Island continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this Chapter 11 Case. On March 3, 2010, pursuant to section 1102 of the Bankruptcy Code, the U.S. Trustee appointed the Creditors' Committee [Docket No. 90], which was reconstituted on April 6, 2010 [Docket No. 184].

In the days and weeks immediately after the Petition Date, the Debtor devoted substantial efforts to stabilizing its operations and preserving and restoring its relationships with vendors, customers, employees and utility providers. To that end, the Debtor sought and obtained a number of orders from the Bankruptcy Court to minimize disruption to its operations and facilitate the administration of this Chapter 11 Case. Several of these orders are briefly summarized below.

### 1.   Postpetition Financing

The Debtor filed a motion requesting authority to (a) enter into the DIP Credit Facility and (b) use postpetition cash collateral during the course of this Chapter 11 Case [Docket No. 26]. On March 31, 2010, the Bankruptcy Court entered the Final DIP Order [Docket No. 171] granting the requested relief. Notably, the WB Group used the proceeds from the DIP Credit Facility to satisfy its obligations under the Revolving ABL Agreement in full.

2.       Cash Management System

The Debtor filed a motion seeking Bankruptcy Court authorization to continue using its existing cash management system, bank accounts, investment practices and business forms [Docket No. 8]. On February 26, 2010, the Bankruptcy Court entered an order granting the requested relief [Docket No. 34]. The order was later amended upon the Creditors' Committee's request [Docket No. 150].

3.       Employee Compensation

The Debtor filed a motion seeking Bankruptcy Court authorization to pay, among other things, prepetition claims and obligations for (a) employees wages, salaries, bonuses, commissions and other compensation, (b) deductions and payroll taxes, (c) reimbursable employee expenses and (d) employee medical and similar benefits. The motion also requested the modification of the automatic stay to allow all workers' compensation claims, both pre- and postpetition, to proceed in the appropriate judicial or administrative forum [Docket No. 9]. On March 25, 2010, the Bankruptcy Court entered a final order granting the requested relief [Docket No. 43].

4.       Customer Programs

The Debtor filed a motion seeking Bankruptcy Court authority to maintain and administer customer programs, and honor prepetition obligations to customers related thereto, in the ordinary course of business and in a manner consistent with past practice [Docket No. 10]. On February 26, 2010, the Bankruptcy Court entered an order granting the requested relief [Docket No. 60].

5.       Shippers and Claimants

The Debtor filed a motion seeking Bankruptcy Court authority to pay, in the ordinary course of business and in its business judgment, certain prepetition claims of shippers and materialmen lien claimants [Docket No. 13]. On February 26, 2010, the Bankruptcy Court entered an order granting the requested relief [Docket No. 63].

6.       Retention of Professionals

To assist the Debtor in carrying out its duties as a debtor in possession, and to represent the Debtor's interests in this Chapter 11 Case, the Debtor received Bankruptcy Court authorization to employ and retain: Kirkland & Ellis LLP as bankruptcy counsel [Docket No. 158]; Troutman Sanders LLP as bankruptcy co-counsel [Docket No. 155]; AlixPartners, LLP as restructuring advisor [Docket Nos. 159 and 495]; Lazard Frères & Co. LLC as investment banker and financial advisor [Docket No. 214]; The Garden City Group, Inc., as notice, claims and solicitation agent [Docket No. 65]; and Cahill Gordon Reindel LLP as special anti-trust counsel [Docket No. 516]. The Debtor also sought and received Bankruptcy Court authorization to retain certain "ordinary course professionals" to assist in matters typically related to the operation of the Debtor's business [Docket No. 153].

7.       Operational Stabilization and Case Administration

In addition to the relief described above, the Debtor received Bankruptcy Court authorization to: (a) manage this Chapter 11 Case under certain proposed procedures [Docket No. 59]; (b) continue its insurance programs [Docket No. 61]; (c) pay its taxes and certain fees in the ordinary course of business [Docket No. 154]; (d) prohibit certain utility providers from discontinuing service [Docket No. 152]; (e) implement a cross-border procedural protocol to govern the cross-border administration of this Chapter 11 Case [Docket No. 157]; (f) extend the deadline for filing its schedules of assets and liabilities and statement of financial affairs [Docket No. 64]; and (g) implement procedures to compensate professionals retained in this Chapter 11 Case [Docket No. 156].

**B.    Unsecured Creditors**

1.       Appointment of the Creditors' Committee

On March 3, 2010, pursuant to section 1102 of the Bankruptcy Code, the U.S. Trustee appointed the Creditors' Committee [Docket No. 90], which was reconstituted on April 6, 2010 [Docket No. 184]. The members

of the Creditors' Committee are: (a) Rappahannock Electric Cooperative; (b) Voith Paper Fabrics & Rolls Systems, Inc.; (c) Hanover County; (d) Falling Creek Log Yard Inc.; and (e) Baden Tax Management, LLC.

The Creditors' Committee sought and received Bankruptcy Court authorization [Docket Nos. 203, 202, 204 and 384] to employ and retain Hunton & Williams, LLP ("Hunton") as counsel to the Creditors' Committee, FTI Consulting, Inc. ("FTI") as financial advisors to the Creditors' Committee, Borden Ladner & Gervais LLP ("Borden") as special Canadian counsel to the Creditors' Committee, and Tavenner & Beran, PLC ("Tavenner") as conflicts counsel to the Creditors' Committee.

2.      Meeting of Creditors

The meeting of creditors pursuant to section 341 of the Bankruptcy Code was held on April 7, 2010 at 2:30 p.m. prevailing Eastern Time at the Office of the U.S. Trustee, 701 East Broad Street, Suite 4300, Richmond, Virginia 23219. In accordance with Bankruptcy Rule 9001(5), which requires, at a minimum, that one representative of the Debtor appear at such meeting of creditors for the purpose of being examined under oath by a representative of the U.S. Trustee and by any attending parties-in-interest, a representative of the Debtor as well as counsel to the Debtor attended the meeting and answered questions posed by the U.S. Trustee and other parties-in-interest present at the meeting.

C.      **The Debtor's Restructuring Efforts and Sale of Assets**

1.      Dual-Track Approach

Pursuant to the terms of the DIP Credit Facility, Bear Island was required to take a dual-track approach to its restructuring and contemporaneously pursue (a) a chapter 11 plan of reorganization in conjunction with a plan of arrangement for the CCAA Applicants (collectively, the "Cross-Border Plan"), and (b) a going-concern sale of all or substantially all of its and the WB Group's assets pursuant to section 363 of the Bankruptcy Code (the "Sale"). Despite management's good-faith efforts, the WB Group was unable to satisfy the milestones under the DIP Credit Facility regarding the Cross-Border Plan. Accordingly, the WB Group focused its efforts towards satisfying the DIP Credit Facility's milestones under regarding consummation of the Sale.

2.      Sale Procedures and Marketing Efforts

To that end, on April 28, 2010, the Bankruptcy Court entered the SISP Procedures and SISP Order. The SISP Procedures and SISP Order described, among other things, (a) the assets to be sold, (b) the manner in which prospective bidders would be solicited and gain access to due diligence materials concerning the assets, (c) the manner in which bidders and bids were to become qualified and (d) the manner in which bids would be solicited and negotiated. Pursuant to the SISP Procedures and SISP Order, the WB Group undertook a comprehensive marketing process to effectuate the Sale. Such efforts included: (x) the dissemination of marketing materials to potential bidders; (y) entering into confidentiality agreements with sixteen potential bidders; and (z) the transmittal of diligence materials to fourteen potential bidders. Bear Island retained Mr. Alan Holtz, a managing director in the Turnaround and Restructuring Services division of AlixPartners, LLP, the Debtors' restructuring advisor, to serve as an independent advisor to the Debtor's board of directors and assist the Debtor's board of directors with its evaluation of the Sale process.

By June 15, 2010, the WB Group had received non-binding indications of interest from four potential bidders regarding the purchase of all or any portion of the assets for sale. The WB Group and its advisors evaluated these indications of interest, and, based upon such analysis, invited two such parties to participate in further discussions and complete a due diligence process with respect to the relevant assets, with the intention that one of these parties would eventually serve as the stalking horse bidder for such assets. Following such parties' additional diligence and active discussions with the WB Group and its advisors, by July 15, 2010, the WB Group had received one offer to purchase all or substantially all of the assets from the Purchaser (the "Initial Offer").

3.     The Stalking Horse Agreement

Following receipt of the Initial Offer, from July 15, 2010 through August 10, 2010, the WB Group, with the assistance of its advisors, negotiated in good-faith and at arms' length with the Purchaser regarding, among other things: (a) the purchase price and net value (including assumed liabilities and other obligations to be performed or assumed by the Purchaser); (b) assets to be included and excluded from the bid; (c) issues surrounding the post-closing employment of certain of the WB Group's management by the Purchaser and the terms and conditions of such employment; (d) issues pertaining to ongoing management and operations of the business post-closing; (e) the transition services required from the WB Group post-closing and any related costs; and (f) the likelihood and timing of consummating the Sale. The Creditors' Committee was an active participant throughout the course of these negotiations, which involvement resulted in certain concessions on the part of the Purchaser and an increase in the recovery to the Estate as a result of the Sale.

At the conclusion of these negotiations, on August 10, 2010, the WB Group, including Bear Island, with the support of the Creditors' Committee, entered into the ASA with the Purchaser.

4.     The Sale Motion and Auction

Contemporaneously with the execution of the ASA, Bear Island filed the *Motion of Bear Island Paper Company, L.L.C. for Entry of Orders Approving the (A) Form of the Sale Agreement, (B) Bidding Procedures, (C) Form and Manner of Notice of the Auction and Sale Hearing, (D) Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (E) Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and (F) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 403] (the "Sale Motion"). The Sale Motion requested, among other things, the Bankruptcy Court's approval of the proposed Bidding Procedures. The Bidding Procedures included, among other things, (a) the process by which a potential buyer may submit a bid to be considered at the Auction, (b) the deadline for the submission of such bids, (c) the time and place of, and procedures governing, the Auction, and (d) the procedures for the WB Group's selection of the winning bid.

On September 1, 2010 the Bankruptcy Court entered the *Order Approving (A) the Form of the Sale Agreement, (B) the Bidding Procedures, (C) the Sale Notice and (D) the Assumption Procedures and Assumption Notice* [Docket No. 469] (the "Bid Procedures Order"), which, among other things, approved the Bidding Procedures. On September 21, 2010, the Debtor conducted the Auction at the conclusion of which, the Debtor determined that, in accordance with the terms and conditions of the Bid Procedures Order, the Purchaser was the successful bidder. The Purchaser's bid consisted of, among other things, $94.5 million in cash and a $78 million credit bid (the "Winning Bid"). The Debtor also determined that Sixth Avenue, a group of minority lenders under the First Lien Credit Facility, qualified as the alternative bidder given that Sixth Avenue submitted the next highest or otherwise second best qualified bid during the Auction. Sixth Avenue's final bid at the Auction consisted of, among other things, $172 million in cash after accounting for expense reimbursement obligations under the Asset Sale Agreement (the "Sixth Avenue Bid"). On September 22, 2010, the Debtor provided notice of the Auction's outcome [Docket No. 503].

5.     The Sale Objections and Sale Order

On September 24, 2010, Sixth Avenue filed the *Objection of Minority First Lien Lenders to Proposed Terms of Sale of Assets to BD White Birch Investment LLC* [Docket No. 518] (the "Sixth Avenue Sale Objection") and a group of majority lenders under the Second Lien Credit Facility filed the *Response of Majority Second Lien Lenders in Their Capacity as Unsecured Creditors to Debtor's Motion for Entry of Order Approving Sale* [Docket No. 517] (the "Majority Second Lien Lenders' Sale Objection," and together with the Sixth Avenue Sale Objection, the "Sale Objections"). On September 28, 2010, the Debtor filed its *Omnibus Reply of Bear Island Paper Company, L.L.C. to (A) the Objection of Minority First Lien Lenders to Proposed Terms of Sale of Assets to BD White Birch Investment LLC and (B) the Response of Majority Second Lien Lenders in Their Capacity as Unsecured Creditors to Debtor's Motion for Entry of Order Approving Sale* [Docket No. 526] (the "Omnibus Sale Objections Reply"). On September 30, 2010, the Bankruptcy Court held a hearing to consider entry of the proposed sale order, the Sale Objections and the Omnibus Sale Objections Reply. At the conclusion of the hearing, the Bankruptcy Court requested additional briefing concerning the Purchaser's right to credit bid on assets that were not secured by the

First Lien Credit Facility. Accordingly, on October 8, 2010, the Debtor filed the *Post Trial Brief of Bear Island Paper Company, L.L.C. in Support of Entry of an Order (A) Authorizing and Approving the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of the Assigned Contracts and (C) Granting Related Relief* [Docket No. 548] (the "Post Trial Brief") and Sixth Avenue filed the *Minority First Lien Lenders' Post-Hearing Submission Addressing the Issue of Credit Bidding for Unencumbered Assets* [Docket No. 549] (the "Post-Hearing Submission"). On October 13, 2010, the Bankruptcy Court held a telephonic hearing whereby the Bankruptcy Court ruled that the Purchaser's Winning Bid was the highest and otherwise best bid received at the Auction and instructed the parties to submit a consensual form of order approving the Sale.

Thereafter, the Debtor worked diligently with the Purchaser, Sixth Avenue, the Creditors' Committee and counsel to the First Lien Credit Facility Agent to reach a consensual form of sale order. Unfortunately, after two weeks of good-faith, arms' length negotiations, the parties were unable to submit a consensual form of order. Accordingly, on October 26, 2010, the Debtor and Sixth Avenue each submitted a letter to the Bankruptcy Court with their respective forms of sale order and an explanation as to the outstanding issues that precluded the parties from agreeing on a consensual form of sale order [Docket Nos. 578 and 579]. Upon the Bankruptcy Court's review of the parties' respective letters and forms of sale order, on November 1, 2010, the Bankruptcy Court filed a letter accepting the Debtor's proposed form of order [Docket No. 581] and entered the *Order (A) Authorizing and Approving the Sale of Assets Free and Clean of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of the Assigned Contracts and (C) Granting Related Relief*, entered on November 3, 2010 (the "Sale Order") [Docket No. 582].

**D.      Chapter 11 Case Administration**

      1.      The Filing of the Schedules and Setting of Bar Dates

          a.      Filing the Schedules

On March 31, 2010, the Debtor filed its Schedules with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code [Docket No. 172].

          b.      Establishment of the Bar Dates

On May 13, 2010, the Bankruptcy Court entered the Bar Date Order: (i) setting July 6, 2010 as the General Bar Date (except for governmental units and certain Claims arising from the rejection of unexpired leases and executory contracts); and (ii) setting August 23, 2010, as the Governmental Bar Date. In accordance with the Bar Date Order, written notice of the General Bar Date and Governmental Bar Date was mailed to, among others, all Holders of Claims listed on the Schedules. In addition, the Debtor published notice of the General Bar Date and Governmental Bar Date in the National Edition of *The Wall Street Journal* and *The Richmond Times-Dispatch*.

On March 29, 2011, the Bankruptcy Court entered the Administrative Claims Bar Date Order setting the Administrative Claims Bar Date as the date that is thirty-five (35) days following the Effective Date [Docket No. 774].

      2.      Exclusivity

Section 1121(b) and (c) of the Bankruptcy Code provide that a debtor has the exclusive right to (a) propose a chapter 11 plan for the first 120 days of a chapter 11 case and (b) solicit votes for its plan for an additional 60 days. Section 1121(d) of the Bankruptcy Code authorizes a bankruptcy court to extend these exclusive periods, for cause shown, by as much as 18 months (to file a plan) and 20 months (to solicit votes). In accordance with Section 1121(c) of the Bankruptcy Code, the Bankruptcy Court granted the Debtor's requests to extend its exclusive periods to propose a chapter 11 plan and solicit votes thereon [Docket Nos. 337, 515, 655, 773 and 839]. Pursuant to such orders, the Debtor's exclusive right to (a) propose a chapter 11 plan expires on August 25, 2011 and (b) solicit votes for its plan expires on October 25, 2011.

## VI.       THE PLAN

> THIS **ARTICLE VI** IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE **MATERIAL TERMS**
> OF THE PLAN.  IT IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT
> AND THE PLAN, AND SHOULD **NOT** BE RELIED UPON FOR A COMPREHENSIVE DISCUSSION OF
> THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS **ARTICLE VI**
> AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL GOVERN.

**A.       Classification and Treatment of Claims and Equity Interests**

The Plan designates five classes of Claims and one Class of Equity Interests, and leaves certain Claims unclassified.  The following sections describe more fully the classification and treatment of Claims and Equity Interests under the Plan.

1.       Unclassified Claims

a.       Administrative Claims

Administrative Claims are those Claims against the Debtor constituting a cost or expense of administration of this Chapter 11 Case of the kind specified in section 503(b) of the Bankruptcy Code, and entitled to priority pursuant to sections 363, 364(c)(1), 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code for the period from the Petition Date to the Effective Date.  The Bankruptcy Code does not require the Debtor to classify Administrative Claims under the Plan.  It does, however, require that, in order for the Plan to be Confirmed, the Debtor to provide that Allowed Administrative Claims be paid in full in Cash, unless a Holder of such Claim consents to different treatment.

Pursuant to the Plan, unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtor or the Plan Administrator, as applicable, each Holder of an Allowed Administrative Claim (other than any Professional Fee Claim) shall receive, in full and final satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim either:  (i) on the Effective Date; (ii) if the Administrative Claim is not Allowed as of the Effective Date, as soon as reasonably practicable after the date on which (A) the Plan Administrator, in its sole discretion, determines that such Administrative Claim shall be Allowed or (B) the Bankruptcy Court determines that such Administrative Claim shall be Allowed; or (iii) if the Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim.

b.       DIP Credit Facility Claims

The DIP Credit Facility Claims shall be indefeasibly paid in full in Cash on the Effective Date in full satisfaction thereof and in accordance with the terms and conditions of the DIP Credit Facility; provided, however, that any Claim of a Lender Owner shall be treated in accordance with Article VI.M of the Plan.  Any expense reimbursement or indemnity provisions contained in the DIP Credit Facility or any loan document governing or entered into in connection with the DIP Credit Facility shall survive such payment in the manner and to the extent set forth therein.

c.       Professional Compensation

All final requests for payment of Professional Fee Claims, including any amounts held back pursuant to the Interim Compensation Procedures Order, must be Filed with the Bankruptcy Court and served on the Plan Administrator and the U.S. Trustee no later than thirty-five (35) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in this Chapter 11 Case, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court and paid by the Estate, Liquidating BIPCo or the Plan Administrator; provided, however, that amounts necessary to satisfy all Professional Fee Claims incurred as of the Sale Closing Date, which have not yet been approved by the Bankruptcy Court, shall be deposited into an escrow account for the benefit of such

Professionals for the payment of such Professional Fee Claims once approved by the Bankruptcy Court. Any amounts remaining in the escrow account five months following the Sale Closing Date shall be returned to the Purchaser. On and after the Effective Date, the Plan Administrator shall administer such escrow.

    d.        Post-Effective Date Professional Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Plan Administrator shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash from the Administrative Fund the reasonable legal, professional or other fees and expenses of Liquidating BIPCo, the Plan Administrator, the Wind Down Creditors' Committee or their respective Representatives, related to the implementation and consummation of the Plan and the transactions contemplated herein. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Liquidating BIPCo, the Plan Administrator or the Wind Down Creditors' Committee may employ and pay any Professional in the ordinary course of business from the Administrative Fund without any further notice to or action, order or approval of the Bankruptcy Court; provided, however, that to the extent the Plan Administrator seeks to use any of the Wind Down Amount to satisfy the fees and expenses discussed in Article II.A.3.b of the Plan, the Plan Administrator and such person or Entity requesting payment shall comply with section 5.18 of the ASA.

    e.        Priority Tax Claims

Priority Tax Claims are Claims asserted against the Debtor for an amount entitled to a priority under section 507(a)(8) of the Bankruptcy Code. The Bankruptcy Code does not require the Debtor to classify Priority Tax Claims under the Plan, but does require that such Claims receive the following treatment unless the Holder of such Claims consents to different treatment. Accordingly, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of its Allowed Priority Tax Claim: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; or (ii) at the option of the Debtor or the Plan Administrator, as applicable, and pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five years after the Petition Date.

    2.        Classified Claims

    a.        Class 1 — Priority Non-Tax Claims

The Claims in Class 1 are of the types identified in section 507(a) of the Bankruptcy Code that are entitled to priority treatment (other than Administrative Claims and Priority Tax Claims). Most of the Claims in Class 1 have already been paid by the Debtor pursuant to orders entered by the Bankruptcy Court during this Chapter 11 Case.

Class 1 is Unimpaired, and Holders of Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan. Except to the extent that a Holder of an Allowed Priority-Non Tax Claim agrees to less favorable treatment, in full and final satisfaction of each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full, in Cash, on the later of the Effective Date, or the date such Priority Non-Tax Claim becomes Allowed, or as soon as practicable thereafter.

    b.        Class 2 — First Lien Claims and Swap Agreement Claims

Class 2 consists of Claims arising under the First Lien Credit Facility and the Swap Agreements. Class 2 is Impaired and Holders of Class 2 Claims are entitled to vote to accept or reject the Plan. On the Initial Distribution Date, each applicable Quarterly Distribution Date thereafter and the Final Distribution Date, in full and final satisfaction of each Allowed First Lien Claim and Allowed Swap Agreement Claim, each Holder of such Allowed First Lien Claim and Allowed Swap Agreement Claim shall receive (i) such Holder's *Pro Rata* share of the Creditor Fund and (ii) such Holder's *Pro Rata* share of all proceeds of the Prepetition Senior Collateral. Any Distribution described above shall be made by Liquidating BIPCo or the Plan Administrator, as applicable, to the First Lien

Credit Facility Agent, and shall be applied by the First Lien Credit Facility Agent, in each case in accordance with the terms and conditions of the First Lien Credit Facility, and any expense reimbursement or indemnity provisions contained in the First Lien Credit Facility or any loan document governing or entered into in connection with the First Lien Credit Facility shall survive in the manner and to the extent set forth therein; provided, however, that any Claim of a Lender Owner shall be treated in accordance with Article VI.M of the Plan.

c.      Class 3 — Second Lien Claims

Class 3 consists of Claims arising under the Second Lien Credit Facility.  Class 3 is Impaired and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.  On the Initial Distribution Date, each applicable Quarterly Distribution Date thereafter and the Final Distribution Date, in full and final satisfaction of each Allowed Second Lien Claim, each Holder of such Allowed Second Lien Claim shall receive such Holder's *Pro Rata* share of the Creditor Fund to the extent permitted by the Prepetition Intercreditor Agreement.

d.      Class 4 — General Unsecured Claims

Class 4 consists of General Unsecured Claims against the Debtor.  Class 4 is Impaired and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.  On the Initial Distribution Date, each applicable Quarterly Distribution Date thereafter and the Final Distribution Date, in full and final satisfaction of each Allowed General Unsecured Claim, each Holder of such Allowed General Unsecured Claim shall receive such Holder's *Pro Rata* share of the Creditor Fund.

e.      Class 5 — Intercompany Claims

Class 5 consists of Intercompany Claims against the Debtor.  Class 5 is Impaired by the Plan and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.  On the Initial Distribution Date, each applicable Quarterly Distribution Date thereafter and the Final Distribution Date, in full and final satisfaction of each Allowed Intercompany Claim, each Holder of such Allowed Intercompany Claim shall receive such Holder's *Pro Rata* share of the Creditor Fund.

f.      Class 6 — Equity Interests

Class 6 consists of all Equity Interests.  Class 6 is Impaired and Holders of Class 6 Claims are deemed to reject the Plan.  Holders of Equity Interests shall neither receive nor retain any property under the Plan.

3.      Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtor or Liquidating BIPCo in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments, against any such Claim.

4.      Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

5.      General Settlement of Claims in Full and Final Satisfaction

As discussed herein and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases and other benefits provided under the Plan, upon the Effective Date, the Plan provisions shall constitute a good-faith compromise and settlement of all Claims, Equity Interests and controversies resolved pursuant to the Plan.  Subject to Article VI of the Plan, all Distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final and in full satisfaction of such Allowed Claims and Equity Interests.

6.         <u>Binding Nature of the Plan</u>

**THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THIS CHAPTER 11 CASE, OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, OR VOTED TO REJECT THE PLAN.**

**B.**     **Acceptance or Rejection of the Plan**

1.         <u>Impaired Classes of Claims Entitled to Vote</u>

Classes 2, 3, 4 and 5 are Impaired by the Plan.  Subject to <u>Article IV</u> of the Plan, the Debtor shall solicit the votes of Holders of Claims in Class 2, Class 3, Class 4 and Class 5 who are entitled to vote under the Solicitation Procedures to either accept or reject the Plan.

2.         <u>Acceptance by an Impaired Class</u>

In accordance with Bankruptcy Code section 1126(c), and except as provided in Bankruptcy Code section 1126(e), each of Class 2, Class 3, Class 4 and Class 5 as Impaired Classes, shall have accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims of such Class that are entitled to vote and have timely, and properly, voted to accept or reject the Plan, vote to accept the Plan.

3.         <u>Presumed Acceptance by Unimpaired Classes</u>

Class 1 is Unimpaired by the Plan.  Under Bankruptcy Code section 1126(f), Holders of Claims in Class 1 are conclusively presumed to accept the Plan, and the Debtor shall not solicit votes of such Holders.

4.         <u>Classes Deemed to Reject the Plan</u>

Class 6 is Impaired by the Plan.  Under Bankruptcy Code section 1126(g), Holders of Equity Interests in Class 6 are deemed to reject the Plan, and the Debtor shall not solicit such Holders votes.

5.         <u>Summary of Classes Voting on the Plan</u>

Pursuant to <u>Article IV</u> of the Plan, the Debtor shall solicit the votes of Holders of Claims in Classes 2, 3, 4 and 5 that are not subject to an objection, or who have filed a motion under Bankruptcy Rule 3018(a) and obtained temporary allowance of their Claims for voting purposes, all as further set out in the Solicitation Procedures, with respect to the Plan.

6.         <u>Reservation of "Cram Down" Rights</u>

The Bankruptcy Code permits the Bankruptcy Court to confirm a chapter 11 plan of liquidation over the dissent of any class of claims or equity interests as long as the standards set forth under section 1129(b) of the Bankruptcy Court are met.  This power to confirm a plan over dissenting classes -- often referred to as "cram down" -- is an important part of the liquidation process.  It assures that no single group (or multiple groups) of claims or equity interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.  The Debtor reserves the right to seek Confirmation of the Plan, notwithstanding the deemed rejection of the Plan by Class 6 (Equity Interests).

C.    **Other Key Aspects of the Plan**

1.    The Plan Administrator

a.    Appointment of the Plan Administrator

As of the Effective Date, the Plan Administrator shall be responsible for implementing the liquidation and Wind Down contemplated by the Plan, including monetizing or abandoning any Assets, pursuing, settling or abandoning all Remaining Causes of Action, resolving all Claims and distributing Cash pursuant to the Plan, and causing Liquidating BIPCo to comply with the ASA. On the Effective Date, the Plan Administrator shall succeed to such powers as would have been applicable to the Debtor's officers, directors and shareholders, and Liquidating BIPCo shall be authorized to be (and, upon the conclusion of the Wind Down, shall be) dissolved by the Plan Administrator. All Assets of the Estate not Distributed to the Holders of Claims on the Effective Date shall be transferred to Liquidating BIPCo and managed and Distributed by the Plan Administrator pursuant to the terms of the Plan, and shall be held in the name of Liquidating BIPCo free and clear of all Liens, Claims, charges or other encumbrances against the Debtor, and Equity Interests in the Debtor, except for rights to such Distributions provided to Holders of Allowed Claims as provided in the Plan.

b.    Actions Against the Plan Administrator

The Confirmation Order shall state that, without permission of the Bankruptcy Court, no judicial, administrative, arbitral or other action or proceeding shall be commenced against the Plan Administrator in its official capacity, with respect to its status, duties, powers, acts or omissions as Plan Administrator in any forum other than the Bankruptcy Court.

c.    Term and Compensation of the Plan Administrator

The Plan Administrator shall serve for the term set forth in, and be compensated from the Administrative Fund in accordance with the terms of, the Plan Administrator Agreement.

d.    Powers of the Plan Administrator

The Plan Administrator shall be a fiduciary of Liquidating BIPCo and shall have all powers, authority and responsibilities specified in the Plan and the Plan Administrator Agreement. In particular, the Plan Administrator's rights, duties and powers shall include the following:

- the Plan Administrator shall succeed to all such powers as would have been applicable to any of the Debtor's officers, directors, managers or shareholders with like effect as if authorized, exercised and taken by unanimous action of such officers, directors, managers and shareholders.

- the Plan Administrator shall be authorized to take all steps necessary to effectuate the Wind Down and to take such other actions as the Plan Administrator determines are in the best interests of the Holders of Claims.; and

- the Plan Administrator, in its reasonable business judgment, in an expeditious and orderly manner, and only to the extent necessary, shall cause Liquidating BIPCo to liquidate, and convert all of the Assets to Cash and make all Distributions in accordance with the Plan. The liquidation of the Assets may be accomplished either through the sale of the Assets (in whole or in combination), including the sale of Remaining Causes of Action, or through prosecution or settlement of any Remaining Causes of Action, or otherwise.

The Plan Administrator shall be expressly authorized to do the following:

- cause Liquidating BIPCo to institute, prosecute, collect, compromise and settle any Remaining Causes of Actions in accordance with the Plan and without further approval

19

or application to the Bankruptcy Court, except as otherwise provided in the Plan, including, prosecuting and/or settling the Remaining Causes of Action pending in any court of appropriate jurisdiction;

- cause Liquidating BIPCo to participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding and litigate or settle such Remaining Causes of Action on behalf of the Liquidating BIPCo or the Estate, or to pursue such Remaining Causes of Actions to settlement or judgment;

- to the extent necessary, open and maintain bank accounts in the name of Liquidating BIPCo, draw checks and drafts thereon by the sole signature of the Plan Administrator and terminate such accounts as the Plan Administrator deems appropriate;

- cause Liquidating BIPCo to make Distributions and take other actions consistent with the Plan and the implementation thereof, including the establishment, reevaluation, adjustment and maintenance of appropriate reserves in accordance with the Plan;

- cause Liquidating BIPCo to collect and liquidate all Assets pursuant to the Plan and to administer the Wind Down and closing of this Chapter 11 Case;

- cause Liquidating BIPCo to file, prosecute or object to any Claims (Disputed or otherwise), and compromise or settle any Claims prior to or after objection, without supervision or approval of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the U.S. Trustee guidelines and requirements, other than those restrictions expressly imposed by the Plan, or to seek Bankruptcy Court approval for any Claims settlements made after objection;

- cause Liquidating BIPCo to retain or engage professionals, employees and consultants, and to pay the from the Administrative Fund the reasonable fees and charges incurred by the Plan Administrator and Liquidating BIPCo's professionals, employees and consultants that relate to the implementation of the Plan, without application to the Bankruptcy Court;

- cause Liquidating BIPCo to seek a determination from the Bankruptcy Court of tax liability under section 505 of the Bankruptcy Code and to pay from the Administrative Fund taxes, if any, related to the Liquidating BIPCo and for all returns filed for or on behalf of Liquidating BIPCo for all taxable periods through the closing of this Chapter 11 Case;

- cause Liquidating BIPCo to invest Cash or moneys received by Liquidating BIPCo or otherwise held by Liquidating BIPCo in accordance with the Plan (which shall be in compliance with section 345 of the Bankruptcy Code);

- execute any documents or take any other actions related to, or in connection with, the liquidation of the Assets and the exercise of the Plan Administrator's powers granted in the Plan, including the exercise of Liquidating BIPCo's rights to conduct discovery and oral examination of any party under Bankruptcy Rule 2004;

- enter into any agreement or execute any document required by or consistent with the Plan, and perform all of the obligations thereunder;

- cause Liquidating BIPCo to abandon in any commercially reasonable manner any Assets that the Plan Administrator reasonably determines are of no benefit to Liquidating BIPCo;

- cause Liquidating BIPCo to preserve Liquidating BIPCo's documents, as necessary, to pursue Remaining Causes of Action and conduct the Wind Down, and to abandon or

destroy documents upon the Plan Administrator's determination that the documents are no longer necessary or beneficial to Liquidating BIPCo;

- cause Liquidating BIPCo to purchase and maintain all insurance policies and pay from the Administrative Fund all insurance premiums and costs that the Plan Administrator deems necessary or advisable;

- cause Liquidating BIPCo to take any and all actions necessary to satisfy the Sale Post-Closing Obligations;

- administer payouts from the Professional Fee Claim escrow upon Bankruptcy Court approval of Professional Fee Claims; and

- take all other actions not inconsistent with the provisions of the Plan, which the Plan Administrator deems reasonably necessary or desirable with respect to administering the Plan.

    e.    Resignation or Removal of Plan Administrator

In the event of the dissolution, bankruptcy, insolvency or removal of the Plan Administrator, a successor trustee may be appointed in accordance with the Plan Administrator Agreement. The Plan Administrator may resign at any time upon 30 days' notice to the Bankruptcy Court, Liquidating BIPCo's counsel and the Wind Down Creditors' Committee's counsel. Any party in interest may move the Bankruptcy Court for the removal of the Plan Administrator for cause upon providing notice to Liquidating BIPCo's counsel; provided, however, that if Liquidating BIPCo or any other party in interest shall object to such removal within 21 days of such notice, such removal shall not be effective until approved by the Bankruptcy Court. No successor Plan Administrator hereunder shall in any event have any liability or responsibility for the acts or omissions of any of his, her or its predecessors. Every successor Plan Administrator appointed pursuant to the Plan shall execute, acknowledge and deliver to the Bankruptcy Court an instrument in writing accepting such appointment. Thereupon, such successor Plan Administrator, without any further action required, shall become fully vested with all of the rights, powers, duties and obligations of his, her or its predecessor.

Notwithstanding any other provision in the Plan, upon the resignation or removal of a Plan Administrator, a Plan Administrator shall continue to serve in such capacity until such time as (i) a successor Plan Administrator is identified and accepts the appointment on substantially the same terms as the resigning Plan Administrator, and (ii) notice is provided to the Bankruptcy Court of such successor Plan Administrator pursuant to Article V.D.5 of the Plan.

    f.    Retention of Professionals

As of and after the Effective Date, the Plan Administrator may cause Liquidating BIPCo to retain professionals, including attorneys, accountants, investment or other financial advisors, auditors, disbursing agents, professionals from the Plan Administrator's own firm, if any, and other agents on behalf of Liquidating BIPCo, as necessary or desirable to carry out the actions necessary to effectuate the Wind Down and close this Chapter 11 Case. More specifically, as of and after the Effective Date, the Plan Administrator may cause Liquidating BIPCo to retain counsel in any matter related to the Estate, including counsel that has acted as counsel for the Debtor or the Creditors' Committee.

Following the Effective Date, the Plan Administrator may cause Liquidating BIPCo to pay from the Administrative Fund, without application to the Bankruptcy Court or any other court of competent jurisdiction, professionals retained by Liquidating BIPCo as of and after the Effective.

    g.    Compliance with Sale Post-Closing Obligations

The Plan Administrator shall be required to take any and all actions, and shall cause Liquidating BIPCo to take any and all actions, necessary to comply with and satisfy the Sale Post-Closing Obligations.

h.      Liability, Indemnification

As of and after the Effective Date, neither Liquidating BIPCo, its designees or professionals, any duly designated agent or Representative of Liquidating BIPCo, including the Plan Administrator, nor any of its employees, including those employees of the Debtor assisting Liquidating BIPCo and the Plan Administrator with the Wind Down, shall be liable for the act or omission of any other designee, agent or Representative of Liquidating BIPCo, nor shall such parties be liable for any act or omission taken or omitted to be taken in such capacity other than for specific acts or omissions resulting from such parties' willful misconduct, gross negligence or fraud.

Liquidating BIPCo and any duly designated agent or Representative of Liquidating BIPCo, including the Plan Administrator and employees of the Debtor assisting Liquidating BIPCo and the Plan Administrator with the Wind Down, may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with Liquidating BIPCo's attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing  (other than for specific acts or omissions resulting from such parties' willful misconduct, gross negligence or fraud).   Notwithstanding such authority, Liquidating BIPCo and any duly designated agent or Representative of Liquidating BIPCo, including the Plan Administrator and employees of the Debtor assisting Liquidating BIPCo and the Plan Administrator with the Wind Down, shall not be under any obligation to consult with Liquidating BIPCo's attorneys, accountants, financial advisors or agents, and such parties determination not to do so shall not result in the imposition of liability on any such party, unless such determination is based on such party's willful misconduct, gross negligence or fraud.

Liquidating BIPCo shall indemnify and hold harmless any duly designated agent or Representative of Liquidating BIPCo, including the Plan Administrator, its designees and professionals, all duly designated agents and Representatives thereof, and those employees of the Debtor assisting Liquidating BIPCo and the Plan Administrator with the Wind Down, from and against all liabilities, losses, damages, claims, costs and expenses (including reasonable attorneys' fees, disbursements and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Estate or the Plan, or the discharge of their duties under the Plan Administrator Agreement or hereunder; provided, however, that no such indemnification shall be made to such persons for actions or omissions as a result of willful misconduct, gross negligence or fraud.  Any such indemnification payments shall be made from the Administrative Fund.

2.      Liquidating BIPCo

a.      Approval of Estate Allocation

The Bankruptcy Court's entry of the Disclosure Statement Order shall constitute the Bankruptcy Court's approval of the Estate Allocation, attached to the Plan as **Exhibit B**.  The Debtor's portion of the Estate Allocation shall vest in the Estate upon entry of the Confirmation Order and vest in Liquidating BIPCo upon the Effective Date.

b.      Continuing Existence

From and after the Effective Date, Liquidating BIPCo shall continue in existence solely for the purposes consistent with the terms of the Plan, which include (i) effectuating the Wind Down, (ii) liquidating the Assets, (iii) enforcing and prosecuting Claims, interests, rights and privileges of Liquidating BIPCo and the Estate, including the Remaining Causes of Action, (iv) resolving Disputed Claims, (v) administering the Plan and taking such actions as are necessary to effectuate the Plan, and (vi) filing appropriate tax returns.  Officers and employees of the Debtor, whose assistance the Plan Administrator requires to effectuate the liquidation and Wind Down of the Estate, shall continue as officers and employees of Liquidating BIPCo, whose fees and expenses shall be satisfied by amounts maintained in the Administrative Fund.  Liquidating BIPCo shall also maintain those books, records and bank accounts necessary to effectuate the liquidation and Wind Down of the Estate.

c.    Vesting of Assets in Liquidating BIPCo

Except as otherwise provided in the Plan or in any agreement, instrument or other document relating thereto, pursuant to section 1141 of the Bankruptcy Code, on or after the Effective Date, all Assets of the Estate and any Assets acquired by the Debtor pursuant hereto shall vest in Liquidating BIPCo, free and clear of all Liens, Claims, charges or other encumbrances; provided, however, that all proceeds of the Prepetition Senior Collateral shall be distributed to the First Lien Credit Facility Agent in accordance with Article III.B.2 of the Plan.  For the avoidance of doubt, the Purchased Assets, including the Purchased Causes of Action, shall be transferred to the Purchaser upon the Sale Closing Date in accordance with the ASA and shall not vest in Liquidating BIPCo.  Except as may be provided in the Plan or the Confirmation Order, on and after the Effective Date, Liquidating BIPCo may use, acquire or dispose of Assets, and compromise or settle any Claims, without supervision or approval by the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, however, that all proceeds of the Prepetition Senior Collateral shall be distributed to the First Lien Credit Facility Agent in accordance with Article III.B.2 of the Plan.

d.    Fees and Expenses of Liquidating BIPCo

Except as otherwise ordered by the Bankruptcy Court, after the Effective Date, any of Liquidating BIPCo or the Plan Administrator's reasonable fees or expenses, as applicable (including the reasonable fees and expenses of professionals retained by Liquidating BIPCo or the Plan Administrator), shall be paid from the Administrative Fund in the ordinary course of business without further order of the Bankruptcy Court.

3.    Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve and its respective members shall be released from all further authority, duties, responsibilities and obligations relating to this Chapter 11 Case; provided, however, that the Creditors' Committee shall continue to have a right to be heard with respect to any and all (a) applications for Professional Fee Claims and (b) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code, if applicable.

4.    Creation of the Wind Down Creditors' Committee

As of and after the Effective Date, the Wind Down Creditors' Committee shall be created solely to oversee the prosecution and/or settlement of the Creditors' Committee Avoidance Causes of Action.  The Wind Down Creditors' Committee shall consist of three members.  The First Lien Credit Facility Agent shall be entitled to select two members to serve on the Wind Down Creditors' Committee.  The Creditors' Committee shall select any members not appointed by the First Lien Credit Facility Agent to serve on the Wind Down Creditors' Committee. Hunton & Williams LLP, counsel for the Creditors' Committee, shall serve as counsel for the Wind Down Creditors' Committee.  The Wind Down Creditors' Committee may retain professionals, including additional attorneys, accountants or financial advisors, and other agents on behalf of the Wind Down Creditors' Committee as necessary or desirable to carry out the actions of the Wind Down Creditors' Committee hereunder.

All rights to commence, pursue and/or settle the Creditors' Committee Avoidance Causes of Action, as appropriate and in the best interests of Liquidating BIPCo, shall, as of the Effective Date, vest in the Wind Down Creditors' Committee.  The proceeds, if any, from the Creditors' Committee Avoidance Causes of Action shall vest in Liquidating BIPCo for Distribution by the Plan Administrator to Holders of Allowed Claims in accordance with the Plan.  The Wind Down Creditors' Committee shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment the Creditors' Committee Avoidance Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

5.    Fees and Expenses of the Wind Down Creditors' Committee

Except as otherwise ordered by the Bankruptcy Court, any of the Wind Down Creditors' Committee's reasonable fees or expenses, as applicable (including the reasonable fees and expenses of professionals and other

agents and representatives retained by the Wind Down Creditors' Committee), shall be paid from the Administrative Fund by Liquidating BIPCo of the Plan Administrator without further order of the Bankruptcy Court.

6.     Liability and Indemnification of the Wind Down Creditors' Committee

As of and after the Effective Date, neither the Wind Down Creditors' Committee, its members, designees or professionals, nor any duly designated agent or Representative of the Wind Down Creditors' Committee, shall be liable for the act or omission of any other member, designee, agent or Representative of the Wind Down Creditors' Committee, nor shall such parties be liable for any act or omission taken or omitted to be taken in such capacity other than for specific acts or omissions resulting from such parties' willful misconduct, gross negligence or fraud.

The Wind Down Creditors' Committee, its members and any duly designated agent or Representative of the Wind Down Creditors' Committee may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with the Wind Down Creditors' Committee's attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advise or opinions are provided in writing. Notwithstanding such authority, the Wind Down Creditors' Committee, its members and any duly designated agent or Representative of the Wind Down Creditors' Committee shall not be under any obligation to consult with the Wind Down Creditors' Committee's attorneys, accountants, financial advisors or agents, and such parties determination not to do so shall not result in the imposition of liability on any such party, unless such determination is based on such party's willful misconduct, gross negligence or fraud.

Liquidating BIPCo shall indemnify and hold harmless the Wind Down Creditors' Committee, its members and any duly designated agent or representative of the Wind Down Creditors' Committee from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation of the Plan, or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification shall be made to such persons for actions or omissions as a result of willful misconduct, gross negligence or fraud.

7.     Treatment of the Debtor's Causes of Action

a.     Preservation of the Remaining Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, as of the Effective Date, all rights related to the Remaining Causes of Action shall vest in Liquidating BIPCo, which such rights may be enforced by the Plan Administrator whether arising before or after the Petition Date. The Plan Administrator's right to commence, prosecute or settle such Remaining Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Plan Administrator may pursue such Remaining Causes of Action, as appropriate, in accordance with the best interests of the Estate and Liquidating BIPCo. No Entity may rely on the absence of a specific reference in the Plan or this Disclosure Statement with respect to any Remaining Cause of Action against them as any indication that the Plan Administrator will not pursue any and all available Remaining Causes of Action against such Entity. Unless any Remaining Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Plan Administrator expressly reserves the right to prosecute all Remaining Causes of Action, for later adjudication, and therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Remaining Causes of Action upon, after or as a consequence of Confirmation or consummation of the Plan.

The Plan Administrator reserves and shall retain the right to prosecute, settle or otherwise dispose of all of the Remaining Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during this Chapter 11 Case or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Remaining Causes of Action that the Debtor may hold against any Entity shall vest in the Plan Administrator, as the case may be. The Plan Administrator shall have the exclusive right, authority and

24

discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Remaining Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

8.      Directors and Officers

On the Effective Date, the persons acting as directors and officers of the Debtor prior to the Effective Date shall be released from all further authority, duties, responsibilities and obligations relating to and arising from operations of the Debtor or this Chapter 11 Case. Upon such release and discharge, the Plan Administrator shall be charged with the authority, duties, responsibilities and obligations relating to and arising from operations of Liquidating BIPCo and this Chapter 11 Case.

9.      Wind Down and Dissolution of the Debtor

As soon as practicable after the Effective Date, the Plan Administrator shall: (a) take any action reasonably necessary to effectuate the Wind Down; (b) file a certificate of dissolution for Liquidating BIPCo, together with all other necessary corporate and company documents, to effect the dissolution of Liquidating BIPCo under applicable non-bankruptcy law; (c) complete and file all of the Debtor and Liquidating BIPCo's final or otherwise required federal, state, local and foreign tax returns, as applicable; (d) pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination for any of the Debtor, its Estate or Liquidating BIPCo's unpaid tax liability regarding any tax incurred during the administration of this Chapter 11 Case, as determined under applicable tax laws; (e) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan; and (f) comply with any regulatory requirements imposed on Liquidating BIPCo under applicable law.

The Plan Administrator shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including any action by the Debtor or Liquidating BIPCo's stockholders or the board of directors, as applicable.

10.      Distributions Under the Plan

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and in the descriptions below. In general, an "allowed" claim or equity interest means that the Debtor agrees, or if there is a dispute, the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the Debtor.

Any claim that is not a disputed claim and for which a proof of claim has been filed, if necessary, is an allowed claim. Any claim that has been listed by the Debtor in its schedules of assets and liabilities, as may be amended from time to time, as liquidated in amount and not disputed or contingent, is an allowed claim in the amount listed in the schedules unless an objection to such claim has been filed. If the holder of such claim files a proof of claim in an amount different than the amount set forth on the Debtor's schedules of assets and liabilities, the claim is an allowed claim for the lower of the amount set forth on the Debtor's schedules of assets and liabilities and on the proof of claim and a disputed claim for the difference. Any claim that has been listed in the Debtor's schedules of assets and liabilities as disputed, contingent or not liquidated and for which a proof of claim has been filed is a disputed claim. Any claim for which an objection has been timely interposed is a disputed claim. For an explanation on how disputed claims will be determined, see Article VII of the Plan.

An objection to any claim may be interposed by the Debtor or Liquidating BIPCo within 60 days after the Effective Date, or such later date as may be fixed by the Bankruptcy Court. Any claim for which an objection has been interposed will be an allowed claim if the objection is determined in favor of the holder of the claim pursuant to a final order of the Bankruptcy Court or as otherwise agreed to by the parties.

a.      General Settlement of Claims

As discussed herein and as provided for in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classifications, Distributions, releases and other benefits

provided under the Plan, upon the Effective Date, the Plan provisions shall constitute a good-faith compromise and settlement of all Claims, Equity Interests and controversies resolved pursuant to the Plan.  Subject to Article VI of the Plan, all Distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final, subject to the terms and conditions of the Prepetition Intercreditor Agreement

b.      Initial Distribution Date

On the Initial Distribution Date, or as soon thereafter as is reasonably practicable, the Plan Administrator shall make, or shall in the Plan Administrator's sole discretion make adequate reserves for, the Distributions required to be made under Article III of the Plan.  Reserves, if any, shall be distributed at the sole discretion of the Plan Administrator and shall not be subject to Bankruptcy Court approval.

c.      Interim Distributions on Account of Allowed Claims

In accordance with the Plan, the Plan Administrator may (but shall not be required to) make a Distribution on a Quarterly Distribution Date if the Plan Administrator deems it appropriate, and shall have the right to make more frequent interim Distributions to Holders of Allowed Claims if the Plan Administrator determines in its sole discretion that such additional interim Distributions are warranted and economical; provided, however, that any such Quarterly or other interim Distribution shall only be made if in the Plan Administrator's sole discretion, the Plan Administrator retains amounts reasonably necessary to make all Distributions pursuant to Article III of the Plan, meet contingent liabilities, maintains the value of the Assets during liquidation, and satisfies other liabilities or expenses Liquidating BIPCo or the Plan Administrator incur in accordance with the Plan or the Plan Administrator Agreement.

d.      Final Distributions on Allowed Claims

Notwithstanding anything herein or in the Plan to the contrary, upon (i) the settlement and satisfaction, or disallowance, of all Administrative, Professional Fee and Priority Claims, (ii) the completion and prosecution and/or settlement of all objections to all other Claims and Remaining Causes of Action, (iii) the liquidation of all Assets, and (iv) the completion of all matters necessary to effectuate the Wind Down, the Plan Administrator shall distribute, as soon thereafter as reasonably practicable, all remaining Assets and proceeds thereof pursuant to the terms of the Plan.  To the extent that the foregoing can be accomplished by the Initial Distribution Date, the Plan Administrator may effectuate all required Distributions on the Initial Distribution Date.

e.      Administrative Fund and Disputed Claims Reserve

i.      Administrative Fund

[•]

ii.      Disputed Claims Reserve

On the Initial Distribution Date, and after making all Distributions required to be made on such date under the Plan, the Plan Administrator shall establish a separate Disputed Claims Reserve for Disputed Claims, which the Plan Administrator shall administer.  The Plan Administrator shall reserve in Cash or other Assets, for Distribution on account of each Disputed Claim, the full asserted amount (or such lesser amount as may be estimated by the Court in accordance with Article VII.A.3 of the Plan) with respect to each Disputed Claim.

To the extent that the Assets placed in a Disputed Claims Reserve consist of Cash, such Cash shall be deposited in an interest-bearing account.  Liquidating BIPCo shall hold Assets in the Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed.  The Disputed Claims Reserve shall be closed and extinguished by the Plan Administrator when all Distributions and other dispositions of Cash or other Assets required to be made hereunder shall have been made in accordance with the terms of the Plan.  Upon closure of the Disputed Claims Reserve, all Cash or other Assets held in the Disputed Claims Reserve shall revest in and become the Assets of Liquidating BIPCo; provided, however, that all proceeds of the Prepetition Senior Collateral shall be distributed to the First Lien Credit Facility Agent in accordance with Article III.B.2 of the Plan.

All funds or other Assets that vest or revest in Liquidating BIPCo pursuant to this paragraph shall be (a) used to pay the reasonable fees and expenses of the Plan Administrator as and to the extent set forth in the Plan and the Plan Administrator Agreement, and (b) thereafter, distributed to Holders of Allowed Claims in accordance with the Plan; provided, however, that all proceeds of the Prepetition Senior Collateral shall be distributed to the First Lien Credit Facility Agent in accordance with Article III.B.2 of the Plan.

>           f.           Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date shall be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date.  The Plan Administrator shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  In making any Distribution with respect to any Claim, the Plan Administrator shall instead be entitled to recognize and deal with, for all purposes hereunder, only such Entity that is listed on the Proof of Claim Filed with respect thereto, or listed on the Schedules, as the Holder thereof as of the close of business on the Record Date, and upon such other evidence, record of transfer or assignment that are known to the Plan Administrator as of the Record Date; provided, however, that all proceeds of the Prepetition Senior Collateral shall be distributed to the First Lien Credit Facility Agent in accordance with Article III.B.2 of the Plan.

>           g.           Delivery of Distributions

>                     i.           General Provisions; Undeliverable Distributions; DIP Credit Facility and First Lien Credit Facility

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein and in the Plan, Distributions to the Holders of Allowed Claims shall be made by the Plan Administrator at (A) the address of each Holder as set forth in the Schedules, unless superseded by the address set forth on Proofs of Claim Filed by such Holder, or (B) the last known address of such Holder if no Proof of Claim is Filed, or if the Debtor has been notified in writing of a change of address; provided, however, that all proceeds of the Prepetition Senior Collateral shall be distributed to the First Lien Credit Facility Agent in accordance with Article III.B.2 of the Plan. If any Distribution is returned as undeliverable, the Plan Administrator may, in its discretion and as the Plan Administrator deems appropriate, take such efforts to determine the current address of the Holder of the Claim with respect to such Distribution; provided, however, that no Distribution to any Holder shall be made unless and until the Plan Administrator has determined the Holder's current address, at which time the Plan Administrator shall make such Distribution to such Holder without interest.

As set forth in Article VI.G.3 of the Plan, amounts in respect of any undeliverable Distributions made by the Plan Administrator shall be returned to, and held in trust by, Liquidating BIPCo until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code.  The Plan Administrator shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; provided, however, that the Plan Administrator's discretion may not be exercised in a manner inconsistent with any of the Plan's express requirements.

Notwithstanding anything in the Plan to the contrary, (X) any expense reimbursement or indemnity provisions contained in the First Lien Credit Facility or DIP Credit Facility, or any loan document governing or entered into in connection with the First Lien Credit Facility or DIP Credit Facility, shall survive in the manner and to the extent set forth therein, (Y) any Distribution with respect to the First Lien Credit Facility or DIP Credit Facility shall be made by the Debtor, Liquidating BIPCo or the Plan Administrator, as applicable, to the First Lien Credit Facility Agent or DIP Agent, as applicable, and shall be applied by such agent in accordance with the terms and conditions of the First Lien Credit Facility or DIP Credit Facility, as applicable, except as otherwise provided in Article VI.M of the Plan, and (Z) nothing in the Plan, including the releases provided in Article X of the Plan, shall impair or otherwise limit the obligation of any Affiliate of the Debtor or any other guarantor under the First Lien Credit Facility to pay in full in Cash the First Lien Claims to the extent and manner set forth in the First Lien Credit Facility or any loan document governing or entered into in connection with the First Lien Credit Facility.

ii.        Minimum Distributions

Notwithstanding anything herein or in the Plan to the contrary, if a Distribution to be made to a Holder of an Allowed Claim on the Initial Distribution Date, or any subsequent date for Distributions (other than the final Distribution Date), totals $50 or less in the aggregate, no such Distribution shall be made to that Holder unless a request therefor is made in writing to the Plan Administrator.

iii.        Unclaimed Property

Except with respect to Assets held in the Disputed Claims Reserve, Distributions that are not claimed within the expiration of one year from the applicable Distribution Date shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or re-vest in Liquidating BIPCo. The Claims upon which such Distributions are based shall be automatically cancelled and expunged. After the expiration of one year from the initial Distribution Date, the Claim of any Entity to those Distributions shall be released and forever barred. Nothing contained in the Plan shall require the Plan Administrator to attempt to locate any Holder of an Allowed Claim. All funds or other Assets that vests or revests in Liquidating BIPCo pursuant to Article VI of the Plan shall be distributed by the Plan Administrator to the other Holders of Allowed Claims in accordance with the provisions of the Plan.

h.        Surrender of Canceled Instruments and Securities

On the Effective Date, or as soon as reasonably practicable thereafter, each Holder of a Certificate, to the extent that any exist, shall be deemed to have surrendered such Certificate to the Plan Administrator. Such surrendered Certificate shall be canceled solely with respect to the Debtor, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding anything herein or in the Plan to the contrary, this paragraph shall not apply to Certificates evidencing Claims that are rendered Unimpaired under the Plan.

i.        Manner of Cash Payments Under the Plan

Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Plan Administrator or by wire transfer from a domestic bank, at the option of the Plan Administrator.

j.        Time Bar to Cash Payments by Check

Checks issued by the Plan Administrator on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to Article VI.J of the Plan shall be made directly to the Plan Administrator by the Holder of the Allowed Claim to whom such check was originally issued. Any Claim in respect of such voided check shall be made in writing on or before the later of (i) the first anniversary of the Initial Distribution Date or (ii) the first anniversary of the date on which the Claim at issue became an Allowed Claim. After such date, all Claims in respect of void checks shall be released and forever barred. The proceeds of such checks shall revest in and become the property of Liquidating BIPCo as unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed in accordance with Article VI.G.3 of the Plan.

k.        Compliance with Tax Requirements

In connection with making Distributions under the Plan, to the extent applicable, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit. All Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Plan Administrator may withhold an entire Distribution due to any Holder of an Allowed Claim until such time as such Holder provides the necessary information to comply with any withholding requirements of any governmental unit. Any property so withheld shall then be paid by the Plan Administrator to the appropriate authority. If the Holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six months from the date the Holder was first notified of the need for such information, or

for the Cash necessary to comply with any applicable withholding requirements, then such Holder's Distribution shall be treated as an undeliverable Distribution in accordance with <u>Article VI.G.1</u> of the Plan.

l.       Interest on Claims

Except as specifically provided for in the Plan, the Confirmation Order or other Final Order of the Bankruptcy Court (including the Final DIP Order) interest shall not accrue on Claims and no Holder of a Claim shall be entitled to interest accruing on any Claim on or after the Petition Date.  Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Petition Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim.  Except as expressly provided herein, in the Plan, in a Final Order of the Bankruptcy Court or other court of competent jurisdiction, no prepetition Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

m.       Setoff and Recoupment

i.       By the Plan Administrator

The Plan Administrator may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that any of the Debtor, the Estate, Liquidating BIPCo or the Plan Administrator may have against the Holder of such Claim; <u>provided</u>, <u>however</u>, that neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Estate, Liquidating BIPCo or the Plan Administrator of any right of setoff or recoupment that any such Entity may have against the Holder of any Claim.

ii.       By the Purchaser

Notwithstanding anything in the Plan to the contrary, pursuant to and in accordance with section 2.2.1 of the ASA, any Distribution to a Lender Owner on account of (A) such Lender Owner's Claim as a lender under the First Lien Credit Facility pursuant to <u>Article III.B.2</u> hereof and (B) such Lender Owner's Claim as a DIP Lender under the DIP Credit Facility pursuant to <u>Article II.A.2</u> of the Plan shall be offset against the Cash Component (as defined in the ASA) of the Purchase Price (as defined in the ASA), such that the Cash Component shall be reduced by the amount of such Lender Owner's Claims in lieu of a Distribution of Cash or other Assets by the Plan Administrator to the Lender Owner.

11.       <u>Procedures for Treating Disputed Claims Under the Plan</u>

a.       Disputed Claims

A Disputed Claim is a Claim that has not been allowed or disallowed pursuant to an agreement by the parties or an order of the Bankruptcy Court.  In addition, all prepetition tort Claims not previously allowed by the Bankruptcy Court are Disputed Claims.  A Claim for which a Proof of Claim has been filed but is listed on the Debtor's Schedules as unliquidated, Disputed or contingent, and which has not yet been resolved by the parties or by the Bankruptcy Court, is a Disputed Claim.  If a Holder of a Claim has filed a Proof of Claim that is inconsistent with the Claim as listed on the Debtor's Schedules, such Claim is a Disputed Claim to the extent of the difference between the amount set forth in the Proof of Claim and the amount scheduled by the Debtor.  Any Claim for which the Debtor or any party in interest has interposed (or will interpose) a timely objection is a Disputed Claim.

b.       Allowance of Claims

After the Effective Date, the Plan Administrator shall maintain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan or other Final Order of the Bankruptcy Court.  Except as expressly provided in the Plan or in any order entered in this Chapter 11 Case (including the Confirmation Order and Final DIP Order), no Claim shall become an Allowed Claim unless and until the Plan Administrator determines, in its sole discretion, that such Claim shall be Allowed or such Claim is Allowed pursuant to Final Order of the Bankruptcy Court.  All settled Claims approved prior to the

29

Effective Date pursuant to a Final Order of the Bankruptcy Court under Bankruptcy Rule 9019, or otherwise, shall be binding upon all parties.

      c.      Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date until the applicable Claims Objection Bar Date, the Plan Administrator, shall maintain the exclusive authority to file objections to Claims and settle, compromise, withdraw or litigate to judgment such objections.  From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court.  The Plan Administrator shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

      d.      Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date, the Plan Administrator, may, at any time, request that the Bankruptcy Court estimate (i) any Disputed Claim pursuant to applicable law, and (ii) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Plan Administrator has previously objected to such Claim, or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during any litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.

Notwithstanding any other provision in the Plan, a Claim that the Plan Administrator has expunged from the Claims Register, but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

      e.      Expungement or Adjustment of Claims Without Objection

Any Claim that has been fully or partially paid, satisfied or superseded may be expunged or adjusted on the Claims Register by the Plan Administrator.  Any Claim that has been amended may be adjusted on the Claims Register by the Plan Administrator.  The Plan Administrator is authorized to take the foregoing action in Article VII.A.4 of the Plan without requiring that a Claims objection be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

      f.      Deadline to File Objections to Claims

Any objections to Claims shall be filed no later than the applicable Claims Objection Bar Date, which shall be on the date that is sixty days after the Effective Date, unless extended by an order of the Bankruptcy Court upon notice and a hearing.

      g.      Disallowance of Claims

All Claims of any Entity from which the Debtor, Liquidating BIPCo, the Plan Administrator or the Wind Down Creditors' Committee seek return of property under sections 542, 543, 550 or 553 of the Bankruptcy Code, or that the Debtor, Liquidating BIPCo, the Plan Administrator or the Wind Down Creditors' Committee allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be disallowed if (i) the Entity, on the one hand, and the Debtor, Liquidating BIPCo, the Plan Administrator or the Wind Down Creditors' Committee, as applicable, on the other hand, agree, or the Bankruptcy Court has determined by Final Order, that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code, and (ii) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

30

h.      Amendments to Claims

Except as otherwise provided in the Plan, on or after the Effective Date, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Plan Administrator. To the extent such prior authorization is not received, any such new or amended Filed Claim shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

i.      No Distributions Pending Allowance

If an objection to a Claim or portion thereof is filed prior to the Effective Date, no payment or Distribution provided under the Plan shall be made on account of such Claim, or portion thereof, unless and until such Disputed Claim becomes an Allowed Claim pursuant to a Final Order.

j.      Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions, if any, shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator shall provide the Distribution to which such Holder is entitled under the Plan as of the Effective Date, if any, to the Holder of such Claim without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

12.     Rejection of Executory Contracts and Unexpired Leases

Except with respect to those Executory Contracts and Unexpired Leases assumed and assigned, or to be assumed and assigned by the Debtor in accordance with the terms of the ASA, the Plan shall constitute a motion to reject all of the Executory Contracts and Unexpired Leases that remain with the Estate, if any, for which the Debtor shall have no further liability. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a finding that such rejections are in the best interest of the Debtor, its Estate and all parties in interest in this Chapter 11 Case.

The Debtor reserves the right to assume and assign any Executory Contract or Unexpired Lease not assumed and assigned in accordance with the terms of the ASA. In the event that the Debtor determines that it is in the best interests of the Estate to assume and assign an Executory Contract or Unexpired Lease, the Debtor shall File, at least ten (10) days prior to the Confirmation Hearing an exhibit to the Plan identifying those Executory Contracts and Unexpired Leases that the Debtor intends to assume and assign.

Claims created by the rejection of Executory Contracts and Unexpired Leases pursuant to Article VIII.A of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be Filed with the Bankruptcy Court and served on the Debtor no later than 30 days after the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to Article VIII.A for which Proofs of Claim are not timely Filed will be forever barred from assertion against the Debtor, the Estate, Liquidating BIPCo, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the releases and permanent injunction set forth in Article X of the Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely Filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to all of the provisions of the Plan.

13.     Conditions Precedent to the Effective Date

a.      Conditions

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

i.      all actions, documents, certificates and agreements necessary to implement the Plan, including documents contained in any supplement to the Plan, shall have

31

been effected or executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; provided, however, that each document, instrument and agreement must be acceptable to the Debtor.  All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements;

ii.       the Sale Closing shall have occurred; and

iii.      the Confirmation Order shall have become a Final Order.

b.       Waiver of Conditions

Notwithstanding the foregoing, but subject to Section 1127 of the Bankruptcy Code, the Debtor reserves the right to waive the occurrence of any condition precedent to the Effective Date or to modify any of the foregoing conditions precedent; provided, however, that the Debtor may not waive or modify the conditions precedent set forth in Article IX.A.2 of the Plan, though the Debtor does reserve the right to continue any scheduled Confirmation Hearing if the Sale has not closed by the date scheduled for the Confirmation Hearing.  Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

14.      Settlement, Release, Injunction and Related Provisions

a.       Compromise and Settlement

Notwithstanding anything in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective Distributions and treatments hereunder takes into account and conforms to the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code, or otherwise.  As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant to the Plan (other than those set forth in the Prepetition Intercreditor Agreement, which shall survive the Effective Date).  The Confirmation Order shall constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (i) in the best interests of the Debtor, its Estate and all Holders of Claims, (ii) fair, equitable and reasonable, (iii) made in good-faith and (iv) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.  The Confirmation Order shall approve the releases by all Entities of all such contractual, legal and equitable subordination rights or Remaining Causes of Action that are satisfied, compromised and settled pursuant to the Plan (other than those set forth in the Prepetition Intercreditor Agreement, which shall survive the Effective Date).

b.       Releases

i.       Releases by the Debtor

*PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, INCLUDING, BUT NOT LIMITED TO, THE CREDITORS' COMMITTEE AVOIDANCE CAUSES OF ACTION, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE SALE AND THE IMPLEMENTATION OF THE LIQUIDATION CONTEMPLATED BY THE PLAN, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED RELEASED BY THE DEBTOR, THE PLAN ADMINISTRATOR, CREDITORS' COMMITTEE AND THE ESTATE FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN,*

*EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT THE DEBTOR, THE PLAN ADMINISTRATOR, THE CREDITORS' COMMITTEE OR THE ESTATE WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR EQUITY INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THIS CHAPTER 11 CASE AND THE CCAA CASES, SALE, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR IN THIS CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE SALE, THE PLAN, THIS DISCLOSURE STATEMENT OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED WILLFUL MISCONDUCT, GROSS NEGLIGENCE, BREACH OF FIDUCIARY DUTY OR A CRIMINAL ACT; PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN OR IN THE PLAN, NOTHING HEREIN OR IN THE PLAN SHALL BE DEEMED TO RELEASE ANY ENTITY FROM THE PURCHASED CAUSES OF ACTION OR FROM ANY SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER ASSOCIATED THEREWITH.*

ii.       Releases by Holders of Claims and Equity Interests

*AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT WHERE OTHERWISE EXPRESSLY SET FORTH IN THE PLAN, INCLUDING THE CREDITORS' COMMITTEE AVOIDANCE CAUSES OF ACTION, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST, EXCEPT WITH RESPECT TO THOSE HOLDERS OF CLAIMS OR EQUITY INTERESTS WHO VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN, SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED THE DEBTOR, THE PLAN ADMINISTRATOR AND THE OTHER RELEASED PARTIES FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT SUCH HOLDER WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THIS CHAPTER 11 CASE AND THE CCAA CASES, THE SALE, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR (OR ANY OF ITS AFFILIATES) AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR DURING THIS CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE SALE, THE PLAN, THIS DISCLOSURE STATEMENT OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER RELATED OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED WILLFUL MISCONDUCT, GROSS NEGLIGENCE, FRAUD, BREACH OF FIDUCIARY DUTY OR A CRIMINAL ACT.*

*NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH DIRECTLY ABOVE DOES NOT RELEASE: (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN; (B) ANY OF THE AFOREMENTIONED RELEASED PARTIES FROM PERSONAL LIABILITY ON ACCOUNT OF ANY STATUTORY VIOLATION*

*OF APPLICABLE TAX LAWS OR BAR ANY RIGHT OF ACTION ASSERTED BY A GOVERNMENTAL TAXING AUTHORITY AGAINST THE AFOREMENTIONED RELEASED PARTY FOR ANY STATUTORY VIOLATION OF APPLICABLE TAX LAWS; (C) ANY OBLIGATION OF ANY AFFILIATE OF THE DEBTOR OR ANY OTHER GUARANTOR TO PAY IN FULL IN CASH THE FIRST LIEN CLAIMS TO THE EXTENT AND MANNER SET FORTH IN THE FIRST LIEN CREDIT FACILITY OR ANY LOAN DOCUMENT GOVERNING OR ENTERED INTO IN CONNECTION WITH THE FIRST LIEN CREDIT FACILITY; OR (D) ANY ENTITY FROM THE PURCHASED CAUSES OF ACTION OR FROM ANY SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER ASSOCIATED THEREWITH.*

    iii.  Approval of the Releases

   *ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES SET FORTH IN* <u>*ARTICLE X.B*</u> *OF THE PLAN AND ITS FINDING THAT THE RELEASES ARE: (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, REPRESENTING A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS AND CAUSES OF ACTION THEREBY RELEASED; (B) IN THE BEST INTERESTS OF THE DEBTOR, ITS ESTATE AND ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO ANY OF THE DEBTOR, ITS ESTATE, THE PLAN ADMINISTRATOR OR CREDITORS' COMMITTEE TO ASSERT ANY CLAIM OR CAUSE OF ACTION THEREBY RELEASED.*

    c.  Exculpation

   *UPON AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE EXCULPATED PARTIES WILL ALL BE DEEMED TO HAVE SOLICITED ACCEPTANCES OF THE PLAN IN GOOD-FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING SECTION 1125(E) OF THE BANKRUPTCY CODE.*

   *EXCEPT WITH RESPECT TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR RELATED DOCUMENTS, INCLUDING THE CREDITORS' COMMITTEE AVOIDANCE CAUSES OF ACTION AND ONLY TO THE EXTENT OF THE CREDITORS' COMMITTEE AVOIDANCE CAUSES OF ACTION, THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR, ANY LIABILITY TO ANY ENTITY FOR ANY PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, ARISING FROM OR RELATING IN ANY WAY TO, THIS CHAPTER 11 CASE, INCLUDING (A) THE OPERATION OF THE DEBTOR'S BUSINESS DURING THE PENDENCY OF THIS CHAPTER 11 CASE, (B) FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING AND/OR EFFECTING THE SALE, THIS DISCLOSURE STATEMENT OR THE PLAN (INCLUDING ANY RELATED CONTRACT, INSTRUMENT, RELEASE, OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION THEREWITH), (C) THE SOLICITATION OF VOTES FOR THE PLAN AND THE PURSUIT OF CONFIRMATION OF THE PLAN, (D) THE ADMINISTRATION OF THE PLAN AND/OR THE ASSETS TO BE DISTRIBUTED UNDER THE PLAN, AND (E) ANY OTHER PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR IN CONTEMPLATION OF, THE DEBTOR'S LIQUIDATION. IN ALL RESPECTS, EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER OR ITS RESPECTIVE DUTIES UNDER, PURSUANT TO OR IN CONNECTION WITH, THE PLAN.*

   *NOTWITHSTANDING ANYTHING HEREIN OR IN THE PLAN TO THE CONTRARY, THE FOREGOING SHALL NOT EXCULPATE ANY ENTITY FROM (I) ANY LIABILITY RESULTING FROM ANY ACT OR OMISSION CONSTITUTING FRAUD, WILLFUL MISCONDUCT, GROSS NEGLIGENCE, CRIMINAL CONDUCT, MALPRACTICE OR MISUSE OF CONFIDENTIAL INFORMATION THAT CAUSES DAMAGES OR ULTRA VIRES ACT AS DETERMINED BY A FINAL ORDER, OR (II) THE PURCHASED CAUSES OF ACTION.*

d.    Injunction

*FROM AND AFTER THE EFFECTIVE DATE, EXCEPT WHERE OTHERWISE EXPRESSLY SET FORTH IN THE PLAN, INCLUDING THE CREDITORS' COMMITTEE AVOIDANCE CAUSES AND PURCHASED CAUSES OF ACTION OF ACTION, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE DEBTOR, LIQUIDATING BIPCO, THE PLAN ADMINISTRATOR, EACH RELEASED PARTY, EACH OF THEIR REPRESENTATIVES, THEIR SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.*

*EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN, IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, INCLUDING, BUT NOT LIMITED TO, THE CREDITORS' COMMITTEE AVOIDANCE CAUSES OF ACTION AND THE PURCHASED CAUSES OF ACTION, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTOR, THE ESTATE, LIQUIDATING BIPCO, THE PLAN ADMINISTRATOR, EACH RELEASED PARTY, EACH OF THEIR REPRESENTATIVES, ANY OF THEIR SUCCESSORS AND ASSIGNS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS (INCLUDING EX OFFICIO MEMBERS), OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, ATTORNEYS, FINANCIAL ADVISORS, ACCOUNTANTS, MANAGED FUNDS, INVESTMENT BANKERS, INVESTMENT ADVISORS, ACTUARIES, PROFESSIONALS, AGENTS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), AND THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE THAT RELATE, IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, TO THE DEBTOR OR THIS CHAPTER 11 CASE.*

*THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS IN THE PLAN SHALL BE IN EXCHANGE FOR, AND IN COMPLETE SATISFACTION OF, CLAIMS AND EQUITY INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTOR OR ANY OF ITS ASSETS, PROPERTY OR ESTATE.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR SHALL BE FULLY RELEASED AS PROVIDED IN THE PLAN.*

*EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN, IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR SHALL BE FULLY RELEASED, AND THE DEBTOR'S LIABILITY WITH RESPECT THERETO, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE, SHALL BE DEEMED SATISFIED.*

*EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN, IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, INCLUDING THE CREDITORS' COMMITTEE AVOIDANCE CAUSES OF ACTION AND THE PURCHASED CAUSES OF ACTION, ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTOR, THE ESTATE, LIQUIDATING BIPCO, THE PLAN ADMINISTRATOR, EACH RELEASED PARTY, THEIR REPRESENTATIVES, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE THAT RELATE, IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, TO THE DEBTOR OR THIS CHAPTER 11 CASE.*

D.      **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain the maximum, legally-permissible jurisdiction over this Chapter 11 Case and all Entities with respect to all matters related to this Chapter 11 Case, the Debtor and the Plan, including jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim, the resolution of any and all objections to the allowance or priority of any Claim, and the resolution of any and all issues related to the release of Liens upon payment of a Secured Claim;

- for periods ending on or before the Effective Date, grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable, and to adjudicate and, if necessary, liquidate any Claims arising therefrom,

- ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other Causes of Action that are pending as of the date hereof or that may be commenced in the future, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Plan Administrator after the Effective Date, provided, however, that the Plan Administrator reserves the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or this Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

- hear and determine all Remaining Causes of Action and Creditors' Committee Avoidance Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

- issue and enforce injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with respect to the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

- resolve any cases, controversies, suits or disputes with respect to the releases by the Debtor, the exculpation and other provisions contained in Article X of the Plan, and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

36

- resolve any matters that may arise in connection with or relate to the Sale or the Sale Order, or any contract, instrument, other agreement or document adopted in connection with the Sale or the Sale Order, and to enter orders in connection therewith;

- resolve any other matters that may arise in connection with or that relate to the Plan, this Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or this Disclosure Statement; and

- enter an order concluding this Chapter 11 Case.

**E.    Miscellaneous Provisions of the Plan**

1.    Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in the Plan: (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and in consultation with the Creditors' Committee, to amend or modify the Plan before the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtor or the Plan Administrator, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission, or reconcile any inconsistency in, the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

2.    Revocation of Plan

The Debtor reserves the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtor revokes or withdraws the Plan, or if Confirmation or the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan (if any), and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity, (ii) prejudice the Debtor or any other Entity's rights in any manner, or (iii) constitute an admission, acknowledgement, offer or undertaking by the Debtor or any other Entity.

3.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, such Entity's heir, executor, administrator, successor or assign.

4.    Reservation of Rights

Except as expressly set forth herein or in the Plan, including with respect to votes cast on the Ballots, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein or in the Plan, nor the taking of any action by the Debtor or any other Entity with respect to the Plan, shall be, or shall be deemed to be, an admission or waiver of any rights of:  (a) the Debtor with respect to the Holders of Claims against, or Equity Interests in, the Debtor, or other Entity; or (b) any Holder of a Claim or an Equity Interest, or other Entity, before the Effective Date.

5.    Payment of Statutory Fees

The Plan Administrator shall pay from the Administrative Fund all fees payable pursuant to section 1930(a) of the Judicial Code for each quarter (including any fraction thereof) until this Chapter 11 Case is closed.

6.      Section 1125(e) Good-Faith Compliance

The Debtor, Liquidating BIPCo, the Plan Administrator and the other Released Parties, and each of their respective Representatives shall be deemed to have acted in "good-faith" under section 1125(e) of the Bankruptcy Code in connection with the Confirmation and consummation of the Plan.

7.      Further Assurances

The Debtor or Liquidating BIPCo, as applicable, all Holders of Claims receiving Distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

8.      Severability

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted; provided, however, that any such alteration or interpretation must be in form and substance reasonably acceptable to the Debtor and, to the extent such alteration or interpretation affects the rights or treatment of Holders of General Unsecured Claims, the Creditors' Committee or its members, and, to the extent such alteration or interpretation affects the rights or treatments of Holders of First Lien Claims, the First Lien Credit Facility Agent; provided further, however, that the Debtor may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing.

Notwithstanding any such order, alteration or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

9.      Service of Documents

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor shall be sent by overnight mail to each of the following individuals:

> White Birch Paper Company
> 80 Field Point Road
> Greenwich, Connecticut 06830
> Attn.:  Edward Sherrick
>
> with a copy to:
>
> Troutman Sanders LLP
> 222 Central Park Avenue, Suite 2000
> Virginia Beach, Virginia 23462
> Attn.:  Jonathan L. Hauser
>
> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Attn.:  Christopher J. Marcus and Richard M. Goldman
>
> Hunton & Williams LLP
> Riverfront Plaza, East Tower
> 951 E. Byrd Street

Richmond, Virginia 23219
Attn.:  Tyler Brown and Jason Harbour

Office of the U.S. Trustee
701 East Broad Street, Suite 4304
Richmond, Virginia 23219
Attn.:  Robert Van Arsdale

10.    Filing of Additional Documents

On or before the Effective Date, the Debtor may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## VII.    CONFIRMATION PROCEDURES

**A.    Confirmation Hearing**

**The Confirmation Hearing will commence on November [22], 2011 at 2:00 p.m. prevailing Eastern Time.**

**The Plan Objection Deadline is November [14], 2011 at 2:00 p.m. prevailing Eastern Time.**

All Plan Objections must be filed with the Bankruptcy Court and served on the Debtor and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline.

**THE BANKRUPTCY COURT WILL NOT CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY–SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

**Plan Objections must be served on all of the following parties:**

White Birch Paper Company
80 Field Point Road
Greenwich, Connecticut 06830
Attn.:  Edward Sherrick

with a copy to:

Troutman Sanders LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Attn.:  Jonathan L. Hauser

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn.:  Christopher J. Marcus and Richard M. Goldman

Hunton & Williams LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, Virginia 23219
Attn.:  Tyler Brown and Jason Harbour

Office of the U.S. Trustee
701 East Broad Street, Suite 4304
Richmond, Virginia 23219
Attn.: Robert Van Arsdale

**B.      Statutory Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following Confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied. The Debtor believes that: (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (2) it has complied, or will have complied, with all of the requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, the Debtor believes that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor, as the Plan proponent, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, this Chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court, as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such Voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Allowed Administrative Claims and Allowed Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is feasible.

- The Debtor has paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtor will pay to the Office of the U.S. Trustee quarterly fees on the last day of the calendar month, following the calendar quarter for which the fee is owed in this Chapter 11 Case, for each quarter (including any fraction thereof) until the case is converted or dismissed, whichever occurs first.

**C.      Best Interests Test**

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Equity Interest either accept the Plan or receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

In a Chapter 7 liquidation case, Holders of General Unsecured Claims in Class 4 could very possibly receive no Distributions from the Estate (in contrast to the expected Distributions under the Plan).  Accordingly, the treatment provided to such Class under the Plan is substantially better than such Class would receive in a Chapter 7 liquidation.  See Article X, "Alternatives to Confirmation and Consummation of the Plan" for further discussion.

**D.      Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that Confirmation should not likely be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor unless such liquidation is proposed in the Plan.  The Plan is a liquidating Plan.  Accordingly, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

**E.      Confirmation Without Acceptance by All Impaired Classes**

The Bankruptcy Court may confirm a plan of liquidation over the rejection or deemed rejection of the plan of liquidation by a class of claims or equity interests if the plan of liquidation "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

1.      No Unfair Discrimination

This test applies to Classes of Claims or Equity Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtor does not believe the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.  The Debtor believes that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation.

2.      Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, Secured versus Unsecured) and includes the general requirement that no Class of Claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class.  In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

a.      Secured Creditors

Each Holder of a Secured Claim either (i) retains its liens on the property, to the extent of the Allowed amount of its Secured Claim and receives deferred cash payments having a value, as of the Effective Date, of at least the Allowed amount of such Claim, (ii) has the right to credit bid the amount of its Claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (iii) receives the "indubitable equivalent" of its allowed Secured Claim.

b.      Unsecured Creditors

Either (i) each Holder of an Impaired Unsecured Claim receives or retains under the Plan property of a value equal to the amount of its Allowed Claim or (ii) the Holders of Claims and Equity Interests that are junior to the Claims of the dissenting Class shall not receive any property under the Plan.

41

c.        Equity Interests

Either (i) each Holder of an Equity Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled or the value of the Equity Interest, or (ii) the Holder of an Equity Interest that is junior to the non-accepting class shall not receive or retain any property under the Plan.

The Debtor believes that the Plan meets the applicable tests described above, even in the event that it is rejected by the Holders of one or more Classes of Claims and Equity Interests.

**F.        Contact for More Information**

Any interested party desiring further information about the Plan may contact legal counsel to the Debtor by writing to Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.:  Christopher J. Marcus, or calling (212) 446-4800.

**VIII.        CERTAIN FEDERAL INCOME TAX CONSEQUENCES**

**A.        Federal Income Tax Consequences of the Plan**

IRS Circular 230 Disclosure:  To ensure compliance with U.S. Internal Revenue Service ("IRS") Circular 230, you are hereby notified that any discussion of tax matters set forth in this Disclosure Statement was written in connection with the promotion and marketing of the transactions or matters addressed herein and was not intended or written to be used, and cannot be used by any taxpayer, for the purpose of avoiding tax-related penalties under U.S. federal tax law.  You should seek advice based on your particular circumstances from an independent tax advisor.

The following is a summary of certain U.S. federal income tax consequences of the Plan to U.S. Holders (as defined below) of Claims against the Debtor.  This summary is general in nature and does not discuss all U.S. federal income tax considerations that may be relevant to a U.S. Holder of a Claim against the Debtor in light of its particular circumstances.  In addition, this summary does not describe any tax consequences arising under the laws of any U.S. state or local, or non-U.S. jurisdiction and does not consider any aspects of U.S. federal tax law other than income taxation.  This summary deals only with U.S. Holders that hold their Claims against the Debtor as a capital asset within the meaning of Section 1221 of the U.S. Internal Revenue Code of 1986, as amended (the "Tax Code") (generally, property held for investment), and does not address tax considerations applicable to any U.S. holder that may be subject to special treatment under the U.S. federal income tax laws, including:

- a bank or other financial institution;

- a tax-exempt organization;

- a retirement plan or other tax-deferred account;

- a partnership, an S corporation or any other pass-through entity, including any entity treated as a pass-through entity for U.S. federal income tax purposes, or an investor in any such entity;

- an insurance company;

- a mutual fund;

- a real estate investment trust;

- a dealer or broker in stocks and securities, or currencies;

- a trader in securities that elects mark-to-market treatment;

42

- a Holder of a Claim subject to the alternative minimum tax provisions of the Tax Code;

- a person that has a functional currency other than the U.S. dollar;

- a person that holds a Claim as part of a hedge, straddle, constructive sale, conversion or other integrated transaction;

- a person that is not a U.S. Holder; or

- certain former U.S. citizens or long-term residents.

If a partnership (including any entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds a Claim against the Debtor, the tax treatment of a U.S. Holder that is a partner in the partnership generally will depend upon the status of the partner and the activities of the partner and the partnership. Such holders should consult their own tax advisors regarding the tax consequences of the Plan.

This summary is based on the Tax Code, the Treasury regulations promulgated and proposed thereunder (the "Treasury Regulations"), and rulings and judicial decisions, all as in effect as of the date of this Disclosure Statement, and all of which are subject to change or differing interpretations at any time, with possible retroactive effect. We have not sought, and do not intend to seek, any ruling from the IRS with respect to the statements made and the conclusions reached in the following summary, and no assurance can be given that the IRS will agree with the views expressed herein, or that a court will not sustain any challenge by the IRS in the event of litigation.

THE DISCUSSION SET OUT HEREIN IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES RELEVANT TO A U.S. HOLDER OF A CLAIM AGAINST THE DEBTOR. WE URGE YOU TO CONSULT YOUR OWN TAX ADVISOR WITH RESPECT TO THE SPECIFIC TAX CONSEQUENCES TO YOU IN CONNECTION WITH THE PLAN IN LIGHT OF YOUR OWN PARTICULAR CIRCUMSTANCES, INCLUDING U.S. FEDERAL ESTATE, GIFT AND OTHER NON-INCOME TAX CONSEQUENCES, AND TAX CONSEQUENCES UNDER U.S. STATE OR LOCAL OR NON-U.S. TAX LAWS.

For purposes of this discussion, the term "U.S. Holder" means a beneficial owner of a Claim against the Debtor that is, for U.S. federal income tax purposes:

- a citizen or resident of the United States;

- a corporation (or any other entity or arrangement treated as a corporation for U.S. federal income tax purposes) organized in or under the laws of the United States or any state thereof or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (ii) the trust has validly elected to be treated as a "U.S. person" under applicable Treasury regulations.

The plan provides for a termination of the Debtor's business operations and the liquidation of the Debtor's Assets. U.S. Holders of Claims against the Debtor will receive distributions according to Article VI of the Plan. The Debtor intends to treat the Distributions as liquidating distributions for U.S. federal income tax purposes, and the following discussion assumes such treatment. Each U.S. Holder of a Claim against the Debtor should recognize gain or loss equal to the excess (if any) of the amount of cash received by the Holder over the Holder's adjusted tax basis in its Claim. Such gains and losses with respect to U.S. Holders of Claims against the Debtor pursuant to the Plan will generally be capital in nature. Such gains and losses will be long-term gains or long-term losses if the U.S.

43

Holder's holding period for the Claims against the Debtor is more than one year at the time of distribution. The deductibility of capital losses is subject to limitations.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AGAINST THE DEBTOR MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN MAY BE UNCERTAIN DUE TO, IN SOME CASES, THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE LAW. NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN, AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED BY THE DEBTOR WITH RESPECT THERETO.

THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED HEREIN. ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY ENCOURAGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL, OR OTHER TAX CONSEQUENCES OF THE PLAN.

## IX.    PLAN-RELATED RISK FACTORS

> **ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ**
> **AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN,**
> **AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED**
> **IN THIS DISCLOSURE STATEMENT, INCLUDING THE DOCUMENTS DELIVERED**
> **TOGETHER HEREWITH, REFERRED TO OR INCORPORATED BY REFERENCE HEREIN.**
> **THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING**
> **THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

**A.    Certain Bankruptcy Law Considerations**

1.    <u>Parties-in-Interest May Object to the Debtor's Classification of Claims and Equity Interests</u>

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. The Debtor created six classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion.

2.    <u>Failure to Satisfy Vote Requirement</u>

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtor may seek to accomplish an alternative chapter 11 plan. There can be no assurance the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

3.    <u>The Debtor May Not Be Able to Secure Confirmation of the Plan</u>

Section 1129 of the Bankruptcy Code sets forth the requirements for Confirmation of a chapter 11 plan, which include a finding by a bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) Confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions as described in the Plan.  If the Plan is not confirmed, it is unclear what Distributions, if any, Holders of Allowed Claims would receive with respect to Allowed Claims.

The Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan, or no distribution of property whatsoever under the Plan.

4.      Nonconsensual Confirmation of the Plan May Be Necessary

Pursuant to section 1129(b) of the Bankruptcy Code, in the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without taking into account the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Debtor believes that the Plan satisfies these requirements and the Debtor may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

5.      The Debtor May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

6.      Risk of Non-Occurrence of the Effective Date

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

7.      Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan

The Distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect Distributions available to Holders of Allowed Claims under the Plan, shall not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan, or require any sort of revote by the Impaired Classes.

### X.      ALTERNATIVES TO THE CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not Confirmed or consummated, the alternatives include, in addition to the dismissal of this Chapter 11 Case, (a) liquidation under Chapter 7 of the Bankruptcy Code and (b) preparation and presentation of an alternative chapter 11 plan.

### A.      Liquidation Under Chapter 7

If the Plan is not confirmed or the Bankruptcy Court determines other cause exists for conversion, this Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code.  In Chapter 7, a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to creditors in accordance with priorities established by the Bankruptcy Code.

The Debtor believes that liquidation under Chapter 7 could very possibly result in no distributions to Holders of General Unsecured Claims (in contrast to the expected Distributions under the Plan).  Conversion to Chapter 7 and the appointment of a Chapter 7 trustee would result in substantial additional Administrative Claims related to the attorneys and other professionals necessary to assist such trustee and their need to extensively study this Chapter 11 Case in order to fulfill their fiduciary duties.  Conversion to Chapter 7 also would result in delays attendant to the chapter 7 trustee's need to analyze issues and research the background of the Debtor, its assets and liabilities and the recovery analysis.

As a result of the foregoing, the Debtor believes that Holders of Allowed General Unsecured Claims would not receive greater distributions under a Chapter 7 liquidation than they will receive under the Plan.

### B.      Alternative Plan(s) of Liquidation

The Debtor believes that the transactions and settlements reflected in the Plan and this Disclosure Statement will result in quicker and higher recoveries for all constituencies than any alternative scenario.

### XI.      GLOSSARY OF DEFINED TERMS

### A.      Defined Terms

For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender will include the masculine, feminine and the neutral gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document will be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed will mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (e) captions and headings to Sections and Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (f) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (g) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

1.      "*Administrative Claims*" means Claims that have been timely Filed before the Administrative Claims Bar Date for costs and expenses of administration under sections 507(a)(2) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the Debtor's business (such as wages, salaries or commissions for services and payments for goods and services); (b) Professional Fee Claims; (c) DIP Credit Facility Claims; and (d) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

2.      "*Administrative Claims Bar Date*" means the date that is thirty-five (35) days after the Effective Date, by which date the holders of Administrative Claims must file proof of such claims.

3.        "*Administrative Claims Bar Date Motion*" means the *Motion of Bear Island Paper Company L.L.C. for the Entry of an Order Pursuant to Bankruptcy Code Sections 105 and 503, and Bankruptcy Rules 2002, 3003 and 9007, (A) Setting an Administrative Claims Bar Date and Procedures for Filing and Objecting to Administrative Claims Requests, and (B) Approving the Form and Manner of Notice Thereof*, dated February 22, 2011 [Docket No. 719].

4.        "*Administrative Claims Bar Date Order*" means the *Order Pursuant to Bankruptcy Code Sections 105 and 503, and Bankruptcy Rules 2002, 3003 and 9007, (A) Setting an Administrative Claims Bar Date and Procedures for Filing and Objecting to Administrative Claims Requests, and (B) Approving the Form and Manner of Notice Thereof*, entered on March 29, 2011 [Docket No. 774].

5.        "*Administrative Fund*" means [•].

6.        "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

7.        "*Allowed*" means, with respect to any Claim, and except as otherwise provided herein, a Claim that:  (a) the Debtor scheduled in a liquidated, undisputed and non-contingent amount; (b) is evidenced by a valid Proof of Claim and as to which the Debtor or other party in interest has not Filed an objection by the Claims Objection Bar Date; or (c) is Allowed pursuant to the Plan or any stipulation approved by, or order of, the Bankruptcy Court.

8.        "*ASA*" means that certain *Asset Sale Agreement*, dated as of August 10, 2010 (as amended or modified from time to time), by and among BD White Birch Investment LLC, as purchaser, and the Debtor, White Birch Paper Company, Stadacona General Partner, Inc., Stadacona L.P., F.F. Soucy General Partner Inc., F.F. Soucy, Inc. & Partners, Limited Partnership, F.F. Soucy L.P., Arrimage de Gros Cacouna Inc. and Papier Masson Ltée, as sellers.

9.        "*Assets*" means all of the rights, title and interest of Liquidating BIPCo in, to and under any and all of its remaining assets and property, whether tangible, intangible, real or personal, of any nature whatsoever, including all property of the Estate under and pursuant to section 541 of the Bankruptcy Code, including Cash, the Debtor's portion of the Estate Allocation, the Remaining Causes of Action, rights and interests in property, and files, books and records of the Estate, in each case other than the Purchased Assets.

10.        "*Auction*" means the auction that took place on September 15, 2010 at the offices of Kirkland & Ellis LLP with respect to the Sale.

11.        "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code.

12.        "*Ballot*" means such ballots accompanying this Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote on the Plan shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

13.        "*Bankruptcy Code*" means title 11 of the United States Code, as may be amended from time to time.

14.        "*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division.

15.        "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to this Chapter 11 Case and the Bankruptcy Court's general, local and chambers rules.

16.      "*Bar Date Order*" means that certain *Order (A) Establishing Bar Dates for Filing Proofs of Claim, Including for Claims Pursuant to Section 503(b)(9) of the Bankruptcy Code; (B) Approving the Form and Manner for Filing Proofs of Claim; and (C) Approving Notice of the Bar Dates*, entered on May 13, 2010 [Docket No. 260].

17.      "*Brant Industries*" means Brant Industries, Inc. and its owners, officers, employees and affiliates.

18.      "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

19.      "*Canadian Sellers*" means, collectively, White Birch Paper Company, Stadacona General Partner Inc., Stadacona L.P., F.F. Soucy General Partner Inc., F.F. Soucy, Inc. & Partners, L.P., F.F. Soucy L.P., Arrimage de Gros Cacouna Inc. and Papier Masson Ltée.

20.      "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

21.      "*CCAA Cases*" means the proceedings commenced on February 24, 2010 by White Birch Paper Company, White Birch Paper Holding Company, Stadacona General Partners Inc., Stadacona L.P., F.F. Soucy General Partner Inc., F.F. Soucy, Inc. & Partners, Limited Partnership, F.F. Soucy L.P., Arrimage de Gros Cacouna Inc., Papier Masson Ltée, Black Spruce Paper Inc. and 3120772 Nova Scotia Company in the Quebec Superior Court, District of Montreal under the *Companies' Creditors Arrangement Act*.

22.      "*Certificate*" means any instrument evidencing a Claim or an Equity Interest.

23.      "*Chapter 11 Case*" means this chapter 11 case captioned, *In re Bear Island Paper Company, L.L.C.*, Case No. 10-31202 (DOT).

24.      "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

25.      "*Claims Objection Bar Date*" means the deadline for objecting to Claims, which shall be the date that is sixty (60) days after the Effective Date, unless extended by an order of the Bankruptcy Court upon notice and a hearing.

26.      "*Claims Register*" means the claims register maintained by the Voting and Claims.

27.      "*Class*" means a category of Holders of Claims or Equity Interests pursuant to section 1122(a) of the Bankruptcy Code.

28.      "*Confirmation*" means the entry of the Confirmation Order on the docket of this Chapter 11 Case, subject to satisfaction or waiver of all conditions specified therein.

29.      "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of this Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

30.      "*Confirmation Hearing*" means the hearing before the Bankruptcy Court on the motion for entry of the Confirmation Order.

31.      "*Confirmation Hearing Notice*" means the written notice provided to Holders of Claims and Equity Interests which includes, among other things:  (a) the Record Date; (b) procedures for the temporary allowance of Claims; (c) the Plan Objection Deadline; and (d) the date and time of the Confirmation Hearing.

32.      "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

33.     "*Creditors' Committee*" means the official committee of unsecured creditors for this Chapter 11 Case appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code on March 3, 2010, which was reconstituted on April 6, 2010.

34.     "*Creditors' Committee Avoidance Causes of Action*" means those claims and causes of action for which the Creditors' Committee obtained standing to assert on behalf of the Estate pursuant to that certain *Stipulated Order Granting the Official Committee of Unsecured Creditors Standing to Prosecute Actions on Behalf of the Debtor's Estate*, entered on December 23, 2010 [Docket No. 653].

35.     "*Creditor Fund*" means:  (a) the Debtor's share of the Estate Allocation; (b) proceeds, if any, from the settlement or prosecution of the Creditors' Committee Avoidance Causes of Action; (c) proceeds, if any, from the sale, settlement or prosecution of the Remaining Causes of Action; and (d) proceeds, if any, from the Wind Down; provided, however, that neither the Prepetition Senior Collateral nor the proceeds thereof shall constitute or be deemed to constitute any portion of the Creditor Fund, and all such proceeds of the Prepetition Senior Collateral shall be distributed to the First Lien Credit Facility Agent in accordance with Article III.B.2 of the Plan.

36.     "*Debtor*" or "*Debtor in Possession*" means Bear Island Paper Company, L.L.C.

37.     "*DIP Agent*" means Credit Suisse AG, Toronto Branch, as administrative agent and Canadian collateral agent under the DIP Credit Facility.

38.     "*DIP Credit Facility*" means that certain $140,000,000 *Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement*, dated as of March 1, 2010 (as amended or modified from time to time), by and among White Birch Paper Holding Company, as guarantor, White Birch Paper Company, Stadacona L.P., F.F. Soucy L.P., Papier Masson Ltée, and Bear Island Paper Company, L.L.C., as borrowers, Credit Suisse AG, Toronto Branch, as administrative agent and Canadian collateral agent, Black Diamond Commercial Finance, L.L.C., as syndication agent, Credit Suisse AG, Toronto Branch and Black Diamond Commercial Finance, L.L.C., as lead arrangers, Credit Suisse AG, as U.S. collateral agent, and the several lender parties thereto.

39.     "*DIP Credit Facility Claim*" means a Claim arising under or in connection with the DIP Credit Facility.

40.     "*DIP Lenders*" mean, collectively, the lenders under the DIP Credit Facility.

41.     "*Disclosure Statement*" means the disclosure statement relating to the Plan, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

42.     "*Disclosure Statement Order*" means the Final Order of the Bankruptcy Court approving this Disclosure Statement.

43.     "*Disputed*" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest: (a) listed on the Schedules as unliquidated, Disputed or contingent, unless a Proof of Claim has been timely Filed; (b) as to which the Debtor or Liquidating BIPCo has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules; or (c) otherwise Disputed by the Debtor or Liquidating BIPCo in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

44.     "*Disputed Claim*" means any Claim that is not yet Allowed.

45.     "*Disputed Claims Reserve*" means the reserve established from the Creditor Fund and maintained by Liquidating BIPCo or the Plan Administrator, as applicable, to hold Cash to be distributed to Holders of Allowed Claims pending resolution of Disputed Claims.

46.     "*Distribution*" means the distribution of Cash or other Assets, as the case may be, by the Debtor, Liquidating BIPCo or the Plan Administrator, as applicable, in accordance with the Plan.

47.     "*Distribution Date*" means the date on which a Distribution is effected.

48.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to the Effective Date have been either satisfied or waived.

49.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

50.     "*Equity Interest*" means any share of common stock, preferred stock or other instrument evidencing an ownership interest in the Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in the Debtor that existed immediately prior to the Effective Date.

51.     "*Estate*" means the estate of the Debtor created on the Petition Date by section 541 of the Bankruptcy Code.

52.     "*Estate Allocation*" means the allocations set forth on **Exhibit B** to the Plan, which allocates (a) the proceeds from the Sale Closing to the Canadian Sellers and the Estate, and (b) repayment obligations under the DIP Facility between the debtors in the CCAA Cases and the Debtor.

53.     "*Exculpated Parties*" means, collectively, the Debtor, the Debtor's officers, directors and direct or indirect equity holders as of the Petition Date, the DIP Agent, the DIP Lenders, the First Lien Credit Facility Agent, the Prepetition Lenders, any other agent or lender under the DIP Credit Facility, the First Lien Credit Facility or Second Lien Credit Facility, the Prepetition Debt Agents (as defined in the Final DIP Order), the Prepetition Debt Lenders (as defined in the Final DIP Order), the Purchaser, the Creditors' Committee and the individual members thereof, the Plan Administrator, and each of their respective Representatives (each of the foregoing in its individual capacity as such).

54.     "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection pursuant to section 365 of the Bankruptcy Code.

55.     "*File*" or "*Filed*" means any pleading that has been entered on the docket of this Chapter 11 Case and properly served in accordance with the Bankruptcy Rules.

56.     "*Final DIP Order*" means the *Final Order (I) Authorizing the Debtor to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Debtor's Limited Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (III) Granting Adequate Protection to Prepetition Debt Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364*, entered on March 31, 2010 [Docket No. 171].

57.     "*Final Distribution Date*" means the date on which Liquidating BIPCo shall make its final Distribution, which shall be a date selected by the Plan Administrator as soon as reasonably practicable after the Effective Date.

58.     "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in this Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has passed without any such appeal, petition for certiorari or motion, or as to which any appeal that has been taken or any petition for certiorari or motion for a new trial, reargument or rehearing that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing will have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

59.  "*First Lien Claim*" means a Claim against the Debtor arising under or in connection with the First Lien Credit Facility.

60.  "*First Lien Credit Facility*" means that certain *Second Amended and Restated First Lien Term Loan Credit Agreement*, dated as of April 8, 2005 (as amended or modified from time to time), by and among White Birch Paper Company and White Birch Paper Holding Company, as borrowers, Credit Suisse AG, Toronto Branch, as administrative agent and as Canadian collateral agent, Credit Suisse, Cayman Islands Branch, as US Collateral Agent, and the lender parties thereto.

61.  "*First Lien Credit Facility Agent*" means Credit Suisse AG, Toronto Branch, as administrative agent under the First Lien Credit Facility.

62.  "*General Bar Date*" means, as established pursuant to the Bar Date Order, 5:00 p.m. prevailing Eastern Time on July 6, 2010.

63.  "*General Unsecured Claims*" means Claims against the Debtor that are not Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims, First Lien Claims, Swap Agreement Claims, Second Lien Claims or Intercompany Claims, the Allowed amount of which shall be reduced by the amount assumed by the Purchaser, if any.

64.  "*Governmental Bar Date*" means, as established pursuant to the Bar Date Order, 5:00 p.m. prevailing Eastern Time on August 23, 2010.

65.  "*Holder*" means the beneficial holder of a Claim or Equity Interest, and, when used in conjunction with a Class or type of Claim or Equity Interest, the beneficial holder of a Claim or Equity Interest in such Class or of such type.

66.  "*Impaired*" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

67.  "*Initial Distribution Date*" means the date on which Liquidating BIPCo shall make its initial Distribution, which shall be a date selected by the Plan Administrator as soon as reasonably practicable after the Effective Date.

68.  "*Intercompany Claim*" means any Claim against the Debtor held by an Affiliate.

69.  "*Interim Compensation Procedures Order*" means that certain *Order Under Sections 105(a) and 331 of the Bankruptcy Code Establishing Procedures for Interim Compensation*, entered on March 25, 2010 [Docket No. 156].

70.  "*Lender Owner*" shall have the meaning ascribed to such term in the ASA.

71.  "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

72.  "*Liquidating BIPCo*" means Bear Island Paper Company L.L.C. on or after the Effective Date.

73.  "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules for the Bankruptcy Court.

74.  "*Petition Date*" means February 24, 2010, the date on which the Debtor Filed this Chapter 11 Case.

75.  "*Plan*" means the *Plan of Liquidation Under Chapter 11 of the Bankruptcy Code*, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules or herewith, as the case may be.

51

76.     "*Plan Administrator*" means AP Services, LLC, who shall serve pursuant to the terms of the Plan Administrator Agreement.

77.     "*Plan Administrator Agreement*" means the agreement, established as of the Effective Date, setting forth the terms and conditions of the employment of the Plan Administrator, in substantially the form of **Exhibit A** to the Plan.

78.     "*Plan Objection*" means an objection timely Filed to the conformation of the Plan and in accordance with the procedures described herein.

79.     "*Plan Objection Deadline*" means, as established by the Disclosure Statement Order, 5:00 p.m. prevailing Eastern Time on November [14], 2011.

80.     "*Prepetition Intercreditor Agreement*" has the meaning set forth in the Final DIP Order.

81.     "*Prepetition Lenders*" means, collectively, the lenders under the First Lien Credit Facility and the Second Lien Credit Facility.

82.     "*Prepetition Senior Collateral*" has the meaning set forth in the Final DIP Order.

83.     "*Priority Claims*" means, collectively, Priority Non-Tax Claims and Priority Tax Claims.

84.     "*Priority Non-Tax Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority payment under section 507(a) of the Bankruptcy Code.

85.     "*Priority Tax Claims*" means any and all Claims of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

86.     "*Professional*" means an Entity:  (a) retained in this Chapter 11 Case pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code, and that is compensated for services rendered prior to the Effective Date pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

87.     "*Professional Fee Claim*" means any Allowed Administrative Claim for the compensation of a Professional, and the reimbursement of expenses incurred by such Professional, through and including the Effective Date.

88.     "*Proof of Claim*" means a proof of Claim Filed against the Debtor in this Chapter 11 Case.

89.     "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim in a particular Class (or several Classes taken as a whole) bears to (b) the aggregate Allowed amount of all Claims in such Class (or several Classes taken as a whole), unless the Plan expressly provides otherwise.

90.     "*Purchased Assets*" means those assets and property transferred, or to be transferred, to the Purchaser pursuant to the ASA.

91.     "*Purchased Causes of Action*" means those claims and causes of action that the Purchaser purchased from the Debtor pursuant to the ASA.

92.     "*Purchaser*" means BD White Birch Investment LLC, in its capacity as purchaser under the ASA, and any Designated Purchaser (as defined in the ASA).

93.     "*Quarterly Distribution Date*" means the first Business Day after the end of each quarterly calendar period (i.e., March 31, June 30, September 30 and December 31 of each calendar year).

94.　　"*Record Date*" means October [5], 2011.

95.　　"*Released Parties*" means, collectively, the Debtor, the Debtor's officers, directors and direct or indirect equity holders as of the Petition Date, the DIP Agent, the DIP Lenders, the First Lien Credit Facility Agent, the Prepetition Lenders, any other agent or lender under the DIP Credit Facility, the First Lien Credit Facility or Second Lien Credit Facility, the Prepetition Debt Agents (as defined in the Final DIP Order), the Prepetition Debt Lenders (as defined in the Final DIP Order), the Purchaser**,** the Creditors' Committee and the individual members thereof, the Plan Administrator, and each of their respective Representatives (each of the foregoing in its individual capacity as such).

96.　　"*Releasing Parties*" means, collectively, the Released Parties and Holders of Claims voting to accept the Plan.

97.　　"*Remaining Causes of Action*" means, except for the Creditors' Committee Avoidance Causes of Action and the Purchased Causes of Actions, all other actions, causes of action, claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims of the Debtor or the Estate, whether Disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing as of the Effective Date or thereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of this Chapter 11 Case, including through the Effective Date, that shall vest, as of the Effective Date, with Liquidating BIPCo.

98.　　"*Representatives*" means, with respect to an Entity, such Entity's officers, directors, employees, members (including *ex officio* members) managers, advisors, attorneys, professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including its respective officers, directors, employees, members and professionals).

99.　　"*Revolving ABL Agreement*" means that certain Revolving Credit Agreement, entered into on or about March 29, 2005 (as amended and restated on January 27, 2006 and February 26, 2008), by and between White Birch Company, WB Holding, Stadacona Limited Partnership, F.F. Soucy Limited Partnership, Papier Masson Ltee and Bear Island (collectively, the "ABL Borrowers"), GE Capital Markets Inc., as lead arranger and syndication agent, General Electric Capital Corporation, as administrative agent, U.S. collateral agent and documentation agent, GE Canada Finance Holding Company, as Canadian agent and Canadian collateral agent, and the lender parties thereto

100.　　"*Sale*" means the sale of all or substantially all of the Debtor's assets to BD White Birch Investment LLC pursuant to the ASA.

101.　　"*Sale Closing*" means the "Closing" as defined in the ASA.

102.　　"*Sale Closing Date*" means the "Closing Date" as defined in the ASA.

103.　　"*Sale Post-Closing Obligations*" means those obligations of the Debtor or Plan Administrator, as applicable, under the ASA, after the Sale Closing, including obligations identified in Article V of the ASA.

104.　　"*Schedules*" mean the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs the Debtor Filed on March 31, 2010 [Docket No. 172] and amended on January 26, 2011 [Docket No. 689] pursuant to section 521 of the Bankruptcy Code.

105.　　"*Second Lien Claim*" means a Claim against the Debtor arising under or in connection with the Second Lien Credit Facility.

106.　　"*Second Lien Credit Facility*" means that certain *Second Lien Term Loan Credit Agreement*, dated on or about April 8, 2005, as amended and restated on January 27, 2006 and May 8, 2007, by and among White Birch Paper Company and White Birch Paper Holding Company, as borrowers, Credit Suisse First Boston, as sole

lead arranger, sole bookrunner, syndication agent and documentation agent, Credit Suisse First Boston Toronto Branch, as Canadian collateral, TD Securities (USA) LLC, as co-arranger and the lender parties thereto.

107.     "*Secured Claim*" means any Claim (a) to the extent reflected in the Schedules or upon a Proof of Claim as a Secured Claim, which is secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or (b) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

108.     "*SISP Procedures and SISP Order*" means the *Order Approving the Debtor's Sale and Investor Solicitation Process and Procedures Related Thereto*, entered on April 28, 2010 [Docket No. 234] and the procedures approved thereby.

109.     "*Swap Agreements*" mean, collectively:  (a) that certain *ISDA 2002 Master Agreement*, dated as of May 16, 2005, between White Birch Paper Company and The Toronto-Dominion-Bank (the "TD Swap Agreement"); (b) that certain *ISDA Master Agreement*, dated as of April 13, 2005, between White Birch Paper Company and Credit Suisse First Boston International (the "CS Swap Agreement"); and (c) that certain *ISDA Master Agreement*, dated as of May 8, 2007, between White Birch Company and Merrill Lynch Capital Services, Inc (the "ML Swap Agreement").

110.     "*Swap Agreement Claims*" means any Claim against the Debtor arising under or in connection with the Swap Agreements.

111.     "*Unexpired Lease*" means a lease of non-residential real property to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

112.     "*Unimpaired*" means a Class of Claims or Equity Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

113.     "*U.S. Trustee*" means the United States Trustee appointed under Article 591 of title 28 of the United States Code to serve in the Eastern District of Virginia.

114.     "*Voting and Claims Agent*" means The Garden City Group, Inc.

115.     "*Voting Classes*" means Classes 2, 3, 4 and 5.

116.     "*Voting Deadline*" means, as established by the Disclosure Statement Order, 5:00 p.m. prevailing Eastern Time on November [14], 2011, which shall be the deadline for, among other things, voting to accept or reject the Plan.

117.     "*Voting Record Date*" means the date set forth in the Disclosure Statement Order for determining the Holders of Claims entitled to vote to accept or reject the Plan.

118.     "*Wind Down*" means, as set forth in Article V.L of the Plan, the wind down and dissolution of Liquidating BIPCo following the Effective Date.

119.     "*Wind Down Amount*" means the "U.S. Wind-Down Amount" as defined in the ASA.

120.     "*Wind Down Creditors' Committee*" means the committee described in Article V.G of the Plan.

## XII.        CONCLUSION AND RECOMMENDATION

The Debtor believes the Plan is in the best interests of all Holders of Claims and Equity Interests.

Dated:  August 24, 2011

Respectfully submitted,

BEAR ISLAND PAPER COMPANY, L.L.C.,

By:     /s/ Edward D. Sherrick
Its:    Edward D. Sherrick
        Senior Vice President and Chief Financial Officer

Prepared by:

**TROUTMAN SANDERS LLP**                      **KIRKLAND & ELLIS LLP**
Jonathan L. Hauser                            Richard M. Cieri (admitted *pro hac vice*)
VSB No. 18688                                 Christopher J. Marcus (admitted *pro hac vice*)
222 Central Park Avenue                       Richard M. Goldman (admitted *pro hac vice*)
Suite 2000                                    601 Lexington Avenue
Virginia Beach, Virginia 23462                New York, New York 10022-4611
Telephone:      (757) 687-7768                Telephone:      (212) 446-4800
Facsimile:      (757) 687-1505                Facsimile:      (212) 446-4900

Co-Counsel for the Debtor and Debtor in Possession

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was sent either electronically or by first class mail, postage prepaid, this 24th day of August, 2011, to all necessary parties.

/s/ Jonathan L. Hauser